19MAG4051

Approved: _____
          DANIEL M. TRACER / TARA M. LA MORTE
          Assistant U.S. Attorneys

Before:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

    - v. -                        :    Violations of
                                       18 U.S.C. §§ 215, 371,
EDWARD SHIN,                      :    656, 1349, and 2
    a/k/a Eungsoo Shin,
                                  :
            Defendant.                 COUNTY OF OFFENSE:
                                  :    NEW YORK

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

         PETER CHARTIER, being duly sworn, deposes and says that he is a Special Agent with the Federal Deposit Insurance Corporation, Office of the Inspector General ("FDIC-OIG") and charges as follows:

                         COUNT ONE
              (Conspiracy to Commit Wire Fraud)

    1.   From at least in or about 2009 through at least in or about 2012, in the Southern District of New York and elsewhere, EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343.

    2.   It was a part and object of the conspiracy that EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18,

United States Code, Section 1343, affecting a financial institution, to wit, SHIN and others fraudulently caused an FDIC-insured banking institution ("Bank-1") to issue, and the U.S. Small Business Administration ("SBA") to guarantee loans, and in so doing, concealed the fact that such loans were issued in violation of SBA rules and regulations, which rendered the loans ineligible for such guarantees.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Conspiracy to Commit Bank Bribery)

3.   From at least in or about 2009 through at least in or about 2012, in the Southern District of New York and elsewhere, EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to solicit bribes as a bank officer, in violation of Title 18, United States Code, Section 215(a)(2).

4.   It was a part and object of the conspiracy that EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, and others known and unknown, being officers, directors, employees, and agents of a financial institution, would and did knowingly and corruptly solicit and demand for the benefit of a person, and corruptly accept and agree to accept things of value exceeding $1,000 from a person, intending to be influenced and rewarded in connection with business and transactions of such institution, in violation of Title 18, United States Code, Section 215(a)(2), to wit, SHIN solicited and agreed to accept bribe payments from an individual with a close relationship to SHIN ("CW-1") in connection with the extension of SBA and commercial loans by Bank-1.

### Overt Acts

5.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

   a.   In or about April 2012, EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, caused Bank-1 to issue a commission check for approximately $50,000 made out to a company controlled by CW-1, in the Southern District of New York, and in connection

(Title 18, United States Code, Section 656.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I am a Special Agent with the FDIC-OIG, and have been employed as such for approximately 2 years. Prior to FDIC-OIG, I was a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), for approximately 5 years, where I was assigned to financial crimes groups. Prior to my employment with HSI, I was a Special Agent with the Internal Revenue Service for approximately 7 years. Throughout my career in law enforcement, I have participated in and conducted many criminal investigations involving violations of federal banking, money laundering, fraud, customs, narcotics, immigration, and tax laws. I have been personally involved in the instant investigation since approximately 2017 and as part of my investigation I have personally obtained and reviewed documents, and conducted interviews with individuals who have knowledge of this matter.

9. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including conversations with, and reports prepared by, other law enforcement officers. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of, and conversations with, others are reported herein, they are reported in sum and substance and in part, unless otherwise indicated.

**THE DEFENDANT**

10. At all times relevant to this Complaint, EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, was the CEO of Bank-1, an FDIC-insured financial institution headquartered in Elkins Park, Pennsylvania with offices in New York, New Jersey, and Pennsylvania. Bank-1 offered a range of financial products to individual consumers and businesses including the provision of both commercial and SBA-guaranteed loans to small businesses. In December 2008, Bank-1 requested participation in the United States Department of the Treasury's Troubled Asset Relief

Program ("TARP"). TARP was created by the Emergency Economic Stabilization Act of 2008, and was designed, among other things, to help stabilize the financial system in the wake of the 2008 financial crisis. One of the programs created under TARP was the Capital Purchase Program ("CPP"), in which the federal government, through TARP, invested in financial institutions in exchange for preferred stocks in those institutions. On February 20, 2008, Bank-1 received approximately $30.4 million in CPP funding and continued to utilize TARP funding until repayment in March 2018.

## BACKGROUND ON SBA 7A LOAN PROGRAM

11. Based on my review of publicly available information and from speaking with representatives of the SBA, I have learned the following:

a. The SBA helps Americans start, build, and grow businesses. In that regard, the SBA offers a variety of loan programs to help businesses succeed. While the SBA does not lend money directly to entrepreneurs to start or grow a business, the SBA guarantees at least some of the losses lenders may incur when such loans are not repaid, provided the lender has complied with SBA loan program requirements, as defined in Title 13, Code of Federal Regulations, Section 101.100 *et seq* and the SBA's publicly available Standard Operating Procedures ("SOPs").

b. One such loan program is SBA's 7(a) Loan Program (the "7A Loan Program"), a program for helping start-up and existing small businesses by providing guarantees on loans made for a variety of business purposes, such as purchasing new land, purchasing or expanding an existing business, and purchasing machinery, furniture, fixtures, supplies, or materials. Under the 7A Loan Program, the SBA guarantees a loan made by a commercial lender pursuant to an SBA Loan Guarantee Agreement.

c. Lenders making SBA-guaranteed loans, including under the 7A Loan Program, may be delegated the authority to issue such loans as a "preferred lender" pursuant to the SBA's "Preferred Lenders Program" or "PLP." *See* 13 C.F.R. § 120.450 *et seq.*; SOP 50-10-5(J), Subpt. A, Ch. 1 ¶ III(C). Lenders operating pursuant to a grant of PLP authority may issue SBA-guaranteed loans without needing to provide documents to, or receive authorization from, the SBA in connection with issuing

5

any particular loan. PLP lenders are then permitted to issue SBA-guaranteed loans pursuant to a Supplemental Guaranty Agreement Preferred Lenders Program (the "Supplemental Guaranty"). PLP lenders are "responsible for confirming that all PLP loan closing decisions are correct, and that it has complied with all requirements of law and SBA regulations." 13 C.F.R. § 120.452(c). Pursuant to the Supplemental Guaranty, a PLP lender further agrees that its "actions in processing and underwriting the PLP loan, and the terms and conditions of the loan itself, comply with SBA Loan Program Requirements."

    d. Lenders participating in the 7A Loan Program, including PLPs, must be knowledgeable of, and comply with, the rules and regulations of the SBA as set forth in the Code of Federal Regulations and the SBA's SOPs. 13 C.F.R. § 120.180. Under these rules, lenders are prohibited from charging any kind of fees to businesses, except as expressly enumerated by regulation. See 13 C.F.R. § 120.221. In particular, a "Lender and/or its Associate may not [c]harge the borrower any commitment, bonus, broker, commission, referral or similar fees." SOP 50-10-5(J), Subpt. B, Ch. 3 ¶ VII(B). If a borrower pays a broker fee to any third party, the fee must be fully documented with the SBA. See 13 C.F.R. § 103.5; SOP 50-10-5(J), ¶ VIII. In addition, a lender, including but not limited to its officers and directors, may not have any ownership interest in a business receiving an SBA-guaranteed loan, or any real or apparent conflict of interest. See 13 C.F.R. § 120.140; SOP 50-10-5(J), ¶ II(E)(3) (explaining that a lender may not have "a direct or indirect financial or other interest in the Small Business Applicant"). Indeed, businesses in which the lender or any of the lender's associates owns an "equity interest" are ineligible for SBA assistance. See 13 C.F.R. § 120.110; SOP 50-10-5 (J), Subpt. B, Ch. 2 ¶ III.A.14.

    e. If a lender violates these or other SBA regulations in connection with the issuance of an SBA-guaranteed loan, it may be deemed to have violated its agreements with the SBA and, in the event of a default, the SBA may decide not to guarantee the loan or to subject the lender to other enforcement actions. 13 C.F.R. § 120.1400 ("SBA Lenders further agree that a violation of Loan Program Requirements constitutes default under their respective agreements with SBA."); see also 13 C.F.R. § 120.524.

## THE SCHEME

12. Based on communications made to law enforcement by a former employee at Bank-1 (the "Former Employee"), who worked directly with EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, between in and about 2011 and 2012, I have learned that SHIN engaged in a corrupt scheme to receive secret payments in connection with loans, including SBA-guaranteed loans issued pursuant to the 7A Loan Program, issued by Bank-1 to various businesses.[1] These loans were often purportedly brokered by CW-1[2]. In or around 2011, Bank-1 became a PLP lender under SBA regulations, and retained that status at least through 2012. During that time, Bank-1 regularly issued SBA-guaranteed loans to small business borrowers. With respect to each such loan, Bank-1 signed written agreements with the SBA wherein it certified that, among other things, its "actions in processing and underwriting the PLP loan, and the terms and conditions of the loan itself, comply with SBA Loan Program Requirements."

13. However, when Bank-1 issued a business loan involving CW-1 as a broker, SHIN secretly and unbeknownst to the SBA arranged to receive a portion of the broker's fee in cash. On other occasions, when Bank-1 issued a business loan that did not involve the use of an actual broker, SHIN arranged to have CW-1 inserted into the transaction to appear as if the loan had been made through a broker in order to generate a broker fee that could be shared with SHIN, when in truth and in fact, CW-1, the "broker," did no actual work to earn a commission on the transaction. In those instances, CW-1 also shared a portion of

---

[1] On or about April 30, 2013, the Former Employee filed a qui tam complaint on behalf of the United States of America and on behalf of herself against Bank-1, SHIN, and others, premised upon the False Claims Act. On or about April 27, 2018, the United States filed a notice of election to decline intervention, and on or about that same date, the United States District Court for the District of New Jersey issued an order unsealing the qui tam complaint and the United States's notice.

[2] CW-1 has been cooperating with law enforcement by providing information about this matter since approximately December 2017. In exchange for his/her cooperation, CW-1 hopes to receive leniency in connection with any sentence imposed on him/her after the entry of a guilty plea. Information provided by CW-1 has been corroborated by records and other sources.

the purported broker's fee in cash with SHIN. During the relevant period, SHIN also arranged for other Bank-1 related bribe payments to be made through CW-1. CW-1 agreed to provide these payments to SHIN in order to ensure that CW-1 was able to continue conducting business with Bank-1. Finally, SHIN also arranged for Bank-1 to issue SBA-guaranteed loans to businesses in which he secretly retained an interest, in direct violation of SBA regulations. Through the course of my investigation, I have learned of numerous such transactions, a number of which are set forth in detail below.

### THE PAYMENT OF BRIBES TO SHIN

14. As part of my investigation, I have obtained financial and corporate records, records from the SBA, and participated in interviews with CW-1, with the Former Employee, and with others who obtained loans from Bank-1. From these records and these interviews, I have learned that CW-1 controlled at least two companies ("Company-1" and "Company-2"). Company-1 and Company-2 were originally set up as a realty companies for CW-1. As further described below, CW-1 used Company-1 and Company-2 to make illicit payments to EDWARD SHIN, a/k/a Eungsoo Shin, the defendant.

15. After being introduced to EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, CW-1 helped small businesses obtain loans from Bank-1. When a loan was obtained from Bank-1, CW-1 was customarily entitled to an approximately one-percent commission, which would usually be deposited in a bank account belonging to Company-1. CW-1 then typically split that commission with SHIN, by providing him with cash when SHIN would visit CW-1's office in New York, New York or otherwise providing funds to others at SHIN's direction. On other occasions, SHIN inserted CW-1 into loan transactions in order to create the appearance of a legitimate broker fee where CW-1 had played no role in brokering the loan. In those circumstances, CW-1 deposited those funds into the bank account of either Company-1 or Company-2 and made bribe payments to SHIN from those funds. For example, based on conversations with CW-1 and from reviewing financial records relating to the transactions at issue, I have learned, among other things, that:

    a. According to records obtained from the SBA, on or about April 1, 2011, Bank-1 disbursed an SBA-guaranteed loan for approximately $5,000,000 to a small business entity located in

New Jersey ("Borrower-1"). On or about April 20, 2011, CW-1 deposited an approximately $37,500 check into Company-1's bank account at Bank-1. While the check was purportedly a commission earned by CW-1 for brokering the loan to Borrower-1, in fact CW-1 did no work to earn the commission. On or about April 20, 2011, CW-1 provided a $25,000 check to a company belonging to a business associate of CW-1 and SHIN, ("CC-2"), for further payment to SHIN.

    b. In or about July 2012, CW-1 received a commission from Bank-1 for brokering the purchase of property and obtaining a loan for that purpose. On or about July 5, 2012, CW-1 deposited approximately $47,500, representing the amount of the commission, into Company-1's bank account. CW-1 then wrote two checks drawing on those funds. On or about July 18, 2012, CW-1 wrote a check for $20,000 to a company that purported to be owned by CW-1, but in reality was operated as a fifty-fifty partnership between CW-1 and SHIN. On or about July 26, 2012, CW-1 wrote a check for $18,000 to another small business run by CW-1.

    c. According to records obtained from the SBA, on or about June 3, 2011, Bank-1 disbursed an SBA-guaranteed loan for $4,350,000 to a small business entity located in the Southern District of New York ("Borrower-2"). On or about June 29, 2011, CW-1 deposited approximately $43,000 into Company-1's bank account at Bank-1. While the check was purportedly a commission earned by CW-1 for brokering the loan to Borrower-2, in fact CW-1 did no work to earn the commission. On or about June 30, 2011, the day after receiving the commission, CW-1 wrote a check to CC-2 for $20,000. A portion of this money was provided to SHIN as a bribe payment.

    d. According to records obtained from the SBA, on or about April 1, 2012, Bank-1 disbursed an SBA-guaranteed loan for $1,550,000 to a small business entity ("Borrower-3"). On or about April 9, 2012, CW-1 deposited a check from Bank-1 for approximately $15,500 into Company-2's bank account. The check purported to be a referral fee in connection with the loan made by Bank-1 to Borrower-3. CW-1, however, had done no work to earn this loan referral fee. On or about April 10 and 11, 2012, CW-1 wrote two checks from Company-2's account for approximately $7,875 and $7,125, respectively. CW-1 then exchanged both checks with an associate for cash. At SHIN's direction, CW-1

9

then kept the proceeds of the first check and provided the $7,875 in cash from the second check to SHIN.

   e. According to records obtained from the SBA, on or about April 17, 2012, Bank-1 disbursed an SBA-guaranteed loan for $5,000,000 to a small business entity ("Borrower-4"). On or about April 20, 2012, CW-1 deposited a check from Bank-1 for approximately $50,000 into Company-2's bank account. The check purported to be for a referral fee in connection with a loan made by Bank-1 to Borrower-4. CW-1, however, had done no work to earn this loan referral fee. On or about April 26 and 30, 2012, CW-1 prepared two checks from Company-2's bank account. The first check was for approximately $17,000 and was written by CW-1 to Borrower-2, a company that CW-1 had previously helped to obtain an SBA-guaranteed loan from Bank-1. The owner of Borrower-2 agreed to exchange the check provided by CW-1 for that amount of cash. At SHIN's direction, CW-1 provided $10,000 of the cash to SHIN and kept $7,000. CW-1 then signed the second check and gave it to SHIN. The second check was subsequently made out to an associate of SHIN for $30,000.

   f. CW-1 often obtained the commission checks from SHIN and/or provided commission cash to SHIN at CW-1's office in New York, New York. From speaking with an individual who was employed by CW-1 to work in CW-1's office during the relevant period, I have learned that SHIN in fact visited CW-1's office on multiple occasions. On other occasions, CW-1 provided SHIN with signed checks drawn on Company-2's bank account as set forth in the preceding paragraph.

  16. On other occasions, EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, arranged for other Bank-1-related payments to be made through CW-1 and his companies. For example, on or about February 28, 2011, at SHIN's direction, CW-1 deposited a check for approximately $39,300 into Company-2's bank account. This check was from a construction company that was doing work on a Bank-1 branch in New Jersey. CW-1 had done no work related to Bank-1's construction or anything to earn a payment. SHIN told CW-1 to write a check for $25,000, which CW-1 subsequently did from Company-2's bank account. CW-1 then provided the check to SHIN who filled it out to another payee. Over approximately the next week, SHIN instructed CW-1 to write SHIN additional checks for $4,500 and $2,500, which CW-1 did. In return for moving the funds, SHIN permitted CW-1 to keep approximately $7,300. CW-1

understood the payments made from the construction company to SHIN to be a kickback from the construction company.

17.     Furthermore, on or about June 8, 2012, at the direction of EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, CW-1 deposited a check for approximately $113,313.74 into Company-2's bank account.  The check purported to relate to a payment from a title company and CW-1 had done no work to earn this payment.  Over the next few weeks, SHIN instructed CW-1 as to what to do with the remaining funds.  Of these funds, CW-1 wrote checks for thousands of dollars that were exchanged for cash and/or provided to SHIN.  For example, in or about July 2012, CW-1 provided SHIN with a signed check drawn on Company-2's account for $50,000.  SHIN subsequently tried to make the check payable to, and use the check at, a casino in Las Vegas.  The casino refused to honor the check, once it discovered that SHIN had no connection to Company-2.

### SHIN's SECRET SELF-DEALING

18.     On or about December 1, 2010, Bank-1 issued an SBA-guaranteed loan for approximately $950,000 to a business in New York, New York ("Borrower-5").  From speaking with CW-1, I have learned that although documents submitted to Bank-1 for purposes of securing the loan concealed any interest of EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, in Borrower-5, Borrower-5 in reality operated as a fifty-fifty partnership between CW-1 and SHIN.  Had SHIN's interest been revealed, the SBA would not have guaranteed the loan.  From my review of SBA records, I have learned that in or about October 2014, this loan went into default status, ultimately resulting in an approximately $611,491 loss to the SBA.

19. On or about May 31, 2009, Bank-1 issued an SBA-guaranteed loan for approximately $1 million to a business located in New York, New York ("Borrower-6"). From speaking with CW-1, I have learned that Borrower-6 was in reality collectively owned by CW-1, SHIN's wife, and a third individual. Furthermore, records I have reviewed from Borrower-6's bank account show that a number of checks totaling over $150,000 were drawn on the account to SHIN's wife. Had SHIN's wife's interest been revealed to SBA, the SBA would not have guaranteed the loan.

WHEREFORE, deponent prays that an arrest warrant be issued for EDWARD SHIN, a/k/a Eungsoo Shin, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
PETER CHARTIER
Special Agent
Federal Deposit Insurance Corporation

Sworn to before me this
22nd day of May, 2019.

_____
THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

12