## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Action |
| | : | |
| Plaintiff, | : | |
| | : | Case No.: 1:19-cr-00552-JPC |
| | : | |
| v. | : | |
| | : | |
| EDWARD SHIN, | : | |
| | : | |
| Defendant. | : | |

---

## MEMORANDUM OF LAW OF DEFENDANT
## EDWARD SHIN IN OPPOSITION TO GOVERNMENT'S
## SUPPLEMENTAL MOTIONS *IN LIMINE*

---

<u>Of Counsel and on the Brief</u>:

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707

Robert J. Basil, Esq.
The Basil Law Group, P.C.
125 West 31st Street #19-B
New York, NY 10001
(917) 994-9973

*Counsel for Defendant Edward Shin*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| TABLE OF AUTHORITIES | . . . . . . . | ii |
| PRELIMINARY STATEMENT | . . . . . . . | 1 |
| I. | THE MOTION TO PRECLUDE CERTAIN OPINION TESTIMONY OF DEFENSE WITNESS ROBERT ZAK SHOULD BE DENIED AS MOOT   . . . . | 1 |
| II. | THE ALLEGATION THAT EDWARD SHIN ASKED A BANK EMPLOYEE TO MISLEAD A LAS VEGAS CASINO ON A PERSONAL CREDIT APPLICATION IS NEITHER DIRECT EVIDENCE NOR 404(B) EVIDENCE   . . . . | 2 |
| | A.   Admissibility as Direct Evidence .   . . . . | 2 |
| | B.   The Evidence is Not Admissible under Rule 404(b)   .   . | 5 |
| | C.   Exclusion under Rule 403 .   . . . . | 7 |
| III. | EVIDENCE RELATING TO THE RELATIVE'S EMPLOYMENT AT THE ARMONK, NEW YORK DELI AND ALLEGED HIDDEN INTEREST SHOULD BE EXCLUDED AND/OR TAILORED .   . . . . . . . | 9 |
| CONCLUSION | . . . . . . . . | 11 |

## TABLE OF AUTHORITIES

### CASES CITED

Old Chief v. United States,
519 U.S. 172 (1997)   .   .   .   .   .   .   .   .   .   .   7, 8

United States v. Carboni,
204 F.3d 39 (2d Cir. 2000)   .   .   .   .   .   .   .   .   .   2, 5

United States v. Gonzalez,
110 F.3d 936 (2d Cir. 1997) .   .   .   .   .   .   .   .   .   2, 3

United States v. Inniss,
No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019)   .   .   6

United States v. Johnson,
469 F. Supp. 3d 193 (S.D.N.Y. 2019)   .   .   .   .   .   .   .   3

United States v. Kassir,
No. 04-CR-356 (JFK), 2009 WL 976821 (S.D.N.Y. April 9, 2009)   .   .   3

United States v. Martoma,
12 Cr. 973 (PGG), 2014 WL 31191 (S.D.N.Y. Jan. 6, 2014)   .   .   .   3, 4

United States v. Mercado,
573 F.3d 138, 141 (2d Cir.2009)   .   .   .   .   .   .   .   .   5

United States v. Midyett,
603 F. Supp. 2d 450 (E.D.N.Y. 2009)   .   .   .   .   .   .   .   5

United States v. Nektalov,
325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) .   .   .   .   .   .   .   3, 7

United States v. Pascarella,
84 F.3d 61 (2d Cir. 1996)   .   .   .   .   .   .   .   .   .   5

United States v. Pitre,
960 F.2d 1112 (2d Cir. 1992)   .   .   .   .   .   .   .   .   6

United States v. Stein,
521 F. Supp. 2d 266 (S.D.N.Y. 2007)   .   .   .   .   .   .   .   4

## RULES CITED

F.R.E. 401 . . . . . . . . . . . 8

F.R.E. 402 . . . . . . . . . . . 5, 7

F.R.E. 403 . . . . . . . . . . . 7, 8

F.R.E. 404(b) . . . . . . . . . . . 2, 3, 5, 6, 7, 9, 10, 11

F.R.E. 1006 . . . . . . . . . . . 2

## OTHER AUTHORITIES CITED

1 J. Weinstein, M. Berger, & J. McLaughlin,
Weinstein's Evidence ¶ 403[03] (1996) . . . . . . . 7

Advisory Committee's Notes on Fed. Rule Evid. 403,
28 U.S.C.App. . . . . . . . . . . 7, 8

## PRELIMINARY STATEMENT

Defendant Edward Shin respectfully submits this memorandum of law in opposition to the supplemental motions *in limine* of the Government dated November 13, 2021. For the reasons set forth herein, these motions should be denied.

### I.   THE MOTION TO PRECLUDE CERTAIN OPINION TESTIMONY OF DEFENSE WITNESS ROBERT ZAK SHOULD BE DENIED AS MOOT

This motion should be denied as moot. Based on the Government's motion and other issues, we will not be calling Robert Zak as a witness. Instead, we have yesterday served on the Government a compilation and accompanying letter prepared by Ronald Lembo, CPA. *A copy is attached hereto as Exhibit 1.* (Please note that certain portions of Exhibit 1 have been redacted pursuant to the electronic filing rules as they contain bank account information.) We believe the revised compilation directly addresses the Government's concerns as it is a lay witness compilation of casino and bank records. For example, the Lembo letter and attachments do not total the amount of the casino wins and losses, but instead merely lists based on the underlying casino and bank records the dates that J.K. was at the casinos. In addition, Mr. Lembo simply calculates the amount based on the same records that J.K. withdrew from ATMs or debit cards at the casinos.

Likewise, the concern of the United States relating to certain expenditures from 1797 Empire, Inc. and Armonk Farm, Inc. has been addressed by listing the potential personal expenses and not attributing them to J.K. We believe testimony of other witnesses will provide the necessary link for admissibility of these summaries at trial.

1

We submit that the Lembo letter and attachments satisfy the requirements of
Federal Rule of Evidence 1006 and are admissible. The underlying documents
referenced in the Lembo letter and attachments were provided in reciprocal discovery
to the Government in May 2021 and October 2021. In addition, some of the underlying
documents were produced by the Government in discovery. For all these reasons, the
motion of the Government should be denied as moot.

## II.   THE ALLEGATION THAT EDWARD SHIN ASKED A BANK EMPLOYEE TO MISLEAD A LAS VEGAS CASINO ON A PERSONAL CREDIT APPLICATION IS NEITHER DIRECT EVIDENCE NOR 404(B) EVIDENCE

The allegations in this case include that Mr. Shin had a hidden interest in a
number of delis, which received Small Business Administration loans from Noah Bank,
as well as that he caused Noah Bank to pay unearned commissions for which he
accepted kickbacks from the cooperating witness J.K. The Government now seeks to
admit testimony that allegedly Mr. Shin asked a Noah Bank employee to mislead a
casino in Las Vegas as to his balance in a personal bank account. The employee will
apparently testify that she subsequently did have that conversation with the casino.
This evidence should be excluded.

### A.   Admissibility as Direct Evidence

Evidence of uncharged criminal conduct or other bad acts is relevant and
properly admissible as direct evidence only if such conduct "arose out of the same
transaction or series of transactions as the charged offense, if it is inextricably
intertwined with the evidence regarding the charged offense, or if it is necessary to
complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d

2

Cir. 2000) (internal quotation marks omitted) (quoting <u>United States v. Gonzalez</u>, 110

F.3d 936, 942 (2d Cir. 1997)).  A "trial court may admit evidence that does not directly

establish an element of the offense charged, in order to provide background for the

events alleged in the Indictment." <u>Gonzalez</u>, 110 F.3d at 941. Background evidence may

be admitted in order to show, for example, that the "circumstances surrounding the

events or to furnish an explanation of the understanding or intent with which certain

acts were performed." <u>Id.</u>  However, "where it is not manifestly clear that the evidence

in question is intrinsic proof of the charged crime, the proper course is to proceed under

Rule 404(b)." <u>United States v. Nektalov</u>, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004)).

In <u>United States v. Johnson</u>, the Court analyzed the admission of other crimes

evidence as direct or intrinsic evidence.  <u>United States v. Johnson</u>, 469 F. Supp. 3d 193,

204 (S.D.N.Y. 2019).  The Court recognized that "Courts in this District employ a narrow

construction in determining whether uncharged crimes are direct evidence of charged

offenses." <u>Id</u>. (citing <u>United States v. Martoma</u>, 12 Cr. 973 (PGG), 2014 WL 31191, at *3

(S.D.N.Y. Jan. 6, 2014)). *See unpublished opinion, attached hereto as Exhibit 2.*  "For example,

uncharged conduct is not "inextricably intertwined" with the charged conduct simply

because it "provides <u>context</u> or is relevant" to charged conduct" (emphasis added).  <u>Id.</u>

Accordingly, the Court recognized that "numerous courts in this circuit ... [have] found

it necessary to conduct Rule 404(b) analysis of uncharged criminal activity that merely

provided context or was somehow relevant to the charged conduct." <u>Id.</u> (quoting

<u>Kassir</u>, 2009 WL 976821, at *2 (citations omitted)). *See unpublished opinion, attached hereto*

*as Exhibit 3.* "In deciding whether uncharged conduct is 'inextricably intertwined' with

charged conduct[,] ... courts have considered whether '[the] details of the uncharged transaction are necessary to understand the charged transaction.'" Id. (citing Martoma, 2014 WL 31191, at *3 (quoting United States v. Stein, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007)).

In this case, the Government is seeking to admit uncharged evidence that allegedly occurred during the same time period as the charged schemes. According to the Government, this witness, an executive at Noah Bank, was asked to perform several alleged fraudulent acts on behalf of Mr. Shin directly in furtherance of the conspiracy. These acts allegedly include assisting in sending a false verification of a line of credit to a party in one of the charged "hidden interest" transactions, as well as assisting in paying numerous commissions to J.K. that were allegedly unearned. The Government is arguing that the same executive allegedly provided information to a casino in the same general time period for a personal line of credit is "inextricably intertwined" with this other testimony. It claims further that it shows "the nature of her relationship with Shin, i.e., Shin's abuse of his authority as bank CEO to use his subordinate in furtherance of this scheme." See Government's Brief at page 10.

Assuming the accuracy of the Government's prediction of the testimony, it appears that Mr. Shin was attempting to obtain a personal line of credit at a casino in Las Vegas. There is no evidence or allegation that the line of credit was somehow going to be used in furtherance of any of the objects of the charged conspiracy, nor is the detail of this alleged event necessary to understand the charged transactions. It is expected that the witness will attempt to testify at length about the alleged unearned

4

commissions over a several-year period. There is no need for this information by the jury. It is an outlier to the charged scheme. Moreover, for the reason set forth below, it unfairly prejudices Mr. Shin.

### B.     The Evidence is Not Admissible under Rule 404(b)

In the alternative, the Government is seeking to admit this same evidence under Rule 404(b) as evidence to prove Mr. Shin's opportunity, lack of accident or mistake and motive.

As outlined above "[t]he Federal Rules of Evidence prohibit admission of evidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." United States v. Mercado, 573 F.3d 138, 141 (2d Cir.2009) (internal quotation marks and brackets omitted) (citing Fed.R.Evid. 404(b)). Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." F.R.E. 404(b).

The Second Circuit has adopted an inclusionary approach to Rule 404(b), admitting other acts evidence unless it is "introduced for the sole purpose of showing the defendant's bad character, ... [is] overly prejudicial under Fed. R. Evid. 403[,] or not relevant under Fed. R. Evid. 402." United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996). "The district court has broad discretion to admit evidence pursuant to Rule 404(b), and its ruling will not be overturned on appeal absent [an] abuse of discretion."

5

United States v. Midyett, 603 F. Supp. 2d 450, 454 (E.D.N.Y. 2009) (citing Carboni, 204 F.3d at 44).  In ruling on the admissibility of evidence under Rule 404(b), the court must consider whether: "(1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction." United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003) (citing United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992)).  The government bears the burden to show that it seeks to offer the other acts evidence for a proper purpose, not as improper propensity evidence. United States v. Inniss, 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019). *See unpublished opinion, attached hereto as Exhibit 4.*

In this case, the Government asserts that this other crimes evidence is highly probative of Mr. Shin's opportunity, lack of accident or mistake and motive. This case involves charges of with multiple loan transactions which the Government alleges were fraudulent.  Likewise, this witness is allegedly going to testify to numerous loan commissions that were allegedly fraudulent or unearned. Introducing evidence of the methods and planning of the charged conduct, specifically the loan transactions and commissions, would certainly permit the Government to establish these issues, as well as the methods used without additionally introducing propensity evidence involving uncharged and irrelevant conduct of one personal credit application. As a result, this additional evidence is clearly not necessary to prove the requisite elements of the charged crimes. Consequently, this evidence should be precluded at trial as Rule 404(b) evidence in this case.

### C.   Exclusion under Rule 403

It is respectfully submitted that even if this Court were inclined to find that the evidence outlined above may be admissible as either direct evidence or under Rule 404(b), it should nonetheless be excluded under Rule 403.  Both the "intrinsic evidence" approach outlined above and the "other act" analysis under Rule 404(b) require the Court to balance probative value and prejudice under Rules 402 and 403. United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004).  This information should be excluded at trial because its probative value is substantially outweighed by the danger of unfair prejudice. See F.R.E. 403 (excluding relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"). Chan, 184 F. Supp. at 343.

The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. See generally 1 J. Weinstein, M. Berger, & J. McLaughlin, Weinstein's Evidence ¶ 403[03] (1996) (discussing the meaning of "unfair prejudice" under Rule 403). So, the Committee Notes to Rule 403 explain, "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C.App., p. 860. See Old Chief v. United States, 519 U.S. 172, 180–85 (1997) (discussing propensity evidence as an example of evidence that is relevant but that "the risk that a jury will convict for crimes

7

other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.").

The Notes to Rule 403 make it clear that rulings on admissibility should be made not on the basis of Rule 401 relevance but on "such considerations as waste of time and undue prejudice (see Rule 403)...." Id. The Notes to Rule 403 also state that when a court considers "whether to exclude on grounds of unfair prejudice," the "availability of other means of proof may ... be an appropriate factor." Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C.App., p. 860. Therefore, it is clear that Rule 403 confers discretion upon the Court by providing that evidence "may" be excluded and that the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives. See 1 McCormick 782, and n. 41 (suggesting that Rule 403' s "probative value" signifies the "marginal probative value" of the evidence relative to the other evidence in the case); 22 C. Wright & K. Graham, Federal Practice and Procedure § 5250, pp. 546–547 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point"). See Chief, 519 U.S. 172, 184-85.

As outlined above, under Rule 403, the Court can exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Additionally, it is also relevant in considering the probative worth the abundance of other evidence on the same point.

8

Here, the Government already intends to introduce multiple loans in its case-in-chief with multiple claims of wrongdoing relating to each loan, including false statements, hidden interest and unearned commissions. In plain language, if the Government cannot persuade the jury of his intent on this amount of alleged evidence it is doubtful that one conversation about a personal credit application will save the Government's day.

Our concern is Rule 404(b) overload. As the Court may soon become aware, this case is already suffering from Rule 404(b) overload. Judge Woods allowed the Government to introduce into evidence allegations of an alleged bribe paid by a construction company to Mr. Shin in connection with the construction of one of Noah Bank's bank branches. In addition, Judge Woods permitted the Government to have J.K. testify about a $113,313.74 check and its alleged distribution to Mr. Shin. As noted above, J.K. has indicated in the Jencks material produced to date that he does not have any idea what the check relates to. These two Rule 404(b) events alone bring before the jury over $150,000.00 in alleged improper payments to Mr. Shin.

Accordingly for the above reasons, we respectfully request that the Government's motion to admit this evidence be denied.

### III.   EVIDENCE RELATING TO THE RELATIVE'S EMPLOYMENT AT THE ARMONK, NEW YORK DELI AND ALLEGED HIDDEN INTEREST SHOULD BE EXCLUDED AND/OR  TAILORED

The Government also seeks to put into evidence the testimony of a relative of Mr. Shin that he began his association with Mr. Shin and J.K. by working at the Armonk, New York deli and that Mr. Shin had an undisclosed secret interest in the deli with J.K.

Despite maintaining since 2019 that the Armonk, New York deli loan was part of the fraud on the Small Business Administration and Noah Bank, the Government has realized recently that the Armonk, New York deli loan at issue did not come from Noah Bank. Nevertheless, through Rule 404(b) and otherwise, the Government seeks to place before the jury the entire story of Mr. Shin's alleged interest in the deli. Even if true, there is nothing illegal about Mr. Shin having an interest in this deli. It would be unduly prejudicial to allow a non-criminal event to be spread before the jury with the suggestion that it is wrongful conduct.

The Government has two theories of admissibility of this evidence. First, the Government alleges that it shows background and context for Mr. Shin's alleged interest with J.K. in three other delis and their "close business relationship between them." In our view, the probative value of that evidence is overwhelmed by the unfair prejudice. If J.K. is to be believed by the jury, he will testify as to three other delis that he allegedly co-owned with Mr. Shin. More importantly, one of the delis, 1797 Empire, Inc. was purchased and operated before the Armonk, New York deli. Accordingly, the relationship and alleged conspiracy between Mr. Shin and J.K. was already underway before the Armonk, New York deli came into the picture.

The Government's second argument as to admissibility relates to how Mr. Shin's relative came to work at the 1797 Empire, Inc. deli. He worked there after leaving the Armonk, New York deli. We suggest to the Court that in the event it believes Relative-1 should be permitted to testify as to where he worked first that his testimony be limited to his obtaining employment at the Armonk, New York deli and working there without

10

all of the alleged details of hidden ownership. We believe that this would be a fair

compromise and preserve the defendant's right not to be subject to yet another Rule

404(b) episode.

## CONCLUSION

For all of the reasons stated above, it is respectfully requested that this Court

deny the Government's motions *in limine*.

Respectfully Submitted,

/s/ Paul B. Brickfield, Esq.

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707

/s/ Robert J. Basil, Esq.

Robert J. Basil, Esq.
The Basil Law Group, P.C.
125 West 31st Street #19-B
New York NY 10001
(917) 994-9973

*Counsel for Defendant Edward Shin*

Dated:     November 18, 2021

11

# Exhibit 1

# L &G

## L & G Accounting Services, Inc

Ronald Lembo, Certified Public Accountant
Linda Levine, Enrolled Agent
Kate Parlej, Enrolled Agent
EIN #85-3685663

530 Ringwood Ave.
Wanaque, NJ 07465
(973) 248-8073
(973) 248-8075 Fax

2024 Macopin Rd, Ste C
West Milford, NJ 07480
(973) 728-2303
(973) 728-2604 Fax

November 17, 2021

Edward Shin
C/O Paul Brickfield
70 Grand Ave.
River Edge, NJ 07661

Dear Mr. Shin:

I have been requested to review casino records, bank records and an excel sheet in order to make a compilation of the casino activity of J█████ K███ In addition, I have been asked to review bank records and Excel sheets relating to potential personal spending by J█████ K███ out of two business entities and to prepare a compilation of these events. I reviewed banking and casino records marked as; D1 to D15, D20 to D40, D100 and D101 as well as excel sheets marked as exhibit A, B, and C.

I reviewed records from six casinos; Resorts World NYC, Mohegan Sun Casino, Wind Creek Bethlehem, PARX Casino, Foxwoods Resort Casino, and Resorts Atlantic City as well as the above banking records and excel sheets. It was determined that Mr. K██ visited casinos for 60 days in 2009, 65 days in 2010, 83 days in 2011, 80 days in 2012 and 54 days in 2013. This is a total of 342 days from January 2009 to December 2013. See attached excel sheets which I have reviewed and adopted (see Exhibit A).

Banking records were reviewed for the following two businesses and transactions were noted for items charged to the business accounts that appear to be personal in nature. The businesses are Armonk Farm, Inc. and 1797 Empire, Inc.

Armonk Farm, Inc. appears to have personal items paid through the business account of $26,630.30 for 2010, $25,782.88 for 2011 and $4,547.87 for 2012. The total is $56,960.05. These expenses were for casino charges as well as for dining, spa expenses, travel and other items.



DEFENDANT'S
EXHIBIT
D-102

1797 Empire, Inc has charges paid through the business account in the same manner as Armonk Farm, Inc. These amounts were $41,242.33 for 2009, $22,447.06 for 2010, $46,067.61 for 2011 and $22,4.4.12 for 2012. The total is $132,494.12 for the four-year period. These expenses were for casino charges as well as for dining, spa expenses, travel and other items.

The two businesses reviewed are detailed in the excel sheets attached which I adopt (see exhibit B&C) and while not all the expenditures may be personal, a pattern emerges that shows charges through the business accounts that do not appear to be business related.

Please feel free to contact me to discuss this report at any time.

Sincerely,

Ronald Lembo
Certified Public Accountant
L&G Accounting Services, Inc.

Encl: Excel Sheets
.

# Exhibit A



## Casino Attendance by J███ K██ - 2009 to 2013

| Date | ATM Withdrawal | Casino | Source |
|------|---------------|--------|--------|
| 1/31/2009 | | Mohegan Sun, Uncasville, CT | |
| 2/4/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/5/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/14/2009 | | Mohegan Sun, Uncasville, CT | |
| 2/18/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/18/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/19/2009 | | Mohegan Sun, Uncasville, CT | |
| 2/20/2009 | | Mohegan Sun, Uncasville, CT | |
| 3/1/2009 | | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
|---|---|---|
| 3/1/2009 | | Mohegan Sun, Uncasville, CT |
| 3/5/2009 | $203.50 | Empire City Casino, Yonkers, NY |
| 3/7/2009 | $203.50 (+$1.50 service fee listed as separate entry) | Empire City Casino, Yonkers, NY |
| 3/8/2009 | | Mohegan Sun, Uncasville, CT |
| 3/8/2009 | | Mohegan Sun, Uncasville, CT |
| 3/9/2009 | | Mohegan Sun, Uncasville, CT |
| 3/9/2009 | | Mohegan Sun, Uncasville, CT |
| 3/18/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/18/2009 | | Mohegan Sun, Uncasville, CT |
| 3/18/2009 | | Mohegan Sun, Uncasville, CT |

| | | |
|---|---|---|
| 3/21/2009 | | Mohegan Sun, Uncasville, CT |
| 3/21/2009 | | Mohegan Sun, Uncasville, CT |
| 3/22/2009 | | Mohegan Sun, Uncasville, CT |
| 3/23/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 3/23/2009 | | Mohegan Sun, Uncasville, CT |
| 3/25/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 3/25/2009 | | Mohegan Sun, Uncasville, CT |
| 3/26/2009 | | Mohegan Sun, Uncasville, CT |
| 3/28/2009 | | Mohegan Sun, Uncasville, CT |
| 3/28/2009 | | Mohegan Sun, Uncasville, CT |

| | | |
|---|---|---|
| 3/29/2009 | | Mohegan Sun, Uncasville, CT |
| 4/5/2009 | $303.50 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ |
| 4/12/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 4/12/2009 | $103.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 4/12/2009 | | Mohegan Sun, Uncasville, CT |
| 4/12/2009 | | Mohegan Sun, Uncasville, CT |
| 4/19/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 4/25/2009 | | Mohegan Sun, Uncasville, CT |
| 4/25/2009 | | Mohegan Sun, Uncasville, CT |
| 4/26/2009 | | Mohegan Sun, Uncasville, CT |

| Date | | Amount | Location |
|---|---|---|---|
| 4/26/2009 | | | Mohegan Sun, Uncasville, CT |
| 5/3/2009 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/3/2009 | | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/3/2009 | | | Mohegan Sun, Uncasville, CT |
| 5/6/2009 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/10/2009 | | | Mohegan Sun, Uncasville, CT |
| 5/16/2009 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/17/2009 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/22/2009 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/22/2009 | | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 5/23/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/24/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 5/24/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/24/2009 | | Mohegan Sun, Uncasville, CT |
| 5/24/2009 | | Mohegan Sun, Uncasville, CT |
| 6/13/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 6/13/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 6/13/2009 | | Mohegan Sun, Uncasville, CT |
| 6/13/2009 | | Mohegan Sun, Uncasville, CT |
| 6/21/2009 | | Foxwoods Resort Casino, Mashantucket, CT |

| 6/28/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/4/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/5/2009 | | Mohegan Sun, Uncasville, CT |
| 7/5/2009 | | Mohegan Sun, Uncasville, CT |
| 7/5/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/12/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/12/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/19/2009 | $303.50 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ |
| 7/19/2009 | $203.50 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ |
| 7/24/2009 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
| --- | --- | --- |
| 7/25/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 7/25/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 7/25/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 7/25/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/26/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 8/9/2009 | | Mohegan Sun, Uncasville, CT |
| 8/9/2009 | | Mohegan Sun, Uncasville, CT |
| 8/15/2009 | | Mohegan Sun, Uncasville, CT |
| 8/15/2009 | | Mohegan Sun, Uncasville, CT |
| 9/5/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ |

| Date | Amount | Location | |
|---|---|---|---|
| 9/5/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ | |
| 9/8/2009 | $54.57 | Borgata, Atlantic City, NJ | |
| 9/12/2009 | | Mohegan Sun, Uncasville, CT | |
| 9/12/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 9/18/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 9/19/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT | |
| 9/19/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 10/9/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT | |
| 10/9/2009 | | Foxwoods Resort Casino, Mashantucket, CT | |
| 10/10/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT | |

| Date | | Location |
|---|---|---|
| 10/10/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/10/2009 | | Mohegan Sun, Uncasville, CT |
| 10/10/2009 | | Mohegan Sun, Uncasville, CT |
| 10/11/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/11/2009 | | Mohegan Sun, Uncasville, CT |
| 11/12/2009 | | Mohegan Sun, Uncasville, CT |
| 11/12/2009 | | Mohegan Sun, Uncasville, CT |
| 11/15/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 11/15/2009 | | Mohegan Sun, Uncasville, CT |
| 11/15/2009 | | Mohegan Sun, Uncasville, CT |

| | | Mohegan Sun, Uncasville, CT |
|---|---|---|
| 11/29/2009 | | Mohegan Sun, Uncasville, CT |
| 11/29/2009 | | Mohegan Sun, Uncasville, CT |
| 12/12/2009 | | Mohegan Sun, Uncasville, CT |
| 12/26/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 12/27/2009 | | Mohegan Sun, Uncasville, CT |
| 12/27/2009 | | Mohegan Sun, Uncasville, CT |
| 12/27/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 12/30/2009 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/2/2010 | | Opus Casino Cruise Line, Freeport, NY |
| 1/5/2010 | | Foxwoods Resort Casino, Mashantucket, CT |

| | | |
|---|---|---|
| ███████████████████████████████████ | | |
| 1/9/2010 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 1/9/2010 | | Mohegan Sun, Uncasville, CT |
| 1/16/2010 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 1/16/2010 | | Mohegan Sun, Uncasville, CT |
| 2/21/2010 | | Mohegan Sun, Uncasville, CT |
| 2/21/2010 | | Mohegan Sun, Uncasville, CT |
| 2/21/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/22/2010 | $204.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 3/5/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/6/2010 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Location | Amount |
|---|---|---|
| 3/7/2010 | Foxwoods Resort Casino, Mashantucket, CT | |
| 3/18/2010 | Mohegan Sun, Uncasville, CT | |
| 4/10/2010 | Mohegan Sun, Uncasville, CT | |
| 4/10/2010 | Mohegan Sun, Uncasville, CT | |
| 5/2/2010 | Mohegan Sun, Uncasville, CT | $204.00 (+$1.50 service fee listed as separate entry) |
| 5/2/2010 | Mohegan Sun, Uncasville, CT | $84.00 (+$1.00 service fee listed as separate entry) |
| 5/2/2010 | Mohegan Sun, Uncasville, CT | $204.00 (+$1.00 service fee listed as separate entry) |
| 5/2/2010 | Mohegan Sun, Uncasville, CT | |
| 5/2/2010 | Mohegan Sun, Uncasville, CT | |
| 5/16/2010 | Mohegan Sun, Uncasville, CT | $304.00 (+$1.50 service fee listed as separate entry) |

| | | |
|---|---|---|
| 5/16/2010 | $204.00 (+$1.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/16/2010 | | Mohegan Sun, Uncasville, CT |
| 5/16/2010 | | Mohegan Sun, Uncasville, CT |
| 5/17/2010 | | Mohegan Sun, Uncasville, CT |
| 5/17/2010 | | Mohegan Sun, Uncasville, CT |
| 5/20/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/20/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 5/20/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 5/21/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/21/2010 | $204.00 | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 5/21/2010 | $104.00 (+$1.00 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 5/23/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/23/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/23/2010 | $51.23 | Foxwoods Resort Casino, Mashantucket, CT (Veranda Café) |
| 5/23/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/23/2010 | | Mohegan Sun, Uncasville, CT |
| 5/23/2010 | | Mohegan Sun, Uncasville, CT |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 5/25/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/29/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/30/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/30/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/30/2010 | | Mohegan Sun, Uncasville, CT |
| 5/30/2010 | | Mohegan Sun, Uncasville, CT |
| 6/1/2010 | $104.00 | Mohegan Sun, Uncasville, CT |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 6/20/2010 | $303.50 (+$1.50 service fee listed as separate entry) | Empire City Casino, Yonkers, NY |
| 6/30/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 7/4/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 7/4/2010 | $304.00 (+$1.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 7/4/2010 | | Mohegan Sun, Uncasville, CT |
| 7/4/2010 | | Mohegan Sun, Uncasville, CT |
| 7/5/2010 | $191.86 | Mohegan Sun, Uncasville, CT (Jasper White's Summer Shack) |
| 7/6/2010 | $404.00 | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 7/6/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 7/19/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ |
| 7/20/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ |
| 7/24/2010 | $304.50 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 7/25/2010 | $304.50 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 7/25/2010 | | Resorts Atlantic City, Atlantic City, NJ |
| 7/26/2010 | $304.50 (+$1.00 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 7/26/2010 | $504.50 | Resorts, Atlantic City, NJ |
| 7/26/2010 | $504.50 | Resorts, Atlantic City, NJ |
| 7/28/2010 | $5.00 | Trump Taj Mahal, Atlantic City, NJ |

| | | | Armonk Farm, Inc. - Noah Bank Account No.: |
|---|---|---|---|
| 7/28/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ | |
| 7/29/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ | |
| 7/30/2010 | | Resorts Atlantic City, Atlantic City, NJ | |
| 7/31/2010 | $304.50 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ | |
| 8/2/2010 | $404.50 | Trump Taj Mahal, Atlantic City, NJ | |
| 8/2/2010 | $504.50 | Trump Taj Mahal, Atlantic City, NJ | |
| 8/2/2010 | $504.50 | Trump Taj Mahal, Atlantic City, NJ | |
| 8/15/2010 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT | |
| 8/15/2010 | | Mohegan Sun, Uncasville, CT | |
| 8/15/2010 | | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
|---|---|---|
| 8/18/2010 | | Mohegan Sun, Uncasville, CT |
| 8/19/2010 | | Mohegan Sun, Uncasville, CT |
| 8/19/2010 | | Mohegan Sun, Uncasville, CT |
| 8/21/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 8/22/2010 | $44.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2010 | | Mohegan Sun, Uncasville, CT |
| 8/22/2010 | | Mohegan Sun, Uncasville, CT |
| 8/23/2010 | | Mohegan Sun, Uncasville, CT |
| 8/23/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 8/23/2010 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 8/24/2010 | | Mohegan Sun, Uncasville, CT |
| 8/28/2010 | | Mohegan Sun, Uncasville, CT |
| 8/29/2010 | | Mohegan Sun, Uncasville, CT |
| 8/29/2010 | | Mohegan Sun, Uncasville, CT |
| 9/6/2010 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 9/6/2010 | | Mohegan Sun, Uncasville, CT |
| 9/6/2010 | | Mohegan Sun, Uncasville, CT |
| 9/7/2010 | $703.99 | Parx Casino, Bensalem, PA |
| 9/14/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 9/20/2010 | $503.50 | Empire City Casino, Yonkers, NY |

| Date | Amount | Location |
|---|---|---|
| 9/26/2010 | | Mohegan Sun, Uncasville, CT |
| 9/26/2010 | | Mohegan Sun, Uncasville, CT |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT |
| 10/2/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/3/2010 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/10/2010 | | Mohegan Sun, Uncasville, CT |
| 10/10/2010 | | Mohegan Sun, Uncasville, CT |

| | | |
|---|---|---|
| 11/10/2010 | Foxwoods Resort Casino, Mashantucket, CT | |
| 11/26/2010 | Mohegan Sun, Uncasville, CT | |
| 11/26/2010 | Mohegan Sun, Uncasville, CT | |
| 11/29/2010 | Parx Casino, Bensalem, PA | |
| 11/30/2010 | Parx Casino, Bensalem, PA | $1,003.99 |
| 12/12/2010 | Foxwoods Resort Casino, Mashantucket, CT | |
| 12/17/2010 | Mohegan Sun, Uncasville, CT | $404.00 (+$1.50 service fee listed as separate entry) |
| 12/17/2010 | Mohegan Sun, Uncasville, CT | |
| 12/18/2010 | Mohegan Sun, Uncasville, CT | $304.00 (+$1.50 service fee listed as separate entry) |
| 12/18/2010 | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
|---|---|---|
| 12/22/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Sugarhouse Casino, Philadelphia, PA |
| 12/25/2010 | | Mohegan Sun, Uncasville, CT |
| 12/26/2010 | $304.00 (+$1.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 12/26/2010 | | Mohegan Sun, Uncasville, CT |
| 12/29/2010 | $20.00 | Mohegan Sun, Uncasville, CT |
| 1/8/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 1/9/2011 | $105.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 1/9/2011 | $205.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 1/10/2011 | $205.00 | Trump Taj Mahal, Atlantic City, NJ |
| 1/10/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ |

| | | |
|---|---|---|
| 1/10/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ |
| 1/10/2011 | $1,005.00 | Trump Taj Mahal, Atlantic City, NJ |
| 1/14/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/15/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 1/15/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/16/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/16/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 1/16/2011 | | Mohegan Sun, Uncasville, CT |
| 1/16/2011 | | Mohegan Sun, Uncasville, CT |
| 1/17/2011 | $54.00 | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 1/18/2011 | $204.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 1/24/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/5/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/6/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 2/6/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/7/2011 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 2/13/2011 | | Mohegan Sun, Uncasville, CT |
| 2/13/2011 | | Mohegan Sun, Uncasville, CT |
| 2/13/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/14/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/14/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 2/20/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 2/20/2011 | | Resorts Atlantic City, Atlantic City, NJ |
| 2/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 2/27/2011 | | Mohegan Sun, Uncasville, CT |
| 2/27/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Location | Amount |
|---|---|---|
| 2/27/2011 | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/28/2011 | Foxwoods Resort Casino, Mashantucket, CT | |
| 2/28/2011 | Foxwoods Resort Casino, Mashantucket, CT | $204.00 |
| 2/28/2011 | Foxwoods Resort Casino, Mashantucket, CT | $404.00 |
| 2/28/2011 | Foxwoods Resort Casino, Mashantucket, CT | $404.00 |
| 2/28/2011 | Mohegan Sun, Uncasville, CT | |
| 2/28/2011 | Mohegan Sun, Uncasville, CT | |
| 3/14/2011 | Mohegan Sun, Uncasville, CT | |
| 3/14/2011 | Mohegan Sun, Uncasville, CT | |
| 3/17/2011 | Mohegan Sun, Uncasville, CT | $304.00 (+$1.50 service fee listed as separate entry) |

| Date | | Amount | Location |
|---|---|---|---|
| 3/17/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/17/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/17/2011 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/18/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/18/2011 | | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 3/18/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/25/2011 | | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/26/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/26/2011 | | | Mohegan Sun, Uncasville, CT |
| 3/26/2011 | | | Foxwoods Resort Casino, Mashantucket, CT |

| | | |
|---|---|---|
| 3/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 3/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 3/27/2011 | | Mohegan Sun, Uncasville, CT |
| 3/27/2011 | | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | $204.00 | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | $404.00 | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | $404.00 | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | $804.00 | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | | Mohegan Sun, Uncasville, CT |
| 3/28/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
| --- | --- | --- |
| 4/17/2011 | | Mohegan Sun, Uncasville, CT |
| 4/17/2011 | | Mohegan Sun, Uncasville, CT |
| 5/1/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/3/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 5/12/2011 | | Mohegan Sun, Uncasville, CT |
| 5/22/2011 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 5/22/2011 | | Mohegan Sun, Uncasville, CT |
| 5/22/2011 | | Mohegan Sun, Uncasville, CT |
| 5/22/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/23/2011 | $304.00 | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 5/23/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 5/23/2011 | | Mohegan Sun, Uncasville, CT |
| 5/23/2011 | | Mohegan Sun, Uncasville, CT |
| 6/11/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 6/12/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 6/13/2011 | $504.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 6/13/2011 | $504.00 | Foxwoods Resort Casino, Mashantucket, CT |
| 6/13/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 6/17/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 6/18/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 6/19/2011 | | Resorts Atlantic City, Atlantic City, NJ |
| 6/21/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/21/2011 | $405.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/25/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 6/25/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ |
| 6/29/2011 | | Mohegan Sun, Uncasville, CT |

| 7/1/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 7/3/2011 | $104.50 (+$1.50 service fee listed as separate entry) | Resorts, Atlantic City, NJ |
| 7/3/2011 | | Resorts Atlantic City, Atlantic City, NJ |
| 7/4/2011 | $105.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ |
| 7/4/2011 | | Resorts Atlantic City, Atlantic City, NJ |
| 7/6/2011 | $10.00 | Trump Taj Mahal, Atlantic City, NJ |
| 7/6/2011 | $10.00 | Trump Taj Mahal, Atlantic City, NJ |
| 7/6/2011 | | Mohegan Sun, Uncasville, CT |
| 7/11/2011 | | Mohegan Sun, Uncasville, CT |
| 7/22/2011 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 7/24/2011 | | Sands Casino, Bethlehem, PA |
| 7/28/2011 | $303.50 | Sands Casino, Bethlehem, PA |
| 7/28/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 7/28/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 7/29/2011 | $303.50 | Sands Casino, Bethlehem, PA |
| 7/29/2011 | $303.50 | Sands Casino, Bethlehem, PA |
| 8/7/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 8/10/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 8/10/2011 | | Mohegan Sun, Uncasville, CT |
| 8/10/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 8/11/2011 | $128.68 | Mohegan Sun, Uncasville, CT (Jasper While's Summer Shack) |
| 8/12/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 8/13/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 8/13/2011 | | Sands Casino, Bethlehem, PA |
| 8/16/2011 | | Sands Casino, Bethlehem, PA |
| 8/16/2011 | $303.50 | Sands Casino, Bethlehem, PA |
| 8/16/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 8/21/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 8/21/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 8/21/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 8/21/2011 | | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $44.00 | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $404.00 (+$2.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 8/22/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 8/22/2011 | | Mohegan Sun, Uncasville, CT |
| 9/3/2011 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location | |
|---|---|---|---|
| 9/4/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA | |
| 9/4/2011 | | Mohegan Sun, Uncasville, CT | |
| 9/11/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT | |
| 9/11/2011 | | Mohegan Sun, Uncasville, CT | |
| 9/11/2011 | | Mohegan Sun, Uncasville, CT | |
| 9/11/2011 | | Foxwoods Resort Casino, Mashanlucket, CT | |
| 9/12/2011 | $304.00 | Mohegan Sun, Uncasville, CT | |
| 9/12/2011 | | Mohegan Sun, Uncasville, CT | |
| 9/14/2011 | | Mohegan Sun, Uncasville, CT | |
| 9/17/2011 | | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
|---|---|---|
| 10/16/2011 | | Mohegan Sun, Uncasville, CT |
| 10/16/2011 | | Mohegan Sun, Uncasville, CT |
| 10/17/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 10/17/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 10/17/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 10/17/2011 | $504.00 (+$2.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 10/17/2011 | | Mohegan Sun, Uncasville, CT |
| 10/17/2011 | | Mohegan Sun, Uncasville, CT |
| 10/30/2011 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 10/30/2011 | | Mohegan Sun, Uncasville, CT |
| 11/6/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 11/7/2011 | $2.00 | Sands Casino, Bethlehem, PA (marked as "balance inquiry") |
| 11/7/2011 | $203.50 (+$2.00 service fee listed as separate entry) | Sands Casino, Bethlehem, PA |
| 11/20/2011 | | Mohegan Sun, Uncasville, CT |
| 11/20/2011 | | Mohegan Sun, Uncasville, CT |
| 11/21/2011 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 11/21/2011 | | Sands Casino, Bethlehem, PA |
| 11/25/2011 | | Mohegan Sun, Uncasville, CT |
| 11/26/2011 | | Parx Casino, Bensalem, PA |

| Date | Amount | Location |
|---|---|---|
| 11/27/2011 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 11/27/2011 | | Mohegan Sun, Uncasville, CT |
| 11/27/2011 | | Mohegan Sun, Uncasville, CT |
| 11/28/2011 | $304.00 | Mohegan Sun, Uncasville, CT |
| 11/28/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 11/28/2011 | $304.00 (+$2.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 11/29/2011 | $27.12 | Mohegan Sun, Uncasville, CT |
| 12/10/2011 | $303.99 (+$1.50 service fee listed as separate entry) | Parx Casino, Bensalem, PA |
| 12/10/2011 | | Parx Casino, Bensalem, PA |
| 12/12/2011 | $303.99 | Parx Casino, Bensalem, PA |

| Date | Amount | Location |
| --- | --- | --- |
| 12/12/2011 | $503.99 (+$2.00 service fee listed as separate entry) | Parx Casino, Bensalem, PA |
| 12/17/2011 | | Mohegan Sun, Uncasville, CT |
| 12/17/2011 | | Mohegan Sun, Uncasville, CT |
| 12/18/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 12/19/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 12/19/2011 | $404.00 (+$2.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 12/19/2011 | $404.00 (+$2.00 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 12/25/2011 | $386.78 (+$0.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (DKNY Company Store) |
| 12/26/2011 | $2.00 | Sands Casino, Bethlehem, PA |

| Date | Amount | Location |
|---|---|---|
| 12/26/2011 | | Foxwoods Resort Casino, Mashantucket, CT |
| 12/29/2011 | $2.00 | Mohegan Sun, Uncasville, CT (marked as "balance inquiry") |
| 1/1/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/1/2012 | $304.00 (+$1.00 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 1/1/2012 | $304.00 (+$1.00 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 1/2/2012 | $5.80 | Sands Bethlehem Casino, Bethlehem, PA |
| 1/20/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 1/20/2012 | | Sands Casino, Bethlehem, PA |
| 1/20/2012 | | Mohegan Sun, Uncasville, CT |
| 1/28/2012 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 1/29/2012 | $204.00 | Mohegan Sun, Uncasville, CT |
| 1/29/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/3/2012 | | Mohegan Sun, Uncasville, CT |
| 2/4/2012 | $118.05 | Mohegan Sun, Uncasville, CT (Godiva Chocolate) |
| 2/12/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 2/12/2012 | | Mohegan Sun, Uncasville, CT |
| 2/12/2012 | | Mohegan Sun, Uncasville, CT |
| 2/13/2012 | $129.75 | Mohegan Sun, Uncasville, CT (Jasper White's Summer Shack) |
| 2/15/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/15/2012 | $304.00 (+$1.00 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 2/15/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 2/15/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 2/19/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 2/19/2012 | | Sands Casino, Bethlehem, PA |
| 2/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/20/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 2/28/2012 | $103.50 (+$1.00 service fee listed as separate entry) | Sands Bethlehem Casino, Bethlehem, PA |
| 2/28/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 2/28/2012 | | Sands Casino, Bethlehem, PA |
| 2/29/2012 | $303.50 | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |

| Date | Amount | Location |
|---|---|---|
| 3/4/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/5/2012 | $303.50 | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/12/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/18/2012 | | Sands Casino, Bethlehem, PA |
| 3/19/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/19/2012 | $50.00 (+$0.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (DKNY Company Store) |
| 3/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/25/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/26/2012 | | Mohegan Sun, Uncasville, CT |
| 3/26/2012 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
|---|---|---|
| 3/26/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/27/2012 | | Mohegan Sun, Uncasville, CT |
| 4/4/2012 | | Sands Casino, Bethlehem, PA |
| 4/5/2012 | | Sands Casino, Bethlehem, PA |
| 4/6/2012 | | Sands Casino, Bethlehem, PA |
| 4/6/2012 | | Sands Casino, Bethlehem, PA |
| 4/7/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 4/8/2012 | | Sands Casino, Bethlehem, PA |
| 4/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 4/22/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |

| Date | Amount | Location |
|---|---|---|
| 4/28/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/2/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 5/7/2012 | | Mohegan Sun, Uncasville, CT |
| 5/7/2012 | | Mohegan Sun, Uncasville, CT |
| 5/7/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 5/27/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 5/28/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 6/3/2012 | $104.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT |
| 6/3/2012 | $3,950.00 (buy in) | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location |
|---|---|---|
| 6/7/2012 | $103.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 6/7/2012 | | Sands Casino, Bethlehem, PA |
| 6/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/1/2012 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 7/1/2012 | | Mohegan Sun, Uncasville, CT |
| 7/1/2012 | | Mohegan Sun, Uncasville, CT |
| 7/7/2012 | $203.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 7/14/2012 | | Parx Casino, Bensalem, PA |
| 7/15/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 7/16/2012 | $303.99 | Parx Casino, Bensalem, PA |

| Date | Location | Amount |
|---|---|---|
| 7/17/2012 | Resorts Atlantic City, Atlantic City, NJ | |
| 7/20/2012 | Foxwoods Resort Casino, Mashantucket, CT | |
| 8/1/2012 | Parx Casino, Bensalem, PA | |
| 8/8/2012 | Mohegan Sun, Uncasville, CT | |
| 8/8/2012 | Mohegan Sun, Uncasville, CT | |
| 8/9/2012 | Mohegan Sun, Uncasville, CT | $304.99 |
| 8/9/2012 | Mohegan Sun, Uncasville, CT | $304.99 |
| 8/9/2012 | Mohegan Sun, Uncasville, CT | |
| 8/9/2012 | Mohegan Sun, Uncasville, CT (Jasper White's Summer Shack) | $187.69 |
| 8/19/2012 | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
|---|---|---|
| 8/19/2012 | | Mohegan Sun, Uncasville, CT |
| 8/20/2012 | $304.99 | Mohegan Sun, Uncasville, CT |
| 8/20/2012 | $305.00 | Trump Taj Mahal, Atlantic City, NJ |
| 8/26/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 8/30/2012 | $303.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 8/30/2012 | $303.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 8/31/2012 | $303.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 9/16/2012 | | Sands Bethlehem Casino, Bethlehem, PA |
| 9/20/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 9/30/2012 | | Mohegan Sun, Uncasville, CT |

| Date | Amount | Location |
| --- | --- | --- |
| 9/30/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/1/2012 | | Mohegan Sun, Uncasville, CT |
| 10/27/2012 | | Parx Casino, Bensalem, PA |
| 10/28/2012 | | Parx Casino, Bensalem, PA |
| 11/4/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY |
| 11/9/2012 | $303.50 | Resorts World Casino New York City, Jamaica, NY |
| 11/10/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 11/11/2012 | | Sands Casino, Bethlehem, PA |
| 11/13/2012 | $106.00 | Resorts World Casino New York City, Jamaica, NY |
| 11/14/2012 | $303.50 | Resorts World Casino New York City, Jamaica, NY |

| | | |
|---|---|---|
| 11/16/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 11/17/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 11/20/2012 | $103.50 | Resorts World Casino New York City, Jamaica, NY |
| 11/23/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY |
| 11/24/2012 | | Sands Casino, Bethlehem, PA |
| 11/24/2012 | | Sands Casino, Bethlehem, PA |
| 11/26/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 12/2/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY |
| 12/8/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY |
| 12/9/2012 | | Sands Casino, Bethlehem, PA |

| Date | Amount | Location |
| --- | --- | --- |
| 12/16/2012 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT |
| 12/16/2012 | | Mohegan Sun, Uncasville, CT |
| 12/16/2012 | | Mohegan Sun, Uncasville, CT |
| 12/16/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 12/17/2012 | | Mohegan Sun, Uncasville, CT |
| 12/17/2012 | | Mohegan Sun, Uncasville, CT |
| 12/23/2012 | | Mohegan Sun, Uncasville, CT |
| 12/28/2012 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/18/2013 | $303.50 | Resorts World Casino New York City, Jamaica, NY |
| 1/18/2013 | $303.50 | Resorts World Casino New York City, Jamaica, NY |

| | | |
|---|---|---|
| 1/20/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/21/2013 | | Mohegan Sun, Uncasville, CT |
| 1/21/2013 | | Mohegan Sun, Uncasville, CT |
| 1/21/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 1/27/2013 | | Mohegan Sun, Uncasville, CT |
| 1/27/2013 | | Mohegan Sun, Uncasville, CT |
| 1/27/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 2/17/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/2/2013 | | Mohegan Sun, Uncasville, CT |
| 3/2/2013 | | Foxwoods Resort Casino, Mashantucket, CT |

| Date | Amount | Location | |
|---|---|---|---|
| 3/4/2013 | | Foxwoods Resort Casino, Mashantuckel, CT | ████████ |
| 3/4/2013 | $203.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) | |
| 3/4/2013 | $303.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) | |
| 3/5/2013 | | Mohegan Sun, Uncasville, CT | |
| 3/5/2013 | | Mohegan Sun, Uncasville, CT | |
| 3/5/2013 | | Foxwoods Resort Casino, Mashantuckel, CT | |
| 3/6/2013 | $304.50 | Mohegan Sun, Uncasville, CT | |
| 3/6/2013 | $304.50 | Mohegan Sun, Uncasville, CT | |
| 3/6/2013 | | Mohegan Sun, Uncasville, CT | |
| 3/6/2013 | | Mohegan Sun, Uncasville, CT | |

| Date | Amount | Location |
| --- | --- | --- |
| 3/11/2013 | $304.25 | Resorts World Casino New York City, Jamaica, NY |
| 3/17/2013 | | Mohegan Sun, Uncasville, CT |
| 3/17/2013 | | Mohegan Sun, Uncasville, CT |
| 3/17/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 3/18/2013 | $304.25 | Resorts World Casino New York City, Jamaica, NY |
| 3/18/2013 | $304.50 | Mohegan Sun, Uncasville, CT |
| 3/18/2013 | | Mohegan Sun, Uncasville, CT |
| 3/25/2013 | $204.25 | Resorts World Casino New York City, Jamaica, NY |
| 3/25/2013 | $304.25 | Resorts World Casino New York City, Jamaica, NY |
| 3/31/2013 | | Mohegan Sun, Uncasville, CT |

| Date | Location | Amount |
|---|---|---|
| 3/31/2013 | Mohegan Sun, Uncasville, CT | |
| 3/31/2013 | Foxwoods Resort Casino, Mashantucket, CT | |
| 4/1/2013 | Foxwoods Resort Casino, Mashantucket, CT | |
| 4/1/2013 | Resorts World Casino New York City, Jamaica, NY | $204.25 |
| 4/1/2013 | Mohegan Sun, Uncasville, CT | |
| 4/1/2013 | Mohegan Sun, Uncasville, CT | |
| 4/2/2013 | Mohegan Sun, Uncasville, CT | |
| 4/2/2013 | Mohegan Sun, Uncasville, CT | |
| 4/8/2013 | Resorts World Casino New York City, Jamaica, NY | $304.25 |
| 4/10/2013 | Foxwoods Resort Casino, Mashantucket, CT | |

| | | |
|---|---|---|
| 4/12/2013 | $304.25 | Resorts World Casino New York City, Jamaica, NY |
| 4/20/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 4/21/2013 | | Mohegan Sun, Uncasville, CT |
| 4/21/2013 | | Mohegan Sun, Uncasville, CT |
| 4/21/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 4/29/2013 | $304.25 | Resorts World Casino New York City, Jamaica, NY |
| 5/6/2013 | $203.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 5/8/2013 | | Mohegan Sun, Uncasville, CT |
| 6/9/2013 | | Mohegan Sun, Uncasville, CT |
| 6/20/2013 | $303.50 | Sands Bethlehem Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |

| Date | Location |
| --- | --- |
| 6/20/2013 | Resorts World Casino New York City, Jamaica, NY |
| 6/26/2013 | Mohegan Sun, Uncasville, CT |
| 7/20/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 7/21/2013 | Mohegan Sun, Uncasville, CT |
| 7/21/2013 | Mohegan Sun, Uncasville, CT |
| 7/21/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 7/28/2013 | Resorts World Casino New York City, Jamaica, NY |
| 8/17/2013 | Parx Casino, Bensalem, PA |
| 9/1/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 9/14/2013 | Mohegan Sun, Uncasville, CT |

| | | |
|---|---|---|
| 9/14/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 9/15/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/3/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/4/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/5/2013 | | Mohegan Sun, Uncasville, CT |
| 10/5/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/6/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/7/2013 | | Foxwoods Resort Casino, Mashantucket, CT |
| 10/12/2013 | | Mohegan Sun, Uncasville, CT |
| 10/12/2013 | | Mohegan Sun, Uncasville, CT |

| | |
|---|---|
| 10/12/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 10/13/2013 | Resorts World Casino New York City, Jamaica, NY |
| 10/19/2013 | Mohegan Sun, Uncasville, CT |
| 10/19/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 10/20/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 10/27/2013 | Foxwoods Resort Casino, Mashantucket, CT |
| 11/10/2013 | Resorts World Casino New York City, Jamaica, NY |
| 11/17/2013 | Resorts World Casino New York City, Jamaica, NY |
| 11/25/2013 | Resorts World Casino New York City, Jamaica, NY |
| 11/27/2013 | Resorts World Casino New York City, Jamaica, NY |

| 11/28/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 11/29/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 11/30/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/1/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/8/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/15/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/16/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/22/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/25/2013 | | Resorts World Casino New York City, Jamaica, NY |
| 12/28/2013 | | Resorts World Casino New York City, Jamaica, NY |

**Total ATM/Credit Card Activity: $66,732.69**

Total days in 2009: 60
Total days in 2010: 65
Total days in 2011: 83
Total days in 2012: 80
Total days in 2013: 54

**Total days overall: 342**

# Exhibit B



DEFENDANT'S
EXHIBIT
D-102B
ALL-STATE LEGAL®

## Selected Expenses - Armonk Farm, Inc. Bank Accounts

| Date | Amount | Transaction Location | Source |
|------|--------|----------------------|--------|
| 2/10/2010 | $400.00 | Lemon, Flushing, NY (unknown, but possibly dining) | |
| 2/10/2010 | $1,000.00 | Lemon, Flushing, NY (unknown, but possibly dining) | |
| 2/16/2010 | $500.00 | New Dongurami, Flushing, NY (dining) | |
| 2/16/2010 | $600.00 | New Dongurami, Flushing, NY (dining) | |
| 2/25/2010 | $177.87 | New Mulan, Flushing, NY (dining) | |
| 2/26/2010 | $220.31 | Cheong Hae Jin, Flushing, NY (dining) | |
| 3/8/2010 | $430.85 | Hirai Mong, New York, NY (dining) | |
| 3/12/2010 | $10.09 | 7-Eleven, Flushing, NY (retail) | |
| 3/12/2010 | $21.06 | 7-Eleven, Flushing, NY (retail) | |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) | |

| | | |
|---|---|---|
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 5/24/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 5/25/2010 | $248.05 | Kang Suh Restaurant, New York, NY (dining) |
| 5/27/2010 | $115.55 | Kang Suh Restaurant, New York, NY (dining) |
| 5/27/2010 | $318.89 | Kang Suh Restaurant, New York, NY (dining) |
| 6/1/2010 | $104.00 | Mohegan Sun, Uncasville, CT (casino) |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |

| Date | Amount | Description |
|------|--------|-------------|
| 6/1/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 6/7/2010 | $575.00 | Axis, Flushing, NY (dining) |
| 6/15/2010 | $232.77 | Mapo BBQ, Flushing, NY (dining) |
| 6/22/2010 | $1,200.00 | Dureesuh, Flushing, NY (dining) |
| 7/6/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 7/6/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 7/12/2010 | $1,000.00 | Golf Town, Bayside, NY (retail) |
| 7/15/2010 | $334.79 | Mapo BBQ, Flushing, NY (dining) |
| 7/19/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/20/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |

| | | |
|---|---|---|
| 7/26/2010 | $504.50 | Resorts, Atlantic City, NJ (casino) |
| 7/26/2010 | $504.50 | Resorts, Atlantic City, NJ (casino) |
| 7/28/2010 | $5.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/28/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/29/2010 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 8/2/2010 | $404.50 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 8/2/2010 | $504.50 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 8/2/2010 | $504.50 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 9/7/2010 | $703.99 | Parx Casino, Bensalem, PA (casino) |
| 9/7/2010 | $160.00 | Myung San Restaurant, Flushing, NY (dining) |

| | | |
|---|---|---|
| 9/14/2010 | $114.24 | Hwangjae Sushi, Flushing, NY (dining) |
| 9/14/2010 | $331.23 | Staples, Flushing, NY (retail) |
| 9/20/2010 | $503.50 | Empire City Casino, Yonkers, NY (casino) |
| 9/23/2010 | $71.00 | Amtrak, Philadelphia, PA (travel) |
| 9/23/2010 | $119.70 | Yuk Jun Restaurant, Flushing, NY (dining) |
| 9/23/2010 | $161.95 | Mapo BBQ, Flushing, NY (dining) |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 9/27/2010 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |

| 10/1/2010 | $800.00 | Korean Korean, Flushing, NY (unknown, but possibly dining) |
| 10/15/2010 | $138.22 | Hann Ji Bach, Flushing, NY (dining) |
| 10/18/2010 | $65.00 | Han Gang Restaurant, Flushing, NY (dining) |
| 10/21/2010 | $1,000.00 | Choko, Flushing, NY (unknown, but possibly auto glass repair) |
| 10/22/2010 | $1,000.00 | Mona Lisa Bar, Flushing, NY (dining) |
| 10/27/2010 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 11/24/2010 | $307.03 | Je Judo Seafood, Flushing, NY (dining) |
| 11/26/2010 | $190.00 | Pine Village Spa, Flushing, NY (spa) |
| 11/26/2010 | $192.06 | Han Gang Restaurant, Flushing, NY (dining) |
| 11/29/2010 | $135.00 | Karaoke MOA, Bayside, NY (karaoke) |

| 11/29/2010 | $329.89 | Samdado Restaurant, Oakland Gardens, NY |
| 11/29/2010 | $362.24 | Enterprise Rent-A-Car, Flushing, NY (car rental) |
| 11/30/2010 | $167.00 | Athena Spa, New York, NY (spa) |
| 11/30/2010 | $1,003.99 | Parx Casino, Bensalem, PA (casino) |
| 12/3/2010 | $2,000.00 | Choko, Flushing, NY (unknown, but possibly auto glass repair) |
| 12/13/2010 | $800.00 | New Dongurami, Flushing, NY (dining) |
| 12/15/2010 | $151.53 | Marco Laguardia Hotel, Flushing, NY (hotel) |
| 12/29/2010 | $20.00 | Mohegan Sun, Uncasville, CT (casino) |
| 1/4/2011 | $190.00 | Cosmos, New York, NY (retail) |
| 1/5/2011 | $138.86 | Hannam Chain, Fort Lee, NJ (retail) |

| Date | Amount | Location |
|---|---|---|
| 1/6/2011 | $116.90 | Misorena, New York, NY (retail) |
| 1/10/2011 | $205.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/10/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/10/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/10/2011 | $1,005.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/18/2011 | $204.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/18/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |

| Royal Asian Bank Account No. 210000000 | | |
| --- | --- | --- |
| 1/19/2011 | $100.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 1/19/2011 | $260.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 1/24/2011 | $277.47 | Yuk Jun Restaurant, Flushing, NY (dining) |
| 1/25/2011 | $250.00 | Athena Spa, New York, NY (spa) |
| 1/31/2011 | $145.62 | Mapo BBQ, Flushing, NY (dining) |
| 1/31/2011 | $151.53 | Marco Laguardia Hotel, Flushing, NY (hotel) |
| 1/31/2011 | $170.00 | Pine Village Spa, Flushing, NY (spa) |
| 2/2/2011 | $300.71 | Marco Laguardia Hotel, Flushing, NY (hotel) |
| 2/28/2011 | $204.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 2/28/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |

| Date | Amount | Description |
|------|--------|-------------|
| 2/28/2011 | $404.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 3/24/2011 | $180.00 | New Dongurami, Flushing, NY (dining) |
| 3/28/2011 | $204.00 | Mohegan Sun, Uncasville, CT (casino) |
| 3/28/2011 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 3/28/2011 | $404.00 | Mohegan Sun, Uncasville, CT (casino) |
| 3/28/2011 | $804.00 | Mohegan Sun, Uncasville, CT (casino) |
| 3/28/2011 | $20.14 | Panera Bread, Mashantucket, CT (dining) |
| 3/28/2011 | $100.00 | Spadium, New York, NY (spa) |
| 3/28/2011 | $1,000.00 | Happy Day, Bayside, NY (dining) |
| 5/6/2011 | $140.00 | Fountain of Youth Spa, Flushing, NY (spa) |

| | | |
|---|---|---|
| 5/6/2011 | $316.06 | Imperial Seoul, New Hyde Park, NY (dining) |
| 5/9/2011 | $110.73 | New Wonjo Restaurant, New York, NY (dining) |
| 5/16/2011 | $900.00 | Mona Lisa Bar, Flushing, NY (dining) |
| 5/23/2011 | $101.74 | Fish and Crab House, Flushing, NY (dining) |
| 5/23/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 5/23/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 5/26/2011 | $426.11 | Je Judo Seafood, Flushing, NY (dining) |
| 6/3/2011 | $174.47 | Marco Laguardia Hotel, Flushing, NY (hotel) |
| 6/6/2011 | $900.00 | Ouh Mou Na Restaurant, Flushing, NY (dining) |
| 6/9/2011 | $110.61 | Kang Suh Restaurant, New York, NY (dining) |

| | | |
|---|---|---|
| 6/13/2011 | $504.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 6/13/2011 | $504.00 | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 6/14/2011 | $143.65 | Hamn Ji Bach, Flushing, NY (dining) |
| 6/21/2011 | $305.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/21/2011 | $405.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/27/2011 | $5.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/28/2011 | $303.50 | Sands Casino, Bethlehem, PA (casino) |

| | | |
|---|---|---|
| 7/29/2011 | $303.50 | Sands Casino, Bethlehem, PA (casino) |
| 7/29/2011 | $303.50 | Sands Casino, Bethlehem, PA (casino) |
| 8/2/2011 | $167.00 | Athena Spa, New York, NY (spa) |
| 8/5/2011 | $153.24 | Kum Gang San, Flushing, NY (dining) |
| 8/16/2011 | $303.50 | Sands Casino, Bethlehem, PA (casino) |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 8/22/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 8/22/2011 | $44.00 | Mohegan Sun, Uncasville, CT (casino) |

| | | |
|---|---|---|
| 8/26/2011 | $112.95 | Kang Suh Restaurant, New York, NY (dining) |
| 9/6/2011 | $321.18 | Pado Sushi, Flushing, NY (dining) |
| 9/7/2011 | $136.89 | Tae Neung Kalbi, Little Neck, NY (dining) |
| 9/12/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 9/16/2011 | $183.90 | Kang Suh Restaurant, New York, NY (dining) |
| 9/27/2011 | $275.00 | JFK Airport, Jamaica, NY (travel) |
| 10/11/2011 | $239.53 | Cheong Hae Jin, Flushing, NY (dining) |
| 10/17/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 11/2/2011 | $688.00 | Bally Total Fitness, New York, NY (gym membership) |
| 11/7/2011 | $900.00 | Dotori Karaoke, Flushing, NY (karaoke) |

| Date | Amount | Location |
|---|---|---|
| 11/10/2011 | $979.88 | Chopsticks Bar, New York, NY (dining) |
| 11/14/2011 | $850.00 | Ouh Mou Na Restaurant, Flushing, NY (dining) |
| 11/15/2011 | $203.11 | Vit Goel Tofu House, Centreville, VA (dining) |
| 11/21/2011 | $167.00 | Athena Spa, New York, NY (spa) |
| 11/21/2011 | $700.00 | Dotori Karaoke, Flushing, NY (karaoke) |
| 11/28/2011 | $304.00 | Mohegan Sun, Uncasville, CT (casino) |
| 11/28/2011 | $402.73 | Cheong Hae Jin, Flushing, NY (dining) |
| 12/12/2011 | $303.99 | Parx Casino, Bensalem, PA (casino) |
| 12/21/2011 | $72.88 | Kang Suh Restaurant, New York, NY (dining) |
| 1/23/2012 | $700.00 | Mona Lisa Bar, Flushing, NY (dining) |

| Date | Amount | Description |
|---|---|---|
| 1/30/2012 | $214.59 | Kang Suh Restaurant, New York, NY (dining) |
| 2/28/2012 | $304.00 | Noblesse Karaoke, Flushing, NY (karaoke) |
| 2/29/2012 | $303.50 | Sands Casino, Bethlehem, PA (casino) (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/5/2012 | $303.50 | Sands Casino, Bethlehem, PA (casino) (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/6/2012 | $228.13 | Staples, New York, NY (retail) |
| 3/7/2012 | $34.83 | B&H Photo, New York, NY (retail) |
| 3/12/2012 | $173.61 | Staples, Flushing, NY (retail) |
| 3/22/2012 | $140.36 | Hahm Ji Bach, Flushing, NY (dining) |
| 3/23/2012 | $25.04 | Kirakuya Sake Bar, New York, NY (dining) |
| 3/23/2012 | $28.85 | Kirakuya Sake Bar, New York, NY (dining) |

| | | |
|---|---|---|
| 4/9/2012 | $1,000.00 | Golf Club at Mansion Ridge, Monroe, NY (golf club) |
| 5/25/2012 | $1,000.00 | Myung Poom, Flushing, NY (dining) |
| 6/21/2012 | $91.46 | Kum Gang San, Flushing, NY (dining) |
| | | **Total: $56,960.05** |

# Exhibit C



## Selected Expenses - 1797 Empire, Inc. Bank Accounts

| Date | Amount | Transaction Location | Source |
|------|--------|----------------------|--------|
| 1/1/2009 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) | |
| 1/1/2009 | $98.25 | Won Jo Restaurant, Flushing, NY (dining) | |
| 1/1/2009 | $96.70 | Cosmos Department Store, New York, NY (retail) | |
| 1/2/2009 | $104.21 | Woo Chon, Flushing, NY (dining) | |
| 1/9/2009 | $280.58 | Samdado Restaurant, Oakland Gardens, NY (dining) | |
| 1/15/2009 | $95.00 | Pine Village Spa, Flushing, NY (spa) | |
| 1/15/2009 | $195.07 | Electronic Land, Inc., Flushing, NY (retail) | |
| 1/16/2009 | $166.40 | Spadium, New York, NY (spa) | |
| 1/16/2009 | $127.83 | Won Jo Restaurant, Flushing, NY (dining) | |
| 1/21/2009 | $387.03 | Ramada, Heredia, Costa Rica (hotel) | |
| 1/21/2009 | $320.04 | Hotel Mango, Alajuela, Costa Rica (hotel) | |

| Date | Amount | Location |
|---|---|---|
| 1/22/2009 | $400.00 | Dureesuh, Flushing, NY (dining) |
| 1/28/2009 | $800.00 | Base A Club, Palisades Park, NJ (nightclub) |
| 1/29/2009 | $208.65 | Somoonnan Jib, Palisades Park, NJ (dining) |
| 1/29/2009 | $50.00 | Somoonnan Jib, Palisades Park, NJ (dining) |
| 2/2/2009 | $600.00 | Dureesuh, Flushing, NY (dining) |
| 2/4/2009 | $1,000.00 | Cherry, Flushing, NY (dining) |
| 2/5/2009 | $300.00 | Eun Ban, Bayside, New York (dining) |
| 2/7/2009 | $248.41 | Cosmos Department Store, New York, NY (retail) |
| 2/12/2009 | $320.41 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/16/2009 | $1,100.00 | Lemon, Flushing, NY (dining) |
| 2/16/2009 | $400.00 | Dureesuh, Flushing, NY (dining) |
| 2/18/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |

| | | |
|---|---|---|
| 2/20/2009 | $117.16 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/20/2009 | $103.77 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/23/2009 | $153.92 | Mapo BBQ, Flushing, NY (dining) |
| 2/25/2009 | $1,000.00 | Hae Goong Café, Flushing, NY (dining) |
| 2/26/2009 | $229.76 | Samdado Restaurant, Oakland Gardens, NY (dining) |
| 2/27/2009 | $325.00 | Honnie Hut, Flushing, NY (dining) |
| 3/5/2009 | $1,000.00 | Young Byn, Flushing, NY (dining) |
| 3/6/2009 | $149.39 | Jang Tuh Sulbulgui, Flushing, NY (dining) |
| 3/7/2009 | $203.50 (+$1.50 service fee listed as separate entry) | Empire City Casino, Yonkers, NY (casino) |
| 3/7/2009 | $166.40 | Spadium, New York, NY (spa) |
| 3/8/2009 | $128.30 | Kum Gang San Restaurant, Flushing, NY (dining) |

| | | |
|---|---|---|
| 3/13/2009 | $368.72 | Yuk Jun Restaurant, Flushing, NY (dining) |
| 3/13/2009 | $61.21 | Arirang Restaurant, New York, NY (dining) |
| 3/14/2009 | $1,050.00 | Ouh Mou Na Restaurant, Flushing, NY (dining) |
| 3/14/2009 | $254.46 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 3/15/2009 | $454.99 | Willow Creek Golf & Country Club, Mt. Sinai, NY (golf club) |
| 3/15/2009 | $120.00 | Samdado Restaurant, Oakland Gardens, NY (dining) |
| 3/16/2009 | $200.00 | Wind Watch Gold & Country Club, Hauppauge, NY (golf club) |
| 3/17/2009 | $239.50 | Tele-Charge Ticketing, New York, NY (entertainment) |
| 3/18/2009 | $1,086.00 | Flame, Flushing, NY (dining) |
| 3/22/2009 | $138.05 | Marriot Hotel, Stamford, CT (hotel) |

| | | |
|---|---|---|
| 3/23/2009 | $131.44 | Marriot Hotel, Stamford, CT (hotel) |
| 3/23/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/23/2009 | $189.60 | Han Joo Restaurant, Flushing, NY (dining) |
| 3/23/2009 | $230.53 | Middle Island Country Club, Middle Island, NY (country club) |
| 3/25/2009 | $1,800.00 | Young Byn, Flushing, NY (dining) |
| 3/25/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/26/2009 | $303.00 | Somoon Restaurant, Flushing, NY (dining) |
| 3/28/2009 | $120.58 | Staples, New York, NY (retail) |
| 3/29/2009 | $93.51 | Arirang Restaurant, New York, NY (dining) |
| 4/2/2009 | $131.08 | KCJ Seafood Corp., Flushing, NY (dining) |

| | | |
|---|---|---|
| 4/5/2009 | $303.50 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ (casino) |
| 4/6/2009 | $444.00 | Long Island National Golf, Riverhead, NY (golf club) |
| 4/8/2009 | $135.20 | Won Jo Restaurant, Flushing, NY (dining) |
| 4/12/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 4/12/2009 | $103.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 4/16/2009 | $27.90 | Galaxy Lobster, Flushing, NY (dining) |
| 4/17/2009 | $200.00 | New Hama, Flushing, NY (dining) |
| 4/20/2009 | $68.17 | Won Jo Restaurant, Flushing, NY (dining) |
| 4/23/2009 | $400.00 | Eun Ban, Bayside, New York (dining) |
| 5/3/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |

| | | |
|---|---|---|
| 5/9/2009 | $110.64 | Minto, Flushing, NY (dining) |
| 5/10/2009 | $390.00 | Links at Cherry Creek, Riverhead, NY (golf club) |
| 5/14/2009 | $74.51 | Won Jo Restaurant, Flushing, NY (dining) |
| 5/15/2009 | $2,438.44 | Chanel, New York, NY (retail) |
| 5/16/2009 | $147.35 | Je Judo Seafood, Flushing, NY (dining) |
| 5/22/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 5/24/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 5/26/2009 | $200.46 | Je Judo Seafood, Flushing, NY (dining) |
| 6/1/2009 | $410.66 | Wind Watch Golf & Country Club, Hauppauge, NY (golf club) |
| 6/1/2009 | $256.82 | Je Judo Seafood, Flushing, NY (dining) |

| 6/4/2009 | $500.00 | Macy's, New York, NY (retail) |
|---|---|---|
| 6/4/2009 | $225.96 | Tae Neung Restaurant, Little Neck, NY (dining) |
| 6/7/2009 | $122.46 | Samdado Restaurant, Oakland Gardens, NY (dining) |
| 6/10/2009 | $48.50 | Won Jo Restaurant, Flushing, NY (dining) |
| 6/13/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 6/17/2009 | $216.00 | Party Party Karaoke, Flushing, NY (karaoke) |
| 7/9/2009 | $444.34 | Chung Catering Corp., Flushing, NY (dining) |
| 7/19/2009 | $203.50 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ (casino) |
| 7/25/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantuckel, CT (casino) |
| 7/25/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantuckel, CT (casino) |

| Date | Amount | Description |
|---|---|---|
| 7/25/2009 | $20.58 | KFC, Flushing, NY (dining) |
| 7/26/2009 | $975.31 | B&H Photo, New York, NY (retail) |
| 8/1/2009 | $252.46 | San Chun Restaurant, Fort Lee, NY |
| 8/4/2009 | $84.86 | Queens Court Hotel, Flushing, NY (hotel) |
| 8/8/2009 | $300.00 | Macy's, Douglaston, NY (retail) |
| 8/9/2009 | $377.14 | Mapo BBQ, Flushing, NY (dining) |
| 8/14/2009 | $182.69 | Mapo BBQ, Flushing, NY (dining) |
| 8/14/2009 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 8/14/2009 | $88.68 | Arirang Restaurant, New York, NY (dining) |
| 8/14/2009 | $99.98 | Macy's, Flushing, NY (retail) |

| | | |
|---|---|---|
| 8/14/2009 | $249.60 | Spadium, New York, NY (spa) |
| 8/15/2009 | $68.23 | Nam Kang Garden, Flushing, NY (dining) |
| 8/16/2009 | $906.30 | New Oriental Fine Arts, Uncasville, CT (retail) |
| 8/17/2009 | $343.26 | Middle Island Country Club, Middle Island, NY (country club) |
| 8/18/2009 | $47.99 | Macy's, New York, NY (retail) |
| 8/18/2009 | $47.99 | Macy's, New York, NY (retail) |
| 8/18/2009 | $175.39 | Wyndham, Uncasville, CT (hotel) |
| 8/19/2009 | $303.00 | QQ Noodle House, Little Neck, NY (dining) |
| 8/19/2009 | $71.04 | Won Jo Restaurant, Flushing, NY (dining) |
| 8/19/2009 | $36.31 | Won Jo Restaurant, Flushing, NY (dining) |

| Date | Amount | Location |
|---|---|---|
| 8/20/2009 | $186.18 | Samdado Restaurant, Oakland Gardens, NY (dining) |
| 8/21/2009 | $156.03 | Dong Hae Su San, Flushing, NY (dining) |
| 8/23/2009 | $640.00 | Spring Lake Golf Course, Middle Island, NY (golf club) |
| 8/23/2009 | $86.37 | Hahm Ji Bach, Flushing, NY (dining) |
| 8/25/2009 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 8/29/2009 | $87.00 | Somoon Restaurant, Flushing, NY (dining) |
| 8/31/2009 | $332.03 | Je Judo Seafood, Flushing, NY (dining) |
| 8/31/2009 | $174.47 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 9/4/2009 | $242.99 | Queens Court Hotel, Flushing, NY (hotel) |
| 9/5/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Borgata, Atlantic City, NJ (casino) |

| | | |
|---|---|---|
| 9/5/2009 | $133.71 | Howard Johnson, Atlantic City, NJ (hotel) |
| 9/6/2009 | $105.61 | King Spa Sauna, Palisades Park, NJ (spa) |
| 9/7/2009 | $181.37 | Ramada Inn, Bayside, NY (hotel) |
| 9/8/2009 | $76.73 | Minnis Shabu Shabu Hib, Flushing, NY (dining) |
| 9/8/2009 | $96.05 | San Soo Gap San II, Flushing, NY (dining) |
| 9/9/2009 | $392.51 | Sheraton, Flushing, NY (hotel) |
| 9/11/2009 | $91.07 | BCD Tofu House, New York, NY (dining) |
| 9/13/2009 | $285.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 9/16/2009 | $208.91 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 9/19/2009 | $203.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |

| | | |
|---|---|---|
| 9/26/2009 | $151.53 | Anchor Inn, Bayside, NY (hotel) |
| 9/30/2009 | $194.95 | Sheraton, Flushing, NY (hotel) |
| 10/3/2009 | $38.11 | Ah Rhee Soo, Flushing, NY (dining) |
| 10/4/2009 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 10/6/2009 | $95.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 10/7/2009 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 10/10/2009 | $303.75 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 10/13/2009 | $290.48 | Cheong Hae Jin, Flushing, NY (dining) |
| 10/16/2009 | $95.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 10/19/2009 | $158.41 | Ramada Inn, Bayside, NY (hotel) |

| 10/23/2009 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
|---|---|---|
| 10/25/2009 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 10/31/2009 | $291.58 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 10/31/2009 | $44.60 | Magna Restaurant, Flushing, NY (dining) |
| 11/2/2009 | $164.16 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 11/4/2009 | $59.66 | BCD Tofu House, New York, NY (dining) |
| 11/7/2009 | $280.10 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 11/8/2009 | $99.04 | Hahm Ji Bach, Flushing, NY (dining) |
| 11/8/2009 | $56.60 | Genji, Jericho, NY (dining) |
| 11/14/2009 | $140.05 | Marco LaGuardia Hotel, Flushing, NY (hotel) |

| 11/15/2009 | $552.00 | Beaver Brook Country Club, Annandale, NJ (golf club) |
| 11/16/2009 | $163.01 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 11/29/2009 | $120.00 | Star Karaoke Studio, Flushing, NY (karaoke) |
| 12/5/2009 | $254.20 | Cheong Hae Jin, Flushing, NY (dining) |
| 12/11/2009 | $145.80 | Anchor Inn, Bayside, NY (hotel) |
| 12/16/2009 | $236.52 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 12/28/2009 | $208.91 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 12/29/2009 | $208.91 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/2/2010 | $150.00 | Opus Casino Cruise Line, Freeport, NY (casino) |
| 1/2/2010 | $185.95 | Marco LaGuardia Hotel, Flushing, NY (hotel) |

| 1/7/2010 | $438.96 | LA Fitness, Location Unknown (gym membership) |
| 1/7/2010 | $351.33 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/9/2010 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 1/9/2010 | 88.73 | Yuraku, Flushing, NY (dining) |
| 1/10/2010 | $117.11 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/10/2010 | $190.00 | Pine Village Spa, Flushing, NY (spa) |
| 1/14/2010 | $254.77 | Cheong Hae Jin, Flushing, NY (dining) |
| 1/15/2010 | $234.22 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/15/2010 | $157.51 | Urban Terrain, Flushing, NY (retail) |
| 1/16/2010 | $83.45 | Genji, Jericho, NY (dining) |

| 1/17/2010 | $117.11 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/17/2010 | $172.68 | Cheong Hae Jin, Flushing, NY (dining) |
| 1/17/2010 | $135.40 | Marriot Hotel, Stamford, CT (hotel) |
| 1/18/2010 | $222.00 | Happy Karaoke, Flushing, NY (karaoke) |
| 1/20/2010 | $234.22 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/24/2010 | $117.11 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/25/2010 | $146.93 | Ramada Inn, Bayside, NY (hotel) |
| 1/25/2010 | $324.00 | Axis, Flushing, NY (bar) |
| 1/26/2010 | $83.67 | Won Jo Restaurant, Flushing, NY (dining) |
| 1/27/2010 | $108.00 | Happy Karaoke, Flushing, NY (karaoke) |

| 1/28/2010 | $280.54 | Kum Gang San Restaurant, Flushing, NY (dining) | |
| 1/28/2010 | $211.26 | Marco LaGuardia Hotel, Flushing, NY (hotel) | |
| 1/29/2010 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) | |
| 1/29/2010 | $265.44 | Cheong Hae Jin, Flushing, NY (dining) | |
| 1/29/2010 | $85.78 | Cheong Hae Jin, Flushing, NY (dining) | |
| 1/30/2010 | $339.85 | Marco LaGuardia Hotel, Flushing, NY (hotel) | |
| 2/1/2010 | $60.00 | Mae Il Jan Chi, Flushing, NY (dining) | |
| 2/2/2010 | $155.17 | Hampton Inn, Garden City, NY | |
| 2/3/2010 | $81.38 | Macy's, Flushing, NY (retail) | |
| 2/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) | |

| 2/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 2/7/2010 | $470.75 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 2/7/2010 | $198.08 | Hahm Ji Bach, Flushing, NY (dining) |
| 2/7/2010 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 2/7/2010 | $45.80 | Paris Baguette, Flushing, NY (dining) |
| 2/11/2010 | $332.12 | Home Plus, Flushing, NY (retail) |
| 2/12/2010 | $422.52 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 2/13/2010 | $332.52 | Target, Flushing, NY (retail) |
| 2/14/2010 | $400.00 | GPS Furniture, Flushing, NY (retail) |
| 2/14/2010 | $93.00 | Golf Town, Bayside, NY (retail) |

| | | |
|---|---|---|
| 2/15/2010 | $150.00 | Bogopa Hooch Golf, Duluth, GA (golf club) |
| 2/16/2010 | $246.15 | Stone Bowl House Woo Nam Jeong, Doraville, GA (dining) |
| 2/24/2010 | $190.00 | Pine Village Spa, Flushing, NY (spa) |
| 2/26/2010 | $203.72 | T J Maxx, Whitestone, NY (retail) |
| 3/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 3/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 3/9/2010 | $190.00 | Pine Village Spa, Flushing, NY (spa) |
| 3/19/2010 | $175.13 | Cheong Hae Jin, Flushing, NY (dining) |
| 3/21/2010 | $158.45 | Mapo BBQ, Flushing, NY (dining) |
| 3/23/2010 | $430.00 | Golf Town, Bayside, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 3/28/2010 | $88.45 | Bayside Diner, Bayside, NY (dining) |
| 3/29/2010 | $311.27 | Cheong Hae Jin, Flushing, NY (dining) |
| 3/29/2010 | $1,178.95 | Cheong Hae Jin, Flushing, NY (dining) |
| 4/2/2010 | $143.62 | Jang Soo Chon, Flushing, NY (dining) |
| 4/4/2010 | $47.63 | Panzon, Flushing, NY (dining) |
| 4/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 4/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 4/7/2010 | $160.22 | TJ Maxx, Whitestone, NY (retail) |
| 4/7/2010 | $43.54 | Staples, New York, NY (retail) |
| 4/9/2010 | $85.00 | TJ Maxx, Whitestone, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 4/12/2010 | $154.52 | TJ Maxx, Whitestone, NY (retail) |
| 4/14/2010 | $54.98 | Payless Shoe Source, Flushing, NY (retail) |
| 4/17/2010 | $20.69 | Barnes & Noble, Bayside, NY (retail) |
| 4/19/2010 | $163.23 | Dong Bang Grill, Fort Lee, NJ (dining) |
| 4/21/2010 | $48.80 | TJ Maxx, Whitestone, NY (retail) |
| 4/22/2010 | $153.84 | Kang Suh Restaurant, New York, NY (dining) |
| 4/26/2010 | $457.28 | Cheong Hae Jin, Flushing, NY (dining) |
| 4/26/2010 | $211.11 | Yuk Jun Restaurant, Flushing, NY (dining) |
| 4/27/2010 | $62.95 | The Harvest Buffet, Great Neck, NY (dining) |
| 5/6/2010 | $92.02 | TJ Maxx, New Hyde Park, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 5/7/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 5/7/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 5/11/2010 | $20.69 | Barnes & Noble, Bayside, NY (retail) |
| 5/14/2010 | $46.92 | Guh Song Restaurant, Queens, NY (dining) |
| 5/14/2010 | $46.24 | Staples, Bayside, NY (retail) |
| 5/17/2010 | $22.18 | Gap, Bayside, NY (retail) |
| 5/20/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 5/23/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 5/28/2010 | $89.00 | Korean Airlines, Location Unknown (travel) |
| 6/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |

| | | |
|---|---|---|
| 6/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 6/26/2010 | $46.75 | IHOP, Flushing, NY (dining) |
| 6/30/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 6/30/2010 | $38.32 | TJ Maxx, Whitestone, NY (retail) |
| 7/3/2010 | $25.17 | IHOP, Flushing, NY (dining) |
| 7/3/2010 | $36.18 | Macy's, Douglaston, NY (retail) |
| 7/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 7/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 7/7/2010 | $37.73 | Geobukson, Bayside, NY (dining) |
| 7/7/2010 | $61.28 | Macy's, Douglaston, NY (retail) |

| | | |
|---|---|---|
| 7/7/2010 | $25.20 | Macy's, Douglaston, NY (retail) |
| 7/10/2010 | $40.00 | Macy's, Douglaston, NY (retail) |
| 7/11/2010 | $99.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/17/2010 | $162.16 | Century 21, Westbury, NY (retail) |
| 7/20/2010 | $127.91 | Marshalls, Westbury, NY (retail) |
| 7/20/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/20/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/20/2010 | $199.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/22/2010 | $22.18 | Duane Reade, Flushing, NY (retail) |
| 7/27/2010 | $45.88 | Modell's, Douglaston, NY (retail) |

| Date | Amount | Location |
|---|---|---|
| 8/2/2010 | $195.51 | Marshalls, Manhasset, NY (retail) |
| 8/4/2010 | $43.54 | Modell's, Douglaston, NY (retail) |
| 8/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 8/8/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 8/12/2010 | $38.00 | TJ Maxx, Carle Place, NY (retail) |
| 8/12/2010 | $68.75 | Minado, Carle Place, NY (dining) |
| 8/13/2010 | $73.76 | Marshalls, Manhasset, NY (retail) |
| 8/19/2010 | $103.58 | Marshalls, Manhasset, NY (retail) |
| 8/20/2010 | $79.42 | Staples, Bayside, NY (retail) |
| 8/20/2010 | $216.66 | Macy's, Douglaston, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 8/23/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 8/23/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 8/23/2010 | $19.99 | Target, Flushing, NY (retail) |
| 8/23/2010 | $53.08 | T J Maxx, Whitestone, NY (retail) |
| 8/25/2010 | $104.00 | NYU Ticket Center, New York, NY (entertainment) |
| 9/3/2010 | $194.30 | Marshalls, Manhasset, NY (retail) |
| 9/6/2010 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 9/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 9/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 9/7/2010 | $95.00 | Fountain of Youth Spa, Flushing, NY (spa) |

| 9/11/2010 | $207.62 | Mapo BBQ, Flushing, NY (dining) |
| 9/12/2010 | $95.00 | Pine Village Spa, Flushing, NY (spa) |
| 9/13/2010 | $27.21 | TJ Maxx, Whitestone, NY (retail) |
| 9/13/2010 | $29.99 | TJ Maxx, Whitestone, NY (retail) |
| 9/19/2010 | $47.00 | College Board, Online Retailer (education) |
| 9/21/2010 | $50.00 | Pine Village Spa, Flushing, NY (spa) |
| 9/21/2010 | $140.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 9/21/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 9/21/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 9/30/2010 | $75.33 | Filenes Basement, Manhasset, NY |

| Date | Amount | Description |
|---|---|---|
| 10/2/2010 | $39.94 | Home Plus, Flushing, NY (retail) |
| 10/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 10/6/2010 | 44.99 | LA Fitness, Location Unknown (gym membership) |
| 10/9/2010 | $168.28 | Marshalls, Manhasset, NY (retail) |
| 10/9/2010 | $117.88 | Filenes Basement, Manhasset, NY |
| 10/15/2010 | $30.01 | Korean Noodle Restaurant, Bayside, NY (dining) |
| 10/15/2010 | $57.39 | Aldo, Location Unknown (retail) |
| 10/15/2010 | $76.19 | TJ Maxx, Whitestone, NY (retail) |
| 10/15/2010 | $40.81 | Target, Flushing, NY (retail) |
| 10/18/2010 | $179.21 | Marshalls, Manhasset, NY (retail) |

| Date | Amount | Description |
|------|--------|-------------|
| 10/20/2010 | $103.09 | Marshalls, Manhasset, NY (retail) |
| 10/21/2010 | $165.00 | Hollywood Music Studio, Flushing, NY (karaoke) |
| 10/21/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 10/21/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 10/21/2010 | $80.50 | TJ Maxx, Whitestone, NY (retail) |
| 10/22/2010 | $86.89 | Marshalls, Manhasset, NY (retail) |
| 11/2/2010 | $70.56 | Marshalls, Manhasset, NY (retail) |
| 11/6/2010 | $26.32 | Dunkin Donuts, Flushing, NY (dining) |
| 11/6/2010 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 11/6/2010 | $44.99 | LA Fitness, Location Unknown (gym membership) |

| | | |
|---|---|---|
| 11/8/2010 | $163.30 | Filenes Basement, Manhasset, NY |
| 11/10/2010 | $51.03 | Marshalls, Manhasset, NY (retail) |
| 11/17/2010 | $200.00 | D.Y. Imports, Inc., Bayside, NY (retail) |
| 11/20/2010 | $39.34 | IHOP, Flushing, NY (dining) |
| 11/22/2010 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 11/27/2010 | $39.34 | IHOP, Flushing, NY (dining) |
| 12/16/2010 | $64.00 | Tropix on the Mile, Freeport, NY (dining) |
| 12/17/2010 | $404.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 12/18/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 12/20/2010 | $95.00 | Fountain of Youth Spa, Flushing, NY (spa) |

| Date | Amount | Location |
|---|---|---|
| 12/22/2010 | $304.00 (+$1.50 service fee listed as separate entry) | Sugarhouse Casino, Philadelphia, PA (casino) |
| 12/29/2010 | $187.20 | Cosmos Department Store, New York, NY (retail) |
| 12/30/2010 | $389.63 | Axis, Flushing, NY (bar) |
| 12/30/2010 | $76.02 | TJ Maxx, New Hyde Park, NY (retail) |
| 1/4/2011 | $163.99 | Syms Corporation, Manhasset, NY (retail) |
| 1/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 1/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 1/7/2011 | $73.84 | Syms Corporation, Manhasset, NY (retail) |
| 1/8/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/9/2011 | $105.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |

| Date | Amount | Description |
|---|---|---|
| 1/9/2011 | $205.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 1/14/2011 | $84.73 | Marshalls, Manhasset, NY (retail) |
| 1/15/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/16/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 1/17/2011 | $54.00 | Mohegan Sun, Uncasville, CT (casino) |
| 1/17/2011 | $53.23 | Marshalls, Manhasset, NY (retail) |
| 1/18/2011 | $103.73 | Marshalls, Manhasset, NY (retail) |
| 1/20/2011 | $141.63 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 1/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 1/21/2011 | $72.76 | Marshalls, Manhasset, NY (retail) |

| | | |
|---|---|---|
| 1/22/2011 | $95.49 | Syms Corporation, Flushing, NY (retail) |
| 1/24/2011 | $500.00 | Agit Room Bar, Flushing, NY (bar) |
| 1/25/2011 | $36.53 | TJ Maxx, Whitestone, NY (retail) |
| 1/25/2011 | $47.00 | College Board, Online Retailer (education) |
| 1/31/2011 | $45.07 | Korean Noodle Restaurant, Bayside, NY (dining) |
| 2/1/2011 | $61.91 | Marshalls, Manhasset, NY (retail) |
| 2/2/2011 | $97.74 | Marshalls, Manhasset, NY (retail) |
| 2/5/2011 | $55.38 | TJ Maxx, New Hyde Park, NY (retail) |
| 2/6/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 2/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| | | |
|---|---|---|
| 2/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 2/9/2011 | $93.25 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/10/2011 | $85.81 | Marshalls, Manhasset, NY (retail) |
| 2/10/2011 | $39.73 | Staples, Bayside, NY (retail) |
| 2/13/2011 | $300.00 | Golf Town, Bayside, NY (retail) |
| 2/14/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 2/14/2011 | $95.00 | Pine Village Spa, Flushing, NY (spa) |
| 2/14/2011 | $95.86 | Mizumi, Douglaston, NY (dining) |
| 2/14/2011 | $27.57 | Syms Corporation, Flushing, NY (retail) |
| 2/14/2011 | $84.96 | San Soo Gap San II, Flushing, NY (dining) |

| | | Chase Bank Account No. XXXXXXXXX [blank] |
|---|---|---|
| 2/15/2011 | $28.17 | Syms Corporation, Manhasset, NY (retail) |
| 2/19/2011 | $35.82 | TJ Maxx, New Hyde Park, NY (retail) |
| 2/20/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 2/20/2011 | $195.98 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 2/21/2011 | $52.98 | Woodbury Commons, Central Valley, NY (retail) |
| 2/21/2011 | 4292.49 | Burberry, Central Valley, NY (retail) |
| 2/22/2011 | $39.11 | Marshalls, Manhasset, NY (retail) |
| 2/23/2011 | $543.29 | Han Gang Restaurant, New York, NY (dining) |
| 2/23/2011 | $31.50 | TJ Maxx, Greenvale, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 2/24/2011 | $111.74 | San Soo Gap San II, Flushing, NY (dining) |
| 2/25/2011 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 2/26/2011 | $108.56 | Marshalls, Manhasset, NY (retail) |
| 2/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 2/28/2011 | $250.00 | Athena Spa, New York, NY (spa) |
| 3/2/2011 | $170.77 | Shop NBC, Location Unknown (retail) |
| 3/4/2011 | $260.68 | Nordstrom Rack, Westbury, NY (retail) |
| 3/6/2011 | $11.52 | Burger King, Douglaston, NY (dining) |
| 3/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 3/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |

| | | |
|---|---|---|
| 3/7/2011 | $139.01 | TJ Maxx, New Hyde Park, NY (retail) |
| 3/8/2011 | $95.00 | Pine Village Spa, Flushing, NY (spa) |
| 3/12/2011 | $228.08 | Nordstrom Rack, Westbury, NY (retail) |
| 3/14/2011 | $285.00 | Pine Village Spa, Flushing, NY (spa) |
| 3/14/2011 | $65.07 | Nordstrom, Old Westbury, NY (retail) |
| 3/14/2011 | $115.12 | Marshalls, Manhasset, NY (retail) |
| 3/17/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/18/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/18/2011 | $124.64 | Nordstrom, Old Westbury, NY (retail) |
| 3/19/2011 | $178.91 | Nordstrom, Old Westbury, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 3/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 3/21/2011 | $76.01 | Syms Corporation, Manhasset, NY (retail) |
| 3/24/2011 | $32.58 | Marshalls, Westbury, NY (retail) |
| 3/24/2011 | $249.81 | Nordstrom, Old Westbury, NY (retail) |
| 3/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/27/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 3/28/2011 | $114.58 | Home & Home, Flushing, NY (retail) |
| 3/29/2011 | $27.21 | Home & Home, Flushing, NY (retail) |
| 3/31/2011 | $32.58 | J. Crew, Manhasset, NY (retail) |
| 4/1/2011 | $47.00 | College Board, Online Retailer (education) |

| | | |
|---|---|---|
| 4/2/2011 | $74.52 | Marshalls, Westbury, NY (retail) |
| 4/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 4/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 4/8/2011 | $221.65 | Cosmos, Queens, NY (retail) |
| 4/14/2011 | $93.20 | Marshalls, Manhasset, NY (retail) |
| 4/15/2011 | $94.98 | Syms Corporation, Flushing, NY (retail) |
| 4/15/2011 | $19.99 | Syms Corporation, Flushing, NY (retail) |
| 4/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 4/22/2011 | $110.47 | Syms Corporation, Flushing, NY (retail) |
| 4/28/2011 | $141.05 | Jumakgol, Flushing, NY (dining) |

| | | |
|---|---|---|
| 4/28/2011 | $180.83 | TJ Maxx, New Hyde Park, NY (retail) |
| 4/28/2011 | $34.99 | Syms Corporation, Flushing, NY (retail) |
| 4/30/2011 | $167.00 | Athena Spa, New York, NY (spa) |
| 4/30/2011 | $35.99 | CVS Pharmacy, Douglaston, NY (retail) |
| 5/2/2011 | $25.00 | Delta Air, JFK Airport, NY (travel) |
| 5/3/2011 | $32.42 | Ann Taylor Outlet, Las Vegas, NV (retail) |
| 5/3/2011 | $37.81 | Brown Shoe Closet, Las Vegas, NV (retail) |
| 5/3/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 5/5/2011 | $129.38 | Coach, Las Vegas, NV (retail) |
| 5/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| Date | Amount | Description |
|---|---|---|
| 5/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 5/9/2011 | $222.16 | Kumkang Shoe, Flushing, NY (retail) |
| 5/10/2011 | $41.00 | College Board, Online Retailer (education) |
| 5/12/2011 | $50.00 | Pine Village Spa, Flushing, NY (spa) |
| 5/12/2011 | $132.69 | U So Bo So, Flushing, NY (dining) |
| 5/12/2011 | $200.00 | Ob's Cavern, Flushing, NY (dining) |
| 5/13/2011 | $175.68 | Nordstrom, Old Westbury, NY (retail) |
| 5/16/2011 | $241.97 | www.newegg.com, Online Retailer (retail) |
| 5/18/2011 | $204.56 | Daffy's, Manhasset, NY (retail) |
| 5/20/2011 | $150.26 | Nordstrom, Old Westbury, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 5/21/2011 | $41.59 | Anthropologie, Greenvale, NY (retail) |
| 5/21/2011 | $65.77 | Applebees, Bayside, NY (dining) |
| 5/22/2011 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 5/23/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 6/1/2011 | $27.08 | TJ Maxx, New Hyde Park, NY (retail) |
| 6/2/2011 | $41.97 | Syms Corporation, Flushing, NY (retail) |
| 6/3/2011 | $143.45 | Daffy's, Manhasset, NY (retail) |
| 6/6/2011 | $25.00 | Pine Village Spa, Flushing, NY (spa) |
| 6/6/2011 | $265.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 6/6/2011 | $109.91 | Hahm Ji Bach, Flushing, NY (dining) |

| 6/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 6/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 6/7/2011 | $110.97 | Sarangbang Two, Flushing, NY (dining) |
| 6/8/2011 | $75.00 | Pine Village Spa, Flushing, NY (spa) |
| 6/8/2011 | $37.49 | Daffy's, Manhasset, NY (retail) |
| 6/9/2011 | $14.79 | McDonald's, Oakland Gardens, NY (dining) |
| 6/11/2011 | $176.08 | Daffy's, Manhasset, NY (retail) |
| 6/13/2011 | $158.19 | Coach, Central Valley, NY (retail) |
| 6/17/2011 | $305.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 6/17/2011 | $210.13 | Macy's, New York, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 6/17/2011 | $433.32 | Macy's, New York, NY (retail) |
| 6/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 6/22/2011 | $86.61 | Daffy's, Manhasset, NY (retail) |
| 6/22/2011 | $65.63 | Marshalls, Manhasset, NY (retail) |
| 6/24/2011 | $300.00 | Kang Suh Restaurant, New York, NY (dining) |
| 6/25/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 6/25/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 6/25/2011 | $32.58 | Marshalls, Manhasset, NY (retail) |
| 6/27/2011 | $84.18 | Biwon, Oakland Gardens, NY (dining) |
| 6/29/2011 | $20.22 | McDonald's, Oakland Gardens, NY (dining) |

| 6/29/2011 | $119.88 | Bally Total Fitness, Location Unknown (gym membership) |
| 6/30/2011 | $88.49 | Syms Corporation, Flushing, NY (retail) |
| 7/1/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 7/2/2011 | $124.98 | LA Fitness, Location Unknown (gym membership) |
| 7/3/2011 | $104.50 (+$1.50 service fee listed as separate entry) | Resorts, Atlantic City, NJ (casino) |
| 7/4/2011 | $105.00 (+$1.50 service fee listed as separate entry) | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/4/2011 | $81.28 | Chung Dam Dong, Palisades Park, NJ (dining) |
| 7/4/2011 | $106.24 | Marshalls, Westbury, NY (retail) |
| 7/6/2011 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |
| 7/6/2011 | $10.00 | Trump Taj Mahal, Atlantic City, NJ (casino) |

| Date | Amount | Description |
|---|---|---|
| 7/6/2011 | $108.52 | Nordstrom, Old Westbury, NY (retail) |
| 7/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 7/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 7/7/2011 | $840.00 | Dongbu Tour & Travel, Palisades Park, NJ (travel agent) |
| 7/9/2011 | $366.35 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 7/9/2011 | $206.35 | Nordstrom, Old Westbury, NY (retail) |
| 7/13/2011 | $34.23 | San & Deul Restaurant, Little Neck, NY (dining) |
| 7/15/2011 | $489.03 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 7/18/2011 | $220.37 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 7/18/2011 | $871.00 | Cheong Hae Jin, Flushing, NY (dining) |

| Date | Amount | Description |
|---|---|---|
| 7/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/22/2011 | $160.55 | Nordstrom, Old Westbury, NY (retail) |
| 7/25/2011 | $77.41 | Syms Corporation, Flushing, NY (retail) |
| 7/26/2011 | $198.24 | San Soo Gap San II, Flushing, NY (dining) |
| 7/28/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 7/28/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 8/1/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 8/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 8/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 8/7/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |

| Date | Amount | Description |
|---|---|---|
| 8/10/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 8/11/2011 | $128.68 | Jasper White's Summer Shack, Uncasville, CT (dining) |
| 8/12/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 8/13/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 8/15/2011 | $28.00 | Paris Baguette, Queens, NY (dining) |
| 8/15/2011 | $174.47 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 8/15/2011 | $80.32 | Mapo BBQ, Flushing, NY (dining) |
| 8/16/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 8/18/2011 | $323.65 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 8/19/2011 | $195.55 | San Soo Gap San II, Flushing, NY (dining) |

| | | |
|---|---|---|
| 8/20/2011 | $73.12 | Kang Suh Restaurant, New York, NY (dining) |
| 8/20/2011 | $95.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 8/21/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 8/21/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 8/22/2011 | $198.00 | Wind Watch Gold & Country Club, Hauppauge, NY (golf club) |
| 8/22/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 8/23/2011 | $58.00 | Made in Asia Bistro, Armonk, NY (dining) |
| 8/29/2011 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 8/31/2011 | $47.07 | San & Deul Restaurant, Little Neck, NY (dining) |
| 9/1/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| Date | Amount | Location |
|---|---|---|
| 9/4/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 9/4/2011 | $271.64 | Cheong Hae Jin, Flushing, NY (dining) |
| 9/5/2011 | $1,000.00 | Dotori Karaoke, Flushing, NY (karaoke) |
| 9/6/2011 | $52.53 | Chinese House, Flushing, NY (dining) |
| 9/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 9/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 9/11/2011 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 9/11/2011 | $642.00 | Café 21, Palisades Park, NJ (dining) |
| 9/11/2011 | $800.00 | Dotori Karaoke, Flushing, NY (karaoke) |
| 9/12/2011 | $221.88 | The Golf Club at Oxford, Oxford, CT (golf club) |

| | | |
|---|---|---|
| 9/14/2011 | $214.85 | Nordstrom, Old Westbury, NY (retail) |
| 9/15/2011 | $30.00 | King Spa Sauna, Palisades Park, NJ (spa) |
| 9/19/2011 | $1,000.00 | Golf Town, Bayside, NY (retail) |
| 9/21/2011 | $60.00 | King Spa Sauna, Palisades Park, NJ (spa) |
| 9/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 9/21/2011 | $64.26 | Marshalls, Manhassel, NY (retail) |
| 9/22/2011 | $261.82 | Nordstrom, Old Westbury, NY (retail) |
| 9/23/2011 | $106.70 | Cheong Haa Jin, Flushing, NY (dining) |
| 9/26/2011 | $215.00 | Fountain of Youth Spa, Flushing, NY (spa) |
| 9/28/2011 | $75.68 | Liquor Lockey, Flushing, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 9/29/2011 | $108.91 | Marshalls, Westbury, NY (retail) |
| 10/1/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 10/3/2011 | $149.72 | Honam, Daegu, South Korea (dining) |
| 10/4/2011 | $215.70 | Bongpiyang, Seoul, South Korea (dining) |
| 10/4/2011 | $291.87 | Chelsan Restaurant, Gwangmyeongsi, Korea (dining) |
| 10/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 10/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 10/10/2011 | $32.50 | Korean Noodle Restaurant, Bayside, NY (dining) |
| 10/13/2011 | $80.00 | College Board, Online Retailer (education) |
| 10/15/2011 | $123.48 | Marshalls, Manhasset, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 10/17/2011 | $231.85 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 10/17/2011 | $97.73 | Nordstrom, Old Westbury, NY (retail) |
| 10/18/2011 | $30.00 | Esea, Online Retailer (entertainment) |
| 10/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 10/24/2011 | $31.50 | College Board, Online Retailer (education) |
| 10/25/2011 | $50.00 | SUNY Electronic Application, Albany, NY (education) |
| 10/27/2011 | $49.50 | ACT Programs, Location Unknown (education) |
| 10/27/2011 | $16.00 | College Board, Online Retailer (education) |
| 10/30/2011 | $54.29 | Syms Corporation, Flushing, NY (retail) |
| 11/1/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| Date | Amount | Location |
|---|---|---|
| 11/4/2011 | $190.98 | Nordstrom, Old Westbury, NY (retail) |
| 11/6/2011 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (casino) |
| 11/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 11/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 11/9/2011 | $93.42 | Sephora, Manhasset, NY (retail) |
| 11/11/2011 | $95.20 | Nordstrom, Old Westbury, NY (retail) |
| 11/14/2011 | $73.62 | Marshalls, Manhasset, NY (retail) |
| 11/17/2011 | $58.34 | Syms Corporation, Flushing, NY (retail) |
| 11/19/2011 | $41.65 | Anthropologie, New York, NY (retail) |
| 11/21/2011 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |

| Date | Amount | Merchant |
|---|---|---|
| 11/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 11/23/2011 | $109.11 | Jang Tuh Sulbulgui, Flushing, NY (dining) |
| 11/23/2011 | $53.69 | Syms Corporation, Flushing, NY (retail) |
| 11/27/2011 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 11/29/2011 | $27.12 | Mohegan Sun, Uncasville, CT (casino) |
| 11/30/2011 | $217.03 | Nordstrom, Old Westbury, NY (retail) |
| 11/30/2011 | $259.35 | Filenes Basement, Manhasset, NY (retail) |
| 12/2/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 12/5/2011 | $163.01 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 12/5/2011 | $52.98 | Tory Burch, Central Valley, NY (retail) |

| 12/5/2011 | $308.16 | Longchamp, Central Valley, NY (retail) |
| 12/6/2011 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 12/6/2011 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 12/8/2011 | $33.91 | Dunkin Donuts/Baskin Robbins, Bayside, NY (dining) |
| 12/10/2011 | $303.99 (+$1.50 service fee listed as separate entry) | Parx Casino, Bensalem, PA (casino) |
| 12/12/2011 | $198.97 | Somoonnan Jib, Palisades Park, NJ (dining) |
| 12/14/2011 | $303.08 | Ultra Diamonds, Manhasset, NY (retail) |
| 12/15/2011 | $201.33 | Hahm Ji Bach, Flushing, NY (dining) |
| 12/16/2011 | $259.16 | Nordstrom, Old Westbury, NY (retail) |

| Date | Amount | Description |
| --- | --- | --- |
| 12/18/2011 | $93.63 | Knock Knock Restoyaki, Bayside, NY (dining) |
| 12/19/2011 | $900.00 | Mona Lisa Bar, Flushing, NY (bar) |
| 12/19/2011 | $64.61 | Daffy's, Manhasset, NY (retail) |
| 12/21/2011 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 12/21/2011 | $245.77 | DSW, Carle Place, NY (retail) |
| 12/21/2011 | $16.00 | College Board, Online Retailer (education) |
| 12/22/2011 | $632.42 | Cosmos Department Store, New York, NY (retail) |
| 12/23/2011 | $190.99 | DSW, Carle Place, NY (retail) |
| 12/23/2011 | $69.52 | Sephora, Manhasset, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 12/25/2011 | $386.78 (+$0.50 service fee listed as separate entry) | DKNY Company Store, Bethlehem, PA (retail) |
| 12/25/2011 | $620.37 | Cheong Hae Jin, Flushing, NY (dining) |
| 12/26/2011 | $2.00 | Sands Casino, Bethlehem, PA (casino) |
| 12/28/2011 | $150.86 | Somoonnan Jib, Palisades Park, NJ (dining) |
| 12/29/2011 | $214.30 | Kang Suh Restaurant, New York, NY (dining) |
| 1/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 1/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 1/11/2012 | $288.52 | Pado Sushi, Flushing, NY (dining) |
| 1/13/2012 | $160.70 | Marshalls, Manhasset, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 1/16/2012 | $160.48 | Nordstrom, Old Westbury, NY (retail) |
| 1/20/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 1/23/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 1/24/2012 | $29.36 | Hahm Ji Bach, Flushing, NY (dining) |
| 1/25/2012 | $223.04 | Nordstrom, Old Westbury, NY (retail) |
| 1/30/2012 | $73.03 | Daffy's, Manhasset, NY (retail) |
| 2/4/2012 | $118.05 | Godiva Chocolate, Uncasville, CT (retail) |
| 2/6/2012 | $400.00 | Happy Day, Bayside, NY (dining) |
| 2/7/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| Date | Amount | Description |
|---|---|---|
| 2/7/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 2/8/2012 | $151.53 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 2/8/2012 | $336.37 | Pado Sushi, Flushing, NY (dining) |
| 2/12/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 2/13/2012 | $129.75 | Jasper White's Summer Shack, Uncasville, CT (dining) |
| 2/14/2012 | $13.80 | Paris Baguette, Queens, NY (dining) |
| 2/15/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 2/15/2012 | $304.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 2/15/2012 | $871.00 | Cheong Hae Jin, Flushing, NY (dining) |

| 2/18/2012 | $157.23 | Hanbat, Palisades Park, NJ (dining) |
|---|---|---|
| 2/19/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 2/20/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 2/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 2/24/2012 | $238.34 | Nordstrom, Old Westbury, NY (retail) |
| 2/25/2012 | $462.07 | Kum Gang San Restaurant, Flushing, NY (dining) |
| 2/26/2012 | $270.00 | Spadium, New York, NY (spa) |
| 2/28/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/4/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |

| Date | Amount | Description |
|---|---|---|
| 3/5/2012 | $182.15 | Kun Jip Restaurant, New York, NY (dining) |
| 3/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 3/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 3/9/2012 | $607.23 | Daffy's, New York, NY (retail) |
| 3/19/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 3/19/2012 | $50.00 (+$0.50 service fee listed as separate entry) | DKNY Company Store, Bethlehem, PA (retail) |
| 3/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 3/21/2012 | $205.44 | Longchamp, Central Valley, NY (retail) |
| 3/22/2012 | $20.69 | Kirakuya Sake Bar, New York, NY (bar) |

| 3/27/2012 | $95.00 | Pine Village Spa, Flushing, NY (spa) |
| 4/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 4/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 4/10/2012 | $10.83 | Tang, Flushing, NY (dining) |
| 4/10/2012 | $186.12 | Tang, Flushing, NY (dining) |
| 4/10/2012 | $124.06 | Marshalls, Manhasset, NY (retail) |
| 4/13/2012 | $125.57 | Bi Won, Oakland Gardens, NY (dining) |
| 4/16/2012 | $162.99 | Tae Neung Kalbi, Little Neck, NY (dining) |
| 4/20/2012 | $180.41 | Kum Gang San Restaurant, Flushing, NY (dining) |

| Date | Amount | Location |
|---|---|---|
| 4/22/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 4/23/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 5/2/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 5/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 5/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 5/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 5/21/2012 | $101.49 | San Soo Gap San II, Flushing, NY (dining) |
| 5/26/2012 | $53.96 | Modell's, Douglaston, NY (retail) |
| 5/27/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |

| Date | Amount | Description |
|---|---|---|
| 5/27/2012 | $190.00 | Hollywood Music Studio, Flushing, NY (karaoke) |
| 5/28/2012 | $190.00 | Pine Village Spa, Flushing, NY (spa) |
| 5/30/2012 | $193.46 | Nordstrom, Old Westbury, NY (retail) |
| 6/3/2012 | $104.00 (+$1.50 service fee listed as separate entry) | Foxwoods Resort Casino, Mashantucket, CT (casino) |
| 6/4/2012 | $277.05 | DSW, Carle Place, NY (retail) |
| 6/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 6/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 6/7/2012 | $103.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 6/18/2012 | $89.65 | Staples, Bayside, NY (retail) |

| Date | Amount | Location |
|---|---|---|
| 6/19/2012 | $94.56 | Gal Bi Ma Eul, Flushing, NY (dining) |
| 6/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 6/28/2012 | $143.88 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/1/2012 | $204.00 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) |
| 7/2/2012 | $115.32 | Gal Bi Ma Eul, Flushing, NY (dining) |
| 7/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 7/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 7/7/2012 | $203.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 7/10/2012 | $265.51 | Nordstrom, Old Westbury, NY (retail) |

| Date | Amount | Description |
|---|---|---|
| 7/10/2012 | $314.87 | Nordstrom, Old Westbury, NY (retail) |
| 7/23/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 7/27/2012 | $263.64 | Nordstrom, Old Westbury, NY (retail) |
| 7/31/2012 | $254.33 | Marshalls, Manhasset, NY (retail) |
| 8/6/2012 | $156.37 | TJ Maxx, New Hyde Park, NY (retail) |
| 8/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 8/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 8/14/2012 | $43.00 | Gal Bi Ma Eul, Flushing, NY (dining) |
| 8/20/2012 | $108.00 | Mizumi, Douglaston, NY (dining) |

| Date | Amount | Description |
|---|---|---|
| 8/21/2012 | $150.62 | Marshalls, Westbury, NY (retail) |
| 8/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 8/24/2012 | $217.24 | TJ Maxx, New Hyde Park, NY (retail) |
| 9/3/2012 | $145.10 | Brooks Brothers, Central Valley, NY (retail) |
| 9/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |
| 9/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 9/11/2012 | $54.65 | San & Deul Restaurant, Little Neck, NY (dining) |
| 9/13/2012 | $370.18 | Cheong Hae Jin, Flushing, NY (dining) |
| 9/13/2012 | $198.66 | Nordstrom, Old Westbury, NY (retail) |

| Date | Amount | Description |
| --- | --- | --- |
| 9/15/2012 | $200.00 | Flame, Flushing, NY (dining) |
| 9/17/2012 | $130.23 | BCD Tofu House, New York, NY (dining) |
| 9/21/2012 | $102.71 | Hudson Wine Market, Fort Lee, NJ (retail) |
| 9/21/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 9/24/2012 | $181.37 | Ramada Inn, Bayside, NY (hotel) |
| 9/24/2012 | $122.94 | TJ Maxx, Whitestone, NY (retail) |
| 9/25/2012 | $48.00 | Karaoke Moa, Bayside, NY (karaoke) |
| 10/2/2012 | $50.47 | San & Deul Restaurant, Little Neck, NY (dining) |
| 10/6/2012 | $49.99 | LA Fitness, Location Unknown (gym membership) |

| | | |
|---|---|---|
| 10/6/2012 | $44.99 | LA Fitness, Location Unknown (gym membership) |
| 10/11/2012 | $161.05 | Marshalls, Westbury, NY (retail) |
| 10/22/2012 | $188.98 | Boss Outlet, Garden City, NY (retail) |
| 10/22/2012 | $19.99 | Bally Total Fitness, Location Unknown (gym membership) |
| 11/1/2012 | $171.53 | Geo Si Gi, Flushing, NY (dining) |
| 11/2/2012 | $198.69 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 11/4/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY (casino) |
| 11/8/2012 | $420.15 | Marco LaGuardia Hotel, Flushing, NY (hotel) |
| 11/10/2012 | $1,100.00 | Flame, Flushing, NY (dining) |

| Date | Amount | Description |
|---|---|---|
| 11/13/2012 | $106.00 | Resorts World Casino New York City, Jamaica, NY (casino) |
| 11/23/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY (casino) |
| 11/26/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Sands Casino, Bethlehem, PA (funds withdrawn from ATM at 511 East Third Street, Bethlehem, PA, not from casino ATM) |
| 11/28/2012 | $349.49 | Samdado Restaurant, Oakland Gardens, NY (dining) |
| 11/29/2012 | $90.37 | Cheong Hae Jin, Flushing, NY (dining) |
| 12/2/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY (casino) |
| 12/2/2012 | $440.00 | Christmas Karaoke, Bayside, NY (karaoke) |
| 12/8/2012 | $303.50 (+$1.50 service fee listed as separate entry) | Resorts World Casino New York City, Jamaica, NY (casino) |
| 12/9/2012 | $190.00 | Fountain of Youth Spa, Flushing, NY (spa) |

| 12/16/2012 | $304.50 (+$1.50 service fee listed as separate entry) | Mohegan Sun, Uncasville, CT (casino) | |
|---|---|---|---|
| | | | Total: $132,494.12 |

# Exhibit 2

KeyCite Yellow Flag - Negative Treatment

Distinguished by U.S. v. Riley, S.D.N.Y., July 14, 2014

2014 WL 31191

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

UNITED STATES of America,

v.

Mathew MARTOMA, Defendant.

No. 12 Cr. 973(PGG).
|
Jan. 6, 2014.

### ORDER

PAUL G. GARDEPHE, District Judge.

*1 In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b–5 and 240.10b5–2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, *inter alia,* that between 2006 and July 2008, Martoma caused his hedge fund employer to trade on the basis of material non-public information. The non-public information was allegedly supplied to Martoma by two doctors— Sidney Gilman and Joel Ross—who were participants in a clinical trial of bapineuzumab, a drug that was thought to be of possible use in treating Alzheimer's disease. Both doctors have entered into cooperation agreements with the Government and are expected to be critical witnesses at trial.

Jury selection will begin on January 7, 2014. This order resolves the Government's motion *in limine* to introduce evidence that the Defendant obtained from Dr. Gilman and Dr. Ross confidential information pertaining to drugs other than bapineuzumab. (*See* Dkt. No. 100)

### BACKGROUND

In the Indictment, the Government alleges that Dr. Gilman and Dr. Ross provided Martoma with material, non-public information from a clinical trial of bapineuzumab. However, the Government has moved *in* limine (Dkt. No. 100) to introduce evidence that Dr. Gilman and Dr. Ross also provided Martoma with confidential information regarding the clinical trials of other drugs.

The material at issue (*see* Def. Br. (Dkt. No. 136) at 5–6; Govt. Br. (Dkt. No. 100) at 2–4) includes the following:

1. raw data from a drug study of a different Alzheimer's drug, the results of which had been publicly released and discussed at a July 2006 medical conference;

2. placebo data from an unpublished study related to Alzheimer's disease, the results of which had been presented at a medical conference by the time the data was disclosed to Martoma;

3. information that the FDA might require a black box warning for a certain anti-epilepsy drug, a possibility that had already been publicly reported; and

4. certain confidential investigator's brochures[1] that Dr. Ross allegedly shared with Martoma, including a brochure for, and part of the study protocol for, a clinical trial conducted on behalf of Epix Pharmaceuticals, the results of which had been publicly released.

Finally, the Government wishes to introduce evidence that Dr. Ross asked Martoma whether he could obtain an investigator's brochure for another Alzheimer's drug called Flurizan. Dr. Ross ultimately obtained the brochure from someone else. (Def.Br.(Dkt. No. 136) at 6; Govt. Br. (Dkt. No. 100) at 3–4)

The Government does not contend that any of this information constitutes material, non-public information, nor does the Government contend that this information was ever traded on or that it was ever contemplated that any of this information would be traded on. Moreover, this information is unrelated to bapineuzumab or the clinical trial concerning bapineuzumab. Given that the results of these various studies had already been publicly released before the information at issue was shared with Martoma, the significance of the confidentiality of the underlying data and investigator's brochures is not readily apparent.

*2 The Government nonetheless contends that this evidence demonstrates the doctors' willingness to share confidential information regarding clinical trials with Martoma and

Martoma's desire for such information. The Government contends that this evidence constitutes both direct evidence of the charged crimes as well as admissible evidence under Fed.R.Evid. 404(b). I conclude that it is neither.

## DISCUSSION

### I. ADMISSIBILITY AS DIRECT EVIDENCE

The Government asserts that this evidence (the "non-bapi evidence") is admissible as direct proof of the crimes charged, because the conduct at issue is inextricably intertwined with the alleged conspiracy, and is relevant to the background of the conspiracy and the nature of the relationship between the Defendant and the doctors, Martoma's alleged coconspirators. Alternatively, the Government argues that the non-bapi evidence is admissible under Fed.R.Evid. 404(b).

"It is well established in the Second Circuit that " 'evidence of uncharged criminal activity is not considered other crimes evidence under Fed.R.Evid. 404(b) if it [1] arose out of the same transaction or series of transactions as the charged offense, [2] if it is inextricably intertwined with the evidence regarding the charged offense, or [3] if it is necessary to complete the story of the crime on trial.' " " United States v. Townsend, No. S1 06 Cr. 34(JFK), 2007 WL 1288597, at * 1 (S.D.N.Y. May 1, 2007), aff'd sub nom., United States v. Mercado, 573 F.3d 138 (2d Cir.2009) (alterations in original) (quoting United States v. Nektalov, 325 F.Supp.2d 367, 370 (S.D.N.Y.2004) (quoting United States v. Carboni 204 F.3d 39, 44 (2d Cir.2000))). Such evidence is instead "direct evidence" of the charged crime. See Nektalov, 325 F.Supp.2d at 370. "However, 'where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b).' " Townsend, 2007 WL 1288597, at *1 (quoting Nektalov, 325 F.Supp.2d at 372).

Most of the cases that the Government relies upon to argue that the non-bapi evidence is admissible as direct evidence address admissibility under Rule 404(b). See United States v. Inserra, 34 F.3d 83, 89 (2d Cir.1994); United States v. Rosa, 11 F.3d 315, 333–34 (2d Cir.1993); United States v. Roldan–Zapata, 916 F.2d 795, 804 (2d Cir.1990); United States v. Brennan, 798 F.2d 581, 589–90 (2d Cir.1986).

Two cases cited by the Government's consider the admissibility of other act evidence as direct evidence. In United States v. Gonzalez, 110 F.3d 936, 939, 942 (2d

Cir.1997), the Second Circuit found that "evidence pertaining to an attempted burglary that occurred in close physical proximity to and immediately preceding the defendants' apprehension" was properly admitted as evidence of the charged crime of felon in possession. The court found that the burglary evidence "provide[d] crucial background evidence that gave coherence to the basic sequence of events that occurred on [the] night" of the crime. Id. at 942. Specifically, the burglary evidence "tended to show that [the defendants] were functioning as armed look-outs while [a co-conspirator] robbed [the] house." Id.

*3 Similarly, in United States v. Carboni, 204 F.3d at 42–44, the Second Circuit found that evidence that the defendant had added fictional inventory to his company's inventory records was "inextricably intertwined" with charges that the defendant had made false statements to a bank to permit borrowing on a line of credit. The Court observed that the uncharged and charged acts occurred at about the same time, and were both part of the defendant's "continued effort to create an overly optimistic picture of Cableco's financial system and thus keep the money flowing from Fleet to the troubled company." Carboni, 204 F.3d at 44.

The circumstances here are nothing like those in Gonzalez and Carboni. In any event, courts in this District have interpreted these cases narrowly. See, e.g., United States v. Newton, No. S101 Cr. 635(CSH), 2002 WL 230964, at *2 (S.D.N.Y. Feb. 14, 2002). In deciding whether uncharged conduct is "inextricably intertwined" with charged conduct—and thus admissible as direct evidence—courts have considered whether "[the] details of the uncharged transaction are necessary to understand the charged transaction." United States v. Stein, 521 F.Supp.2d 266, 271 (S.D.N.Y.2007). Courts have not found charged and uncharged conduct inextricably intertwined where "[t]he charged crimes are straightforward and may be fully understood without reference to [the uncharged conduct]." Newton, 2002 WL 230964, at *2.

Evidence that Dr. Gilman and Dr. Ross provided Martoma with confidential information regarding the clinical trials of drugs other than bapineuzumab is not inextricably intertwined with the conduct charged in the Indictment. It is not necessary for the jury to know that the doctors provided the Defendant with confidential information about other drugs in order for the jury to understand the Government's theory that the Defendant obtained material, nonpublic information from

the doctors about bapineuzumab, which the Defendant then traded on.

"Indeed, the Indictment itself refutes the Government's 'inextricably intertwined' claims, as it tells a compelling, complete, and detailed story" with almost no mention of the confidential information concerning the other drug trials.[2] *See United States v. Hatfield*, 685 F.Supp.2d 320, 323 (E.D.N.Y.2010). Even if—as the Government alleges —information about other drug trials was discussed in the same conversations in which the bapineuzumab clinical trial was discussed, temporal proximity alone is not sufficient to establish that charged and uncharged conduct is intertwined. *See Stein*, 521 F.Supp.2d at 271 (rejecting argument that uncharged conduct should be admitted because it was discussed "at the same time" as charged conduct; because the Government "has not explained why details of the uncharged transaction are necessary to understand the charged transaction ... [i]t ... has failed to show that those details are inextricably intertwined with proof of the charged transaction"). Because it is "not manifestly clear" that the non-bapi evidence is intrinsic proof of the charged offenses, it is not admissible as direct evidence.

## II. ADMISSIBILITY AS RULE 404(b) EVIDENCE

\*4 "Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of prior or subsequent 'bad acts'—evidence of 'crimes, wrongs, or acts' other than those charged in the indictment." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir.2011) (quoting Fed.R.Evid. 404(b)). "The rule prohibits the admission of such evidence if it 'prove[s] the character of a person' to show his propensity to commit the charged act, but permits its admission for other purposes." *Id.* (quoting Fed.R.Evid. 404(b)) (alteration in original). Permissible purposes include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed.R.Evid. 404(b).

"This Circuit follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402. Even under this approach, however, district courts should not presume that such evidence is relevant or admissible." *Curley*, 639 F.3d at 56.

To be admissible under Rule 404(b), "evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially

more probative than prejudicial. In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction." *United States v. Downing*, 297 F.3d 52, 58 (2d Cir.2002).

The Government argues that evidence that Martoma obtained confidential information from Dr. Gilman and Dr. Ross regarding other clinical trials is admissible to show Martoma's knowledge, intent, or lack of mistake or accident. Where the Government asserts that it intends to offer other act evidence for such proper purposes, "this does not end the inquiry .... Rather, the court must also determine whether the proffered evidence is relevant to that proper purpose under Federal Rules of Evidence 401 and 402, and if so, whether that probative value is substantially outweighed by any risk of unfair prejudice under Federal Rule of Evidence 403." *United States v. Kahale*, 789 F.Supp.2d 359, 385 (E.D.N.Y.2009). As to relevance, the proponent must demonstrate that the other acts are " 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [and intent] inference[s] advocated by the proponent of the evidence.' " *United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir.1989) (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987)).

Here, the Court concludes that the Government has not "demonstrate[d] that the other-act evidence 'provide[s] a reasonable basis for inferring knowledge [,] [intent, or lack of mistake].' " *See Kahale*, 789 F.Supp.2d at 385 (quoting *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir.1993)) (second alteration in original). Given that the non-bapi evidence is concededly not material and not non-public information, and given that the non-bapi evidence was never traded on, the fact that Martoma obtained this information from the doctors does not make it any more or less likely that he intended to obtain and trade on material, non-public information related to the bapineuzumab clinical trial. Since "there is no evidence that the other ... [t]ransactions were fraudulent or illegal ... those other transactions cannot 'logically show' [the Defendant's] knowledge [or intent]." *See id.*

\*5 Nor does the non-bapi evidence demonstrate opportunity. The fact that the doctors shared confidential information with the Defendant does not lead to an inference that they possessed, or shared with him, material, non-public information that Martoma could trade on. *See United States v. Maravilla*, 907 F.2d 216, 222 (1st Cir.1990) ("To show 'opportunity' is to show that the defendant had some special

capacity, ability or knowledge that would enable him to commit the crime."); *United States v. Green,* 648 F.2d 587, 592 (9th Cir.1981) (Though the word ["opportunity" under 404(b) ] has been little used by the courts it evidently is intended to cover all or a part of a category called "capacity" ...").

The Government asserts—in passing—that that the non-bapi evidence is admissible to show Martoma's *modus operandi* (Govt.Br.(Dkt. No. 100) at 7) "Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.,* a *modus operandi,* where the [acts] are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.' " *United States v. Mills,* 895 F.2d 897, 907 (2d Cir.1990) (quoting 2 J. Weinstein & M. Berger, Weinstein'S Evidence ¶ 404[16], at 404–127 (1985)). The crime alleged is not a signature crime, and the non-bapi evidence concededly was not used for purposes of insider trading.

Finally, the Government argues that the non-bapi evidence is admissible to show the background of the conspiracy and the relationship of the Defendant and his co-conspirators. The Second Circuit has "held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Rosa,* 11 F.3d at 334.

Here, however, the evidence that the Government seeks to introduce is that the doctors were providing Martoma with other confidential information *at the same time* that they were providing material, non-public information about bapineuzumab. The non-bapi evidence thus does not constitute background evidence, nor does it help explain how a relationship of trust between the Defendant and the doctors developed. At best, the non-bapi evidence might demonstrate that the Defendant has a propensity to obtain confidential information from doctors, and that Dr. Gilman and Dr. Ross had a propensity to give Martoma confidential information. Evidence that "goes to criminal propensity alone, [is] precisely what Rule 404(b) prohibits, [however]." *United States v. Scott,* 677 F.3d 72, 80 (2d Cir.2012). "Even [the Second Circuit's] " 'inclusionary approach' " to Rule 404(b) evidence cannot support the admission of such propensity evidence." *Id.* (quoting *United States v. LaFlam,* 369 F.3d 153, 156 (2d Cir.2004)).

I also find that "any probative value that could be attached to this evidence is substantially outweighed by the risk of unfair prejudice [and juror confusion] under Federal Rule of Evidence 403." *Kahale,* 789 F.Supp.2d at 385. As an initial matter, were the Court to admit proof that the non-bapi evidence was "confidential" in nature, it would be required to permit the Defendant to introduce evidence that the results of the corresponding studies had all been publicly announced when the "confidential" data and investigator brochures were shared with Martoma. As noted above, given that the results of the various studies had already been publicly released before the information at issue was shared with Martoma, the remaining significance of "confidential" designations is not likely to be clear to the jury. In any event, the Defendant's "anticipated efforts to defend the legitimacy of these other ... [t]ransactions [would] necessarily result in delay, [and] confusion of the issues." *See id.* at 386.

*6 Moreover, admitting evidence that Martoma obtained "confidential" information regarding non-bapi clinical trials during the same time period alleged in the Indictment presents some risk of juror confusion as to the type of information that can be relied on for purposes of a conviction —*i.e.,* material, non-public information concerning the bapineuzumab clinical trial. Introduction of the non-bapi evidence also leads to a risk that jurors will presume that, if Martoma could obtain "confidential" information from the doctors, he could also obtain material, non-public information from these same doctors, and trade on it. As discussed above, this would not be a fair inference.[3]

## CONCLUSION

The Government's motion *in limine* to introduce evidence that the Defendant obtained from Dr. Gilman and Dr. Ross confidential information pertaining to drugs other than bapineuzumab is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 100).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 31191

U.S. v. Martoma, Not Reported in F.Supp.3d (2014)

2014 WL 31191

Footnotes

1    An "investigator's brochure" is a compilation of clinical and non-clinical data concerning the drug that is the subject of a clinical study. The purpose of the investigator's brochure is to provide to those conducting the study the information they need to understand the rationale for key features of the protocol—including dose, dose frequency, methods of administration, and safety monitoring procedures. The investigator's brochure is also designed to support the clinical management of study subjects during the clinical trial. *See* Ctr. for Drug Evaluation & Research & Ctr. for Biologics Evaluation & Research, FDA, Guidance for Industry, E6 Good Clinical Practice: Consolidated Guidance 42–43 (1996), *available at* http://www. fda.gov/downloads/Drugs/Guidances/ucm073122.pdf.

2    The only reference in the detailed, fifteen-page indictment to information regarding other drug trials is a statement that Dr. Ross provided confidential information to Martoma about the bapineuzumab drug trial "and other Alzheimer's disease drug trials ... with the expectation that Martoma would assist [Dr. Ross] in obtaining additional clinical trial business." (Superseding Indictment (Dkt. No. 61) ¶ 11)

3    Evidence that Dr. Ross asked Martoma to obtain the investigator's brochure for Flurizan has no probative value. Martoma did not obtain the brochure for Dr. Ross and, in any event, there is no suggestion that the investigator's brochure contained material, non-public information, or that Dr. Ross or Martoma ever traded on the information contained in the brochure.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 3

2009 WL 976821
United States District Court,
S.D. New York.

UNITED STATES of America

v.

Oussama KASSIR, a/k/a "Abu Abdulla,"
a/k/a "Abu Khadija," Defendant.

No. 04 Cr. 356(JFK).
|
April 9, 2009.

**Attorneys and Law Firms**

Lev L. Dassin, Acting United States Attorney for the Southern District of New York, of Counsel: Eric B. Bruce, Michael Farbiarz, Assistant United States Attorney, New, York, NY, for the United States of America.

Mark S. DeMarco, Bronx, NY, Edgardo Ramos, Day Pitney, LLP, New York, NY, for Defendant.

*OPINION AND ORDER*

JOHN F. KEENAN, District Judge.

**\*1** Defendant Oussama Abdullah Kassir, a/k/a "Abu Abdulla" a/k/a "Abu Khadija," is charged with providing material support to a terrorist organization, namely, al Qaeda, by attempting to establish a jihad training camp in Bly, Oregon, and by operating and maintaining a number of terrorist websites. Trial is scheduled to begin on April 13, 2009.

Before the Court is the Government's motion in limine seeking to admit certain evidence as direct evidence of the charged crimes or, alternatively, as evidence of other acts pursuant to Federal Rule of Evidence 404(b).

**I. BACKGROUND**

The Court assumes familiarity with its previous opinions in this case, which discuss the underlying facts and the charges in the indictment. *See United States v. Kassir,* No. 04 Cr. 356, (S.D.N.Y. Apr. 2, 2009); 2008 U.S. Dist. LEXIS 51256, 2008

WL 2653952 (S.D.N.Y. July 3, 2008). Below it discusses only those facts relevant to the instant motion.

The Government has asked the Court to find the following four categories of evidence admissible at trial:

(1) *Kassir's prior association with terrorist groups other than al Qaeda:* Over the years, Kassir ... told numerous witnesses (including [an officer of the Swedish Security Police (known as "SAPO") ] during a recorded interview) that he had previously associated with members of other terrorist organizations, including but not limited to Lashkar–e–Tayyiba ("LET") and Hezbollah.

(2) *Kassir's prior attendance at, or attempts to attend, jihad training camps in other countries, such as Kashmir, Lebanon, and Afghanistan:* Over several years, Kassir repeatedly told numerous witnesses (including both lay witnesses and SAPO Police Officers) that he had previously attended jihad training camps and/ or attempted to attend jihad training camps in other countries. Kassir also told at least one witness he attended a training camp funded by Usama bin Laden....

(3) *Kassir's admissions that he has previously killed people:* At times, Kassir has also indicated that he has killed people during the course of fighting jihad....

(Gov't's Br. 7.) At the Court's request, the Government elaborated on this third category of evidence in a letter dated April 6, 2009: Angelica Osman, a Government witness, will testify that, while demonstrating how to slit someone's throat with a knife at the Bly camp, Defendant stated he had used that very knife to kill non-believers during jihad. A second Government witness, Ayat Hakima, will testify that, on a different occasion, Defendant stated that "he had been a hit man for Usama bin Laden and had killed thirty-four people by various-methods while fighting jihad." (Gov't's Apr. 6, 2009, Letter.)

(4) *Kassir's activities at the Seattle Mosque after departing the Bly, Oregon ranch:* ... [S]everal witnesses will testify in this matter that, after leaving Bly, Kassir and co-conspirator Haroon Aswat returned to the Dar Ul Salaam Mosque in Seattle. Once back in Seattle, Kassir and Aswat found in abundance what Bly lacked—young Muslim men who were followers of Abu Hamza al-Masri and were willing, at varying levels, to undertake jihad training. During their stay at the Mosque, Kassir engaged in training in activities such as assembling and

U.S. v. Kassir, Not Reported in F.Supp.2d (2009)

2009 WL 976821, 79 Fed. R. Evid. Serv. 425

disassembling of AK–47's, altering AK–47's to launch grenades, possessing firearms, the building of silencers for a firearm, and practicing formations to "protect the Islamic leader." At the Mosque, Kassir also distributed compact disks containing instructions on how to build bombs and other weapons. Finally, Kassir gathered men from the Mosque together and advocated terrorist attacks and suicide bombings.

*2 (Gov't's Br. 8.)

The Government argues that evidence of Defendant's attendance at jihad training camps in other countries, admissions that he killed people during jihad fighting, and activities at the Seattle mosque are admissible as direct evidence of the charged crimes or, alternatively, as other acts evidence under Rule 404(b). The Government also argues that evidence of Defendant's association with terrorist groups other than al Qaeda is admissible as other acts evidence under Rule 404(b).

## II. DISCUSSION

### A. Uncharged Criminal Activity as Direct Evidence

"It is well established that evidence of uncharged criminal activity is not considered other crimes evidence under Fed.R.Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez,* 110 F.3d 936, 942 (2d Cir.1997) (internal quotation marks and indicators of alterations from the original omitted). Evidence that meets the criteria set forth in *Gonzalez* is considered direct evidence of the charged offenses, meaning the court is "not required to instruct the jury against making an improper inference of criminal propensity." *United States v. Brand,* No. 04 Cr. 194, 2005 U.S. Dist. LEXIS 471, at *8, 2005 WL 77055 (S.D.N.Y. Jan. 12, 2005). However, "where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Nektalov,* 325 F.Supp.2d 3 67, 372 (S.D.N.Y.2004); *see also* 1 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 404.02[11] (8th ed. 2002) ("We note that there is no significant cost to requiring a Rule 404(b) analysis; all the prosecution must do is establish a not-for-

character purpose for the bad acts evidence, and give pretrial notice ....").

### 1. Jihad Training Camps in Other Countries

The Government argues that evidence that Defendant attended and attempted to attend jihad training camps in other countries is direct evidence of the charged conduct and therefore need not be analyzed under Rule 404(b). According to the Government, without knowing that Kassir attended or attempted to attend other jihad training camps, the jury would find the Government's accusation that Kassir was the lead trainer at the Bly camp "artificial, contrived, and unrealistic." (Gov't's Br. 9.) The Government also argues that Kassir's past attendance at jihad training camps is directly relevant to the website charges in that it could explain where Kassir acquired or became familiar with the training materials that he distributed over the Internet.

These arguments wrongly assume that uncharged criminal activity that provides context or is relevant to the charged conduct need not be treated as other act evidence under Rule 404(b). The true test is not whether the evidence provides context or is relevant, but rather whether it meets the criteria set forth in *Gonzalez.* Underscoring this point are the decisions of numerous courts in this circuit that found it necessary to conduct Rule 404(b) analysis of uncharged criminal activity that merely provided context or was somehow relevant to the charged conduct. *See, e.g., United States v. Townsend,* No. 06 Cr. 34, 2007 U.S. Dist. LEXIS 32639 (S.D.N.Y. Apr. 30, 2007) (Keenan, J.) (conducting Rule 404(b) analysis after finding that, "although the proffered evidence is certainly relevant to show the background of the charged conspiracy, it does not appear to be inexorably intertwined." (internal quotation marks and indicators of alterations from the original omitted)); *United States v. Ferguson,* 246 F.R.D. 107, 115 (D.Conn.2007) (same); *Nektalov,* 325 F.Supp.2d at 370 (same). Therefore, to avoid Rule 404(b) analysis, evidence of uncharged criminal activity must do more than provide context or be relevant; it must meet the *Gonzalez* criteria, such as by being inextricably intertwined with the charged conduct.

*3 The Government directs the Court to three cases in which the Second Circuit found that uncharged criminal activity was inextricably intertwined with the charged conduct and, therefore, admissible as direct evidence: *United States v. Carboni,* 204 F.3d 39, 44 (2d Cir.2000), *United States v.*

*Gonzalez,* 110 F.3d 936, 942 (2d Cir.1997), and *United States v. Towne,* 870 F.2d 880, 886 (2d Cir.1989).[1] All three cases are distinguishable from the instant case.

In *Carboni,* the Second Circuit found that, where the defendant was charged with making false statements to obtain a line of credit, evidence that he falsified his business's inventory—the uncharged criminal conduct—was inextricably intertwined with his efforts to dupe his bank. In essence, the Second Circuit found that the uncharged conduct was "part and parcel" of the charged conduct. *United States v. Newton,* No. 01 Cr. 635, 2002 U.S. Dist. LEXIS 2414, at *7 (S.D.N.Y. Feb. 11, 2002) (interpreting *Carboni* ). Kassir's prior attendance at jihad training camps in other countries, on the other hand, is a discrete offense. It was not undertaken to conceal or further the charged conduct; in fact, it was not coordinated with the charged conduct in any way.

In *Gonzalez,* the Second Circuit found it unnecessary to apply Rule 404(b) to evidence of defendants' uncharged attempted robbery since the attempted robbery explained the sequence of events surrounding the contemporaneous, charged firearm offense. The circuit court was concerned that, without learning about the attempted robbery, the jury would find defendants' conduct immediately prior to their arrest baffling, such as the fact that defendants were arrested while running down the street, away from the scene of the attempted burglary, with their guns drawn. In the instant case, Kassir's prior attendance at jihad training camps is not essential to understanding the sequence of events surrounding the charged conduct. The uncharged conduct here is far more remote to the charged conduct in both time and place and is thus not essential to completing the story.

Finally, in *Towne,* the Second Circuit considered the admissibility of evidence showing that the defendant possessed a weapon on days other than the specific date alleged in the indictment's firearm charge. After noting that "[t]he continuous possession of the same gun does not amount to a series of crimes, but rather constitutes a single offense," the circuit court ruled that the evidence of possession on other days was direct evidence of the charged offense. *Towne,* 870 F.2d at 886. Unlike the conduct in *Towne,* however, Kassir's charged and uncharged conduct are not a single continuous offense.

Evidence that Kassir attended or attempted to attend jihad training camps in other countries does not meet the *Gonzalez* criteria. This uncharged criminal activity is not part of the

same transaction as the charged conduct, is not inextricably intertwined with that conduct, and is not necessary to complete the story. It is conduct wholly distinct from any that the Second Circuit has found to be direct evidence of the charged conduct. To be admissible, then, this evidence must pass muster under Rule 404(b).

### 2. Admissions of Killings

*4 For largely the same reasons just discussed, evidence that Defendant admits he killed people in the course of fighting jihad does not meet the criteria set forth in *Gonzalez* and therefore must be analyzed under Rule 404(b). The killings were not coordinated with the charged conduct, were temporally and spatially remote from that conduct, and were not part of the same continuous offense. In short, they are not inextricably intertwined with the charged conduct, nor are they necessary to complete the story. Although Kassir's admissions that he killed people may provide relevant context —for instance, implying that Kassir was competent to teach killing techniques—as the Court has already noted, evidence that provides context but fails to meet the *Gonzalez* criteria does not escape Rule 404(b) analysis.

### 3. Seattle Mosque

Evidence of Defendant's activities at the Seattle mosque is admissible as direct evidence of the charged conduct. "When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Thai,* 29 F.3d 785, 812 (2d Cir.1994); *accord United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.1983) ("It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy."); *United States v. Concepcion,* 983 F.2d 369, 392 (2d Cir.1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an other act within the meaning of Rule 404(b); ... it is part of the very act charged." (internal quotation marks omitted)).

The indictment contains multiple conspiracy charges, including conspiracy to provide and conceal material support and resources to terrorists "[f]rom in or about October 1999, up to and including in or about early 2000" (Count One) and conspiracy to provide material support and resources to a foreign terrorist organization during the same time frame (Count Two).[2] Defendant's activities at the Seattle

**U.S. v. Kassir, Not Reported in F.Supp.2d (2009)**

2009 WL 976821, 79 Fed. R. Evid. Serv. 425

mosque took place during the charged time frame for these conspiracies. According to the Government, Kassir arrived in Bly in late November or early December 1999, and then moved to Seattle "a few weeks later." (Gov't's Br. 11.) The Government further proffers that documentary evidence from the Immigration and Naturalization Service will confirm that Kassir left the United States on March 7, 2000. Therefore, the jihad training Kassir provided at the Seattle Mosque took place sometime between late November 1999 and March 2000—in other words, during the charged time frame.

Defendant's activities at the Seattle mosque were also in furtherance of the charged conspiracies. While in Seattle, Defendant allegedly taught young men how to use firearms, assume combat formations, and make bombs. This conduct is nearly identical to the conduct that the indictment cites as the overt acts supporting the conspiracy charge in Count One, namely, the training Kassir provided at the Bly camp. Defendant's activities at the Seattle mosque are within the scope of the conspiracies charged in Counts One and Two, were done in furtherance of those conspiracies, and, therefore, are direct evidence of those conspiracies.

### B. Other Act Evidence

**\*5** The Court now considers whether evidence of Kassir's association with terrorist groups other than al Qaeda, attendance and attempted attendance at jihad training camps in other countries, and admissions that he killed people while fighting jihad are admissible as other act evidence.

Rule 404(b) provides, in relevant part,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....

Fed.R.Evid. 404(b). The Second Circuit "follow[s] an inclusionary rule, allowing the admission of [other act] evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Inserra,* 34 F.3d 83, 89 (2d Cir.1994). Rule 403 requires the exclusion of even relevant other act evidence "if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury." Fed.R.Evid. 403. Where evidence is admitted pursuant to Rule 404(b), upon defendant's request the Court must give an appropriate limiting instruction to the jury. *United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992).

### 1. Association with Terrorist Groups Other Than al Qaeda

Evidence that Defendant associated with terrorist groups other than al Qaeda is admissible to prove Defendant's motive, intent, preparation, knowledge, and absence of mistake or accident. This other act evidence is relevant for these proper purposes in that it tends to show, among other things, that Defendant (1) was motivated by a jihadist agenda, a shared aim of LET, Hezbollah, and al Qaeda; (2) intended to provide material support to al Qaeda, an organization with goals similar to those of organizations with which Defendant had already consorted; (3) was in a position to glean enough information from other terrorists to be sufficiently prepared to train would-be terrorists; (4) knew that his charged conduct would benefit al Qaeda or other terrorists, given his familiarity with how terrorist groups operated; and (5) did not mistakenly engage in the charged conduct.

The Court recognizes that there are special considerations when other act evidence is offered to prove a defendant's intent or knowledge. Specifically, "as a general rule," such an offer "should await the conclusion of the defendant's case." *Pitre,* 960 F.2d at 1120. "However, where it is apparent that intent [or knowledge] will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief, rather than waiting until the conclusion of the defendant's case." *Id.* (internal quotation marks omitted). A defendant can take the issue of his intent or knowledge out of dispute, but, to do so, he "must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed." *United States v. Colon,* 880 F.2d 650, 659 (2d Cir.1989).

**\*6** It is apparent that intent and knowledge will be disputed in this case. First, the Government represents that, "[b]ased on informal conversations with defense counsel, it appears that the defense intends to argue at trial, among other things, that Kassir did not knowingly support al Qaeda and other terrorists through his activities." (Gov't's Br. 14.) Second, Defendant himself claimed in a post-arrest interview with an F.B.I. agent that his trip to the United States was nothing more than a vacation. (*Id.*) Finally, though the Government

**U.S. v. Kassir, Not Reported in F.Supp.2d (2009)**

2009 WL 976821, 79 Fed. R. Evid. Serv. 425

highlighted these two facts in its brief, Defendant chose not to address either in his response. That is to say, Defendant made no statement of sufficient clarity to indicate that he did not dispute his intent or knowledge. Therefore, at this juncture, it is proper for the Court to rule on the admissibility of other act evidence to prove intent and knowledge; however, the Court reserves its right to revisit its holdings regarding all of the proffered other act evidence should Defendant take his intent and/or knowledge out of dispute.

Although relevant and offered for a proper purpose, Defendant's association with other terrorist groups must also meet the requirements of Rule 403 to be admissible. The Court finds that the danger this evidence will unfairly prejudice the defendant does not substantially outweigh its probative value. The danger of unfair prejudice is relatively low since Defendant's association with terrorist groups other than al Qaeda "did not involve conduct more inflammatory" than Defendant's charged conduct—providing material support to al Qaeda. *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir.1999) (finding that Rule 403 did not require excluding other act evidence of a past choking where charged conduct, another choking, was equally inflammatory).

Defendant argues that Defendant's association with terrorist groups other than al Qaeda should be excluded on the ground that it is not sufficiently similar to the charged conduct. This argument goes to the probative value of the evidence. *See United States v. Corey,* 566 F.2d 429, 431 (2d Cir.1977) ( "Probative value [of other act evidence] is dependent on the existence of a close parallel between the crime charged and the acts shown."); *see also United States v. Gordon,* 987 F.2d 902, 908 (2d Cir.1993) ("There is no necessity for synonymity but there must be substantial relevancy."). The Court rejects Defendant's argument. Defendant's association with other terrorist groups is sufficiently similar to the charged conduct to have substantial relevancy. The Court has already explained how this evidence is relevant to Defendant's motive, intent, preparation, knowledge, and absence of mistake or accident.

Defendant also argues that the instant case is analogous to *United States v. Al–Moayad,* 545 F.3d 139 (2d Cir.2008). In *Al–Moayad,* the Second Circuit vacated a conviction against two defendants charged with conspiring to provide material support to terrorist organizations on the ground that the district court admitted unfairly prejudicial evidence of an uncharged terrorist bombing. The analogy is not apt. In *Al–Moayad,* the only link between the defendants and the

bombing was incredibly tenuous: a speaker at a wedding one of the defendants attended made a cryptic allusion to the attack. The defendants were never implicated in the bombing in any way; in fact, they were not even mentioned during the extensive testimony covering the attack. *Id.* at 161. The district court also only offered to give a limiting instruction so "vague" and "tendentious" that "it was reasonable ... for [defense] counsel to withdraw his request for a limiting instruction ." *Id.* at 162. The specific uncharged criminal conduct proffered here—and, indeed, all of the uncharged criminal conduct in this case—is conduct by Kassir himself. Thus, its probative value is orders of magnitude stronger than the uncharged criminal activity offered in *Al–Moayad.* Furthermore, the Court is aware of its obligation to provide clear and understandable limiting instructions, at Defendant's request, to ensure that the jury receives this evidence for its proper, non-propensity purposes.

### 2. Jihad Training Camps in Other Countries

**\*7** Evidence that Defendant attended or attempted to attend jihad training camps in other countries is admissible to prove Defendant's motive, intent, preparation, knowledge, and absence of mistake or accident. This other act evidence is relevant for these proper purposes since it tends to show, among other things, that Defendant (1) was motivated by a jihadist agenda; (2) intended to establish his own jihad training camp; (3) had received sufficient jihad training to train others and had access to, or was familiar with, jihad training materials that he could distribute over the Internet; (4) knew that establishing a jihad training camp and disseminating jihad training materials over the Internet would materially support al Qaeda; and (5) did not inadvertently perform the charged conduct. The danger that this evidence will unfairly prejudice the defendant does not substantially outweigh its probative value. As with Defendant's association with other terrorist groups, this other act evidence is no more inflammatory than the charged conduct. Therefore, Defendant's prior attendance at, or attempts to attend, jihad training camps is admissible under Rules 404(b) and 403 for the purposes discussed above.

### 3. Admissions of Killings

For the same reasons discussed in reference to Defendant's association with other terrorist groups and his attendance at other jihad training camps, Defendant's claim that he has

Case 1:19-cr-00552-JPC   Document 128   Filed 11/18/21   Page 188 of 210

U.S. v. Kassir, Not Reported in F.Supp.2d (2009)
2009 WL 976821, 79 Fed. R. Evid. Serv. 425

killed people in the course of fighting jihad is relevant for the purposes of proving his motive, preparation, and absence of mistake or accident. Additionally, this evidence is highly probative of Defendant's knowledge that the ultimate goal of his charged conduct was to kill people. It is also probative of the fact that he intended this to be the ultimate goal. Defendant's knowledge and intent are central issues in the case since Counts One, Two, Six, and Seven accuse Kassir of providing or conspiring to provide material support to terrorists, knowing and intending that the support would assist a conspiracy to kill, kidnap, maim, and injure persons in a foreign country. (Redacted Indictment ¶¶ 2, 4, 12, 14.)

Uncharged murder evidence is highly prejudicial for obvious reasons. *See United States v. Khan,* 591 F.Supp.2d 202, 206 (E.D.N.Y.2008); *United States v. Gotti,* 399 F.Supp.2d 417, 420 (S.D.N.Y.2005) ("Admitting evidence of an uncharged murder raises serious concerns ...."). Nonetheless, the danger that uncharged murder evidence will unfairly prejudice the defendant does not necessarily outweigh the evidence's probative value. *See, e.g., United States v. Matera,* 489 F.3d 115, 121 (2d Cir.2007) (finding no abuse of discretion where district court admitted uncharged murders to prove existence of enterprise for RICO purposes); *United States v. Miller,* 116 F.3d 641., 682 (2d Cir.1997) (same). Where the uncharged murder evidence is no more serious than the charged conduct, the danger of unfair prejudice is reduced. *Cf. United States v. Williams,* 205 F.3d 23, 34 (2d Cir.2000) ("[W]e find no undue prejudice under Rule 403; the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction."). In weighing the probative value of an uncharged murder, courts should consider whether its value "is undercut by the availability of other, less prejudicial evidence that makes the same point." *Gotti,* 399 F.Supp.2d at 419 (S.D.N.Y.2005) (internal quotation marks omitted) (citing *Old Chief v. United States,* 519 U.S. 172, 182–83, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ( "[A] judge applying Rule 403 could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point.").

*8 Defendant's admissions that he killed people during jihad fighting have high probative value, and this value is not substantially outweighed by the danger of unfair prejudice. The Court reaches this conclusion for several reasons. First, this evidence is uniquely persuasive on the questions of Defendant's knowledge and intention regarding the ultimate aim of his conduct. There is no less risky alternative proof that would have the same efficacy. Second, Defendant faces extremely serious charges, such as those accusing him of directly conspiring to kill people in a foreign country (Counts Five and Ten). Defendant's uncharged killings are no more inflammatory or serious than these accusations. Finally, the Government has offered to argue only that Defendant *claims* that he killed people as opposed to arguing that Defendant *actually did* kill people. The Court accepts this offer and finds that this distinction in conjunction with limiting instructions, should the Defendant request them, will reduce the danger of unfair prejudice without affecting the evidence's probative value.

Nonetheless, the Court will not allow the Government to elicit testimony regarding the total number of people that Defendant claims he killed. This ruling bars, for example, evidence that Defendant claims he killed thirty-four people. This possibly exaggerated total adds nothing to the probative value of the evidence while greatly increasing its prejudicial effect. Thus, the Court will permit Angelica Osman to testify that Kassir, during a knife-fighting demonstration, said he had used that very knife to kill non-believers. The Court will also permit Ayat Hakima to testify that Kassir said he killed people for Usama bin Laden by various methods while fighting jihad, but there shall be no reference to the total number of killings claimed by Kassir.

### Conclusion

This constitutes the Court's ruling on the motion in limine.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 976821, 79 Fed. R. Evid. Serv. 425

Footnotes

1   The Government also cites several other cases for the general proposition that background evidence can be relevant and admissible: *United States v. Rosa,* 11 F.3d 315, 334 (2d Cir.1993); *United States v. Inserra,* 34 F.3d 83, 89 (2d

Cir.1994); *United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990); *United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992); *United States v. Lasanta,* 978 F.2d 1300, 1307 (2d Cir.1992); and *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986). Notably, in all of these cases, the Second Circuit found the evidence of uncharged criminal activity admissible as other act evidence under 404(b) and not as direct evidence of the charged conduct.

2      The Court refers to the counts as numbered in the redacted indictment provided to the Defendant with a March 17, 2009, letter from the Government.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 4

2019 WL 6999912
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America,

v.

Donville INNISS, Defendant.

18-CR-134 (KAM)
|
Signed 12/20/2019

**Attorneys and Law Firms**

Sylvia Shweder, David Norwich Gopstein, United States
Attorneys Office, Brooklyn, NY, Gerald Moody, U.S.
Department of Justice, Washington, DC, for United States of
America.

Steven Zachary Legon, Steven Zachary Legon, Attorney at
Law, Anthony L. Ricco, New York, NY, Garnett H. Sullivan,
South Hempstead, NY, for Defendant Donville Inniss.

John Joseph Rolecki, Varnum LLP, Gary Mouw, Grand
Rapids, MI, for Defendant Ingrid Innes.

## MEMORANDUM AND ORDER

MATSUMOTO, United States District Judge:

\*1 A three-count second superseding indictment, dated
August 1, 2019, charges defendants Donville Inniss ("Mr.
Inniss" or the "defendant"), and two others, Ingrid Innes
("Ms. Innes"), and Alex Tasker ("Mr. Tasker") (collectively,
"defendants") with conspiracy to commit money laundering
(Count I), in violation of 18 U.S.C. § 1956(h) and money
laundering (Counts II and III), in violation of 18 U.S.C. §
1956(a)(2)(A). (ECF No. 50, Second Superseding Indictment
(S-2) ("Indictment").)

These charges are based on the following allegations: From in
or about and between August 2015 and April 2016, Mr. Inniss,
using his position as the Minister of Industry and as a member
of the Parliament of Barbados, engaged in a scheme to accept
approximately $36,000 in bribes from Ms. Innes, then-CEO
of the Insurance Corporation of Barbados Ltd. ("ICBL"),
and Mr. Tasker, then-Senior VP of ICBL, in violation of
Barbadian law, and laundered the proceeds of the bribes to

and through the United States. (*Id.* ¶ 10.) Furthermore, the
Indictment alleges that Mr. Inniss, using his official position
as Minister of Industry, caused the Barbados Investment
and Development Corporation ("BIDC"), an agency of the
government of Barbados and over which Mr. Inniss exercised
authority, to renew two insurance contracts with ICBL. (*Id.*
¶¶ 11 - 17.)

Specifically, the Indictment alleges that, in or about July 2015,
Mr. Inniss caused the BIDC to renew an insurance contract
with ICBL ("2015 Contract"), and that the 2015 Contract
required the BIDC to pay a premium of approximately
661,469.30 Barbadian Dollars, or roughly $330,734.65, to
ICBL. (*Id.* ¶ 12.) In return, ICBL employees, including the
other two defendants, Ms. Innes and Mr. Tasker, allegedly
agreed to pay a bribe of approximately $16,536.73 ("Bribe
One") to Mr. Inniss, in consideration for his role in having
caused the BIDC to renew the 2015 Contract. (*Id.* ¶ 13.)
Bribe One represented five percent of the total premium that
the BIDC owed to ICBL under the 2015 Contract. (*Id.*) The
Indictment charges that, in concealment of the bribes, Mr.
Inniss arranged to launder the bribes through a bank account
in the Eastern District of New York in the name of the New
York Dental Company ("New York Dental Company Bank
Account") (*Id.* ¶ 14.) Payment was routed through a bank
branch located in Brooklyn, New York. (*Id.*)

The Indictment also alleges that, in or about March 2016, Mr.
Inniss caused the BIDC to renew another insurance contract
with ICBL ("2016 Contract"). (*Id.* ¶ 16.) In return, ICBL
employees, including the other two defendants, allegedly
agreed to pay an additional bribe of approximately $20,000
("Bribe Two") to Mr. Inniss, in consideration for having
caused the BIDC to renew the 2016 Contract. (*Id.* ¶ 17.)

The Indictment further alleges the following transfers of
funds: On or about August 17, 2015, a majority shareholder
of ICBL ("Bermuda Company") transferred approximately
$16,536.73 to the New York Dental Company Bank Account
based on a false invoice provided by Ms. Innes, Mr. Tasker,
and "ICBL Executive 1" for purported consulting services.
(*Id.* ¶ 15.) On or about August 19, 2015, the New York
Dental Company transferred approximately $16,000 to a bank
account in the United States in the name of Mr. Inniss via
a check made payable to Mr. Inniss. (*Id.*) Additionally, on
or about April 18, 2016, the Bermuda Company transferred
approximately $20,000 to the New York Dental Company
Bank Account, based on a false invoice prepared by Ms.
Innes, Mr. Tasker, and unnamed "ICBL Executive 1" for

purported consulting services. (*Id.* ¶ 18.) On or about April 25, 2016, The New York Dental Company made transfers of approximately $9,000 and $8,000 to bank accounts in the United States, including at "Bank 1," in the name of Mr. Inniss, via checks made payable to Mr. Inniss. (*Id.*) On or about April 27, 2016, the New York Dental Company transferred approximately $2,750 to a bank account in the United States in the name of Mr. Inniss, via a check made payable to Mr. Inniss. (*Id.*)

## RELEVANT BACKGROUND

**\*2** Pursuant to the April 3, 2019 Pretrial Scheduling Order ("Pretrial Scheduling Order"), the parties were required to file their pretrial motions by June 7, 2019, opposition papers by June 28, 2019, and reply papers by July 5, 2019. (ECF No. 37, Pretrial Scheduling Order.) Though the parties filed pretrial motions by June 7, 2019, they continued to submit filings, including additional motions, well outside of the court-ordered schedule. On August 23, 2019, the government filed a supplemental motion *in limine* and a motion to produce and find a document not protected by the attorney-client privilege. (ECF No. 53, Supplemental Motion in Limine; ECF No. 54, First Motion to Produce and find document not protected by a-c privilege.) On September 3, 2019, the government filed a supplement to its first motion *in limine.* (ECF No. 56, Letter re September 6, 2019 conference and supplemental motion in limine as to Donville Inniss.) On September 4, 2019, the government filed a motion to take a Rule 15 deposition, which the court granted on September 12, 2019. (ECF No. 62, Motion to Take Deposition; ECF No. 70, Memorandum and Order granting Motion to Take Deposition.) Over two months after submitting his initial pretrial motions on June 7, 2019, Mr. Inniss filed a motion to strike a section of foreign law and to object to that portion of the proposed testimony of the government's expert witness, Thomas Durbin LLM ("Mr. Durbin"). (ECF No. 74, Letter Motion to Strike Section of Foreign Law and Objection to Proposed Expert Testimony ("Def. Mot. to Strike"), dated 9/16/2019.) The parties mutually agreed, with permission from the court, to adjourn the trial date from October 28, 2019 to January 13, 2020, in part to permit the court to consider the later-filed motions. (Dkt. Entry dated 10/14/2019.)

This Memorandum and Order addresses the government's eight motions *in limine* before the court ("Gov. Motions"). Pursuant to the Pretrial Scheduling Order, on June 5, 2019, the government timely submitted its initial five motions *in limine*,

requesting that the court: (1) admit evidence concerning defendant's request to ICBL for a purported donation to the Corporation; (2) preclude defendant from introducing evidence or argument concerning Barbadian criminal law enforcement, including that Barbadian law enforcement has not, to date, charged defendant with any crimes; (3) preclude defendant from introducing evidence or argument that bribes are a custom or practice in Barbados; (4) preclude evidence or argument concerning defendant's prior commission of "good acts" or non-commission of other bad acts; and (5) preclude evidence or argument concerning defendant's family background, health condition, age, conditions of pretrial release, or any other personal factor unconnected to guilt. (ECF No. 39, First Motion in Limine by USA as to Donville Inniss.) On July 1, 2019, three days after the court-ordered deadline set forth in the Pretrial Scheduling Order, and without seeking an extension, defense counsel filed defendant's response to the government's initial motions *in limine.* (ECF No. 43, Response to Motion re First Motion in Limine.) On July 3, 2019, the government timely submitted its reply to defendant's response. (ECF No. 44, Notice Reply as to Donville Inniss re Response to Motion.)

On August 23, 2019, nearly two months after the deadline to file pretrial motions according to the Pretrial Scheduling Order, the government filed two pretrial motions, in addition to its first five motions: (6) a supplemental motion *in limine*, requesting that the court admit evidence of defendant's "financial motive to commit the charged offenses," either as direct evidence or pursuant to Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)") (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss); and (7) a motion requesting that the court find that a document is not protected by the attorney-client privilege, permit the government to use the document in its prosecution of the case, and produce the document to Mr. Inniss in discovery. (ECF No. 54, First Motion to Produce and find document not protected by a-c privilege ("Privilege Motion").)

On September 5, 2019, Mr. Inniss filed his opposition to the government's supplemental motion *in limine.* (ECF No. 63, Response in Opposition re Supplemental Motion in Limine.) On September 3, 2019, counsel for Ms. Innes, Mr. John Joseph Rolecki, Esq., filed a notice of appearance, and Ronald DeWaard, Esq. and Gary Mouw, Esq. filed motions to appear *pro hac vice* on behalf of Ms. Innes (collectively, "Ms. Innes's counsel"). (ECF No. 57, Notice of Attorney Appearance: John Joseph Rolecki; ECF No. 58, Motion to Appear Pro Hac Vice

for Gary Mouw; ECF No. 59, Motion to Appear Pro Hac Vice for Ronald DeWaard.) On September 3, 2019, Ms. Innes's counsel filed a letter requesting 10 additional days to respond to the government's Privilege Motion, which extension the court granted on September 5, 2019. (ECF No. 60, Motion for Extension of Time to File Response/Reply as to First Motion to Produce and find document not protected by a-c privilege; Dkt. Order dated 9/5/2019.) On September 13, 2019, Ms. Innes's counsel filed its response in opposition to the government's Privilege Motion, including three exhibits that it provided to the court for *in camera* review. (ECF No. 73, Response to Motion re First Motion to Produce and find document not protected by a-c privilege ("Privilege Opp.").) On September 18, 2019, the government filed its reply brief in further support of its Privilege Motion.[1] (ECF No. 75, Reply to Response to Motion re First Motion to Produce and find document not protected by a-c privilege (response to Doc #73) ("Privilege Reply").)

**\*3** On September 3, 2019, the government filed its eighth pretrial motion *in limine*, requesting that the court admit evidence concerning two additional 7,000 Barbadian dollar "donations" that ICBL made to defendant as direct evidence of the crimes charged or admissible evidence under Rule 404(b). (ECF No. 56, Supplement to Government's First Motion in Limine.) On September 6, 2019, defense counsel filed its opposition to the motion. (ECF No. 64, Response in Opposition re First Motion in Limine (Supplemental Letter Dated September 3, 2019).) On September 12, 2019, the government filed its reply. (ECF No. 71, Letter Reply in Support of Supplemental Motion in Limine.)

For the reasons set forth below, the court grants in part and denies in part the government's motions *in limine.*

## LEGAL STANDARDS

### A. Motions *in Limine*

The government's pretrial motions all seek preliminary rulings on the admissibility of certain evidence. "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine.*" *Highland Capital Mgmt., LP v. Schneider*, 551 F. Supp. 2d 173, 176-77. The purpose of a motion *in limine* is to "aid the trial process by enabling the court to rule in advance of trial on the relevance of certain forecasted evidence." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). Thus, the trial court should only exclude evidence when it is "clearly inadmissible on all

potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001); *see also, e.g., United States v. Ceballo*, No. 13-CR-308 (KAM), 2014 WL 4980554, at \*1 (E.D.N.Y. Oct. 6, 2014); *Barret*, 2011 WL 6704862, at \*4.

In reviewing motions *in limine*, the court bears in mind that the Federal Rules of Evidence establish a general rule of admissibility. Fed. R. Evid. 401. If evidence is "relevant," it is admissible "unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 402. Evidence is relevant where "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence, on the other hand, is not admissible. Fed. R. Evid. 402. "Evidence need not be conclusive in order to be relevant." *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) (internal quotation marks and citation omitted). "Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility." *Id.* (internal quotation marks and citation omitted).

### B. Uncharged Criminal Conduct or Bad Acts

The threshold question in deciding a motion *in limine* to admit evidence of a criminal defendant's prior criminal conduct or bad acts is determining whether such evidence constitutes *direct* evidence of the crime charged or *other acts* evidence subject to Rule 404(b). *See United States v. Ivanova*, 19 F. Supp. 3d 511, 514 (S.D.N.Y. 2014). In either case, the court must determine whether the evidence is relevant and, if so, consider whether to exclude the evidence pursuant to Rule 403 because its probative value is substantially outweighed by a danger of unfair prejudice. *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) (citing *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000)).

Although evidence may be relevant as probative of defendant's charged conduct, this evidence may nevertheless be inadmissible under Federal Rule of Evidence 403 ("Rule 403") if "its probative value is **substantially outweighed** by a danger of ... unfair prejudice." Fed. R. Evid. 403 (emphasis added); *United States v. Bourne*, No. 08-CR-888, 2011 WL 4458846, at \*12 (E.D.N.Y. Sept. 23, 2011) ("Evidence of uncharged acts may be admissible, subject to limitations imposed by Rule [ ]403[.]"). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into

declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In determining whether evidence is unfairly prejudicial, the court considers it in the context of the crime charged, excluding evidence that is "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (upholding district court's admission of evidence of "similar act" because it was relevant to defendant's assertion of mistake); *cf. United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged.' ") (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

### 1. Admissibility as Direct Evidence

**\*4** Evidence of uncharged criminal conduct or other bad acts is relevant and properly admissible as direct evidence, as opposed to other acts evidence under Rule 404(b), if such conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). A "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Indictment." *Gonzalez*, 110 F.3d at 941. Background evidence may be admitted in order to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.*

"[W]here ... a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotation marks omitted) (upholding district court's admission of 16 uncharged robberies). "An act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1875658, at \*3 (E.D.N.Y. Apr. 22, 2015) (quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999)) (internal quotation marks omitted); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in

conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

All evidence of "intrinsic act[s] offered as direct proof of the crime charged will, by definition, satisfy Rule 404(b)." *Id.* The only practical difference in admitting other acts as direct evidence is that "the Government escapes 404(b)'s notice requirement and the Court need not give a limiting instruction cautioning the jury against making an improper inference of criminal propensity." *Id.*

### 2. Admissibility under Rule 404(b)

Rule 404(b) provides that:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving **motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.**

Fed. R. Evid. 404(b) (emphasis added).

The Second Circuit has adopted an inclusionary approach to Rule 404(b), admitting other acts evidence unless it is "introduced for the sole purpose of showing the defendant's bad character, ... [is] overly prejudicial under Fed. R. Evid. 403[,] or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996). "The district court has broad discretion to admit evidence pursuant to Rule 404(b), and its ruling will not be overturned on appeal absent [an] abuse of discretion." *United States v. Midyett*, 603 F. Supp. 2d 450, 454 (E.D.N.Y. 2009) (citing *Carboni*, 204 F.3d at 44).

In ruling on the admissibility of evidence under Rule 404(b), the court must consider whether: "(1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice[,] or not relevant and (4) the trial court administered an appropriate limiting instruction." *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (citing *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)). The government must show that it seeks to offer the other acts evidence for a proper purpose, not as improper propensity evidence.

## DISCUSSION

### A. Motion to Admit Evidence of Mr. Inniss's Request to ICBL for a Purported Donation to the Corporation

**\*5** The government's first motion *in limine* seeks to admit evidence concerning defendant's request to ICBL for a purported "donation" to the Corporation in December 2015, as direct evidence of the charged crimes in the Superseding Indictment or, in the alternative, as admissible evidence pursuant to Rule 404(b).[2] (ECF No. 39 at 3-7.) Mr. Inniss's counsel conceded the government's motion, noting that the government's request seems "well within reason," but noted that defense counsel "may renew its opposition ... and seek preclusion" pursuant to Federal Rule of Evidence 403, once the defense has had an opportunity to review the 3500 materials (ECF No. 43, p. 3, fn. 3.) As of the date of this decision, Mr. Inniss's counsel does not dispute that evidence "that Donville Inniss requested a bribe ... during the time period set forth in the indictment would be probative of the existence of the conduct alleged in the indictment, and therefore constitute[s] direct evidence." (ECF No. 43, p. 3.) The court agrees. For the reasons set forth below, the court **grants** the government's motion *in limine* to admit direct evidence regarding Mr. Inniss's solicitation of an alleged bribe in December 2015, ICBL's payment of the alleged bribe, and the subsequent transfer of $6,500 from an account at First Caribbean International Bank (Barbados) Limited to Mr. Inniss's personal bank account in Florida.

According to the government, while defendant was the Minister of Industry in Barbados, he controlled the Corporation. In 2014 and 2015, defendant sought purported "donations" from ICBL and directed payment of those "donations" to the Corporation. (ECF No. 39, p. 3.) The government asserts that evidence reflects that at least one of these purported "donations" was a bribe. (*Id.*) The government seeks to introduce "evidence that Inniss sought another bribe payment from ICBL," on or about December 12, 2015, when Mr. Inniss sent an email to Mr. Tasker with an attached "invoice" dated December 10, 2015, requesting $4,000.00 as a "fee for professional services rendered in respect of corporate growth strategies." (*Id.*) The invoice was from the Corporation and addressed to ICBL, to Mr. Tasker's attention. (*Id.*) The December 10, 2015 invoice was allegedly "replaced" by a second invoice, also dated December 10, 2015, which requested $4,000.00 as a "donation" to a "community event," and omitted any reference to a "fee for professional services." (*Id.* at 3-4.) On or about December

17, 2015, ICBL made out a check to the Corporation for 4,000 Barbadian dollars (approximately $2,000). (*Id.* at 4.) A document produced by ICBL described the payment as a "donation – community event." (*Id.*) Mr. Inniss deposited this check into an account in the name of the Corporation, at First Caribbean International Bank (Barbados) Limited. (*Id.*) On or about December 22, 2015, approximately $6,500 was transferred from an account at First Caribbean International Bank (Barbados) Limited to Mr. Inniss's personal bank account in Florida. (*Id.*)

The court finds that evidence of Mr. Inniss's December 2015 request to ICBL to pay the foregoing amounts to the Corporation is admissible as direct evidence of the money laundering conspiracy charged in Count One of the Indictment. (*Id.* at 5.) ICBL paid the purported bribes that are alleged in the Indictment on or about August 17, 2015 and April 18, 2016, respectively. (*Id.*) The government asserts that "[e]vidence showing that Inniss requested an additional bribe from Tasker in the middle of that time period – in or about December 2015 – and that, at around the same time, funds were transferred from an account at the bank where Inniss received the bribe (First Caribbean International Bank (Barbados) Limited) to Inniss' personal bank account in the United States, is 'inextricably intertwined' with the evidence regarding' Count One and 'is necessary to complete the story of the crime[ ] on trial." (*Id.* at 5-6 (emphasis added) (citing *Carboni*, 204 F.3d at 44).)

Evidence that Mr. Inniss solicited, received, and transferred to his personal bank account another bribe from Mr. Tasker, a co-defendant who is also charged in the Indictment with conspiracy to launder money and money laundering offenses, during the time period alleged in the Indictment, is plainly admissible. Such evidence reflects conduct that "arose out of the same transaction or series of transactions as the charged offense," is "inextricably intertwined" with the evidence regarding the charged offenses and is "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d at 44 (2d Cir. 2000) (internal quotation marks omitted) (quoting *United States v. Gonzalez*, 110 F.3d at 942 (2d Cir. 1997)). Thus, the court finds that this uncharged conduct is not "other crimes" evidence and is therefore not subject to the restrictions of Rule 404(b).

**\*6** As previously noted, it is well-settled that "uncharged acts may be admissible as direct evidence of the conspiracy itself." *See Baez*, 349 F.3d at 93 (2d Cir. 2003) (internal quotation marks omitted); *cf. United States v. Rivera*, No. 13-

CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22, 2015) ("An act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged.") (quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999)) (internal quotation marks omitted); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Accordingly, the court grants the government's motion *in limine* to admit evidence regarding Mr. Inniss's solicitation of one or more purported bribes and the subsequent transfer of $6,500 from an account at First Caribbean International Bank (Barbados) Limited to Mr. Inniss's personal bank account in Florida. Because the court finds that such evidence is admissible as direct evidence, it need not decide whether this evidence is also admissible under Rule 404(b).

### B. Motion to Preclude Evidence of Barbadian Criminal Law Enforcement

The government's second motion *in limine* requests that the court preclude the defendant from introducing evidence or argument concerning Barbadian criminal law enforcement, including that Barbadian law enforcement has not, to date, charged defendant with any crime, on the ground that such information is irrelevant to the case. (ECF No. 39, pp. 7-10.) Additionally, the government asserts that if the court found such evidence to be relevant, the court should preclude the admission of this evidence under Rule 403 because it would risk jury confusion and invite the jury to draw improper inferences regarding Mr. Inniss's guilt or innocence. (*Id.*)

Defense counsel has acknowledged the merits of the government's motion *in limine*: "[T]he decisions of local law enforcement are plainly irrelevant to the charges of a conspiracy to commit money laundering and substantive money laundering in this case. Donville Inniss does not have any intention to raise such issues, and therefore takes no position on the government's application." (ECF No. 43, p. 3.)

For the reasons set forth below, the court grants the government's motion *in limine* to preclude defendant from introducing evidence concerning either the activities, or inaction, of Barbadian law enforcement against Mr. Inniss.

Federal Rule of Evidence 401 ("Rule 401") classifies evidence as relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Under Federal Rule of Evidence

402 ("Rule 402"), relevant evidence is generally admissible, whereas irrelevant evidence is "not admissible." Fed. R. Evid. 402.

Whether the Barbadian law enforcement authorities have charged Mr. Inniss with a crime or whether they are investigating Mr. Inniss is irrelevant to the jury's determination at trial of whether Mr. Inniss solicited or accepted bribes, in violation of the Barbados Prevention of Corruption Act. Information regarding the Barbadian law enforcement authorities' actions – or lack thereof – would be probative of entirely irrelevant issues for purposes of the present trial, including potentially "timing issues, the availability and allocation of law enforcement resources and prosecutorial priorities." (ECF No. 39, p. 8.) The government cited *United States v. Heon-Cheol Chi*, in which the court granted the government's motion *in limine* seeking to preclude the defendant from offering evidence of whether he had been prosecuted in Korea for the specified unlawful activity of bribery. (*Id.*) In that case, the Central District of California court ruled that "whether defendant has been arrested, charged with, or convicted of a crime in Korea is not relevant to the defendant's state of mind." *United States v. Heon-Cheol Chi*, No. 16-824 (JFW), Tr. at 56:22-24 (C.D. Cal. July 7, 2017). As noted above, defense counsel did not object to the government's motion and expressly concedes that evidence concerning the Barbadian government's action is "plainly irrelevant" here. (ECF No. 43 at 3.) Therefore, the court grants the government's motion *in limine* to preclude irrelevant evidence concerning Barbadian criminal law enforcement, including whether such law enforcement has charged defendant with any crimes.

### C. Motion to Preclude Evidence That Bribes Are a Custom or Practice in Barbados

*7 The government's third motion *in limine* seeks to preclude Mr. Inniss from introducing evidence or argument that bribes are a custom or practice in Barbados. (ECF No. 39 at 10-12.) The government indicates that it has "disclosed evidence to the defendant that ICBL made payments to other government officials in Barbados" and that the "charges against [Mr. Inniss] are entirely unrelated to these other payments that ICBL made to other government officials. (*Id.* at 10-11.) Furthermore, the government represents that it "does not intend to introduce any evidence of these unrelated payments" and "is not aware that [Mr. Inniss] knew of these payments." (*Id.*) Accordingly, the government asserts that the existence of such payments is irrelevant to the charges against Mr. Inniss. (*Id.*) Defense counsel apparently concedes

the government's motion *in limine* concerning this issue: "Inniss is unaware of any lawful 'custom or common practice' defense to a violation of charges of a conspiracy to commit money laundering and/or money laundering"; defendant is "unaware that bribery is a 'custom or common practice' in Barbados"; and defendant "does not have any intention to raise such an issue." (ECF No. 43 at 3-4.)

The court agrees that evidence of unrelated bribes paid by ICBL, of which Mr. Inniss was not aware, is not relevant to the charges against Mr. Inniss. Fed. R. Evid. 401; Fed. R. Evid. 402. Indeed, whether or not bribery is an industry practice in Barbados would not shed any light on Mr. Inniss's state of mind. *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (holding that the district court properly excluded testimony that attempted to establish an "everybody-is-doing-it" defense). Finally, as noted above, defense counsel has represented that it is not aware that bribery is, in fact, a common practice or custom in Barbados and that defendant does not intend to make such an argument. (ECF No. 43 at 3-4.) Accordingly, the court finds the unrelated bribes irrelevant and **grants** the government's motion *in limine* to preclude any evidence that ICBL has paid bribes to other individuals, or argument that bribery may have been commonplace or part of industry practice in Barbados.

### D. Motion to Preclude Evidence Concerning Defendant's Prior Commission of Good Acts or Non-Commission of Bad Acts

The government's fourth motion *in limine* requests that the court preclude evidence or argument concerning Mr. Inniss's prior commission of "good acts" or non-commission of other bad acts. For the reasons set forth below, the court **grants** the government's motion.

"While non-criminal activities may be relevant where the defendant is alleged to have engaged in 'ceaseless' criminal conduct, '[a] defendant may not seek to establish his innocence ... through proof of the absence of criminal acts on [other] specific occasions.' *See United States v. Nekritin*, No. 10-CR-491 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)); *see also United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (testimony that "defendant had not taken bribes" on prior occasions was improperly admitted). "[C]haracter evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts." *Benedetto*, 571 F.2d at 1249-50. (citing *Michelson v. United States*, 335 U.S.

469, 477 (1948)). In *Benedetto*, the Second Circuit found that the district court had improperly admitted "evidence of **specific acts** ... ostensibly designed to prove that [defendant] was a person of good character, unlikely to have taken the alleged bribes." *Id.* (emphasis added). Similarly, in *O'Connor*, the Second Circuit noted that proposed testimony about defendant's "specific good acts, as reflected in FBI reports of interviews with [others] who stated that they had not paid appellant any bribes" should be excluded. *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (citing *Benedetto*, 571 F.2d at 1249-50).

Although a character witness may give general testimony concerning the defendant's reputation for a "pertinent trait of character" or the witness's opinion of the defendant with regard to that trait, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a); Fed. R. Evid. 405(a). A defendant may not testify or offer other proof to establish specific acts in conformity with a trait, unless that trait is an "**essential element** of the charge, claim, or defense." Fed. R. Evid. 405(b) (emphasis added). For instance, in *Rivera*, the court precluded "evidence of unrelated prior good conduct, i.e., charitable giving or cooperation with law enforcement" on the basis that it was not relevant to the charged conduct, and any minimal probative value of such evidence was outweighed by the likelihood of jury confusion and the risk of jury nullification. *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015).

**\*8** Defense counsel opposes the government's motion *in limine* by arguing that the Second Circuit has allowed criminal defendants to "introduce evidence of ... good character." (ECF No. 43 at 5.) Defendant's argument, however, misses the mark. It is undisputed that Mr. Inniss may offer evidence of a pertinent character trait under Rule 404(a)(2)(A), so long as it does not take the form of specific prior act evidence, or evidence that Mr. Inniss did not commit bad acts on prior occasions. Fed. R. Evid. 404(a)(2)(A).

Moreover, as the government noted, none of the cases cited by defense counsel supports the proposition that a defendant may introduce evidence of specific prior good acts or non-commission of other bad acts. (ECF No. 44 at 2.) In *Pujana-Mena*, the defense had presented "three character witnesses ... who testified as to [defendant's] reputation in his community as an honest and law-abiding person," as opposed to specific prior good acts. *United States v. Pujana-Mena*, 949 F.2d

24, 26 (2d Cir. 1991). In *Han*, the Second Circuit found that the district court had erred in excluding defendant's proffered testimony of "his reputation for uprightness and an unwillingness to exploit others," but that this error was harmless in light of the substantial evidence presented at trial that tended to prove defendant's criminal intent. *United States v. Han*, 230 F.3d. 560, 563-64 (2d Cir. 2000). Evidence of a defendant's lack of criminal record is, however, typically admitted as "background" evidence even though it may be of "relatively low probative value." *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988) (finding that testimony concerning defendant's military service, college education, and lack of criminal history was admissible as "background" evidence). Therefore, the court grants the government's fourth motion *in limine* requesting preclusion of evidence or argument concerning Mr. Inniss's prior commission of "good acts" or non-commission of other bad acts. Pursuant to Federal Rule of Evidence 405 ("Rule 405"), Mr. Inniss may, however, proffer evidence of good character in the form of testimony regarding his reputation, without reciting good acts or the lack of bad acts.

## E. Motion to Preclude Evidence Concerning Defendant's Family Background, Health, Age, and Other Personal Factors

The government's fifth motion *in limine* requests that the court preclude evidence or argument concerning Mr. Inniss's family background, health condition, age, conditions of pretrial release, or "any other personal factor unconnected to guilt." (ECF No. 39 at 13.) The government also requests that the court preclude evidence or argument "concerning the punishment or consequences [defendant] faces if convicted," on the basis that such evidence or argument would create a risk of jury confusion. (*Id.* at 14.) Defense counsel did not confirm whether Mr. Inniss intends to offer the above categories of evidence at trial; nevertheless, defense counsel opposes the government's motion on the ground that "[s]hould Donville Inniss decide to exercise his Sixth Amendment right to testify at his upcoming trial, the jurors will have the opportunity [to] hear his individual history, which includes both his triumphs and failures." (ECF No. 43 at 6.) Further, defense counsel asserts that "[t]estimony about a witness' individual history and present circumstances is customary" and would not "cause jurors to lose sight of their function." (*Id.* at 6-7.) However, defense counsel acknowledges that the court should "instruct the jury that its verdict is not to be based upon sympathy." (*Id.* at 7.)

**\*9** The district court has "wide discretion concerning the admissibility of background evidence," such as information about a defendant's career or education. *Blackwell*, 853 F.2d at 88 (2d Cir. 1988); *United States v. Kosinski*, 2017 WL 4953902, at \*5 (D. Conn. Oct. 31, 2017). Consistent with that discretion, a court may limit the introduction of background evidence that is not relevant under Rule 401 or that risks unfair prejudice, confusing the issues, misleading the jury, or wasting time under Rule 403. Fed. R. Evid. 401; Fed. R. Evid. 403; *Kosinski*, 2017 WL 4953902, at \*5-6 (D. Conn. Oct. 31, 2017); *United States v. Lopez*, 2017 WL 6554955, at \*6 (W.D.N.Y. Dec. 22, 2017) (documents concerning a defendant's employment history and educational record, which were offered to prove defendant's law-abiding nature, were properly excluded as evidence of specific acts).

As previously noted, pursuant to Rule 405, defendant is permitted to elicit witness testimony concerning defendant's reputation for a pertinent character trait or a witness's opinion regarding that trait. Fed. R. Evid. 405; *United States v. Lopez*, 2017 WL 6554955, at \*6. Consistent with the bounds and guidelines of Rules 401, 403, 405, and any other relevant rule of evidence asserted by the parties, the court shall evaluate the relevance, probative value, and potential prejudicial effect of any proffered evidence, and shall exclude evidence that is not relevant, lacking in probative value, or substantially more prejudicial than probative. At this juncture, the court respectfully **denies**, in part, the government's fifth motion *in limine*, with respect to the government's request that the court preclude evidence of any personal or background information concerning Mr. Inniss.

The court next considers the government's request that the jury be instructed not to reach a verdict motivated by sympathy for defendant. It is well-established law that the jury has a limited function – to determine guilt or the lack thereof; consequently, the jury has no role in sentencing with the exception of certain circumstances, such as capital cases, or where a witness or prosecutor misleads the jury, which are not relevant here. In *Shannon v. United States*, the United States Supreme Court stated the following about the jury's role at trial:

It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed. The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on

those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. *Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.* Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States,* 512 U.S. 573, 579 (1994) (emphasis added) (internal citations and quotation marks omitted).

Applying *Shannon,* courts within the Second Circuit have ruled that a defendant is generally not entitled to a jury instruction on the sentence he could receive. *United States v. Pabon-Cruz,* 391 F.3d 86, 94-95 (2d Cir. 2004) (holding it was not error for district court not to inform the jury of the mandatory minimum sentence defendant would receive if convicted); *United States v. Polouizzi,* 564 F.3d 142, 160-61 (2d Cir. 2009) (same); *United States v. Blume,* 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.") (citation omitted); *United States v. Dupree,* 833 F. Supp. 2d 255, 261-62 (E.D.N.Y. 2011), *vacated and remanded on other grounds,* 706 F.3d 131 (2d Cir. 2013). Furthermore, the court shall instruct the jury and give limiting instruction that the jury must not reach a verdict out of sympathy for any party, or based on a consideration of the potential consequences defendant faces if convicted.

**\*10** Thus, the court **grants,** in part, the government's fifth motion *in limine,* with respect to the government's request to preclude evidence or argument concerning the potential punishment or consequences defendant faces if convicted.

### F. Motion to Admit Evidence Concerning Defendant's Financial Motive to Commit the Charged Offenses

The government's sixth motion *in limine* requests that the court admit evidence of Mr. Inniss's "financial motive" to commit the charged offenses, as direct evidence or, in the alternative, as evidence pursuant to Rule 404(b). (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss.) As set forth in the government's motion, Mr. Inniss is alleged to have received approximately $36,000 in bribe payments from ICBL through bank accounts in the United States. (*Id.* at 1-2.) Shortly before and during the same time period that Mr. Inniss was allegedly accepting and laundering bribe payments from ICBL, emails supposedly show that he was facing financial difficulties. (*Id.* at 2.) The government

stated that, on March 5, 2015, defendant sent an email to an individual (the "Individual") requesting a $75,000 loan to assist with an investment and college fees for his son; in that email, he also wrote that time was "of the essence." (*Id.*; ECF No. 46, Ex. A, GX 71.)

After receiving the loan, emails allegedly show that defendant had trouble repaying it. On August 18, 2015, defendant sent the Individual an email stating that he had just missed a call and he had "not forgotten loans." (ECF No. 46, Ex. A, GX 74.) Defendant explained there were "[d]elays on my end." (*Id.*) On the following day, defendant allegedly deposited a $16,000 check from the New York Dental Company into his personal bank account. (ECF No. 46, Ex. A, GX 13.) On October 26, 2015, the Individual emailed defendant, requesting overdue loan payments: "Donville, our year end is December as you know, we need to get the outstanding monthly payments of $2,000 per month from July to December for a total of $12,000 before then[.]" (ECF No. 46, Ex. A, GX 75.) In response, defendant stated: "I have expended 32k here to deal with issues arising from a [sic] our extortionist friend in jail! Will call you tomorrow[.]" (*Id.*) On November 23, 2015, defendant sent the Individual an email requesting an account number so he could "rob a bank and pay[.]" (ECF No. 46, Ex. A, GX 76.) On December 8, 2015, defendant emailed the Individual, stating, "My challenge is getting USD[.]" (ECF No. 46, Ex. A, GX 77.) On March 9, 2016, the Individual emailed defendant, asking, "Will you have any outstanding repayment amounts for me next week?? Any currency is OK[.]" (ECF No. 46, Ex. A, GX 79.)

On May 19, 2016, defendant emailed the Individual, requesting the "name of payee and mailing address so that I may mail a USD check to get loan payment going"; the Individual responded with the requested information. (ECF No. 46, Ex. A, GX 81.) On or about June 7, 2016, defendant appears to have sent a check of $2,000 to the payee that the Individual had identified. (ECF No. 46, Ex. A, GX 83.) Defendant allegedly sent this check from the same account in which he deposited the $16,000 check from the New York Dental Company in August 2015. (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss 2.) On October 24, 2016, defendant emailed the Individual stating that he had sent him a check in August "that seems not to have cleared account"; the Individual responded that he had received the check. (ECF No. 46, Ex. A, GX 83.)

**\*11** In its opposition, Mr. Inniss's counsel asserts that the "probative value of ... evidence of [Mr. Inniss's] debt is

substantially outweighed by the prejudice" to Mr. Inniss. (ECF No. 63, Response in Opposition re Supplemental Motion in Limine 2-3.) In support of its opposition, defendant's counsel makes the following assertions: (i) "the evidence of motive ... unfairly characterizes Donville Inniss as a person in significant debt"; (ii) "there is no connection between receipt of the bribes and repayment of the [$75,000] loan," which are allegedly temporally "too far removed" from each other; and (iii) the government's argument assumes a fact that never happened, *i.e.* that Mr. Inniss accepted a bribe of $20,000 in order to pay $20,000 in past due loan obligations. (*Id.*)

As an initial matter, "[i]t is in the trial judge's discretion to admit evidence suggesting the defendant['s] motive for the crime charged." *United States v. King*, 560 F.2d 122, 133 (2d Cir. 1977) (citations omitted). In a number of cases within the Second Circuit, courts have admitted evidence of financial difficulty on the grounds that it is relevant and not unduly prejudicial. For example, in *United States v. Reed*, the Second Circuit found that, in a case charging defendant, operations manager at a brokerage house, with securities fraud and mail fraud, evidence that defendant was behind in his mortgage payments and was thus facing potential foreclosure was relevant "because a defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial." *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981). The court also noted that "there is nothing inherently prejudicial about being behind in one's mortgage payments." *Id.* Moreover, such evidence was not hearsay because it went to defendant's belief, rather than the truth of the matter asserted. *Id.* Similarly, in *United States v. Polansky*, the Second Circuit ruled that, in a case charging defendant with solicitation and receipt of a bribe, the court properly allowed the government to cross-examine defendant concerning his financial liabilities, which were in excess of $100,000, because defendant's outstanding debts "tended to show that [defendant] had a motive for seeking and accepting gratuities." *United States v. Polansky*, 418 F.2d 444, 448 (2d Cir. 1969). Evidence of motive may also be admissible as circumstantial evidence. *United States v. Zive*, 299 F. Supp. 1273, 1277 (S.D.N.Y. 1969).

The court finds that evidence of defendant's debt obligations – including defendant's seeking out and obtaining a $75,000 loan from the Individual, as well as documents and communications concerning the repayment of the loan – is relevant, probative, and of defendant's state of mind, including motive, and not unduly prejudicial. *See generally United*

*States v. King*, 560 F.2d 122, 133 (2d Cir. 1977) (citations omitted); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981); *United States v. Polansky*, 418 F.2d 444, 448 (2d Cir. 1969); *United States v. Zive*, 299 F. Supp. 1273, 1277 (S.D.N.Y. 1969). In addition, the court finds that defendant's interactions with the Individual concerning his debt obligations provide background and context for the charged offenses; thus, such evidence is admissible to show "circumstances surrounding the events" at issue. *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citations omitted).

The court disagrees that evidence concerning Mr. Inniss's financial motive was temporally "too far removed" from his alleged receipt of the bribes. As noted above, one month after defendant allegedly accepted a bribe payment in April 2016, defendant stated that he was going "to get loan payment going." (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss 2-3.) Defendant also allegedly deposited a $16,000 check from the New York Dental Company into his personal bank account, one day after he emailed the Individual noting that there were delays on his end in effectuating the loan payments. (*Id.* at 2.) Notably, Mr. Inniss is charged in the Indictment with having used "a United States bank account in the name of the New York Dental Company" to further the money laundering scheme. (ECF No. 50, Indictment ¶¶ 11, 14, 15, 18, *et seq.*) For the foregoing reasons, the court **grants** the government's motion to admit evidence concerning Mr. Inniss's $75,000 debt obligation, including supporting documentation and communications with the Individual.[3]

### G. Motion to Produce and Find a Document Not Protected by the Attorney-Client Privilege

**\*12** The government's seventh motion *in limine* requests that the court find that the document at issue (the "Document") is not protected by the attorney-client privilege.[4] (ECF No. 54, Privilege Motion.) The court has examined the Document, the Supporting Documents submitted by the government, and the factual background provided by the government and by Ms. Innes, who has asserted attorney-client privilege with respect to the Document. The court does not now consider whether the Document is relevant, probative, or unduly prejudicial with respect to Mr. Inniss's upcoming trial. Rather, the sole aim of the government's Privilege Motion is to allow the court to rule on whether the Document is protected by the attorney-client privilege.

The government asserts that (1) the Document is not protected by the attorney-client privilege because it was allegedly not kept confidential and (2) even if the Document had been confidential, Ms. Innes waived the attorney-client privilege with respect to the Document when she voluntarily provided the tablet computer containing the Document to KPMG. (ECF No. 54, Privilege Motion 4-6.) In opposition to the government's motion, Ms. Innes's counsel asserts that (1) the Document, which was allegedly prepared by Ms. Innes at the direction of, and for her counsel, for the purpose of securing legal advice, is an attorney-client privileged communication, and (2) Ms. Innes "did not waive the privilege when, complying with a directive received from her employer, she returned company-issued computer devices and inadvertently forgot to remove a copy of the attorney-client privileged communication." (ECF No. 73, Privilege Opp. 1.) For the reasons set forth below, the court **respectfully denies** the government's motion and finds that the Document is protected by the attorney-client privilege and that Ms. Innes has not waived the attorney-client privilege with respect to the Document.

### 1. Relevant Facts[5]

According to the Document's metadata, the Document was created by Ms. Innes on October 9, 2016, approximately four days after she was suspended from her employment at ICBL for alleged conduct that was likely to result in litigation. (*Id.* at 2; ECF No. 54, Ex. C.) The three-page Document, which is titled "Chronological Order of Events," appears to be a memorandum recounting ICBL's "business development" efforts generally, including ICBL's attempts "in gaining and preserving Government Business[.]" (ECF No. 54, Ex. A.) The Document mentions interactions between Mr. Inniss and other individuals at ICBL, including a reference to an alleged "verbal agreement [between Mr. Tasker and Mr. Inniss, obligating ICBL] to pay an annual retainer to promote, market and develop business[.]" (*Id.*) The Document sets forth, from the perspective of Ms. Innes, a bulleted chronology of the events leading up to and around the time of Ms. Innes's suspension from ICBL. The court understands that Ms. Innes was suspended from ICBL on October 5, 2016, (ECF No. 73, Privilege Opp. 2.); the Document describes events that allegedly occurred on "Tuesday, afternoon, October 4[th]," "Oct[ober] 5," and "October 7." (ECF No. 54, Ex. A.)

According to Ms. Innes's counsel, Ms. Innes secured legal counsel in Barbados, within a few days following her

suspension, to represent her in connection with ICBL's internal investigation and in anticipation of potential litigation. (ECF No. 73, Privilege Opp. 1 and Ex. 2.) Ms. Innes is not herself a lawyer. (ECF No. 54, Privilege Motion 2.) Ms. Innes's then-counsel, Mr. Tariq Khan ("Mr. Khan"), requested that Ms. Innes prepare, for his use, a summary of the background facts and events leading up to her suspension. (*Id.* at 1-2.) Consequently, Ms. Innes prepared the Document that is the subject of the present dispute. (Innes Decl. ¶ 5.) Ms. Innes prepared the Document, when she was away on vacation, on a company-issued tablet (the "Device"); she saved the Document to the Device's local hard drive, as opposed to "ICBL's computer system."[6] (ECF No. 73, Privilege Opp. 2; ECF No. 54, Privilege Motion 2-3.) The Document was not password-protected, and it does not contain any express notation that it is attorney-client privileged. (ECF No. 54, Privilege Motion 2-3.) On October 9, 2016, Ms. Innes sent the Document, using her personal, private Gmail account, to her counsel, Mr. Khan. (ECF No. 73, Privilege Opp. 2.)

**\*13** On October 23, 2016, John Wight, the President and CEO of BF&M Limited, ICBL's parent company, informed Ms. Innes that "during the suspended period, the company issued laptop and phone [must] be returned to the company." (ECF No. 54, Ex. D at 5.) On October 25, 2016, Mr. Wight again wrote to Ms. Innes, requesting that she return her company-issued laptop and phone: "KPMG, who are advising the Board of Directors of ICBL, [are] to secure and image your Company issued laptop and mobile device. These will be returned to you following this process." (*Id.* at 2-3.) In response, Ms. Innes informed Mr. Wight that she "would be happy to do this but I am flying to Barbados this morning and [am] actually at the gate for the 8:20am flight." (*Id.* at 2.) Later that evening, Mr. Wight wrote to Ms. Innes for the third time regarding her company-issued laptop and phone: "We will require you to bring your laptop and company issued phone to the KPMG offices in Barbados tomorrow morning. Can you please contact [name omitted] of KPMG first thing tomorrow morning to drop those off." (*Id.*)

On October 26, 2016, Ms. Innes wrote to Mr. Wight, "Laptops and cell delivered to kpmg. Just realized that I have an iPad [*sic*] also. Emails are not on the iPad [*sic*] – I will deliver to kpmg in the next couple of days[.]" (ECF No. 54, Ex. E at 1.) Later that day, Mr. Wight responded, "Please drop off [the iPad] at the KPMG offices tomorrow morning." (*Id.*) Ms. Innes complied with Mr. Wight's request that she return the iPad, *i.e.* the Device. (ECF No. 54, Privilege Motion

2.) The government notes that KPMG "found the Document while searching the [Device] for information relevant to ICBL's internal investigation" and that ICBL informed the government from the [Device] before turning it over to KPMG." (*Id.*) The government further notes that "ICBL's outside counsel voluntarily produced the Document to the government on or about December 9, 2016." (*Id.* at 3.)

The parties are in apparent agreement that, during an interview of Ms. Innes conducted by KPMG in late December 2016 ("December 2016 Interview"), the Document was shown to Ms. Innes. During the December 2016 Interview, Mr. Khan asserted attorney-client privilege over the Document, directed Ms. Innes not to answer questions about the Document, and terminated the interview. (*Id.*; ECF No. 73, Privilege Opp. 3; ECF No. 73, Ex. 1 ¶ 14.) According to Ms. Innes's counsel, Ms. Innes and Mr. Khan "did not discover that the attorney-client privileged document had been inadvertently disclosed until it was shown to them during [the December 2016 Interview]." (ECF No. 73, Privilege Opp. 3.) After the December 2016 Interview, Mr. Khan "formally objected to ICBL's use of the [Document] in connection with an employment hearing" on the basis of attorney-client privilege. (*Id.*; ECF No. 73, Ex. 1 ¶ 14.) At some point after the December 2016 Interview, Ms. Innes allegedly retained a lawyer in the United States who engaged in discussions with the government about the government's investigation. (ECF No. 54, Privilege Motion 3.) Ms. Innes's counsel represents that, by letter dated May 10, 2017, Ms. Innes's counsel continued to assert that the Document was protected by the attorney-client privilege, which had not been waived, and requested that the government destroy all copies of the Document. (*Id.*; ECF No. 73, Privilege Opp. 3.) To date, Ms. Innes' counsel has not filed any motion in this court claiming privilege over the Document. (ECF No. 54, Privilege Motion 3.)

Ms. Innes's counsel represents that, "[h]aving created the [Document] weeks earlier, and in complying with the company's demand that she immediately return her devices, Innes simply forgot that the attorney-client privileged document was saved on the local hard drive on one of her devices." (ECF No. 73, Privilege Opp. 3.) Furthermore, Ms. Innes's counsel represents that neither Ms. Innes nor Mr. Khan knew of the inadvertent disclosure until the Document was shown to them during the December 2016 Interview. (*Id.*)

**2. Legal Standards and Application**

\*14  The Second Circuit has stated:

[T]he attorney-client privilege, dating back to the 1600s, is the most ancient of the confidential communication privileges. Originally, it was the attorney's privilege; today, it is recognized as the client's.... The purposes for the privilege are twofold: first, it assures that a person seeking legal advice may do so safely. Its existence therefore encourages the full and truthful revelation by the client of all the facts in his possession. Second, no attorney can represent a client effectively unless the client discloses fully all the facts in his possession. Thus, the privilege 'recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.'

*United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

**i. The Document Is Protected by the Attorney-Client Privilege**

A party claiming attorney-client privilege must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citation omitted).

As Ms. Innes' counsel notes, the government does not dispute that the Document was an attorney-client communication that was prepared by Ms. Innes at the direction of and for her counsel for the purpose of securing legal advice. (ECF No. 73, Privilege Opp. 4.) Based on the court's review of Ms. Innes's Declaration and an email from Ms. Innes to Mr. Khan, which were submitted to the court for *in camera* review, the court notes that Ms. Innes appears to have retained Mr. Khan as legal counsel following her suspension. (ECF No. 73, Ex. 1, Innes Decl. ¶¶ 3-6; ECF No. 73, Ex. 2, Email from Ms. Innes to Mr. Khan, dated Oct. 9, 2016.) Moreover, Ms. Innes appears to have prepared the Document at Mr. Khan's request, for the purpose of receiving legal advice. Therefore, in assessing whether the Document is protected by the attorney-client privilege, the court's inquiry turns on whether or not Ms. Innes intended for the Document to be and in fact kept it confidential. *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citation omitted).

As the government notes, the Second Circuit has not "specifically addressed the extent to which information stored on an employer's computer system can be a confidential communication for purposes of the attorney-client privilege." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98, 107-08 (S.D.N.Y. 2008). Thus, the court analyzes the four advisory factors outlined in *United States v. Hatfield* to evaluate whether Ms. Innes, as an employee, had a "reasonable expectation" that the Document would remain confidential despite being stored on her company's Device. *United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 WL 3806300, at *8 (E.D.N.Y. Nov. 13, 2009). In assessing an employee's reasonable expectation of privacy for material stored on employer-issued electronic devices or on an employer's email account, courts have increasingly considered the following: " '(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?' " *United States v. Finazzo*, No. 10-CR-457 (RRM), 2013 WL 619572, at *7 (E.D.N.Y. Feb. 19, 2013) (quoting *In re Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. 154, 160 (S.D.N.Y. 2011)), *aff'd* by *United States v. Finazzo*, 682 F. App'x 6, 15-16 (2d Cir. 2017). To be sure, this test involves a "highly fact-dependent analysis." *Finazzo*, No. 10-CR-457 (RRM), 2013 WL 619572, at *7.

*15 The government asserts that Ms. Innes did not have a "reasonable expectation" that the Document was confidential because (1) ICBL's Code of Conduct bans "outside daily activity" (Ex. F, Code of Conduct ¶ 1.11.3); (2) ICBL's Code of Conduct notes that "the Company reserves the right to monitor or review all data and information contained on an employee's Company-issued computer or electronic device" (*Id.* ¶ 1.11.4); (3) although ICBL does not "as a general matter grant[ ] third parties a regular right of access to Company-issued technologies," Ms. Innes nevertheless could have "reasonably foresee[n] that ICBL could have chosen to grant a third party such as KPMG access to the tablet"; and (4) Ms. Innes was aware of ICBL's Code of Conduct. (*See generally* ECF No. 54, Privilege Motion 4-5.)

In response, Ms. Innes's counsel asserts that Ms. Innes did have a reasonable expectation that the Document would be kept confidential because (1) ICBL's Code of Conduct did not prohibit all types of personal use on company computers; (2) there is no evidence that ICBL actually monitored the

company's computer system or the local hard drives of employees' devices; (3) the government has conceded that ICBL did not generally grant third parties the right to access ICBL's computers or emails; and (4) though Ms. Innes was "generally aware of the company's policy, she also knew that it did not provide that the company *will* monitor" employees' hard drives. (ECF No. 73, Privilege Opp. 5-6.)

Applying the above four advisory factors, the court finds that, on balance, they slightly favor Ms. Innes's position. First, the court finds that ICBL's policy does not ban all personal use of company-issued electronic devices. Though the Code of Conduct contains certain proscriptions against, *e.g.*, "fraud or theft," as well as use of company equipment "in the conduct of an outside business or in support of any religious, political or other outside daily activity," these proscriptions do not rise to the level of an outright or total ban on all personal use or personal legal use. (ECF No. 54, Ex. F, Code of Conduct ¶¶ 1.11.1-1.11.4.) In *Hatfield*, the court found that this factor favored the party asserting attorney-client privilege where the company's policy did not ban their employees from using company equipment to conduct personal legal matters. *Hatfield*, No. 06-CR-0550, 2009 WL 3806300, at *9. Furthermore, the fact that the employer's Code of Conduct states that "Company resources, such as ... equipment ... are provided for Company business use" does not necessarily negate an employee's reasonable expectation that documents on her computer will be kept confidential. (ECF No. 54, Ex. F, Code of Conduct ¶ 1.11.1.) Thus, this factor tips in favor of Ms. Innes.

Second, the court finds that ICBL has not established, official company policy notwithstanding, that it monitors the use of employees' computers or emails. Apart from an unsworn letter from ICBL's outside counsel, Mr. Adam B. Siegel, which claims that the company "avails itself" of its right to "monitor[ ] Company-issued computers and electronic devices, including tablets, when a breach of Company policy is suspected, when requested by senior management, and in other circumstances as appropriate," (ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody, dated 6/9/2017) there is insufficient basis to believe that ICBL actually enforced its computer policies, not to mention enforced them on a regular basis. Indeed, Ms. Innes's sworn Declaration noted that, to her knowledge as former CEO, "the company did not generally enforce this [monitoring] policy, let alone monitor or access the local hard drives of employee's computers." (ECF No. 73, Ex. 1, Innes Decl. ¶ 18.)

In *Curto v. Medical World Communications, Inc.*, a New York federal court recognized that whether an employer routinely enforced its computer usage policies is relevant to the court's assessment of the employee's "reasonable expectation" of confidentiality when conducting personal business on an employer-issued device. *Curto v. Med. World Commc'ns, Inc.*, No. 03-CV-6327 (DRH), 2006 WL 1318387, at *3 (E.D.N.Y. May 15, 2006) (employer's general lack of enforcement of its computer usage policies created a "false sense of security" that lulled employees into believing that the policy would not be enforced). Courts have also found that a computer policy that indicates the company *reserves the right* to or *may* monitor information on employees' company-issued devices, *as is the case here*, is distinct from a computer policy that indicates the company *will* monitor such devices. *Id.* at *6 (distinguishing a policy stating that auditing "shall be implemented" from one stating that the employer "may" monitor the employee's computer usage); *United States v. Hatfield*, 2009 WL 3806300, at *9 (E.D.N.Y. Nov. 13, 2009) (noting that the policy does not indicate that company "*will* monitor employee computer hard drive or e-mail files, only that it has the *right* to do so").[7]

*16 Furthermore, in *Orbit One*, a New York federal court found that the employee's expectation of confidentiality was reasonable, notwithstanding language in the employer's handbook, because the employer "never had ready access to [the employee's] computer" that contained the privileged documents. *Orbit One Commc'ns, Inc.*, 255 F.R.D. at 108. Here, it is undisputed that Ms. Innes created and stored the Document on her company-issued Device, while she was suspended from her employment and away on "vacation" abroad. (ECF No. 73, Ex. 1, Innes Decl. ¶¶ 2, 5-6.) It is also undisputed that Ms. Innes did not save the Document to ICBL's computer system or, as far as the court is aware, otherwise connect the Device to ICBL's computer system while on vacation. (*Id.* ¶¶ 6-7.) ICBL's counsel represented to the government that "ICBL could have remotely monitored and accessed [the Document] that the metadata shows was stored in the 'My Documents' folder on the tablet, for example, via an established VPN connection." (ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody 1-2.) Crucially, ICBL's counsel and the government have *not* indicated that Ms. Innes ever connected the Device to the company's networks via a VPN connection when she created, stored, or used her personal email to transmit the Document to her counsel. Thus, the court finds that the government has not established that ICBL, in fact, had "ready access" or the technological capability to monitor or inspect the contents of

the Device's local hard drive while Ms. Innes was away on vacation. Thus, this factor also tips in favor of Ms. Innes.

Third, because the government concedes that "ICBL does not 'as a general matter grant[ ] third parties a regular right of access to Company-issued technologies,' " this factor favors Ms. Innes's position. The government claims that it was "reasonably foreseeable that ICBL could have chosen to grant a third party such as KPMG access to the tablet that contained the Document in connection with its 'independent' investigation," which is what ultimately occurred in this case. (ECF No. 54, Privilege Motion 5.) There is no evidence that KPMG or any other third party was granted access to the Device containing the Document at the time the Document was created, stored, and transmitted to Ms. Innes's counsel. Indeed, the Document was not discovered until KPMG was in physical possession of the Device. As Ms. Innes's counsel notes, "[W]hen Ms. Innes created the Document on October 9, 2016, no third-party had been granted access to ICBL's computers or systems." (ECF No. 73, Privilege Opp. 6.) And, as noted above, Ms. Innes created the Document when she was traveling abroad and not connected to the company's server. Therefore, at the time Ms. Innes created the Document, the court finds that she had a reasonable expectation that third parties would not have access to the Document.

Fourth, the court finds that there is sufficient evidence that Ms. Innes was aware of ICBL's Code of Conduct and the use and monitoring policies, thus this factor weighs in favor of the government. Nevertheless, for reasons discussed above, the court finds that Ms. Innes had a reasonable expectation that her communications with her attorney, including the Document at issue, would be kept confidential. As ICBL's counsel represented to the government in its June 9, 2017 letter, Ms. Innes was provided with the company's Code of Conduct and signed a "Managing Director's Message" urging ICBL's employees to "promote the principles set out in this Code." (ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody 2.) The court notes that though "ICBL [was not] able to locate records regarding the last time Ms. Innes was formally notified of the Company's policies prior to October 9, 2016, or certified her understanding of such policies," *id.*, Ms. Innes has conceded that she "was generally aware of the company's policy," (ECF No. 73, Privilege Opp. 6.).

The government also asserts that Ms. Innes "apparently requested that ICBL monitor the technology of other employees." (ECF No. 54, Privilege Motion 5; ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody 2.) If true, such

a request may bolster an inference that Ms. Innes was aware that her own personal activities on company-issued devices could be subject to monitoring. Ms. Innes has represented that she "do[es] not recall requesting IT administrators to monitor other employees' company-issued technology." (ECF No. 73, Ex. 1, Innes Decl. ¶ 18.) Ms. Innes's counsel further asserts that Ms. Innes "knew that [the company's policy] did not provide that the company *will* monitor employee's[sic] computer hard drives," citing the *Curto* decision. (ECF No. 73, Privilege Opp. 6.) In *Curto*, the court noted that the company had actually enforced its computer policy on "approximately four instances," including instances where an employee "allegedly downloaded pornographic materials" and another employee "allegedly play[ed] poker on the internet." *Curto*, 2006 WL 1318387, at *3. There, the court concluded that the general lack of enforcement of the company's computer policy, despite a few isolated instances of monitoring, did not vitiate plaintiff's assertion of attorney-client privilege over emails sent through her personal email account. *Id.* Here, in contrast to *Curto*, the court finds that Ms. Innes's creation of the Document, at the request of her attorney, for the purpose of receiving legal advice, could hardly be seen as rising to the level of the flagrantly offensive and inappropriate activities that led to computer monitoring in *Curto*. Applying *Curto*, the court notes that even if ICBL had monitored a few employees' computer activities for blatantly offensive conduct, that would not necessarily negate Ms. Innes's reasonable expectation that *her* activities would not be subject to monitoring. In light of the fact that Ms. Innes had been suspended by ICBL on October 5, 2016, just four days before she created the Document, and her concession that she was generally aware of the company's computer policy, the court finds that this factor weighs in the government's favor.

*17 On balance, the court finds that the four advisory factors slightly favor Ms. Innes's position; thus, the court concludes that Ms. Innes had a reasonable expectation that the Document was and would remain confidential when she created it and emailed it to her counsel.

### ii. No Waiver of Attorney-Client Privilege

The government also asserts that, "even if the Document were confidential, the defendant ... waived any attorney-client privilege that she may have had over the Document when she voluntarily provided the tablet computer containing the Document to KPMG ... and failed to assert any privilege or take any other precautions to protect any privacy interest in the Document." (ECF No. 54, Privilege Motion 6.) "Voluntary disclosure of privileged communications to a third party

results in waiver of the attorney-client privilege[.]" *Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36 F. Supp. 2d 127, 129-30 (E.D.N.Y. 1998) (citations omitted). The court is not convinced, however, that the present circumstances amount to "voluntary disclosure" or intentional waiver of the attorney-client privilege by Ms. Innes, based on her return of the Device at her employer's urging. In arguing that "voluntary disclosure of confidential material to a third party waives any applicable attorney-client privilege," the government cites *Schanfield v. Sojitz Corporation of America, United States v. Jacobs,* and *Aventa Learning, Inc. v. K12, Inc.* (*Id.* at 5.) All three cases are easily distinguishable from the instant case.

In *Schanfield,* plaintiff had asserted attorney-client privilege over a number of emails between plaintiff and three of plaintiff's family members, one of whom was a non-attorney. In those emails, plaintiff had shared "the underlying facts of his lawsuit and his initial ideas about legal strategy, and then [sought] advice on the matter from his [family members]," including his sister who was not a lawyer. *Schanfield v. Sojitz Corp. of Am*, 258 F.R.D. 211, 216 (S.D.N.Y. 2009). The court found that plaintiff had waived the attorney-client privilege over those communications when he disclosed them to his sister. *Id.* Unlike in *Schanfield,* the government has not alleged that Ms. Innes discussed or knowingly divulged the substance of the Document or her attorney's advice to anyone other than her attorney. And, because Ms. Innes sent the Document to her attorney using her personal, private Gmail account, there is no reason to believe that Ms. Innes disclosed the Document through use of her company's email account or company server.

The government also cites *United States v. Jacobs,* in which the client had disclosed "the gist of [his] attorney's advice" to third parties. *United States v. Jacobs*, 117 F.3d 82, 90 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States,* 573 U.S. 351 (2014). Despite the fact that the client had inaccurately conveyed the substance of his attorney's advice, the Second Circuit found that the client had waived the attorney-client privilege over his attorney's communications. *Id.* at 90. As noted above, Ms. Innes is not alleged to have communicated, whether orally or in writing, her attorney's legal advice; thus, *Jacobs* is also distinguishable from the instant case.

The government next cites *Aventa Learning,* a Washington federal civil case expressly applying Washington state law, which the court does not find instructive here. *Aventa*

*Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1106 (W.D. Wash. 2011). In that case, the employee waited "nearly a year and [a] half following his relinquishment of the [company] computer" before asserting attorney-client privilege, whereas in the instant case, Ms. Innes asserted attorney-client privilege over the Document in "late December 2016," as soon as she realized the accidental disclosure, and approximately two months after she returned the Device to her employer, ICBL, in late October 2016. (*Id.*; ECF No. 54, Privilege Motion 2-3.) Additionally, it is unclear whether the plaintiff in *Aventa Learning* intentionally waived the attorney-client privilege, whereas in the instant case, Ms. Innes has asserted that she "did not recall that saved on one of the devices was the Chronological Order of Events document [she had] prepared for [her] attorney." (ECF No. 73, Ex. 1 ¶ 13.) Based on the foregoing facts, the court finds that Ms. Innes' disclosure of the Document to her employer, ICBL, did not amount to a "voluntary disclosure" resulting in intentional waiver of her attorney-client privilege over that Document. *Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36 F. Supp. 2d 127, 129-30 (E.D.N.Y. 1998) (citations omitted).

**\*18** Having found that Ms. Innes did not intentionally waive the attorney-client privilege with respect to the Document, the court now considers whether her inadvertent disclosure of the Document nevertheless resulted in waiver of the attorney-client privilege in regard to the Document. Where "the disclosure was inadvertent, the attorney-client privilege will not be waived unless the producing party's conduct was 'so careless as to suggest that it was not concerned with the protection of the asserted privilege.' " *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96-CV-7590(DAB)(JCF), 1997 WL 736726, at \*4 (S.D.N.Y. Nov. 26, 1997).

The standard test for waiver through inadvertent disclosure was discussed in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985). Under that test, a court must consider: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the disclosure; and (4) overarching issues of fairness. *See id.*; *see also Prescient Partners, L.P.*, 1997 WL 736726, at \*5-7. Most courts in the Second Circuit have adopted a "flexible, 'middle of the road approach' " to inadvertent waiver, which provides that "inadvertent waiver will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege." *United States v. Gangi*,

1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000) ("[W]hen waiver occurs as a result of inadvertent document disclosure, courts have limited the scope of that waiver based on the circumstances involved and overall fairness.") (citing *Gangi*, 1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998)).

With respect to the first factor, courts have found that a "disclosing party's failure to include a legend or other notation identifying the document as an attorney-client communication ... weighs toward a finding of waiver." *LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending*, No. 04-CV-5452 (PKL), 2007 WL 2324292, at \*4 (S.D.N.Y. Aug. 13, 2007) (citations omitted); *Atronic Int'l, GmBH v. SAI Semispecialists of Am., Inc.*, 232 F.R.D. 160, 164 (E.D.N.Y. 2005) (failure to label documents "confidential" or "privileged" contributed toward a finding of waiver); *Estiverne v. Goodwine*, No. 06-CV-6617 (NG), 2009 WL 10706260, at \*3 (E.D.N.Y. Oct. 19, 2009) (failure to identify a procedure to keep privileged documents separate from non-confidential documents weighs toward finding of waiver); *Local 851 of Int'l Bhd. of Teamsters*, 36 F. Supp. 2d at 132 (E.D.N.Y. 1998) (same). A disclosing party's attempt to delete the privileged communications from her work-issued devices has been found to be a reasonable precaution to prevent inadvertent disclosure. *Curto v. Med. World. Commc'ns, Inc.*, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at \*3 (E.D.N.Y. May 15, 2006). The fact that Ms. Innes did not label her Document as "confidential" or "privileged," and did not delete the Document stored on the Device, are among the strongest arguments for a finding of waiver. Other relevant facts point the other way. As Ms. Innes's counsel notes, Ms. Innes took reasonable precautions to keep the Document confidential: she prepared the Document while out of office, saved the Document to the Device's local hard drive, to which ICBL did not have access, and emailed the Document using her private Gmail account, to which ICBL likewise did not have access.

**\*19** The government asserts that the fact that Ms. Innes sent the Document using her personal email account is "not before the Court" because the Document recovered from her tablet is "not an e-mail that the defendant sent through her personal e-mail account[.]" (ECF No. 75, Privilege Reply 4.) Though acknowledging the merits of the government's position, the court finds that Ms. Innes's sending of the Document through her personal email account indicates that she intended to keep, and took a reasonable precaution to keep, the Document confidential. To be sure, the *Curto* decision explicitly found

that an employee's sending of privileged communications, using an personal email account, which did not go through the employer's servers, was a reasonable precaution. *Curto*, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *3 (E.D.N.Y. May 15, 2006). Though Ms. Innes took certain reasonable precautions, she failed to take an obvious and critical precaution when she allegedly "forgot" to remove the privileged Document before returning the Device to KPMG. Thus, the first factor weighs in the government's favor.

With respect to the second factor, "[i]nordinate delay in claiming the privilege can prejudice the adversary and may be deemed waiver." *Local 851 of Int'l Bhd. of Teamsters*, 36 F. Supp. 2d at 133 (E.D.N.Y. 1998) (citation omitted). In one case, the New York federal court found that defendant had satisfied the second *Lois Sportswear* factor where he requested the document's return one day after being made aware of its inadvertent disclosure. *Id.* (citing *Gangi*, 1 F. Supp. 2d at 266) (finding second factor satisfied where government sought relief from the court the following day upon learning that privileged information was disclosed). Here, as noted above, when Ms. Innes allegedly learned of the inadvertent disclosure of the Document during the December 2016 Interview, Mr. Khan asserted attorney-client privilege over the Document, and Ms. Innes was allegedly instructed to not answer any questions regarding the Document. (ECF No. 73, Privilege Opp. 8; ECF No. 73, Ex. 1, Innes Decl. ¶ 14.) Applying the second factor of the *Lois Sportswear* test, the court finds that Ms. Innes, through her counsel, promptly took steps to rectify the error, so this factor weighs in Ms. Innes's favor.

With respect to the third *Lois Sportswear* factor, courts look to whether the overall volume of documents produced was substantial compared to the inadvertent disclosure. "Extraordinary" circumstances, such as "expedited discovery or massive document production ... would lessen the significance of the inadvertent disclosure." *Estiverne*, 2009 WL 10706260, at *5. If the disclosing party produced "a number of additional documents" concerning the supposedly privileged subject matter, the court may find that the inadvertent disclosure was not "an isolated inadvertent error" and instead, fault the protective measures or steps taken by the disclosing party to prevent such disclosure. *Id.* Here, as discussed above, the record before the court establishes that, on at least four separate occasions, Ms. Innes's employer urgently requested that she return her company-issued devices; specifically, between October 23, 2016 and October 26, 2016, Ms. Innes's employer emailed

her four times requesting that she drop off her company-issued devices with the company. (ECF No. 54, Exs. D and E.) Ms. Innes informed her employer that she was out of the country and would return the devices as soon as she returned. (ECF No. 54, Ex. D.) Ms. Innes delivered the company-issued laptop and cell phone to KPMG, the day after her return to Barbados, on October 26, 2016. (ECF No. 54, Ex. E.) Soon after delivering the laptop and cell phone, Ms. Innes informed her employer that she "just realized" that she also had a company-issued tablet (*i.e.* the Device), and the employer pressed her to return the Device as well. (ECF No. 54, Ex. E.) As far as the court is aware, the confidential attorney-client privileged Document was the only such document stored on Ms. Innes's company-issued devices.

*20 The court is not aware of other facts that would further shed light on how the third *Lois Sportswear* factor should apply here, since neither the government nor Ms. Innes's counsel have informed the court of the total number of documents and data retrieved from Ms. Innes's company-issued devices.[8] The court observes that this is not a case in which an outside law firm handles the collection, review, and production of a large quantity of custodians' computer files, resulting in a small number of privileged documents slipping through the cracks and into the hands of the opposing party. In the instant case, Ms. Innes created the Document, which was intended to be kept confidential, and two weeks later, as soon as she was physically able to comply with her employer's directive, she personally, yet inadvertently and mistakenly, delivered the Device containing the Document to a third party. Although the extent of the disclosure was small, Ms. Innes's lapse was quite significant and difficult to excuse. Accordingly, the court finds that this factor weighs in favor of the government.

With respect to the fourth *Lois Sportswear* factor, the court must consider whether unfairness would result to either party from the court's ruling. For example, if the government has "already relied on the contents" of the privileged document in shaping its litigation strategy, or if information contained in the privileged document "is vital to the factual claims" in the case, that consideration would weigh in the government's favor. *LaSalle Bank*, 2007 WL 2324292, at *6; *Atronic*, 232 F.R.D. at 166. Courts in the Second Circuit are generally reluctant to find inadvertent waiver and are willing to limit the scope of any waiver, where "the disclosure occurred early in the proceedings, was made to opposing counsel rather than to the court, and was not demonstrably prejudicial to [the] other party." *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d

Cir. 2000); *Gangi*, 1. F. Supp. 2d at 264 (S.D.N.Y. 1998). The court is also mindful that "clients should be encouraged to provide full disclosure to their attorneys without fear that their disclosure will be invaded[.]" *See Curto*, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *3; *see also In re Grand Jury Investigation*, 399 F.3d 527, 531-32 (2d Cir. 2005).

Here, Ms. Innes's counsel asserts that "[w]aivers of the attorney-client privilege should not be found based on a simple mistake, especially in a criminal case where a defendant's liberty is at stake and the privileged document is her description of events prepared for her attorney at her attorney's specific request." (ECF No. 73, Privilege Opp. 3.) The court agrees. Because the government has not established that it will be prejudiced if the Document is found to be protected by the attorney-client privilege, and because prejudice to Ms. Innes's defense will result should the court find waiver, the court finds that the fourth *Lois Sportswear* factor weighs strongly in favor of Ms. Innes.

Having applied the four factors outlined above, the court concludes that Ms. Innes and her counsel did not evince such "extreme carelessness" as to suggest that they were not concerned with the protection of the attorney-client privilege with respect to the Document at issue. *United States v. Gangi*, 1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000). The court finds that the Document was and remains protected by the attorney-client privilege; further, the court finds that Ms. Innes's inadvertent disclosure of the Document has not waived the attorney-client privilege. For the reasons discussed above, the court respectfully **denies** the government's seventh motion *in limine*.

### H. Motion to Admit Evidence Regarding Two 7,000 Barbadian Dollar "Donations"

The government's eighth motion *in limine*, which was styled as a "supplemental" motion *in limine*, requests that the court <u>admit</u> evidence concerning two 7,000 Barbadian dollar "donations," on January 14, 2015 and February 11, 2015, which ICBL allegedly made to Mr. Inniss, as direct evidence of the crimes charged or under Rule 404(b). (ECF No. 56, Supplement to Government's First Motion in Limine.) The government proffers "the same reasons described in [its] original motion" *in limine*, which concerned Mr. Inniss's request for a purported 4,000 Barbadian dollar "donation" in December 2015, as grounds for the court to admit evidence of these two 7,000 Barbadian dollar "donations" that ICBL also

allegedly made to the Corporation on January 14, 2015 and February 11, 2015. (*Id.* at 2.)

**\*21** In its opposition, defense counsel explained that it had not objected to the government's first motion *in limine* regarding the 4,000 Barbadian dollar "donation" because "it would seem that evidence [that Mr. Inniss] requested a bribe, on any date, *during the time period set forth in the indictment*, would be probative of the existence of the conduct alleged in the indictment...." (ECF No. 64, Response in Opposition re First Motion in Limine (Supplemental Letter Dated September 3, 2019) 1 (emphasis added).) By contrast, defense counsel argues that the government's request to admit the two additional payments in the amount of 7,000 Barbadian dollars each, "fall well outside of the August 2015 to April 2016 time period of the money laundering conspiracy which is charged in Count One of the superseding indictment." (*Id.*) Thus, defense counsel asserts that this evidence "is not properly admissible as direct evidence, because it has no evidentiary nexus or relationship to the actual conspiracy charged, and can only serve to confuse or mislead the jury." (*Id.*) Furthermore, defense counsel argues that the court should also decline to admit such evidence under Rule 404(b) because "this evidence is more properly reserved for rebuttal evidence, depending upon the issues of law and/or factual assertions to be raised by Donville Inniss at trial." (*Id.*)

In its reply, the government cites *United States v. Reed* in arguing that the two purported "donations" should be admitted as direct evidence. (ECF No. 71, Letter Reply in Support of Supplemental Motion in Limine.) In *Reed*, the district court had ruled that evidence of defendant's criminal conduct from approximately two years prior to the date of the charged criminal conspiracy, was admissible as direct evidence because "it is intertwined with the evidence regarding the charged offense" and comprised "background" evidence of defendant's relationship with a co-conspirator. *United States v. Reed*, no. 13-cr-1818, 2013 WL 6906827, at *15 (Appellant Br.) (2d Cir. Dec. 26, 2013). The Second Circuit affirmed, stating that evidence "relating to the time period before the charged conspiracy [is] admissible [when] it 'arose out of the same transaction or series of transactions as the charged offense, ... is inextricably intertwined with the evidence regarding the charged offense, or ... is necessary to complete the story of the crime on trial." *United States v. Reed*, 576 F. App'x 60, 61 (2d Cir. 2014) (quoting *Carboni*, 204 F.3d at 44).

Here, the court finds that the two purported "donations," dated January 14, 2015 and February 11, 2015, "arose out of the same series of transactions as the charged offense," were allegedly "made ... at around the time that co-defendant Ingrid Innes was seeking assistance from [Mr. Inniss] in connection with government affairs in Barbados," and were made to the Corporation, which defendant allegedly controlled, and which also received the 4,000 Barbadian dollar "donation" in December 2015. (ECF No. 71, Letter Reply in Support of Supplemental Motion in Limine 1-2.) Accordingly, the court finds that evidence regarding the two purported "donations" allegedly made to the Corporation from ICBL, in January and February 2015, is intertwined with evidence of, and comprises direct evidence of, the charged conspiracy, and thus is admissible as direct evidence of the money laundering conspiracy charged in Count One of the Indictment.

Even if the two purported "donations" "were not inextricably intertwined, the district court [has] the discretion to admit them as background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed, and how [defendant's] role in the conspiracy evolved[.]" *See United States v. Escalera*, 536 F. App'x 27, 32 (2d Cir. 2013); *see also United States v. Edwards*, 723 F. App'x 48, 50 (2d Cir. 2018) (evidence of uncharged conduct admissible to show defendant's "relationship with some of his co-conspirators" and was "necessary to complete the story of the crime on trial").

For the foregoing reasons, the court **grants** the government's eighth motion *in limine* to admit evidence of two purported "donations" from ICBL to the Corporation in January and February 2015.

## CONCLUSION

As set forth above, the court **grants:** (i) the government's first motion *in limine* to admit evidence regarding Mr. Inniss's solicitation of an alleged bribe from ICBL in December 2015, ICBL's payment of the alleged bribe,

and the subsequent transfer of $6,500 from an account at First Caribbean International Bank (Barbados) Limited to Mr. Inniss's personal bank account in Florida; (ii) the government's second motion *in limine* to preclude defendant from introducing evidence concerning either the activities, or inaction, of Barbadian law enforcement against Mr. Inniss; (iii) the government's third motion *in limine* to preclude any evidence that ICBL has paid bribes to other individuals, or argument that bribery may have been commonplace or part of industry practice in Barbados; (iv) the government's fourth motion *in limine* to preclude evidence or argument concerning Mr. Inniss's prior commission of "good acts" or non-commission of other bad acts; (v) the government's sixth motion *in limine* to admit evidence concerning Mr. Inniss's $75,000 debt obligation, including supporting documentation and communications with the Individual; and (vi) the government's eighth motion *in limine* to admit evidence regarding two purported "donations" made to the Corporation by ICBL in January and February 2015.

**\*22** The court **denies** the government's seventh motion *in limine* and finds that the Document is protected by the attorney-client privilege and that Ms. Innes has not waived the attorney-client privilege with respect to the Document. Thus, the government should take reasonable steps to promptly remove and/or destroy the Document and any copies thereof currently in its possession and is not permitted to use the Document in its prosecution of this case.

As noted above, the court **grants in part** and **denies in part** the government's fifth motion *in limine*.

Lastly, as noted in footnote one, the court directs Ms. Innes to file her unredacted declaration on ECF **by 5:00 p.m on December 23, 2019.** (ECF No. 73, Ex. 1.)

**SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 6999912

Footnotes

1    Ms. Innes had submitted her declaration, in support of her opposition to the government's Privilege Motion, to the court for *in camera* review, "to preserve her attorney-client privilege," but articulated no reason why the declaration was privileged. (ECF No. 73, Privilege Opp. 1-2 n.1.) The government has requested that the court order Ms. Innes to "unseal all portions of her declaration that are not protected by the attorney-client privilege." (ECF No. 75, Privilege Reply 3.) Ms. Innes did not object to the government's specific request that she unseal all portions of her declaration that are not protected by the attorney-client privilege.

The court finds that Ms. Innes's declaration is not protected by the attorney-client privilege because it does not contain any substantive discussion of her counsel's legal advice or other confidential communication between Ms. Innes and her counsel. The court hereby **grants** the government's request and directs Ms. Innes's counsel to file Ms. Innes's unredacted declaration on ECF **by 5:00 p.m. on December 23, 2019.**

2     For the purpose of ruling on the admissibility of evidence, the court accepts as true the government's factual characterizations regarding the evidence it seeks to admit, as contained in the government's motions *in limine.* (*See, e.g.,* ECF Nos. 39, 53, and 56.)

3     The court notes defendant's objection to evidence of Mr. Inniss's past due loan obligations on the ground that such evidence "relies upon the inference the Donville Inniss accepted a bribe in the amount of approximately $20,000 to be used to repay $20,000 in past due loan obligations," which is "a false inference." (ECF No. 63, Response in Opposition re Supplemental Motion in Limine 3.) The government has charged Mr. Inniss, along with others, with substantive money laundering counts in violation of 18 U.S.C. § 1956(a)(2)(A); the offense conduct allegedly includes a "wire transfer in the amount of approximately $20,000 from a Bermuda Company account in Bermuda to a bank account at Bank 1 in Elmont, New York, in the name of the New York Dental Company," on approximately April 18, 2016. (ECF No. 50, Indictment ¶ 24.) As the court noted in footnote two, for the purpose of ruling on the admissibility of evidence, the court accepts as true the government's factual characterizations regarding the evidence it seeks to admit, as contained in the government's motions *in limine.*

4     The Document was provided to the court under seal by the government, in support of its Privilege Motion, along with six other documentary exhibits ("Supporting Documents").

5     To the extent that certain facts are not in dispute, the court relies upon them for the purpose of ruling on the government's Privilege Motion.

6     Though "ICBL's computer system" is rather vague, the court understands this to refer to a shared drive or network that was accessible to ICBL. In any event, the parties appear to agree that Ms. Innes *locally* saved the Document to the "Documents" folder on the Device's hard drive. (ECF No. 54, Privilege Motion 2; ECF No. 73, Privilege Opp. 2.)

7     Though the court finds that this advisory factor weighs in Ms. Innes's favor, the court also cautions against an undue focus on the specific wording of any company's computer policy, insofar as this factor assumes that a typical employee actually reads the entirety of his or her employer's computer policy and analyzes the specific language used therein. To the extent that an employer's computer policy or Code of Conduct arguably may be akin to a contract of adhesion, it may be inappropriate for courts to discount an employee's claim that he or she had a reasonable expectation of confidentiality in documents or files stored on an employer's device, simply because the Code of Conduct evinces the employer's intent to monitor its employees' computers. *See Klos v. Lotnicze,* 133 F.3d 164, 168-69 (2d Cir. 1997) (noting that a "contract of adhesion is a contract formed as a 'product of a gross inequality of bargaining power' between parties" typically "offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms," and noting that the concept of adhesion contracts "evolved from public policy that refuses to enforce a contract provision when it offends basic notions of civility and fair play"); Restatement (Second) of Contracts § 178 (1981) (discussing agreements that are unenforceable on grounds of public policy). *Cf. EEOC v. Morgan Stanley & Co.,* No. 01-CV-8421 (RMB)(RLE), 2002 WL 31108179 (S.D.N.Y. Sept. 20, 2002) (finding provision restricting speech in employer's Code of Conduct was unenforceable because it violated public policy).

8     Ms. Innes's counsel asserts that Ms. Innes's device likely contained "hundreds if not thousands of separate documents, only one of which was a three-page attorney-client privileged communication." (ECF No. 73, Privilege Opp. 8.)

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.