UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                                   :
UNITED STATES OF AMERICA,                                          :
                                                                   :
            -v-                                                    :            19 Cr. 552 (JPC)
                                                                   :
EDWARD SHIN,                                                       :            OPINION AND
                                                                   :            ORDER
                              Defendant.                           :
                                                                   :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Defendant Edward Shin is the former Chief Executive Officer of Noah Bank.  He is charged

with multiple violations of federal law for allegedly causing Noah Bank to issue illegal loans to

companies that Shin had secret ownership in, issue loans to borrowers who had put insufficient

funds towards the businesses, and pay fees to brokers that secretly gave Shin a kickback.  The

Court has set a trial-ready date of April 4, 2022.  Pending are three motions *in limine* filed by the

Government.  The Government has moved to admit (1) evidence that Shin had a Noah Bank

employee mislead a casino in Las Vegas about Shin's personal bank account balance and (2)

evidence involving a food market in Armonk, New York, including the involvement in that

business of two alleged co-conspirators.  The Government also has moved to exclude evidence

involving a 2018 recorded conversation between a cooperating witness and Shin.  For the reasons

below, the Court grants the two motions to admit evidence and reserves ruling on the motion to

exclude evidence about the recorded conversation.

## I.  Background

**A.  Alleged Criminal Conduct[1]**

Shin was the Chief Executive Officer of Noah Bank, an FDIC-insured regional bank headquartered in Pennsylvania with branches in New York, New Jersey, and Pennsylvania. Indictment ¶ 1; Complaint ¶ 10.  Noah Bank's business included, among other services, the issuance of commercial loans to small businesses that were guaranteed by the U.S. Small Business Administration ("SBA").  Indictment ¶ 1; Complaint ¶ 10.

While the SBA does not itself lend money directly to individuals seeking to start or expand a business, the SBA guarantees at least some of the losses incurred by the lender if the loans are not repaid, provided the lender complies with the relevant loan program requirements, including the applicable law and procedures.  Indictment ¶ 2.  One of the SBA's programs is known as the 7(a) Loan Program, which is focused on helping start-ups and existing small businesses by guaranteeing loans for various business purposes, such as acquiring land, expanding operations, and purchasing machinery or other materials.  *Id.* ¶ 3.  Under the SBA's procedures, and as relevant to the allegations against Shin, a lender may not have any real or apparent conflict of interest with a borrower, must assess the appropriate amount of equity the borrower is required to have in the small business receiving the loan, and may permit the payment of broker fees only in connection with loan funds that are reasonable and customary for the services performed.  *Id.* ¶ 4; Complaint ¶ 11(d); *see, e.g.*, 13 C.F.R. §§ 120.110, 120.140, 120.221, 130.5.

The Indictment alleges that, at all times relevant to the Indictment, Noah Bank was what is known as a preferred lender under the SBA's Preferred Lenders Program ("PLP").  Indictment ¶ 3.

---

[1] What follows in this section are only allegations, which are taken from the Complaint, Dkt. 1 ("Complaint"), and the second superseding Indictment, Dkt. 115 ("Indictment").  Shin remains presumed innocent unless proven guilty beyond a reasonable doubt.

That preferred lender status allowed Noah Bank to provide SBA-guaranteed loans without first providing documentation to, or even securing approval from, the SBA. *Id.*; Complaint ¶¶ 11(c), 12. With PLP status came additional responsibilities for Noah Bank. A lender operating by a grant of PLP authority must confirm that all its PLP loan closing decisions are correct and that it has complied with all requirements under the law and SBA regulations, including the aforementioned ones concerning conflicts of interest, equity injections, and payment of broker fees. Indictment ¶¶ 3-4; Complaint ¶ 11(c); *see* 13 C.F.R. § 120.452(c).

The Indictment alleges that between 2009 and 2013 Shin had Noah Bank issue loans to small businesses under false and fraudulent pretenses, including in violation of the SBA's requirements. Indictment ¶ 5; *see also* Complaint ¶¶ 12-13. These alleged violations fall into three buckets.

First, the Government alleges that Shin caused Noah Bank to issue loans to businesses in which Shin hid his financial interest from the bank and the SBA. Indictment ¶ 6. For example, according to the Government, in 2009, Shin and a co-conspirator ("CC-1") caused Noah Bank to issue a $1 million SBA loan to fund the purchase and establishment of a business ("Borrower-1") in which Shin had an undisclosed interest. *Id.* ¶ 6(a). Four years later, Shin sold Borrower-1 to another entity ("Borrower-2") that his relative ("Relative-1") owned. *Id.* ¶ 6(b). Shin then had Noah Bank issue a $1 million SBA loan to Borrower-2. *Id.* Much of that loan was used to pay off the outstanding balance of the prior loan that Noah Bank had issued to Borrower-1. *Id.* Borrower-2 ultimately defaulted, so Noah Bank called on the guarantee from the SBA. *Id.* ¶ 6(d). The Government alleges that "[h]ad the SBA been informed about SHIN's undisclosed conflicts of interest and the actual circumstances of the loans to Borrower-1 and Borrower-2, the SBA would not have guaranteed those loans." *Id.*

Second, the Government alleges that Shin caused Noah Bank to issue SBA loans to borrowers that did not meet the SBA's equity injection requirements—money that the borrower had to invest in the business to fund part of the purchase. *Id.* ¶ 7. The Government alleges one instance of this conduct involving Borrower-2's purchase of Borrower-1, discussed above. The SBA documents required Borrower-2 to invest $180,000 in cash to buy Borrower-1. *Id.* ¶ 7(a). But Borrower-2 and its owner, Relative-1, lacked sufficient funds to make a cash injection of that size. *Id.* So Shin gave Relative-1 a $250,000 check that Relative-1 deposited into his bank account. *Id.* Relative-1 then provided Noah Bank with his bank statement, which reflected a $250,000 balance thanks to that deposit, to make it appear that Borrower-2 could satisfy the required cash injection. *Id.* The Government alleges that Shin knew that Relative-1 had no intention of advancing that cash and, "[h]ad the SBA been informed of the true facts and circumstances of Borrower-2's inability to fund a cash injection, the SBA would not have guaranteed the loan to Borrower-2." *Id.*

Third, the Government contends that Shin received secret kickbacks from commission fees that Noah Bank paid to CC-1 for loans that Noah Bank issued. *Id.* ¶ 8. According to the Government, CC-1 also acted as a business broker linking Noah Bank to potential borrowers. *Id.* But Shin directed Noah Bank to pay broker fees to CC-1 even when CC-1 had done no work connecting the bank to a borrower. *Id.* CC-1 would then share some of that fee with Shin. *Id.* The Government alleges that "[i]n total, SHIN and CC-1 split hundreds of thousands of dollars of commission fees in this manner unbeknownst to the SBA or [Noah] Bank." *Id.* ¶ 8(c).

**B.  Procedural History**

Shin was arrested on May 29, 2019, Dkt. 4, and was arraigned on the original indictment on August 2, 2019, Dkt. 10.  The operative Indictment charges Shin in five counts with (1) conspiracy to commit bank fraud and wire fraud, in violation of 18 U.S.C. § 1349; (2) conspiracy to commit bank bribery, in violation of 18 U.S.C. §§ 371 and 215(a)(2); (3) bank bribery, in violation of 18 U.S.C. §§ 215(a)(2) and 2; (4) theft, embezzlement, or misapplication of bank funds by a bank officer, in violation of 18 U.S.C. § 656; and (5) conspiracy to commit loan fraud, in violation of 18 U.S.C. §§ 371 and 1014.  Indictment ¶¶ 9, 13-14, 17, 19, 21-22.

This case was reassigned to the undersigned on October 12, 2021.  The Government and Shin both subsequently filed supplemental motions *in limine*.[2]  The Government first moved (1) to exclude Shin's summary witness, Robert Zak, from opining on CC-1's total gambling wins and losses; (2) to admit evidence that Shin had a Noah Bank employee mislead a Las Vegas casino about Shin's personal account balance at Noah Bank; and (3) to admit evidence about a food market in Armonk, New York, called Madison Kim's Farm Inc., in which Shin, CC-1, and Relative-1 all supposedly had involvement.  Dkt. 124 ("Govt. MIL 1").  The Government later moved to exclude evidence involving a recorded conversation between CC-1 and Shin in 2018. *See* Dkt. 131 ("Govt. MIL 2").  Shin moved (1) to preclude the Government from mentioning in its opening statement a $113,313.74 check that was allegedly deposited into CC-1's account and (2) to exclude various evidence from the SBA about Noah Bank's civil violations.  Dkt. 127.

At a November 23, 2021, conference, the Court heard oral argument on the motions *in limine*.  With the parties in agreement, the Court denied as moot (1) Shin's motion to exclude the

---

[2] The Honorable Gregory H. Woods, to whom this case was originally assigned, decided various motions *in limine* previously filed by the parties on February 12, 2021.  Dkt. 109.

evidence surrounding the $113,313.74 check and (2) the Government's motion to exclude Mr. Zak from opining on CC-1's gambling wins and losses.  Dkt. 140 at 44-46.[3]  The Court also did not reach, as not ripe, Shin's motion to exclude evidence of certain administrative findings concerning Noah Bank because the Government had yet to provide the defense with the exhibits that it would seek to offer at trial.  *Id.* at 45.  The Court therefore addresses the Government's remaining motions *in limine* in this Opinion and Order.

## II.  Motions *in Limine*

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (quotations omitted).  "Evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds."  *Id.* at 257 (quotations omitted).  Courts considering a motion *in limine* may reserve judgment until trial so that the motion is placed in the appropriate factual context.  *See id.* at 258.  And a ruling on a motion *in limine* "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [party's] proffer."  *Luce v. United States*, 469 U.S. 38, 41 (1984).

### A.  Government's Motions *in Limine* to Admit Evidence

The Court begins with the Government's motions *in limine* to admit certain evidence at trial.  First, the Government seeks to offer evidence that, in or around 2011, Shin had Noah Bank's

---

[3] In a November 18, 2021 letter, and later confirmed at the November 23, 2021 conference, the Government explained that it does not intend to reference the $113,313.74 check in its opening statement.  Dkt. 129; Dkt. 140 at 44.  Shin's counsel also confirmed at that conference that he no longer plans call Mr. Zak as a witness at trial.  Dkt. 140 at 45-46.

Chief Lending Officer ("Witness-1") mislead a casino in Las Vegas about his personal account balance at Noah Bank.  Second, the Government seeks to offer evidence relating to Madison Kim's Farm Inc., the Armonk food market.

### 1. Applicable Standards for the Admissibility of Uncharged Conduct

To admit evidence at trial, the evidence must be relevant.  The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (quotations omitted).  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Under Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act" is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  But the "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "The Second Circuit's inclusionary rule allows the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence."  *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (quotations omitted).  In addition, "upon request, the district court must give an appropriate limiting instruction to the jury."  *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).  "Even under th[e] [inclusionary] approach, however, district courts should not presume that [other act] evidence is relevant or admissible."  *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  Rather, such evidence "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  *Huddleston v. United States*, 485 U.S. 681, 689 (1988).

Evidence of uncharged criminal conduct or other bad acts is also admissible as direct evidence, instead of just as Rule 404(b) "other acts" evidence, "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (quotations omitted). Thus, a "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (quotations omitted). This admissible background evidence includes, for example, "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quotations omitted). And when "a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (quotations omitted).

Thus, all evidence of "intrinsic act[s] offered as direct proof of the crime charged will, by definition, satisfy Rule 404(b)." *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004). This means that "the only practical result of admitting evidence as intrinsic to the charged crime rather than under Rule 404(b) is that the Government escapes 404(b)'s notice requirement and the Court need not give a limiting instruction cautioning the jury against making an improper inference of criminal propensity." *Id.* And when "it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *Id.*

Lastly, a Rule 403 balancing test applies to all evidence. Under Rule 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.  "The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission." *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174-75 (2d Cir. 2000).  And as the advisory committee notes to Federal Rule of Evidence 403 explain, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note.

### 2.  Efforts to Mislead a Las Vegas Casino

With these background principles in mind, the Court first turns to the Government's motion to admit evidence that Shin directed Witness-1 to mislead a Las Vegas casino about his personal bank account balance.  Witness-1 was Noah Bank's Chief Lending Officer, reported directly to Shin, and, according to the Government, played a central role in the fraud and bribery conspiracies. Govt. MIL 1 at 9.  The Government expects that Witness-1 will testify that, at Shin's direction, she caused Noah Bank to issue fraudulent broker checks to CC-1 and his companies, knowing that CC-1 had not served as the loan broker, which included funds that were later kicked back to Shin. *Id*.  The Government further expects Witness-1 to testify that Shin directed her to help him draft a letter falsely claiming that a small business seeking a loan from Noah Bank had a large line of credit available at the bank.  *Id.*  The Government proffers that Witness-1 knew that letter to be false and discussed the falsity with Shin, yet still helped prepare the letter.  *Id.*  The Government contends that this borrower was another company in which Shin had an undisclosed interest.  *Id.*

The Government now seeks an *in limine* ruling authorizing Witness-1 to testify that Shin instructed her that, if she received a call from a Las Vegas casino asking whether Shin had certain

funds available to him at Noah Bank, she should answer yes. *Id.* at 6. Witness-1 is also expected to testify that she in fact received a phone call from a Las Vegas casino about Shin's account balance and that she confirmed the amount despite not knowing his actual balance. *Id.*

Here, the proffered testimony would be direct evidence of Witness-1's relationship with Shin. Among other things, it will help provide background to, and explain, the trust that Shin placed in her as a participant in the bank fraud and bribery conspiracies, as he reached out to her and trusted her to lie to the casino about his account balance. The proffered testimony also would provide background about how the conspiracies operated and the relationship of some of the participants, by showing that Shin would use his subordinates—and specifically, Witness-1—to advance his own financial interests, including through deception. This is particularly probative given the Government's expressed trial theory that Shin used Witness-1 to further his fraud and bribery schemes. And the evidence about an inquiry from a casino as to Shin's account balance additionally would corroborate the Government's proffered evidence that Shin attempted to use a $50,000 kickback from CC-1 to pay off a gambling debt at a Las Vegas casino. *Id.* at 10.

While the Court admits the evidence as direct evidence of the charged criminal activity, it also would be admissible as proof of motive under Rule 404(b). Specifically, the Government has expressed that it intends to argue that one of Shin's motives for engaging in the fraud and bribery schemes was to pay off gambling debts, which the Government expects will include evidence regarding the aforementioned $50,000 check from CC-1. Testimony that Shin also had Witness-1 lie to a Las Vegas casino about his account balance would show financial issues arising from gambling.

The evidence also survives a Rule 403 analysis, as its probative value is not substantially outweighed by the risk of unfair prejudice or undue delay. Evidence that Witness-1 deceived a

Las Vegas casino at Shin's direction is no more sensational than the evidence of the charged crimes. *See United States v. Perez*, 387 F.3d 201, 210 (2d Cir. 2004) (affirming under a Rule 403 analysis the district court's admission of testimony that "was no more sensational than the other evidence of the alleged . . . crimes"). Nor should the evidence consume a major portion of the trial. Witness-1, who is already expected to testify at trial, will present the evidence and the Court intends to ensure that the testimony on this topic remains relatively brief.

### 3. Evidence Concerning Madison Kim's Farm

The Court also concludes that the proffered evidence involving Shin's undisclosed interest in Madison Kim's Farm, along with evidence of the involvement of others in that business, is admissible as direct evidence of the charged offenses. Here, the Government seeks to admit evidence to establish that, in or about 2010, Shin and CC-1 invested in and bought a food market in Armonk called Madison Kim's Farm, and about a year later, Relative-1 started to work there. Govt. MIL 1 at 13. CC-1 is further expected to testify that Shin insisted that his name be left off any ownership paperwork for Madison Kim's Farm. *Id.* at 14.

While Shin and CC-1's purchase of Madison Kim's Farm did not involve a loan from Noah Bank, the proffered testimony still is admissible evidence for a few related reasons. First, this evidence would show a business relationship between Shin and CC-1, thus providing background as to their relationship in the charged conduct. As noted, CC-1 allegedly co-owned businesses with Shin, in which Shin hid his ownership interest, and acted as a broker who gave illegal kickbacks to Shin. The business partnership with Madison Kim's Farm also took place during the same period as the charged conduct involving Shin and CC-1's other businesses.

Second, this evidence would explain how another alleged co-conspirator, Relative-1, came to work with Shin. The testimony, as proffered, would establish that Relative-1 worked at Madison Kim's Farm until around 2012 when the business was sold, and then Shin invited Relative-1 to

work at another store that Shin operated with CC-1 called 1797 Empire Inc.[4]  *Id.* at 13.  The Government expects to offer evidence that Relative-1 later bought 1979 Empire Inc. at Shin's suggestion and with Shin's assistance.  *Id.*  The background of Relative-1's work at Madison Kim's Farm would thus help the jury understand how Relative-1 came to work at 1797 Empire Inc.  That background appears to be particularly significant given CC's expected testimony that 1797 Empire Inc. received an SBA loan from Noah Bank after Shin failed to disclose his partial ownership interest in the company.  *Id.* at 13 n.4.

Lastly, the evidence that Shin did not include his name on the ownership documents for Madison Kim's Farm, yet still was an owner of that business, additionally provides context to the level of trust among Shin and his alleged co-conspirators.  This appears to be particularly probative because the events concerning Madison Kim's Farm occurred during the same time that, based on the Government's proffer, Shin and CC-1 operated multiple businesses together that procured SBA loans from Noah Bank, with them failing to disclose Shin's ownership interest.  The evidence also helps to explain why Shin entrusted Relative-1 with managing the business at 1797 Empire Inc.

While the Court finds the proffered evidence admissible as direct evidence of the charged conduct, the particular evidence of Shin's failure to include his name on the ownership documents of Madison Kim's Farm also is admissible under Rule 404(b) as proof of lack of mistake and *modus operandi*.  Shin similarly is alleged to have failed to include his name on the ownership documents of businesses he co-owned with CC-1, for which SBA loans were sought.  The proffered evidence concerning similar conduct with Madison Kim's Farm's ownership documents

---

[4] Based on the Government's description of 1797 Empire Inc. in its motion *in limine* and the allegations in the Indictment concerning Borrower-1, it appears that the two entities are the same.

is proof that Shin's exclusion of his name on other documents was not a mistake, but rather deliberately done and reflected how he operated.

Here too, this evidence is not unduly prejudicial for purposes of a Rule 403 analysis. Shin owning a business without a Noah Bank loan, yet concealing his financial interest, is less sensational than evidence showing that Shin allegedly hid business ownership information from Noah Bank to obtain a business loan that he otherwise was not eligible to receive. This evidence will also take up a small part of the trial and will not require calling any additional witnesses.

\*     \*     \*

While the Court has found that both pieces of evidence qualify as direct evidence of the charged offenses, the Court will consider any limiting instruction that Shin proposes for admitting this evidence. Shin must submit any proposed limiting instruction to the Court before the trial testimony.

## B.  Government's Motion *in Limine* to Exclude Evidence

The Court turns next to the Government's motion to exclude evidence of an October 2018 meeting between Shin and CC-1. The meeting occurred years after the alleged criminal conduct ended, and about seven months before Shin's arrest. The Government had directed CC-1 to meet with Shin and covertly record the meeting. Govt. MIL 2 at 1. At the meeting, CC-1 and Shin discussed several allegations later charged by the Government, including matters concerning 1797 Empire and Café 45, two companies in which the Government alleges Shin had an undisclosed interest. *Id.* at 1-2; Dkt. 139 ("Opposition 2") at 2. Shin essentially denied any involvement in these companies and told CC-1 that any tax issue with 1797 Empire was CC-1's issue. Govt. MIL 2 at 2. Shin also repeatedly expressed suspicion that CC-1 was recording their meeting and cooperating with law enforcement. *Id.* In addition, when CC-1 mentioned to Shin that he had been unable to broker a loan since "then," appearing to refer to when they last worked together,

Shin responded (as translated): "You don't have to bring that up.  If you return to the diligent and innocent man of old, then I can do business with you, because I trust your ability, right? . . . But, today is not the time to talk about such things, right?"  *Id.*

The Government argues that the Court should preclude Shin from eliciting any testimony and introducing any evidence about the October 2018 meeting, contending that Shin's statements would be inadmissible hearsay.  Govt. MIL 2 at 3.  It also argues that the Court should exclude the evidence under Rule 403 because the danger of the jury considering the statements during the meeting for an impermissible hearsay purpose outweighs the statements' minimal probative value. *Id.* at 4.

In opposing the motion *in limine*, Shin explains that he will "seek admission of this transcript for two purposes: one, for impeachment of [CC-1] and his credibility, including his prior inconsistent statements on material issues in this case and two, for potential use in Mr. Shin's case-in-chief as a prior consistent statement in the event Mr. Shin testifies at trial."  Opposition 2 at 1-2.  Shin also suggests that the Court reserve deciding the motion until CC-1 has testified on direct examination.  *Id.* at 9.

A court should not grant a motion *in limine* to exclude evidence "unless such evidence is clearly inadmissible on all potential grounds."  *Hart*, 90 F. Supp. 3d at 257 (quotations omitted). And "[c]ourts may reserve deciding a motion *in limine* until trial."  *Id.* at 258.  Here, the Court will reserve deciding the Government's motion *in limine* as to the October 2018 meeting.  But the Court will provide some guideposts for the parties.

First, it is premature to determine whether Shin's statements during the October 2018 meeting would be admissible as a prior consistent statement.  Under Federal Rule of Evidence 801(d)(1)(B), a declarant's prior statement is not hearsay if the declarant testifies at trial and is

14

subject to cross-examination about the prior statement, and the statement "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper or influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Fed. R. Evid. 801(d)(1)(B).  Shin of course has the right to testify, or not to testify, at trial, and may make that decision until the close of the defense case.  The Court therefore will reserve deciding on whether Shin's statements are admissible as a prior consistent statement until trial.

Second, the Government has expressed that it will not introduce evidence of the October 2018 conversation in its case-in-chief.  Govt. MIL 2 at 1.  And Shin has represented that he will seek to substantively admit the transcripts only if he testifies at trial.  *See* Opposition 2 at 1-2, 5; *see also id.* at 1 ("The Government's motion focuses improperly on the admissibility of Mr. Shin's statements.").  To be sure, if Shin does not testify and the Government does not introduce Shin's prior statements, it does not appear that he could offer those statements as *substantive evidence* offered for the truth of the matters asserted therein—whether through eliciting it on cross-examination, introducing the transcript, or playing a recording.  "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  *United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)).  Nor may a defendant "introduce his own hearsay statements through [a witness] to 'impeach' earlier statements [the witness] had made that were already in evidence."  *United States v. Faruki*, 803 F.3d 847, 857 (7th Cir. 2015); *see also United States v. McDaniel*, 398 F.3d 540, 545-46 (6th Cir. 2005).  To allow otherwise would effectively allow a defendant "to testify without being under oath, without cross-examination, and without direct scrutiny by the jury."  *Id.* at 546.  And for a defendant to introduce hearsay statements under

15

the state of mind exception at Rule 803(3), the "statements [must] 'face forward, rather than backward.'" *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (quoting *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir. 1984)).

The jury therefore may not rely on the substance of Shin's statements for their truth, such as whether Shin was involved in the fraudulent transactions and the charged conduct.  For example, Shin repeatedly denied that he had anything to do with the events that CC-1 discussed, and which are the subject of the charges.  *See* Government MIL 2 at 1-2.  To the extent that these statements are only relevant for their truth, they qualify as hearsay.  And because the October 2018 meeting took place almost five years after the charged conduct, Shin's statements do not show Shin's state of mind when the charged conduct took place.  *See Blake*, 195 F. Supp. 3d at 610 (rejecting admitting defendant's statements because they were a "self-serving explanation of past events").

But the Court reserves ruling, until after CC-1's direct examination, on whether Shin may cross-examine CC-1 on his statements during that October 2018 conversation or otherwise admit evidence (or elicit testimony) of his statements for impeachment purposes.  Shin contends that, from reviewing materials disclosed by the Government, there are "numerous prior inconsistent statements made by [CC-1] in the tape recording," Opposition 2 at 3, and identifies several statements that he believes fall into this category in his opposition brief, *id.* at 3-5.  At this point, without hearing CC-1's testimony, the Court cannot assess whether any of his statements during the October 2018 meeting would be proper grounds for impeachment.  If the Court admits any statements by CC-1, it will also consider whether other limited statements during that conversation may be put before the jury, not to offer the truth of those statements, but for context and completeness as the jury considers CC-1's statements.  *See Faruki*, 803 F.3d at 857 (affirming the district court allowing defendant's counsel to cross-examine a government witness about specific

statements that the witness made in taped conversations with the defendant, but only to the extent that the statements impeached the testimony by the witness, while prohibiting the defendant to introduce his own hearsay statements to "impeach" earlier statements). If the Court does so, it will also consider any limiting instruction proposed by the Government.

### III.  Conclusion

For the reasons given, the Court grants the Government's motion to admit (1) evidence that Shin had a Noah Bank employee mislead a casino in Las Vegas about Shin's personal account balance at Noah Bank and (2) evidence involving Madison Kim's Farm. The Court reserves ruling on excluding evidence of the October 2018 conversation between CC-1 and Shin until after CC-1's direct examination.

The Clerk of the Court is respectfully directed to close the motions pending at Docket Numbers 124, 127, 131.

SO ORDERED.

Dated: January 14, 2022
       New York, New York

                              JOHN P. CRONAN
                       United States District Judge