UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
UNITED STATES OF AMERICA,                                               :
                                                                        :
                -v-                                                     :  19 Cr. 552 (JPC)
                                                                        :
EDWARD SHIN,                                                            :  OPINION AND
                                                                        :  ORDER
                Defendant.                                              :
                                                                        :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

On May 25, 2022, following a multi-week trial, a jury found Edward Shin, the former Chief Executive Officer of Noah Bank, guilty of all six counts of the Indictment. The Government's evidence at trial established that, from around 2009 to 2013, Shin caused Noah Bank to issue loans guaranteed by the Small Business Administration ("SBA") to companies that Shin had a secret financial interest in, to issue SBA-guaranteed loans to borrowers with insufficient equity injections in their businesses, and to pay fees to brokers who gave Shin a secret kickback. Shin now moves under Federal Rule of Criminal Procedure 33 for a new trial. Because each of Shin's arguments lacks merit, the Court denies the motion.

I. Background

A. Criminal Conduct[1]

Shin was the Chief Executive Officer of Noah Bank, a Federal Deposit Insurance Corporation-insured regional bank headquartered in Pennsylvania with branches in New York,

---

[1] The following account is drawn from the evidence at trial. The Court "draw[s] all permissible inferences in favor of the government and resolve[s] all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). The transcript of the trial can be found at Docket Numbers 187, 189, 191, 193, 195, 197, 199, 201, 203, 205, 207, 209, 211, 213, 215, 217, and 219 (collectively, "Tr.").

New Jersey, and Pennsylvania.  Tr. at 1788:24-1789:4.  At the relevant time, Noah Bank's business included issuing commercial loans that were guaranteed by the SBA to small businesses.  *Id.* at 185:8-13, 1623:11-20, 1707:6-8.

While the SBA does not itself lend money directly to individuals seeking to start or expand a business, the SBA guarantees at least some losses incurred by the lender if the loans are not repaid, provided the lender complies with the relevant loan program requirements, including the applicable law and procedures.  *Id.* at 185:25-186:1-2, 1623:21-1624:1.  One of the SBA's lending programs is known as the 7(a) Loan Program, which focuses on helping start-ups and existing small businesses by guaranteeing loans for various business purposes, such as acquiring land, expanding operations, and purchasing inventory.  *Id.* at 625:15-21.

During Shin's criminal conduct, Noah Bank was what is known as a preferred lender under the SBA's Preferred Lenders Program ("PLP").  *Id.* at 558:14-16.  That preferred lender status allowed Noah Bank to issue SBA-guaranteed loans without first providing documentation to, or even securing approval from, the SBA.  *Id.* at 629:12-25, 630:1-11.  With PLP status came additional responsibilities for Noah Bank.  A lender operating with PLP status must confirm that all its PLP loan closing decisions are correct and that it has complied with all requirements under the law and the SBA's regulations.  *Id.* at 630:16-23, 632:12-15.  A lender that fails to comply with these requirements risks having the SBA not guarantee the loan.  *Id.* at 631:2-10.  Some of these requirements include directing PLP lenders to assess the appropriate amount of equity the borrower must have in the small business receiving the loan and only permitting PLP lenders to pay broker fees for loans if the fees are reasonable and customary for the services performed.  *Id.* at 627:14-628:2, 628:12-24, 649:25-650:9.

SBA procedures also require a PLP lender to avoid conflicts of interest. An SBA employee, Kandace Zelaya, testified that under those procedures, "[a] lender or its associates may not have a real or apparent conflict of interest with a small business or SBA." *Id.* at 642:8-9. A conflict of interest occurs, when, for instance, a bank employee, officer, or board member has an ownership interest or an "indirect or direct financial interest or other interest" in the borrower's business. *Id.* at 640:18-22, 642:14-22. Zelaya explained that a direct financial interest could arise "if the officer, director, or the close relative actually owned an interest in the small business applicant." *Id.* at 643:5-7. And she testified about various scenarios that would create an indirect financial interest. For example, an indirect financial interest could involve a bank employee "or their close relative [being] employed by the small business" or owning a business that the borrower would then hire or contract with. *Id.* at 643:8-18.

Between around 2009 to 2013, Shin had Noah Bank issue loans to small businesses under false and fraudulent pretenses, including in violation of the SBA's requirements. *Id.* at 151:15-19, 164:13-16, 165:8-11, 166:12-17, 167:10-168:15, 711:6-8, 750:17-752:23, 763:23-764:2. His violations fell into three buckets. First, Shin caused Noah Bank to issue loans to businesses in which Shin hid his conflicts of interest from the bank and the SBA. *Id.* at 117:13-118:1, 1133:21-134:6, 1415:7-15, 1424:24-1426:15, 1433:8-1434:21. One of those businesses was First Avenue Lee's Market. First Avenue Lee's Market received an SBA loan from Noah Bank, yet Shin hid his $275,000 investment in the business from Noah Bank and the SBA. *See, e.g.*, Govt. Exhs. 620-A, 628, 639, 639-T; Tr. at 1372:12-14, 1415:16-1418:14, 2064:10-23. Second, Shin caused Noah Bank to issue SBA loans to borrowers that did not meet the SBA's equity injection requirements—money that the borrower had to invest in the business to fund part of the purchase. Tr. at 349:3-24, 652:2-7, 1433:18-19. Third, Shin received secret kickbacks from commission

fees that Noah Bank paid to CC-1 for loans that Noah Bank issued.  *Id.* at 709:24-710:4, 717:5-718:6, 724:17-725:9, 742:7-18.

**B.  Procedural History**

Shin was arrested on May 29, 2019, Dkt. 4, and was arraigned on the original indictment on August 2, 2019, Dkt. 10.  The indictment was superseded multiple times, culminating with a third superseding indictment that was filed on March 8, 2022.  Dkt. 158 ("Indictment").  The Indictment charged Shin in six counts with (1) conspiracy to commit bank fraud and wire fraud, in violation of 18 U.S.C. § 1349;  (2) conspiracy to commit bank bribery, in violation of 18 U.S.C. §§ 371 and 215(a)(2); (3) bank bribery, in violation of 18 U.S.C. §§ 215(a)(2) and 2; (4) theft, embezzlement, or misapplication of bank funds by a bank officer, in violation of 18 U.S.C. § 656; (5) conspiracy to commit loan fraud, in violation of 18 U.S.C. §§ 371 and 1014; and (6) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.  Indictment ¶¶ 9, 13-14, 17, 19, 21-22, 25-26.

This case was reassigned to the undersigned on October 12, 2021.  Dkt. 108.  After a multi-week trial, a jury convicted Shin of all six counts.  Tr. at 2412:12-2413:13.  Shin has moved for a new trial under Federal Rule of Criminal Procedure 33.  Dkt. 186 ("Motion").  The Government opposes the Motion.  Dkt. 223.

## II.  Legal Standards

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  This Rule affords a trial judge "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005).  "It is

well-settled," however, "that motions for new trials are not favored and should be granted only with great caution." *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958); *accord United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006). "The ultimate test" in considering whether to grant a Rule 33 motion "is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (cleaned up). In other words, to vacate a judgment and grant a new trial, "there must be a real concern that an innocent person may have been convicted." *Id.* (cleaned up).

### III. Discussion

**A. Financial Interest Challenge**

Shin first argues that the Court should vacate the jury's verdict on all counts because "the term 'financial interest' was [not] defined anywhere" for the jury. Motion at 7. The Court takes Shin to be making three separate arguments: (1) the Indictment was deficient because it did not define "financial interest"; (2) the jury charge was legally flawed for not defining "financial interest"; and (3) the Government's evidence was insufficient for the jury to understand what types of financial interest count as prohibited conflicts of interest. The Court will take each argument in turn.

**1. The Indictment's Definiteness**

The Court begins with Shin's challenge to the Indictment's definiteness. Under Federal Rule of Criminal Procedure 7(c)(1), "[t]he indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment meets this requirement "when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quotations omitted). The "indictment need do little more than to track the

5

language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id.* (quotations omitted).  In other words, the indictment need only provide the "essence of a crime," which is often called the "core of criminality." *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).

For each count, the Indictment alleged what crime Shin committed and the statute that was violated.  Indictment ¶¶ 9-11, 13-14, 15(a)-(c), 17, 19, 21-23, 25-26.  It then accurately stated the elements of each charged offense and the approximate time and place of the crimes that Shin allegedly committed.  *Id.* ¶¶ 5, 6(a)-(d), 7(a), 8(a)-(b), 9, 13, 15(a)-(c), 17, 19, 21, 25.  And even though it need not have done so, the Indictment provided eight more numbered paragraphs with additional allegations about the conduct underlying the charged offenses.  *Id.* ¶¶ 1-8.  The Indictment therefore sufficiently provided Shin with the essence of the charged crimes.  The Indictment was not required to define "financial interest" because that definition and other "particulars of how [he] effected the crime falls outside th[e] purview" of what an indictment must allege.  *D'Amelio*, 683 F.3d at 418.

To the extent that Shin argues that the Government violated his constitutional rights by constructively amending the Indictment or by presenting a variance in proof, that argument fails as well.  *See* Motion at 6-7 ("According to the evidence presented by Government, Lee's First Avenue Market . . . was a business 100% owned by David Lee, but secretly owned by Ed Shin. . . . [T]he charge in the superseding indictment is not that Shin had 'ownership' of First Avenue, but that he had a 'financial interest.'").[2]  While the Second Circuit "views constructive amendment as

---

[2] Related to his argument trying to draw a distinction between financial interest and ownership, Shin also claims that "legal right to ownership is the crucial element of the supposed crime." Motion at 8. But the crucial question for the challenged offenses is whether Shin hid (or failed to disclose) a conflict of interest in the borrowers, not whether he legally owned those businesses.

6

a *per se* violation of the Grand Jury Clause requiring reversal, it has consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *D'Amelio*, 683 F.3d at 417 (cleaned up).  Because the Indictment provided such notice, any constructive amendment argument fails.

Nor did the Government's proof impermissibly vary from the Indictment.  "[A] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment."  *Id.* (cleaned up).  A variance violates the Constitution "only if it infringes on the notice and double jeopardy protections of an indictment."  *Id.* (quotations omitted).  In other words, the question is "whether the variance in proof altered or modified essential elements of the offense charged to the point there is a substantial likelihood that [Shin] may have been convicted of an offense other than that charged in the indictment."  *Id.* at 422 (cleaned up).  The Indictment alleged, and the Government offered proof and argued at trial, that Shin deliberately hid his financial interests from Noah Bank and the SBA.  Thus, the facts at trial did not "broaden[] the possible basis for conviction beyond that contained in the indictment."  *Id.* at 423 (quotations omitted).

### 2. Jury Charge

To start, Shin's argument that the Court needed to define "financial interest" in the jury instruction hits an immediate forfeiture wall.  Under Federal Rule of Criminal Procedure 30(d), when a defendant has "failed to raise a specific objection to the omission of the necessary . . . language from the [jury] charge," the defendant has forfeited the issue.  *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006); *see* Fed. R. Crim. P. 30(d).

Shin never asked for a definition of "financial interest" in his proposed jury charge, *see* Dkt. 85-1 ("Joint Request to Charge"), or at the charging conference, *see* Tr. at 1909-34.  Indeed, the only mention of "financial interest" in the Joint Request to Charge came from Shin, and he did

not propose a definition of that term. Joint Request to Charge at 52 (proposing to instruct the jury "that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment"). The closest Shin came to raising this issue was in arguing the Rule 29 motion at the close of the proof. There, Shin's counsel said that he did not know how the term would be defined for the jurors in the event they asked for clarification: "If the jury comes back and asks the Court for a definition of financial interest, which they may well do, I don't know what we tell them." Tr. at 2150:23-25. Yet Shin's lawyer never asked the Court to instruct the jury on the meaning of financial interest. Because Shin never raised that issue during the trial, he has forfeited the argument.

But even if this exchange during the Rule 29 argument could be viewed as preserving the issue, Shin's argument would fail. "A trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition." *United States v. Morris*, 928 F.2d 504, 511 (2d Cir. 1991) (quoting *United States v. Chenault*, 844 F.2d 1124, 1131 (5th Cir. 1988)). For instance, the Second Circuit has affirmed a district court's decision to not define "authorization" in a jury instruction because "the word is of common usage." *Id.* And in the civil context, the Second Circuit has affirmed not defining "pizzeria services for the jury because the jury was capable of determining the meaning of that term." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 269 (2d Cir. 2011). Other circuits have similarly affirmed trial court decisions to not define statutory terms that have a common usage.

Examples include district courts not defining for juries such phrases and terms as "in furtherance of,"[3] "materiality,"[4] "intimidate,"[5] "possession,"[6] "in relation to,"[7] and "knowingly."[8]

This case presents even stronger reasons for declining to grant a Rule 33 motion on these grounds.  Not only is "financial interest" a commonly used phrase (more on this below), it is not even a statutory term or phrase.  And unlike the above cases, the term at issue—here, "financial interest"—never appeared in the jury charge.  The question for the jury was whether Shin deliberately hid his conflicts of interest with false or misleading information or omissions, not whether Shin had a financial interest in a borrower.  Shin has therefore "provided no reason to believe that, in the absence of more detailed instructions, the jury could have convicted based on a legally erroneous theory, or otherwise" that the jury would have returned a different verdict. *United States v. Jones*, 847 F. App'x 28, 30-31 (2d Cir. 2021).

### 3. Evidentiary Deficiency as to the Meaning of Financial Interest

The Court next turns to Shin's argument that the evidence was insufficient to permit the jury to understand what sort of "financial interest" qualifies as a prohibited conflict of interest.  In evaluating a sufficiency of the evidence challenge under Rule 33, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it

---

[3] *United States v. Robinson*, 435 F.3d 1244, 1250 (10th Cir. 2006).

[4] *United States v. Blasini-Lluberas*, 169 F.3d 57, 67 (1st Cir. 1999).

[5] *United States v. Fulmer*, 108 F.3d 1486, 1495 (1st Cir. 1997).

[6] *United States v. Garza-Juarez*, 992 F.2d 896, 910 (9th Cir. 1993).

[7] *United States v. Bafia*, 949 F.2d 1465, 1476 (7th Cir. 1991).

[8] *United States v. Chambers*, 918 F.2d 1455, 1460 (9th Cir. 1990).

must still "exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *Id.* (quotations omitted); *accord United States v. Bell*, 584 F.3d 478, 484 (2d Cir. 2009).

Here, the Government provided more than enough information about the types of financial interests that would raise problems for the Bank's SBA lending program. Zelaya testified that a bank issuing an SBA loan cannot "[h]ave a real or apparent conflict of interest with a small business with which it is dealing." Tr. at 639:21-22. She also testified that this requirement applies to not only the bank but also the bank's employees, officers, and board members. *Id.* at 640:18-22. She explained that if a bank does not comply with this conflict-of-interest requirement, then it would disqualify the loan from an SBA guarantee. *Id.* at 642:17-21 (The "SBA will not guarantee a loan if the lender, its associates, partner, or a close relative has a direct or indirect financial or other interest in the small business applicant, or had such interest within six months prior to the date of the application."). Zelaya then explained what could count as a direct and indirect financial interest:

> A direct interest would . . . be if the officer, director, or the close relative actually owned an interest in the small business applicant.
>
> The indirect financial interest would be if, for example, a member of the board of directors has a construction company and the small business applicant is applying for a loan to renovate its business location and they contracted with that board of directors' construction company to do the renovations. That would be an indirect financial interest because if the loan got approved, then the contractor would make sure they got paid.
>
> And other interests would be potentially if the associate or their close relative was employed by the small business.

Tr. at 643:8-18. Taken together, Zelaya's testimony provided the jury with more than enough information about what conflicts of interest Shin could hide from Noah Bank that would create problems for Noah Bank's SBA loan program.

Shin resists this conclusion by claiming that "the crucial term, 'financial interest,' remains undefined." Motion at 8. But that argument misses that Zelaya's testimony provided several examples of what counts as a financial interest, allowing the jury to deduce its meaning. And as discussed, the argument fails to understand that "financial interest" is a commonly understood term. Indeed, the Motion implicitly acknowledges as much. In discussing the phrase, the Motion gives examples of what counts as a financial interest that neatly fall within Zelaya's testimony about what direct and indirect interests create conflicts of interest:

> It was clear from the evidence that several people or entities had financial interest in First Avenue [Lee's Market]. David Lee had financial interest due to his ownership. Noah Bank had financial interest due to its loan agreement and lien in collateral. Employees had financial interests due to their employee contracts/legal rights. Vendors had financial interest due to their contracts with First Avenue [Lee's Market].

*Id.* at 9. As Zelaya explained, if David Lee, any of First Avenue Lee's Market employees, or any of its vendors were employed by, on the board of, or otherwise legally affiliated with Noah Bank, SBA regulations would not permit the SBA to guarantee a loan to First Avenue Lee's Market. In the same way, Shin's investment and involvement in First Avenue Lee's Market created a conflict of interest.

**B.  Shin's Constitutional Challenge**

Shin next argues that "[t]he record is devoid of any definition of 'ownership' or 'financial interest' sufficient to have given Shin fair warning of any criminal repercussions attached to any actions he was considering with respect to First Avenue." Motion at 10. He also claims that "even if there were evidence that might be interpreted to conclude that Shin thought he had some criminal liability, such a conclusion would not constitute fair warning." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 786 (1974)).

Essentially, Shin claims that the relevant SBA regulations were so unclear that he could not have known that his financial interests in First Avenue Lee's Market would count as a conflict of interest. The Court thus interprets Shin as making two arguments in this regard. First is an argument that the charged statutory language in the Indictment is unconstitutionally vague. Second is a challenge to the sufficiency of the proof of Shin's required mental state. The Court takes each argument in turn.

### 1. Void for Vagueness Challenge

The Fifth Amendment's Due Process Clause "guarantees that ordinary people have fair notice of the conduct a statute proscribes" while "guard[ing] against arbitrary or discriminatory law enforcement." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quotations omitted). Shin cannot show that any of his offenses of conviction provided unfair notice or produced arbitrary enforcement.

In evaluating whether a law provides constitutionally insufficient notice, courts ask whether the law gives a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Here, Shin only claims that the SBA regulations, which do not create criminal liability, do not define "financial interest." Motion at 10-11. That argument mistakes the inquiry. Shin does not argue that the *statutes* of conviction failed to put an ordinary person on notice. Nor could he. The statutes provide sufficient notice of the proscribed conduct. But even if the Court could look to the SBA regulations—which, again, do not create criminal liability—"ownership" and "financial interest" are sufficiently self-explanatory to allow a person of ordinary intelligence to know what is and is not prohibited. In any event, the Government's proof at trial—including evidence of Shin deliberately hiding conflicts of interest from Noah Bank and from the Government to help facilitate loans—fall within the heartland of what the charged statutes prohibit. *See United States v. Melgar-Diaz*, 2 F.4th

1263, 1269 (9th Cir. 2021) (rejecting void-for-vagueness challenge under the clear standards prong when the "conduct fell within the heartland of what [the challenged statute] prohibits"). Shin's as-applied vagueness challenges therefore fail.

Nor can Shin prevail on an arbitrary enforcement theory. Under this theory, even when a person of ordinary intelligence has notice of what a statute prohibits, the statute may still be unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citations omitted). "To survive a vagueness challenge, a statute must provide explicit standards for those who apply it." *Dickerson v. Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010) (cleaned up). But even if a statute fails to do so, it may survive "an as-applied challenge if the particular enforcement at issue is consistent with the core concerns underlying the statute such that the enforcement did not represent an abuse of the discretion afforded under the statute." *Id.* at 748 (cleaned up). Shin has not argued that the statutes of conviction lack any ascertainable standard for inclusion or exclusion. And regardless, as discussed, deliberately hiding conflicts of interest from a bank and the Government to help facilitate loans falls within the core of what these statutes prohibit.

### 2. Sufficiency of the Evidence

Lastly, the Court turns to Shin's sufficiency of the evidence challenge. Here, the Government provided more than sufficient evidence for a reasonable jury to find Shin guilty beyond a reasonable doubt. With respect to the specific arguments in the Motion, several pieces of testimony showed that Shin knew and understood that he had conflicts of interest and that he deliberately hid them. For example, Shin's nephew, David Lee, testified that Shin told him "to not mention that [Shin] was involved in either 1797 Empire or First Avenue Lee's Market." Tr. at 1435:15-18. And when Shin discovered that Lee did not follow his directions about not discussing his involvement in these properties, Shin "was very upset" and told Lee to never again

13

"[t]ell anybody about his involvement." *Id.* at 1436:10-13. Besides Lee's testimony, James Kim, who was Shin's accomplice, business partner, and purported loan broker, testified that he understood that "a bank president cannot receive a loan from his or her own bank and do business with it" and that Shin had "mention[ed] something" similar to him. *Id.* at 864:13-16.

Shin's own testimony further confirmed his understanding that borrowers were not allowed to hide conflicts of interest. First, Shin's testimony permitted the inference that he was familiar with what circumstances counted as conflicts of interest. Shin testified that "between 2009 and 2019" he knew that SBA loan participants "may not . . . self deal." *Id.* at 2039:13-24. He also testified that he was familiar with certain SBA rules, received updates about SBA regulations, had direct contact with the SBA, and told employees to come to him with questions about SBA policies. *Id.* at 2039:10-2041:11. Second, Shin's testimony allowed a juror to reasonably infer that Shin understood that his conduct was criminal. Shin admitted that he personally lent money to Lee and Kim and that they "probably" used the loans toward their businesses that received SBA loans. *Id.* at 2032:10-14, 2034:14-17. And during his testimony, Shin repeatedly gave evasive answers to questions about personally loaning money to these businesses. *See id.* at 2031:21-2035:8. From all this testimony, a reasonable juror could find that Shin understood that he had the required knowledge about his conflicts of interest.

In sum, there was competent, satisfactory, and sufficient evidence adduced at trial to support the jury's verdict because, among other things, the proof established that Shin knew and understood that he had conflicts of interest and that he deliberately hid those interests.

## IV.  Conclusion

For all these reasons, the Court denies Shin's motion for a new trial.  The Clerk of the Court is respectfully directed to close the motion pending at Docket Number 186.

SO ORDERED.

Date: August 11, 2022
New York, New York

_____
JOHN P. CRONAN
United States District Judge