**EXHIBITS A THROUGH K** TO DECLARATION OF ROBERT J. BASIL IN SUPPORT OF DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE, VARIANCES AND OTHER RELIEF AND DEFENDANT'S SENTENCING MEMORANDUM - PERSONAL IDENTIFIERS REDACTED

EXHIBIT A





EXHIBIT B

**ALLAN E. RUBENSTEIN, MD, COMPREHENSIVE NEUROLOGY SERVICES, PC**
**CLINICAL PROFESSOR OF NEUROLOGY AND PEDIATRICS, NYU LANGONE MEDICAL CENTER**
Board Certified, American Board of Psychiatry and Neurology (Neurology)
Member, American Academy of Neurology

139 West 82nd Street Suite 1G, New York, N.Y. 10024
Tel: (212) 974-3009   Email: arubenstein@cns-pc.com

**April 8, 2019**

**Summary of Neurological Evaluation of Edward Shin, DOB ▓/63**
**Date of Evaluation: 4/8/19**

**Records Reviewed: See Attached**

**INTRODUCTION:**
Edward Shin is a 56 year old ambidextrous Asian-American man who was examined unaccompanied. Mr. Shin was informed that no doctor-patient relationship is involved or implied. Mr. Shin understood and agreed.

**HISTORY:**
Mr. Shin states that he was in a bar standing in the middle of a stairway on 4/22/17 when he was pushed down 15 steps. He hit his head and face and was unconscious. He was taken via ambulance to New York-Presbyterian Hospital, where he was admitted to the SICU. Mr. Shin does not remember anything about the event other than he was having a drink with colleagues on a Friday evening and regained consciousness ~36 hours later. On arrival, he was confused and combative, GCS =14, 11. He was bleeding from his nose and sustained hematomas to the left frontal scalp, left cheek and left periorbital area. CT scan of the head reported a left subdural hematoma. Probable trace left subarachnoid hemorrhage as well. Right temporal and frontal hemorrhage. He was intubated and sedated. CT scan of the facial bones 4/22/17 reported an extensive left-sided facial bone fracture including the frontal and posterior walls of the maxillary sinus, floor and lateral wall of the orbit without evidence of entrapment, zygomatic arch, and skull base including left lateral wall of the sphenoid sinus and left temporal skull. Hemorrhage into the paranasal sinuses. Hemorrhage superior aspect left orbit. CT scan of the cervical spine 4/22/17 reported no evidence of acute cervical spine fracture. Mild degenerative disc and face changes. Mild degenerative spinal stenosis at C4-5, C5-6 and C6-7. Left C5-6 and bilateral C6-7 neural foraminal moderate narrowing. CT scan of the thoracic spine 4/22/17 reported no evidence of acute thoracic spine fracture. Mild degenerative disc changes throughout the thoracic spine. CT scan of the lumbar spine 4/22/17 reported no evidence of acute lumbar spine fracture. Mild to moderate degenerative disc and facet changes. L4-5 grade 1 retrolisthesis. Disc bulges at L3-4, L4-5 and L5-S1. Mild central canal stenosis at L3-4, L4-5 and L5-S1. Bilateral L3-4, bilateral L4-5 and bilateral L5-S1 moderate neural foraminal narrowing. X-ray of the left forearm 4/22/17 reported a distal radius fracture. Findings at mid-portion of radius more likely chronic. CT scan of the chest, abdomen and pelvis 4/22/17 reported no intrathoracic injury, visceral abdominal injury, hemoperitoneum or retroperitoneal hematoma. He had an ETOH level of 260 and was started on Mannitol. Repeat CT scan of the head 4/22/17 reported stable extent of acute intracranial hemorrhage. His left wrist was placed in a cast.

After he was extubated and awake he left and went to the Temple University Health System ED on 4/25/17, where he was admitted to the SICU for observation. CT scan of the head 4/25/17 reported multicompartmental hemorrhage including right inferior temporal lobe parenchymal hematoma/hemorrhagic contusion and falx/tentorium subdural hematoma.   Extra-axial blood products in the left frontotemporal convexity also compatible with acute hemorrhage.   Multiple calvarial, skull base, and facial bone fractures.   Nondisplaced non-depressed left squamous temporal bone fracture.   Mildly displaced left mastoid temporal bone fracture with small hemorrhagic effusion.   Left zygomatic arch, zygoma, and left lateral and posterior orbital wall fractures.   Without post septal or retro-orbital hematoma.   Left sphenoid wing fracture extending into the sphenoid sinus with resultant hemorrhagic effusion.   CT scan angiogram head/neck 4/25/17 reported patent cervical and cerebral vasculature.   His left arm fracture was reduced and a splint placed.   X-ray of the left elbow, forearm and left wrist 4/25/17 reported no fracture or malalignment in the left elbow.   There was an acute minimally impacted intra-articular distal radial fracture.   There was minimal positive ulnar variance.   He was put on Keppra.   CT scan of the head 4/26/17 reported stable multi-compartmental hemorrhage without directional herniation or new intracranial blood product.   On 4/27/17, Dr. Alcorn performed an open reduction and internal fixation of left zygomatico-maxillary complex fractures.   He was discharged to rehab on 4/29/17 in stable condition.

X-ray of the left wrist 5/23/17 reported interval volar plate-screw fixation for the comminuted impacted distal radial intra-articular fracture seen without evidence of hardware complication.   Slight interval improvement in alignment.   Resolution of widening of the distal radioulnar joint and resolution of posttraumatic positive ulnar variance.   Ghost tracks were noted within the distal radius.   CT scan of the head/ 5/25/17 reported near complete interval resolution of all hyperdense blood products.   Mild interval increase in the size of the lateral and third ventricles, likely due to resolving edema.

Dr. Philip, neurosurgery, followed up with him on 5/25/17.   He had some word-finding and organizational skill problems since the injury, in addition to headaches.   These problems indicate residual central nervous system dysfunction post traumatic brain damage.   He was prescribed amantadine as a neuroprotective and Topamax to prevent headaches.   A routine EEG 6/7/17 was normal awake and asleep.   Dr. Philip followed up with him on 6/29/17.   Speech, memory and word-finding had improved with amantadine.   The plan was to continue amantadine and Topamax.   On 9/21/17 Dr. Philip noted there was no significant further improvement with amantadine. Both medications were then tapered and discontinued by 10/17/17.

Mr. Shin subsequently returned to work as CEO of a bank but now works from a home office 2 days a week. He states he has some problems performing his job duties at the same level as before the injury.   He continues to have headaches and pain in the left forehead and face which is constant, for which he takes Tylenol, and has persistent left face numbness. He has persistent pain in his left shoulder, arm and neck, for which he sees a chiropractor and takes OTC pain medication. He is additionally mildly unsteady.   He used to play golf twice a week and now cannot play more than 6 holes at a time.   He is no longer able to jog.   He is able to drive and take public transportation.   He has hypertension, for which he takes medication.   He denies smoking, alcohol or drug abuse. He denies prior trauma.

**PHYSICAL EXAMINATION:**
Height: 5'8.5 "
Weight: 214  lbs

Carotid pulses were 2+= without bruits.

All palpation was carried out by using light finger pressure. The claimant was instructed to respond immediately if he felt pain under the examiner's finger by saying 'pain' and to keep repeating the word as many times as pain was experienced. When performing range of motion, the claimant was advised to do the best he was capable of.

Tenderness was noted to palpation of the left temple and face.

**CERVICAL SPINE:**
The claimant was not using a cervical collar.

Palpation of the cervical spine revealed no vertebral tenderness or spasm of the paraspinal muscles.

The range of motion of the cervical spine showed flexion at 45 degrees (45 degrees normal), extension was 45 degrees (45 degrees normal), right and left lateral bending was 45 degrees (45 degrees normal) and right and left lateral rotation was 80 degrees (80 degrees normal).

Pain was noted looking to the left.

**THORACIC SPINE:**
There was no tenderness over the thoracic spine or thoracic paraspinal muscles. There was no spasm of the thoracic paraspinal muscles.

**LUMBAR SPINE:**
The claimant was not wearing a lumbosacral support.

Palpation of the lumbar spine revealed no vertebral tenderness. There was no paraspinal muscle spasm on the right or left side.

The range of motion of the lumbar spine showed flexion at 60 degrees (60 degrees normal), extension was 30 degrees (30 degrees normal), right and left lateral bending was 30 degrees (30 degrees normal) and right and left lateral rotation was 30 degrees (30 degrees normal). Sitting straight leg-raising test was at 90 degrees bilaterally (90 degrees normal).

**GAIT AND STATION:**
The claimant had a normal gait. The claimant did not require assistance in getting on and off the examination table. The claimant did not use a cane, walker or crutches to ambulate. Heel and toe walking were normal.

**FUNCTIONAL MUSCLE TESTING:**
Functional muscle testing revealed muscle strength to be 5/5 in all four extremities. Tone was normal. No atrophy noted. Full ROM both shoulders.

**SENSORY EXAMINATION:**
Pin and light touch were noted in the left upper lip. Tinel's sign and Phalen's sign were negative bilaterally.

**REFLEXES:**
Deep tendon reflexes were symmetrical and 1-2+ in all four extremities.   Plantar responses were flexor bilaterally.

**COORDINATION:**
Finger-to-nose and heel-to-shin tests were normal bilaterally. Tandem gait was performed with some unsteadiness.

**HIGHER MENTAL FUNCTION:**
The Minnesota mini mental status exam (MMSE) was performed and was 29/30, within normal range. The CAMDEX interview score was 11/19, which indicates significant cognitive and/or personality change.

**CRANIAL NERVES:**
Cranial nerves II through XII are intact.  Fundi are normal.  No nystagmus.  Accommodation and sacchades are normal. VA 20/70, 20/40 with glasses.

**IMPRESSION AND DIAGNOSIS:**
**Mr. Shin sustained a moderately severe traumatic brain injury with intracranial and subdural hemorrhages and multiple facial, orbital, sinus and left radius fractures 1 year ago requiring surgical repairs for a facial fracture and for a left wrist fracture. He had significant cognitive dysfunction immediately after the head injury and has now improved but has mild residual cognitive dysfunction which is likely to be permanent. Cognitive behavioral therapy may be of limited help.   He continues to have post-concussion headaches, facial pain, fatigue, and unsteadiness. It is likely that his headaches and fatigue will improve.  Given the extent of his facial fractures, he may have permanent facial pain. The facial numbness is permanent.  His persistent left shoulder pain should be further assessed by an orthopedic specialist.**

**Mr. Shin, having suffered a traumatic brain injury of moderate degree, is at substantially greater risk for the development of migraine, seizures, Parkinson's disease and dementia than he would have had he not suffered this brain injury. Ref: Venkatakrishna Rajajee, MBBS, "Traumatic brain injury: Epidemiology, Classification, and Pathophysiology" (Uptodate.com).**

**The above is stated within a reasonable degree of medical certainty.  I certify and affirm, under penalty of perjury, that I prepared and have read the above report and hereby certify and affirm my findings and conclusions.**

**Allan E. Rubenstein, M.D.**

Edward Shin Records Reviewed

| | |
|---|---|
| 4/22/17 | Flushing Hospital Medical Center – Prehospital care report. |
| 4/22/17 | New York-Presbyterian – SICU admission note. |
| 4/22/17 | New York-Presbyterian – CT scan of the head/brain. |
| 4/22/17 | New York-Presbyterian – Chest x-ray. |
| 4/22/17 | New York-Presbyterian – CT scan of the head/brain. |
| 4/22/17 | New York-Presbyterian – CT scan of the facial bones. |
| 4/22/17 | New York-Presbyterian – CT scan of the cervical spine. |
| 4/22/17 | New York-Presbyterian – CT scan of the thoracic spine. |
| 4/22/17 | New York-Presbyterian – CT scan of the lumbar spine. |
| 4/22/17 | New York-Presbyterian – X-ray of the left forearm. |
| 4/22/17 | New York-Presbyterian – CT scan of the chest, abdomen and pelvis. |
| 4/22/17 | New York-Presbyterian – Chest x-ray. |
| 4/22/17 | New York-Presbyterian – Neurosurgery consult note. |
| 4/22/17 | New York-Presbyterian – X-ray of the pelvis. |
| 4/22/17 | New York-Presbyterian – CT scan of the head/brain. |
| 4/22/17 | New York-Presbyterian – X-ray of the left wrist. |
| 4/24/17 | Alexandra Halevi, MD of New York-Presbyterian – Discharge summary. |
| 4/25/17 | David Karras, MD of Temple University Health System – ED record. |
| 4/25/17 | Benjamin Immerman, MD of Temple University Hospital – Consultation report. |
| 4/25/17 | Temple University Hospital – CT scan of the head. |
| 4/25/17 | Temple University Hospital – CT scan angiogram head/neck. |
| 4/25/17 | Temple University Hospital – X-ray of the left elbow, forearm and left wrist. |
| 4/26/17 | Bong-Soo Kim, MD of Temple University Hospital – Neurosurgery consultation. |
| 4/26/17 | Ying Jiang, MD of Temple University Hospital – Ophthalmology consultation. |

| | |
|---|---|
| 4/26/17 | Temple University Hospital – Physical therapy evaluation. |
| 4/26/17 | Temple University Hospital – Occupational therapy evaluation. |
| 4/26/17 | Temple University Hospital – CT scan of the head. |
| 4/27/17 | Nicole Ferro, DO Temple University Hospital – PM and R consultation. |
| 4/27/17 | Nicholas Alcorn, MD of Temple University Hospital – Operative report. |
| 4/29/17 | Danielle Betz, MD of Temple University Hospital – Discharge summary. |
| 5/23/17 | Temple University Health System – X-ray of the left wrist. |
| 5/25/17 | Temple University Health System – CT scan of the head/brain. |
| 5/25/17 | Villanueva Philip, MD of Temple University Physicians – Follow-up report. |
| 6/7/17 | Temple University – EEG 1 hour. |
| 6/29/17 | Villanueva Philip, MD of Temple University Physicians – Follow-up report. |
| 9/21/17 | Villanueva Philip, MD of Temple University Physicians – Progress note. |
| 10/19/17 | Villanueva Philip, MD of Temple University Physicians – Follow-up report. |
| 2/1/19 | Examination before Trial. |

Allan E. Rubenstein, M.D.

Curriculum Vitae

**ALLAN EARL RUBENSTEIN, MD**
**CLINICAL PROFESSOR OF NEUROLOGY AND PEDIATRICS, NYU LANGONE**
**MEDICAL CENTER**
139 West 82 St. Suite 1G
New York, NY 10024
Phone: (212) 974-3009
Cell: 917-699-8613
E-Mail: Arubenstein@CNS-PC.com

## ACADEMIC TRAINING:

Cornell University, B.A., 1966

University of Rochester School of Medicine, 1966 – 1968
Tufts University School of Medicine, 1968 – 1970, M.D., 1970

Intern, Medicine, Columbia University College of Physicians and Surgeons,
Harlem Hospital Division, 1970 – 1971

Resident in Neurology, Columbia-Presbyterian Medical Center –
New York Neurological Institute, 1971 – 1974

## POST-GRADUATE TRAINING:

Annual Course on Radioassay Techniques, The Endocrine Society,
Bethesda, MD, 1977

Medical Genetics and Experimental Mammalian Genetics, Jackson Laboratory,
Bar Harbor, ME, 1982

6th Annual Concussion Across the Spectrum of Injury
NYU Langone Health, 2019

## SPECIALTY BOARD CERTIFICATION:

American Board of Psychiatry and Neurology, 1976 (Neurology)
American Society for Neuroimaging, Neuro-CT, 1982 (Inactive)

## MEDICAL SOCIETIES:

American Academy of Neurology, Fellow 1978 – 2004, Active 2004-Present
American Society for Clinical Oncology
Society for Neuro-Oncology
American Association for Cancer Research
New York State Medical Society
New York County Medical Society
New York Academy of Sciences (Inactive)
New York Academy of Medicine
Royal Society of Medicine (Inactive)

1

## HONORS, AWARDS AND APPOINTMENTS

**HONORS AND AWARDS:**

- 1978:              Founder,  Children's Tumor Foundation
- 1978-2003:      Director of Medical Affairs, Children's Tumor Foundation
- 1989:              Distinguished Achievement in Medical Research, East Manhattan Chamber of Commerce
- 2003-Present:  Medical Director Emeritus, Children's Tumor Foundation
- 2013:              Juilliard School concert series endowed in my honor for children at Hassenfeld Pediatric Cancer Center, NYU Langone Medical Center
- 2014-2019:     Connecticut River Museum, Essex, CT:  Board of Trustees
- 2015:              Fredonia High School (Fredonia, NY) Academic Hall of Fame/Commencement Address
- 2018:              Children's Tumor Foundation, 40th Anniversary Award

**ACADEMIC JOURNALS:**

- Contributing Editor:   Mount Sinai Journal of Medicine, 1976 - 2004
- Invited Reviewer:       New England Journal of Medicine, Science, Cancer Research, Neurology, Archives of Neurology, Journal of the Autonomic Nervous System, Family Medicine

**ACADEMIC ORGANIZATIONS:**

- Children's Tumor Foundation
  - 1978: Co-Founder
  - 1978 - 2003: Medical Director
  - 1987 - 2003: Board of Directors
  - 2003-Present:  Medical Director Emeritus
  - 2015 Children's Tumor Foundation expert panel on dermal neurofibromas
- Dysautonomia Foundation:
  - 1980 - 1992: Medical Advisory Board
- Von Hippel-Lindau Family Alliance
  - 1994 – 2003  Medical Advisory Board
- American Board of Psychiatry and Neurology
  - 1976-1990: Examiner

**GOVERNMENTAL AGENCIES:**

- **NINDS**
- 1987: Working Group on NF
- 1987: Neurogenetics Study Section, Ad hoc member -- National Cancer Institute
- 1982: U.S. Representative, U.S. – Japan Cooperative Cancer Program, Workshop on Neural Crest Tumors
- **U.S. FDA**
- 1996, 2001  Neurology Study Section, Ad hoc member -- Orphan Products Grant Program
- **U.S. DEPARTMENT OF DEFENSE**

- 1997 - 2000 Member, Integration Panel, U.S. Army NF Research Program ,
- 2001: Head, Integration Panel, U.S. Army NF Research  Program

## HOSPITAL APPOINTMENTS:

- NYU Langone Medical Center: Adult and Pediatric Neurology
- 2009 – Present: Attending
- Mount Sinai Hospital, Neurology:
  - 1974 - 1981: Assistant Attending
  - 1982 - 2009: Associate Attending
- Beth Israel Hospital, Neurology:
  - 1974 - 1976: Assistant Attending
- Catholic Medical Center of Brooklyn and Queens:
  - 1974 - 1986: Consultant in Neurology

## MEDICAL SCHOOL APPOINTMENTS:

- **INSTRUCTOR, NEUROLOGY 1974 - 1976**
  - Department of Neurology, Mount Sinai School of Medicine
  - Chief of Neurology, Bernstein Institute at Beth Israel Hospital
  - Director of Neurology Rotation, Beth Israel Hospital
    - Conducted daily teaching rounds with residents.
    - Organized and ran weekly neurology conference.
    - Supervised medical student rotation in neurology.
- **ASSISTANT PROFESSOR, NEUROLOGY 1977 - 1981**
  - Director, Autonomic Function Laboratory
    - Developed clinical autonomic function laboratory with physiologic, pharmacologic and pupillometric capabilities.
    - Studied autonomic abnormalities in Shy-Drager syndrome, OPCA, Parkinson's disease, various types of peripheral neuropathy and familial Dysautonomia.
    - Received peer reviewed funding from the Dysautonomia Foundation and appointed to its Medical Advisory Board.
    - Contributor to first textbook on autonomic failure, edited by Sir Roger Bannister.
- **ASSOCIATE PROFESSOR, NEUROLOGY: 1982-2008**
  - Director, Mount Sinai Neurofibromatosis Research and Treatment Center
  - **Neurofibromatosis (NF) is a group of genetically determined disorders which predispose to developmental problems of the nervous and skeletal system, including learning disability, ADHD, and Asperger's syndrome; neural tumors, including optic glioma, acoustic neuroma, cerebral and spinal tumors; skin tumors; and malignancy.**

Established first interdisciplinary clinic devoted to Neurofibromatosis in the world. The clinic has been a model for over 50 other NF clinics in the U.S., Europe and South America.  The clinic had one of the largest NF populations in the world.

- Contributed to descriptions of numerous clinical phenomena in NF which expanded the spectrum of the disorder, including learning disability, progressive dural ectasia and adult onset

3

meningocoele, congenital megacolon, congenital melanocytic nevi, benign brainstem tumors, xanthogranuloma, clustering of severe complications in NF kindreds, familial transmission of segmental NF, post-zygotic mutation in twins with NF, unidentified bright objects (UBO's) on MRI, large deletion phenotype in NF-1, recurrent sporadic mutations in NF-1, and post-radiation malignancy in NF-2.

- Organized first genetic counseling program for NF, which includeed individual and family counseling, crisis intervention, outreach and support groups.
- Designated by New York State Office of Mental Retardation and Developmental Disabilities as only NF outreach and Crisis intervention center in New York State.
- Designated as participating center in National NF Foundation pilot project on clinical database for NF; participating center in first multi-center clinical trials for the treatment of NF-1.

## RESEARCH

- Developed cellular biology laboratory focusing on growth control in neurofibromas. The laboratory had 2 junior faculty Ph.D.s, 1 post-doctoral fellow and 1 M.D. – Ph.D. candidate. The laboratory received funding from the Easter Seals Research Foundation, the National NF Foundation and the NIH.
- Performed first neurotransmitter analysis of neurofibromas, first studies on effects of growth factors on neurofibromas and first identified NGF receptors on neurofibromas. The latter discovery led to the ability to produce pure schwann cell cultures from neurofibromas and to the use of the NGF receptor gene as a candidate gene in the first successful linkage study on NF.
- NF tumor, blood, skin biopsy and autopsy material from the center was a major source of research material for numerous gene linkage, cloning and cancer research laboratories in the U.S. and Europe.

## TEACHING

- Provided specialty clinic experience for adult and pediatric neurology, pediatrics and genetic residents.
- Developed the first NF specialty rotation for genetic counseling students in the world with Sarah Lawrence College graduate program in Human Genetics and the Mount Sinai Department of Genetics.

- **2009-Present:**

  **CLINICAL PROFESSOR OF NEUROLOGY AND PEDIATRICS, NYU LANGONE MEDICAL CENTER**

  Activities include patient care, teaching and research.  The NYU NF Center has the largest population of NF patients in the US.

## CORPORATE ACTIVITIES

**1992 – Present:  THE COOPER COMPANIES, (COO, NYSE):  Vice Chairman of the Board of Directors and Lead Director, Chairman of Governance/Nominating Committee, Member of the Science/Technology Committee.**

The Cooper Companies is a publicly-traded medical device company based in Pleasanton, California (COO, NYSE).  CooperVision manufactures contact lenses.  CooperSurgical/CooperGenomics produces products for Women's Health Care, including the Paragard IUD, IVF equipment and pre-implantation genetic diagnosis.  The company has 10,000 employees world-wide and is listed on the S&P 500.

**2003-2011: NEXGENIX PHARMACEUTICALS,  Founder and CEO**

Privately-held drug development effort for orphan neurologic disorders.  NexGenix merged in 2011 with Oncosynergy, a public biotechnology company based in San Francisco.

**2012-Present: PLEX PHARMACEUTICALS:  Chairman, Scientific Advisory Board**

Privately-held biotechnology company based in San Diego, California.

**2019: COLOURSMITH,  Advisory Board**

Start-up in Halifax, NS, developing a contact lens for color blindness.

## PATENTS/ PATENT APPLICATIONS



1.
2.
3.
4.
5.

# PUBLICATIONS

1. Rubenstein AE, Boyle J, Odoroff CL and Kunitz SJ: Effects of improved sanitary facilities on infant diarrhea in a Hopi village. Public Health Reports 84: 1093 – 1097, 1969.

2. Rubenstein AE and Brust JCM: Parkinsonian syndrome as a complication of post-thyroidectomy hypoparathyroidism. NY State J. Med. 74: 2029 – 2030, 1974.

3. Rubenstein AE, Lovelace RE, Behrens MD and Weisburg, LA: Moebius syndrome in association with peripheral neuropathy and Kallman syndrome. Arch. Neurol. 32: 480-482, 1975.

4. Rubenstein AE and Yahr MD: Adult onset autonomic dysfunction coexistent with familial dysautonomia in a consanguineous family. Neurol. 27: 168-170, 1977.

5. Rubenstein AE and Wainapel SF: Acute hypokalemic myopathy in alcoholism. Arch. Neurol. 35: 553-555, 1977.

6. Yahr MD and Rubenstein AE: Extrapyramidal disorder of the central nervous system. In: Tice's Practice of medicine. Vol. 10, Chap. 12, Harper and Row, New York, NY 1977.

7. Rubenstein AE, Yahr MD, Mytilineou C, et al: Peripheral catecholamine depletion in amyloid autonomic neuropathy. Mt. Sinai J. Med. 45 (6): 782-789, 1978.

8. Rubenstein AE, Horowitz SH and Bender AN: Cholinergic dysautonomia in the myasthenic (Lambert-Eaton) syndrome. Neurol. 29: 720-723, 1979.

9. Rubenstein AE, Mytilineou C, Yahr MD, Sivak M, Mindel J. and Frontera AT: Orthostatic hypotension in the Holmes-Adie syndrome. Mt. Sinai J. Med. 47: 15-23, 1980.

10. Gleicher N, Milano CL, Rubenstein AE and Deligdisch L: Phakomatoses in reproductive medicine. Mt. Sinai J. Med. 47: 311-316, 1980.

11. Korczyn AD, Rubenstein AE, Yahr MD and Axelrod F: The pupil in familial dysautonomia. Neurol. 31 (5): 628-629, 1981.

12. Rubenstein AE, Mytilineou C, Yahr MD, Pearson J. and Goldstein M: Neurotransmitter analysis of dermal neurofibromas: implications for the pathogenesis and treatment of Neurofibromatosis. Neurol. 31 (9): 1184-1188, 1981.

13. Mindel JS, Rubenstein AE and Franklin B: Ocular erotamine tartrate troxicity during treatment of vacor-induced orthostatic hypotension. Am. J. Opthalm. 92: 492-296, 1981.

14. Businaro R, Butler R, Rubenstein AE and Revoltella R: Monoclonal antibodies to mouse nerve growth factor produced by somatic cell hybrids. J. Neurosci. Res. 6: 89-98, 1981.

15. Wulfsohn M and Rubenstein AE: The management of Shy-Drager syndrome with propantheline and intermittent self-catheterization. J. Urology 126: 122-123, 1981.

16. Rubenstein AE, Mytilineou C, Yahr MD and Revoltella R: Neurologic aspects of Neurofibromatosis. Adv. Neurology 29: 11-23, 1981.

17. Riccardi V, Rubenstein AE, Fitzpatrick TB, et al: Clinical Diagnosis of Neurofibromatosis. Adv. Neurology 29: 86-89, 1981.

18. Rubenstein AE, Korczyn AD, Rayfield EJ and Thorton JC: Symposium on Diabetic Autonomic Neuropathy: Neurophysiology. NYS J. of Med. 82 (6): 588-589, 1982.

19. Korczyn AD and Rubenstein AE: Autonomic complications of therapy. In: Silverstein, A. ed: Neurologic Complications of Drugs. Plenum Press, New York, 1982.

20. Rubenstein AE: Amyloid neuropathy, In: Bannister, R., ed. Autonomic Failure. Oxford University Press, London, 1983.

21. Spence AM, Bader JL, Parry DL, Field LL, Funderburk SJ, Rubenstein AE, Gilman A and Sparkes RS: Linkage analysis of Neurofibromatosis. British Journal of Medical Genetics 25: 334-337, 1983.

22. Rubenstein AE: Neurofibromatosis. World Book Encyclopedia 22: 1173, 1983.

23. Rubenstein AE and Yahr F: Neurofibromatosis Information Booklet. Published by the National Neurofibromatosis Foundation, 1983.

24. Rubenstein AE, Gudesblatt M and Yahr MD: Acute autonomic neuropathy. Int. J. Neurology 31: 41-43, 1984.

25. Sobue G, Sonnenfeld KH, Rubenstein AE, Pleasure D: Tissue culture studies of Neurofibromatosis: Effects of axolemmal fragments and cyclic adenosine 3', 5' – monophospate analogues on proliferation of Schwann-like and fibroblast-like neurofibroma cells. Ann. Neurol. 18: 68-73, 1985.

26. Sonnenfeld KH, Bernd P, Sobue G, Lebwohl M and Rubenstein AE. Nerve growth factor receptors on dissociated neurofibroma Schwann-like cells. Cancer Res, 76: 117, 1986.

27. Rubenstein AE: Neurofibromatosis: A Review of the clinical problem. Ann. NY Acad. Sci. 486: 1-13, 1986.

28. Sonnenfeld KH, Bernd P, Rubenstein AE and Sobue G: Nerve growth factor binding to cells derived from Neurofibromatosis. Ann. NY Acad. Sci. 486: 107-114, 1986.

29. Pleasure D, Kreider B, Sobue G, Ross A, Koprowski H, Sonnenfeld K and Rubenstein AE: Schwann-like cells cultured from human dermal neurofibromas: immunohistological identification and response to Schwann cell mitogens. Ann NY Acad. Sci. 486: 227-240, 1986.

30. Rubenstein AE: Neurofibromatosis. Medicine in the News 5:98, 1986.

31. Rubenstein AE: Neurofibromatosis 1977-1987: Conn. Med. 42: 1-3, 1987.

32. Seizenger BR, Rouleau GA, Ozeliis LJ, Lane AH, Farmer GE, Lamiell JM, Haines J, Yuan J, Collins D, Majoor-Krakaver D, Bonner T, Mathew C, Rubenstein AE, Halperin J, McConkie-Rosell A, Green J, Trofatter J, Ponder B, Elerman L, Bowmer M, Schimke R, Oostra B, Aronin N, Smith D, Drabkin H, Waziri M, Hobbs W, Martuza R, Conneally P, Hsia AY, Gusella J: Von Hippel-Landau Disease Maps to the Region of Chromosome 3 Associated with Renal Cell Carcinoma. Nature, vol. 332, March 17, 1988, p. 268.

33. Rubenstein AE, Aron A. Wallace S and Halperin J: Neurologic Aspects of Neurofibromatosis. In: NF: A Handbook for Patients, Families and Health Care Professional. Thieme-Stratton. NY, 1990, p. 55-58.

34. Aron A, Wallace S, Rubenstein AE and Halperin J: Learning Disabilities in Neurofibromatosis. In: NF: A Handbook for Patients, Families and Health Care Professionals. Thieme-Stratton. NY, 1990, p. 55-58.

35. Rubenstein AE and Halperin JC: Neurofibromatosis: Diagnosis and Management. Neurology Forum 2 (1): 13-14, 1991.

36. Rubenstein AE: Phakomatoses. In: Current Diagnosis in Neurology. Mosby-Yearbook, Phil., 1994.

37. Kayes LM, Burke W, Bennett R, Ehrlickh P, Rubenstein AE, Riccardi VM, Stephens K: Deletions spanning the Neurofibromatosis 1 gene: identification and phenotype of five patients. J. Am. Soc. Hum. Genetics 54 (3): 424-436, 1994.

38. Mindel J. Rubenstein AE, Walalce S, Aron A, Halperin JH: Congenital Horner's Syndrome does not prevent the development of Lisch Nodules in NF-1. Ann. Neurology, 35 (1): 123-124, 1994.

39. Leppig KA, Vislochil D, Neil S, Rubenstein AE, Johnson VP, Zhu XL, Brothman AR, and Stephens K: The detection of contiguous gene deletions at the Neurofibromatosis 1 locus with fluorescence in situ hybridization: Cytogenet Cell Genet 72: 95-98, 1996.

40. Guttman DH, Aylsworth A, Carey JC, Korf B, Marks J, Pyertiz RE, Rubenstein AE and Viskochil D: The Diagnostic Evaluation and multidisciplinary Management of Neurofibromatosis 1 and Neurofibromatosis 2. JAMA 278 (1): 51-57, 1997.

41. Rubenstein AE and Lieberman F: Neurocutaneous Syndromes. In: Prognosis in Neurology. Butterworth-Heinemann, NY, 1998

42. Rubenstein AE and Lieberman F: Clinical Overview of Neurofibromatosis 2. In: Gann Monograph on Cancer Research 46: 1998

43. Maruyama K, Weaver M, Leppig KA, Farber R, Ortenberg J, Rubenstein AE, Immken L, Ccurry C and Stephens K: A quantitative PCR gene dosage assay to detect deletion of the NF-1 gene: Implications for molecular delineation of microdeletions. J. Am. Soc. Hum. Genetics 58: 1998

44. Lim DJ, Rubenstein AE, Evans DG et al:  Advances in Neurofibromatosis 2 (NF2): A workshop report. J. Neurogenetics: 14(2):63-106, 2000.

45. Baser ME, Evans DG, Jackler RK, Sujansky E, Rubenstein A., Neurofibromatosis 2, radiosurgery and malignant nervous system tumours., Br J Cancer. 2000 Feb;82(4):998.

46. 1: Packer RJ, Gutmann DH, Rubenstein A, Viskochil D, Zimmerman RA, Vezina G, Small J, Korf B.. Plexiform neurofibromas in NF1: toward biologic-based therapy. Neurology. 2002 May 28;58(10):1461-70

47. Fishbein L, Zhang X, Fisher LB, Li H, Campbell-Thompson M, Yachnis A, Rubenstein, A., Muir D and Wallace MR:  In vitro studies of steroid hormones in neurofibromatosis 1 tumors and schwann cells:  Molecular Carcinogenesis 28: 2007.

48. Wang, C., Barluenga, S., Koripelly, G.K., Fontaine, J., Chen, R., Yu, J., Shen, X., Chabala, J.C., Heck, J., Rubenstein, A. & Winssinger, N. (2009)   Synthesis of pochoxime prodrugs as potent HSP90 inhibitors. Bioorg Med Chem Lett. 19, 3836-3840.

49. Evans, D.G., Kalamarides, M., Hunter-Schaedle, K.,    Blakeley, J., Allen, J., Babovic-Vuskanovic, D., Belzberg, A., Bollag, G., Chen, R., DiTomaso, E., Golfinos, J., Harris, G., Jacob, A., Kalpana, G., Karajannis, M., Korf, B., Kurzrock, R., Law, M., McClatchey, M., Packer, R., Roehm, P., Rubenstein, A., Slattery III, W., Tonsgard, R.H., Welling, B., Widemann, B., Yohay, K. & Giovannini, M. (2009) Consensus recommendations to accelerate clinical trials for neurofibromatosis type 2. *Clin. Cancer Res.* **15**, 5032-5039.

50. ZhuH, Woolfenden S,  Bronson RT, Jaffer ZM, BarluengaS, Winssinger N, Rubenstein AE, Chen R and Charest A.: The Novel Hsp90 inhibitor NXD3001 induces tumor regression in a genetically engineered mouse model of glioblastoma multiforme. Molecular Cancer Therapeutics, September 2010 9:2618-2623.

51. Tanaka K, EskinA, Careyre F, Jessen WJ, Mananet J, Niwa-Kawakita M, Chen R, White CH, Vitte J, Jaffer ZM, RubensteinAE and Giovannini M: Therapeutic potential of Hsp90 inhibition for Neurofibromatosis type 2. Clinical Cancer Research 19: 3856-3858, 2013

52. Cha JR, Kyle JH,  Tradewell ML, Gentil BJ, Minotti S, Jaffer ZM, ChenR, Rubenstein AE, and Durham H:  A novel small molecule HSP90 inhibitor, NXD 30001, differentially induces heat shock proteins in nervous tissue  in culture  and in vivo. Cell Stress and Chaperones. Published online October 3, 2013.

53. GellerM, FilhoAB, OliveiraL, RubensteinAE et al.: A Proof-of-Concept Assessment of the Safety and Efficacy of Intralesional Diclofenac in the Treatment of Cutaneous Neurofibromas. Int. J. Clinical Med 2015 (6): 975-983

## ABSTRACTS

1. Rubenstein AE, Yahr MD and Mytilineou C: peripheral adrenergic hypersensitivity in orthostatic hypotension: The effects of denervation versus decentralization. Neurology 28: 376, 1978.

2. Rubenstein, AE, Horowitz SH and Bender AN: Cholinergic dysautonomia in the myasthenic (Easton-Lambert) syndrome. Neurology 28: 381, 1978.

3. Rubenstein AE, Mytilineou C and Horowitz SH: superficial catecholamine depletion in lepromatous leprosy with intact circulatory reflexes: Evidence for a temperature-linked distribution of autonomic neuropathy. Neuropathy. Neurology 30: 568, 1979.

4. Rubenstein AE, Ginsber-Fellner F, Korczyn AD, Witt MD, Horowitz SH, Mindel JS, Frontera AT and Lowe YH: Chronic autonomic neuropathy due to rodenticide ingestion. Neurology 29: 443, 1980.

5. Rubenstein AE, Mytilineou C and Yahr MD: Adrenergic neurotransmitters in dermal neurofibromas: Implications for the pathogenesis and treatment of Neurofibromatosis. Neurology 30: 440, 1980.

6. Rubenstein AE, Korczyn AD, Yahr MD and Axeldord FB: The pupil in familial dysautonomia. Neurology 30: 440, 1980.

7. Pressman MR, Spielman AJ, Korczyn AD, Pollack CP, Rubenstein AE and Weitzman ED: Pupillary rhythms in normals and narcoleptics through the course of a day. Sleep Research, 9: March, 1980.

8. Rubenstein AE, Mindel JS, Korczyn AD and Perla CS: Iris nevi in Neurofibromatosis: evidence for a specific effect of puberty. Neurology 314: 64, 1981.

9. Rubenstein AE, Korczyn AD, Rayfield EJ and Thornton JC: the pupil in diabetes mellitus. Neurology 314: 194, 1981.

10. Bader JL and Rubenstein AE: Disseminated Neurofibromatosis in 1 of 2 monozygous twins. Neurology 314: 98, 1981.

11. Bader JL, Kanton AF and Rubenstein AE: Increased risk of cancer with neurofibromatosis. Proc. Amer. Sci. Clin.. Oncol. 22, 1981.

12. Rubenstein AE, Mytilineou C and Ladman R: Neurofibromas transplanted to the anterior chamber of the eye: An animal model for axon sheath cell trophic interactions in neurofibromatosis. Neurology 32, 1982.

13. Rubenstein AE, Mytilineou C and Ladman R: Successful treatment of pain in familial cutaneous leiomyomatosis with stellate ganglion block. Neurology 32. 1982.

14. Spence AM, Bader JL, Parry DL, Field LL, Funderburk SJ, Rubenstein AE, Gilman PA and Sparkes RS: Linkage analysis of Neurofibromatosis. American Society for Human Genetics, 1982.

15. Gudesblatt MS, Goodman AD and Rubenstein AE: Autonomic neuropathy in autoimmune disorders. Neurology 33, 1983.

16. Rubenstein AE, Korczyn AD and Yahr MD: Thermal salivation following Guillan-Barre syndrome: Evidence for abherrant regeneration of sympathetic cholinergic fibers. Neurology 33, 1983.

17. Rubenstein AE, Bader JL, Aron AA and Wallace S: Familial transmission for segmental Neurofibromatosis. Neurology 33, 1983.

18. Rubenstein AE, Ladman RK, Mytilineou C, Aron AA, Wallace S. and Stillman S: Nerve growth factor in neural tumors in disseminated Neurofibromatosis. Neurology 33, 1983.

19. Rubenstein AE, Bader JL, Pearson J. Buzhilovich G and Sun CJ: The association of smooth muscle tumors with neural crest tumors: Implication for the pathogenesis of Neurofibromatosis. Proc. American Soc. Clin. Oncol. 24, 1983.

20. Sonnenfeld KH, Bernd P, Rubenstein AE: Radioautographic identification of 125 I-nerve growth factor binding cells for neurofibromas. Sox. Neurosci. Abst. 10: 27, 1984.

21. Rubenstein AE, Aron AM and Wallace S: Adult presentation of Meningoceles in Neurofibromatosis, Neurology 34 (Suppl. 1): 168, 1984.

22. Rubenstein AE, Cohen LB, Aron AM and Wallace S: Primary mesenteric plexus alteration as a cause of megacolon in Neurofibromatosis. Neurology 34 (Suppl. 1) 211, 1984.

23. Rubenstein AE, Wallace S, Aron AM and Penchazadeh G: Neurological complications in 250 cases of Neurofibromatosis, Ann. Neurology 16 (1): 133, 1984.

24. Rubenstein AE, Seitz SC, Wallace S, Aron AM and Lebwohl M: Increased Risk of Congenital Pre-Malignant Melanocytic Nevi in Neurofibromatosis: Neurology 35 (Suppl. 1): 194, 1985

25. Rubenstein AE, Wallerstein R, Aron Rubenstein et al: Lack of correlation of megalencephaly with learning disability in disseminated Neurofibromatosis. Am. J. Hum. Genet. 37 (Suppl.): 214, 1985.

26. Taff IP, Handelsman J, Rubenstein AE, Aron A and Wallace S: Madelung's Deformity Associated with Von Recklinghausen Neurofibromatosis (VRNF); "Extension of the spectrum of Dysplastic Phenomena Associated with VRNF" Neurology 36, (Suppl. 1): 168, 1986.

27. Rubenstein AE, Taff I, Aron A and Wallace S Clustering of severe complications in 2 kindred with Neurofibromatosis 1: Neurology 37, (Suppl. 1): 132, 1987.

28. Aron A, Rubenstein AE and Wallace S: Optic glioma in children with NF. Ann. Neurology 19: 862, 1987.

29. Rubenstein AE, Wallace S, Aron A and Halperin J: Severe Pruritus in a Case of NF1, American Society of Human Genetics, NNFF Clinical Care Conference, San Diego, 1987.

30. Rubenstein AE, Huang P, Kugler S, Wallace S, Sassower K, Aron A and Halperin J: Unidentified Signals on Magnetic Resonance Imaging in children with Neurofibromatosis: Neurology 38, (Suppl. 1): 282, 1988.

31. Rubenstein AE, Halperin J, Aron A, Wallace S and Sassower K: NF 1 and 2: Distinct Genotypes with Overlapping Phenotypes: Am. J. Hum. Genet. 45 (3) Suppl.: 195, 1988.

32. Rubenstein AE, Halperin J, Siezenger B and Bader J: A Possible Double Dose Family of NF1, NNFF 10th Anniversary Research Symposium, NY 1988.

33. Rubenstein AE, Wallace S, Aron A, Kugler S and Halperin J: UBO's on MRI in NF1: American Society of Human Genetics, NNFF Clinical Care Symposium, New Orleans, 1988.

34. Aron A, Rubenstein AE, Wallace S, Kugler S and Halperin JC: Optic Glioma in NF11: The Mt. Sinai NF Center Experience. National NF Foundation Conference on Optic Gliomas in NF, New York, 1989.

35. Rubenstein AE, Halperin JC, Mindel J, Wallace S and Aron A: Lisch Nodules in neurofibromatosis-1 are not Dependent on Sympathetic Intervention. Am. J. Hum. Genet. 47 (3) Suppl.: A76, 1990.

36. Rubenstein AE, Wallace S, Aron A, Nizam M, Halperin J, & Wolfe D.: Post-Radiation Malignancy in Neurofibromatosis 2 American College of Medical Genetics, NNFF Clinical Care Conference, Los Angeles, 1995.

37. Baser ME, MacColin NM, Sujansky E, Evans DGR and Rubenstein AE: Malignant nervous system tumors in patients with NF2. Fed. Amer. Soc. Exp. Biol. Summer Research Conference on NF, Aspen, 1996.

38. Rubenstein AE, Luce N, Wallace S, Nizam F. and Aron A: Multiple de novo mutations in the NF1 gene in a kindred demonstrated by protein truncation assay. Fed. Amer. Soc. Exp. Biol. Summer Research conference on NF, Aspen, 1996.

10

39. <u>Rubenstein AE,</u> Luce M, Wallace S and Davis L: Absence of abnormality on protein truncation assay for NF1 mutation in 2 cases of Proteus syndrome: Further evidence that the Elephant Man did not have NF1. Fed. Amer. Soc. Exp. Biol. Sumer Research Program on NF, Aspen, 1996.

40. Srinivasa Reddy Natala, Shyama Siddique, David Carney, Ann Mladek, Jeffrey Stebbins, Li Yang, Pooi San Lee, Daniel Brimberry, Robert Ardecky, Peter Teriete, <u>Allan Rubenstein,</u> Jann Sarkaria, Nicholas Cosford, and Sridhar Prasad: Cyto-Mito™ - A Novel Class of Dual-Acting Hsp90 Inhibitors for the Treatment of Glioblastoma, Neuro-Oncology, Volume 19, Issue suppl_6, 6 November 2017, Pages vi61,https://doi.org/10.1093/neuonc/nox168.248.

## BOOKS

1. Neurofibromatosis: edited by <u>Allan E. Rubenstein,</u> Richard P. Bunge and David E. Housman. New York Academy of Sciences, NY, 1986.
2. Neurofibromatosis: A Handbook for Patients, Families and Health Care Professionals. Edited by <u>Allan E. Rubenstein</u> and Bruce R. Korf. Thieme-Stratton, NY, 1990.
3. Neurofibromatosis: A Handbook for Patients, Families and Health Care Professionals.2[nd] Edition. Bruce R. Korf and Allan E. Rubenstein, Thieme, NY, 2005.

## INVITED LECTURES AND NON PUBLISHED PAPERS
## PRESENTED AT NATIONAL CONFERENCES

1. Columbia-Presbyterian Medical Center, NY, Neurology Grand Rounds: Acute Autonomic Neuropathy, 1981.
2. Massachusetts General Hospital, Boston, Neurofibromatosis Symposium, Department of Neurosurgery: Theoretical Aspects of Neurofibromatosis, 1982.
3. National Institute of Health, Bethesda, Interdepartmental Genetics Conference: A Possible Double Dose Family with Neurofibromatosis, 1982.
4. National Cancer Institute, U.S. – Japan Cooperative Cancer Program: Workshop on Neural Crest Tumors, Honolulu, 1982.
5. Yale University School of Medicine, New Haven, Neurofibromatosis Symposium, Department of Genetics: Neurofibromatosis: An Overview, 1984.
6. University of California at San Diego, San Diego, Neurofibromatosis Symposium, Department of Genetics: Neurofibromatosis Aspects of Neurofibromatosis, 1985.
7. University of Medicine and Dentistry of New Jersey, Rutgers, Neurology Grand Rounds: Neurofibromatosis, 1985.
8. North Shore University Hospital, Great Neck, Neurofibromatosis Symposium, Department of Genetics: Current Research in Neurofibromatosis, 1986.
9. Israel Neurological Society Annual Meeting, Tel Aviv, Invited Guest Lecture: Current Research in Neurofibromatosis, 1986.
10. Tulane University School of Medicine, New Orleans, Neurofibromatosis Symposium, Department of Genetics: Current Research in Neurofibromatosis, 1986.
11. Albany Medical College, Albany, Neurofibromatosis Symposium, Department of Rehabilitation Medicine: A Clinical Review of Neurofibromatosis, 1986.
12. University of Medicine and Dentistry of New Jersey, Newark, Neurology Grand Rounds: Neurofibromatosis, 1987.

13. 1st European Conference on Neurofibromatosis Sponsored by the British Neurofibromatosis Foundation: Neurofibromatosis: An Overview, 1987.

14. University of Indiana Medical Center, Indianapolis, Visiting Professor in Neurology, Neurology Grand Rounds: Neurologic Aspects of Neurofibromatosis, 1987.

15. University of Cincinnati Medical Center, Cincinnati, Department of Genetics: Review of Current Research in Neurofibromatosis, 1987.

16. The Salk Institute, La Jolla, Department of Neurosciences: Neurofibromatosis: the Clinical Problems, 1987.

17. University of South Florida Medical School, Tampa, Department of Genetics, Neurofibromatosis Symposium: Current Research in Neurofibromatosis, 1987.

18. Columbia-Presbyterian medical center, New York, Orthopedic Grand rounds: Orthopedic Aspects of Neurofibromatosis, 1987.

19. National Institute of Health, Bethesda, Consensus Development Conference on Neurofibromatosis: Variant Forms of Neurofibromatosis, 1987.

20. Booth Memorial Hospital, Queens, Pediatric Grand Rounds: Neurofibromatosis in Children, 1988.

21. The Cleveland Clinic, Cleveland, Department of Neurology, Neurofibromatosis Symposium: Neurologic Aspects of Neurofibromatosis, 1989.

22. Hackensack Medical Center, Hackensack, Pediatric Grand Rounds: Neurofibromatosis: Current Status, 1989.

23. Memorial Sloane-Kettering Hospital, New York, Pathology Seminar: Neurofibromatosis: An Update, 1990.

24. California Chapter NNFF Symposium, Los Angeles: Neurolgoic Aspects of Neurofibromatosis, 1990.

25. National Association for Research in Neurologic Disorders, Washington, D.C." Research in Neurofibromatosis: The Next Decade, 1990.

26. First German Symposium on Neurofibromatosis, Sponsored by the German Neurofibromatosis Foundation, Hamburg: Neurofibromatosis Research: An Overview, 1990.

27. Cold Spring Harbor Conference, Cold Spring Harbor, Research Directions in Neurofibromatosis: Sympathetic Influences on Development of the Neurofibromatosis Phenotype, 1990.

28. University of Washington Medical Center, Seattle, Visiting Professor in Genetics: Phenotype Diversity in Neurofibromatosis, 1990.

29. Society for Neuroscience Annual Meeting, St. Louis, Neurofibromatosis Symposium: Neurofibromatosis – The Clinical Problem, 1990.

30. Rockefeller University, New York, Department of Dermatology: Neurofibromatosis: A Clinical Overview and Research Update, 1990.

31. Albert Einstein School of Medicine, New York, Neurology Grand Rounds: Neurofibromatosis, 1991.

32. World Health Organization Conference on Neurofibromatosis, Jacksonville, Neurofibromatosis: Incidence and Distribution, 1991.

33. Medical Center of Delaware, Wilmington, Neurology Grand Rounds: Neurofibromatosis, 1991.

34. American Academy of Neurology Annual Meeting, Boston, Seminar: Neurofibromatosis; From Clinical Phenotypes to the Genes, 1991.

35. University of Medicine and Dentistry of New Jersey, Rutgers, Neurology Grand Rounds: Neurofibromatosis update, 1992.

36. University of Medicine and Dentistry of New Jersey, Newark, Neurology Grand Rounds: Neurofibromatosis Update, 1992.

37. 2nd European Conference on Neurofibromatosis, Vienna: NF: A Clinical Overview, 1992.

38. International Congress of Dysmorphology, Strasbourg: Historical Aspects of NF1 and NF2, 1993.
39. International NF Association Conference, Hong Kong: Neurological Aspects of NF-1, 1994.
40. Jikei University, Tokyo: Neurological Aspects of NF-1, 1994.
41. Fifth European Neurofibromatosis Symposium, University of Leuven, Belgium: Recent Advances in NF-1 and NF-2, 1995.
42. Fifth European Neurofibromatosis Symposium, University of Leuven, Belgium: Post-radiation malignancy in NF-2, 1995.
43. Beijing University, Beijing: NF-1: A Clinical Overview, 1995.
44. Cold Spring Harbor Banbury Conference, Cold Spring Harbor, Developing Therapies for Neurofibromatosis: NF-1 Treatment: Data and Data Collection, 1995.
45. Neuro-otology New York 1996 (CME Conference) NF-2: An Update.
46. UCSD, Children's Hospital, San Diego: Mini Seminar LVII: NF – Overview and Recent Developments, 1995.
47. Sarah Larence College, New York, Graduate Program in Human Genetics: NF: An Update, 1997.
48. Manhattan Eye, Ear and Throat Hospital, New York. Otolaryngology Grand Rounds: NF-2, 1997.
49. Lenox Hill Hospital, New York, Pediatric Grand Rounds: NF: An Overview, 1998.
50. NYU Medical Center. Neurology Grand Rounds: Advances in genetic diagnosis of NF-1 and NF-2, 1998.
51. 12th European Symposium on Neurofibromatosis, Lisbon, 2007:  NX101: Development of a non-surgical treatment for dermal neurofibromas in neurofibromatosis type 1.
52. Chen, R., Yu, J.C., Shen, X.D., Rubenstein, A.E., Tsutsumi, S., Beebe, K., Neckers, L., Barluenga, S., Wang, C., Fontaine, J., KaAouadi, K., and Winssinger, N. Pochoximes, potent Hsp90 inhibitors with in vivo activities. 4th international conference on The Hsp90 Chaperone Machine October 2-6th, 2008, Seeon, Germany.
53. Panday, U., Cha, J., Jaffer, Z.M., Chen, R., Durham, H., Taylor, J.P., Winssinger, N., and Rubenstein, A.E. Proof-of-concept for a novel small molecule Hsp90 inhibitor for aging-related diseases. 13th Congress of the International Association of Biomedical Gerontology, 2009, Quebec City, Canada
54. Third International Research Workshop on Frontotemporal Dementia in ALS.  Sunday June 21 - Thursday June 25, 2009.  London, Ontario, Canada.  Inhibitors as Potential Therapeutic Agents in ALS
55. Cha, J., Pandey, U., Zhu, H., Jaffer, Z. M., Chen, R., Charest, A., Taylor, J. P., Durham, H. D., Winssinger, N., and Rubenstein, A.E. A novel small molecule Hsp90 inhibitor: Applications for diseases of the nervous system. Gordon Conference: Stress Proteins in Growth, Development & Disease, 2009, Proctor Academy, Andover, NH.
56. Lukyanov, E., Chen, R., Zaffer, Z.M., Winssinger, N., Rubenstein, A.E., Zagzag, D., and Newcomb, E.W. Hsp90 inhibitor NXD30001 increased survival of GL261 glioma bearing mice. Joint Meeting of the Society for Neuro-Oncology and the AANS/CNS Section on Tumors, 2009, New Orleans, Louisiana.
57. Pandey, U., Jaffer, Z.M., Chen, R., Taylor, J. P., Winssinger, N., and Rubenstein, A.E. Proof-of-concept for a novel small molecule Hsp90 inhibitor for SBMA. Motor Neurone Disease Association, International Symposium on ALS/MND, 2009, Berlin, Germany.
58. Durham, H.D., Cha, J., Jaffer, Z. M., Chen, R., Winssinger, N., and Rubenstein, A.E. Evaluating the therapeutic potential of a novel small molecule Hsp90 inhibitor for motor neuron diseases. Motor Neurone Disease Association, International Symposium on ALS/MND, 2009, Berlin, Germany

13

59. Rubenstein, A.E., Pandey, U, Jaffer, ZM, Chen, R., Barluenga, S., Winssinger, N., and Taylor, J.P Proof-Of-Concept for a novel small molecule Hsp90 inhibitor for spinal and bulbar muscular atrophy (SBMA). American Academy of Neurology, 62nd Annual Meeting, 2010, Toronto, Canada.

60. Chen, R., Tanaka, K., Jaffer, Z.M., Winssinger, N., Giovannini, M. and Rubenstein, A.E. Targeting a chaperone for Neurofibromatosis Type 2. House Ear Institute and Children's Tumor Foundation, NF2 – State of the Clinical Trial Meeting, 2010, Las Vegas, Nevada.

61. Karo, T., Jaffer, Z.M., Chen, R., Winssinger, N. Rubenstein, A.E. and Giovannini, M. Therapeutic potential for a novel Hsp90 inhibitor, NXD30001, for NF2. Children's Tumor Foundation, Annual Conference, 2010, Baltimore, Maryland.

Allan E. Rubenstein, M.D.


Court Testimony / Depositions

# COMPREHENSIVE NEUROLOGY SERVICES, PC

139 West 82nd Street. Suite 1G
New York, NY 10024
Tel: (212) 974-3009
Email: arubenstein@cns-pc.com

## Allan E Rubenstein, MD, Medical Director
Clinical Professor of Neurology & Pediatrics, NYU School of Medicine
Board Certified, American Board of Psychiatry and Neurology (Neurology)
Member, American Academy of Neurology

## Court Testimony and Deposition

### 2002
December 19, 2002 - Rosario, Ingrid (Joel Glaser, Trolman, Glaser & Lichtman) vs. San Roman (U.S. District Court, Eastern District of New York) – Deposition (P)

### 2003
November 14, 2003 - Evans, Dana Joy (Mark Sullivan, Aaronson, Rappaport, Feinstein & Deutch) vs. Saul Hoffman, MD – (Supreme Court of New York State) - Court Testimony on behalf of Defendant, alleged complication of surgery, decided in favor of defendant.

November 11, 2003 - Franklin, Corderius (Michael Ragas, Scherffius, Ballard, Still and Ayers) – (State Court of DeKalb County, Georgia)    - Deposition (P)

July 22, 2003 - Sorrels, Jessie Thomas (Lisa Beck, Cloniger, Lindsay, Hensley & Searson) vs. William Sither, MD (Superior Court of North Carolina, Haywood County) – Court Testimony (P)

January 21, 2003 - Baylis, Frank (David Carroll, Roberts, Carroll, Feldstein & Pierce) vs. Doberstein (State of Rhode Island, Superior Court) - Court Testimony

### 2004
April 27-28, 2004 - Loprimo, Robert (Stuart Samuel, Samuel & Weiniger) vs. Irina Grossman, MD. Gil Lederman, MD and Staten Island University Hospital (Supreme Court of New York State, Richmond County) – Court Testimony on behalf of Plaintiff, NF1 treatment.

March 26, 2004 - Rosario, Benjamin & Emma (R. Martin Oliveras) vs. Joaquin Garcia, MD. Barry Efros, MD, Leoncio Gonzalez, MD, Howard Weiss, MD (Superior Court of New Jersey, Morristown) – Deposition (P)

March 22, 2004 - York, Mary Jane (Earl McCall, McCall, Finney & Phillips) vs. Herman Posas, Jr. MD, Bipinchandra Patel, MD and The Neurological Institute (State Court of Lowden County, Georgia) – Deposition

July 19, 2004 – Trucker, Trina (Tonja Arnold, Becker Law Office) vs. Graulich– (Location: 152 W. 57th St., NY, NY) – Deposition (P)

July 20, 2004 – Lorme, Gina- (Delia Peters, Martinez & Rittorto) vs. Delta Airlines – (Location: 152 W. 57th St., NY, NY) – Deposition on behalf of Defendant, damages concerning alleged back trauma.

**2005**
None

**2006**
December 11, 2006 – Casey, David (George Bush, Law Offices of George D. Bush) vs. Board of Regents, University System of Georgia – (Location: 152 W. 57th St., NY, NY) – Deposition (P)

**2007**
May 21, 2007 – Watson, Michael (Gary Ginsberg, Ginsberg & Ginsberg) vs. Alan Hilibrand, MD & Steven Mandel, MD (Location: 152 W. 57th St., NY, NY) – Deposition (P)

May 29, 2007 – Watson, Michael (Gary Ginsberg, Ginsberg & Ginsberg) vs. Alan Hilibrand, MD & Steven Mandel, MD (Location- Trenton, New Jersey) – Court Testimony (P)

**2008**
June 5, 2008 - Sterry, Juliette (Steven Samuel -Samuel & Ott) (Location: Long Island, NY) – Court Testimony on behalf of Plaintiff, med mal case cerebrovascular disease

September 19, 2008 - Diego, Candidta (Phil Russotti -Wingate, Russotti & Shapiro, LLP) vs. NY Queens Hospital – (Queens County Courthouse, NY)  - Court Testimony (P)

October 6, 2008 - Ortiz, Grace (Dennis Breitner – Finz & Finz) vs. NJ Health Systems, et. al.(location 152 West 57th St., NY, NY 10019) – Deposition on behalf of Plaintiff, HIE

October 21, 2008 – Irving, Thomas (John Hensley – Janet, Jenner & Suggs, LLC) vs. Jerrold Gale & Hendersonville Radiological Consultants – (Location: 152 W. 57th St., NY, NY) – Deposition(P)

December 30, 2008 – Lerman, S. (Location: Binghamton, NY) - Court Testimony, Parental custody case involving adolescent with seizure disorder

**2009**

June 23, 2009 – Hashimi, E (Abigail Miller - Stephens, Boatwrights, Primeau, Cooper & Coleman, PC) - Location: Manassas, VA – Court testimony, Family services hearing on behalf of Defendant, head trauma/alleged child abuse

Sept. 22, 2009 – Kamouei, S (Gregg Viola – Eccelston & Wolfe, PC) – (location – 152 West 57th St., Ste. 11B, NY, NY 10019) – Deposition on behalf of Defendant, alleged head trauma injury.

**2010**

February 4, 2010 – Irving, Thomas (Lisa Beck – Janet, Jenner & Suggs, LLC) (Location - Superior Court of Henderson County, North Carolina – Court Testimony-(P)

April 22, 2010 – DeStefano, V (Anthony Cocca – Bubb, Grogan) – Location – 152 West 57th St., Ste. 11B, NY, NY 10019) – Deposition on behalf of Plaintiff,  HIE

June 29, 2010 – Guerrero, B, (Patrick Arre – Chasen, Leyner & Lamparello) Hudson Superior Court, Jersey City, NJ – Court testimony on behalf of Plaintiff, HIE

## 2011

January 18, 2011 – Chau, Tom K. (Steve Pruzan - Miracle, Pruzan & Pruzan) – 152 West 57th St., Ste. 11B, New York 10019 – Deposition

February 25, 2011 – Anderson, Ivalyn (Brett, Thomas - Roebuck, Thomas, RoseBuck & Adams) - 152 West 57th St., Ste. 11B, NY, NY 10019 – Deposition

April 5, 2011 – Garcia, Gypsy (Dennis Breitner - Silberstein, Awad, Miklos, PC) – Location – Bronx Civil Court, Bronx, NY – Damages/causation testimony on behalf of Plaintiff, HIE

August 23, 2011 – Burns, Ashtyn (John Doubeck, Doubeck & Pyfer, LLP) – Location – 1790 Broadway, Suite 800, NY, NY 10019 – Deposition on behalf of Plaintiff, HIE

August 30, 2011 – Ford, Saundra (B. Elliot Grysen, Atty) – Location – 1790 Broadway, Suite 800, NY, NY 10019 – Deposition on behalf of Defendant, cerebrovascular disease

November 29, 2011 – Ali, Tasmina (Angela Howard, Atty, Law offices of Anthony Vardaro) – Location – Queens Borough Hall, 120-55 Queens Blvd Kew Gardens, NY 11424 – Court Testimony on behalf of Defendant, NF1 optic glioma management

## 2012

March 6, 2012 – Flores, Ray (John Rowley, Attorney, 1250 S. Capital of Texas Highway, Three Cielo Center, Suite 400, Austin, TX 78746) – Location – 1790 Broadway, Suite 800, NY, NY 10019 – Deposition on behalf of Plaintiff, cerebrovascular disease

July 27, 2012 – Adams, Laura (Jake Kennedy, Attorney, The Victoria Building, Suite 200, 10 Pinckney Colony Road, Bluffton, SC 29909) – Location – 1790 Broadway, Suite 800, NY, NY 10019 – Deposition on behalf of Plaintiff, cerebrovascular disease

August 3, 2012 – Farrell, Thomas (Waide DeCosta, Attorney, Unit # 1, 3rd Flr., Thompson Building, P.O. Box 591, Grand Cayman KY1-1502, Cayman Islands) – Location – Grand Cayman, Cayman Islands – Court testimony on behalf of Defendant, damages concerning head trauma

December 10, 2012 – Jenny Fay Kusner  (ZAREMBA BROWNELL & BROWN PLLC)
 Location: Staten Island Court….testimony on behalf of Plaintiff, causation concerning low birth weight infant/ autism spectrum disorder

## 2013

2/1/2013 - Jordan Ekberg. Location:  NY  Deposition on behalf of Plaintiff, management of seizures.

2/15/2013- Amelia Konefal. Location: NJ. Deposition on behalf of Plaintiff, perinatal CVA

April 4, 2013 – Marquis Starks; et al. v. Leonida Torres, M.D.; et al., Case No. L-545-08, Essex County, New Jersey. Deposition on behalf of Plaintiff

April 12, 2013 Colbroth v. Burmann.  Location:  Paducah, KY.  Trial testimony on behalf of defendant,

management of NF1 optic glioma. Decided in favor of defendant.
April 22, 2013 – Joseph and Rita Scheiring v. Paul A. Grossmann, M.D.; et al., Case No. CL 123923, Polk County, Iowa. Deposition on behalf of Plaintiffs

June 24, 2013 – Imani Santiago; et al. v. The Children's Resue Fund; et al., Case No. 350716/09, Bronx, New York. Trial Testimony on behalf of Defendants

June 26, 2013 – John and Peggy Cwikla v. Dr. Daniel Milton, Oncology Specialist S.C.; et al., Case No. 09 L 11870, Cook County, Illinois. Deposition on behalf of Plaintiffs

June 27, 2013 – Tiffany and Jeremy Brannen; et al. v. Becky Clark and Jason Clark, Case No. CV12-0439, Parker County, Texas. Deposition on behalf of the Plaintiffs

July 2, 2013 – Barbara Graf v. Midstate Medical Center; et al., Case No. CV 08 5023182 S, New Haven, New York. Deposition on behalf of Plaintiff

July 22, 2013 – William Szabo v. New York State, Case No. 122970, Erie County, New York. Trial Testimony on behalf of Plaintiff

October 9, 2013 – Deborah Burchett, as legal guardian of Cassandra Burchett v. Secretary of the Department of Health and Human Services, Case No. 12-119V, United States Court of Federal Claims. Trial Testimony on behalf of Plaintiff, Vaccine board

October 21, 2013 – Sabino Perez and Luz Maria Amezquita; et al. v. AMISUB of South Carolina, Inc, d/b/a Piedmont Medical Center; et al., Case No. 2001-CP-46-01348, York County, South Carolina. Deposition on behalf of Plaintiff

October 29, 2013 – Frederick Rupp v. Viren Desai, M.D.; et al., Case No. ESX-L-0048-12, Essex County, New Jersey. Deposition on behalf of Plaintiff

December 3, 2012 – Mimi Torres, individually and as legal Guardian of Trinity Torres v. Anthony H. Jackson, M.D.; et al., Case No. 2011-750, Hampden County, Massachusetts. Deposition on behalf of Plaintiff

December 16, 2013 – Kelvin Frimpong; et al. v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; et al., Case No. 376669-V, Montgomery County, Maryland. Deposition on behalf of Defendants

## 2014

January 28, 2014 – Amelia Konefal, et al. v. Susan Cocoziello, M.D. et al.; Case No. BER-L-4857-10, Bergen County, Superior Court of New Jersey, Trial Testimony on behalf of Defendants

February 26, 2014 – Joseph Scheiring; et al. v. Paul A. Grossman, M.D.; et al.; Case No. CL 123923; Polk County, Iowa, Trial Testimony on behalf of Plaintiff.

May 13, 2014 – Charles McGrory, et al. v. VHS San Antonio Partners, LLC et al.; Case No. 2012-C1-00310, Bexar County, District Court of Texas, Deposition on behalf of Plaintiff.

August 25, 2014 – Alicia Jackson as parent and natural guardian of Kamar Johnson et al. v. Miami Valley Hospital, et al.; Montgomery County, Common Pleas Court of Ohio, Deposition on behalf of the Plaintiff.

## 2015

June 17, 2015 – Michelle and Brandon Gray, et al v. Dr. Ahmad Al-Jerdi, D.O. et al; Case No. 14-000035-NH; Wayne County, Circuit Court of Michigan, Deposition on behalf of Plaintiff.

July 28, 2015 – Priscilla R. Dewbre et al. v. K. Anthony Shanbour, M.D. et al; Case No. CJ-2011-8107, Oklahoma County, District Court of Oklahoma, Deposition on behalf of Plaintiff.

August 17, 2015 – Ava Ippoliti, et al v. Lisa M. Geer-Yan, et al; J.D of Fairfield at Bridgeport, Superior Court, Deposition on behalf of Plaintiff

September 29, 2015 – June Elsman et al. v Dr. Haight et al; Nassau Supreme Court, Trial Testimony on behalf of the Plaintiff.  Topic:  Contracture in Multiple Sclerosis.

November 18, 2015 – Saundra Boyd et al. v Sam Sydney, M.D. et al; Baltimore City, Circuit Court of Baltimore, Deposition on behalf of Plaintiff

## 2016

February 17, 2016 - Saundra Boyd et al. v Sam Sydney, M.D. et al; Baltimore City, Circuit Court of Baltimore, Trial Testimony on behalf of Plaintiff.

February 18, 2016 – Travis J. Denham et al v David R. Hockmuth, M.D. and Catholic Health Initiatives-Iowa Corp. et al; Polk County, The Iowa District Court; Deposition on behalf of Plaintiff.

March 15, 2016 – Richard Moffett et al v Saint Agnes Healthcare, Inc. d/b/a Saint Agnes Hospital, et al; Baltimore City, Circuit Court of Baltimore, Deposition on behalf of Plaintiff.

May 24, 2016 – John Terehoff an infant by his Mother and natural guardian Yekaterina Gaverisheva, et al v Rubin Frenkel, MD and Bay OB/GYN, PC, et al; Kings, New York Supreme Court, Hearing on behalf of Plaintiff.

## 2017

January 13, 2017 – John Terehoff an infant by his Mother and natural guardian Yekaterina Gaverisheva, et al v Rubin Frenkel, MD and Bay OB/GYN, PC, et al; Kings, New York Supreme Court, Trial Testimony on behalf of Plaintiff

January 20, 2017 – Darryl W. Gardner v Joel R. Taylor, MD, Jahangir Imani, MD, Ruth M. Indahyung, MD IHC Health Services Inc. dba McKay Dee Hospital Center et al; Salt Lake City, Second Judicial District Court of Utah, Deposition on behalf of Plaintiff.

January 31, 2017 – Dennis Paradise v Kessler Institute For Rehabilitation et al; Essex County, Superior Court of New Jersey, Deposition on behalf of Defendant.

February 21, 2017 – Robert B. Ferruggiari v Christopher Winfree, MD, New York-Presbyterian/Columbia University Medical Center et al; Bergen County, Superior Court of New Jersey Law Division, Deposition on behalf of Plaintiff.

February 24, 2017 – Steven Sperber v Julie Ann Murphy f/k/a Julie Sperber , Miami-Dade County, Circuit Court of Florida, Family Court.  Neuro Issue; Postural Orthostatic Hypotension.  Deposition.

March 13, 2017 – Linda Wendt v Jill Bowerman, MD, Midmichigan Medical Center-Midland; Midland County, Circuit Court of Michigan, Deposition on behalf of Plaintiff.

March 17, 2017 – Steven Sperber v Julie Ann Murphy f/k/a Julie Sperber , Miami-Dade County, Circuit Court of Florida, Family Court.  Neuro Issue; Postural Orthostatic Hypotension.  Trial Testimony.

May 9, 2017 – Valeria Sambanidis v ASC, Deposition on behalf of Defendant.

July 31, 2017 – David Harrison v Jersey Central Power & Light Company et al; Mercer County, Superior Court of New Jersey, Deposition on behalf of Plaintiff.

September 18, 2017 – Aiden Leotta, an infant by his natural mother and Guardian ad Litem, Kristyn Leotta et al v. Bruce Edelman, MD et al; Superior Court of New Jersey, Deposition of Plaintiff.

September 29, 2017 – The people of the State of New York v. Danthony Horton; Queens County, Supreme County of the State of New York, Trial on behalf of the Defendant.

October 16, 2017 – Danielle Madden-Buck, as Mother and Natural Guardian of Aleigha Buck et al v. Carmen Llopiz-Valle, MD, Nikolaos Kiourankais MD, Zachary Merriam, DO and Maimonides Medical Center, Kings County, Supreme Court of the State of New York, Trial on behalf of Plaintiff.

November 10, 2017 – Lucia Kui v Bergen County Prosecutor's Office, employment discrimination lawsuit, deposition on behalf of Plaintiff.

December 5, 2017 – Manuel Namina v Concord Manor, LLC, County of Queens, Supreme Court of the New York State, trial on behalf of Defendant.

## 2018

January 11, 2018 - Priscilla R. Dewbre et al. v. K. Anthony Shanbour, M.D. et al; Case No. CJ-2011-8107, Oklahoma County, District Court of Oklahoma, Deposition on behalf of Plaintiff.

March 9, 2018 – David Casey v Board of Regents et. al; County of Richmond, negligence lawsuit, Superior court of Georgia, Deposition on behalf of Plaintiff.

March 19, 2018 – Sonia Medrano vs. New York University Benefits, worker's compensation, deposition on behalf of Defendant.

April 12, 2018 – Valerie Gray, Parent and Natural Guardian of Connor Gray v. Crouse Hospital et al; Count of Onondaga, Supreme Court of New York, Trial on behalf of the Plaintiff.

May 29, 2018 - David Harrison v Jersey Central Power & Light Company et al; Mercer County, Superior Court of New Jersey, Trial Testimony on behalf of Plaintiff.

June 12, 2018 - Eric Rhoad Sr. v New York City Transit Authority et al; Count of Kings, Supreme Court of the State of New York, trial on behalf of Defendant.

June 19, 2018 – Cleofoster Baptiste v RLP-East, LLC, and Bovis Lend Lease; County of New York, Supreme Court of New York, trial on behalf of Defendant.

June 27, 2018 – Ramon Rosario v IBK Construction; County of New York, Supreme Court of New York deposition on behalf of Defendant.

July 25, 2018 – Rainah Simmons by her next friend and guardian, Tammy Green v Estate of Fredrice E. Sager, by Cahtie L. Sager, Executor, Fredric Sager, D.O., P.C., Fifth Avenue OBGYN, P.C. et al; County of Polk, Iowa District Court, deposition on behalf of Plaintiff.

September 7, 2018 – Tricia Schmahl vs. Lake Decatur, INC. a corporation/d/b/a Dales's Southlake Pharmacy, County of Macon, Illinois Circuit Court, deposition on behalf of Defendant.

October 15, 2018 – Johnathan Ousley, a minor by and through his guardians and next friends, Angie Ousley and Joey Ousley vs Kimberly Nordin, OD; Nordin Eye Center, P.S.C.; Antoin Hana, MD; Susan Howard Arnp; and Eastern Kentucky Tender Care Pediatrics, LLC et al; Commonwealth of Kentucky, Floyd Circuit Court, deposition on behalf of Plaintiff.

October 18, 2018 – Ivy Abrams and Jason Abrams vs. Cross Sound Ferry Services, INC.; Eastern District of New York, United States District Court, deposition on behalf of Defense.

**2019**

February 27, 2019 – John Olson and Katherine Olson vs. David M. Grosiak, M.D et al.; Superior Court of New Jersey; Deposition (P). Topic: Diagnosis of Bacterial Meningitis

March 4, 2019 – Amelia Morrissey vs. Vinay Puri, M.D. et al.; Commonwealth of Kentucky, Jefferson Circuit Court; Deposition (P). Topic: Pediatric Meningioma

March 14, 2019 – Estate of Lance C. Klimowicz vs. Monmouth Medical Center Southern Campus, et. al.; Superior Court of New Jersey, Ocean County; Deposition (P). Topic: Malignant Neuroleptic Syndrome

March 15, 2019 – Crystal Paquette PPA Colbey Paquette vs. Carla DeSantis, M.D. et al.; State of Connecticut, Judicial District of Hartford; Deposition (P). Topic: HIE

March 18, 2019 – Estate of John Millman, Sr. vs. Tallwoods Care Center, et al.; Superior Court of New Jersey, Law Division Ocean County (D). Topic: Head Trauma in Elderly Nursing Home Patient

**List does not include court appearances for peer review cases.

# Comprehensive Neurology Services PC

## Fee Schedule

# COMPREHENSIVE NEUROLOGY SERVICES, PC

139 W 82nd Street, Suite 1G, New York, NY 10024
Tel: (212) 974-3009
Email: ARubenstein@cns-pc.com

## Allan E Rubenstein, MD, Medical Director

Clinical Professor of Neurology & Pediatrics, NYU Langone School of Medicine
Board Certified, American Board of Psychiatry and Neurology (Neurology)
Member, American Academy of Neurology

## FEE SCHEDULE

| | |
|---|---|
| **Retainer:** | $3,500 Defense medical malpractice |
| | $4,500 Plaintiff medical malpractice |
| | $2,500 Defense personal injury |
| | $3,000 Plaintiff personal injury |
| | $2,500 worker's comp. |
| **Deposition:** | $3,000 per deposition |
| **Expert Court Testimony:** | $5,000 per day |

A **prepaid** retainer is required for all cases. The retainer will be applied toward services rendered at the described fee rate of $600/hr. The retainer also serves as a non-refundable minimum fee for any services rendered.

The retainer covers up to 500 pages of review, IME examination and written report. Anything over 500 pages will be an additional hourly rate of $600/hr. We request all records sent **electronically**.

| | |
|---|---|
| Travel Time | $3,500 per day |

## CANCELLATION FEES

**IME's:** $550 no-show. Kindly provide 24 hours cancellation notice to avoid a $550 cancellation/no-show fee.

**Deposition & Trial Testimony:** If cancelled within 1 business week, full fee is due; if cancelled within 1-2 business weeks, half fee is due.



**Temple Physicians, Inc.**
Temple University Health System

**TPI Temple Physicians at Wyndmoor**
8200 FLOURTOWN AVENUE
SUITE 5
WYNDMOOR PA 19038
Phone: 215-233-1555
Fax: 215-233-0308

June 6, 2022

Patient:         **Edward Shin**
Date of Birth: ▇▇▇63
Date of Visit:

To Whom It May Concern:

Edward Shin has been my medical patient for over 10 years.  On April 20, 2017 he
suffered a severe injury when he was pushed down the stairs in New York.  At that
time he suffered a subdural hematoma, facial fractures and a left arm fracture.  He
was treated at a local hospital and after discharge came to see me on April 25, 2017.
At that time he was disoriented and I was concerned due to the head injury.  I referred
him to Temple Hospital and he was admitted to the trauma unit.
The patient was then treated for subdural hematoma, fracture of the zygoma which
required surgery, and a left arm fracture.  After these treatments he has continued to
suffer headaches and stress reaction.  His daily headache pain and emotional stress
continue to preclude gainful employment.  He continues to suffer greatly from his
injuries.
He continues to be treated for other chronic problems which include hypertension,
prediabetes, and sleep apnea.

Sincerely,

Simeon L Bardin, MD

9L<6HC



# A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes

*Final Draft*

*November 10, 2014*

- *The views stated in this submission are presented on behalf of the Criminal Justice Section. The report has not been approved by the House of Delegates or the Board of Governors of the American Bar Association and therefore may not be construed as representing the policy of the American Bar Association.*

**The American Bar Association Criminal Justice Section**
**1050 Connecticut Avenue, NW, Washington, DC 20036**
**202-662-1500 • crimjustice@americanbar.org**
**www.americanbar.org/crimjust**

## **Economic Offenses**

(a)    **Base Offense Level**:                    [6-8]

(b)    **Specific Offense Characteristics**

(1) **Loss**.  If the loss exceeded $20,000, increase the offense level as follows:

(A) More than $20,000          add  [4]
(B) More than $100,000         add  [6]
(C) More than $1,000,000       add  [8]
(D) More than $5,000,000       add  [10]
(E) More than $10,000,000      add  [12]
(F) More than $50,000,000      add  [14]

(2) **Culpability**

(A) Lowest culpability          subtract [6-10]
(B) Low culpability             subtract [3-5]
(C) Moderate culpability        no change
(D) High culpability            add [3-5]
(E) Highest culpability         add [6-10]

(3) **Victim Impact**

(A) Minimal or none             no increase
(B) Low                         add [2]
(C) Moderate                    add [4]
(D) High                        add [6]

(c)    **Special Offense Considerations**

For offenses of a kind specified in Section 2B1.1(b)(3) through (9), (11) through (14), or (16) through (18), the court should consider those offense characteristics to the extent they are appropriate in determining culpability or victim impact.  Where the offense presents a special concern of the kind intended to be addressed by these subsections, and where the concern has not been addressed in determining the offense level, increase by 2 offense levels. [incorporate specific Congressional directives].

(d)    **Offense level cap of 10 for non-serious offenses by first offenders**

If the defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.

*Application Notes*:

1.   *Loss*:

     [To be incorporated from current 2B1.1 with the modification that loss means actual loss].

2.   *Culpability*:

     *Consideration of the various culpability factors*

     The guideline has 5 levels of culpability that range from lowest to highest.  The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense and the defendant's participation in it; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive.  Other factors may also bear on the culpability level.

     Because of the nature and number of these culpability factors, as well as the almost limitless variety of possible combinations, there is no workable formula for assigning values to each individual factor.  Rather than assign a numeric score to each individual culpability factor,  the court instead arrives at one of five culpability levels after considering the combined effect of all culpability factors.  The weight that each particular culpability factor plays in a given case will vary.  In some cases, the defendant's motive will be the factor most indicative of the defendant's culpability. In other cases, extenuating circumstances will play the most prominent role.  Also, these various factors will often overlap.  A less culpable motive, or a less culpable nature of the offense, will sometimes be evident in the extenuating circumstances that prompted the defendant to commit the offense.

     The end result of the court's analysis should be a culpability level that "ranks" the defendant in the hierarchy of five levels of culpability for all defendants sentenced under this guideline. By definition, all defendants sentenced under the guideline are to some degree "culpable."  The court should not be reluctant to find a mitigating culpability value out of concern that it will signal a lack of opprobrium for the offense – the point of the analysis is to accomplish proportionality by meting out sentences that are sufficient but not greater than necessary to accomplish the purposes of sentencing in the light of each defendant's culpability when compared with all

1

other defendants sentenced under this guideline.

As a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – "moderate culpability" – would account for the largest number of defendants sentenced under the guideline.  A defendant seeking an assessment of "low" or "lowest" culpability bears the burden of proof to establish this, while the government bears the burden to prove either "high" or "highest" culpability.

In assigning a culpability level, the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate specific offense characteristic.   Although in some circumstances there may be overlapping considerations bearing on each factor, loss, culpability, and victim impact are each intellectually distinct concepts warranting individualized assessment.  Thus, a high loss or significant victim impact may result from conduct reflecting mitigated culpability by some or even all of the criminally responsible participants.  Conversely some cases may present aggravated culpability resulting in more limited loss or victim impact.

There is also overlap between the considerations that inform the defendant's level of culpability and those that bear on the defendant's role in the offense as determined under Chapter Three.  Nevertheless, as with the relationship of culpability to loss and victim impact, role in the offense is also intellectually distinct from culpability and requires separate inquiry.  Where it is necessary for the court to weigh the same considerations governing role in the offense in its assessment of culpability, this may in some circumstances require a sentence outside the range resulting from a cumulative application of the culpability and role adjustments.

The court should also recognize that this guideline is intended to address *offense* characteristics.  The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a).  Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

(A)      *Motive/Nature of Offense*

One factor in the culpability level is the defendant's motive or the nature of the offense.  The following examples occur frequently in cases sentenced under this guideline.

    (1)      *Predatory* – These offenses are intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking.  These offenses – accompanied by no legitimate purpose – are among the most culpable types of offenses sentenced under this guideline.

2

(2)     *Legitimate ab initio* – These offenses often arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties.  Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.

(3)     *Risk shifting* – These offenses are not specifically intended to cause loss.  Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense.  Examples include false statements for the purpose of obtaining a bank loan that is intended to be repaid.  Such offenses are generally less culpable than those where loss is specifically intended.

(4)     *Gatekeeping* – These offenses are not specifically intended to cause loss or even to shift the risk of loss.  Instead, they violate so-called "gatekeeping" requirements intended generally to prevent practices that create potential loss or a risk of loss.  Examples include billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity.  Such offenses are generally at the lower level of culpability under this factor.

There may be cases where the nature of the offense fits more than one of these descriptions.  And there may be cases for which none of these categories is appropriate.  Whether or not these descriptions fit a particular case, the court should take them into account when considering how the defendant's motive (including the nature of the offense) compares, for culpability purposes, to that of other defendants sentenced under this guideline whose offenses match these descriptions.

(B)     *Gain*

Another culpability factor is the gain to the defendant or to others involved in the criminal undertaking.

(1)     *Commensurate with loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is roughly commensurate with the loss, this ordinarily indicates a higher degree of culpability.

3

(2)      *Less than loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability than (1).

(3)      *Minimal or Zero* – Where the defendant and others involved in the criminal undertaking derive little or no gain from the offense, this ordinarily indicates a lesser degree of culpability than (2).

The extent to which the defendant *personally* gained may also be relevant to the culpability level.  For example, an accountant convicted for participation in a securities fraud scheme would be less culpable (on the factor of gain) than an officer of the company who personally gained more than the accountant.  Also, a small amount of gain in relation to the loss may not always mean a lower level of culpability.  For example, a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss.  The degree of culpability in this example varies depending on the extent to which the loss was foreseeable to the defendant.

(C)      *Degree of sophistication/organization*

Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability. The reverse is also true – where the offense is executed in a simple manner without the involvement of large numbers of participants, this generally reflects a lesser threat of harm and a lower level of culpability.  The court should also consider the extent of the defendant's contribution to the offense's sophistication or organization.  A defendant with less responsibility for the offense's sophistication or organization would be less culpable, all other things being equal, than one with greater responsibility for these characteristics.

(D)      *Duration*

As with sophistication and organization, the duration of the offense and the defendant's participation in it also frequently reflects differences in culpability. Criminal undertakings that extend over several months or longer suggest a greater degree of culpability, while those that occur in a single event or over a shorter period of time in many circumstances reflect a lower level of culpability.

4

(E)    *Extenuating circumstances*

Some defendants will commit an offense in response to various circumstances, such as coercion or duress. There are many extenuating circumstances that could contribute to the commission of an offense, and the extent of their contribution will also vary from case to case. A defendant's culpability will be affected by the nature of these extenuating circumstances and the extent to which they played a part in the commission of the offense.

(F)    *Efforts to mitigate harm, including voluntary cessation, self-reporting, or restitution*

A defendant will sometimes take steps that help mitigate the harm or otherwise reflect a lower level of culpability. Where the defendant voluntarily ceases the offense conduct prior to its detection, this generally indicates a decreased level of culpability. Self-reporting of the offense is also a sign of lower culpability, as is voluntary restitution. In considering the significance of restitution, care must be taken not to punish a defendant more severely as a result of a lack of financial resources.

The court may consider a defendant's cessation of criminal conduct even if it does not qualify as a legal defense to conviction for conduct that occurred after the defendant's involvement ceased. For example, the court may consider the fact that a defendant ceased taking part in a conspiracy even though the legal standard for withdrawing from the conspiracy was not met.

3.    *Victim Impact*:

The guideline has four levels of victim impact: (1) minimal or none; (2) low; (3) moderate; and (4) high. As with the culpability levels, there are many factors to consider in arriving at the appropriate level of victim impact. The court should consider how the combination of these factors places the defendant's offense in comparison to victim impact in other cases under this guideline. The court should also be cognizant that the amount of the victim(s)' loss is already accounted for and should not be counted again in the context of victim impact. An additional score for victim impact is appropriate only where there is a harm beyond that inherent in the amount of the loss.

(A)    *Vulnerability of victims*

Where victims are identified and targeted because some particular vulnerability they suffer, this may indicate a higher degree of victim impact (and/or culpability). The court should be careful not to "double count" the vulnerability of the victims in assessing culpability, victim impact, and the special adjustment in Chapter Three for vulnerable victims, 3A1.1(b). Nevertheless, there may be some circumstances in

5

which the vulnerability of victims results in a peculiar degree of impact, particularly where that impact was foreseeable to the defendant, that would warrant an increase in the victim impact adjustment as well as an enhancement for vulnerable victim in Chapter Three.

(B)    *Significance of loss*

Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact. This may be more common where the victims are individual as opposed to institutional. It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution.

(C)    *Other non-economic harm*

Where the victim has suffered a significant non-economic harm, this may not be captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense under some circumstances in the absence of an upward adjustment reflecting victim impact.

(D)    *Victim inducement of offense*

In some circumstances the victim has contributed to the offense in some manner. This may include inducing the commission of the offense or some lesser degree of conduct. Under such circumstances it may be appropriate to partially discount the impact on the victim as a measure of offense severity.

4.    *Offense level cap for offenses that are not "otherwise serious"*:

The Sentencing Reform Act provides as follows: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…." 28 U.S.C. § 994(j). Many of the offenses falling within this guideline are not "otherwise serious."

In determining whether an offense is not "otherwise serious," the court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense. For example, a low level employee who is peripherally involved in what would be an "otherwise serious" offense as to other defendants may nevertheless qualify for this offense level cap.

Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's

6

offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense. Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.

**Reporter's Notes**

**A.      Members of the Task Force and Principles of Consensus.**

In April 2013 the Criminal Justice Section of the American Bar Association assembled this Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms.  The Task Force consists of five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders:

- Stephen Saltzburg (Chair)
  Professor of Law, George Washington
  University School of Law

- James E. Felman, Esquire (Reporter)
  Kynes, Markman & Felman, P.A.

- Sara Sun Beale
  Professor of Law
  Duke University School of Law

- Barry Boss, Esquire
  Cozen O'Connor

- David Debold, Esquire
  Gibson Dunn & Crutcher

- The Honorable Nancy Gertner
  Professor of Law
  Harvard Law School

- The Honorable John Gleeson
  United States District Court
  Eastern District of New York

- A. J. Kramer (Observer)
  Federal Defender
  District of Columbia

- Gary Lincenberg, Esquire
  Bird, Marella, Boxor, Wolpert,
  Nessim, Brooks & Lincenberg

- The Honorable Gerard Lynch
  United States Court of Appeals

for the Second Circuit

- Jane Anne Murray
  Practitioner in Residence
  University of Minnesota Law School

- Kyle O'Dowd, Esquire
  Associate Executive Director for Policy
  National Association of Criminal
  Defense Lawyers

- Marjorie J. Peerce, Esquire
  Ballard, Spahr, Stillman
  & Friedman, P.C.

- Mary Price, Esquire
  Vice President and General Counsel
  Families Against Mandatory Minimums

- The Honorable Jed Rakoff
  United States District Court
  Southern District of New York

- Neal Sonnett, Esquire
  Neal R. Sonnett, P.A.

- Kate Stith
  Professor of Law
  Yale Law School

- The Honorable Jonathan Wroblewski
  (Observer)
  Director, Office of Policy and
  Legislation
  United States Department of Justice

8

After a number of meetings and telephone conferences, the group arrived at a consensus proposal subject to a number of important caveats. These caveats are an essential aspect of the proposal to avoid misunderstanding its nature and scope.

First, we feel more strongly about the structure of the proposal than we do about the specific offense levels we have assigned. We assigned offense levels in the draft because we think it is helpful in understanding the structure, but the levels have been placed in brackets to indicate their tentative nature. Indeed, in some instances we have bracketed a range of levels, although as noted below in the discussion of the "Twenty-Five Percent Rule" we recognize that a final guideline likely could not include such a range. We have performed no research and have no empirical basis for the levels we assigned in the draft.

We have applied the proposal to an array of specific case scenarios, and this exercise was very helpful to us on a number of levels. We were reassured about the structure of the proposal – we felt the proposal captured the offense characteristics most relevant to sentencing, and it placed appropriate weight on the considerations of loss, culpability, and victim impact in relation to one another. We also felt that the proposal is sufficiently clear and specific that it leads to reasonably uniform application. Although the culpability and victim impact considerations do not lend themselves to exact quantification in the same way as measuring the amount of loss, we were able to reach consensus on the application of the proposal to the scenarios without undue difficulty or disparity. Most us were comfortable with the range of outcomes that result from the levels assigned in the draft, but it should be understood that we devoted the bulk of our efforts to structural improvements and less time to issues of optimal punishment severity, in part out of a recognition that there are inherently political components to such judgments.

Second, we discussed but did not fully resolve the question of whether certain categories or types of offenses should be sentenced under a separate guideline in light of the very wide array of offenses sentenced under this guideline. We believe, in particular, that certain types of securities offenses where changes in the value of market capitalization drive the loss calculation may be especially suited for consideration under a separate guideline.

Third, the proposal is submitted as a consensus product in accordance with the following limiting principles:

1.    It is assumed that, for the foreseeable future, the current structural framework dictated by statute will remain in place, including the 25% rule (28 U.S.C. § 994(b)(2)), and that the Commission therefore will still find it necessary to assign fairly specific numeric values to sentencing considerations. The draft proposal is written to comply with that assumed structural framework, although it should be noted that the American Bar Association supports the repeal of the 25% rule. ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates (August 2004), http://www.abanet.org/crimjust/kennedy/Justice KennedyCommission ReportsFinal.pdf).

2.    This structural framework (both the 25% rule and the guidelines' overly arithmetic approach) is not ideal because it can be unduly rigid and lead to the arbitrary

assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

3.      A better structural framework would (a) place less emphasis on arithmetic calculations and those few sentencing considerations that lend themselves to exact quantification; and (b) allocate greater sentencing authority to the judiciary.

4.      The Task Force is not necessarily of one mind regarding the ideal allocation of sentencing authority between the Congress, the Sentencing Commission, the Judiciary, and the Executive Branch, but it was not deemed necessary to achieve consensus on this point as this proposal is premised on the assumption that the current structural framework will remain in place.

**B.      Intent of the Proposal Within the Existing Guidelines Structure**

The proposal is intended as a free-standing substitution in the Guidelines Manual for the existing Guideline Section 2B1.1. There are two aspects of this substitution that bear particular emphasis.

First, we understand that Subsection (c) of the proposed guideline regarding Specific Offense Characteristics ("SOCs") would need to be tailored to comply with specific Congressional directives to the Sentencing Commission. Many of these directives are open-ended, and require only that the Commission "consider" amending the guidelines as necessary in light of specific legislation. We believe our proposal accommodates those directives by instructing the court to apply the SOCs in the existing guideline that resulted from such directives where the offense presents a special concern of the kind intended to be addressed by these SOCs, and where that concern has not otherwise been addressed in determining the offense level under the guideline. But we also recognize that there have been a handful of Congressional directives that required specific amendments to the guideline. An example of such a specific directive is that contained in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10606, 124 Stat. 119, 1006 (2010), which directed new offense level increases for higher loss frauds involving government health care programs. Our proposal would need to be conformed to these specific directives if adopted by the Sentencing Commission.

Second, the proposal, like all provisions of Chapter Two of the Guidelines, is intended to deal solely with *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

10

## C.      Compliance with the "Twenty-Five Percent" Rule

Title 28 U.S.C. § 994(b)(2) provides: "If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment."  Early in the life of the Sentencing Commission, it decided to construe this statutory limitation to apply not only to the final sentencing range resulting from the guidelines computation, but also to each adjustment along the route of that computation.   While this construction of the statute does not appear to be compelled by its terms, our proposal is drafted on the assumption that the Commission will not revisit this question.  Accordingly, we recognize that adoption of our proposal would require the Commission to select a specific numeric value for the base offense level and each of the culpability categories.   As noted above, we elected to include a range of possible values in our proposal to illustrate the range of possible outcomes under it, depending on the levels ultimately selected by the Commission.   We are confident, however, that if a specific value is inserted for the base offense level and each of the culpability levels, our proposal would then comply with the statute.   We have heard some outside comment that because the culpability consideration groups together a wide array of factors and thus results in such a wide array of ultimate offense level outcomes, this renders the proposal violative of the statute.   We do not agree with this view, and find support for our position in the observation that role in the offense also groups together a wide array of potential considerations and can result in an eight-level swing in the range resulting from those considerations.  *See* U.S.S.G. §§ 3B1.1, 1.2.

## D.      Case Scenarios

These scenarios are intended to illustrate application of the proposal and the manner in which it might diverge from the current guideline.   They are intended as a rough illustration of how the proposal would operate based on a very general level of detail.   A much wider array of facts would frequently be relevant to a court's consideration of an appropriate sentence.   Also, the scenarios do not include information regarding the history or characteristics of the offender under the assumption that these very important sentencing factors will be considered by the court in fashioning a reasonable sentence pursuant to 18 U.S.C. § 3553(a).   Finally, the scoring of the scenarios continues to utilize a range of offense levels for the base and culpability factors, but we recognize that adoption of the proposal would require the selection of a specific numeric value for these factors in accordance with the "twenty-five percent" rule in 28 U.S.C. § 994(b)(2).

11

**Case Scenario 1**

The defendant was an organizer and leader of a fraudulent "lottery" scheme in which elderly persons were identified and contacted by telephone, advised that they had won a lottery award, and told that to obtain the award they must first pay advance fees to cover matters such as taxes, insurance, bonding, or other matters.  After the victims submitted the requested fees, they were advised to expect the delivery of their winnings via armored car to their homes at specific dates and times.  When the armored car did not arrive, the victims' efforts to contact those to whom they had remitted the fees were not successful.  The scheme victimized 14 individuals, most of whom were 70 years old or older.  For six of the victims, the losses represented their life savings. The fees paid ranged from $20,000 to $175,000, with a total loss to all victims of roughly $1.7 million.  The majority of these funds were obtained by the defendant and converted to his personal use.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +16 |
| more than 10 victims/mass marketing: | +2 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +8 |
| Highest culpability: | +6-10 |
| High victim impact: | +6 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 32-38 |

This scenario presents a predatory offense where the defendant's gain was roughly commensurate with the loss.  Although the scenario does not specify the degree of sophistication or duration of the offense, some sophistication and duration is implicit in the nature and extent of the scheme.  No extenuating circumstances or efforts to mitigate harm are specified.  This presents a "highest culpability" offense.  The victim impact is also "high" in light of the significance of the loss to six of the victims.  The scheme targeted the victims based on their elderly status, and if some of them were unusually vulnerable for that reason this would be additional support for findings of high victim impact and highest culpability.  It is assumed that for purposes of Chapter Three this scenario would also score adjustments for both vulnerable victim and leadership role in the offense.  These adjustments are the same under both this proposal and the existing guideline as this proposal does not address Chapter Three.

**Case Scenario 2**

The defendant was the owner of a legitimate business for many years and financed the operations of the business through a line of credit secured by the inventory and accounts receivable of the business. When the business came on difficult times, the defendant caused the submission of false information to the lender regarding both inventory and accounts receivable, thus enabling the business to borrow more than it would otherwise have been permitted to borrow. The defendant also attempted to support the operations of the business by liquidating his personal assets and investing the proceeds into the business. The lender discovered the fraud and caused the termination of the business. After mitigating its losses by selling the inventory and collecting legitimate accounts receivable, the lender was left with a loss of approximately $6.9 million. A forensic accounting revealed that during the period of the fraud the defendant contributed more funds to the business than he withdrew from it in salary and other compensation.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +18 |
| More than $1 Million in gross receipts: | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +10 |
| Low culpability: | -3-5 |
| Low victim impact | +2 |
| Role in the offense | +4 |
| | 17-21 |

This scenario presents a mixture of legitimate ab initio and risk shifting fraud. Although the offense had some degree of sophistication, the less culpable motive, zero gain to the defendant, extenuating circumstances, and efforts to mitigate harm result in a "low culpability" score. The victim impact is also rated as "low" given that it involved a single institutional victim, but not minimal given the magnitude of the loss and the difficulty of the detection of the offense and the efforts needed to mitigate its harm. It is assumed the defendant would receive a leadership role in the offense adjustment under Chapter Three.

**Case Scenario 3**

The defendant was the owner of a durable medical equipment business that provided oxygen to Medicare patients.  To qualify for reimbursement, equipment providers must ensure the oxygen is medically necessary by sending patients to an independent laboratory for testing.  Instead of referring patients to independent labs for testing, the defendant caused his employees to conduct the testing themselves and then falsely represent to Medicare that the testing had been performed by an independent lab.  Virtually all of the oxygen was medically necessary, although Medicare would not have paid the bills for it had the failure to qualify the patients by independent testing been disclosed. The fraud continued for more than a year, and involved in false representations regarding the testing of 159 patients.  The amount billed to Medicare for their oxygen was $7.1 million.  The patients were billed a small co-pay fee, and a small portion of the reimbursement for the oxygen received by these patients was also paid by 109 supplemental insurance companies.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Intended loss: | +20 |
| Sophisticated means: | +2 |
| Production of unauthorized access device: | +2 |
| More than 250 victims: | +6 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 44 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Actual loss: | +10 |
| Moderate culpability: | 0 |
| Low victim impact: | +2 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 25-27 |

This scenario presents a gatekeeping offense (although if the oxygen was either not provided or medically unnecessary this would be a predatory offense).  Under current law in at least some circuits, the amount billed is treated as loss notwithstanding the medical necessity of the oxygen. *See*, *e.g.*, *United States v. Bane*, 720 F.3d 818 (11th Cir. 2013).  Notwithstanding the less culpable motive, the defendant's culpability is considered "moderate" given his personal benefit as the owner of the company, the degree of sophistication involved, the duration of the offense, and the absence of any extenuating circumstances or efforts to mitigate harm.  The victim impact is considered low in light of the medical necessity of the treatments provided but not minimal in light of the sensitive nature of the government benefits program at issue.  It is assumed that an additional three-level upward adjustment would be required under the Congressional directive presently located at 2B1.1(b)(7), as well as a leadership enhancement under Chapter Three.

14

## Case Scenario 4

The defendant accepted $1,000 to act as a "straw purchaser" in a fraudulent real estate transaction that resulted in a $250,000 loss to a financial institution.

Score under current guideline:

| | |
|---|---|
| Base offense level: | 7 |
| Loss: | +12 |
| Role in the offense | <u>-2</u> |
| | 17 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Loss: | +6 |
| Low culpability: | -3-5 |
| Minimal victim impact: | 0 |
| Role in the offense | <u>-2</u> |
| | 5-9[1] |

This scenario presents a risk shifting offense in which the defendant's gain is minimal in relation to the loss and the offense involved limited sophistication and duration. On the other hand, the defendant knowingly played an essential role in a serious offense causing a significant risk of loss and did derive a direct personal benefit from the offense. For these reasons, the defendant's culpability would be "low" but not "lowest." The victim impact is considered minimal in that the victim is institutional, the amount of the loss did not threaten the security of the institution, and the severity of the offense conduct is adequately captured by the loss amount alone. A mitigating role in the offense adjustment under Chapter Three is assumed, but would not in all cases be applied.

---

[1]If the Base Offense Level is set at 8, Low Culpability is set at -3, and the defendant did not receive a mitigating role adjustment, this would result in an offense level 11, but in this scenario the offense level cap for non-serious offenses would cap the offense level at 10 if the defendant is a first offender.

15

**EXHIBIT D**

XM5HCshi1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                          19 Cr. 552 (JPC)

EDWARD SHIN,

                    Defendant.
------------------------------x

                                          New York, N.Y.
                                          May 17, 2022
                                          9:03 a.m.


Before:

                    HON. JOHN P. CRONAN,

                                          District Judge
                                          and Jury
                              APPEARANCES

DAMIAN WILLIAMS
 United States Attorney for the
 Southern District of New York
BY:  TARA LaMORTE
     ANDEN CHOW
     Assistant United States Attorneys

BRICKFIELD & DONAHUE
 Attorney for Defendant
BY:  PAUL BOYTON BRICKFIELD
          -and-
THE BASIL LAW GROUP PC
BY:  ROBERT J. BASIL
          -and-
McGUIRE LAW LLC
BY:  CAROLYN McGUIRE


ALSO PRESENT:
 FRAN YOON, Korean Interpreter
 KYEONG-SIK SONG, Korean Interpreter

XM5HCshi1

1          (In open court; jury not present)

2          (Case called)

3          (Appearances noted)

4          THE COURT:  So I wanted to start early this morning

5    before the jury comes in for a few issues.  First, a couple of

6    juror issues.  The second, we need to resolve the issues with

7    the admissibility of exhibits 204 and 205, and 436.  Third,

8    hopefully there is time for the motion to quash that was filed

9    yesterday.

10         So those are the issues.  A little bit of bad news on

11   the jury front.

12         (Continued on next page)

13         (Page 1551 sealed)

14

15

16

17

18

19

20

21

22

23

24

25

M5HNSHI4                          Reinhard - Cross

1    trial, did you have any knowledge of who BADA Realty was?

2    A.  No.

3              MR. CHOW:  No further questions, your Honor.

4              THE COURT:  Any cross-examination?

5              MR. BASIL:  Yes, your Honor.

6    CROSS-EXAMINATION

7    BY MR. BASIL:

8    Q.  Good afternoon, Mr. Reinhard.

9    A.  Hello.

10   Q.  My name is Robert Basil, and I represent Edward Shin.

11             During your direct examination, you stated that if a

12   member of the board of directors, for example, had a financial

13   interest in a borrower, that would trigger an obligation for

14   disclosure, correct?

15   A.  Yes.

16   Q.  And who would the disclosure be targeted toward?

17   A.  Either or both loan committees.

18   Q.  Now, the term "financial interest" that we just used, to

19   your knowledge, is that term, "financial interest" defined in

20   any bank policies or procedures?

21   A.  I do not know.

22   Q.  And the same question for any SBA SOPs or regulation:  Is

23   the term "financial interest" defined, to your knowledge, in

24   any SBA SOP or regulation?

25   A.  I do not know.

M5HNSHI4                    Reinhard - Cross

1   Q.  So, how is it that, let's say the loan committee determines

2   whether there is some kind of financial interest that requires

3   disclosure.

4   A.  Well, if there's any financial interest, no matter how you

5   define it, it should be disclosed.

6   Q.  Well, how is, in my example, the member of the board of

7   directors supposed to determine whether he has a financial

8   interest in a borrower?

9   A.  If you're in doubt you disclose.

10  Q.  But that principle you just stated is not written down

11  anywhere for someone at the board of directors to go look up,

12  right?

13  A.  An obligation to disclose a financial interest, yes.

14  Q.  But the term "financial interest" we already determined, to

15  your knowledge, is not defined anywhere for that board of

16  directors to go look up?

17  A.  Right.

18          MR. BASIL:  Can we pull up Government Exhibit 317-02.

19  BY MR. BASIL:

20  Q.  Now, Mr. Reinhard, we went through this on your direct.

21  This is a loan request information form for the management loan

22  committee; is that right?

23  A.  Yes.

24  Q.  All right.  So this is for a particular borrower.  Who is

25  that?

M5HNSHI4                        Reinhard - Cross

1   A.  First Ave. Lee's Market Inc.

2   Q.  Now, the rate spread line, 2.75 plus -- I'm without my

3   glasses.  Why don't you read it for me while I get my glasses,

4   Mr. Reinhard?

5   A.  Sure.  "2.75 percent plus the Wall Street Journal prime

6   rate adjusted on the first day of each calendar quarter."

7   Q.  To your knowledge, is that the highest rate permitted on

8   this SBA loan?

9   A.  Yes, it is.

10  Q.  So the borrower here did not get any special break, at

11  least on the rate spread, correct?

12  A.  Correct.

13  Q.  And the ten-year term, that's standard for this kind of

14  loan, is it not?

15  A.  Yes.

16  Q.  So the borrower in this instance did not get any special

17  deal on the term of the loan, correct?

18  A.  Well, it could have been a five-year balloon payment.

19  Q.  Okay.  But ten years is more or less standard, is it not?

20  A.  I would say either a ten-year loan with a five-year balloon

21  or straight ten years; one's as standard as the other.

22  Q.  So, by getting a ten-year term, am I correct that this

23  borrower didn't get any special deal or consideration, right?

24  A.  He got a better deal than a five-year balloon but nothing

25  extra special.

M5HNSHI4                          Reinhard - Cross

1    Q.  Okay.  Now, the packaging fee of $2500, that is a standard

2    fee for this kind of loan, correct?

3    A.  Yes.

4    Q.  The borrower didn't get any discount?

5    A.  No.

6    Q.  One of the concerns of a loan that's under a conflict of

7    interest is that the borrower might get some kind of special

8    consideration, right?

9    A.  Correct.

10   Q.  So, at least as far as the terms of this loan, this

11   borrower does not appear to have gotten any special

12   consideration, right?

13   A.  Yes.

14   Q.  And if a member of the board of directors has an interest

15   in a borrower and it is disclosed at Noah Bank during this time

16   period, isn't it correct that that loan can still be

17   considered?

18   A.  Yes.

19   Q.  And in fact very often -- not very often.  In fact, that

20   occurred from time to time, right?

21   A.  Yes.

22   Q.  And that's called something called a Reg. O loan or Reg. O

23   disclosure?

24   A.  Yes.

25   Q.  So if Mr. Shin in this case had disclosed that he was a,

M5HNSHI4                         Reinhard - Cross

1    let's say 50 percent owner in this borrower, would that have

2    disqualified this borrower from a loan at Noah Bank?

3    A.  No.

4    Q.  You would have then undertaken an underwriting with that

5    consideration in mind, correct?

6    A.  With it being a Reg. O loan, that means the borrower cannot

7    get loans any more advantageous than any other borrower.

8    Q.  In fact, if Mr. Shin was on the loan committee, he wouldn't

9    be allowed to participate, right?

10   A.  Yes.

11   Q.  But the loan committee could still approve that loan if

12   they found that it was a loan that otherwise would have been

13   approved, right?

14   A.  Yes.

15   Q.  So, this loan, are you able to say from your recollection

16   and from the documentation you received and the documentation

17   you reviewed prior to your testimony, had Mr. Shin come to you

18   and said, "I am a 50 percent owner in this business," would the

19   loan have been approved even though he made that disclosure, if

20   you will?

21   A.  It's possible.

22           MR. BASIL:  Could you go to -- I appreciate it if we

23   would bring up page 5 of 317.

24   BY MR. BASIL:

25   Q.  You testified earlier about the personal financial status.

M5HNSHI4                          Reinhard - Cross

1              MR. BASIL:  Can we blow up the box with personal

2     financial status in the contents.  Thank you.

3     BY MR. BASIL:

4     Q.  Okay.  So the $215,000 that's in the first column of

5     numbers, and that was you understood to be the amount of cash

6     that this borrower, Bum Tak Lee, had in some bank account in a

7     demand deposit, right?

8     A.  Yes.

9     Q.  Neither the loan officer nor the management loan committee

10    accepts that as being true without documentation, correct?

11    A.  Yes.

12    Q.  And the standard documentation is two months' bank account

13    statements?

14    A.  Yes.

15    Q.  So, in order for this loan to have been presented to the

16    management loan committee, am I correct that the loan officer

17    would have had to have seen two months of bank statements with

18    $215,000 in it?

19    A.  Yes.

20    Q.  And so the loan committee would have relied on the bank

21    officer presenting the loan to have confirmed that in fact

22    $215,000 was sitting in a demand deposit, right?

23    A.  Yes.

24    Q.  Now, loan officers prepare this document, correct?

25    A.  Yes.

M5HNSHI4                          Reinhard - Cross

1    Q.  Mr. Shin is not a loan officer, correct?

2    A.  Correct.

3    Q.  To your knowledge, Mr. Shin would not have prepared this

4    document, correct?

5    A.  Correct.

6    Q.  Mr. Shin would not have been the person to determine

7    whether there was documentation for the $215,000, correct?

8    A.  Correct.

9    Q.  Now, you were good enough on direct to give us some

10   highlights of your career at Noah Bank, right?

11   A.  Yes.

12   Q.  But you had highlights before you got to Noah Bank, didn't

13   you?

14   A.  Yes.

15   Q.  Now, is it true that early in your career you were a bank

16   auditor?

17   A.  I was an internal auditor.

18   Q.  Right, right.  Employed by a bank?

19   A.  Yes.

20   Q.  But you had an auditing function, correct?

21   A.  Yes.

22   Q.  And where was that, at least in the first instance?

23   A.  National Penn Bank.

24   Q.  Back in 1982?

25   A.  Yes.

M5HNSHI4                          Reinhard - Cross

1    Q.  And what did you do as a staff auditor at National Penn

2    Bank back in the 1982 to whenever it was you ceased being a

3    staff auditor?

4    A.  You went in the various departments of the bank.  There was

5    a written audit program, and you performed the steps in the

6    audit program.

7    Q.  In fact, eventually you became head of that audit

8    department, didn't you?

9    A.  Yes.

10   Q.  And were you trained as an auditor somewhere other than the

11   bank?

12   A.  No.

13   Q.  You learned your auditing at the bank, right?

14   A.  Yes.

15   Q.  And how long were you in that audit function at National

16   Penn Bank?

17   A.  Four years.

18   Q.  And am I correct that there is something called

19   professional skepticism with respect to auditors and audits?

20   A.  Okay.

21   Q.  Well, are you familiar with the term?

22   A.  Yes.

23   Q.  It is a term commonly used amongst auditors, right?

24   A.  Yes.

25   Q.  What does it mean, as far as you understand?

M5HCshi7                         Shin - direct

1    just let my chambers know this evening and we could meet before

2    then, otherwise we'll figure around 9:30 tomorrow.

3            Thank you, everyone.

4            (Adjourned to May 18, 2022 at 9:30 a.m.)

5                                    * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    KEVIN GORMAN

 4   Direct By Mr. Chow . . . . . . . . . . . . .1600

 5   Cross By Mr. Brickfield  . . . . . . . . . .1618

 6    MICHAEL REINHARD

 7   Direct By Mr. Chow . . . . . . . . . . . . .1621

 8   Cross By Mr. Basil . . . . . . . . . . . . .1668

 9   Redirect By Mr. Chow . . . . . . . . . . . .1700

10   Recross By Mr. Basil . . . . . . . . . . . .1704

11    JOHN KIM

12   Direct By Mr. Chow . . . . . . . . . . . . .1705

13   Cross By Mr. Brickfield . . . . . . . . . . .1713

14    DAVID LASKY

15   Direct By Mr. Chow . . . . . . . . . . . . .1719

16   Cross By Mr. Brickfield  . . . . . . . . . .1726

17    GABRIELLA VACCARO

18   Direct By Mr. Brickfield . . . . . . . . . .1754

19   Cross By Mr. Chow  . . . . . . . . . . . . .1775

20   Redirect By Mr. Brickfield . . . . . . . . .1778

21    EDWARD SHIN

22   Direct By Mr. Brickfield . . . . . . . . . .1780

23                     GOVERNMENT EXHIBITS

24   Exhibit No.                          Received

25    312-06, 312-22, 312-26, 312-19, 312-20, . . .1601
</pre>

312-21, 315-06, 317-02,

317-03, 322-26, 322-27, 1706,

1713, 1716, 1722, 1726, and

1830

1721   . . . . . . . . . . . . . . . . . . .1617

1830   . . . . . . . . . . . . . . . . . . .1701

1016   . . . . . . . . . . . . . . . . . . .1709

1025    . . . . . . . . . . . . . . . . . .1720

                    DEFENDANT EXHIBITS

Exhibit No.                                Received

131-A   . . . . . . . . . . . . . . . . . .1756

D110-A    . . . . . . . . . . . . . . . . .1757

7J: ;4;F E

| | Loan Number | Note. No. | Borrowing Entity | Origination Date | Note Amount | Loan Status | Status Change Date | Default Date | Default Amount | Amount of Liquidation | Liquidation Date | Amount of SBA Guaranty | Guaranty Received Date | NB Charge off Amount | NB Charge off Date | Subsequent SBA Demand Amount | Subsequent SBA Demand Date | NB Additional Charge off | NB Additional Charge off Date | NB Total Charge Off (Net) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 1 | | | 1797 Empire Inc | 05/11/2009 | $ 1 000 000 | Fully Repaid | 09/30/2013 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2 | | | 32 Madison Farm Inc | 06/21/2010 | $ 950 000 | Default | 10/01/2014 | 10/1/2014 | $ 683 929.69 | 92 651.09 | 1/24/2017 10/23/2018 7/26/2019 | $ 542 048.88 | 7/24/2017 | $ 68 393.00 | 12/31/2014 | $ 551 627.60 | 5/29/2020 | $ 532 150.74 | 6/10/2020 | $ 591 278.60 |
| 3 | | | 809 Lexington Grocery Inc | 12/21/2012 | $ 3 950 000 | Fully Repaid | 04/08/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 | | | Armonk Farm Inc | 10/21/2011 | $ 500 000 | Fully Repaid | 09/13/2012 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5 | | | Armonk Farm Inc | 03/10/2011 | $ 120 000 | Fully Repaid | 09/13/2012 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 6 | | | Armonk Farm Inc | 03/04/2010 | $ 1 100 000 | Fully Repaid | 09/13/2012 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7 | | | Aspen Market Place Corp | 12/30/2011 | $ 2 070 000 | Fully Repaid | 08/17/2015 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8 | | | Chung Palisades Medical LLC | 12/30/2012 | $ 2 400 000 | Fully Repaid | 03/03/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9 | | | Eden Organic Market Inc | 07/06/2012 | $ 200 000 | Fully Repaid | 10/04/2013 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 | | | Everybeauty Inc | 05/25/2012 | $ 1 500 000 | Fully Repaid | 11/14/2019 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 11 | | | First Ave Lee's Market Inc | 09/30/2013 | $ 1 050 000 | Default | 08/01/2017 | 08/01/17 | $ 731 048.38 | 2 025.77 | 9/24/2020 | - | - | $ 182 762.10 | 12/28/2017 | - | - | $ 548 286.28 | 5/22/2020 | $ 729 022.61 |
| 12 | | | First Ave Lee's Market Inc | 04/03/2015 | $ 150 000 | Fully Repaid | 02/28/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 13 | | | First Ave Lee's Market Inc | 10/02/2015 | $ 75 000 | Fully Repaid | 02/28/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 14 | | | First Ave Lee's Market Inc | 02/28/2017 | $ 300 000 | Default | 12/28/2017 | 12/5/2017 | $ 285 669.77 | - | - | - | - | $ 285 669.77 | 12/28/2017 | - | - | - | - | $ 285 669.77 |
| 15 | | | Garden of Eden | 04/20/2012 | $ 5 000 000 | Still in repayment | | 12/1/2015 | $ 3 022 132.73 | - | - | - | - | $ 755 533.19 | 6/30/2016 | $ 1 584 000.54 | 6/29/2021 | $ 347 219.46 | 6/30/2021 | $ 857 063.72 |
| 16 | | | H.D Parts All Inc | 05/04/2012 | $ 1 000 000 | Fully Repaid | 10/28/2014 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 | | | J & J Bloom Spa Inc | 03/16/2012 | $ 300 000 | Still in repayment | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 18 | | | Lakewood Farmers Market Inc | 10/20/2011 | $ 1 200 000 | Fully Repaid | 03/09/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 19 | | | Lakewood Farmers Market Inc | 08/10/2012 | $ 300 000 | Fully Repaid | 03/09/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 20 | | | Lee 77 Corp | 05/25/2013 | $ 200 000 | Still in repayment | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 21 | | | Nail & Spa 72 Inc | 07/23/2012 | $ 300 000 | Fully Repaid | 11/01/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 22 | | | Niobe Nails & Spa Inc | 07/23/2012 | $ 200 000 | Fully Repaid | 05/10/2019 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23 | | | Noah Super Laundromat LLC | 06/16/2009 | $ 1 485 000 | Default | 12/11/2012 | 12/11/2012 | $ 1 347 692.08 | 885 000.00 | 12/17/2015 | $ 663 750.00 | 3/3/2016 | $ 199 497.98 | 12/17/2015 | - | - | - | - | $ 199 497.98 |
| 24 | | | R Four LLC | 07/23/2012 | $ 795 000 | Fully Repaid | 04/21/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 25 | | | Royal Garden Inc | 01/14/2011 | $ 200 000 | Default | 08/01/2014 | 8/1/2014 | $ 129 248.28 | 87 520.40 | 6/1/2020 | - | - | $ 41 727.88 | - | - | - | - | - | $ 41 727.88 |
| 26 | | | SCY Realty Inc | 03/30/2012 | $ 1 550 000 | Fully Repaid | 01/11/2017 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 27 | | | Sharon Springs Inc | 09/24/2014 | $ 3 500 000 | Fully Repaid | 08/31/2018 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 28 | | | Teaneck Windsor LLC | 03/28/2011 | $ 5 000 000 | Fully Repaid | 12/01/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 29 | | | Windsor R&B Inc | 05/03/2012 | $ 1 500 000 | Fully Repaid | 12/01/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - |



GOVERNMENT EXHIBIT 1016

19 Cr. 552 (JPC)

| LOAN DETAILS | | | | BROKER FEE DETAILS | | | | | EXHIBIT (GX) |
|---|---|---|---|---|---|---|---|---|---|
| Borrower Name | Loan Number | Loan Date | Loan Amount | Paid to | Check Date | Check Number | Amount | |
| 1797 Empire Inc. | 34■ | 2009-05-11 | $1,000,000 | - | - | - | - | - |
| 32 Madison Farms Inc. | 39■ | 2010-06-21 | $950,000 | - | - | - | - | - |
| 809 Lexington Grocery, Inc. | 55■ | 2012-12-21 | $3,950,000 | SBA Eastern Realty | 2012-12-21 | NB 013011 | $39,500 | GX 308-07 |
| Armonk Farm Inc. | 49■ | 2011-10-21 | $500,000 | - | - | - | - | - |
| Armonk Farm Inc. | 45■ | 2011-03-10 | $120,000 | - | - | - | - | - |
| Armonk Farm Inc. | 39■ | 2010-03-04 | $1,100,000 | - | - | - | - | - |
| Aspen Market Place Corp. | 50■ | 2011-12-30 | $2,070,000 | BADA Realty Inc. | 2012-01-19 | RAB 001984 | $10,350 | GX 312-15 |
| Chung Palisades Medical LLC | 56■ | 2012-12-20 | $2,400,000 | SBA Eastern Realty, Inc. | 2012-12-24 | NB 013017 | $12,000.00 | GX 335-06 |
| Eden Organic Market Inc. | 52■ | 2012-07-06 | $200,000 | SBA Eastern Realty, Inc. | 2012-08-20 | NB 003004 | $2,000 | GX 315-14 |
| Everbeauty, Inc. | 52■ | 2012-05-25 | $1,500,000 | SBA Eastern Realty, Inc. | 2012-07-02 | NB 002770 | $15,000 | GX 316-21 |
| First Ave Lee's Market Inc. | 64■ | 2013-09-30 | $1,050,000 | - | - | - | - | - |
| First Ave Lee's Market Inc. | 75■ | 2015-04-03 | $150,000 | - | - | - | - | - |
| First Ave Lee's Market Inc. | 79■ | 2015-10-02 | $75,000 | - | - | - | - | - |
| Garden of Eden Enterprises, Inc | 51■ | 2012-04-20 | $5,000,000 | BADA Realty Inc. | 2012-04-20 | NB 002450 | $50,000 | GX 321-22 |
| HD Parts All, Inc. | 51■ | 2012-05-04 | $1,000,000 | SBA Eastern Realty, Inc. | 2012-07-02 | NB 002769 | $10,000 | GX 336-05 |
| J&J Bloom Spa Inc. | 51■ | 2012-03-16 | $300,000 | BADA Realty Inc. | 2012-03-20 | NB 002310 | $3,000 | GX 322-19 |
| Lakewood Farmers Market Inc. | 49■ | 2011-10-20 | $1,200,000 | SBA Eastern Realty, Inc. | 2011-11-02 | NB 001636 | $12,000 | GX 324-37 |
| Lakewood Farmers Market Inc. | 53■ | 2012-08-10 | $300,000 | SBA Eastern Realty, Inc. | 2012-08-20 | NB 003004 | $3,000 | GX 325-12 |
| Lee 77, Corp. | 58■ | 2013-01-25 | $200,000 | SBA Eastern Realty, Inc. | 2013-01-29 | NB 013108 | $2,000 | GX 326-07 |
| Nail & Spa 72, Inc | 52■ | 2012-07-23 | $300,000 | SBA Eastern Realty, Inc. | 2012-09-12 | NB 003130 | $3,000 | GX 327-24 |
| Niobe Nail & Spa Inc. | 52■ | 2012-07-23 | $200,000 | SBA Eastern Realty, Inc. | 2012-09-12 | NB 003130 | $2,000 | GX 327-24 |
| Noah Super Laundromat LLC | 34■ | 2009-06-16 | $1,485,000 | SBA Eastern Realty, Inc. | [July 2009] | - | $3,712.50 | GX 338-03 |
| R Four LLC (non-SBA) | - | 2012-07-23 | $795,000 | SBA Eastern Realty, Inc. | 2012-09-12 | NB 003130 | $1,987.50 | GX 327-24 |
| Royal Garden Inc. (non-SBA) | - | 2011-01-14 | $200,000 | SBA Eastern Realty, Inc. | 2011-05-31 | NB 009422 | $1,000 | GX 340-01 |
| SCY Realty Inc. | 51■ | 2012-03-30 | $1,550,000 | BADA Realty Inc. | 2012-04-03 | NB 002351 | $15,500 | GX 329-2 |
| Sharon Springs, Inc. | 70■ | 2014-09-24 | $3,500,000 | SBA Eastern Realty, Inc. | 2014-10-29 | NB 007533 | $35,000 | GX 330-10 |
| Teaneck Windsor, LLC | 45■ | 2011-03-28 | $5,000,000 | SBA Eastern Realty, Inc. | 2011-04-18 | RAB 009244 | $37,500 | GX 331-11 |
| Windsor R&B Inc | 51■ | 2012-05-03 | $1,500,000 | SBA Eastern Realty, Inc. | 2012-05-14 | NB 002569 | $15,000 | GX 332-14 |
| | **TOTAL LOANS** | | **$37,595,000** | | | **TOTAL BROKER FEES:** | **$273,550** | |

**GOVERNMENT EXHIBIT 1025**

19 Cr. 552 (JPC)

| LOAN DETAILS | | BROKER FEE DETAILS | | BROKER FEE DISCLOSURES | | | |
|---|---|---|---|---|---|---|---|
| Borrower Name | Loan Amount | Paid to | Amount | Credit Memo | Loan Pipeline(s) | MLC/BOD Minutes | Form 159 |
| 809 Lexington Grocery, Inc | $3,950,000 | SBA Eastern Realty | $39,500 | Seeks 1% broker fee for "SBA Eastern Realty, Byung Hoon Kim" (GX 308-02) | - | "1% broker" (GX 308-03) | "Referral fee paid, if any: $39,500" to "SBA Eastern Realty," "Byung Hoon Kim" (GX 308-06) |
| Aspen Market Place Corp | $2,070,000 | BADA Realty Inc | $10,350 | No broker fee condition (GX 312-05) | Referral Source: blank (GX 312-4, 312-08) | Silent (GX 312-06) | "Name of referral agent": blank "Referral fee paid, if any: $0" (GX 312-11) |
| Chung Palisades Medical LLC | $2,400,000 | SBA Eastern Realty, Inc | $12,000 00 | Seeks 1% broker fee for "SBA Eastern Realty, Byung Hoon Kim" (GX 335-01) | - | - | - |
| Eden Organic Market | $200,000 | SBA Eastern Realty, Inc | $2,000 | No broker fee condition (GX 315-04) | Referral Source: blank (GX 315-02) | "no broker" (GX 315-06) | "Name of referral agent:" "N/A" "Referral fee paid, if any: $0" (GX 315-12) |
| Everbeauty, Inc | $1,500,000 | SBA Eastern Realty, Inc | $15,000 | No broker fee condition (GX 316-06) | Referral Source: blank (GX 316-01, 316-03, 316-04, 316-05, 316-07, 308-08, 316-09, 316-10, 316-11, 316-13) | "no broker" (GX 316-12) | "Name of referral agent:" "N/A" "Referral fee paid, if any: $0" (GX 316-18) |
| Garden of Eden Enterprises, Inc | $5,000,000 | BADA Realty Inc | $50,000 | No broker fee condition (GX 321-08) | 3/21/12 to 4/11/12: Referral Source: Choel Kim (GX 321-03, 321-04, 321-06, 321-09) 4/18/12: Referral Source: blank (GX 321-13) | "no broker" (GX 321-10) | "Name of referral agent:" "N/A" "Referral fee paid, if any: $0"" (GX 321-18) |
| HD Parts All, Inc | $1,000,000 | SBA Eastern Realty Inc | $10,000 | No broker fee condition (GX 336-01, GX 336-06) | - | "no broker" (GX 336-02) | - |
| J&J Bloom Spa Inc | $300,000 | BADA Realty Inc / SBA Eastern Realty Inc | $3,000 / $3,000 | No broker fee condition (GX 322-07) | Referral Source: blank (GX 322-04, 322-05, 322-09, 322-11, 322-14) | "broker fee: none" (GX 322-07) | "Name of referral agent:" "N/A" "Referral fee paid, if any: $0" (GX 322-15) |
| Lakewood Farmers Market Inc | $1,200,000 | SBA Eastern Realty, Inc | $12,000 | "SOURCE: KORE Consulting" (GX 324-10) Seeks 1% broker fee for "KORE CONSULTING" (GX 324-26)          Seeks 1% broker fee for "SBA Eastern Realty, C/O Byung Hoon Kim (GX 324-38) | 9/9/11: Referral Source: blank (GX 324-01) 9/15/11 to 10/12/11: Referral source: KORE (GX 324-05, 324-11, 324-13, 324-14, 324-18) 10/19/11: Referral Source: blank (GX 324-23) | - | "Referral fee paid, if any: $12,000" to "CORE CONSULTING" (GX 324-31) |
| Lakewood Farmers Market Inc | $300,000 | SBA Eastern Realty, Inc | $3,000 | - | Referral Source: blank (GX 325-02, 325-03, 325-04, 325-05, 325-06) | - | "Name of referral agent:" "N/A" "Referral fee paid, if any: $0" (GX 325-08) |
| Lee 77, Corp | $200,000 | SBA Eastern Realty, Inc | $2,000 | Attached to email dated 1/23/13: Seeks 1% broker fee for "SBA Eastern Realty, C/O Byung Hoon Kim" (GX 326-02) | 12/5/12 and 12/12/12: Referral Source: blanks (GX 326-08, 326-09) 12/20/12 to 1/24/13 Referral Source: James Kim (GX 326-10, 326-11, 326-12, 326-13, 326-14, 326-15) | 12/14/12: "no broker" (GX 326-01) | "Referral fee paid, if any: $2,000" to "Byung Hoon Kim," "SBA Eastern Realty Inc " (GX 326-06) |
| Nail & Spa 72, Inc | $300,000 | SBA Eastern Realty, Inc | $3,000 | No broker fee condition (GX 327-05) | Referral Source: blank (327-04, 327-06, 327-08, 327-11, 327-12, 327-13) | "no broker" (GX 327-07) | "Name of referral agent: "N/A" "Referral fee paid, if any: $0" (GX 327-16) |
| Niobe Nail & Spa Inc | $200,000 | SBA Eastern Realty, Inc | $2,000 | No broker fee condition (GX 327-05) | Referral Source: blank (GX 327-04, 327-06, 327-08, 327-11, 327-12, 327-13) | "no broker" (GX 327-07) | "Name of referral agent: "N/A" "Referral fee paid, if any: $0"" (GX 327-17) |
| Noah Super Laundromat LLC | $1,485,000 | SBA Eastern Realty, Inc | $3,712 50 | Seeks 25% broker fee for "SBA Eastern Realty Inc C/O Byung Hoon Kim" (GX 338-01) | - | Silent (GX 338-02) | - |

| LOAN DETAILS | | BROKER FEE DETAILS | | BROKER FEE DISCLOSURES | | | |
|---|---|---|---|---|---|---|---|
| **Borrower Name** | **Loan Amount** | **Paid to** | **Amount** | **Credit Memo** | **Loan Pipeline(s)** | **MLC/BOD Minutes** | **Form 159** |
| R Four LLC | $795,000 | SBA Eastern Realty, Inc | $1,987 50 | Discloses 1% "Fee"; silent as to broker (GX 327-25) | Referral Source: blank (GX 327-26) | | |
| Royal Garden Inc | $200,000 | SBA Eastern Realty, Inc | $1,000 00 | - | - | - | - |
| SCY Realty Inc | $1,550,000 | BADA Realty Inc | $15,500 | Undated copy: No broker fee condition (GX 329-01) Attached to email to Shin et al dated 3/6/12: Seeks 1% broker fee for "Bada Realty Inc C/O William Gil" (GX 329-08) Attached to email to BOD member dated 3/8/12: Seeks 1% broker fee for "Bada Realty Inc C/O William Gil" (GX 329-12) | Referral Source: blank (GX 329-03, 329-04, 329-05, 329-07, 329-09, 329-14, 329-16, 329-21) | Silent (GX 329-10) | "Referral fee paid, if any: $15,500" to "William Gil," "Bada Realty Inc " (GX 329-24) |
| Sharon Springs, Inc | $3,500,000 | SBA Eastern Realty, Inc | $35,000 | "Referral Fee" - "yes" - "1% or $50,000" to "SBA Eastern Realty Inc C/O Byung Hoon Kim" (GX 330-04) | - | "$50,000 broker fee" (GX 330-05, 330-06) | - |
| Teaneck Windsor, LLC | $5,000,000 | SBA Eastern Realty, Inc | $37,500 | 3/11/11 approval: "SOURCE: Royal Asian Bank" (GX 331-04)  Attached to email dated 3/14/11: Seeks 1% broker fee for "SBA Eastern Relaty Inc C/O Byung Hoon Kim" | - | Silent (GX 331-06) | "Referral fee paid, if any: "$37,500" to "Byung Hoon Kim," "SBA Eastern Realty Inc " (GX 331-09) |
| Windsor R&B Inc | $1,500,000 | SBA Eastern Realty, Inc | $15,000 | No broker fee condition (GX 332-01, 332-03) | Referral Source: blank (GX 332-02, 332-07) | "no broker" (GX 332-04) | "Referral fee paid, if any: $0" (GX 332-10) |
| **TOTAL LOANS:** | **$32,650,000** | **TOTAL BROKER FEES:** | **$276,550** | | | | |



7301 Old York Road, Elkins Park, PA 19027
Tel. 215.424.5100 Fax.215.424.0609


August 1, 2022


**VIA: EMAIL ATTACHMENT**
stephanie mcmahon@nysp.uscourts.gov
Ms. Stephanie M. McMahon
*U.S. Probation Officer Specialist*
*Southern District of New York*
500 Pearl Street, 7ᵗʰ Floor
New York, NY 10007

       Re: <u>U.S. v. Edward E. Shin – Victim Impact Statement</u>


Ms. McMahon:


     This will serve us the victim impact statement related to the above-captioned criminal action. In addition to the uncalculated costs of loss of reputation, employee turnover, and diminution of customer good will, the schedule following lays out the Banks losses directly proximate to the crimes of which Mr. Shin has been convicted.


<u>**FDIC**</u> **insured**

August 1, 2022
Ms. Stephanie M. McMahon
Page 2

| US. V. Shin | | |
|---|---|---|
| **Financial Damages to Noah Bank** | | |
| | | |
| 32 Madison Farm Inc. | $ 551,627.60 | |
| First Avenue Lees Market | 548,286.28 | |
| SBA guaranty repayments | | $ 1,099,913.88 |
| Independent Investigation Cost | | 582,151.12 |
| Cost of Response to US Govt. Subpoena | | 238,796.84 |
| | | |
| Broker Fees paid to James Kim companies | $ 270,550.00 | |
| Broker fees disclosed in credit memo | | |
|   and SBA Form 159 | 141,712.50 | |
| Fraudulent undisclosed broker fees | | 128,837.50 |
| | | |
| *The Basil Law Group v. Noah Bank* | | |
|   Legal fees | | $    115,818.00 |
| *JKAYC LLC v. Noah Bank* | | |
|   Legal Fees | $ 104,723.00 | |
|     Lost deposit | 400,000.00 | |
|     Abandoned Construction costs | 491,665.00 | |
| | | 996,388.00 |
| *Shin v. Noah Bank* legal fees | | 25,000.00 |
| Total financial damages suffered by Noah Bank | | $ 3,186,905.34 |

By way of explanation, the first two items are SBA 7(a) loans which defaulted, were purchased by SBA pursuant to its guarantees and which guarantees were withdrawn on account of undisclosed interests of affiliates in the borrowers as alleged and proved by the government.

Noah Bank was compelled to arrange for an independent investigation of the Government's allegations against Mr. Shin for the benefit of regulators and stock holders. The Bank engaged Starfield & Smith, attorneys at law and Mercadien, forensic accountants, to conduct the investigation. The amount of loss represents the aggregate of the fees incurred by those two firms.

The Bank was compelled to produce documents in response to the government's forthwith subpoena. The Bank engaged KL Discovery to collect and convert millions of pages of documents into searchable files. The amount represents the total fees paid for that work.

The charges proved against Mr. Shin included procuring the payment of fraudulent broker fees for loans that had had no broker. The amount claimed represents those fees that were not disclosed to the SBA or the loan committees.

August 1, 2022
Ms. Stephanie M. McMahon
Page 3

The total amount claimed as loss includes the costs of two concluded legal actions against the Bank and one pending claim. The *Basil Law Group v. Noah Bank* was a spurious action brought against the Bank for the obvious purpose of forcing the Bank to fund the cost of Mr. Shin's criminal defense. The Bank prevailed but only after expending the claimed amount in legal fees and costs to litigate the case through to the appellate level. The second concluded action was brought against the Bank for breach of a lease for a new branch, the regulatory approval of which became impossible following the arrest of Mr. Shin. The pending action is based on Mr. Shin's own attempt to force the Bank to fund the costs of his criminal defense by laying spurious allegations of breach of contract, wrongful discharge, and defamation.

Thank you for the opportunity to present the above impact statement.

Yours Truly,

Glenn Richard James, Executive Vice President &
            General Counsel
For Noah Bank

GRJ/gj

## Note 500701 – GARDEN OF EDEN ENTERPRISES INC

| | Relationship | Date of Birth | Phone Number | Tax Identification |
|---|---|---|---|---|
| ⊟ GARDEN OF EDEN ENTERPRISES INC | 👤 Owner/Signer | | [B] (212) 675-■<br>[F] (212) 253- | EIN 20-■ |

GARDEN OF EDEN
ENTERPRISES INC (Alternate
Name)

| **Phone Number** | | **E-Mail Address** | |
|---|---|---|---|
| Fax: | (212) 253-■ | E-Mail Address: | ■ |
| Business Phone: | (212) 675-■ | Web Page Address: | ■ |
| Business Phone: | (212) 675-■ | E-Mail Address: | ■ |
| Home Phone: | (917) 217-■ | | |

🏢 220 EAST 23RD STREET SUITE 605
NEW YORK NY 10010

Additional Relationships
PLP ■ 0-04 APPR.04.17.12
Tax Name: GARDEN OF EDEN ENTERPRISES
INC 20-■
See Mailing Information

## Account Classification

| | | | | |
|---|---|---|---|---|
| Portfolio: | ■ 441 | Responsibility Code: | | [222] ■ |
| Line: | ■ 441 | Purpose Code: | | [510] Commercial/General Purpose |
| Product: | [540170] SBA 7(a) LOANS | Employee Officer Director: | | [0] |
| Accounting Branch: | [38] MANHATTAN | Collateral: | | Multiple |

## Warnings

Partially Charged-Off: Jun 30, 2021
Date Non-Accrual: Feb 26, 2016
Collection
Past Due
Advance Restriction Code: Non-Post if > Max Credit
Payment Restriction Code: Zero Payment Tolerance
Placed

## Priority Miscellaneous

**Description**

⊟ 3/20/13 -RISK RATING CHANGED FROM 4(PASS) TO 6(SPECIAL MENTION) / FDIC . (RL)
   Responsibility Code: [222] ■
   Miscellaneous Code: [0]
   Addenda: 6
⊟ 5/8/15– MONTAGUE FANCY FOOD, INC. RELEASED AS A GUARANTOR & RELEASED AS A COLLATERAL WITH
   PRINCIPAL PAYDOWN & REAMORTIZE AFTER PRINCIPAL PAYDOWN (REFER MLC 4/21/15)
   Responsibility Code: [222] ■
   Miscellaneous Code: [0]
   Addenda: 8
⊟ 06/30/15-RISK RATING CHANGED TO 5 FROM 6 DUE TO INTERNAL REVIEW (REQUEST FROM ON 06/30/15)
   Responsibility Code: [222] ■
   Miscellaneous Code: [0]
   Addenda: 10
⊟

**Description**

01/20/16- HOLD FUNDS IN DDA# 31█████77 IN THE AMOUNT OF $35,255.70 (RESERVED FOR THE LOAN PAYMENT).
Responsibility Code: [222] █████
Miscellaneous Code: [0]
Addenda: 11

⊟ 02/04/16- RISK RATING CODE HAS BEEN CHANGED TO 6 FROM 5 DUE TO DELINQUENCY OF THE LOAN (60 dpd+) (REQUESTED BY GARY on 02
Responsibility Code: [222] █████
Miscellaneous Code: [0]
Addenda: 12

⊟ 02/29/16- RISK RATING CODE HA█ BEEN CHANGED TO 7 FROM 6 DUE TO DELINQUENCY OF THE LOAN (90 dpd+)
2/29/█
██████████████Irvin █
Addenda: 13

## Summary

| | | | |
|---|---|---|---|
| Principal Balance: | $1,990,777.03 | Interest Method: | [1] 365/365 Payments P&I |
| Interest Balance: | $0.00 | Current Payment Due Date: | Dec 01, 2015 |
| Net Payoff: | $3,117,970.25 | Current Payment Due Amount: | $46,515.80 |
| Current Other Escrow Balance: | $0.00 | Date Last Payment: | Oct 28, 2021 |
| Current Late Charge Balance: | $141,226.16 | Amount Last Payment: | $16,200.00 |
| Current Other Escrow Interest Balance: | $0.00 | Current Days Past Due: | 2,176 |
| Lost Interest: | $985,967.06 | Total Amount Due: | $2,965,756.56 |
| Participation Balance: | $0.00 | Total Amount Past Due: | $2,824,530.40 |
| Net Principal: | $1,990,777.03 | Payment Frequency: | Monthly |
| Book Balance: | $1,133,713.31 | Regular Payment Amount: | $46,515.80 |
| Net Book Balance: | $1,133,713.31 | Current Rate Over: | 5.750000 |
| Charged Off Principal: | $857,063.72 | One Day's Interest: | $313.6155 |
| Total Collateral Value: | $0.00 | Original Note Amount: | $5,000,000.00 |
| Pledge LTV: | Secured | Original Note Date: | Apr 20, 2012 |
| Payments Scheduled: | 120 | Maturity Date: | Apr 20, 2022 |
| Payments Billed: | 114 | Months To Maturity: | 5.3 |
| Payments Made: | 42 | Date Accrued Through: | Nov 14, 2021 |
| Times Extended: | | Date Last Transaction Activity: | Nov 12, 2021 |
| Times Renewed: | 0 | Date Principal Paid To: | Nov 01, 2015 |
| Times Past Due 1-29 Days: | 1 | Date Interest Paid To: | Nov 02, 2015 |
| Times Past Due 30-59 Days: | 1 | Date Last Change: | Jun 18, 2021 |
| Times Past Due 60-89 Days: | 1 | Date Last Updated: | Nov 12, 2021 |
| Times Past Due 90+ Days: | 69 | | |

## Participation

| | | | |
|---|---|---|---|
| Participation Number: | 600701 | Percent Participated: | 75.0000% |
| Principal Balance: | $0.00 | Interest Method: | [2] 365/365 P&I Separate |
| Interest Balance: | $0.00 | Principal Payment Frequency: | Maturity |
| Current Rate Over Split: | 5.750000 | Interest Payment Frequency: | Maturity |
| Total Amount Past Due: | $0.00 | Percent Participated Method: | Percentage of Base Note Balance |
| Original Note Amount: | $3,750,000.00 | Source Code: | [8888] |
| Original Note Date: | May 02, 2012 | Recourse Code: | No Recourse |
| Maturity Date: | Apr 20, 2022 | | |

## Book Balance

| | | | |
|---|---|---|---|
| Principal Balance: | $1,990,777.03 | LTD Charge-off Amount: | $1,102,752.65 |
| (-) Participation Principal Balance: | $0.00 | (-) LTD Participation Charge-off Amount: | $347,219.46 |
| (-) Charge-off Amount: | #17 $857,063.72 | (-) LTD Recoveries: | $245,688.93 |
| (+) Participation Charged-off Amount: | $0.00 | (+) LTD Participation Recoveries: | $347,219.46 |
| (-) Non-Accrual Interest Paid: | $0.00 | Loan Loss Recovery: | $857,063.72 |
| (+) Participation Non-Accrual Interest Paid: | $0.00 | | |
| (-) Non-Accrual Late Charges Paid: | $0.00 | Recognized Income on Non-Accrual Transactions: | $0.00 |
| Net Book Balance: | $1,133,713.31 | | |

## Non-Accrual

| | | | |
|---|---|---|---|
| Date Non-Accrual: | Feb 26, 2016 | Non-Accrual Code: | [2] Non-Accrual (Accrual = 0) |
| Beginning Non-Accrual Principal Balance: | $3,022,132.73 | Non-Accrual Late Charge Option: | Do Not Allow Non Accrual Late Charges |
| Non-Accrual Interest: | $864,930.93 | Automatic Recovery Override: | No Override |
| Lost Interest: | $985,967.06 | Non-Accrual Participation Override: | No Override |
| Lost Interest 2021: | $102,894.79 | | |
| Lost Interest 2020: | $137,457.48 | | |

## Charge Off

| | | | |
|---|---|---|---|
| Principal Balance: | $1,990,777.03 | Date First Charged Off: | Jun 30, 2016 |
| Charged Off Amount: | $857,063.72 | Amount First Charged Off: | $755,533.19 |
| Active Amount: | $1,133,713.31 | Date Last Charged Off: | Jun 30, 2021 |
| Adjusted Principal: | $1,133,713.31 | Amount Last Charged Off: | $347,219.46 |
| | | Date Last Recovery: | Jul 26, 2021 |
| | | Amount Last Recovery: | $2,025.00 |

## Status

| | | | |
|---|---|---|---|
| Status: | Active | Risk Score 1: | 0 |
| Write Down Status: | Not a Write Down | Risk Score 2: | 0 |
| Date Current Charge Off: | Jun 30, 2021 | Risk Ranking: | [0] NONE |
| Non-Accrual Code: | [2] Non-Accrual (Accrual = 0) | Credit Score: | 0 |
| Date Non-Accrual: | Feb 26, 2016 | Required Pledge LTV: | 0.00% |
| Loan Rating Code 1: | [7] SUBSTANDARD | | |
| Loan Rating Code 2: | [0] | | |
| Loan Rating Code 3: | [0] | | |

### Review Options

| | |
|---|---|
| Review Processing Option: | None |

### Bankruptcy

| | |
|---|---|
| Bankruptcy Chapter: | None |
| Bankruptcy Status: | None |

## Posting

| | |
|---|---|
| Payment Restriction Code: | Zero Payment Tolerance |
| Advance Restriction Code: | Non-Post if > Max Credit |

Advance Restriction Past Due Days:                                          0
Billing Retention Override:                      No Override

## Statement/Notification

| | | | |
|---|---|---|---|
| HUD/SCRA Notice Option: | No Notification | Handling Code Option: | Use Address Value |
| Number of Right to Cures Sent: | 0 | Account Title Option: | Title Not Printed |
| Collection Report Request Code: | Print on Collection Report | Document Distribution Group: | [0] |
| Nickname Option: | Nickname Not Printed | Notification Option: | No Notification |
| Language Preference Indicator: | English | Receipt Balance Override: | No Override |
| | | Rate Change Notification Override: | No Notification |
| | | Maturity Notice Override: | No Notification |
| | | Payment Change Notice Override: | No Notification |
| | | Auto Payment Billing Notice Override: | No Notification |
| | | LAS/6202 Statement Cycle: | 02 |
| | | Combined Statement Option: | Combine on LAS Statement |
| | | DDA Credit Back Identification: | 0 |

## Codes

| | | | |
|---|---|---|---|
| Class: | [40] SBA 7(a) LOAN | Purpose Code: | [510] Commercial/General Purpose |
| Division: | [2] | Opened By Responsibility Code: | [0] |
| Branch Region: | [38] MANHATTAN | Referral Responsibility Code: | [0] |
| Accounting Method: | Class | Account Opened Method: | [0] IN PERSON |
| Accounting Value: | 40 | Miscellaneous Code: | [117] Post - Modified Loans |
| Cost Center: | [0] | Electronic Banking Restriction: | Not Restricted |
| Recourse Code: | No Recourse | Direct/Indirect Code: | Direct |
| Secured/Unsecured Code: | Secured | Source Code: | [0] |
| Commitment Number: | 0 | SBA Office: | NYDO |
| Escrow Interest Reporting Code: | No | SBA Group Number: | 5171415004 |
| Loan Interest Reporting Code: | Borrower Only | SBA Status Code: | 2 |
| NAICS Code: | [445110] Supermarkets and Other Grocery (except Convenience) Stores | HMDA Reporting Code: | Not Reported |
| Payoff Option: | Negative Interest/Negative Escrow Not Allowed | Renegotiated Debt: | Not Renegotiated |
| | | Maturity Intention Code: | [0] Payable at Maturity (maturity date printed) |
| | | Line Life Insurance Option: | No |
| | | Universal Loan Identifier: | |

## FHLB

Reporting Code:                 Not Reportable (LAS6010)

## FHA/CRA

MSA Code:                       [0]

## Credit Bureau

| | | | |
|---|---|---|---|
| Reporting Code: | [1] | Past Due History Days: | 28 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type Code: | | | | [01] | Terms Duration: | | | | | | | |
| Amount Past Due: | | | | $0.00 | Deferral Start Date: | | | | | | | |
| | | | | | Deferral End Date: | | | | | | | |

## Payment History Profile

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| History Recalculation Override: | 0 | | | | | | | | | | | |
| History Profile Cycle: | 1 | | | | | | | | | | | |

| | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021: | | L | L | L | L | L | L | L | L | L | L | L |
| 2020: | L | L | L | L | L | L | L | L | L | L | L | L |
| 2019: | L | L | | | | | | | | | | |

## Consumer Status

| | | |
|---|---|---|
| Owner | ECOA Code | Consumer Information Indicator |
| GARDEN OF EDEN ENTERPRISES INC | | |

## Additional Information

| | |
|---|---|
| PRIMARY COLLATERAL STATE: | NY |
| COLLATERAL LOCATION CODE: | 1 |
| RELATED LOANS: | 72 |
| 22. SITE VISITATION DATE: | Oct 21, 2015 |
| 23. ANNUAL REVIEW DATE: | Oct 27, 2015 |

## Billing Summary

| | | | |
|---|---|---|---|
| Maximum Credit: | $0.00 | Interest Accrued From: | Apr 20, 2012 |
| Maturity Date: | Apr 20, 2022 | Interest Accrued Through: | Oct 31, 2021 |
| **Activity This Period** | | Total Amount Past Due: | $2,824,530.40 |
| Principal Advances: | $5,000,000.00 | Late Charge Balance: | $141,226.16 |
| Principal Paid: | $3,009,222.97 | Principal Billed: | $1,842,943.75 |
| Finance Charges Paid: | $864,930.93 | Interest Billed: | $981,586.65 |
| | | Escrow Billed: | $0.00 |
| | | Other Escrow Billed: | $0.00 |
| | | Insurance Billed: | $0.00 |
| | | Total Payment Billed: | $2,965,756.56 |
| | | Principal Billed Through: | Nov 01, 2021 |
| | | Interest Billed To: | Nov 01, 2021 |
| | | Interest As Of: | Apr 20, 2012 |

## Payment Summary

| | | | |
|---|---|---|---|
| Current Payment Due Date: | Dec 01, 2015 | Payment Code: | Debit Demand Deposit |
| Current Payment Due Amount: | $46,515.80 | | |
| Regular Payment Amount: | $46,515.80 | Statement Billing Code: | Always Produced |
| Regular Escrow Portion: | $0.00 | Statement Format Override: | 0 |
| Regular Other Escrow Portion: | $0.00 | Regular Payment Override: | No Override |
| Current Escrow Portion: | $0.00 | Statement Suspension Option: | (None) |
| | $0.00 | Payment Split Override: | No Override |

Current Other Escrow
Portion:

| | |
|---|---|
| Payment Frequency: | Monthly |
| Interest Payment Frequency: | |
| Date Last Payment: | Oct 28, 2021 |
| Last Payment: | $16,200.00 |
| Payment Re-bill Request Code: | No Request |
| Re-bill Advance Code: | Do Not Rebill |
| Draft Day Adjuster: | 0 |
| Principal Variance Option: | Principal Variance Does Not Apply |
| LTD Curtailments: | $1,610,572.62 |
| LTD Reapplied Curtailments: | $0.00 |
| Automatic Payment Option: | Do Not Collect Late Charges/Fees |
| Automatic Draft Amount: | $0.00 |
| Automatic Draft Payment Option: | Draft Amount |
| Date Last Automatic Payment: | Nov 01, 2021 |
| Automatic Payment Maturity Option: | Final Payment - Manual |

| | |
|---|---|
| ACH Standard Entry Class: | PPD (Consumer) |
| Document Distribution Group: | [0] |
| Transaction Sequence Override: | No Override |

## *Payment Schedule*

| Start Date | | Frequency | Number | Total Amount | P/I Amount | Escrow | Other Escrow | Rate |
|---|---|---|---|---|---|---|---|---|
| Jun 01, 2012 | Paid | Monthly | 36 | $54,884.61 | $54,884.61 | $0.00 | $0.00 | |
| Jun 01, 2015 | Paid | Monthly | 2 | $46,512.81 | $46,512.81 | $0.00 | $0.00 | |
| Aug 01, 2015 | Paid | Monthly | 3 | $46,509.84 | $46,509.84 | $0.00 | $0.00 | |
| Nov 01, 2015 | Paid | Monthly | 1 | $46,515.80 | $46,515.80 | $0.00 | $0.00 | |
| Dec 01, 2015 | | Monthly | 2 | $46,515.80 | $46,515.80 | $0.00 | $0.00 | |
| Feb 01, 2016 | | Monthly | 3 | $46,874.06 | $46,874.06 | $0.00 | $0.00 | |
| May 01, 2016 | | Monthly | 6 | $46,895.77 | $46,895.77 | $0.00 | $0.00 | |
| Nov 01, 2016 | | Monthly | 3 | $43,049.23 | $43,049.23 | $0.00 | $0.00 | |
| Feb 01, 2017 | | Monthly | 3 | $42,600.16 | $42,600.16 | $0.00 | $0.00 | |
| May 01, 2017 | | Monthly | 3 | $42,113.95 | $42,113.95 | $0.00 | $0.00 | |
| Aug 01, 2017 | | Monthly | 3 | $41,618.88 | $41,618.88 | $0.00 | $0.00 | |
| Nov 01, 2017 | | Monthly | 3 | $40,892.49 | $40,892.49 | $0.00 | $0.00 | |
| Feb 01, 2018 | | Monthly | 3 | $40,370.93 | $40,370.93 | $0.00 | $0.00 | |
| May 01, 2018 | | Monthly | 3 | $39,812.69 | $39,812.69 | $0.00 | $0.00 | |
| Aug 01, 2018 | | Monthly | 3 | $39,251.94 | $39,251.94 | $0.00 | $0.00 | |
| Nov 01, 2018 | | Monthly | 3 | $38,693.11 | $38,693.11 | $0.00 | $0.00 | |
| Feb 01, 2019 | | Monthly | 3 | $38,126.85 | $38,126.85 | $0.00 | $0.00 | |
| May 01, 2019 | | Monthly | 3 | $37,381.40 | $37,381.40 | $0.00 | $0.00 | |
| Aug 01, 2019 | | Monthly | 3 | $36,889.42 | $36,889.42 | $0.00 | $0.00 | |
| Nov 01, 2019 | | Monthly | 3 | $36,187.92 | $36,187.92 | $0.00 | $0.00 | |
| Feb 01, 2020 | | Monthly | 3 | $35,854.51 | $35,854.51 | $0.00 | $0.00 | |
| May 01, 2020 | | Monthly | 3 | $36,329.05 | $36,329.05 | $0.00 | $0.00 | |
| Aug 01, 2020 | | Monthly | 3 | $37,304.74 | $37,304.74 | $0.00 | $0.00 | |
| Nov 01, 2020 | | Monthly | 3 | $36,848.09 | $36,848.09 | $0.00 | $0.00 | |
| Feb 01, 2021 | | Monthly | 3 | $35,201.10 | $35,201.10 | $0.00 | $0.00 | |
| May 01, 2021 | | Monthly | 3 | $32,931.56 | $32,931.56 | $0.00 | $0.00 | |

| Start Date | Frequency | Number | Total Amount | P/I Amount | Escrow | Other Escrow | Rate |
|---|---|---|---|---|---|---|---|
| Aug 01, 2021 | Monthly | 3 | $29,614.37 | $29,614.37 | $0.00 | $0.00 | |
| Nov 01, 2021 | Monthly | 6 | $26,284.83 | $26,284.83 | $0.00 | $0.00 | |
| Apr 20, 2022 | Maturity | 1 | $26,284.83 | $26,284.83 | $0.00 | $0.00 | |

## Payment Billed

| | | | |
|---|---|---|---|
| Current Billed Due Date: | May 01, 2020 | Principal Billed Through: | Nov 01, 2021 |
| Current Payment Billed: | $124,339.57 | Total Payment Billed: | $2,965,756.56 |
| Current Principal Billed: | $76,079.39 | Total Principal Billed: | $1,842,943.75 |
| Current Interest Billed: | $42,374.87 | Total Interest Billed: | $981,586.65 |
| Current Insurance Billed: | $0.00 | Total Escrow Billed: | $0.00 |
| Current Escrow Billed: | $0.00 | Total Other Escrow Billed: | $0.00 |
| Current Other Escrow Billed: | $0.00 | Total Insurance Billed: | $0.00 |
| Current Late Charge Billed: | $5,885.31 | Total Late Charge Billed: | $139,911.92 |
| Current Fees Billed: | $0.00 | Total Fees Billed: | $0.00 |

## Billing History

| Due Date | Billing Date | Principal: | Interest: | Escrow | Late Charge | Total | Completed |
|---|---|---|---|---|---|---|---|
| Nov 01, 2021 | Oct 18, 2021 | $16,511.72 | $9,773.11 | $0.00 | $0.00 | $26,284.83 | No |
| Oct 01, 2021 | Sep 16, 2021 | $129,429.44 | $65,147.27 | $0.00 | $8,846.73 | $203,423.44 | No |
| Sep 01, 2021 | Aug 17, 2021 | $160,445.89 | $93,938.34 | $0.00 | $14,965.07 | $269,349.30 | No |
| Aug 01, 2021 | Jul 19, 2021 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | No |
| Jul 01, 2021 | Jun 16, 2021 | $97,026.98 | $54,205.24 | $0.00 | $7,599.05 | $158,831.27 | No |
| Jun 01, 2021 | May 17, 2021 | $98,907.04 | $53,242.21 | $0.00 | $7,599.05 | $159,748.30 | No |
| May 01, 2021 | Apr 16, 2021 | $99,011.18 | $53,259.22 | $0.00 | $7,967.84 | $160,238.24 | No |
| Apr 01, 2021 | Mar 17, 2021 | $99,984.13 | $55,055.51 | $0.00 | $7,967.84 | $163,007.48 | No |
| Mar 01, 2021 | Feb 16, 2021 | $222,309.82 | $111,199.41 | $0.00 | $3,604.52 | $337,113.75 | No |
| Feb 01, 2021 | Jan 19, 2021 | $41,651.02 | $25,177.47 | $0.00 | $12,464.19 | $79,292.68 | No |
| Jan 01, 2021 | Dec 17, 2020 | $78,011.27 | $39,269.47 | $0.00 | $3,711.47 | $120,992.21 | No |
| Dec 01, 2020 | Nov 16, 2020 | $26,478.92 | $10,369.17 | $0.00 | $12,490.27 | $49,338.36 | No |
| Nov 01, 2020 | Oct 19, 2020 | $161,830.27 | $87,454.18 | $0.00 | $8,196.21 | $257,480.66 | No |
| Oct 01, 2020 | Sep 16, 2020 | $107,284.75 | $55,189.65 | $0.00 | $8,196.21 | $170,670.61 | No |
| Sep 01, 2020 | Aug 17, 2020 | $105,999.08 | $57,220.77 | $0.00 | $8,196.21 | $171,416.06 | No |
| Aug 01, 2020 | Jul 17, 2020 | $108,905.85 | $55,040.40 | $0.00 | $8,182.58 | $172,128.83 | No |
| Jun 01, 2020 | May 18, 2020 | $213,077.00 | $113,670.36 | $0.00 | $14,039.37 | $340,786.73 | No |
| May 01, 2020 | Apr 16, 2020 | $109,343.48 | $55,618.86 | $0.00 | $5,885.31 | $170,847.65 | No |

## Payments Past Due

| | 1-29 Days | 30-59 Days | 60-89 Days | 90+ Days | Total |
|---|---|---|---|---|---|
| Current Amount: | $26,284.83 | $29,614.37 | $29,614.37 | $2,739,016.83 | $2,824,530.40 |
| Current Payments: | 1 | 1 | 1 | 69 | 72 |
| LTD Payments: | 1 | 1 | 1 | 69 | 72 |

## Payment Change

| | | | |
|---|---|---|---|
| Payment Change Frequency: | Rate Frequency | Recalc Increment Override: | $0.00 |
| Recalculation Code: | [1] Remaining Term | Recalc Amount Override: | $0.00000 |
| Recalculation Term: | 0 | Increase Percent Change Cap: | 0.0000 |
| Maximum Payment Amount: | $0.00 | Decrease Percent Change Cap: | 0.0000 |
| Minimum Payment Amount: | $0.00 | | |

### Billing Transactions

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Apr 20, 2012 | NEW LOAN ADVANCE | $5,000,000.00 | $5,000,000.00 | | $5,000,000.00 |
| Apr 30, 2012 | INTERIM INTEREST PAYMENT | $8,664.38 | | $8,664.38 | $5,000,000.00 |
| Jun 04, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $30,466.81 | $24,417.80 | $4,969,533.19 |
| Jul 02, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $31,384.06 | $23,500.55 | $4,938,149.13 |
| Aug 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $30,763.92 | $24,120.69 | $4,907,385.21 |
| Sep 04, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $30,919.10 | $23,965.51 | $4,876,466.11 |
| Oct 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $31,823.68 | $23,060.93 | $4,844,642.43 |
| Nov 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $31,225.51 | $23,659.10 | $4,813,416.92 |
| Dec 03, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $32,136.27 | $22,748.34 | $4,781,280.65 |
| Jan 02, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $31,524.82 | $23,359.79 | $4,749,755.83 |
| Feb 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $31,683.92 | $23,200.69 | $4,718,071.91 |
| Mar 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $34,073.39 | $20,811.22 | $4,683,998.52 |
| Apr 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $32,010.02 | $22,874.59 | $4,651,988.50 |
| May 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $32,899.19 | $21,985.42 | $4,619,089.31 |
| Jun 03, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $32,327.01 | $22,557.60 | $4,586,762.30 |
| Jul 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,197.26 | $21,687.35 | $4,553,565.04 |
| Aug 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉877 | $54,884.61 | $32,647.00 | $22,237.61 | $4,520,918.04 |
| Sep 03, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $32,806.43 | $22,078.18 | $4,488,111.61 |
| Oct 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,663.34 | $21,221.27 | $4,454,448.27 |
| Nov 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,131.04 | $21,753.57 | $4,421,317.23 |
| Dec 02, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,989.35 | $20,895.26 | $4,387,327.88 |
| Jan 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,453.47 | $21,431.14 | $4,353,874.41 |
| Feb 03, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,616.94 | $21,267.67 | $4,320,257.47 |
| Mar 03, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $35,817.54 | $19,067.07 | $4,284,439.93 |
| Apr 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $33,950.01 | $20,934.60 | $4,250,489.92 |
| May 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $34,796.68 | $20,087.93 | $4,215,693.24 |
| Jun 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $34,297.02 | $20,587.59 | $4,181,396.22 |
| Jul 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $35,117.82 | $19,766.79 | $4,146,278.40 |
| Aug 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $34,636.01 | $20,248.60 | $4,111,642.39 |
| Sep 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $34,805.16 | $20,079.45 | $4,076,837.23 |
| Oct 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $35,611.88 | $19,272.73 | $4,041,225.35 |
| Nov 03, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 310▉77 | $54,884.61 | $35,149.04 | $19,735.57 | $4,006,076.31 |
| Dec 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▉77 | $54,884.61 | $35,940.72 | $18,943.89 | $3,970,135.59 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|------|-------------|-------------------|-----------|-----------|-------------------|
| Jan 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $54,884.61 | $35,496.21 | $19,388.40 | $3,934,639.38 |
| Feb 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $54,884.61 | $35,663.97 | $19,220.64 | $3,898,975.41 |
| Mar 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $54,884.61 | $37,680.78 | $17,203.83 | $3,861,294.63 |
| Apr 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $54,884.61 | $36,021.80 | $18,862.81 | $3,825,272.83 |
| May 08, 2015 | May loan payment | $54,884.61 | $36,806.27 | $18,078.34 | $3,788,466.56 |
| May 08, 2015 | Principal Payment | $579,216.92 | $579,216.92 | | $3,209,249.64 |
| Jun 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $46,512.81 | $30,160.93 | $16,351.88 | $3,179,088.71 |
| Jul 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $46,512.81 | $31,488.35 | $15,024.46 | $3,147,600.36 |
| Aug 03, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮7 | $46,509.84 | $30,146.64 | $16,363.20 | $3,117,453.72 |
| Sep 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 310▮▮77 | $46,509.84 | $32,267.77 | $14,242.07 | $3,085,185.95 |
| Oct 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 310▮▮77 | $46,509.84 | $31,929.17 | $14,580.67 | $3,053,256.78 |
| Nov 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31▮▮77 | $46,515.80 | $31,124.05 | $15,391.75 | $3,022,132.73 |
| Dec 11, 2015 | Automatic Late Charge | $2,325.79 | | | $3,022,132.73 |
| Jan 11, 2016 | Automatic Late Charge | $2,325.79 | | | $3,022,132.73 |
| Feb 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| Mar 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| Apr 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| May 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Jun 13, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Jun 30, 2016 | Charge off #500701 GARDEN OF EDEN | $755,533.19 | | | $3,022,132.73 |
| Jul 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Aug 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Aug 24, 2016 | Principal Payment | $35,255.70 | $35,255.70 | | $2,986,877.03 |
| Aug 25, 2016 | Reinstated Principal | $8,813.93 | | | $2,986,877.03 |
| Sep 12, 2016 | Automatic Late Charge | $2,344.78 | | | $2,986,877.03 |
| Sep 13, 2016 | Principal Payment | $190,000.00 | $190,000.00 | | $2,796,877.03 |
| Sep 19, 2016 | Reinstated Principal | $47,500.00 | | | $2,796,877.03 |
| Oct 04, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,781,877.03 |
| Oct 05, 2016 | Reinstated Principal | $3,750.00 | | | $2,781,877.03 |
| Oct 11, 2016 | Automatic Late Charge | $2,344.78 | | | $2,781,877.03 |
| Nov 08, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,766,877.03 |
| Nov 10, 2016 | Reinstated Principal | $3,750.00 | | | $2,766,877.03 |
| Nov 14, 2016 | Automatic Late Charge | $2,152.46 | | | $2,766,877.03 |
| Dec 05, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,751,877.03 |
| Dec 06, 2016 | Reinstated Principal | $3,750.00 | | | $2,751,877.03 |
| Dec 12, 2016 | Automatic Late Charge | $2,152.46 | | | $2,751,877.03 |
| Jan 06, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,736,877.03 |
| Jan 09, 2017 | Reinstated Principal | $3,750.00 | | | $2,736,877.03 |
| Jan 11, 2017 | Automatic Late Charge | $2,152.46 | | | $2,736,877.03 |
| Feb 08, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,721,877.03 |
| Feb 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,721,877.03 |
| Feb 13, 2017 | Automatic Late Charge | $2,130.00 | | | $2,721,877.03 |
| Mar 08, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,706,877.03 |
| Mar 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,706,877.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|------|-------------|-------------------:|-----------:|----------:|------------------:|
| Mar 13, 2017 | Automatic Late Charge | $2,130.00 | | | $2,706,877.03 |
| Apr 10, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,691,877.03 |
| Apr 11, 2017 | Automatic Late Charge | $2,130.00 | | | $2,691,877.03 |
| Apr 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,691,877.03 |
| May 09, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,676,877.03 |
| May 11, 2017 | Automatic Late Charge | $2,105.69 | | | $2,676,877.03 |
| May 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,676,877.03 |
| Jun 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,676,877.03 |
| Jun 12, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,661,877.03 |
| Jun 12, 2017 | Automatic Late Charge | $2,105.69 | | | $2,661,877.03 |
| Jul 11, 2017 | Automatic Late Charge | $2,105.69 | | | $2,661,877.03 |
| Jul 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,661,877.03 |
| Jul 12, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,646,877.03 |
| Aug 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,646,877.03 |
| Aug 14, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,631,877.03 |
| Aug 16, 2017 | Reinstated Principal | $3,750.00 | | | $2,631,877.03 |
| Sep 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,631,877.03 |
| Sep 15, 2017 | Reinstated Principal | $3,750.00 | | | $2,631,877.03 |
| Sep 15, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,616,877.03 |
| Oct 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,616,877.03 |
| Oct 17, 2017 | Reinstated Principal | $3,750.00 | | | $2,616,877.03 |
| Oct 17, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,601,877.03 |
| Nov 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,601,877.03 |
| Nov 13, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,586,877.03 |
| Nov 13, 2017 | Automatic Late Charge | $2,044.62 | | | $2,586,877.03 |
| Dec 11, 2017 | Automatic Late Charge | $2,044.62 | | | $2,586,877.03 |
| Dec 19, 2017 | Reinstated Principal | $3,750.00 | | | $2,586,877.03 |
| Dec 19, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,571,877.03 |
| Jan 11, 2018 | Automatic Late Charge | $2,044.62 | | | $2,571,877.03 |
| Jan 16, 2018 | Reinstated Principal | $3,750.00 | | | $2,571,877.03 |
| Jan 16, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,556,877.03 |
| Feb 12, 2018 | Automatic Late Charge | $2,018.54 | | | $2,556,877.03 |
| Feb 20, 2018 | Reinstated Principal | $3,750.00 | | | $2,556,877.03 |
| Feb 20, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,541,877.03 |
| Mar 12, 2018 | Automatic Late Charge | $2,018.54 | | | $2,541,877.03 |
| Mar 20, 2018 | Reinstated Principal | $3,750.00 | | | $2,541,877.03 |
| Mar 20, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,526,877.03 |
| Apr 11, 2018 | Reinstated Principal | $3,750.00 | | | $2,526,877.03 |
| Apr 11, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,511,877.03 |
| Apr 11, 2018 | Automatic Late Charge | $2,018.54 | | | $2,511,877.03 |
| May 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,511,877.03 |
| May 15, 2018 | Reinstated Principal | $3,750.00 | | | $2,511,877.03 |
| May 15, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,496,877.03 |
| Jun 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,496,877.03 |
| Jun 15, 2018 | Reinstated Principal | $3,750.00 | | | $2,496,877.03 |
| Jun 15, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,481,877.03 |
| Jul 09, 2018 | Reinstated Principal | $1,875.00 | | | $2,481,877.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Jul 09, 2018 | Principal Payment | $7,500.00 | $7,500.00 | | $2,474,377.03 |
| Jul 11, 2018 | Reinstated Principal | $1,875.00 | | | $2,474,377.03 |
| Jul 11, 2018 | Principal Payment | $7,500.00 | $7,500.00 | | $2,466,877.03 |
| Jul 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,466,877.03 |
| Aug 13, 2018 | Automatic Late Charge | $1,962.59 | | | $2,466,877.03 |
| Aug 14, 2018 | Reinstated Principal | $3,750.00 | | | $2,466,877.03 |
| Aug 14, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,451,877.03 |
| Sep 11, 2018 | Automatic Late Charge | $1,962.59 | | | $2,451,877.03 |
| Sep 12, 2018 | Reinstated Principal | $3,750.00 | | | $2,451,877.03 |
| Sep 12, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,436,877.03 |
| Oct 11, 2018 | Automatic Late Charge | $1,962.59 | | | $2,436,877.03 |
| Oct 17, 2018 | Reinstated Principal | $3,750.00 | | | $2,436,877.03 |
| Oct 17, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,421,877.03 |
| Nov 13, 2018 | Automatic Late Charge | $1,934.65 | | | $2,421,877.03 |
| Nov 14, 2018 | Reinstated Principal | $3,750.00 | | | $2,421,877.03 |
| Nov 14, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,406,877.03 |
| Dec 11, 2018 | Automatic Late Charge | $1,934.65 | | | $2,406,877.03 |
| Dec 17, 2018 | Reinstated Principal | $3,750.00 | | | $2,406,877.03 |
| Dec 17, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,391,877.03 |
| Jan 11, 2019 | Automatic Late Charge | $1,934.65 | | | $2,391,877.03 |
| Jan 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,391,877.03 |
| Jan 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,376,877.03 |
| Feb 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,376,877.03 |
| Feb 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,376,877.03 |
| Feb 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,361,877.03 |
| Mar 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,361,877.03 |
| Mar 18, 2019 | Reinstated Principal | $3,750.00 | | | $2,361,877.03 |
| Mar 18, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,346,877.03 |
| Apr 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,346,877.03 |
| Apr 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,346,877.03 |
| Apr 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,331,877.03 |
| May 13, 2019 | Automatic Late Charge | $1,869.07 | | | $2,331,877.03 |
| May 16, 2019 | Reinstated Principal | $1,875.00 | | | $2,331,877.03 |
| May 16, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,324,377.03 |
| Jun 11, 2019 | Automatic Late Charge | $1,869.07 | | | $2,324,377.03 |
| Jun 17, 2019 | Reinstated Principal | $3,750.00 | | | $2,324,377.03 |
| Jun 17, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,309,377.03 |
| Jul 11, 2019 | Automatic Late Charge | $1,869.07 | | | $2,309,377.03 |
| Jul 17, 2019 | Reinstated Principal | $1,875.00 | | | $2,309,377.03 |
| Jul 17, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,301,877.03 |
| Jul 29, 2019 | Reinstated Principal | $1,875.00 | | | $2,301,877.03 |
| Jul 29, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,294,377.03 |
| Aug 12, 2019 | Automatic Late Charge | $1,844.47 | | | $2,294,377.03 |
| Aug 26, 2019 | Reinstated Principal | $3,750.00 | | | $2,294,377.03 |
| Aug 26, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,279,377.03 |
| Sep 11, 2019 | Automatic Late Charge | $1,844.47 | | | $2,279,377.03 |
| Sep 20, 2019 | Reinstated Principal | $1,875.00 | | | $2,279,377.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Sep 20, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,271,877.03 |
| Oct 11, 2019 | Automatic Late Charge | $1,844.47 | | | $2,271,877.03 |
| Oct 30, 2019 | Reinstated Principal | $3,750.00 | | | $2,271,877.03 |
| Oct 30, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,256,877.03 |
| Nov 12, 2019 | Automatic Late Charge | $1,809.39 | | | $2,256,877.03 |
| Nov 29, 2019 | Reinstated Principal | $3,750.00 | | | $2,256,877.03 |
| Nov 29, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,241,877.03 |
| Dec 11, 2019 | Automatic Late Charge | $1,809.39 | | | $2,241,877.03 |
| Jan 13, 2020 | Automatic Late Charge | $1,809.39 | | | $2,241,877.03 |
| Feb 11, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| Mar 11, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| Apr 13, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| May 11, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Jun 11, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Jul 13, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Aug 11, 2020 | Automatic Late Charge | $1,865.23 | | | $2,241,877.03 |
| Aug 31, 2020 | Reinstated Principal | $3,750.00 | | | $2,241,877.03 |
| Aug 31, 2020 | Principal Payment | $15,000.00 | $15,000.00 | | $2,226,877.03 |
| Sep 11, 2020 | Automatic Late Charge | $1,865.23 | | | $2,226,877.03 |
| Sep 29, 2020 | Reinstated Principal | $3,750.00 | | | $2,226,877.03 |
| Sep 29, 2020 | Principal Payment | $15,000.00 | $15,000.00 | | $2,211,877.03 |
| Oct 13, 2020 | Automatic Late Charge | $1,865.23 | | | $2,211,877.03 |
| Oct 29, 2020 | Reinstated Principal | $4,050.00 | | | $2,211,877.03 |
| Oct 29, 2020 | Principal Payment | $16,200.00 | $16,200.00 | | $2,195,677.03 |
| Nov 12, 2020 | Automatic Late Charge | $1,842.40 | | | $2,195,677.03 |
| Nov 30, 2020 | Reinstated Principal | $3,900.00 | | | $2,195,677.03 |
| Nov 30, 2020 | Principal Payment | $15,600.00 | $15,600.00 | | $2,180,077.03 |
| Dec 11, 2020 | Automatic Late Charge | $1,842.40 | | | $2,180,077.03 |
| Dec 28, 2020 | Reinstated Principal | $4,050.00 | | | $2,180,077.03 |
| Dec 28, 2020 | Principal Payment | $16,200.00 | $16,200.00 | | $2,163,877.03 |
| Jan 11, 2021 | Automatic Late Charge | $1,842.40 | | | $2,163,877.03 |
| Jan 25, 2021 | Reinstated Principal | $4,800.00 | | | $2,163,877.03 |
| Jan 25, 2021 | Principal Payment | $3,000.00 | $3,000.00 | | $2,160,877.03 |
| Jan 25, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,144,677.03 |
| Feb 11, 2021 | Automatic Late Charge | $1,760.05 | | | $2,144,677.03 |
| Feb 25, 2021 | Reinstated Principal | $2,025.00 | | | $2,144,677.03 |
| Feb 25, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,136,577.03 |
| Feb 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,136,577.03 |
| Feb 26, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,128,477.03 |
| Mar 11, 2021 | Automatic Late Charge | $1,760.05 | | | $2,128,477.03 |
| Mar 15, 2021 | Reinstated Principal | $2,025.00 | | | $2,128,477.03 |
| Mar 15, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,120,377.03 |
| Mar 31, 2021 | Reinstated Principal | $2,025.00 | | | $2,120,377.03 |
| Mar 31, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,112,277.03 |
| Apr 12, 2021 | Automatic Late Charge | $1,760.05 | | | $2,112,277.03 |
| Apr 19, 2021 | Reinstated Principal | $2,025.00 | | | $2,112,277.03 |
| Apr 19, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,104,177.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Apr 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,104,177.03 |
| Apr 26, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,096,077.03 |
| May 10, 2021 | Reinstated Principal | $4,050.00 | | | $2,096,077.03 |
| May 10, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,079,877.03 |
| May 11, 2021 | Automatic Late Charge | $1,646.57 | | | $2,079,877.03 |
| May 24, 2021 | Reinstated Principal | $2,025.00 | | | $2,079,877.03 |
| May 24, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,071,777.03 |
| Jun 11, 2021 | Automatic Late Charge | $1,646.57 | | | $2,071,777.03 |
| Jun 16, 2021 | Reinstated Principal | $2,025.00 | | | $2,071,777.03 |
| Jun 16, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,063,677.03 |
| Jun 23, 2021 | Reinstated Principal | $2,025.00 | | | $2,063,677.03 |
| Jun 23, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,055,577.03 |
| Jun 30, 2021 | To record #600701 write off against on rep. from SBA repay | $347,219.46 | | | $2,055,577.03 |
| Jul 12, 2021 | Automatic Late Charge | $1,646.57 | | | $2,055,577.03 |
| Jul 19, 2021 | Reinstated Principal | $2,025.00 | | | $2,055,577.03 |
| Jul 19, 2021 | Principal payment | $8,100.00 | $8,100.00 | | $2,047,477.03 |
| Jul 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,047,477.03 |
| Jul 26, 2021 | Principal payment | $8,100.00 | $8,100.00 | | $2,039,377.03 |
| Aug 11, 2021 | Automatic Late Charge | $1,480.71 | | | $2,039,377.03 |
| Aug 19, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,023,177.03 |
| Sep 13, 2021 | Automatic Late Charge | $1,480.71 | | | $2,023,177.03 |
| Sep 20, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,006,977.03 |
| Oct 12, 2021 | Automatic Late Charge | $1,480.71 | | | $2,006,977.03 |
| Oct 28, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $1,990,777.03 |
| Nov 12, 2021 | Automatic Late Charge | $1,314.24 | | | $1,990,777.03 |

### *Finance Charge Calculation*

| Date | Annual Percentage Rate | Daily Periodic Rate | Principal: | Days | Finance Charge |
|---|---|---|---|---|---|
| Apr 20, 2012 | 5.750000 | .00015753 | $5,000,000.00 | 45 | $35,445.20 |
| Jun 04, 2012 | 5.750000 | .00015753 | $4,969,533.19 | 28 | $21,920.40 |
| Jul 02, 2012 | 5.750000 | .00015753 | $4,938,149.13 | 30 | $23,337.82 |
| Aug 01, 2012 | 5.750000 | .00015753 | $4,907,385.21 | 34 | $26,284.76 |
| Sep 04, 2012 | 5.750000 | .00015753 | $4,876,466.11 | 27 | $20,741.68 |
| Oct 01, 2012 | 5.750000 | .00015753 | $4,844,642.43 | 31 | $23,659.10 |
| Nov 01, 2012 | 5.750000 | .00015753 | $4,813,416.92 | 32 | $24,264.89 |
| Dec 03, 2012 | 5.750000 | .00015753 | $4,781,280.65 | 30 | $22,596.46 |
| Jan 02, 2013 | 5.750000 | .00015753 | $4,749,755.83 | 30 | $22,447.47 |
| Feb 01, 2013 | 5.750000 | .00015753 | $4,718,071.91 | 28 | $20,811.22 |
| Mar 01, 2013 | 5.750000 | .00015753 | $4,683,998.52 | 31 | $22,874.59 |
| Apr 01, 2013 | 5.750000 | .00015753 | $4,651,988.50 | 30 | $21,985.42 |
| May 01, 2013 | 5.750000 | .00015753 | $4,619,089.31 | 33 | $24,012.93 |
| Jun 03, 2013 | 5.750000 | .00015753 | $4,586,762.30 | 28 | $20,232.02 |
| Jul 01, 2013 | 5.750000 | .00015753 | $4,553,565.04 | 31 | $22,237.61 |
| Aug 01, 2013 | 5.750000 | .00015753 | $4,520,918.04 | 33 | $23,502.58 |
| Sep 03, 2013 | 5.750000 | .00015753 | $4,488,111.61 | 28 | $19,796.87 |
| Oct 01, 2013 | 5.750000 | .00015753 | $4,454,448.27 | 31 | $21,753.57 |

| Date | Annual Percentage Rate | Daily Periodic Rate | Principal | Days | Finance Charge |
|---|---|---|---|---|---|
| Nov 01, 2013 | 5.750000 | .00015753 | $4,421,317.23 | 31 | $21,591.77 |
| Dec 02, 2013 | 5.750000 | .00015753 | $4,387,327.88 | 31 | $21,425.78 |
| Jan 02, 2014 | 5.750000 | .00015753 | $4,353,874.41 | 32 | $21,948.29 |
| Feb 03, 2014 | 5.750000 | .00015753 | $4,320,257.47 | 28 | $19,056.47 |
| Mar 03, 2014 | 5.750000 | .00015753 | $4,284,439.93 | 29 | $19,573.43 |
| Apr 01, 2014 | 5.750000 | .00015753 | $4,250,489.92 | 30 | $20,087.93 |
| May 01, 2014 | 5.750000 | .00015753 | $4,215,693.24 | 32 | $21,251.71 |
| Jun 02, 2014 | 5.750000 | .00015753 | $4,181,396.22 | 29 | $19,102.67 |
| Jul 01, 2014 | 5.750000 | .00015753 | $4,146,278.40 | 31 | $20,248.60 |
| Aug 01, 2014 | 5.750000 | .00015753 | $4,111,642.39 | 32 | $20,727.18 |
| Sep 02, 2014 | 5.750000 | .00015753 | $4,076,837.23 | 29 | $18,625.00 |
| Oct 01, 2014 | 5.750000 | .00015753 | $4,041,225.35 | 33 | $21,008.83 |
| Nov 03, 2014 | 5.750000 | .00015753 | $4,006,076.31 | 28 | $17,670.63 |
| Dec 01, 2014 | 5.750000 | .00015753 | $3,970,135.59 | 32 | $20,013.83 |
| Jan 02, 2015 | 5.750000 | .00015753 | $3,934,639.38 | 31 | $19,215.05 |
| Feb 02, 2015 | 5.750000 | .00015753 | $3,898,975.41 | 28 | $17,198.22 |
| Mar 02, 2015 | 5.750000 | .00015753 | $3,861,294.63 | 30 | $18,248.58 |
| Apr 01, 2015 | 5.750000 | .00015753 | $3,825,272.83 | 37 | $22,296.62 |
| May 08, 2015 | 5.750000 | .00015753 | $3,209,249.64 | 24 | $12,133.60 |
| Jun 01, 2015 | 5.750000 | .00015753 | $3,179,088.71 | 30 | $15,024.46 |
| Jul 01, 2015 | 5.750000 | .00015753 | $3,147,600.36 | 33 | $16,363.21 |
| Aug 03, 2015 | 5.750000 | .00015753 | $3,117,453.72 | 29 | $14,242.06 |
| Sep 01, 2015 | 5.750000 | .00015753 | $3,085,185.95 | 30 | $14,580.67 |
| Oct 01, 2015 | 5.750000 | .00015753 | $3,053,256.78 | 32 | $15,391.76 |
| Nov 02, 2015 | 5.750000 | .00015753 | $3,022,132.73 | 60 | $28,565.36 |
| Jan 01, 2016 | 6.000000 | .00016438 | $3,022,132.73 | 236 | $117,242.19 |
| Aug 24, 2016 | 6.000000 | .00016438 | $2,986,877.03 | 20 | $9,819.86 |
| Sep 13, 2016 | 6.000000 | .00016438 | $2,796,877.03 | 21 | $9,654.97 |
| Oct 04, 2016 | 6.000000 | .00016438 | $2,781,877.03 | 35 | $16,005.31 |
| Nov 08, 2016 | 6.000000 | .00016438 | $2,766,877.03 | 27 | $12,280.38 |
| Dec 05, 2016 | 6.000000 | .00016438 | $2,751,877.03 | 27 | $12,213.81 |
| Jan 01, 2017 | 6.250000 | .00017123 | $2,751,877.03 | 5 | $2,356.05 |
| Jan 06, 2017 | 6.250000 | .00017123 | $2,736,877.03 | 33 | $15,465.22 |
| Feb 08, 2017 | 6.250000 | .00017123 | $2,721,877.03 | 28 | $13,050.09 |
| Mar 08, 2017 | 6.250000 | .00017123 | $2,706,877.03 | 24 | $11,124.15 |
| Apr 01, 2017 | 6.500000 | .00017808 | $2,706,877.03 | 9 | $4,338.41 |
| Apr 10, 2017 | 6.500000 | .00017808 | $2,691,877.03 | 29 | $13,901.88 |
| May 09, 2017 | 6.500000 | .00017808 | $2,676,877.03 | 34 | $16,207.94 |
| Jun 12, 2017 | 6.500000 | .00017808 | $2,661,877.03 | 19 | $9,006.62 |
| Jul 01, 2017 | 6.750000 | .00018493 | $2,661,877.03 | 11 | $5,414.91 |
| Jul 12, 2017 | 6.750000 | .00018493 | $2,646,877.03 | 33 | $16,153.20 |
| Aug 14, 2017 | 6.750000 | .00018493 | $2,631,877.03 | 32 | $15,574.94 |
| Sep 15, 2017 | 6.750000 | .00018493 | $2,616,877.03 | 32 | $15,486.17 |
| Oct 17, 2017 | 6.750000 | .00018493 | $2,601,877.03 | 27 | $12,991.56 |
| Nov 13, 2017 | 6.750000 | .00018493 | $2,586,877.03 | 36 | $17,222.22 |
| Dec 19, 2017 | 6.750000 | .00018493 | $2,571,877.03 | 13 | $6,183.07 |
| Jan 01, 2018 | 7.000000 | .00019178 | $2,571,877.03 | 15 | $7,398.55 |
| Jan 16, 2018 | 7.000000 | .00019178 | $2,556,877.03 | 35 | $17,162.59 |

| Date | Annual Percentage Rate | Daily Periodic Rate | Principal: | Days | Finance Charge |
|---|---|---|---|---|---|
| Feb 20, 2018 | 7.000000 | .00019178 | $2,541,877.03 | 28 | $13,649.53 |
| Mar 20, 2018 | 7.000000 | .00019178 | $2,526,877.03 | 12 | $5,815.27 |
| Apr 01, 2018 | 7.250000 | .00019863 | $2,526,877.03 | 10 | $5,019.13 |
| Apr 11, 2018 | 7.250000 | .00019863 | $2,511,877.03 | 34 | $16,963.77 |
| May 15, 2018 | 7.250000 | .00019863 | $2,496,877.03 | 31 | $15,374.60 |
| Jun 15, 2018 | 7.250000 | .00019863 | $2,481,877.03 | 16 | $7,887.60 |
| Jul 01, 2018 | 7.500000 | .00020548 | $2,481,877.03 | 8 | $4,079.79 |
| Jul 09, 2018 | 7.500000 | .00020548 | $2,474,377.03 | 2 | $1,016.86 |
| Jul 11, 2018 | 7.500000 | .00020548 | $2,466,877.03 | 34 | $17,234.34 |
| Aug 14, 2018 | 7.500000 | .00020548 | $2,451,877.03 | 29 | $14,610.50 |
| Sep 12, 2018 | 7.500000 | .00020548 | $2,436,877.03 | 19 | $9,513.83 |
| Oct 01, 2018 | 7.750000 | .00021233 | $2,436,877.03 | 16 | $8,278.70 |
| Oct 17, 2018 | 7.750000 | .00021233 | $2,421,877.03 | 28 | $14,398.55 |
| Nov 14, 2018 | 7.750000 | .00021233 | $2,406,877.03 | 33 | $16,864.62 |
| Dec 17, 2018 | 7.750000 | .00021233 | $2,391,877.03 | 15 | $7,617.96 |
| Jan 01, 2019 | 8.000000 | .00021918 | $2,391,877.03 | 14 | $7,339.45 |
| Jan 15, 2019 | 8.000000 | .00021918 | $2,376,877.03 | 31 | $16,149.73 |
| Feb 15, 2019 | 8.000000 | .00021918 | $2,361,877.03 | 31 | $16,047.82 |
| Mar 18, 2019 | 8.000000 | .00021918 | $2,346,877.03 | 28 | $14,402.75 |
| Apr 15, 2019 | 8.000000 | .00021918 | $2,331,877.03 | 31 | $15,843.98 |
| May 16, 2019 | 8.000000 | .00021918 | $2,324,377.03 | 32 | $16,302.47 |
| Jun 17, 2019 | 8.000000 | .00021918 | $2,309,377.03 | 30 | $15,184.94 |
| Jul 17, 2019 | 8.000000 | .00021918 | $2,301,877.03 | 12 | $6,054.25 |
| Jul 29, 2019 | 8.000000 | .00021918 | $2,294,377.03 | 28 | $14,080.56 |
| Aug 26, 2019 | 8.000000 | .00021918 | $2,279,377.03 | 25 | $12,489.73 |
| Sep 20, 2019 | 8.000000 | .00021918 | $2,271,877.03 | 11 | $5,477.40 |
| Oct 01, 2019 | 7.500000 | .00020548 | $2,271,877.03 | 29 | $13,537.89 |
| Oct 30, 2019 | 7.500000 | .00020548 | $2,256,877.03 | 30 | $13,912.25 |
| Nov 29, 2019 | 7.500000 | .00020548 | $2,241,877.03 | 33 | $15,201.76 |
| Jan 01, 2020 | 7.250000 | .00019863 | $2,241,877.03 | 91 | $40,522.69 |
| Apr 01, 2020 | 5.750000 | .00015753 | $2,241,877.03 | 152 | $53,682.20 |
| Aug 31, 2020 | 5.750000 | .00015753 | $2,226,877.03 | 29 | $10,173.47 |
| Sep 29, 2020 | 5.750000 | .00015753 | $2,211,877.03 | 30 | $10,453.39 |
| Oct 29, 2020 | 5.750000 | .00015753 | $2,195,677.03 | 32 | $11,068.61 |
| Nov 30, 2020 | 5.750000 | .00015753 | $2,180,077.03 | 28 | $9,616.23 |
| Dec 28, 2020 | 5.750000 | .00015753 | $2,163,877.03 | 28 | $9,544.77 |
| Jan 25, 2021 | 5.750000 | .00015753 | $2,144,677.03 | 31 | $10,473.66 |
| Feb 25, 2021 | 5.750000 | .00015753 | $2,136,577.03 | 1 | $336.58 |
| Feb 26, 2021 | 5.750000 | .00015753 | $2,128,477.03 | 17 | $5,700.23 |
| Mar 15, 2021 | 5.750000 | .00015753 | $2,120,377.03 | 16 | $5,344.51 |
| Mar 31, 2021 | 5.750000 | .00015753 | $2,112,277.03 | 19 | $6,322.36 |
| Apr 19, 2021 | 5.750000 | .00015753 | $2,104,177.03 | 7 | $2,320.35 |
| Apr 26, 2021 | 5.750000 | .00015753 | $2,096,077.03 | 14 | $4,622.85 |
| May 10, 2021 | 5.750000 | .00015753 | $2,079,877.03 | 14 | $4,587.12 |
| May 24, 2021 | 5.750000 | .00015753 | $2,071,777.03 | 23 | $7,506.64 |
| Jun 16, 2021 | 5.750000 | .00015753 | $2,063,677.03 | 7 | $2,275.69 |
| Jun 23, 2021 | 5.750000 | .00015753 | $2,055,577.03 | 26 | $8,419.41 |

| Date | Annual Percentage Rate | Daily Periodic Rate | Principal: | Days | Finance Charge |
|---|---|---|---|---|---|
| Jul 19, 2021 | 5.750000 | .00015753 | $2,047,477.03 | 7 | $2,257.83 |
| Jul 26, 2021 | 5.750000 | .00015753 | $2,039,377.03 | 24 | $7,710.52 |
| Aug 19, 2021 | 5.750000 | .00015753 | $2,023,177.03 | 32 | $10,199.02 |
| Sep 20, 2021 | 5.750000 | .00015753 | $2,006,977.03 | 38 | $12,014.36 |
| Oct 28, 2021 | 5.750000 | .00015753 | $1,990,777.03 | 18 | $5,645.08 |

### Mailing Label

GARDEN OF EDEN ENTERPRISES INC                    eStatement:
720 ANDERSON AVE STE 2
CLIFFSIDE PK NJ 07010-2040

### Loan To Date

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Apr 20, 2012 | Original Rate | Interest Rate: | 5.750000 | | |
| Apr 20, 2012 | NEW LOAN ADVANCE | $5,000,000.00 | $5,000,000.00 | | $5,000,000.00 |
| Apr 30, 2012 | INTERIM INTEREST PAYMENT | $8,664.38 | | $8,664.38 | $5,000,000.00 |
| Jun 04, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $30,466.81 | $24,417.80 | $4,969,533.19 |
| Jul 02, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $31,384.06 | $23,500.55 | $4,938,149.13 |
| Aug 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $30,763.92 | $24,120.69 | $4,907,385.21 |
| Sep 04, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████877 | $54,884.61 | $30,919.10 | $23,965.51 | $4,876,466.11 |
| Oct 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $31,823.68 | $23,060.93 | $4,844,642.43 |
| Nov 01, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $31,225.51 | $23,659.10 | $4,813,416.92 |
| Dec 03, 2012 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $32,136.27 | $22,748.34 | $4,781,280.65 |
| Jan 02, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $31,524.82 | $23,359.79 | $4,749,755.83 |
| Feb 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $31,683.92 | $23,200.69 | $4,718,071.91 |
| Mar 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $34,073.39 | $20,811.22 | $4,683,998.52 |
| Apr 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $32,010.02 | $22,874.59 | $4,651,988.50 |
| May 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $32,899.19 | $21,985.42 | $4,619,089.31 |
| Jun 03, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $32,327.01 | $22,557.60 | $4,586,762.30 |
| Jul 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $33,197.26 | $21,687.35 | $4,553,565.04 |
| Aug 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 310████77 | $54,884.61 | $32,647.00 | $22,237.61 | $4,520,918.04 |
| Sep 03, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $32,806.43 | $22,078.18 | $4,488,111.61 |
| Oct 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $33,663.34 | $21,221.27 | $4,454,448.27 |
| Nov 01, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 310████77 | $54,884.61 | $33,131.04 | $21,753.57 | $4,421,317.23 |
| Dec 02, 2013 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $33,989.35 | $20,895.26 | $4,387,327.88 |
| Jan 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $33,453.47 | $21,431.14 | $4,353,874.41 |
| Feb 03, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 31█████77 | $54,884.61 | $33,616.94 | $21,267.67 | $4,320,257.47 |
| Mar 03, 2014 | | $54,884.61 | $35,817.54 | $19,067.07 | $4,284,439.93 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | | | | |
| Apr 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $33,950.01 | $20,934.60 | $4,250,489.92 |
| May 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $34,796.68 | $20,087.93 | $4,215,693.24 |
| Jun 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $34,297.02 | $20,587.59 | $4,181,396.22 |
| Jul 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,117.82 | $19,766.79 | $4,146,278.40 |
| Aug 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $34,636.01 | $20,248.60 | $4,111,642.39 |
| Sep 02, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $34,805.16 | $20,079.45 | $4,076,837.23 |
| Oct 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,611.88 | $19,272.73 | $4,041,225.35 |
| Nov 03, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,149.04 | $19,735.57 | $4,006,076.31 |
| Dec 01, 2014 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,940.72 | $18,943.89 | $3,970,135.59 |
| Jan 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,496.21 | $19,388.40 | $3,934,639.38 |
| Feb 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $35,663.97 | $19,220.64 | $3,898,975.41 |
| Mar 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $37,680.78 | $17,203.83 | $3,861,294.63 |
| Apr 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $54,884.61 | $36,021.80 | $18,862.81 | $3,825,272.83 |
| May 08, 2015 | May loan payment | $54,884.61 | $36,806.27 | $18,078.34 | $3,788,466.56 |
| May 08, 2015 | Principal Payment | $579,216.92 | $579,216.92 | | $3,209,249.64 |
| Jun 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,512.81 | $30,160.93 | $16,351.88 | $3,179,088.71 |
| Jul 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,512.81 | $31,488.35 | $15,024.46 | $3,147,600.36 |
| Aug 03, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,509.84 | $30,146.64 | $16,363.20 | $3,117,453.72 |
| Sep 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,509.84 | $32,267.77 | $14,242.07 | $3,085,185.95 |
| Oct 01, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,509.84 | $31,929.17 | $14,580.67 | $3,053,256.78 |
| Nov 02, 2015 | PAYMENT FROM NOAH BUSINESS CHK ACCOUNT 3177 | $46,515.80 | $31,124.05 | $15,391.75 | $3,022,132.73 |
| Dec 11, 2015 | Automatic Late Charge | $2,325.79 | | | $3,022,132.73 |
| Jan 01, 2016 | Rate Change | Interest Rate: | 6.000000 | | |
| Jan 11, 2016 | Automatic Late Charge | $2,325.79 | | | $3,022,132.73 |
| Feb 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| Mar 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| Apr 11, 2016 | Automatic Late Charge | $2,343.70 | | | $3,022,132.73 |
| May 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Jun 13, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Jun 30, 2016 | Charge off #500701 GARDEN OF EDEN | $755,533.19 | | | $3,022,132.73 |
| Jul 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Aug 11, 2016 | Automatic Late Charge | $2,344.78 | | | $3,022,132.73 |
| Aug 24, 2016 | Principal Payment | $35,255.70 | $35,255.70 | | $2,986,877.03 |
| Aug 25, 2016 | Reinstated Principal | $8,813.93 | | | $2,986,877.03 |
| Sep 12, 2016 | Automatic Late Charge | $2,344.78 | | | $2,986,877.03 |
| Sep 13, 2016 | Principal Payment | $190,000.00 | $190,000.00 | | $2,796,877.03 |
| Sep 19, 2016 | Reinstated Principal | $47,500.00 | | | $2,796,877.03 |
| Oct 04, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,781,877.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|------|-------------|-------------------|-----------|-----------|-------------------|
| Oct 05, 2016 | Reinstated Principal | $3,750.00 | | | $2,781,877.03 |
| Oct 11, 2016 | Automatic Late Charge | $2,344.78 | | | $2,781,877.03 |
| Nov 08, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,766,877.03 |
| Nov 10, 2016 | Reinstated Principal | $3,750.00 | | | $2,766,877.03 |
| Nov 14, 2016 | Automatic Late Charge | $2,152.46 | | | $2,766,877.03 |
| Dec 05, 2016 | Principal Payment | $15,000.00 | $15,000.00 | | $2,751,877.03 |
| Dec 06, 2016 | Reinstated Principal | $3,750.00 | | | $2,751,877.03 |
| Dec 12, 2016 | Automatic Late Charge | $2,152.46 | | | $2,751,877.03 |
| Jan 01, 2017 | Rate Change | Interest Rate: | 6.250000 | | |
| Jan 06, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,736,877.03 |
| Jan 09, 2017 | Reinstated Principal | $3,750.00 | | | $2,736,877.03 |
| Jan 11, 2017 | Automatic Late Charge | $2,152.46 | | | $2,736,877.03 |
| Feb 08, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,721,877.03 |
| Feb 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,721,877.03 |
| Feb 13, 2017 | Automatic Late Charge | $2,130.00 | | | $2,721,877.03 |
| Mar 08, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,706,877.03 |
| Mar 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,706,877.03 |
| Mar 13, 2017 | Automatic Late Charge | $2,130.00 | | | $2,706,877.03 |
| Apr 01, 2017 | Rate Change | Interest Rate: | 6.500000 | | |
| Apr 10, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,691,877.03 |
| Apr 11, 2017 | Automatic Late Charge | $2,130.00 | | | $2,691,877.03 |
| Apr 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,691,877.03 |
| May 09, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,676,877.03 |
| May 11, 2017 | Automatic Late Charge | $2,105.69 | | | $2,676,877.03 |
| May 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,676,877.03 |
| Jun 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,676,877.03 |
| Jun 12, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,661,877.03 |
| Jun 12, 2017 | Automatic Late Charge | $2,105.69 | | | $2,661,877.03 |
| Jul 01, 2017 | Rate Change | Interest Rate: | 6.750000 | | |
| Jul 11, 2017 | Automatic Late Charge | $2,105.69 | | | $2,661,877.03 |
| Jul 12, 2017 | Reinstated Principal | $3,750.00 | | | $2,661,877.03 |
| Jul 12, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,646,877.03 |
| Aug 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,646,877.03 |
| Aug 14, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,631,877.03 |
| Aug 16, 2017 | Reinstated Principal | $3,750.00 | | | $2,631,877.03 |
| Sep 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,631,877.03 |
| Sep 15, 2017 | Reinstated Principal | $3,750.00 | | | $2,631,877.03 |
| Sep 15, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,616,877.03 |
| Oct 11, 2017 | Automatic Late Charge | $2,080.94 | | | $2,616,877.03 |
| Oct 17, 2017 | Reinstated Principal | $3,750.00 | | | $2,616,877.03 |
| Oct 17, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,601,877.03 |
| Nov 13, 2017 | Reinstated Principal | $3,750.00 | | | $2,601,877.03 |
| Nov 13, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,586,877.03 |
| Nov 13, 2017 | Automatic Late Charge | $2,044.62 | | | $2,586,877.03 |
| Dec 11, 2017 | Automatic Late Charge | $2,044.62 | | | $2,586,877.03 |
| Dec 19, 2017 | Reinstated Principal | $3,750.00 | | | $2,586,877.03 |
| Dec 19, 2017 | Principal Payment | $15,000.00 | $15,000.00 | | $2,571,877.03 |
| Jan 01, 2018 | Rate Change | Interest Rate: | 7.000000 | | |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Jan 11, 2018 | Automatic Late Charge | $2,044.62 | | | $2,571,877.03 |
| Jan 16, 2018 | Reinstated Principal | $3,750.00 | | | $2,571,877.03 |
| Jan 16, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,556,877.03 |
| Feb 12, 2018 | Automatic Late Charge | $2,018.54 | | | $2,556,877.03 |
| Feb 20, 2018 | Reinstated Principal | $3,750.00 | | | $2,556,877.03 |
| Feb 20, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,541,877.03 |
| Mar 12, 2018 | Automatic Late Charge | $2,018.54 | | | $2,541,877.03 |
| Mar 20, 2018 | Reinstated Principal | $3,750.00 | | | $2,541,877.03 |
| Mar 20, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,526,877.03 |
| Apr 01, 2018 | Rate Change | Interest Rate: | 7.250000 | | |
| Apr 11, 2018 | Reinstated Principal | $3,750.00 | | | $2,526,877.03 |
| Apr 11, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,511,877.03 |
| Apr 11, 2018 | Automatic Late Charge | $2,018.54 | | | $2,511,877.03 |
| May 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,511,877.03 |
| May 15, 2018 | Reinstated Principal | $3,750.00 | | | $2,511,877.03 |
| May 15, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,496,877.03 |
| Jun 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,496,877.03 |
| Jun 15, 2018 | Reinstated Principal | $3,750.00 | | | $2,496,877.03 |
| Jun 15, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,481,877.03 |
| Jul 01, 2018 | Rate Change | Interest Rate: | 7.500000 | | |
| Jul 09, 2018 | Reinstated Principal | $1,875.00 | | | $2,481,877.03 |
| Jul 09, 2018 | Principal Payment | $7,500.00 | $7,500.00 | | $2,474,377.03 |
| Jul 11, 2018 | Reinstated Principal | $1,875.00 | | | $2,474,377.03 |
| Jul 11, 2018 | Principal Payment | $7,500.00 | $7,500.00 | | $2,466,877.03 |
| Jul 11, 2018 | Automatic Late Charge | $1,990.63 | | | $2,466,877.03 |
| Aug 13, 2018 | Automatic Late Charge | $1,962.59 | | | $2,466,877.03 |
| Aug 14, 2018 | Reinstated Principal | $3,750.00 | | | $2,466,877.03 |
| Aug 14, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,451,877.03 |
| Sep 11, 2018 | Automatic Late Charge | $1,962.59 | | | $2,451,877.03 |
| Sep 12, 2018 | Reinstated Principal | $3,750.00 | | | $2,451,877.03 |
| Sep 12, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,436,877.03 |
| Oct 01, 2018 | Rate Change | Interest Rate: | 7.750000 | | |
| Oct 11, 2018 | Automatic Late Charge | $1,962.59 | | | $2,436,877.03 |
| Oct 17, 2018 | Reinstated Principal | $3,750.00 | | | $2,436,877.03 |
| Oct 17, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,421,877.03 |
| Nov 13, 2018 | Automatic Late Charge | $1,934.65 | | | $2,421,877.03 |
| Nov 14, 2018 | Reinstated Principal | $3,750.00 | | | $2,421,877.03 |
| Nov 14, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,406,877.03 |
| Dec 11, 2018 | Automatic Late Charge | $1,934.65 | | | $2,406,877.03 |
| Dec 17, 2018 | Reinstated Principal | $3,750.00 | | | $2,406,877.03 |
| Dec 17, 2018 | Principal Payment | $15,000.00 | $15,000.00 | | $2,391,877.03 |
| Jan 01, 2019 | Rate Change | Interest Rate: | 8.000000 | | |
| Jan 11, 2019 | Automatic Late Charge | $1,934.65 | | | $2,391,877.03 |
| Jan 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,391,877.03 |
| Jan 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,376,877.03 |
| Feb 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,376,877.03 |
| Feb 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,376,877.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|------|-------------|-------------------:|-----------:|----------:|------------------:|
| Feb 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,361,877.03 |
| Mar 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,361,877.03 |
| Mar 18, 2019 | Reinstated Principal | $3,750.00 | | | $2,361,877.03 |
| Mar 18, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,346,877.03 |
| Apr 11, 2019 | Automatic Late Charge | $1,906.34 | | | $2,346,877.03 |
| Apr 15, 2019 | Reinstated Principal | $3,750.00 | | | $2,346,877.03 |
| Apr 15, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,331,877.03 |
| May 13, 2019 | Automatic Late Charge | $1,869.07 | | | $2,331,877.03 |
| May 16, 2019 | Reinstated Principal | $1,875.00 | | | $2,331,877.03 |
| May 16, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,324,377.03 |
| Jun 11, 2019 | Automatic Late Charge | $1,869.07 | | | $2,324,377.03 |
| Jun 17, 2019 | Reinstated Principal | $3,750.00 | | | $2,324,377.03 |
| Jun 17, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,309,377.03 |
| Jul 11, 2019 | Automatic Late Charge | $1,869.07 | | | $2,309,377.03 |
| Jul 17, 2019 | Reinstated Principal | $1,875.00 | | | $2,309,377.03 |
| Jul 17, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,301,877.03 |
| Jul 29, 2019 | Reinstated Principal | $1,875.00 | | | $2,301,877.03 |
| Jul 29, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,294,377.03 |
| Aug 12, 2019 | Automatic Late Charge | $1,844.47 | | | $2,294,377.03 |
| Aug 26, 2019 | Reinstated Principal | $3,750.00 | | | $2,294,377.03 |
| Aug 26, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,279,377.03 |
| Sep 11, 2019 | Automatic Late Charge | $1,844.47 | | | $2,279,377.03 |
| Sep 20, 2019 | Reinstated Principal | $1,875.00 | | | $2,279,377.03 |
| Sep 20, 2019 | Principal Payment | $7,500.00 | $7,500.00 | | $2,271,877.03 |
| Oct 01, 2019 | Rate Change | Interest Rate: | 7.500000 | | |
| Oct 11, 2019 | Automatic Late Charge | $1,844.47 | | | $2,271,877.03 |
| Oct 30, 2019 | Reinstated Principal | $3,750.00 | | | $2,271,877.03 |
| Oct 30, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,256,877.03 |
| Nov 12, 2019 | Automatic Late Charge | $1,809.39 | | | $2,256,877.03 |
| Nov 29, 2019 | Reinstated Principal | $3,750.00 | | | $2,256,877.03 |
| Nov 29, 2019 | Principal Payment | $15,000.00 | $15,000.00 | | $2,241,877.03 |
| Dec 11, 2019 | Automatic Late Charge | $1,809.39 | | | $2,241,877.03 |
| Jan 01, 2020 | Rate Change | Interest Rate: | 7.250000 | | |
| Jan 13, 2020 | Automatic Late Charge | $1,809.39 | | | $2,241,877.03 |
| Feb 11, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| Mar 11, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| Apr 01, 2020 | Rate Change | Interest Rate: | 5.750000 | | |
| Apr 13, 2020 | Automatic Late Charge | $1,792.72 | | | $2,241,877.03 |
| May 11, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Jun 11, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Jul 13, 2020 | Automatic Late Charge | $1,816.45 | | | $2,241,877.03 |
| Aug 11, 2020 | Automatic Late Charge | $1,865.23 | | | $2,241,877.03 |
| Aug 31, 2020 | Reinstated Principal | $3,750.00 | | | $2,241,877.03 |
| Aug 31, 2020 | Principal Payment | $15,000.00 | $15,000.00 | | $2,226,877.03 |
| Sep 11, 2020 | Automatic Late Charge | $1,865.23 | | | $2,226,877.03 |
| Sep 29, 2020 | Reinstated Principal | $3,750.00 | | | $2,226,877.03 |
| Sep 29, 2020 | Principal Payment | $15,000.00 | $15,000.00 | | $2,211,877.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|------|-------------|-------------------:|-----------:|----------:|------------------:|
| Oct 13, 2020 | Automatic Late Charge | $1,865.23 | | | $2,211,877.03 |
| Oct 29, 2020 | Reinstated Principal | $4,050.00 | | | $2,211,877.03 |
| Oct 29, 2020 | Principal Payment | $16,200.00 | $16,200.00 | | $2,195,677.03 |
| Nov 12, 2020 | Automatic Late Charge | $1,842.40 | | | $2,195,677.03 |
| Nov 30, 2020 | Reinstated Principal | $3,900.00 | | | $2,195,677.03 |
| Nov 30, 2020 | Principal Payment | $15,600.00 | $15,600.00 | | $2,180,077.03 |
| Dec 11, 2020 | Automatic Late Charge | $1,842.40 | | | $2,180,077.03 |
| Dec 28, 2020 | Reinstated Principal | $4,050.00 | | | $2,180,077.03 |
| Dec 28, 2020 | Principal Payment | $16,200.00 | $16,200.00 | | $2,163,877.03 |
| Jan 11, 2021 | Automatic Late Charge | $1,842.40 | | | $2,163,877.03 |
| Jan 25, 2021 | Reinstated Principal | $4,800.00 | | | $2,163,877.03 |
| Jan 25, 2021 | Principal Payment | $3,000.00 | $3,000.00 | | $2,160,877.03 |
| Jan 25, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,144,677.03 |
| Feb 11, 2021 | Automatic Late Charge | $1,760.05 | | | $2,144,677.03 |
| Feb 25, 2021 | Reinstated Principal | $2,025.00 | | | $2,144,677.03 |
| Feb 25, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,136,577.03 |
| Feb 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,136,577.03 |
| Feb 26, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,128,477.03 |
| Mar 11, 2021 | Automatic Late Charge | $1,760.05 | | | $2,128,477.03 |
| Mar 15, 2021 | Reinstated Principal | $2,025.00 | | | $2,128,477.03 |
| Mar 15, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,120,377.03 |
| Mar 31, 2021 | Reinstated Principal | $2,025.00 | | | $2,120,377.03 |
| Mar 31, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,112,277.03 |
| Apr 12, 2021 | Automatic Late Charge | $1,760.05 | | | $2,112,277.03 |
| Apr 19, 2021 | Reinstated Principal | $2,025.00 | | | $2,112,277.03 |
| Apr 19, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,104,177.03 |
| Apr 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,104,177.03 |
| Apr 26, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,096,077.03 |
| May 10, 2021 | Reinstated Principal | $4,050.00 | | | $2,096,077.03 |
| May 10, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,079,877.03 |
| May 11, 2021 | Automatic Late Charge | $1,646.57 | | | $2,079,877.03 |
| May 24, 2021 | Reinstated Principal | $2,025.00 | | | $2,079,877.03 |
| May 24, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,071,777.03 |
| Jun 11, 2021 | Automatic Late Charge | $1,646.57 | | | $2,071,777.03 |
| Jun 16, 2021 | Reinstated Principal | $2,025.00 | | | $2,071,777.03 |
| Jun 16, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,063,677.03 |
| Jun 23, 2021 | Reinstated Principal | $2,025.00 | | | $2,063,677.03 |
| Jun 23, 2021 | Principal Payment | $8,100.00 | $8,100.00 | | $2,055,577.03 |
| Jun 30, 2021 | To record #600701 write off against on rep. from SBA repay | $347,219.46 | | | $2,055,577.03 |
| Jul 12, 2021 | Automatic Late Charge | $1,646.57 | | | $2,055,577.03 |
| Jul 19, 2021 | Reinstated Principal | $2,025.00 | | | $2,055,577.03 |
| Jul 19, 2021 | Principal payment | $8,100.00 | $8,100.00 | | $2,047,477.03 |
| Jul 26, 2021 | Reinstated Principal | $2,025.00 | | | $2,047,477.03 |
| Jul 26, 2021 | Principal payment | $8,100.00 | $8,100.00 | | $2,039,377.03 |
| Aug 11, 2021 | Automatic Late Charge | $1,480.71 | | | $2,039,377.03 |
| Aug 19, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,023,177.03 |

| Date | Description | Transaction Amount | Principal: | Interest: | Principal Balance |
|---|---|---|---|---|---|
| Sep 13, 2021 | Automatic Late Charge | $1,480.71 | | | $2,023,177.03 |
| Sep 20, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $2,006,977.03 |
| Oct 12, 2021 | Automatic Late Charge | $1,480.71 | | | $2,006,977.03 |
| Oct 28, 2021 | Principal Payment | $16,200.00 | $16,200.00 | | $1,990,777.03 |
| Nov 12, 2021 | Automatic Late Charge | $1,314.24 | | | $1,990,777.03 |

1181

M568SHI1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        19 Cr. 552 (JPC)

 5   EDWARD SHIN,

 6              Defendant.
     ------------------------------x

 7                                    New York, N.Y.
                                      May 6, 2022
 8                                    10:00 a.m.

 9

10   Before:

11                    HON. JOHN P. CRONAN,

12                                    District Judge
                                        and Jury

13                        APPEARANCES

14   DAMIAN WILLIAMS
       United States Attorney for the
15     Southern District of New York
     BY:  TARA LaMORTE
16        ANDEN CHOW
          JESSICA GREENWOOD
17        Assistant United States Attorneys

18   BRICKFIELD & DONAHUE
       Attorneys for Defendant
19   BY:  PAUL BOYTON BRICKFIELD
               -and-
20   THE BASIL LAW GROUP PC
     BY:  ROBERT J. BASIL
21        CAROLYN McGUIRE

22

23   ALSO PRESENT:
       FRAN YOON, Korean Interpreter
       KYEONG-SIK SONG, Korean Interpreter
24     JAE KIM, Korean Interpreter
       LENA LEE, Korean Interpreter
25              (Trial resumed; jury not present)
```

1269

M568SHI5                          Coskun - Cross

1   A.  I will not know if they didn't tell me.

2   Q.  I'm sorry?

3   A.  I will not know if they didn't tell me to visit me, but I

4   know Jun Woo Kim, he visit the store himself.

5   Q.  Do you know if Mr. Shin visited your store?

6   A.  Yes.

7   Q.  By the way, you mentioned some meetings you had with

8   Mr. Shin.  Do you recall a meeting where you and Mr. Shin had

9   somewhat harsh words about the loan and the payment and that

10  sort of thing?

11  A.  I'm sorry.  Can you repeat the question?

12  Q.  Do you remember a meeting with Mr. Shin where you had some,

13  I will use the term harsh words with Mr. Shin about the loan

14  and the repayment and the status of the loan at some point in

15  time?

16  A.  Yes.

17  Q.  That's in addition to the more social references you made

18  on your direct, correct?

19  A.  I do not understand the question.

20  Q.  Anyhow, the loan performed very well up until today,

21  correct?

22  A.  Yes.

23  Q.  It turned out to be a good deal for Noah Bank and a good

24  deal for Garden of Eden?

25  A.  I believe so.

EXHIBIT J

### Request to Honor SBA 7(a) Loan Guaranty

| Date: | 11/9/16 | | |
|---|---|---|---|
| Loan Number: | 51▮▮▮▮ | Loan Name: | Garden of Eden Enterprises, Inc. |

JULIE KO                                             201-328-8090
7301 OLD YORK ROAD                                   jko@noahbank.com
ELKINS PARK, PA 19027                                201-944-8294

Enclosed you will find the required documents in support of the following:

☐  **Pre-Purchase**

Request that SBA purchase the guaranteed portion directly from our institution as this loan has not been sold in the secondary market, or our institution has purchased the sold portion from the secondary market holder and is now making request for purchase directly to SBA. *(if lender has purchased the sold portion, please make sure SBA's Fiscal Transfer Agent's records reflect a paid status prior to submitting your request for purchase to SBA)*

☒  **Secondary Market Purchase with Post Purchase Package**

Request that SBA purchase the guaranteed portion of a loan that has been sold in the secondary market, and our institution will not purchase. This request includes a complete post purchase review package.

☐  **Secondary Market Purchase**

Request that SBA purchase the guaranteed portion on a loan that has been sold in the secondary market, and our institution will not purchase. This request does not include a post purchase review package. The post purchase review package will be provided under separate cover within 15 business days of SBA's purchase of the guaranteed portion of the loan.

I, JULIE KO, SVP _____ , hereby certify, represent and warrant on behalf of NOAH BANK _____ that all information and documentation submitted to the U.S. Small Business Administration in connection with this purchase request and/or post purchase review package is accurate, genuine and complete and contains true copies of NOAH BANK'S records for this loan. I further certify that I have personally reviewed and confirmed, based upon NOAH BANK'S _____ records, the copy of NOAH BANK'S _____ Transcript of Account with respect to this loan provided herewith and that to the best of my knowledge and belief the information contained therein is true and accurate. I also certify to the best of my knowledge and belief that NOAH BANK _____ has materially complied with the SBA Loan Program Requirements (as defined in 13 CFR 120.10) applicable to this loan.

By signing below, I represent and warrant that I have the proper authority to execute this document on behalf of     NOAH BANK            NK

Signature:   JULIE KO _____   Date: 11/9/16

## Primary Contact:

NOAHBANK
노아은행

Julie Ko
SVP/ Closing Department
2337 Lemoine Avenue
Fort Lee, NJ 07024
Tel : 201.328-8090
jko@noahbank.com

## Secondary Contact:

NOAHBANK
노아은행

Jong Keun (John) Kim
DCCO / FSVP
2337 Lemoine Ave.,
Fort Lee, NJ 07024
Jkim7@noahbank.com
Direct# 201-328-8094
Cell# 201-749-6416

CONFIDENTIAL - FORTHWITH GRAND JURY SUBPOENA

SBA Loan Name:  Garden of Eden Enterprises, Inc.
SBA Loan #:        PLP 5 ██████████

Tab 1 – Demand that SBA Honor Its Guaranty

Explanation regarding the business failure:

GARDEN OF EDEN ENTERPRISES, INC., the subject borrower, had its request for loan
approved on April 4, 2012. The borrower has requested loan of $5,000,000 to support its
refinance, inventory purchase, and working capital. At the interest rate of WSJP+2.50% (adjusted
calendar quarterly), the term of the loan was set at 10 years. Corporately guaranteed by GARDEN
OF EDEN GOURMET INC., COSKUN BROTHERS SPECIALTY FOOD, INC., MONTAGUE
FANCY FOOD, INC., BROADWAY SPECIALTY FOOD, INC., the loan was closed on April
20th of 2012.

The subject borrower has defaulted on the SBA loan due to emergence of many competitors
within its close proximity. Over the past four years, borrower competed against Whole Foods and
Trader Joe's who have opened their locations several blocks from the subject. Competing against
mega supermarkets such as these, the borrower lacked advantages to gain profit from their
operations. In searching for ways to additionally gain profit for loan payments as well as for its
operational expenses, the borrower took a risk and expanded to a new location in NJ. Despite the
anticipation to bring in more profit, the plan for expansion has failed. With the failure of
expansion, the borrower was liable for more debt, which it was not financially capable for
repaying.

In result, the reason for business failure is following: competition against mega supermarkets,
unrewarded risk of expansion, additional liabilities caused by the expansion.

Explanation regarding business personal property liquidation status:

The bank is unable to make actions to liquidate business personal property of the borrower, as its
assets are protected under Chapter 11 bankruptcy. Currently, the bank has allowed the borrower
to continue its operation by receiving monthly charge of $15,000.

CONFIDENTIAL - FORTHWITH GRAND JURY SUBPOENA                                        NB000342052

---

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2198-20

THE BASIL LAW
GROUP, PC,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

NOAH BANK,

     Defendant-Respondent/
     Cross-Appellant.

_____

Argued April 28, 2022 – Decided June 14, 2022

Before Judges Currier, DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7591-19.

Robert J. Basil argued the cause for appellant/cross-respondent (The Basil Law Group, PC, attorneys; Robert J. Basil and David A. Cohen, on the briefs).

Kelly A. Zampino argued the cause for respondent/cross-appellant (Hartmann Doherty Rosa Berman & Bulbulia, LLC, attorneys; Mark A. Berman and Kelly A. Zampino, on the briefs).

PER CURIAM

Plaintiff appeals from the trial court's order denying its summary judgment motion and granting defendant summary judgment.  In its cross-appeal, defendant challenges the trial court's order denying its request for attorney's fees and costs under Rule 4:46-5(b).  We affirm the court's order granting defendant summary judgment.  Because the trial court failed to provide any reasons for the denial of counsel fees, we remand for the court to comply with its obligation under Rule 1:7-4(a) and issue a decision regarding defendant's application for attorney's fees and costs.

I.

Defendant's President and CEO, Edward Shin, retained plaintiff to substitute as trial counsel for defendant in a federal court suit.  The case involved a rival bank, NOA Bank, and issues related to trademarks and unfair business practices (the NOA litigation).

In January 2018, the parties executed a retainer agreement (the 2018 agreement) under which they agreed plaintiff would receive a $650,000 flat fee for its legal services performed in the NOA litigation.  The 2018 agreement required defendant to make an initial payment of $100,000 and subsequent monthly installment payments of $100,000 until the entire balance was paid

2

"even if the [NOA litigation] . . . [was] resolved before the entire amount [was] paid."

In February 2018, plaintiff sent defendant an invoice for $50,000. Plaintiff had agreed to reduce the initial payment amount from $100,000 to $50,000. Defendant made the $50,000 payment the following day. Plaintiff sent defendant an invoice for $25,000 in May and June, which defendant paid.

In September 2018, defendant's principals, including Shin, settled the NOA litigation without assistance of counsel. The settlement occurred prior to the commencement of trial. Robert J. Basil, plaintiff's director and manager, estimated he spent approximately 300 hours working on the litigation. Other attorneys affiliated with plaintiff or employed on a per diem basis also worked on the matter, but Basil testified he worked the most hours.[1]

According to plaintiff, after the NOA litigation settled, Shin approached Basil and asked for a reduction of the fixed fee balance of $550,000. Basil agreed to accept $250,000 as full payment of the amount due. In exchange, Shin orally promised Basil that plaintiff would remain defendant's primary counsel for all litigation matters and would be paid advisors to defendant's board of

---

[1] Plaintiff contends that if the case had proceeded to trial, counsel would have billed at least 1000 to 1250 hours and $10,000 in contract attorney's fees.

3

directors (the oral agreement).  This agreement was never reduced to writing.
During his deposition, Basil explained that Shin did not want the oral agreement
in writing because Shin wanted defendant's accounting records to reflect only
the income from the settlement with NOA Bank and not the offsetting expense
of the counsel fees paid to plaintiff.  Basil further stated that Shin said he
intended to pay plaintiff the additional $400,000 owed on the 2018 agreement
but he could not put it into writing.

During his deposition, Shin explained that under the oral agreement,
which he referred to as the "gentleman's agreement," defendant would not have
to pay the 2018 agreement price ($650,000) for plaintiff's legal services.  In
exchange, defendant would "take care" of plaintiff by providing plaintiff with
additional legal work in 2019 and 2020.  Shin stated that defendant would
attempt to pay the remaining $400,000 if defendant "was able to do so" or if
defendant engaged in "a merger transaction in which everybody hit the lottery."

Shin testified he thought he "generally" told the board of directors about
the oral agreement he made with plaintiff that defendant would continue using
plaintiff as its primary outside legal counsel.  However, he did not think he told
defendant's new general counsel, Glenn James, about the oral agreement when

James was hired in 2019.  Basil stated that he did not know whether defendant's board knew of the oral agreement.

On December 12, 2018, plaintiff sent an updated invoice for the "final payment on the flat fee arrangement for the [NOA litigation]."  The invoice reflected that defendant had paid plaintiff $100,000 for its legal services to date and owed an additional $150,000.  The following day, defendant paid the $150,000 invoice, which plaintiff acknowledged in an email.

As stated, James became defendant's general counsel in January 2019.  On February 4, 2019, James sent Basil an email requesting a copy of the parties' engagement letter.  In response, Basil stated that plaintiff "never entered into an overall engagement letter" as it was acting as "of counsel" to defendant's outside corporate counsel.  According to James, Basil stated there was no representation letter and no flat fee arrangement other than one with respect to a collection case.

James requested Basil prepare a written retainer agreement.  Basil did so and forwarded it to James for review.  James's proposed changes were made by Basil.  During the negotiation of this agreement, Basil never mentioned to James the oral agreement he had with Shin.

A-2198-20

The parties executed the revised retainer agreement on February 6, 2019 (the 2019 agreement).   The 2019 agreement stated on its first line that it "replace[d] all prior agreements between [plaintiff] and [defendant]." (emphasis added).   The remainder of the agreement set forth the terms of plaintiff's representation of defendant.

In addition, the 2019 agreement stated that the "written terms are not subject to any prior oral agreements or understandings, and they can be modified only by further agreement by both [defendant] and a director of [plaintiff]." (emphasis added).   The agreement also stated that defendant could terminate plaintiff's services with or without cause.   And it included the following provision: "Unless we have agreed to a fee cap or a fixed fee in relation to a particular matter, our billing will be based on the actual number of hours spent by the lawyers or paralegals . . . ."

In June 2019, Shin stepped down as defendant's President and CEO after criminal charges were filed against him alleging illegal conduct relating to loan transactions occurring while in his position with defendant.   He was later indicted on charges relating to wire fraud, bank bribery, solicitation, theft, and embezzlement.   Defendant was a victim of some of the criminal conduct alleged against Shin.

A-2198-20

Defendant's chairman of the board, Edwin Lloyd, asked plaintiff to conduct an internal investigation of the criminal allegations to protect defendant's interests.  However, when Basil informed James that plaintiff would be assisting Shin's criminal defense counsel, James told Basil that plaintiff would not be conducting the internal investigation.  At Basil's request, James executed a waiver of conflict agreement so Basil could represent Shin in the criminal prosecution.

Thereafter, James consulted with outside counsel regarding a potential or actual conflict of interest arising from plaintiff's representation of defendant and Shin.  The outside counsel recommended defendant terminate plaintiff's services.  James discussed the issues with defendant's board, and all agreed it was a conflict of interest for plaintiff or Basil to represent Shin and defendant simultaneously.  As a result, defendant terminated plaintiff as its counsel on all pending litigation matters, and from any future work.

Lloyd testified during his deposition that defendant terminated plaintiff due to a "number of different challenges" including expenses and costs.  Lloyd maintained the decision to terminate plaintiff was a "business decision."  He stated the board decided to terminate plaintiff's services because it believed it no longer needed plaintiff's services.

7

A-2198-20

II.

On August 12, 2019, Basil sent James an email demanding defendant pay the $400,000 in unpaid legal fees owed to plaintiff under the 2018 agreement. Basil explained that "as a favor to [defendant] and [defendant's] Board, [plaintiff] repeatedly forbore" payment under the fixed fee agreement and was now collecting the balance.

Basil asserted that defendant's reason for terminating plaintiff was a "strategic" measure to position defendant "in front of the regulators after the arrest of . . . Shin." Basil "declare[d] [defendant] [was] once-again in breach of the [2018 agreement], and also in breach of all agreements to forebear full payment performance or to reduce the amount due under [the 2018 agreement]." He demanded payment within thirty days.

When payment did not follow, plaintiff instituted suit, alleging defendant breached the parties' oral contract and the covenant of good faith and fair dealing, and requested relief under the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-59. Plaintiff sought damages of $400,000.

Both parties moved for summary judgment. For the purposes of its motion, defendant accepted there was an oral agreement. Defendant also sought attorney's fees under Rule 4:46-5(b), alleging Basil acted in bad faith in certain

A-2198-20

statements made in his affidavit supporting plaintiff's summary judgment motion.

In a March 9, 2021 order and accompanying written decision, the trial court found there was no ambiguity in the 2019 agreement. The court stated, "The agreement clearly provides that it 'replaces all prior agreements between [plaintiff] and [defendant].'" In addition, the agreement stated its terms were "not subject to any prior oral agreements or understandings." Moreover, the court found that the "secret" oral agreement between plaintiff and Shin could not be used to vary the terms of the 2019 agreement, because defendant's board was unaware of the oral agreement. The court concluded there was no breach of contract.

In considering plaintiff's allegations that defendant breached the covenant of good faith and fair dealing in terminating plaintiff's services, the court found the record devoid of any facts that the termination was done with malice or ill motive. Instead, the trial court determined that defendant terminated plaintiff's legal services due to a conflict of interest that stemmed from plaintiff's representation of Shin in a criminal case which arose out of actions taken by Shin during his employment with defendant. The court found any other reasons plaintiff offered for the termination were only speculation.

A-2198-20

Although the court's order denied defendant's request for attorney fees under Rule 4:46-5(b), it did not provide any reasoning for the denial.

### III.

On appeal, plaintiff asserts the trial court erred in not enforcing the parties' oral agreement and granting defendant summary judgment.  In a cross-appeal, defendant contends the court erred in denying it attorney's fees under Rule 4:46-5(b) because plaintiff's motion for summary judgment was frivolous.

We review the trial court's grant or denial of a motion for summary judgment de novo.  Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021).  We apply the same standard as the motion judge and consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  See R. 4:46-2(c).

"Cases involving contract interpretations are particularly suited to disposition by summary judgment."  CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC, 410 N.J. Super. 114, 119 (App. Div. 2009) (citing Spaulding Composites Co. v. Liberty Mut. Ins. Co., 346 N.J. Super. 167, 173 (App. Div. 2001)).  An interpretation of a contract is reviewed de novo.  See

10

Kieffer v. Best Buy, 205 N.J. 213, 222 (2011) (citing Jennings v. Pinto, 5 N.J. 562, 569-70 (1950)).

Plaintiff asserts the trial court erred in finding the 2019 agreement was a fully integrated, unambiguous contract.  Plaintiff contends the 2019 agreement did not affect the 2018 agreement or oral agreement, and because those agreements remained in effect, plaintiff is entitled to the remainder of the fixed fee balance ($400,000).  We disagree.

The "basic tenet of contract interpretation is that contract terms should be given their plain and ordinary meaning."  Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 321 (2019) (citations omitted).  While the touchstone of contract interpretation is for a court to determine the intention of the contracting parties, "[i]t is not the real intent but the intent expressed or apparent in the writing that controls."  Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 135 (2001) (alteration in the original) (citations omitted).  Thus, one party's intention concerning the meaning of a contract provision, when secret and not expressed in the contract itself, is immaterial and inadmissible, and cannot serve to vary the contract's terms.  See Domanske v. Rapid-Am. Corp., 330 N.J. Super. 241, 246 (App. Div. 2000); See also Brawer v. Brawer, 329 N.J. Super. 273, 283 (App. Div. 2000) (holding that the fact that

11

a contracting party "has a different, secret intention from that outwardly manifested" is immaterial).

Contract law dictates that courts should enforce contracts based on the parties' intent and the contract's express terms, as well as the surrounding circumstances and purpose of the contract.  Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)).  But when the "language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect."  Ibid.  If the contract is ambiguous, courts may use extrinsic evidence as an aid to interpretation.  Ibid. (citing Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016)).

The language of the 2019 agreement is plain, capable of legal construction, and should be given its appropriate force and effect.  The 2019 agreement clearly states that it "replaces all prior agreements between [plaintiff] and [defendant]."  It also states that the agreement "constitute[s] the entire terms of the engagement of [plaintiff] with respect to the [r]epresentation."  Further, the 2019 agreement's "written terms are not subject to any prior oral agreements or understandings."

A-2198-20

Basil drafted the 2019 agreement.  He is a seasoned attorney— practicing more than thirty years as a commercial litigator and performing outside general counsel work.  If he did not intend the 2019 agreement to supersede all prior agreements, he would have stated so.  And if he intended to preserve the oral agreement he had with Shin, he also would have included that in the 2019 agreement.

The trial court did not err in granting defendant summary judgment.  The 2019 agreement is enforceable because it reflects the parties' intent and the purpose of the contract, which is that the 2019 agreement solely governed the attorney-client relationship.  See ibid.

Plaintiff further contends the trial court erred in ignoring the 2019 agreement term that states:

> Unless we have agreed to a fee cap or a fixed fee in relation to a particular matter, our billing will be based upon the actual number of hours spent by the lawyers or paralegals who participate in the [r]epresentation at rates previously accepted by [defendant].

Plaintiff asserts the language prohibits the 2019 agreement from replacing the 2018 agreement or oral agreement, which are fixed fee agreements in relation to a particular matter.

13

A-2198-20

As stated, the court properly found the 2019 agreement replaced all prior agreements. Moreover, the 2018 agreement and oral agreement were extinguished by accord and satisfaction, a substitute contract where a debt is settled other than by full payment and arises where "valid consideration is offered, intended, and accepted in full satisfaction of a claim." 29 Williston on Contracts § 73:27 (4th ed. 2021). An accord and satisfaction requires "a clear manifestation that both the debtor and the creditor intend the payment to be in full satisfaction of the entire indebtedness." Zeller v. Markson Rosenthal & Co., 299 N.J. Super. 461, 463 (App. Div. 1997).

In October 2018, Shin asked Basil for a reduction of the fixed fee balance of $550,000. Defendant had only paid $100,000 towards the agreed contract price of $650,000. Shin and Basil agreed to a reduced payment amount of $250,000. This agreement was the accord.

In December, plaintiff sent defendant an updated invoice for the "final payment on the flat fee arrangement for the [NOA litigation]." The invoice showed that defendant had paid $100,000 for plaintiff's legal services and owed an additional $150,000. Thereafter, defendant paid plaintiff $150,000, which plaintiff acknowledged in an email. This was the satisfaction, as it was the completed compromise of the disputed claim.

14

A-2198-20

Because the oral agreement was a valid and fully performed accord and satisfaction contract, the 2018 agreement and oral agreement were no longer in effect.  Therefore, the only contract governing plaintiff's legal representation of defendant was the 2019 agreement.

We turn to plaintiff's contention that the trial court erred in finding plaintiff did not demonstrate a breach of the covenant of good faith and fair dealing.  Plaintiff asserts that under the oral agreement, defendant agreed to continue using plaintiff's services as long as the billing rates remained the same and defendant was satisfied with the work product.  Plaintiff also contends defendant breached the covenant when it failed to honor the monthly payment schedule and convinced plaintiff to accept less than the $650,000 owed under the 2018 agreement.

It is a well-established principle that every contract contains an implied covenant of good faith and fair dealing.  R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 276 (2001).  "[N]either party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract."  Id. at 277 (quoting Ass'n Grp. Life, Inc v. Catholic War Veterans of U.S., 61 N.J. 150, 153 (1972)).

15

Plaintiff's arguments lack merit.  After the NOA litigation settled, plaintiff agreed to monthly payments of $50,000—which is less than the $100,000 payment schedule contained in the 2018 agreement.  Basil even conceded during his deposition that "[i]t's incorrect if that [modified payment] was claimed to be a breach of some duty since I waived the $50,000."  And as discussed, plaintiff accepted defendant's final payment of $150,000, agreeing to a total payment of $250,000 in lieu of the original $650,000 flat fee price.  As plaintiff agreed to the modified payment, it cannot demonstrate there was a breach of the implied covenant.

In addressing the termination of plaintiff's services, the trial court found nothing in the record that suggested "malice or ill motive on the part of [defendant]."  James described the advice given by outside counsel that there existed a conflict of interest in plaintiff's dual representation and counsel's recommendation to terminate plaintiff's services.  In addition, defendant's board was no longer satisfied with plaintiff's services once Basil decided to represent Shin in his criminal case.  Basil conceded defendant could terminate plaintiff under the oral agreement if defendant became dissatisfied with plaintiff's representation.  Therefore, defendant did not breach the implied covenant in

16

terminating plaintiff's services.  We see no reason to disturb the court's order finding no breach of the covenant of good faith and fair dealing.

Any further arguments asserted by plaintiff lack sufficient merit to be considered in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

In a cross-appeal, defendant contends the trial court erred in denying its motion for attorney's fees under <u>Rule</u> 4:46-5(b) because plaintiff's motion for summary judgment was frivolous.  Under the rule:

> If the court is satisfied, at any time, that any of the affidavits submitted pursuant to this [summary judgment] rule <u>are presented in bad faith</u> or solely for the purpose of delay, <u>the court shall forthwith order</u> the party employing them <u>to pay to the other party the amount of the reasonable expenses resulting from the filing of the affidavits, including reasonable attorney's fees</u>, and any offending party or attorney may be adjudged guilty of contempt.
>
> [<u>R.</u> 4:46-5(b) (emphasis added).]

<u>See also</u> <u>Chi. Title Ins. Co. v. Ellis</u>, 409 N.J. Super. 444, 463 (App. Div. 2009).

Other than denying defendant's application in the order, the court did not address the request for attorney's fees.  The court did not state whether it found plaintiff acted in bad faith or why it denied defendant's motion.  Under <u>Rule</u> 1:7-4(a) a judge must "find the facts and state its conclusions of law . . . on every motion decided by a written order."  Therefore, we vacate the portion of the

17

order denying defendant counsel fees and remand to the trial court for consideration of the application and reasoning for the grant or denial of the motion.

Affirmed in part, vacated in part, and remanded to the trial court for further proceedings as directed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-2198-20