**EXHIBITS L THROUGH U** TO DECLARATION OF ROBERT J. BASIL IN SUPPORT OF DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE, VARIANCES AND OTHER RELIEF AND DEFENDANT'S SENTENCING MEMORANDUM - PERSONAL IDENTIFIERS REDACTED

ÒÝPⓒⓒÝ Š

THE BASIL LAW GROUP, P.C.
Robert J Basil, Esq. (025721988)
32 East 31st Street, 9th Floor
New York, New York 10016
(917) 994-9973
*For Plaintiff, Edward Shin*


------------------------------------------------------X
EDWARD SHIN,                                    :        SUPERIOR COURT OF NEW JERSEY
                                                         LAW DIVISION – BERGEN COUNTY
                        Plaintiff,              :        DOCKET NO.: BER-L-      20

- vs.                                           :

NOAH BANK,                                      :        **CIVIL ACTION**

                                                :        **COMPLAINT AND JURY DEMAND**

                        Defendant.              :
------------------------------------------------------X

      The plaintiff, Edward Shin ("Shin") as and for his Complaint against the Defendant,

NOAH BANK, and demand for a trial by jury on all counts so triable, alleges and states as

follows:

**_Nature of the action and parties_**

      1.      This is an action for wrongful termination of employment, retaliation, breaches of

a common stock option agreement between Shin and Noah Bank, as well as Shin's contractual

rights to restricted stock in Noah Bank, as well as related claims.

      2.      Noah Bank is a lending institution licensed to undertake the business of banking in

the State of New Jersey with its principal place of business located in Bergen County at 2337

Lemoine Avenue, Fort Lee, NJ 07024.

3.      In 2004, Shin became the CEO of Royal Asian Bank ("RAB"), an entity formed

that same year as a division of a larger banking entity, Royal Bancshares PA, Inc.  (NASDAQ:

RBPAA)/Royal Bank America ("RBPAA").

4.      From its inception, RAB focused its efforts upon servicing the local Korean-

American communities in Pennsylvania, New Jersey, and New York.

5.      As a result of certain language translation and pronunciation issues, RAB began

very early on to refer to itself as "Noah Bank" or " 노아 " which then became the Bank's trade

name in English and Korean languages, respectively.

6.      On August 20, 2004, Shin and RAB entered into a written employment agreement

under which Shin agreed to perform the responsibilities of RAB's President and CEO.

7.      On July 17, 2006, RAB obtained a separate charter and became a subsidiary of

RBPAA.

8.      On February 22, 2007, Shin and RAB entered into a new employment agreement

under which Shin agreed to perform the responsibilities of President and Chief Executive Officer.

See **Exhibit A**.

9.      As of November 14, 2008, RAB adopted a "2008 Long-Term Incentive Plan" for

the purpose of rewarding certain employees for rendering services over a prolonged period of time.

10.     On about December 30, 2010, Shin led a group of Korean-American investors that

bought RAB with the goal of targeting the Korean-American community in Northern New Jersey,

as well as in New York and Pennsylvania.

11.     As of December 30, 2010, RAB entered into an agreement with Shin entitled: *Stock*

*Option Agreement for Non-Qualified Stock Option between Royal Asian Bank and Edward E. Shin*

*(the Optionee)* (hereinafter "Shin Option Agreement").  See **Exhibit B**.

12.     The Shin Option Agreement provided that:

(a)     Date of Grant: December 30, 2010;

(b)     Number of Shares Subject to Options: 500,000;

(c)     Purchase Price for Shares: $1.00 per share;

(d)     Options expiration date: January 30, 2021 or *inter alia* "immediately upon termination of [Shin's] continuous employment with the Bank for any reason other than [Shin's] death;

(e)     Payment for exercise of the option could be in cash, check, or undertaking to pay cash;

(f)     The option could be exercised in whole or part;

(g)     Notices under the plan were to be delivered to Shin in writing; and

(h)     Vesting of options to purchase shares was to be determined as described in a "Vesting Schedule" attached to the Shin Option Agreement.

13.     The "Vesting Schedule" provided that if certain performance goals were reached by Noah Bank at five different times, options for 100,000 shares would be awarded to Shin for each of those different times.

14.     The performance goals for each of the five different times were met by Noah Bank and, in any event, were lifted during 2017 as directed by Noah Bank's board of directors and approved by the majority of Noah Bank's shareholders.

15.     Upon the meeting of the fifth performance goal and pursuant to board actions, Shin has become vested in 500,000 options to purchase restricted shares of Noah Bank common stock.

16.     The Vesting Schedule provided that once performance criteria were met for any given period, the "Restricted Shares shall lapse and unrestricted certificate(s) of the Common Stock [of Noah Bank Bank] shall be released to the Employee[.]"

17.     After the Shin Option Agreement was executed, the strike price was reduced to $.64 and the amount of options vested for Shin as of the date of this Complaint is 733,714 due to various dividend and other events occurring after the Shin Option Agreement became effective.

18.     On November 4, 2008, February 23, 2011, December 30, 2013, April 23, 2015, and October 12, 2017, RAB and/or Noah Bank and Shin entered into a Restricted Stock Grant Agreements ("Shin Restricted Stock Grant Agreements").  See **Exhibit C** (The April 23, 2015 grant was not documented by way of executed agreement as were the other grants).

19.     The Shin Restricted Stock Grant Agreements provided that Shin was to receive a total of 2,194,708.75 restricted shares of RAB/Noah Bank common stock at various times pursuant to each agreement's vesting schedule

20.     Due to the passage of time, the reaching of financial goals, and/or the entering into of various subsequent agreements between Shin and RAB/Noah Bank, all obstacles to conversion of restricted shares into unrestricted common stock of Noah Bank had been removed.

21.     Each of the Shin Restricted Stock Grant Agreements, except the April 23, 2015 grant, contained a forfeiture provision.

22.     None of the forfeiture provisions preclude Shin from obtaining and retaining all rights and privileges attendant to the Shin Restricted Stock Grant Agreements.

23.     The termination of Shin, if his termination has actually occurred, was not an event triggering the forfeiture of any of the rights and privileges attendant to the Shin Restricted Stock

Grant Agreements due to *inter alia* the bad faith nature of such termination.

24.    In addition to the terms of the various vesting schedules, Shin agreed to delay his receipt of bonuses to which he was entitled in exchange for (a) removal of all restrictions on the originally restricted shares and (b) delayed bonus payment without interest.

25.    On February 23, 2011, Shin and RAB entered into an "Amendatory Agreement" under which certain terms of Shin's February 22, 2007 employment agreement were modified or replaced, including Shin's compensation.  See **Exhibit D**.

26.    On June 1, 2011, RAB officially changed its name to "Noah Bank."

27.    On July 16, 2014, RAB, now "Noah Bank," sent a letter to Robert C. Lopez of the Bureau of Commercial Institutions, Commonwealth of Pennsylvania, Department of Banking, and Edwin H. Lloyd, Assistant Regional Director, Federal Deposit Insurance Corporation, in which Noah Bank made certain representations regarding Noah Bank's effort to address concerns FDIC had expressed regarding the financial condition of Noah Bank.  See **Exhibit E**.

28.    Among the representations made by Noah Bank on July 16, 2014 to the banking authorities were various "Cost Control Initiatives" including the following: "The Bank has eliminated by mutual consent all employment agreements[.]"

29.    As of July 16, 2014, Shin's employment agreement, as amended, was "eliminated" to the extent stated in the July 16, 2014 letter.

30.    Noah Bank and the FDIC subsequently entered into a consent decree on October 23, 2014 affecting Noah Bank's ability to undertake certain banking activities without the permission of the FDIC.

31.    To entice Shin to continue to act as President and Chief Executive Officer during

the period of the consent decree, Noah Bank proposed and Shin agreed that all of the same terms and conditions of Shin's then-existing employment agreement would continue in full force and effect, except as expressly prohibited by the Cost Control Incentive and other representations in the July 16, 2014 letter, and Noah Bank further agreed that when Noah Bank exited the consent decree period that all "eliminated" terms and conditions of Shin's employment agreement would be restored in full, and documented in a signed agreement.

32.     While the consent decree was in place, Noah Bank continued to pay Shin the same compensation Noah Bank had paid to Shin before entry of the consent decree, as proposed by Noah Bank and agreed to by Noah Bank and Shin.

33.     On July 6, 2018, Shin and Noah Bank negotiated a new employment agreement (the "July 6, 2018 Employment Agreement").  See **Exhibit F**.

34.     Shin and Noah Bank agreed that the July 6, 2018 Employment Agreement was binding immediately and that it would be memorialized though a more formal agreement than the draft attached to this Complaint as Exhibit F, but was nonetheless immediately binding.

35.     The July 6, 2018 Employment Agreement provided that:

(a)     Shin would be employed as President and CEO;

(b)     The term was through December 31, 2019 with one year "evergreen" after that date;

(c)     Either Noah Bank or Shin could terminate the contract on 60-day notice if notice were given before November 1 of any year;

(d)     Shin's base salary would be $350,000;

(e)     Shin would be entitled to participate in pension and other benefit plans,

including equity incentive plans; and

(f)     Shin would be entitled to severance benefits in the amount of salary plus health insurance for the greater of the remainder of the contract term or twelve months, whichever was longer in the event of "Involuntary termination without Cause absent change-in-control."

36.     Upon agreement to the terms of the July 6, 2018 Employment Agreement, Noah Bank entered the terms of that agreement into its business records in a spreadsheet entitled "Employment Contracts as of August 9, 2018."  See **Exhibit G**.

37.     The consent decree was lifted on November 8, 2016, removing any possible bar to the enforceability of the July 6, 2018 Employment Agreement.

38.     Shin and Noah Bank both performed under the terms of the July 6, 2018 Employment Agreement until January 1, 2019, when Shin's compensation was raised to $450,000 but no other terms or conditions were altered.

39.     Beginning on January 1, 2019, Shin and Noah Bank both performed under the terms of the July 6, 2018 Employment Agreement, except for the aforementioned increase in compensation, until the Board determined that Shin would be placed on administrative leave with pay on about May 30, 2019.

40.     Shin's duties were primarily performed in New Jersey, but also less extensively in New York and Pennsylvania, throughout his employment.

41.     Shin discharged his duties as the President and CEO of Noah Bank continuously since its inception until he was instructed by Noah Bank that he was no longer permitted on Noah Bank property and all Noah Bank personnel were forbidden to communicate with Shin by order

7

of Noah Bank management and/or board of directors on about May 31, 2019.

42.     Shin, not being able to perform the functions of his positions due to Noah Bank's quarantining instruction, relinquished his CEO duties on about June 1, 2019, and after false criminal charges, including charges of allegedly fraudulent activity (*i.e.*, bank fraud) undertaken by Shin as CEO of Noah Bank, had been lodged against Shin on May 29, 2019 in the United States District Court for the Southern District of New York.

43.     As of May 29, 2019, Shin's options had long been fully vested.

44.     Shin was immediately placed on "Administrative Leave with Pay" by Noah Bank beginning as of May 30, 2019.

45.     On June 19, 2019, Noah Bank's Board of Directors met to consider Shin's employment status.

46.     On June 19, 2019, Noah Bank's Board of Directors passed a resolution continuing Shin's employment status, continuing Shin's administrative leave status, continuing Shin's insurance benefits, but providing Shin with no financial compensation.

47.     On July 9, 2019, Norman Greenspan, Esq., of Starfield & Smith, an outside law firm hired by Noah Bank to advise concerning Small Business Administration issues, provided Shin with his first notice of the results of June 19, 2019, board of directors meeting and informed counsel for Shin that Shin had been placed on "administrative leave with fully-paid health insurance benefits but without salary, bonus or other benefits."  See **Exhibit H**.

48.     Counsel for Shin wrote to Greenspan on July 11, 2019, in response to Shin's loss of financial compensation, reminding Greenspan of Shin's presumption of innocence and requesting a continuation of salary payments.  See **Exhibit I**.  Noah Bank, in bad faith, rejected

this request.

49.     The actions taken by the Noah Bank's Board of Directors regarding Shin's employment status and compensation beginning on May 29, 2019, and continuing to date, violated, *inter alia*, the July 6, 2018 Employment Agreement and were undertaken in bad faith.

50.     On about May 31, 2019, Noah Bank's management and board of directors communicated to all Noah Bank employees that their future communications with Shin were strictly forbidden, although there was no legal basis for such a command.

51.     Noah Bank's severe, public actions against Shin's interests were communicated to the public, including many close friends and long-time associates of Shin, and signaled that Noah Bank had already determined that Shin was guilty of bank fraud as charged and was to be contacted only upon pain of termination of employment.

52.     Noah Bank acted in bad faith by treating Shin as if he were guilty of all charges, rather than affording him any presumption of innocence, as a means of attempting to separate Noah Bank from any potential prosecution.

53.     The conduct and communications of Noah Bank's management and board of directors placed Shin in a false light, in that although Shin was innocent of the charges lodged against him, Noah Bank's actions and communications presented Shin to the public, including numerous Noah Bank employees who had previously admired and respected Shin, as a person guilty of felonious acts.

54.     The management and officers responsible for the conduct or communications regarding Shin, acting within the scope of their employment with Noah Bank, knew or should have known that the criminal charges lodged against Shin were false, as the records of Noah Bank

9

revealed that no criminal conduct had been undertaken by Shin.

55.     On July 19, 2019, Greenspan wrote on behalf of Noah Bank to Robert J. Basil of The Basil Law Group seeking to have Mr. Basil communicate to Shin the contents of Noah Bank's position regarding Shin's employment, communication rights, benefit rights, and rights to his stock options ("7-19-2019 Greenspan Email").  See **Exhibit J**.

56.     The sending of the 7-19-2019 Greenspan Email continued Noah Bank's bad faith treatment of Shin.

57.     The 7-19-2019 Greenspan Email, treating Shin like an already convicted criminal, barred Shin from communicating "directly with anyone in the Bank."

58.     Noah Bank, through the 7-19-2019 Greenspan Email, warned that "If Mr. Shin persists in texting and emailing members of Bank staff, the Bank will simply block the messages and calls."

59.     Greenspan did not inform Robert J. Basil that Noah Bank's Co-Chairman of the Board of Directors, Edwin Lloyd, had already warned all Noah Bank employees that they were forbidden to communicate with Shin on pain of termination.

60.     Although Noah Bank had not attempted to terminate Shin's employment at that point in time, the 7-19-2019 Greenspan Email misrepresented Shin's employment status for the purpose of denying him his right to exercise his stock options, even though they were vested.

61.     As Noah Bank explained in the 7-19-2019 Greenspan Email, "Immediately prior to the date of his termination from employment with the Bank, June 19, 2019, Mr. Shin held vested options to purchase Noah Bank common stock. Pursuant to section 6.a of his stock option agreement. . . all of his outstanding vested and unvested options expired immediately upon his

termination by the Bank on June 19, 2019.  Accordingly, he has no further rights in those options."

62.     Noah Bank's declaration of forfeiture of Shin's stock option rights on July 19, 2019, was in bad faith, as (a) Shin had not been terminated on June 19, 2019 (if ever), and (b) even if Shin had been terminated on June 19, 2019, he was never notified sufficiently in advance so that he could exercise his options before his last date of employment and avoid forfeiture.

63.     Noah Bank was not finished with its bad faith treatment of Shin.

64.     In that same 7-19-2019 Greenspan Email, Noah Bank proclaimed, "In addition to his stock options, Mr. Shin had unvested shares of restricted stock.  Effective immediately with his termination from the bank on June 19, 2019, all of his restricted shares were forfeit[ed]."

65.     Noah Bank's 7-19-2019 Greenspan Email was intentionally inaccurate, as Mr. Greenspan was aware that Shin's employment was not terminated on June 19, 2019, but that Shin was instead placed on "administrative leave with fully-paid health insurance benefits but without salary, bonus or other benefits."

66.     If Shin's employment had been terminated on June 19, 2019, such termination would have been in violation of *inter alia* the July 6, 2018 Employment Agreement and the common law of New Jersey.

67.     Through enforcement of the intentionally inaccurate statement of Mr. Greenspan, Noah Bank has endeavored to bar Shin from obtaining the fruits of his contracts with Noah Bank regarding his employment, his stock options and his restricted stock rights.

68.     On October 16, 2018, Noah Bank had executed a reverse split stock plan under which all of Noah Bank Bank's common stock, including the stock subject to this Complaint's allegations, were reduced by a 1-to-10 ratio, *i.e.,* Shin's previous right to receive 500,000 shares

11

of Noah Bank common stock was converted into his right to receive 50,000 shares of Noah Bank common stock.

69.     As a result of the reverse stock split, Shin also was the holder of 194,134 shares of unrestricted common stock.

70.     In March 2020, Shin requested from Noah Bank certificates representing the 194,134.000 shares of Noah Bank Common Stock to which he was the rightful owner.

71.     In response to Shin's requests for certificates, Noah Bank provided Shin with certificates amounting to only 120,762.625 shares.

72.     By refusing to issue Noah Bank Common Stock certificates representing 73,371.375 shares (194,134.000 minus 120,762.625), Noah Bank has converted Shin's Noah Bank Common Stock shares without justification.

73.     As of the date of this Complaint, Shin was also entitled to receive, but has not received, 170,564.93 unrestricted shares of Noah Bank Common Stock pursuant to his restricted stock rights.

74.     As of the date of this Complaint, Shin was entitled to receive, but has not received, 733,714 options to purchase Noah Bank Common Stock at $.64/share.

75.     On September 14, 2019, counsel for Shin attempted to get clarification of Shin's employment status, requesting: "Kindly provide a detailed report concerning Mr. Shin's employment status with Noah Bank after the criminal charges because known to Noah Bank, including the dates of any changes in such status."  See **Exhibit K**.

76.     In bad faith, Noah Bank declined to respond to Shin's counsel's September 14, 2019 request for clarification of Shin's employment status.

77.     On about December 1, 2019, as a resident of the Commonwealth of Pennsylvania,

Shin filed a claim against Noah Bank with the Pennsylvania Department of Labor & Industry for

workers compensation benefits with regard to an injury he had suffered on April 21, 2017 while

conducting bank business.

78.     Notice was sent by the court to Noah Bank on December 5, 2019.  See **Exhibit L**.

79.     As of the time of Shin's workers compensation filing, he had not been terminated

by Noah Bank.

80.     Shin's workers compensation claim was defended by Noah Bank.

81.     Noah Bank falsely represented to the Court that Shin's injury did not occur while

he was acting as an employee of Noah Bank.

82.     Noah Bank resisted settlement of Shin's workers compensation claim by taking an

extremely contentious deposition of Shin before beginning serious settlement discussions.

83.     Shin's workers compensation claim was ultimately settled on about May 18, 2020,

with Shin neither claiming nor receiving any recovery for lost wages or other compensation due

to him for his services or pursuant to any of his employment agreements, but only in compensation

for his physical injuries suffered while being injured in the course of his employment.

84.     Before Shin's workers compensation case was settled, Noah Bank renewed its

aborted efforts to terminate Shin's employment status on February 13, 2020 when Noah Bank's

benefits administrator communicated to Shin that his employment had been terminated as of

December 31, 2019 in the context of sending a notice regarding Shin's rights to COBRA benefits

as a terminated employee.

85.     This notice was an admission by Noah Bank that Shin had not been terminated

13

earlier.

86.     On about February 15, 2020, Shin received notice from Noah Bank's employee benefit plan administrator (the "February 13, 2020 Notice") that he was being removed from the employee health insurance plan as of Shin's termination date, "12/31/2019."  See **Exhibit M**.

87.     The termination date provided by Noah Bank's employee benefit plan in the February 13, 2020 Notice matched the end date of the initial term of the July 6, 2018 Employment Agreement, but otherwise failed to comply with Shin's contractual termination rights.

88.     Noah Bank's efforts to terminate Shin's employment status was in retaliation for Shin's filing a workers' compensation claim against Noah Bank.

89.     The February 13, 2020 Notice was the first notice received by Shin terminating his employment under the July 8, 2018 Employment Agreement, or otherwise.

90.     The February 13, 2020 Notice was insufficient to terminate the July 6, 2018 Employment Agreement or otherwise to terminate Shin's employment status.

91.     The July 6, 2018 Employment, except as the compensation was later increased to $450,000, remains in full force and effect as a result of Noah Bank's failure to terminate effectively and other bad faith actions as referred to in this Complaint.

92.     The actionable conduct referred to in this Complaint took place primarily, if not entirely, within the state of New Jersey.

93.     Before filing this Complaint, Shin filed a notice of arbitration with the American Arbitration Association and served upon Noah Bank a demand for arbitration for some of his employment related claims stated in this Complaint.

94.     Noah Bank objected to such arbitration on the ground that Shin was not entitled to

arbitration and demanded that Shin's arbitration demand be withdrawn, a demand to which Shin fully complied.

## COUNT ONE
### (BREACH OF SHIN OPTION AGREEMENT)

95.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

96.    Shin met or otherwise satisfied performance goals that qualified him under the Shin Option Agreement to receive 733,714 options to purchase Noah Bank Common Stock.

97.    Noah Bank's failure to provide Shin with 733,714 options to purchase Noah Bank Common Stock breached the Shin Option Agreement.

98.    Noah Bank's breach of the Shin Option Agreement violated the express terms of the Shin Option Agreement, as well as the implied duty of good faith and fair dealing implied in the Shin Option Agreement.

99.    As a proximate result of Noah Bank's breach of the Shin Option Agreement, Shin was damaged.

**WHEREFORE** Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Interest;

(E) Costs of suit including reasonable attorney's fees; and

(F) Such other relief as the Court may deem appropriate.

**COUNT TWO**
**(BREACH OF SHIN RESTRICTED STOCK GRANT AGREEMENTS)**

100.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

101.    Shin met or otherwise satisfied performance goals that qualified him under the Shin Restricted Stock Grant Agreements that qualified him to receive 2,194,708.75 unrestricted shares of Noah Bank Common Stock.

102.    Noah Bank's failure to provide Shin with 2,194,708,75 unrestricted shares of Noah Bank Common Stock breached the Shin Restricted Stock Grant Agreements.

103.    Noah Bank's breach of the Shin Restricted Stock Grant Agreement violated the express terms of the Shin Restricted Stock Grant Agreements, as well as the implied duty of good faith and fair dealing implied in the Shin Restricted Stock Grant Agreements.

104.    As a proximate result of Noah Bank's breach of the Shin Restricted Stock Grant Agreements, Shin was damaged.

**WHEREFORE** Shin demands:

    (A) Compensatory damages;

    (B) Consequential damages;

    (C) Incidental damages;

    (D) Interest;

    (E) Costs of suit including reasonable attorney's fees

    (F) Removal of all restrictions on the stock subject to this Count; and

    (G) Such other relief as the Court may deem appropriate.

## COUNT THREE
## (PROMISSORY ESTOPPEL – EMPLOYMENT TERMS AND CONDITIONS)

105.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

106.    To entice and induce Shin to continue to act as President and Chief Executive Officer, after the July 16, 2014 "elimination" of Shin's employment agreements, Noah Bank proposed and Shin agreed that all of the same terms and conditions of Shin's then-existing employment agreement would continue in full force and effect, except as prohibited by the Cost Control Incentive and other representations in the July 16, 2014 letter, and further agreed that when Noah Bank had exited the consent decree that all "eliminated" terms and conditions of Shin's employment agreement would be restored in full and in a signed agreement.

107.    Shin reasonably relied upon Noah Bank's promise to restore Shin's employment agreement in full and in a signed agreement to his detriment by continuing to act as President and Chief Executive Officer without a written employment contract.

108.    As a proximate result of such reliance, Shin was damaged.

**WHEREFORE** Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Reliance damages;

(E) Back-pay;

(F) Front-pay;

17

(G) Interest;

(H) Costs of suit including reasonable attorney's fees; and

(I)  Such other relief as the Court may deem appropriate.

## COUNT FOUR
### (BREACH OF THE JULY 6, 2018 EMPLOYMENT AGREEMENT)

109.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

110.    Shin met his performance goals, and enhanced the Bank's portfolio by attracting business and investors to Noah Bank

111.    Noah Bank breached the terms of the July 6, 2018 Employment Agreement by, *inter alia*, failing to abide by its evergreen provisions, failure to give the required 60-day notice of termination, failure to pay required compensation, failure to provide benefits, and failure to provide termination benefits.

112.    Noah Bank's breaches of the July 6, 2018 Employment Agreement violated the express terms of the July 6, 2018 Employment Agreement, as well as the implied duty of good faith and fair dealing implied in the Shin Restricted Stock Grant Agreements.

113.    As a proximate result of Noah Bank's breach of the July 6, 2018 Employment Agreement, Shin was damaged.

**WHEREFORE** Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Back-pay;

(E) Front-pay;

(F) Interest;

(G) Costs of suit including reasonable attorney's fees; and

(H) Such other relief as the Court may deem appropriate.

## COUNT FIVE
## (DEFAMATION – FALSE LIGHT and DEFAMATION IN EMPLOYMENT)

114.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

115.    In response to the filing of the May 29, 2019 false criminal charges against Shin, Noah Bank undertook public actions designed to cast Shin in the false light of a criminal, not merely an accused criminal entitled to a presumption of innocence.

116.    The actions taken by Noah Bank in the wake of the May 29, 2019 false criminal charges lodged against Shin were undertaken by Noah Bank knowing that the criminal charges lodged against Shin were false, recklessly disregarding the facts within Noah Bank's knowledge that the criminal charges lodged against Shin were false, or while Noah Bank should have discovered though reasonable diligence that the criminal charges lodged against Shin were false.

117.    The actions taken placed Shin in a false light of a convicted felon which were highly offensive to Shin and would be highly offensive to a reasonable person in Shin's circumstances.

118.    The false light to which Shin was subjected amounted to defamation *per se* under applicable law.

119.    Noah Bank had knowledge of or acted in reckless disregard as to the falsity of the

19

criminal charges lodged against Shin at the times Noah Bank took the public actions against Shin.

120.    Noah Bank had knowledge of or acted in reckless disregard of the false light under which Shin would be placed by its public actions undertaken in the wake of the May 29, 2019 false criminal charges lodged against Shin.

121.    Noah Bank knew or should have known that such actions would expose Shin to ridicule or contempt; cause Shin to lose the goodwill and confidence of others in the public and banking industry; and injure his reputation within the banking community.

122.    Noah Bank further knew the false allegations against Shin would be communicated within the banking and surrounding community and did nothing to counteract or refute articles appearing in news outlets communicating the false criminal charges or to quell false rumors.

123.    As a proximate result of the false light casts upon Shin, Shin suffered damages, including severe emotional distress.

**WHEREFORE**, Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Punitive damages;

(E) Interest;

(F) An injunction requiring Noah Bank to retract publicly all false statements made regarding the subject of this Count.

(G) Costs of suit including reasonable attorney's fees; and

(H) Such other relief as the Court may deem appropriate.

20

**COUNT SIX**
**(RETALIATION FOR FILING WORKERS COMPENSATION CLAIM –**
**NJSA 34:15-39.1)**

124.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

125.    Attempts to terminate Shin's employment status were undertaken after Shin had filed for workers compensation benefits against Noah Bank for injuries incurred while working for Noah Bank.

126.    All attempts to terminate Shin's employment status after the date Shin filed for workers compensation benefits against Noah Bank were undertaken in retaliation for Shin's filing of such claims in violation of NJSA 34:15-39.1.

127.    Shin's filing of a worker's compensation claim played a role in and was a determining factor in Noah Bank's termination of Shin.

128.    As a proximate result of such retaliation, Shin has suffered damages, including severe emotional distress.

**WHEREFORE**, Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Punitive damages;

(E) Interest;

(F) Costs of suit including reasonable attorney's fees; and

(G) Such other relief as the Court may deem appropriate.

## COUNT SEVEN
## (COMMON LAW - *PIERCE* RETALIATION)

129.     Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

130.     The adverse employment actions of Noah Bank stated in this Complaint, including but not limited to Noah Bank's actions in withholding Shin's unrestricted stock certificates, stock options, and restricted stock ("Shin's Financial Instruments"), withholding Shin's compensation, withholding termination benefits, undertaking false light actions, and Shin's wrongful termination, were undertaken contrary to clear mandates of public policy.

131.     Examples of actions Noah Bank's retaliation in violation of public policy include Noah Bank's retaliatory actions taken in response to Shin's protected actions taken in furtherance of public policy, including but not limited to:

(a)      Shin's insistence upon maintaining his innocence pursuant to the penumbra of rights contained in the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, as well as the common law of the State of New Jersey.

(b)      Shin's availing himself of the benefits of workers compensation rights (Noah Bank's retaliation was a violation of NJSA 34:15-39.1).

(c)      Shin's retention of former Noah Bank attorneys Robert J. Basil and Jerry J. Kim to defend Shin in civil and criminal matters.

(d)      Shin's willingness to provide truthful evidentiary and testimonial support

22

of The Basil Law Group, P.C. in its claim against Noah Bank for unpaid legal fees in the amount of $400,000.

(e)     Shin's willingness to provide truthful evidentiary and testimonial support for JKAYC, Inc. in its litigation against Noah Bank for breach of a commercial lease.

132.     Noah Bank wrongfully terminated and subjected Shin to retaliation.

133.     As a proximate result of Noah Bank's retaliation, Shin suffered financial and emotional distress damages.

**WHEREFORE**, Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Punitive damages;

(E) Back-pay;

(F) Front-Pay;

(G) Interest; and

(H) Such other relief as the Court may deem appropriate.

## COUNT EIGHT
## (CONVERSION OF SHIN'S FINANCIAL INSTRUMENTS)

134.     Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

135.     Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

136.    The acts of Noah Bank in withholding Shin's Financial Instruments unrestricted stock certificates, stock options, and restricted stock ("Shin's Financial Instruments") constituted Noah Bank's intentional exercise of dominion or control over Shin's Financial Instruments.

137.    Noah Bank's intentional exercise of dominion or control over Shin's Financial Instruments so seriously interfered with the rights of Shin to control Shin's Financial Instruments that Noah Bank should, *inter alia*, be required to pay Shin for the full value of all such instruments.

138.    The aforementioned acts of Noah Bank with regard to Shin's Financial Instruments proximately caused Shin to be damaged.

**WHEREFORE,** Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Punitive damages;

(E) Award of the highest intermediate fair market and full value of any converted financial instruments and interest from the date of conversion where applicable;

(F) Costs of suit including reasonable attorney's fees; and

(G) Such other relief as the Court may deem appropriate.

**COUNT NINE**
**(BREACH OF AGREEMENT/PROMISSORY ESTOPPEL/ DUTY TO PAY DEFERRED BONUSES)**

139.    Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

140.    At various times during his employment, Shin agreed to defer, but not waive,

receipt of earned bonuses, for the purpose of assisting Noah Bank to present more favorable financial reports to the regulatory bodies and the public.

141.   Noah Bank promised to pay the bonuses upon Shin's demand.

142.   Shin reasonably relied upon Noah Bank's promises of delayed payment in agreeing to defer earned bonuses to his detriment.

143.   No payment of deferred bonuses has been received by Shin.

144.   Shin hereby demands payment of all deferred bonuses.

145.   The failure of Noah Bank to pay all deferred bonuses proximately caused economic injury and damage to Shin.

**WHEREFORE**, Shin demands:

(A) Compensatory damages;

(B) Consequential damages;

(C) Incidental damages;

(D) Reliance damages;

(E) Interest;

(F) Costs of suit including reasonable attorney's fees; and

(G) Such other relief as the Court may deem appropriate.

**COUNT TEN**
**(BREACHES OF COVENANTS OF GOOD FAITH AND FAIR DEALING)**

146.   Shin repeats and realleges all of the allegations in the preceding paragraphs as if state in full herein.

147.   In each and every agreement referred to in this Complaint, there was an implied duty of good faith and fair dealing on the part of Noah Bank.

25

148.    In all incidents of Noah Bank's technical compliance with the terms of such agreements, Noah Bank breached the implied duty of good faith and fair dealing implied in such agreement.

149.    As a proximate cause of such breaches of the implied duty of good faith and fair dealing, Shin was damaged.

**WHEREFORE**, Shin demands:

(A) Compensatory damages for each of the preceding Counts;

(B) Consequential damages for each of the preceding Counts;

(C) Incidental damages for each of the preceding Counts;

(D) Costs of suit including reasonable attorney's fees for each of the preceding Counts; and

(E) Such other relief as the Court may deem appropriate.

THE BASIL LAW GROUP, P.C.
Attorney for plaintiff,
Edward Shin
32 East 31st Street, 9th Floor
New York NY 10016
9179949973 (phone)
8315361075 (fax)

By:      /S/ ROBERT J. BASIL
Robert J Basil (025721988)
robertjbasil@rjbasil.com
David A. Cohen (045581990)
davidacohen@rjbasil.com

## DESIGNATION OF TRIAL COUNSEL AND JURY DEMAND

Plaintiff Edward Shin hereby designates Robert J. Basil, Esq. as its trial counsel in this action, and demands a trial by jury on all claims so triable.

THE BASIL LAW GROUP, P.C.
Attorney for plaintiff,
 Edward Shin

Dated:  May 26, 2019

By: /s/ ROBERT J. BASIL_____
    Robert J. Basil


## CERTIFICATION

I hereby certify pursuant to R. 4:5-1 that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

I further certify that all appropriate persons or entities which ought to be joined hereto pursuant to R. 4:28-1 have, to the best of my knowledge, been joined as parties in this action.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

I further certify that the foregoing statements made by me are true.  I am aware that if any of the above statements made by me are willfully false, I am subject to punishment.

Dated:  May 26, 2019

By:   /s/ ROBERT J. BASIL____
      Robert J. Basil

27

**EXHIBIT M**

## TOLLING AND NON-WAIVER AGREEMENT

This Tolling and Non-Waiver Agreement ("Agreement"), dated as of September *25*, 2020, is entered into by and between Edward Shin ("Shin") and Noah Bank ("Bank"), or each individually as "Party".

WHEREAS, on or about May 26, 2020, Shin filed a Complaint against the Bank in the action entitled Edward Shin v. Noah Bank, Superior Court of New Jersey, Bergen County, Docket No. BER-L-003054-20 (the "Action") alleging, among other things, that the Bank is liable to Shin for damages purportedly caused by the Bank's wrongful termination of employment and breach of common stock option and restricted stock agreements.

WHEREAS, the Parties agree that it is in their mutual best interest and the interest of judicial economy to proceed to mediation;

WHEREAS, the Parties desire to enter into this Agreement to toll and otherwise preserve any and all of their respective rights, claims and defenses against the other Parties hereto arising out of, or otherwise relating to, the Complaint brought in the Action which they have or may have as of September *25*, 2020 (the "Effective Date");

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Parties agree and covenant as follows:

1.      Shin shall file a stipulation dismissing, without prejudice, his complaint against the Bank, within 10 days of receiving this fully executed Agreement.

2.      The Parties shall not file or otherwise pursue any claims, defenses, or causes of action that they may have against the other Party arising from the facts alleged in, or relating to,



the Complaint in the Action until this Agreement is deemed terminated in accordance with Paragraph 7 of this Agreement.

3.      Any and all of the Parties' respective claims, causes of action, and defenses against each other which are, or may be, available at the Effective Date arising from the facts alleged in, or relating to, the Complaint in the Action shall be preserved as of the Effective Date for purposes of any applicable statutes of limitation, and/or for purposes of any waiver, estoppel, laches or other "time-based" defense (collectively "Time-Based Defenses"). All such claims, causes of action, and defenses shall be tolled for the purposes of all Time-Based Defenses from the Effective Date through and including the termination of this Agreement under Paragraph 7 herein.

4.      No Party shall assert, plead or otherwise argue that any claims, causes of action, or defenses against each other which are, or may be, available as of the Effective Date arising from the facts alleged in, or relating to, the Complaint in the Action are barred by any Time-Based Defenses as a result of the passage of time from the Effective Date through and including the effective date of termination of this Agreement under Paragraph 7 of this Agreement.

5.      In addition, no Party shall use or otherwise rely on any such delay in asserting such claims, causes of action, and defenses pursuant to this Agreement as evidence for any purpose at a trial or other proceeding between the Parties, nor otherwise rely on the terms or existence of this Agreement in any such trial or other proceeding between the Parties; provided, however, this Agreement may be used by the Parties for the purpose of enforcing its provisions, including (without limitation) establishing the tolling and preservation of claims, causes of action, and defenses under this Agreement.



6.      Subject to Paragraphs 4 and 5 of this Agreement, upon the termination of this Agreement, the Parties shall be entitled to raise any and all claims, causes of action, and defenses against each other arising out of the facts alleged in, or relating to, the Complaint in the Action that could have been raised on or before the Effective Date, including any Time-Based Defenses, however, the Complaint must be refiled in the Court of Common Pleas-Montgomery County. Notwithstanding anything to the contrary in this paragraph, the Parties agree and stipulate that there is outstanding discovery still remaining in connection with the Complaint in the Action, including: responses to interrogatories and document requests, the depositions of Shin and a corporate representative of the Bank, the exchange of expert reports, and expert depositions as necessary. The Parties specifically agree that the remaining discovery shall be conducted on an agreed-upon schedule after this agreement is terminated under Paragraph 7 and the Complaint is reinstated against the Bank. The Parties further agree that any discovery that was conducted and exchanged, including any deposition testimony, prior to the Effective Date shall be deemed to have also taken place in any Action filed and/or instituted by Shin against the Bank, including the reinstatement of the Complaint.

7.      This Agreement, unless extended by the written consent of all Parties, will expire effective January 1, 2022. Notwithstanding the preceding, any Party may terminate this Agreement at any time and upon thirty (30) day notice and by providing its Notice of Intention to Terminate in writing to the other Parties to this Agreement. This Agreement (except for the tolling protections described in Paragraphs 3 through 6) shall thereafter terminate thirty (30) days following receipt of written notice by a Party of the other Party's intention to terminate the Agreement.



8.    Any notice under this Agreement shall be in writing and sent by overnight courier, or by other expedited means (*i.e.*, electronic mail), so long as it is actually received by the following representatives, or such representatives as the Parties may subsequently direct in writing:

> If to Shin:
>
> Robert J Basil, Esquire
> THE BASIL LAW GROUP, P.C.
> 32 East 31st Street, 9th Floor
> New York, New York 10016
> Email: robertjbasil@rjbasil.com
>
> If to the Bank:
>
> Lawrence B. Berg, Esquire
> Marshall, Dennehey, Warner, Coleman & Goggin
> 15000 Midlantic Drive, Suite 200
> P.O. Box 5429
> Mt. Laurel, New Jersey 08054
> Email: lbberg@mdwcg.com

9.    This Agreement shall not constitute an acknowledgement or admission by the Parties with regard to the liability of any Party, the existence or quantum of any damages, or the applicability of any defenses, including any Time-Based Defenses, in connection with the Complaint in the Action.

10.    The Parties acknowledge that this Agreement contains the entire integrated agreement of the Parties with regard to the preservation and tolling of any of their claims, causes of action and defenses against each other arising from, or relating to, the Complaint in the Action. This Agreement can only be amended in a writing signed by all Parties.



11.     This Agreement may be executed in counterparts, each of which when executed shall be deemed an original, but all of which when taken together, shall constitute but one and the same instrument.

12.     Each of the undersigned represents that he or she has the authority to execute this Agreement on behalf of the Party for which he or she is signing.

IN WITNESS WHEREOF, the Parties accept and agree to be bound by this Agreement.

EDWARD SHIN                              NOAH BANK

By: _____     By: _____

Name: _Ruben J Basil_               Name: _Glenn Richard James P_

Date: _Sept 24 2020_                Title: _E.U.P. & Gen. Cons._

                                    Date: _25 Sep 2020_

LEGAL/132674133 v1



-5-

EXHIBIT N-DEFENSE FULL IMPACT CHART

## Income Received by Noah Bank on 29 Loans

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Borrower Name | Loan Number | Loan Date | Loan Amount | Noah Bank Fee Income | SBA Fee Income | Interest Income and Other Fees | Total Income | Source |
| 1797 Empire, Inc. | 34▮ | 5/11/2009 | $1,000,000 | $55,125 | $0 | $222,064.00 | $277,189 | GX 304-02 (as to Column 6); USAO_000403603 to USAO_000403612 (as to Column 7) |
| 32 Madison Farms, Inc. | 39▮ | 6/21/2010 | $950,000 | $79,173 | $0 | $199,024 | $278,197 | GX 305-06 (as to Column 6); USAO_000403625 to USAO_000403642 (as to Column 7) |
| 809 Lexington Grocery, Inc. | 55▮ | 12/21/2012 | $3,950,000 | $325,875 | $108,594 | $699,261 | $1,133,730 | GX 308-02 (as to Column 5); USAO_000403669 to USAO_000403679 (as to Column 7) |
| Armonk Farm, Inc. | 49▮ | 10/21/2011 | $500,000 | $41,250 | $10,312 | $28,705 | $80,267 | GX 309-02 (as to Column 6); USAO 000403680 to USAO_000403686 (as to Column 7) |
| Armonk Farm, Inc. | 45▮ | 3/10/2011 | $120,000 | $10,393 | $0 | $12,028 | $22,421 | GX 310-05 (as to Column 6); USAO_000403687 to USAO_000403693 (as to Column 7) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Armonk Farm, Inc. | 39 | 3/4/2010 | $1,100,000 | $97,485 | $0 | 135,013 | $232,498 | GX 311-01 (as to Column 6); USAO_000403694 to USAO_000403702 (as to Column 7) |
| Aspen Market Place. Corp. | 50 | 12/30/2011 | $2,070,000 | $160,273 | $55,719 | $366,618 | $582,610 | GX 312-02 (as to Column 6); USAO_000403703 to USAO_000403712 (as to Column 7) |
| Chung Palisades Medical, LLC | 56 | 12/20/2011 | $2,400,000 | $0 | $65,000 | $405,440 | $470,440 | GX 335-01 (as to Column 6); 3556-17 (as to Column 7) |
| Eden Organic Market, Inc. | 52 | 7/6/2012 | $200,000 | $18,207 | $4,500 | $16,886 | $39,886 | GX 315-04 (as to Column 6); USAO_000403736 to USAO_000403742 (as to Column 7) |
| Everbeauty, Inc. | 52 | 5/25/2012 | $1,500,000 | $127,800 | $39,688 | $502,432 | $669,920 | GX 316-06 (as to Column 6); USAO_000403743 to USAO_000403757 (as to Column 7) |
| First Ave Lee's Market, Inc. | 64 | 9/30/2013 | $1,050,000 | $86,625 | $27,562 | $211,063 | $325,250 | GX 317-02 (as to Column 6); USAO_000403758 to USAO_000403770 (as to Column 7) |
| First Ave Lee's Market, Inc. | 75 | 4/3/2015 | $150,000 | $0 | $0 | $16,911 | $16,911 | GX 318-04 (as to Column 6); USAO_000403771to USAO_000403778 (as to Column 7) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| First Ave Lee's Market, Inc. | 79⬛ | 10/2/2015 | $75,000 | $0 | $0 | $5,893 | $5,893 | GX 319-04 (as to Column 6); USAO_000403779 to USAO_000403785 (as to Column 7) |
| First Ave Lee's Market, Inc. (non-SBA) | | 2/28/2017 | $300,000 | $0 | $0 | Unknown | Unknown | Not available. |
| Garden of Eden Enterprises, Inc. | 51⬛ | 4/20/2012 | $5,000,000 | $393,843 | $138,125 | $867,430 | $1,399,398 | GX 321-08 (as to Column 6); USAO_000403802 to USAO_000403825 (as to Column 7) |
| HD Parts All, Inc. | 51⬛ | 5/4/2012 | $1,000,000 | $85,200 | $26,250 | $131,658 | $243,108 | GX 336-07 (as to Column 6); 3556-19 (as to Column 7) |
| J&J Bloom Spa, Inc. | 51⬛ | 3/16/2012 | $300,000 | $24,682 | $6,187 | $106,843 | $137,712 | GX 322-12 (as to Column 6) USAO_000403826 to USAO_000403841 and GX 322-07(as to Column 7) |
| Lakewood Farmers Market, Inc. | 49⬛ | 10/20/2011 | $1,200,000 | $99,500 | $29,250 | $341,624 | $470,374 | GX 324-03 (as to Column 6); USAO_000403858 to USAO_000403870 (as to Column 7) |
| Lakewood Farmers Market, Inc. | 53⬛ | 8/10/2012 | $300,000 | $27,300 | $6,750 | $71,787 | $105,837 | GX 325-13 and GX 325-07 (as to Column 6); USAO_000403871 to USAO_000403882 (as to Column 7) |
| Lee 77 Corp. | 58⬛ | 1/25/2013 | $200,000 | $18,000 | $4,500 | $73,800 | $96,300 | GX 326-02 and GX 326-03 (as to Column 6); USAO_000403883 to USA_000403897 (as to Column 7) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nail & Spa 72, Inc. | 52███ | 7/23/2012 | $300,000 | $26,493 | $6,750 | $73,564 | $106,807 | GX 327-10 (as to Column 6); USAO_000403898 to USAO_000403909 (as to Column 7) |
| Niobe Nail & Spa, Inc. | 52███ | 7/23/2012 | $200,000 | $17,662 | $4,500 | $61,413 | $83,575 | GX 327-05 (as to Column 6); USAO_000403910 to USAO_000403923 (as to Column 7) |
| Noah Super Laundromat, LLC | 34███ | 6/16/2009 | $1,485,000 | $108,924 | $0 | $381,611 | $490,535 | 3556-21 and 3556-26; GX 338-01 (as to Column 6) |
| R Four, LLC (non-SBA) | N/A | 7/23/2012 | $795,000 | $0 | $0 | $199,913 | $199,913 | 3556-22 (as to Column 7) |
| Royal Garden, Inc. (non-SBA) | N/A | 1/14/2011 | $200,000 | $0 | $0 | $25,122 | $25,122 | 3556-23 and 3556-27 (as to Column 7) |
| SCY Realty, Inc. | 51███ | 3/20/2012 | $1,550,000 | $144,440 | $41,094 | $429,365 | $614,899 | GX 329-06 (as to Column 6); USAO_000403939 to USAO_000403952 (as to Column 7) |
| Sharon Springs, Inc. | 70███ | 9/24/2014 | $3,500,000 | $0 | $95,937 | $2,176 | $98,113 | GX 330-07 (as to Column 6); USAO_000403953 to USAO_000403963 (as to Column 7) |
| Teaneck Windsor, LLC | 45███ | 3/28/2011 | $5,000,000 | $285,000 | $138,125 | $1,486,898 | $1,910,023 | GX 331-05 (as to Column 6); USAO_000403964 to USAO_000403980 (as to Column 7) |
| Windsor R&B, Inc. | 51███ | 5/3/2012 | $1,500,000 | $127,800 | $39,688 | $340,053 | $507,541 | GX 332-01 (as to Column 6); USAO_000403981 to USAO_000403991 (as to Column 7) |

GZJ KDKV Q

# 1 in 6 Small Business Administration Loans Fail, Study Finds

Kevin Voigt, Caren Weiner Campbell | Oct 3, 2017



Many or all of the products featured here are from our partners who compensate us. This may influence which products we write about and where and how the product appears on a page. However, this does not influence our evaluations. Our opinions are our own. Here is a list of our partners and here's how we make money.

Loans backed by the U.S. Small Business Administration's 7(a) program are the gold standard for Main Street entrepreneurs seeking cash to start a business or grow. The loans are coveted for low interest rates and long repayment terms, and are highly competitive. The application process is time-consuming, and applicants often walk away empty-handed.

Getting one of these SBA-backed loans, however, is no guarantee of success: More than 1 in 6 loans (17.4%) awarded from 2006 through 2015 went into default, which in this analysis means that the issuing lender determined that it wasn't likely to be repaid, a recent NerdWallet study shows.

That's an improvement from the default rate for the 10-year period ending in 2008, when nearly 1 in 4 (24.7%) SBA loans weren't paid back. But still worse than the 10-year default rate ending in 2000, when slightly more than 1 in 10 loans (11.5%) went bad, the data analysis found.

The findings emerge from an analysis of over 1 million loans issued since 1991 by banks participating in the SBA's flagship loan program. To understand how SBA 7(a) loans fail over time, NerdWallet calculated the percentage of defaulted loans in a series of 10-year periods, starting from the fiscal years that covered 1991 through 2000, through the 10-year period ending with the fiscal year for 2015. NerdWallet obtained the data from the SBA.

## Loans took 4.7 years, on average, to fail

Data from 2016 and 2017 were excluded from the analysis because the loans are too new for meaningful default rates — the average failing loan took 4.7 years to default; the median failure time was 4.1 years, according to our research.

This report focuses on the small businesses that attracted the most SBA loans and what kinds of businesses had the best and worst rates of loan defaults.

The data show the chaos that led to the Great Recession, echoed in high default rates for loans to real estate-related businesses. Mortgage and other loan brokers had the worst default rate with nearly 2 in 3 loans failing (65.6%) from 2006 to 2015. This default rate was followed by residential property managers (46.2%) and real estate offices of agents and brokers (45.5%), the analysis found.

In all, NerdWallet found that loans to 221 kinds of businesses that received 200 loans or more during the 10-year period went to debt collection at rates higher than average (17.4%), including loans to debt collectors themselves — 25% of collection agencies defaulted on their loans from 2006 through 2015.

The businesses with the lowest rate of defaults over the same time period were breweries (3.9%), businesses that support oil and gas operations (4%) and veterinary services (4.3%).

## A key funding source for U.S. small businesses

Small businesses created 60% of the nation's new jobs from 2009-2013, according to the SBA, and the 7(a) loan program is designed to stoke that economic engine by supporting those who are starting a business or expanding one. The program backed $24.1 billion in loans in 2016, up from $14.5 billion in 2006.

The SBA doesn't make the loans; rather, banks and other financial institutions choose the businesses to fund as long as they meet 7(a) loan eligibility requirements. In return, the SBA guarantees to pay participating banks 85% of unpaid loans for $150,000 or less and 75% of unpaid loans for over $150,000.

The 7(a) program guarantees loans of up to $5 million made for working capital, company expansion or equipment purchases. The program is designed to pay for itself — fees paid by participating banks are used to cover SBA guarantees on loans that go bad.

The SBA guarantees allow banks to charge interest rates far lower than the rates entrepreneurs will get from online small-business lenders or by using credit cards. SBA loan interest rates range from 6.5% to 9%, and the loans have long repayment terms, ranging from 7 years for working capital loans to 25 years for real estate loans, according to the SBA.

Other funding options like online small-business loans have an average APR of about 50%, according to a NerdWallet analysis. And merchant cash advances have APRs as high as 350%, with repayment terms measured in months rather than years.

## Default picture improving, but not for all

Banks primarily look at the financial health and credit history of the business and its owners when considering a loan application, no matter the industry. But when loan approval and default rates are examined by specific business types, some clear winners and losers emerge.

To understand defaults by industry, this data analysis eliminated business categories that recorded fewer than 200 loans in total from 2006 through 2015 (306 kinds of businesses received 200 or more loans).

Default rates were under 15% until the 10-year period ending in 2005, when the percentage of failed loans began to climb, peaking at 24.7% in 2008. The 17.4% rate of failed loans recorded in the decade ending in 2015 was the lowest since 2005 (17.3%).

## Other key findings

**Consumers move toward online services and shopping.** The trend appears to have hit businesses like videotape and disc rental stores, which saw 42.7% of loans go into default from 2006 to 2015, along with travel agencies (39.4%) and bookstores (31.4%).

**Brick-and-mortar stores struggle.** When looking at 221 businesses with higher than average default rates, different categories of stores appear under pressure as consumers turn away from visiting department stores (40.6% defaulted from 2006 through 2015), women's and men's clothing stores (33.6% and 32.9%, respectively) and shoe stores (31.6%).

**Health care providers appear to be doing well.** Loans to optometrist (4.9%), dentist (5.2%) and physician offices (5.6%) from 2006 through 2015 had some of the lowest default rates, as did loans to pharmacies (5.3%) and home health care services (8.8%).

## 20 business types* with the highest SBA loan 10-year default rate (2006-2015)

| Business** | Number of loans 2006-2015 | 10-year default rate |
|---|---|---|
| 1. Mortgage and nonmortgage loan brokers | 948 | 65.6% |
| 2. Residential property managers | 889 | 46.2% |
| 3. Offices of real estate agents and brokers | 2,638 | 45.5% |

| Business** | Number of loans 2006-2015 | 10-year default rate |
|---|---|---|
| 4. Multifamily housing construction | 701 | 42.8% |
| 5. Videotape and disc rental | 232 | 42.7% |
| 6. All other support activities for transportation | 580 | 42.1% |
| 7. Nonresidential property managers | 338 | 42% |
| 8. Window treatment stores | 233 | 41.6% |
| 9. Department stores | 291 | 40.6% |
| 10. All other support services | 1,196 | 40.5% |
| 11. Offices of real estate appraisers | 354 | 40.4% |
| 12. Travel agencies | 376 | 39.4% |
| 13. Cut and sew apparel contractors | 242 | 38.8% |
| 14. Jewelry, watch, precious stone, and precious metal merchant wholesalers | 560 | 38.2% |
| 15. Computer and  computer peripheral equipment and software merchant wholesalers | 337 | 37.1% |
| 16. Title abstract and settlement offices | 232 | 37.1% |
| 17. Other activities related to real estate | 876 | 37% |
| 18. Wireless telecommunications carriers (except satellite) | 484 | 37% |
| 19. Men's and boys' clothing and furnishings merchant wholesalers | 265 | 35.9% |
| 20. Siding contractors | 212 | 35.4% |

* Based on business types, or categories, that received 200 or more loans

** For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## 20 business types* with the lowest SBA loan 10-year default rate (2006-2015)

| Business** | Number of loans 2006-2015 | 10-year default rate |
|---|---|---|
| 1. Breweries | 308 | 3.9% |
| 2. Support activities for oil and gas operations | 569 | 4% |
| 3. Veterinary services | 2,732 | 4.3% |

| Business** | Number of loans 2006-2015 | 10-year default rate |
|---|---|---|
| 4. Broilers and other meat type chicken production | 1,654 | 4.8% |
| 5. Offices of optometrists | 1,317 | 4.9% |
| 6. Offices of dentists | 7,204 | 5.2% |
| 7. Pharmacies and drug stores | 1,809 | 5.3% |
| 8. Chicken egg production | 297 | 5.4% |
| 9. Offices of physicians (except mental health specialists) | 6,683 | 5.6% |
| 10. Funeral homes and funeral services | 679 | 6.5% |
| 11. Recyclable material merchant wholesalers | 347 | 7.2% |
| 12. Lessors of nonresidential buildings (except miniwarehouses) | 809 | 7.7% |
| 13. Offices of physical, occupational and speech therapists, and audiologists | 1,807 | 7.8% |
| 14. Hotels (except casino hotels) and motels | 3,370 | 7.8% |
| 15. Other heavy and civil engineering construction | 526 | 8.8% |
| 16. Machine tool manufacturing | 250 | 8.8% |
| 17. Machine shops | 1,577 | 8.8% |
| 18. Home health care services | 2,121 | 8.8% |
| 19. Offices of lawyers | 4,923 | 9.2% |
| 20. Wineries | 210 | 9.5% |

\* Based on business types, or categories, that received 200 or more loans

\*\* For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## What businesses attract the most SBA loans?

To find what businesses attract the most loans, we sorted loan approvals by business type in 2016, the latest full year of data. We then telescoped out to see approval rates by business type, or category, across the first 16 years of the new century — a time frame that includes two presidential administrations and two cycles of recession and recovery — to see how they compare.

## Some observations

**Restaurants are top draw for SBA loans.** Loans to both full- and limited-service restaurant categories (think table service versus counter service) accounted for 8.7% of all loans in 2016, and 9% of SBA loans issued since 2001.

**Nearly 1 in 3 loans went to the top 20 business types.** Over 1,000 business categories received 7(a) loan funding from 2001 to 2016, but the 20 that received the most accounted for 30.4% of approved loans.

**Top 2016 recipients mirror the 16-year picture.** Comparing last year's top 20 loans by business category to the top 20 from 2001 to 2016, 19 categories dominate both lists.

## 20 business types* with the highest SBA loan approval rate (2016)

| Business** | Number of loans approved in 2016 | Percentage of 2016 loans |
|---|---|---|
| 1. Full-service restaurants | 2,910 | 4.92% |
| 2. Limited-service restaurants | 2,214 | 3.74% |
| 3. Offices of dentists | 1,070 | 1.81% |
| 4. General freight trucking, long-distance, truckload | 1,046 | 1.77% |
| 5. Fitness and recreational sports centers | 1,019 | 1.72% |
| 6. Residential remodelers | 1,015 | 1.72% |
| 7. Hotels (except casino hotels) and motels | 990 | 1.67% |
| 8. Landscaping services | 917 | 1.55% |
| 9. All other specialty trade contractors | 868 | 1.47% |
| 10. Beauty salons | 837 | 1.42% |
| 11. Plumbing, heating, and air-conditioning contractors | 806 | 1.36% |
| 12. General freight trucking, local | 786 | 1.33% |
| 13. General automotive repair | 776 | 1.31% |
| 14. Offices of physicians (except mental health specialists) | 752 | 1.27% |
| 15. Child day care services | 746 | 1.26% |
| 16. Offices of lawyers | 732 | 1.24% |
| 17. Beer, wine and liquor stores | 597 | 1.01% |
| 18. Gasoline stations with convenience stores | 582 | 0.98% |
| 19. Electrical contractors and other wiring installation contractors | 580 | 0.98% |
| 20. Insurance agencies and brokerages | 529 | 0.89% |

* Based on business types, or categories, that received 200 or more loans
** For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## 20 business types* with the highest SBA loan approval rate (2001–2016)

| Business** | Number of loans approved | Percentage of all loans |
|---|---|---|
| 1. Full-service restaurants | 42,984 | 4.80% |
| 2. Limited-service restaurants | 37,185 | 4.15% |
| 3. Offices of dentists | 14,344 | 1.60% |
| 4. Beauty salons | 14,178 | 1.58% |
| 5. General automotive repair | 13,518 | 1.51% |
| 6. Gasoline stations with convenience stores | 12,445 | 1.39% |
| 7. Landscaping services | 12,377 | 1.38% |
| 8. Offices of physicians (except mental health specialists) | 11,901 | 1.33% |
| 9. All other specialty trade contractors | 11,658 | 1.30% |
| 10. Child day care services | 10,317 | 1.15% |
| 11. Hotels (except casino hotels) and motels | 9,900 | 1.11% |
| 12. Offices of chiropractors | 9,686 | 1.08% |
| 13. Fitness and recreational sports centers | 9,500 | 1.06% |
| 14. Electrical contractors and other wiring installation contractors | 9,384 | 1.05% |
| 15. General freight trucking, local | 9,341 | 1.04% |
| 16. Beer, wine and liquor stores | 8,925 | 1.00% |
| 17. Plumbing, heating, and air-conditioning contractors | 8,843 | 0.99% |
| 18. Residential remodelers | 8,777 | 0.98% |
| 19. Offices of lawyers | 8,769 | 0.98% |
| 20. General freight trucking, long-distance, truckload | 8,072 | 0.90% |

* Based on business types, or categories, that received 200 or more loans

** For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## Trending: Lawyers, bars and health clubs

To chart the fastest-growing industries in recent years by increase in SBA-backed loans, we measured 2016 loan data against 2011, when the job market had its first full year of recovery after the Great Recession, according to U.S. Bureau of Labor Statistics.

We also looked to see how 2016 industry approval trends compared with 2001 data.

Successful loan applications surged in recent years to businesses that focus on personal services, beverages and delivery. Overall, the number of loan approvals for these businesses increased 30% from 2011 through 2016. Some trends of note:

**Fitness and recreational sports centers gain strength.** This business category was the fastest-growing in 2016 by increase in SBA-backed loans. Approved loans jumped 128.5% from 2011; the growth rate from 2001 was even higher (228.7%).

**Loans to lawyers chart highest 16-year growth.** SBA loan approvals to offices of lawyers in 2016 were up 246.9% over the rate in 2001. Law firms ranked 19th among businesses receiving loan approvals from 2001 through 2016.

**Companies on the move.** In the past six years, loans to local freight trucking companies grew 91.2% and charted 208.2% growth since 2001.

**Bars, coffee shops and liquor stores serving more.** Places to sit down for a drink, be it a bar (68.2%) or a snack and nonalcoholic beverage bar like a coffee shop (68%), charted the fourth- and fifth-fastest growth in SBA loan approvals from 2011 to 2016. Similarly, places to pick up a cold one (beer, wine and liquor stores) were among the top 20 fastest-growing categories (41.1%) of loan recipients in the past six years.

**Rise of personal-service businesses.** "Other personal care services" — a catch-all business category that includes day spas, hair weaving and tattoo shops — was the third-fastest growing category (76.2%) since 2011. "All other personal services" — another broad category that includes wedding planners, personal trainers and house sitters — charted the ninth-highest increase for the past six years.

## 20 fastest-growing businesses* based on SBA loan approval (2011-2016)

| Business** | Loans approved in 2011 | Loans approved in 2016 | Percentage increase in loans |
|---|---|---|---|
| 1. Fitness and recreational sports centers | 446 | 1,019 | 128.5% |
| 2. General freight trucking, local | 411 | 786 | 91.2% |
| 3. Other personal care services | 231 | 407 | 76.2% |
| 4. Drinking places (alcoholic beverages) | 233 | 392 | 68.2% |
| 5. Snack and nonalcoholic beverage bars | 312 | 524 | 68% |
| 6. Landscaping services | 578 | 917 | 58.7% |
| 7. Hotels (except casino hotels) and motels | 659 | 990 | 50.2% |
| 8. Child day care services | 511 | 746 | 46% |
| 9. All other personal services | 267 | 389 | 45.7% |
| 10. Single family housing construction | 243 | 352 | 44.9% |
| 11. Dry cleaning and laundry services (except coin-operated) | 203 | 294 | 44.8% |

| Business** | Loans approved in 2011 | Loans approved in 2016 | Percentage increase in loans |
|---|---|---|---|
| 12. Insurance agencies and brokerages | 368 | 529 | 43.8% |
| 13. Beauty salons | 586 | 837 | 42.8% |
| 14. Beer, wine and liquor stores | 423 | 597 | 41.1% |
| 15. General automotive repair | 554 | 776 | 40.1% |
| 16. All other specialty trade contractors | 628 | 868 | 38.2% |
| 17. Electrical contractors and other wiring installation contractors | 433 | 580 | 34% |
| 18. Full-service restaurants | 2,182 | 2,910 | 33.4% |
| 19. Automotive body, paint, and interior repair and maintenance | 222 | 291 | 31.1% |
| 20. Limited-service restaurants | 1,726 | 2,214 | 28.3% |

\* Based on business types, or categories, that received 200 or more loans

\*\* For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## 20 fastest-growing businesses* based on SBA loan approval (2001-2016)

| Business** | Loans approved in 2001 | Loans approved in 2016 | Percentage increase in loans |
|---|---|---|---|
| 1. Offices of lawyers | 211 | 732 | 246.9% |
| 2. Fitness and recreational sports centers | 310 | 1,019 | 228.7% |
| 3. General freight trucking, local | 255 | 786 | 208.2% |
| 4. Offices of dentists | 471 | 1,070 | 127.2% |
| 5. All other specialty trade contractors | 383 | 868 | 126.6% |
| 6. Landscaping services | 405 | 917 | 126.4% |
| 7. Snack and nonalcoholic beverage bars | 234 | 524 | 123.9% |
| 8. Veterinary services | 224 | 456 | 103.6% |

| Business** | Loans approved in 2001 | Loans approved in 2016 | Percentage increase in loans |
|---|---|---|---|
| 9. Other personal care services | 209 | 407 | 94.7% |
| 10. Drinking places (alcoholic beverages) | 220 | 392 | 78.2% |
| 11. All other personal services | 220 | 389 | 76.8% |
| 12. Offices of physicians (except mental health specialists) | 448 | 752 | 67.9% |
| 13. Hotels (except casino hotels) and motels | 611 | 990 | 62% |
| 14. Engineering services | 209 | 335 | 60.3% |
| 15. Limited-service restaurants | 1,507 | 2,214 | 46.9% |
| 16. Beauty salons | 573 | 837 | 46.1% |
| 17. Child day care services | 511 | 746 | 46% |
| 18. Beer, wine and liquor stores | 409 | 597 | 46% |
| 19. Single family housing construction | 246 | 352 | 43.1% |
| 20. Full-service restaurants | 2,280 | 2,910 | 27.6% |

* Based on business types, or categories, that received 200 or more loans

** For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: A NerdWallet analysis of data provided by the U.S. Small Business Administration

## Important notes for businesses

**Some industries get far more SBA loans.** SBA loans funded hundreds of business categories from 2001 through 2016. But the fact that nearly a third went to just 20 kinds of businesses suggests entrepreneurs in these fields might want to consider an SBA loan.

### How Much Do You Need?

$

SEE YOUR LOAN OPTIONS

with Fundera by NerdWallet

**Size to qualify depends on industry.** SBA definitions of qualifying businesses by number of employees or annual receipts vary widely — prohibiting borrowing by businesses that have more than 500 employees in some cases and more than $7.5 million in average annual receipts in others. Check with the SBA to see if your business qualifies.

**Average loan amounts vary widely.** For example, the highest average loan size in 2016 was to hotels, with a loan amount of $1.9 million, on average. By comparison, limited-service restaurants received about $350,000, on average, per loan.

**Find the right 7(a) lender for you.** Banks follow SBA guidelines but use their own underwriting criteria to evaluate loan applications. Ask your SBA district office or consult the SBA LINC tool to find potential 7(a) lenders. (Want to know more? This SBA loan guide will help.)

## 10-year SBA 7(a) loan defaults (starting in 2006) for business types with 200 or more loans

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Residential Property Managers | 411 | 889 | 46.23 |
| Offices of Real Estate Agents and Brokers | 1199 | 2638 | 45.45 |
| Multifamily Housing Construction | 300 | 701 | 42.80 |
| Video Tape and Disc Rental | 99 | 232 | 42.67 |
| All Other Support Activities for Transportation | 244 | 580 | 42.07 |
| Nonresidential Property Managers | 142 | 338 | 42.01 |
| Window Treatment Stores | 97 | 233 | 41.63 |
| Department Stores | 118 | 291 | 40.55 |
| All Other Support Services | 484 | 1196 | 40.47 |
| Offices of Real Estate Appraisers | 143 | 354 | 40.40 |
| Travel Agencies | 148 | 376 | 39.36 |
| Cut and Sew Apparel Contractors | 94 | 242 | 38.84 |
| Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | 214 | 560 | 38.21 |
| Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | 125 | 337 | 37.09 |
| Title Abstract and Settlement Offices | 86 | 232 | 37.07 |
| Other Activities Related to Real Estate | 324 | 876 | 36.99 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Wireless Telecommunications Carriers (except Satellite) | 179 | 484 | 36.98 |
| Men's and Boys' Clothing and Furnishings Merchant Wholesalers | 95 | 265 | 35.85 |
| Siding Contractors | 75 | 212 | 35.38 |
| Clothing Accessories Stores | 326 | 933 | 34.94 |
| All Other Business Support Services | 348 | 997 | 34.90 |
| Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | 89 | 255 | 34.90 |
| Tile and Terrazzo Contractors | 176 | 507 | 34.71 |
| Family Clothing Stores | 303 | 877 | 34.55 |
| Art Dealers | 130 | 377 | 34.48 |
| Other Commercial Equipment Merchant Wholesalers | 87 | 254 | 34.25 |
| Software and Other Prerecorded Compact Disc, Tape, and Record Reproducing | 86 | 252 | 34.13 |
| Interior Design Services | 375 | 1107 | 33.88 |
| Women's, Children's, and Infants' Clothing and Accessories Merchant Wholesalers | 344 | 1018 | 33.79 |
| All Other Legal Services | 100 | 296 | 33.78 |
| Women's, Girls', and Infants' Cut and Sew Apparel Manufacturing | 83 | 246 | 33.74 |
| Carpentry Contractors | 477 | 1414 | 33.73 |
| Women's Clothing Stores | 535 | 1591 | 33.63 |
| Cosmetics, Beauty Supplies, and Perfume Stores | 404 | 1207 | 33.47 |
| Automotive Transmission Repair | 113 | 339 | 33.33 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Couriers and Express Delivery Services | 105 | 316 | 33.23 |
| All Other General Merchandise Stores | 463 | 1400 | 33.07 |
| Men's Clothing Stores | 110 | 334 | 32.93 |
| Computer and Office Machine Repair and Maintenance | 167 | 511 | 32.68 |
| Nail Salons | 426 | 1307 | 32.59 |
| All Other Information Services | 167 | 513 | 32.55 |
| Single Family Housing Construction | 1323 | 4074 | 32.47 |
| Marketing Consulting Services | 729 | 2280 | 31.97 |
| All Other Home Furnishings Stores | 323 | 1012 | 31.92 |
| Administrative Management and General Management Consulting Services | 861 | 2705 | 31.83 |
| Drugs and Druggists' Sundries Merchant Wholesalers | 162 | 509 | 31.83 |
| Shoe Stores | 229 | 725 | 31.59 |
| Gift, Novelty, and Souvenir Stores | 622 | 1971 | 31.56 |
| Flooring Contractors | 359 | 1142 | 31.44 |
| Book Stores | 134 | 427 | 31.38 |
| Independent Artists, Writers, and Performers | 219 | 705 | 31.06 |
| Flower, Nursery Stock, and Florists' Supplies Merchant Wholesalers | 80 | 260 | 30.77 |
| Other Technical and Trade Schools | 109 | 355 | 30.70 |
| Furniture Stores | 527 | 1725 | 30.55 |
| Painting and Wall Covering Contractors | 554 | 1817 | 30.49 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Electronics Stores | 588 | 1929 | 30.48 |
| Advertising Agencies | 377 | 1246 | 30.26 |
| Other Clothing Stores | 537 | 1776 | 30.24 |
| Automotive Glass Replacement Shops | 71 | 238 | 29.83 |
| Appliance Repair and Maintenance | 60 | 203 | 29.56 |
| Children's and Infants' Clothing Stores | 140 | 478 | 29.29 |
| Janitorial Services | 743 | 2557 | 29.06 |
| Cafeterias, Grill Buffets, and Buffets | 71 | 245 | 28.98 |
| Limousine Service | 196 | 677 | 28.95 |
| Floor Covering Stores | 255 | 882 | 28.91 |
| Other Gasoline Stations | 81 | 281 | 28.83 |
| Local Messengers and Local Delivery | 132 | 458 | 28.82 |
| Office Administrative Services | 85 | 296 | 28.72 |
| Florists | 335 | 1167 | 28.71 |
| Pet and Pet Supplies Stores | 229 | 809 | 28.31 |
| Exam Preparation and Tutoring | 129 | 456 | 28.29 |
| Other Electronic Parts and Equipment Merchant Wholesalers | 138 | 489 | 28.22 |
| Home Furnishing Merchant Wholesalers | 121 | 429 | 28.21 |
| Graphic Design Services | 296 | 1054 | 28.08 |
| Investment Advice | 203 | 723 | 28.08 |
| All Other Motor Vehicle Dealers | 89 | 318 | 27.99 |
| Confectionery and Nut Stores | 82 | 293 | 27.99 |
| Dental Laboratories | 101 | 361 | 27.98 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Other Specialized Design Services | 141 | 505 | 27.92 |
| New Car Dealers | 112 | 404 | 27.72 |
| Jewelry and Silverware Manufacturing | 77 | 278 | 27.70 |
| All Other Miscellaneous Ambulatory Health Care Services | 147 | 531 | 27.68 |
| Periodical Publishers | 99 | 359 | 27.58 |
| Used Car Dealers | 417 | 1518 | 27.47 |
| Other Building Material Dealers | 309 | 1128 | 27.39 |
| Cut Stone and Stone Product Manufacturing | 72 | 264 | 27.27 |
| Automotive Exhaust System Repair | 65 | 240 | 27.08 |
| Motorcycle, ATV, and All Other Motor Vehicle Dealers | 117 | 432 | 27.08 |
| Used Household and Office Goods Moving | 87 | 322 | 27.02 |
| Other Management Consulting Services | 540 | 2001 | 26.99 |
| Other Personal and Household Goods Repair and Maintenance | 245 | 908 | 26.98 |
| Security Guards and Patrol Services | 97 | 361 | 26.87 |
| Human Resources and Executive Search Consulting Services | 133 | 499 | 26.65 |
| Residential Remodelers | 1394 | 5247 | 26.57 |
| Hobby, Toy, and Game Stores | 205 | 777 | 26.38 |
| General Freight Trucking, Long-Distance, Less Than Truckload | 84 | 319 | 26.33 |
| Motor Vehicle Supplies and New Parts Merchant Wholesalers | 195 | 746 | 26.14 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Sewing, Needlework, and Piece Goods Stores | 103 | 394 | 26.14 |
| Toy and Hobby Goods and Supplies Merchant Wholesalers | 65 | 249 | 26.10 |
| Masonry Contractors | 217 | 832 | 26.08 |
| All Other Transit and Ground Passenger Transportation | 73 | 280 | 26.07 |
| Promoters of Performing Arts, Sports, and Similar Events without Facilities | 58 | 224 | 25.89 |
| Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | 101 | 391 | 25.83 |
| Furniture Merchant Wholesalers | 94 | 366 | 25.68 |
| Brick, Stone, and Related Construction Material Merchant Wholesalers | 78 | 304 | 25.66 |
| All Other Specialty Food Stores | 600 | 2347 | 25.56 |
| All Other Personal Services | 867 | 3393 | 25.55 |
| Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | 109 | 427 | 25.53 |
| All Other Health and Personal Care Stores | 169 | 663 | 25.49 |
| All Other Miscellaneous Food Manufacturing | 67 | 263 | 25.48 |
| Office Supplies and Stationery Stores | 132 | 519 | 25.43 |
| Service Establishment Equipment and Supplies Merchant Wholesalers | 61 | 241 | 25.31 |
| Drycleaning and Laundry Services (except Coin-Operated) | 832 | 3301 | 25.20 |
| Glass and Glazing Contractors | 94 | 373 | 25.20 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Household Appliance Stores | 119 | 475 | 25.05 |
| Collection Agencies | 59 | 236 | 25.00 |
| All Other Miscellaneous Store Retailers (except Tobacco Stores) | 1116 | 4470 | 24.97 |
| Tax Preparation Services | 251 | 1007 | 24.93 |
| Commercial Photography | 74 | 297 | 24.92 |
| Security Systems Services (except Locksmiths) | 160 | 644 | 24.84 |
| Vending Machine Operators | 228 | 923 | 24.70 |
| All Other Miscellaneous Manufacturing | 286 | 1160 | 24.66 |
| Food (Health) Supplement Stores | 166 | 678 | 24.48 |
| Other Services to Buildings and Dwellings | 355 | 1457 | 24.37 |
| Child and Youth Services | 53 | 218 | 24.31 |
| Meat Markets | 159 | 654 | 24.31 |
| Automobile and Other Motor Vehicle Merchant Wholesalers | 74 | 305 | 24.26 |
| Wood Kitchen Cabinet and Countertop Manufacturing | 174 | 718 | 24.23 |
| Caterers | 356 | 1473 | 24.17 |
| Structural Steel Erection Contractors | 60 | 249 | 24.10 |
| Building Inspection Services | 59 | 245 | 24.08 |
| Other Automotive Mechanical and Electrical Repair and Maintenance | 136 | 568 | 23.94 |
| Temporary Help Services | 121 | 507 | 23.87 |
| Other Services Related to Advertising | 118 | 495 | 23.84 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Apparel Accessories and Other Apparel Manufacturing | 102 | 428 | 23.83 |
| Other Construction Material Merchant Wholesalers | 105 | 442 | 23.76 |
| Other Grocery and Related Products Merchant Wholesalers | 200 | 842 | 23.75 |
| Snack and Nonalcoholic Beverage Bars | 967 | 4071 | 23.75 |
| Fish and Seafood Merchant Wholesalers | 55 | 233 | 23.61 |
| Tobacco Stores | 90 | 382 | 23.56 |
| General Freight Trucking, Local | 1322 | 5626 | 23.50 |
| Amusement Arcades | 57 | 243 | 23.46 |
| Jewelry Stores | 352 | 1502 | 23.44 |
| Home and Garden Equipment Repair and Maintenance | 53 | 227 | 23.35 |
| Internet Publishing and Broadcasting and Web Search Portals | 60 | 257 | 23.35 |
| Other Miscellaneous Nondurable Goods Merchant Wholesalers | 376 | 1612 | 23.33 |
| Other Personal Care Services | 594 | 2546 | 23.33 |
| Process, Physical Distribution, and Logistics Consulting Services | 83 | 357 | 23.25 |
| Musical Instrument and Supplies Stores | 70 | 302 | 23.18 |
| Carpet and Upholstery Cleaning Services | 178 | 770 | 23.12 |
| Other Business Service Centers (including Copy Shops) | 80 | 347 | 23.05 |
| Photography Studios, Portrait | 233 | 1013 | 23.00 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Other Miscellaneous Durable Goods Merchant Wholesalers | 537 | 2348 | 22.87 |
| Other Commercial and Service Industry Machinery Manufacturing | 69 | 302 | 22.85 |
| Educational Support Services | 151 | 661 | 22.84 |
| All Other Telecommunications | 58 | 255 | 22.75 |
| All Other Outpatient Care Centers | 73 | 321 | 22.74 |
| Motion Picture and Video Production | 187 | 827 | 22.61 |
| Specialized Freight (except Used Goods) Trucking, Long-Distance | 115 | 512 | 22.46 |
| Fruit and Vegetable Markets | 57 | 255 | 22.35 |
| Newspaper Publishers | 46 | 207 | 22.22 |
| Wholesale Trade Agents and Brokers | 107 | 482 | 22.20 |
| Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | 232 | 1046 | 22.18 |
| Other Building Equipment Contractors | 151 | 682 | 22.14 |
| Automotive Parts and Accessories Stores | 404 | 1831 | 22.06 |
| Hardware Merchant Wholesalers | 44 | 202 | 21.78 |
| Architectural Services | 214 | 984 | 21.75 |
| Drywall and Insulation Contractors | 244 | 1124 | 21.71 |
| Employment Placement Agencies | 184 | 848 | 21.70 |
| All Other Miscellaneous Wood Product Manufacturing | 82 | 379 | 21.64 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | 93 | 430 | 21.63 |
| General Line Grocery Merchant Wholesalers | 107 | 495 | 21.62 |
| Supermarkets and Other Grocery (except Convenience) Stores | 800 | 3706 | 21.59 |
| Other Accounting Services | 335 | 1562 | 21.45 |
| Landscape Architectural Services | 251 | 1181 | 21.25 |
| Other Foundation, Structure, and Building Exterior Contractors | 153 | 721 | 21.22 |
| Nursery, Garden Center, and Farm Supply Stores | 137 | 653 | 20.98 |
| Private Mail Centers | 141 | 680 | 20.74 |
| Baked Goods Stores | 152 | 736 | 20.65 |
| Wired Telecommunications Carriers | 53 | 257 | 20.62 |
| Other Building Finishing Contractors | 176 | 857 | 20.54 |
| Sporting and Recreational Goods and Supplies Merchant Wholesalers | 160 | 782 | 20.46 |
| Other Support Activities for Road Transportation | 45 | 221 | 20.36 |
| Sign Manufacturing | 185 | 913 | 20.26 |
| Concrete Contractors | 287 | 1425 | 20.14 |
| Beauty Salons | 1522 | 7559 | 20.13 |
| Commercial Screen Printing | 147 | 737 | 19.95 |
| Freight Transportation Arrangement | 139 | 697 | 19.94 |
| All Other Consumer Goods Rental | 83 | 423 | 19.62 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| All Other Automotive Repair and Maintenance | 216 | 1106 | 19.53 |
| Wine and Distilled Alcoholic Beverage Merchant Wholesalers | 62 | 318 | 19.50 |
| Car Washes | 300 | 1548 | 19.38 |
| Motor Vehicle Towing | 153 | 791 | 19.34 |
| Diagnostic Imaging Centers | 67 | 347 | 19.31 |
| Commercial Bakeries | 96 | 498 | 19.28 |
| Fine Arts Schools | 95 | 495 | 19.19 |
| All Other Specialty Trade Contractors | 1328 | 6938 | 19.14 |
| Other Individual and Family Services | 72 | 378 | 19.05 |
| Software Publishers | 78 | 410 | 19.02 |
| Fresh Fruit and Vegetable Merchant Wholesalers | 66 | 348 | 18.97 |
| Industrial Building Construction | 81 | 427 | 18.97 |
| Other Industrial Machinery Manufacturing | 50 | 266 | 18.80 |
| Electrical Contractors and Other Wiring Installation Contractors | 815 | 4349 | 18.74 |
| General Freight Trucking, Long-Distance, Truckload | 825 | 4403 | 18.74 |
| Electronic Shopping and Mail-Order Houses | 294 | 1579 | 18.62 |
| Hardware Stores | 208 | 1118 | 18.60 |
| Exterminating and Pest Control Services | 84 | 453 | 18.54 |
| Services for the Elderly and Persons with Disabilities | 68 | 368 | 18.48 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Used Merchandise Stores | 132 | 716 | 18.44 |
| Commercial and Institutional Building Construction | 385 | 2093 | 18.39 |
| Coin-Operated Laundries and Drycleaners | 293 | 1595 | 18.37 |
| Sports and Recreation Instruction | 215 | 1171 | 18.36 |
| Commercial Printing (except Screen and Books) | 498 | 2725 | 18.28 |
| Automotive Oil Change and Lubrication Shops | 74 | 406 | 18.23 |
| Sporting Goods Stores | 494 | 2711 | 18.22 |
| Limited-Service Restaurants | 3475 | 19085 | 18.21 |
| Retail Bakeries | 175 | 966 | 18.12 |
| Full-Service Restaurants | 4138 | 22965 | 18.02 |
| Roofing Contractors | 220 | 1256 | 17.52 |
| Tire Dealers | 77 | 440 | 17.50 |
| Automotive Body, Paint, and Interior Repair and Maintenance | 429 | 2474 | 17.34 |
| All Other Miscellaneous Schools and Instruction | 165 | 953 | 17.31 |
| Barber Shops | 133 | 770 | 17.27 |
| Support Activities for Animal Production | 38 | 220 | 17.27 |
| Specialized Freight (except Used Goods) Trucking, Local | 270 | 1567 | 17.23 |
| Fitness and Recreational Sports Centers | 860 | 4998 | 17.21 |
| Custom Computer Programming Services | 355 | 2076 | 17.10 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| All Other Amusement and Recreation Industries | 326 | 1912 | 17.05 |
| Site Preparation Contractors | 356 | 2126 | 16.75 |
| Industrial Machinery and Equipment Merchant Wholesalers | 101 | 607 | 16.64 |
| General Automotive Repair | 1073 | 6470 | 16.58 |
| Elementary and Secondary Schools | 35 | 213 | 16.43 |
| Optical Goods Stores | 45 | 275 | 16.36 |
| Other Electronic and Precision Equipment Repair and Maintenance | 37 | 228 | 16.23 |
| Meat and Meat Product Merchant Wholesalers | 47 | 292 | 16.10 |
| Power and Communication Line and Related Structures Construction | 41 | 255 | 16.08 |
| Insurance Agencies and Brokerages | 539 | 3367 | 16.01 |
| Plumbing, Heating, and Air-Conditioning Contractors | 899 | 5659 | 15.89 |
| Other Direct Selling Establishments | 160 | 1008 | 15.87 |
| Landscaping Services | 1020 | 6449 | 15.82 |
| Sheet Metal Work Manufacturing | 41 | 265 | 15.47 |
| Computer Systems Design Services | 394 | 2563 | 15.37 |
| Water and Sewer Line and Related Structures Construction | 71 | 463 | 15.33 |
| Sporting and Athletic Goods Manufacturing | 37 | 243 | 15.23 |
| All Other Professional, Scientific, and Technical Services | 461 | 3030 | 15.21 |
| Convenience Stores | 515 | 3386 | 15.21 |
| Child Day Care Services | 660 | 4367 | 15.11 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Testing Laboratories | 30 | 201 | 14.93 |
| Farm Supplies Merchant Wholesalers | 30 | 202 | 14.85 |
| Data Processing, Hosting, and Related Services | 94 | 639 | 14.71 |
| Other Computer Related Services | 323 | 2212 | 14.60 |
| Medical Laboratories | 45 | 309 | 14.56 |
| Bowling Centers | 48 | 334 | 14.37 |
| Ambulance Services | 35 | 246 | 14.23 |
| Drinking Places (Alcoholic Beverages) | 383 | 2692 | 14.23 |
| Other Commercial and Industrial Machinery and Equipment Rental and Leasing | 64 | 459 | 13.94 |
| Gasoline Stations with Convenience Stores | 798 | 5737 | 13.91 |
| General Rental Centers | 37 | 268 | 13.81 |
| Offices of All Other Miscellaneous Health Practitioners | 207 | 1517 | 13.65 |
| Nursing Care Facilities | 34 | 253 | 13.44 |
| Research and Development in the Physical, Engineering, and Life Sciences | 31 | 234 | 13.25 |
| Commercial and Industrial Machinery and Equipment (except Automotive and Electronic) Repair and Maintenance | 164 | 1244 | 13.18 |
| Other Scientific and Technical Consulting Services | 138 | 1047 | 13.18 |
| Offices of Chiropractors | 611 | 4665 | 13.10 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| All Other Miscellaneous General Purpose Machinery Manufacturing | 31 | 238 | 13.03 |
| Surveying and Mapping (except Geophysical) Services | 28 | 215 | 13.02 |
| All Other Miscellaneous Fabricated Metal Product Manufacturing | 104 | 817 | 12.73 |
| Offices of Physicians, Mental Health Specialists | 49 | 386 | 12.69 |
| Offices of Certified Public Accountants | 324 | 2582 | 12.55 |
| Fabricated Structural Metal Manufacturing | 42 | 341 | 12.32 |
| Metal Service Centers and Other Metal Merchant Wholesalers | 29 | 239 | 12.13 |
| All Other Plastics Product Manufacturing | 69 | 574 | 12.02 |
| Pet Care (except Veterinary) Services | 200 | 1668 | 11.99 |
| Beer, Wine, and Liquor Stores | 501 | 4217 | 11.88 |
| Food Service Contractors | 86 | 727 | 11.83 |
| Offices of Podiatrists | 31 | 263 | 11.79 |
| Industrial Supplies Merchant Wholesalers | 52 | 444 | 11.71 |
| Fuel Dealers | 33 | 288 | 11.46 |
| Mobile Food Services | 64 | 565 | 11.33 |
| Offices of Mental Health Practitioners (except Physicians) | 54 | 477 | 11.32 |
| Logging | 50 | 444 | 11.26 |
| Engineering Services | 288 | 2575 | 11.18 |
| Environmental Consulting Services | 54 | 500 | 10.80 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Solid Waste Collection | 51 | 480 | 10.62 |
| Highway, Street, and Bridge Construction | 77 | 772 | 9.97 |
| Wineries | 20 | 210 | 9.52 |
| Offices of Lawyers | 451 | 4923 | 9.16 |
| Home Health Care Services | 187 | 2121 | 8.82 |
| Machine Shops | 139 | 1577 | 8.81 |
| Machine Tool Manufacturing | 22 | 250 | 8.80 |
| Other Heavy and Civil Engineering Construction | 46 | 526 | 8.75 |
| Hotels (except Casino Hotels) and Motels | 262 | 3370 | 7.77 |
| Offices of Physical, Occupational and Speech Therapists, and Audiologists | 140 | 1807 | 7.75 |
| Lessors of Nonresidential Buildings (except Miniwarehouses) | 62 | 809 | 7.66 |
| Recyclable Material Merchant Wholesalers | 25 | 347 | 7.20 |
| Funeral Homes and Funeral Services | 44 | 679 | 6.48 |
| Offices of Physicians (except Mental Health Specialists) | 372 | 6683 | 5.57 |
| Chicken Egg Production | 16 | 297 | 5.39 |
| Pharmacies and Drug Stores | 95 | 1809 | 5.25 |
| Offices of Dentists | 372 | 7204 | 5.16 |
| Offices of Optometrists | 65 | 1317 | 4.94 |
| Broilers and Other Meat Type Chicken Production | 79 | 1654 | 4.78 |
| Veterinary Services | 118 | 2732 | 4.32 |

| Business type | Number of chargeoffs (defaults) | Number of loans | % of chargeoffs for 10-year period starting in 2006 |
|---|---|---|---|
| Support Activities for Oil and Gas Operations | 23 | 569 | 4.04 |
| Breweries | 12 | 308 | 3.90 |

For detailed NAICS business descriptions, go to www.naics.com/search/

SOURCE: NerdWallet analysis of data provided by the U.S. Small Business Administration.

## METHODOLOGY

NerdWallet examined the Small Business Administration's records of loans approved in the 7(a) program for the fiscal years 1991-2016 (October 1, 1990, through September 30, 2016). The records were obtained through the SBA.

Records for loans that were canceled before disbursement have been excluded from this analysis.

All analysis of specific years are fiscal years, so 2016 is from Oct. 1, 2015, to Sept. 30, 2016.

Dollar amounts were adjusted for inflation and expressed as 2016 dollars.

**Default rates**

To calculate default rates, we examined all loans that originated and defaulted within a 10-year time frame. For example, 7(a) program loans that originated and failed from 1991 through 2000 saw 11.5% of the loans default; 1992-2001 loans defaulted at a rate of 12.1%, and so forth.

We eliminated loan records missing a North American Industry Classification System (NAICS) code, and incomplete and duplicate records, to yield a total of 1.05 million unique, non-canceled loans. We also eliminated 2016 and 2017 data from the analysis, as those loans are too new for meaningful failure rates. (The average loan went into default 4.7 years after origination in 1991-2015; the median span is 4.1 years before default, our research found.)

To calculate 2006 through 2015 default rates by business category, we eliminated categories that saw fewer than 200 loans during that time frame.

**Loan approval trends**

To examine loan approval trends by business, loan records from 2001 to 2016 were identified by origination year and NAICS type. The remaining 895,746 unique, non-canceled loans were used in this analysis.

Records that had NAICS codes and descriptions from 1997, 2002 and 2007 were updated to correspond with identifying information from the updated 2012 NAICS edition.

To calculate the fastest-growing industries, we compared the number of loans each industry received in the fiscal years 2001, 2011 and 2016. We eliminated any business category that received fewer than 200 loans each of those years.

About the authors: Kevin Voigt is a former investing writer for NerdWallet. He has covered financial issues for more than 20 years, including for The Wall Street Journal and CNN.com. Read more

Caren Weiner Campbell is a former banking and studies writer for NerdWallet. Her work has been featured by Money magazine and The New York Times. Read more

**EXHIBIT P**




**Temple**
**Physicians, Inc.**
Temple University Health System

**TPI Temple Physicians at Wyndmoor**
8200 FLOURTOWN AVENUE
SUITE 5
WYNDMOOR PA 19038
Phone: 215-233-1555
Fax: 215-233-0308

June 6, 2022

Patient:        **Edward Shin**
Date of Birth:        63
Date of Visit:

To Whom It May Concern:

Edward Shin has been my medical patient for over 10 years.  On April 20, 2017 he
suffered a severe injury when he was pushed down the stairs in New York.  At that
time he suffered a subdural hematoma, facial fractures and a left arm fracture.  He
was treated at a local hospital and after discharge came to see me on April 25, 2017.
At that time he was disoriented and I was concerned due to the head injury.  I referred
him to Temple Hospital and he was admitted to the trauma unit.
The patient was then treated for subdural hematoma, fracture of the zygoma which
required surgery, and a left arm fracture.  After these treatments he has continued to
suffer headaches and stress reaction.  His daily headache pain and emotional stress
continue to preclude gainful employment.  He continues to suffer greatly from his
injuries.
He continues to be treated for other chronic problems which include hypertension,
prediabetes, and sleep apnea.

Sincerely,

Simeon L Bardin, MD

EXHIBIT Q

**KIM CHIROPRACTIC**
& REHAB CENTER

T. 215-782-1235
F. 215-782-1239

921 W. Cheltenham Ave. Elkins Park. PA 19027

June 27, 2022

RE:     Mr. Edward Shin

To whom it may concern;

This is to confirm that Mr. Edward Shin is currently a patient receiving care in this office for his ongoing spinal condition due to a catastrophic injury that took place on April 20, 2017.

Mr. Shin was pushed down a steep flight of stairs that resulted in fractured cranium and facial bones. The force of the impact caused a hemorrhage to occur in his brain that required immediate surgery. He also fractured in his left wrist that was also surgically repaired. Although the surgery was successful and he had healed outwardly, Mr. Shin continues to suffer from the aftermath of the injury.

I started seeing Mr. Shin in the latter part of 2018. At the time of his initial visit, Mr. Shin presented with severe neck, shoulder, and upper back injury that was made worse by cervical disc herniations. There were significant decreased ranges of motion to his neck, upper back, left shoulder and torso that prevented him from proper use of his arm and left hand. He also suffered from spinal pain in the cervical, thoracic, and lumbar area. His other symptoms include facial pain and numbness as well as headaches.

Along with Chiropractic spinal manipulations, Mr. Shin also received Acupuncture treatments in order to help him control his pain level without having to rely on high dose pain medications.

These treatments have been helping to keep him functional and to keep his pain level at a manageable level thus far.

Due to the level of trauma experienced, he needed and will continue to require ongoing care to keep his condition stable.

At this time, he is susceptible to aggravations and exacerbations when under stress. He condition also degrades with weather and temperature changes.

He continues to suffer and will surely woren without proper medical care.

Sincerely Yours,

Sang H. Kim, MS., DC

**EXHIBIT R**

\# ███████ 2

8/20/16
2:00 AM

Dear Tony Buttle,

I would like to have my marker for payment plan.

I can pay $5,000 per month So 20 month payment for my marker $100,000. Please accept my offer. Any question, discuss

please call me. 2ot ███████
I can bring $5,000 every month. !!! Start 9/15/2016

Edward E Shin.

0 0 ███████ 42

Please

Ed Shin

* I have to stop gamble. This is way to stop gamble.

SANDS - SHIN, EDWARD - 000250

Because I am

drunk & sick,

No Service at all

Will not pay $90,000

at all.

You have to talk to

my attorney !!!

Good luck!!!

SANDS - SHIN, EDWARD - 000251

USAO_000402924



August 20, 2022

Honorable John P. Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U. S. Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Cronan:

Greeting! I am writing to you in behalf of SORAE International, Inc. (DBA GATE Institute, gateinstitute.org), a non-profit organization dedicated to bringing leadership development and educational excellence to local and global communities. Our most recent effort, "Urban Theological Education Initiative," identified two young African-American scholars in the urban settings of Philadelphia, PA, and empowered their positional leadership by creating full-time teaching posts at a major seminary by which they will influence and train up future leaders in the local communities and beyond.

I want to let you know that, understanding fully that Mr. Edward Shin faced felony charge and was found guilty on his jury trial, we are able to present an opportunity for him to conduct community service in and through our organization. The number of hours of service can be up to 15-hours per week in total of up to 700-hours of service. The work would be in the area of clerical and administrative assistance for our staff as they proceed on multiple educational projects. In particular, we can utilize his service for correspondences and online communications as we continue to address issues pertaining to academic accreditation and institutional advancement. Furthermore, we would be glad to share his hours of service with our partner institutions in the inner-city settings such as *Vocatio* School and *Missio* Seminary in whatever ways they can be benefited by the arrangement.

I will personally administer supervision for his community service along with Prof. Eunjin Kim, our programs director.

Please let me know if there is a need for further explanation of our intent. You can reach me at 267-475-5539 and spark@wts.edu. I am happy to be at your service.

Sincerely,

Dr. S. Steve Park,
President,
SORAE International, Inc.

**42 Crime & Just. 199**

Crime and Justice
2013

Evidence Seldom Matter
Daniel S. Nagin[a1]

Copyright © 2013 by The University of Chicago; Daniel S. Nagin

# DETERRENCE IN THE TWENTY-FIRST CENTURY

## ABSTRACT

The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment. However, the evidence in support of certainty's effect pertains almost exclusively to apprehension probability. Consequently, the more precise statement is that certainty of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent. This conclusion has important policy implications among which are that lengthy prison sentences and mandatory minimum sentencing cannot be justified on deterrence. There are four major research gaps. The first concerns the mechanism by which police affect perceptions of the probability of apprehension. The second concerns the inextricable link between the deterrent effect of the threat of punishment and the potentially criminogenic effect of the experience of punishment. The third concerns the concept of a sanction regime defined by the sanctions legally available and how that legal authority is administered. Theories of deterrence conceive of sanctions in the singular, not the plural, and do not provide a conceptual basis for considering the differential deterrent effects of different components of the sanction regime. The fourth involves sanction risk perceptions. Establishing the link between risk perceptions and sanction regimes is imperative; unless perceptions adjust, however crudely, to changes in the sanction regime, desired deterrent effects will not be achieved.

Three enduring questions have occupied centuries of scholarship on crime and punishment. Does punishment prevent crime? How does punishment prevent crime? And should punishment be used to prevent crime? This essay is concerned with the first two of these questions.

*200 The criminal justice system dispenses justice by apprehending, prosecuting, and punishing individuals who break the law. These activities may prevent crime by three distinct mechanisms: incapacitation, specific deterrence, and general deterrence. Convicted offenders are sometimes punished with imprisonment. Incapacitation concerns crimes averted by their physical isolation during the period of their incarceration. Specific and general deterrence involve possible behavioral responses. General deterrence refers to the crime prevention effects of the threat of punishment. Specific deterrence concerns the aftermath of the failure of general deterrence--the effect on reoffending, if any, that results from the experience of actually being punished.

In this essay, I consider the theoretical and evidentiary basis for general deterrence. In another recent *Crime and Justice* essay (Nagin, Cullen, and Jonson 2009), I surveyed the evidence on the specific deterrence effects of imprisonment. Here, I draw heavily from recent and prior deterrence reviews by me and others.

My aim is to provide a succinct summary of the current state of theoretical and empirical knowledge about deterrence in support of several interrelated objectives. The first is to provide a selective intellectual history of deterrence research that identifies important recurring themes. I highlight both what has been learned and persistent flaws that should be addressed in future research.

The second objective concerns the framing of discourse on deterrence, which often takes the same pattern, particularly in policy discussions: one group arguing that sanction threats always deter and another group arguing that sanction threats never deter. When deterrence effects are unpacked, it is clear that sanction threats are not universally efficacious: magnitudes of deterrent effects range from none to seemingly very large. Thus, another primary objective is to move discourse about deterrence away from the equally indefensible positions that deterrence effects are always or never present to a more nuanced and useful inquiry into the basis for variation in the existence and size of deterrent effects.

The third objective is policy related. Prison populations have been rising in the United States for four decades. Only recently have there been signs that the increase is abating. In 2009 and 2010, state-level prison population declined but federal-level population continued to increase (Bureau of Justice Statistice 2012). Less well recognized is that prison populations have risen elsewhere in the world, for example, in **201** the Netherlands since 1975 and more recently in England and Wales, Portugal, Spain, and New Zealand. An incarceration-based sanction policy that reduces crime solely by incapacitation will necessarily increase the rate of imprisonment. In contrast, if the crime control policy also prevents crime by deterrence, it may be possible to reduce both imprisonment and crime; successful prevention by any mechanism, whether by deterrence or otherwise, has the virtue of averting not only crime but also the punishment of perpetrators. Hence, it is important to identify policies that increase imprisonment but have only negligible effects on crime rates.

My main conclusions are as follows: First, there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs. Such severity-based deterrence measures include "three strikes, you're out," life without the possibility of parole, and other laws that mandate lengthy prison sentences.

Second, on the basis of the earlier noted *Crime and Justice* review (Nagin, Cullen, and Jonson 2009), I have concluded that there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that that reoffending is either unaffected or increased.

Third, there is substantial evidence that increasing the visibility of the police by hiring more officers and allocating existing officers in ways that materially heighten the perceived risk of apprehension can deter crimes. This evidence is consistent with the perceptual deterrence literature that surveys individuals on sanction risk perceptions and relates these perceptions to their actual or intended offending behavior. This literature finds that perceived certainty of punishment is associated with reduced self-reported or intended offending.

Thus, I conclude, as have many prior reviews of deterrence research, that evidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. However, the certainty of punishment is conceptually and mathematically the product of a series of conditional probabilities: the probability of apprehension given commission of a crime, the probability of prosecution given apprehension, the probability of conviction given prosecution, and the probability of sanction given conviction. The evidence in support of certainty's deterrent **202** effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent. This more precise statement has important policy implications; the empirical evidence from the policing and perceptual deterrence literature is silent on the deterrent effectiveness of policies that mandate incarceration after apprehension. These include policies such as mandatory minimum sentencing laws or sentencing guidelines that mandate incarceration. Thus, this revised conclusion about the deterrent effect of punishment certainty should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects.

Together these conclusions have a range of policy implications, particularly as they relate to the United States (Durlauf and Nagin 2011*b*). First, it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis. Thus, the case for crime prevention benefits of measures requiring lengthy prison sentences such as California's three-strikes law must rest on incapacitation. Another implication is that crime prevention would be enhanced by shifting resources from imprisonment to policing or, in periods of declining criminal justice system budgets, that policing should get a larger share of a smaller overall budget.

While accumulation of knowledge about deterrence in the past four decades has been impressive, much remains to be learned. There are four major theoretical and related empirical gaps. The first concerns the deterrent effect of the certainty of apprehension. There are two distinct mechanisms by which the police may deter crime. One stems from their effectiveness in apprehending perpetrators of crimes; by definition this activity involves occurrences in which deterrence has failed. Thus, police effectiveness in successfully apprehending criminal perpetrators can have a deterrent effect only on others or on the perpetrator's future behavior. The second mechanism involves the effect of the intensity of police presence in creating a perception that apprehension risk is sufficiently high that no crime is committed in the first place. I speculate that this second mechanism is the primary source of police effectiveness in deterring crime whereas the first role primarily prevents crime by capturing and incapacitating crime-prone individuals. The research gap involves developing rigorous empirical tests of **203** this contention and developing improved theoretical models of how police presence and tactics can reduce the attractiveness of criminal opportunities by increasing the perceived risk of apprehension.

The second gap concerns the distinction between specific and general deterrence. The two are inextricably linked because the experience of punishment is a consequence of the failure of the threat of punishment to deter crime, yet no theory of deterrence explicitly addresses how the experience of punishment influences the deterrent effect of the threat of punishment. Relevant issues include how the experience of punishment affects the proclivity to commit crime due to potential stigma effects, sustained contacts with criminals in a prison setting, or participation in rehabilitative programs as well as the effect of the experience of punishment on perceptions of the certainty and severity of sanctions. Analysis of these and other related issues will require longitudinal data on individuals who do and do not have the experience of punishment.

The third theoretical gap concerns the concept of a sanction regime. A sanction regime defines the sanctions that are legally available for the punishment of various types of crime and how that legal authority is administered. Depending on the crime and characteristics of the offenders, such as age or prior record, available sanctions range in severity from verbal reprimands to fines and different forms of community service to lengthy terms of imprisonment and execution. How the legal authority is administered determines the relative frequency with which the available sanction options are used and also the swiftness of their application. Thus, both dimensions of the sanction regime-- the legal authority for different types of sanctions and how that authority is administered--combine to determine the certainty, severity, and celerity of sanctioning options available for punishment of a specific type of crime.

Theories of deterrence, however, specify sanction threats in the singular, not the plural. For example, a sizable number of studies examine the question whether capital punishment deters murder. Yet properly understood, the relevant question is the differential or marginal deterrent effect of execution over the deterrent effect of other available or commonly used penalties. In this case the alternative penalty would be a lengthy prison sentence--sometimes life without the possibility of parole. Yet none of the capital punishment studies take account of differences across states and over time in the severity of noncapital punishments **204** for murder (Nagin and Pepper 2012). Theories of deterrence that conceive of sanctions in the singular do not provide a conceptual basis for considering the differential deterrent effect of different types of sanction options. The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes. At least in the United States, such data are largely unavailable.

The fourth theoretical and empirical gap involves sanction risk perceptions, an issue that I emphasized in an earlier review of the deterrence literature (Nagin 1998). Deterrence is the behavioral response to the perception of sanction threats. Establishing the link between risk perceptions and sanction regimes is imperative; the conclusion that crime decisions are affected by sanction risk perceptions is not sufficient to conclude that policy can deter crime. Policy cannot directly manipulate perceptions. It can affect only the variety and severity of sanctions legally available in the sanction regime and the manner of their administration. Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved.

Since the publication of Nagin (1998), valuable headway has been made in how the experience of apprehension or not following commission of a crime affects sanction risk perceptions. This research is valuable for specification of a theory that combines the concepts of general and specific deterrence. However, it does not address how perceptions are formed about the two key dimensions of a sanction regime: the legal authority for different types of sanctions and how that authority is administered. Numerous surveys have been conducted of the general public's knowledge of sanction regimes, especially concerning the legal authority for different types of sanctions (Apel 2013). Not surprisingly, the surveys find that knowledge of sanction regimes is poor. However, the fundamental flaw with these surveys is that knowledge of the potential legal consequences of lawbreaking is unnecessary for most people; their decisions to refrain from crime are based on the mere knowledge that the behavior is legally prohibited or for other nonlegal considerations such as morality or fear of social censure (Packer 1968; Zimring and Hawkins 1973; Andenaes 1974; Wikstrom et al. 2012). That said, for individuals for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration. More than a decade after my **\*205** earlier review, it remains the case that little is known about how individuals form perceptions of the sanction regimes they confront.

This essay is organized in the following sections. Key concepts of deterrence are discussed in Section I, where I also set out a simplified model of deterrence that is referred to throughout the essay. Section II provides a brief summary of the themes, conclusions, and flaws of research on the deterrent effects of prison and the police up to about 1990. In Section III, I summarize the evidence on the deterrent effects of capital punishment. I discuss the capital punishment literature separately because of its distinctive features and salience. I then examine in Section IV post-1990 studies of the crime prevention effects of imprisonment and in Section V post-1990s studies of the police effects on crime. Section VI discusses the survey-based literature on the accuracy of sanction risk perceptions, their formation, and their relationship to self-reported criminality. Section VII offers conclusions.

## I. Key Concepts

Deterrence is a theory of choice in which would-be offenders balance the benefits and costs of crime. Benefits may be pecuniary, as in the case of property crime, but may also involve intangible benefits such as defending one's honor, expressing outrage, demonstrating dominance, cementing a reputation, or seeking a thrill. The potential costs of crime are comparably varied. Crime can entail personal risk if the victim resists. It may also invoke pangs of conscience or shame (Braith-waite 1989). I am mainly concerned with offender responses to the costs that attend the imposition of official sanctions such as arrest, imprisonment, execution, fines, and other restrictions on freedom and liberty such as mandated drug testing or electronic monitoring.

The origins of most modern theories of deterrence can be traced to the work of the Enlightenment-era legal philosophers (Beccaria 1764; Bentham 1789). The motivation for their work was their mutual abhorrence of the administration of punishment without constructive purpose. For them the constructive purpose was preventing crime. As Beccaria observed, "it is better to prevent crimes than punish them" ([1764] 1986, p. 93). Beccaria and Bentham argued that there are three key ingredients to the deterrence process: the severity, certainty, and celerity of punishment. These concepts, particularly the certainty and severity of punishment, form the foundation of nearly all contemporary **\*206** theories of deterrence. The enduring impact of their thinking is remarkable testimony to their innovation.

The theory of deterrence is predicated on the idea that if state-imposed sanction costs are sufficiently severe, criminal activity will be discouraged, at least for some. Thus, one of the key concepts of deterrence is the severity of punishment. Severity alone, however, cannot deter. There must also be some possibility that the sanction will be incurred if the crime is committed. Indeed the argument that the probability of punishment, not severity, is the more potent component of the deterrence process goes back to Beccaria, who observed that "one of the greatest curbs on crime is not the cruelty of punishments, but their infallibility .... The certainty of punishment even if moderate will always make a stronger impression" ([1764] 1986, p. 58).

In the lifetimes of Beccaria and Bentham there was no criminal justice system as we know it. Punishment for lawbreaking was almost certainly less regular and more haphazard than it is today. Punishment in contemporary society, however, also still remains far from guaranteed. In order for a formal sanction--whether moderate or severe--to be imposed, the offender must first be apprehended, usually by the police.[1] He must next be charged and successfully prosecuted and, finally, sentenced by the judge. Successful passage through all of these stages is far from certain. The most important set of actors

affecting certainty is the police: without detection and apprehension, there is no possibility of conviction or punishment. For this reason special attention is given to discussing what is known about the deterrent effect of police activities and presence.

The third conceptual component of the theory of deterrence advanced by Bentham and Beccaria is the swiftness of punishment, which Bentham referred to as celerity. Celerity is the least studied of the conceptual troika underlying deterrence theory. The theoretical basis for its effect on deterrence is ambiguous, as is the empirical evidence on its effectiveness. Even Beccaria seemed to base his case for celerity more on normative considerations of just punishment than on deterrence effectiveness. He observed that "the more promptly and the more closely punishment follows upon the commission of a crime, the more just and useful will it be. I say more just, because the criminal is **207** thereby spared the useless and cruel torments of uncertainty, which increase with the vigor of imagination and with the sense of personal weakness" (Beccaria [1764] 1986, p. 36).

In 1968 economist Gary Becker published the first modern formalization of the Beccaria-Bentham conception of the deterrence process (Becker 1968). Since then, other formalizations have appeared in economics, criminology, law, and sociology--some in the form of mathematical models and others in the form of nonmathematical conceptual theories (Cornish and Clarke 1986).

For the purposes of this essay still another formalization is provided. I have two purposes. One is to provide a conceptual structure for framing results that are well established in the literature. The second is more ambitious. I earlier indicated that the seemingly greater deterrent effect of certainty rather than severity of punishment reflected a response to the certainty of apprehension. In this regard, I distinguished two distinct functions of the police: apprehending the perpetrators of crime and serving in a sentinel function that deters crime from happening in the first place. The second purpose is to formalize this distinction. In so doing I link situational crime prevention theory with deterrence theory.

Bentham's conception of criminal choice involved the would-be of- • fender balancing the potential pains of punishment against the pleasures of the offense. In this spirit the model formalizes the decision of a would-be offender to victimize a potential criminal opportunity, whether that opportunity is a person in the form of a potential robbery victim or property that might be stolen or vandalized.

The choice model is depicted in figure 1. It distinguishes four possible outcomes if the target is victimized: the criminal act is successfully completed, the act is not successfully completed and the perpetrator is not apprehended, the act is not successfully completed and the perpetrator is apprehended but not convicted, and the act is not successfully completed and the perpetrator is both apprehended and convicted. The probability of each of these outcomes is determined by the following probabilities.

*Perceived Probability of Successful Completion of the Act*. This probability, which is denoted by $P_s$, measures the would-be offender's perception of the chances the target can be successfully victimized. This perception will be affected by how effectively the opportunity is protected. For property targets, the level of protection is determined by **208** technological safeguards such as alarm and surveillance systems and use of physical protection such as locked showcases. For human targets, the protection level is affected by the care with which valuable property is secured, for example, by keeping it out of sight. Protection may also be provided by what Cohen and Felson (1979) call capable guardians such as security guards, vigilant employees, or onlookers who are willing to intervene. Importantly, the police may also serve as a guardian. I refer to police as acting as sentinels when acting in this role. An idling police car outside a liquor store greatly reduces the chance, probably to zero, that the store can be successfully robbed. This brings me to the risk of apprehension.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Fig. 1.--The decision to victimize a target**

*Perceived Probability of Apprehension Given Noncompletion*. Police perform another crime control function that is distinct from their role as official guardians. They apprehend those offenders who chose to act on a criminal opportunity. When acting in this role, police are described as "apprehension agents." The sentinel and apprehension roles of the police are conceptually linked but distinct. They are conceptually linked because botli roles are based on the legal authority of the

police to arrest persons suspected of committing a crime. Because a contributing factor to $P_s$ is the risk of apprehension, arrest authority is one source of police influence on $P_s$ in their sentinel role. However, the sentinel role of police is distinct from their apprehension role because the latter comes into play only when deterrence has failed and a **209** would-be offender becomes an actual offender. Thus, at one moment police can be functioning as a sentinel and in the next moment they can be acting as an apprehension agent. The would-be offender's perception of the probability of apprehension given commission of the crime is denoted by $P_a$.

In this model I assume that the risk of apprehension is limited to acts that are not successfully completed. I make this assumption for several reasons. First, it is useful for clarifying the distinction between police acting as sentinels and police acting as apprehension agents. Second, it conforms to the seeming reality that most offenders are apprehended at the scene of the crime or soon thereafter. I say seeming because I have been able to identify only two studies (Greenwood, Chaiken, and Petersilia 1977; Blake and Coupe 2001) that report relevant data. Data reported in both support this assumption.

*Perceived Probability of Conviction Given Apprehension*. The offender's perception of the probability that apprehension will actually result in conviction is denoted by $P_{c|a}$.

Under this setup, the probability of successful completion is $P_s$, the probability of nonsuccessful completion but with apprehension avoidance is $(1-\text{i})(1-P_a)$, the probability of nonsuccessful completion followed by apprehension but not conviction is $(1-P_s)(P_a)(1-P_{c|a})$, and the probability of nonsuccessful completion followed by apprehension and conviction is $(1 - P_s)(P_a)(P_{c|a})$.

The benefits and costs of each of these outcomes are assumed to be determined by the following factors:

• *Rewards*. Rewards measures the total benefits of victimizing a target. For a crime with a property motive, the value of the property to the perpetrator likely accounts for all or a major share of the total reward. However, the thrill of offending or--in the case of violent crimes without a property motive--the satisfaction of humiliating, physically hurting, or killing the victim may also be relevant to the reward value of a target.

• *Crime commission cost*. Crime commission cost measures the total cost of committing the crime separate from the sanction cost defined below. Commission cost includes time searching for the opportunity, planning time, if any, and the effort required to commit the crime itself. Importantly, it also includes the potential costs to the perpetrator of victim retaliation or resistance. Finally, commission cost includes Raskolnikov-like feelings of guilt or shame that **210** may affect the perpetrator, whether or not he is apprehended and sanctioned.

• *Perceived formal sanction cost*. Perceived sanction cost measures the would-be perpetrator's assessment of the formal sanction cost that might be imposed if convicted. These costs include the loss of freedom if imprisoned and the unpleasantness of other restrictions on freedom due to conditions of parole or probations and fines.

• *Perceived informal sanction cost*. The imposition of formal sanctions may also trigger informal sanctions by family, friends, and the community at large, which for some offenders may be even more costly than the formal sanctions. Informal sanction cost may also involve large economic costs due to job loss.

• *Perceived cost of apprehension*. Apprehension imposes costs that are distinct from formal and informal sanction costs. These include the unpleasantness of the apprehension itself, possible loss of liberty due to pretrial detention, and legal fees. Perceived cost of apprehension also includes the social and economic costs triggered by arrest, even without conviction, such as disapproval of family, friends, and the community at large, as well as job loss.

At the end of each branch, figure 1 shows the costs that attend the various forms of an unsuccessful attempt or the benefit of a successful attempt. If the individual chooses to act on a criminal opportunity, the benefits and costs of the four possible outcomes and their attendant probabilities are as follows:

1. The offender successfully completes the criminal act. This occurs with probability $P_s$, and the net benefit to the offender is reward less commission cost. Thus, the expected benefit of victimization is $P_s$(Reward--Commission Cost), which is denoted as $P_s$(R - CC).

2. The offender is not successful and is not apprehended. This occurs with probability $(1-P_s)(1 - P_a)$. The cost to the offender is that much, or all, of the commission cost is incurred but with no reward. For simplicity it is assumed that all of the commission cost is incurred. Thus, the contribution of this outcome to expected cost is $(1-P_s)(1 - P_a)$(Commission Cost), which is denoted as $(1 - P_s)(1 - P_a)$CC.

3. The offender is not successful and is apprehended but is not convicted and formally sanctioned. This occurs with probability **211** $(1-P_s)(P_a)(1- P_{a|c})$. In this case the cost to the offender is commission cost plus apprehension cost. Thus the contribution of this outcome to expected cost is $(1 - P_s)(P_a)(1-P_{c|a})$(Commission Cost + Apprehension Cost), which is denoted as $(1 - P)(P_a)(1 - P_{c|a})$(CC + AC). Because, as already noted, most apprehensions occur at the scene of the crime or shortly thereafter, it is assumed that the perpetrator does not have the opportunity to enjoy the rewards provided by the act.

4. The offender is not successful but is apprehended, convicted, and formally sanctioned. This occurs with probability $(1 -P_s)(P_a)(P_{c|a})$. In this case the cost to the offender is commission cost plus apprehension cost plus formal and informal sanction cost. Thus, the contribution of this outcome to expected cost, again assuming that the rewards are not enjoyed, is $(1 - P_s)(P_a)$ $[P_{c|a}$(Commission Cost + Apprehension Cost + Formal Sanction + Informal Sanction Cost)], which is denoted as $(1 -P_s)(P_a)(P_{c|a})$(CC + AC + FS + ISC).[2]

An arrow at the top of figure 1 highlights that the possible events depicted occur over time. Success or failure at completion is typically immediate, whereas the down tree events occur later, often months after the criminal event in the case of conviction and sentencing. I return to this observation in the discussion of the celerity of punishment.

It is assumed that the crime will be committed if the expected benefits from a successful completion exceed the expected cost of an unsuccessful attempt, namely, if

$$P_s(R - CC) > (1 - P_s)(1 - P_a)CC + (1 - P_s)(P_a)(1 - P_{c|a})(CC + AC)$$
$$+ (1 - P_s)(P_a)(P_{c|a})(CC + AC + FS + ISC)$$

(1)

An equivalent form of this relationship moves $P_s$ on the left-hand side to the right-hand side, in which case the crime will be committed if

$$(R - CC) > (1 - P_s) \Big[ (1 - P_a)CC + (P_a)(1 - P_{c|a})(CC + AC) + (P_a)(P_{c|a})(CC + AC + FS + ISC) \Big] \quad (2)$$

The left-hand side of equation (2) measures the net benefits of committing **\*212** the crime and the right-hand side measures the costs. Several observations about this relationship are relevant to the remainder of the discussion.

First, unless the net benefit of crime commission is positive (i.e., $R - C > 0$),[3] the offense will not be committed regardless of the formal and informal sanction costs specified on the right-hand side of equation (2). Particularly if commission cost is understood to include the shame of committing an act that involves taking another person's property or doing violence to that person, for most people sanction costs are irrelevant to the decision to refrain from crime. For example, Bachman, Paternoster, and Ward (1992) found in a study of sexual assault that sanction risk perceptions were relevant to self-reported intentions to offend only for the least morally committed. The absence of an effect for those with higher levels of moral commitment, however, should not be construed as their being impervious to incentives but to their moral commitment being a sufficient basis for refraining from sexual assault.[4] This elementary but fundamental point has been made repeatedly in the discussion about the degree to which sanction threats affect behavior among different individuals. See, for example, Zimring and Hawkins (1973) and more recently Piquero et al. (2011) and Wikstrom et al. (2012). I return to this point in the discussion of sanction risk perceptions and their influence on behavior in Section VI.

Second, the bottom three branches of the tree pertain to the consequences of failure to complete the crime. Commission cost contributes to the total cost of all three of these branches, apprehension cost contributes to two of the three branches--apprehension with and without conviction--and informal and formal sanction costs contribute only to the final branch, apprehension with conviction. This implies that increases in perceived commission cost will have a greater deterrent effect than equal increases in either perceived apprehension cost or perceived formal and informal sanction costs. In turn the structure of the tree implies that increases in apprehension cost will have a greater effect than equal increases in either formal or informal sanction cost. This observation helps to explain the longstanding conclusion from the perceptual deterrence literature that shame, a key component of commission cost and apprehension cost, plays a more **\*213** decisive role in the deterrence process than sanction cost. This issue is discussed further in Section III. It also explains the seeming effectiveness of situational crime prevention tactics, a topic I allude to in Section V.

Third, the structure of the tree also implies that decreases in $P_s$ will have larger deterrent effects than equal-sized increases in either $P_a$ or $P_{c|a}$ and that increases in $P_a$ will have a bigger deterrent impact than an equal increase in $P_{c|a}$. This observation is consistent with the longstanding belief dating back to Beccaria that the certainty of punishment is a more effective deterrent than the severity of punishment. However, I earlier noted that the evidence suggests that a more precise statement of the certainty conclusion pertains to the certainty of apprehension. The decision model laid out here provides a still more precise statement of that conclusion. Decreases in $P_s$ provide more effective deterrence than equal increases in $P_a$. Concerning the distinction between police serving as sentinels or as apprehension agents, when serving in their role as sentinels, they affect $P_s$, whereas when serving as apprehension agents, they affect $P_a$. This implies that the sentinel role of policing is more effective in deterring crime than their apprehension agent role. This observation is relevant to the discussion in Section V of the varying findings on police effectiveness in preventing crime.

## II. Deterrence Research to the 1990s

Empirically based deterrence research began in earnest in the late 1960s. There were three major instigators. One was technological: the growing availability of computers and statistical software for analyzing crime data, which were also growing in availability. The second was social: the steady growth of crime rates during the 1960s. The third was intellectual, especially within economics, with the publication in 1968 of Becker's seminal article "Crime and Punishment: An Economic Approach."

Deterrence studies up to the 1990s are usefully grouped into three categories: experimental and quasi-experimental studies, aggregate studies, and perceptual deterrence studies. My 1998 *Crime and Justice* review provided an extended discussion of the three types of studies (Nagin 1998). This section summarizes conclusions of the experimental and quasi-experimental

studies and aggregate studies of this research era that are most relevant to this review. Because of the persistence of **214** themes in the pre- and post-1990s perceptual deterrence research and the continuity of the research methods used, I discuss this body of research without reference to era in Section VI.

### A. Experimental and Quasi-Experimental Studies

This category of studies examines the effect of targeted policy interventions such as police crackdowns or implementation of statutes changing penalties. In the experimental studies the intervention and control treatments are randomly assigned. A classic example is the Minneapolis Domestic Violence Experiment (Sherman and Berk 1984) in which police responded to misdemeanor incidents of domestic violence with one of three randomly chosen responses. The arrest response was found to be most effective in preventing recidivism, but as discussed in Section V, this finding was not consistent across replications of the experiment in other localities.

True experiments, however, compose only a small fraction of the studies in this category. Most are quasi experiments. The best-designed quasi-experimental studies attempt to incorporate important features of a true experiment: a well-defined treatment regime, measurement of response before and after treatment, and a control group. Two classic studies of this genre are Ross's studies of the effects on drunk driving of the British Road Safety Act (Ross 1973) and of Scandinavianstyle drunk driving laws. Most studies in this group examine the effects of police crackdowns on drug markets, disorderly behavior, and drunk driving. Excellent reviews of these studies are available in Sherman (1990) and Ross (1982). Both Sherman and Ross conclude that the interventions were generally successful in generating an initial deterrent effect. For instance, in drunk-driving interventions, this was evidenced by a reduction in fatalities in which the driver was intoxicated or in drug market crackdowns by reduced dealing. However, they also concluded that the effect was generally only transitory: the initial deterrent effect typically began decaying even while the intervention was in effect. One exception to this finding of at least initial deterrent effectiveness concerned studies of increases in sentence severity. Ross (1982) discusses the ineffectiveness of severity enhancements in three very different places: Finland, Chicago, and New South Wales, Australia. Evidence even of an initial effect is less consistent than in studies of interventions that increased the certainty of apprehension.

I take away three important lessons from this literature. First, the **215** generally more consistent findings of initial effectiveness in the apprehension-based interventions, compared to the severity-based interventions, provide more evidence in support for my modified version of the certainty effect, namely, that certainty of apprehension is a more effective deterrent than the severity of the ensuing legal consequences, but with an important proviso. Ross (1982) attributed the ineffectiveness of severity-enhancing policies to the fact that they trigger a system response that reduced certainty of punishment. He pointed out that if judges or juries believed the penalties too harsh, they may have responded by refusing to convict guilty defendants. Police and prosecutors may respond similarly. Thus, any potential deterrent effect of the severity enhancement may be canceled by the reduction in certainty. This result is a reminder not only of the difficulty of enforcing penalties that are deemed unjust but also that certainty and severity do not operate independently--they interact. Tonry (2009) forcefully elaborates on many of these points.

Second, Sherman (1990) offers useful nomenclature for describing the finding of only transitory effects. He uses the term "initial deterrence decay" to describe the decline in the deterrent response as "potential offenders learn through trial and error that they had overestimated the certainty of getting caught at the beginning of the crackdown" and "residual deterrence," which is a crime suppression effect that extends beyond the intervention until offenders learn by experience or word of mouth that "it is once again 'safe' to offend" (p. 10). Sherman's observations are a reminder that deterrence is a perceptual phenomenon. In Sherman (1990) and Nagin (1998), we both discuss the decay of initial deterrence as a possible response to what behavioral economists call ambiguity aversion. People consistently prefer gambles in which the risks are clearly comprehensible compared to equivalent gambles in which the risks are less transparent. Initial deterrence may be a response to perceptions of uncertainty about true risk rather than to any change in the true risk of apprehension. Thus, unless policy can affect perceptions, there will be no behavioral response. It is also a reminder that perceptions may be updated in response to cues from the environment and therefore will not necessarily be stable. I return to this important issue in the discussion of the perceptions studies in Section VI.

Third, the findings from these studies have stood the test of time. In my judgment, well-conducted experimental and quasi-experimental **216** studies of deterrence provide the most convincing evidence of the circumstances under which deterrence is and is not effective. This holds for both the post-1990s and the pre-1990s literatures.

### B. Aggregate Studies

The pre-1990s aggregate studies generally analyzed the association of crime rates across geographic units, usually states, with measures of the certainty and severity of punishment. The most basic form of these analyses involved bivariate correlations across states of crimes rates for the crime categories composing the FBI part I crime index (e.g., murder and nonnegligent homicide, robbery, burglary) with certainty of punishment, measured by prison admissions per reported crime, and severity of punishment, measured by median time served. More elaborate analyses were conducted in a regression format. These analyses added various state characteristics known to be correlated with crime (e.g., age and racial composition, urbanization) to the base regression model relating crime rate to the certainty and severity measures. Negative and significant associations were generally found between the crime rate and the certainty of imprisonment ratio. The association of time served with the crime rate was generally insignificant.

Reviews of these studies, including a high-visibility National Research Council (NRC) report (Blumstein, Cohen, and Nagin 1978), concluded that the aggregate studies suffered from such grave flaws that they did not provide a basis for valid inference about deterrent effects. Two flaws are particularly noteworthy because they remain relevant to the interpretation of a successor strand of post-1990 aggregate studies discussed in Section IV. The first is that the associations do not distinguish the behavioral response to sanction threats, deterrence, from incapacitation. The second is more fundamental-- distinguishing cause from effect. All forms of nonexperimental data are vulnerable to the criticism that the outcome of interest, in this case the crime rate, is the cause of the predictor of interest, in this case sanctions, and not vice versa. High crime rates, for example, might prompt a police crackdown followed by crime rates declining for other reasons. Cross-polity studies of natural variations in crime rates and sanction levels are particularly vulnerable to this concern because there is generally no basis for assessing whether the variations in sanction levels are the result of factors independent of the crime rate. By contrast, for quasi-experimental **\*217** studies, institutional research can reveal whether the intervention was prompted by rising crime rates.

### III. Capital Punishment

Studies of the deterrent effect of capital punishment have been and continue to be the source of bitter contention. Isaac Ehrlich's 1975 study, in which he concluded that each execution averted seven to eight homicides, is undoubtedly the most-cited study of this kind. The 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and an accompanying commissioned paper (Klein, Forst, and Filatov 1978) laid out a lengthy list of criticisms of the Ehrlich analysis. The NRC report concluded that "available studies [including Ehrlich's] provide no useful evidence on the deterrent effect of capital punishment" (p. 9).

Coincidentally, that report was issued shortly after the 1976 Supreme Court decision *Gregg v. Georgia* ended the moratorium on execution in the United States. In the 35 years since publication of the 1978 report, and more especially in recent years, a considerable number of *post-Gregg* studies have attempted to estimate the effect of the legal status or the actual implementation of the death penalty on homicide rates. These studies have reached widely varying conclusions and have resulted in often bitter disagreement about their interpretation.

This more recent literature has been the subject of still another NRC report titled *Deterrence and the Death Penalty*, which I coedited (Nagin and Pepper 2012), as well as two reviews of the literature commissioned by the NRC committee (Chalfin, Haviland, and Raphael 2013; Charles and Durlauf 2013) and two valuable reviews by Donohue and Wolfers (2005, 2009). The NRC report and all of the reviews are highly critical of the post-Gregg research. The report concluded, "Research to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, the Committee recommends that these studies not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment" (Nagin and Pepper 2012, p. 3).

The NRC report leveled two key criticisms of the post-Gregg capital **\*218** punishment deterrence research that transcend the high-profile but still narrow issue of the deterrent effect of capital punishment. They also apply to studies of the deterrent

effect of other forms of sanction-prison, fines, and community control--that form the backbone of contemporary sanction policy in the United States and most other countries. One

criticism concerned the incomplete specification of the sanction regime for homicide. Even for capital-eligible convictions for homicide, only a minority of cases result in a sentence of death, let alone an execution (Nagin and Pepper 2012). This is true even for states such as Texas and Virginia that make the most intense use of capital punishment. Instead, most homicides result in a lengthy prison sentence, sometimes life without parole. A study by Cook (2009) illustrates this point. Of 274 cases prosecuted as capital cases, only 11 resulted in a death sentence. Another 42 resulted in dismissal or a verdict of not guilty, which left 221 cases resulting in conviction and sentences to a noncapital sanction.

None of the post-Gregg studies take into account the noncapital component of the sanction regime. As discussed in Nagin and Pepper (2012) and Chalfin, Haviland, and Raphael (2013), there are sound reasons for expecting that the severity of the noncapital sanctions for homicide varies systematically with the availability and the intensity of use of capital punishment. For example, the political culture of a state may affect the frequency of use of capital punishment and also the severity of noncapital sanctions for homicide. Thus, any effect that these noncapital sanctions have on homicide may contaminate the estimated effect of capital punishment on homicide. In capital punishment studies the potential for such bias is particularly strong because, as noted, noncapital sanctions remain the dominant sanction response to capital-eligible murders, even in states that make the most intense use of capital punishment.

Homicide is not the only criminal offense punishable by a range of qualitatively different sanction alternatives. Indeed the sanction regimes for most other criminal offenses, even felonies include more than one sanction option for their punishment. This point is returned to in Section IV.

A second key criticism elaborated in the NRC report concerned the specification of perceptions of the capital punishment component of the sanction regime. Studies typically suppose that people who are contemplating *219 murder perceive sanction risks as subjective probabilities of arrest, conviction, and execution. Lacking data on these subjective probabilities, researchers presume that they are somehow based on the observable frequencies of arrest, conviction, and execution.

The report concluded that several factors made the attempts by the panel studies to specify the capital component of state sanction regimes uninterpretable. First, the findings are very sensitive to the way in which the risk of execution is specified. For example, because of delays between the imposition of a death sentence and its being carried out, if ever, researchers routinely computed ratios in which the numerator was the number of executions in a given state and year divided by the number of death sentences imposed in that state in some prior year. Results are very sensitive to how that ratio is computed (Chalfin, Haviland, and Raphael 2013), and there is no logical basis for resolving disagreements about how the true risk of execution should be measured. Among the difficulties is that only 15 percent of those sentenced to death in the United States since 1977 have been executed, with close to 40 percent leaving death row for other reasons (vacated sentences or convictions, commutations, a successful appeal, or death by other causes) and 45 percent still awaiting execution (Snell 2010). Available information for calculating the risk depends on the size of the state: for large states such as Texas and California, there are far more data for calibrating risk than for small states such as Delaware and Montana. Further complicating matters, policies can change as a result of court decisions and administrative decrees of elected officials. This unpredictability calls into question the usefulness of prior data on the death penalty when calculating present and future risk. Because none of the measures used has any clear relationship with the correct measure, there is no reasoned basis for arbitrating competing claims about which study provides the better estimate of the deterrent effect of the death penalty.

Even if it were possible to judge which measure more closely corresponds to true risk, there is no evidence that the perceptions of potential murderers correspond to this risk. The above discussion concerns only one aspect of sanction regime, the risk of execution given conviction. Other relevant dimensions of the sanction regime are the risk of conviction given commission of a murder and the certainty and severity of the noncapital component alternatives to the death penalty. The assumption that potential murderers have accurate perceptions of *220 these risks and consequences is not credible: indeed it is preposterous. I return to the issue of sanction risk perceptions in Section VI.

## IV. Imprisonment and Crime

There have been two distinct waves of aggregate studies of the relationship between imprisonment and crime. Studies in the 1960s and 1970s described in Section II examined associations of state-level crime rates to state-level certainty of punishment, measured by the ratio of prison admissions to reported crimes, and to state-level severity of punishment as measured by median time served. These studies suffered from fundamental deficiencies laid out in the 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and elsewhere. As a consequence, aggregate-level deterrence research went largely "silent" for more than a decade.

### A. Post-1990s Aggregate Studies

By the mid-1990s, a second generation of studies emerged. Unlike the first-generation studies, which primarily involved cross-sectional analyses of states, second-generation studies had a longitudinal component in which data were analyzed across states and over time. Another important difference in the second-generation studies is that they did not attempt to estimate certainty and severity effects separately. Instead they examined the relationship between the crime rate and the rate of imprisonment as measured by prisoners per capita.

A review by Donohue (2009) identifies six studies of the relationship of crime rates to imprisonment rates. All find statistically significant negative associations between imprisonment rates and crime rates, implying a crime prevention effect for imprisonment. However, the magnitude of the estimate varied widely: from nil for a study that allowed for the possibility that prevention effects decline as the scale of imprisonment increases (Liedka, Piehl, and Useem 2006) to--0.4 percent for each 1 percent increase in the imprisonment rate (Spelman 2000).

Apel and Nagin (2009), Donohue (2009), and Durlauf and Nagin (2011$a$, 2011$b$) discuss important flaws in these studies. One is that they are necessarily measuring the combined effect of deterrence and incapacitation on crime rates and thus cannot be interpreted as measuring the deterrent effect of imprisonment. At best they can be said to estimate the upper bound of that effect.

**\*221** Other shortcomings are even more fundamental. One concerns the same fundamental flaw of the first-generation studies--distinguishing cause from effect. While imprisonment prevents crime through a combination of deterrence and incapacitation, crime also generates the prison population. The object of interest is the effect of the imprisonment rate on the crime rate, but data available for estimation of that effect also reflect the effect of the crime rate on the imprisonment rate. Thus, statistical isolation of the crime prevention effect requires properly accounting for the effect of crime on imprisonment.

The shortcomings in the statistical strategies used in these studies to identify the crime prevention effect of imprisonment are discussed at length in Durlauf and Nagin (2011$a$, 2011$b$). To summarize, with the exception of Levitt (1996) and Johnson and Raphael (2012), the conclusions of these studies rest on a form of statistical analysis pioneered by the Nobel laureate Clive Granger (1969). Granger's method is often mistakenly interpreted as providing estimates with a causal interpretation, which in the context of the aggregate imprisonment studies would be the expected change in the crime rate resulting from a policy that changes the imprisonment rate by a specified amount. In fact, the results are not in general amenable to this interpretation. Instead, application of Granger's method provides only a basis for forecasting future changes in the crime rate as a function of prior changes in the imprisonment rate and the crime rate. While valid forecasts can be based on correlations alone, valid causal interpretation requires more than establishing correlation.

Figure 2 illustrates the problem. Panel $A$ depicts hypothetical crime and imprisonment functions. The crime function $C(I)$ describes the crime rate as a function of the imprisonment rate, I, and the imprisonment function 7(C) measures the imprisonment rate as a function of the crime rate, $C$. The function $C(I)$ is shown to be downward sloping in I to reflect the crime reduction effects of imprisonment via some combination of deterrence and incapacitation. Studies of the relationship of the crime rate to the imprisonment rate aim to measure whether this line is in fact downward sloping and, if so, by how much. The function $I(C)$ is depicted as upward sloping because for any fixed set of policies determining the certainty and severity of punishment, imprisonment rates will be a rising function of the crime **\*223** rate.[5] The intersection of the $C(I)$ and $I(C)$ functions at $I_0$ and $C_0$ measures the observed level of crime and imprisonment.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Fig. 2.--The challenge of identifying the effect of the imprisonment rate on the crime rate**

Crime rates and imprisonment rates are, of course, affected by a multitude of other factors beyond their mutual interaction as depicted in panel $A$. The key to estimating $C(I)$ is identifying some factor, called an instrumental variable (TV), that is thought to affect the imprisonment rate but that affects the crime rate only via its effect on shifting the location of imprisonment rate function. Suppose that such an IV were identified and denoted by z. Panel $B$ demonstrates how changing values of z from $z_1$ to $z_2$ to $z_3$ shifts the $I(C)$ function and, in so doing, traces out the $C(I)$ function. Connecting the points ($I_1$ $C_1$), ($I_2$, $C_2$), and ($I_3$, $C_3$) estimates $C(I)$. In this fashion, IV regression models can be said to identify $C(I)$ and thereby the crime reduction effect of the imprisonment rate on the crime rate. However, the key to IV regression successfully isolating this effect is that $C(I)$ is not directly affected by z. Panel $C$ illustrates the failure of this assumption. If z also shifts $C(I)$, the changing equilibrium values of the imprisonment rate and crime rate no longer trace out the $C(I)$ function.

Only Levitt (1996) and Johnson and Raphael (2012) use an IV regression approach to identify the causal effect of imprisonment on crime. Levitt uses court-ordered prison releases to form a set of IVs. He argues that such court orders meet the test for providing a valid estimate of the effect of the imprisonment rate on the crime rate: the orders have no direct effect on the crime rate and affect it only insofar as the court orders affect the imprisonment rate, which in turn affects the crime rate.

Even if one accepts this argument, the estimated effect has only limited policy value. By its construction, it is likely measuring the effect on crime of the early release of selected prisoners, probably those nearing the end of their sentenced terms. It may also be reflecting the effect of diversion of individuals convicted of less serious crimes either to local jails or to community supervision. In either case, the estimates are not informative about the crime prevention effects, whether by deterrence or incapacitation, of sentence enhancements related to the **\*224** manner in which a crime is committed (e.g., weapon use), the characteristics of the perpetrator (e.g., prior record), or policies affecting the likelihood of incarceration. More generally, the uncertainty about what is actually being measured inherently limits the value of the estimated effects for both policy and social science.

A more recent study by Johnson and Raphael (2012) is based on a technically complex IV regression model. Identification is based on the assumption that prison populations do not change instantaneously in response to changes in the size of the criminal population. Similarly to the non-IV-based analysis of Liedka, Piehl, and Useem (2006), Johnson and Raphael conclude that the crime prevention effect of imprisonment has diminished with the scale of imprisonment, which was rising steadily over the period of their analysis, 1978-2004.

One explanation for the Johnson and Raphael finding is that the states and the federal government over this period collectively implemented policies with steadily declining average deterrent effectiveness. Given that knowledge of the deterrent effectiveness of alternative sanction policies is so limited, this explanation is not credible. An alternative explanation involving incapacitation is more credible. If the crime reduction effect of incarceration primarily stems from incapacitation, the Johnson and Raphael finding is consistent with the concept of "stochastic selectivity" (Canela-Cacho, Blumstein, and Cohen 1997), whereby high-rate offenders are more likely to be apprehended and incarcerated than low-rate offenders. Thus, as the scale of imprisonment increases, higher-rate offenders will be less likely to be at large committing crimes. Johnson and Raphael's finding is replicated by Vollaard (2013) in an analysis of the Netherlands' Habitual Offender Law. Vollaard attributes the entirety of the crime prevention effect that he estimates to incapacitation. Also of note, Owens (2009) in her analysis of 2003 data from Maryland finds modest incapacitation effects.

The incapacitation interpretation of the Johnson and Raphael finding of decreasing crime prevention returns with the scale of imprisonment is more credible than the deterrence interpretation. This interpretation also implies that the study is not useful for learning about deterrence. However, even the incapacitation interpretation is cast in doubt by the aging of the US prison population. Between 1991 and 2010, the percentage of prisoners in state and federal prisons over 45 years old has nearly tripled from 10.6 percent to 27.4 percent (Bureau of Justice Statistics 1999, 2011). Thus, the seeming decline in the incapacitative **\*225** effectiveness of prison with scale may be reflecting only the aging of the prison population, which coincides witli rising imprisonment rates. Further complicating the decreasing returns interpretation is the changing composition of the prison population in terms of the composition of prisoner conviction offense. Over the past four decades, the percentage of prisoners incarcerated for non-part I FBI index crimes has increased substantially (Blumstein and Beck 1999, 2005). Thus, the reduction in crime prevention effectiveness may be due to the types of prisoners incarcerated, not to scale effects.

All of these studies, whedier IV based or not, also suffer from an important conceptual flaw that limits dieir usefulness in understanding deterrence and devising crime control policy. Prison population is not a policy variable per se; radier, it is an outcome of sanction policies dictating who goes to prison and for how long, namely, the certainty and severity of punishment. In all incentive-based dieories of criminal behavior, in the tradition of Bendiam and Beccaria, the deterrence response to sanction threats is posed in terms of the certainty and severity of punishment, not in terms of the imprisonment rate. Therefore, to predict how changes in certainty and severity might affect the crime rate requires knowledge of the relationship of the crime rate to certainty and severity as separate entities, which is not provided by the literature that analyzes the relationship of the crime rate to the imprisonment rate.

The studies are also conducted at a too-global level. In Nagin (1998), I describe the two-dimensional taxonomy of sanction policies affecting the scale of imprisonment. One dimension labeled "type" distinguishes three broad categories: policies regulating certainty of punishment such as laws requiring mandatory imprisonment, policies influencing sentence lengdi such as determinate sentencing laws, and policies regulating parole powers. The second dimension of the taxonomy, "scope," distinguishes policies that cast a wide net, such as a general escalation of penalties for broad categories of crime, compared to policies that focus on targeted offenses (e.g., drug dealing) or offenders (e.g., three-strikes laws).

The nearly 500 percent growdi in prison population over the last two decades is attributable to a combination of policies belonging to all cells of this matrix. Parole powers have been gready curtailed; sentence lengdis increased, both in general and for particular crimes (e.g., drug dealing); and judicial discretion to impose nonincarcerative sanetions **226** has been reduced (Tonry 1996; Blumstein and Beck 1999, 2005; Raphael and Stoll 2009). Consequently, any effect on the crime rate of the increase in prison population reflects the effects of an amalgam of potentially interacting treatments.

There are good reasons for predicting differences in the crime reduction effects of different types of sanctions (e.g., mandatory minimums for repeat offenders vs. prison diversion programs for first-time offenders). Obvious sources of heterogeneity in offender response include factors such as prior contact with the criminal justice system, demographic characteristics, and the mechanism by which sanction threats are communicated to their intended audience. Indeed, available evidence on the deterrent effect of sentence enhancements, the next topic of discussion, demonstrates such heterogeneity.

### B. Policy Evaluation Studies of Sentence Enhancements

There have been comparatively few studies of the deterrent effects of sentence enhancements, judged relative to their importance in contemporary crime control policy. The earliest post-1970s attempts to measure severity effects analyzed the deterrent impact of sentence enhancements for gun crimes. In a series of studies, Loftin, McDowell, and colleagues (Loftin and McDowall 1981, 1984; Loftin, Heumann, and McDowall 1983) examined whether sentence enhancements for gun use in committing another type of crime such as robbery deter gun use in the commission of crime. While the findings are mixed, this body of research has generally failed to uncover evidence of a deterrent effect (but see McDowall, Loftin, and Wiersema 1992).

However, one important caveat remains with respect to extrapolating these studies to understanding the link between deterrence and severity. The same literature that found that gun penalty enhancements were ineffective also found that these laws generally failed to increase the sentences actually received in gun-related crime prosecutions. Thus, gun-using criminals may not have responded because the real incentives were not changed. This again is a reminder of Tonry's (2009) commentary on the highly inconsistent administration of mandatory minimum sentencing.

Kessler and Levitt (1999) examine the deterrent impact of another California sentence enhancement law, Proposition 8, passed in 1982. Proposition 8 anticipated the three-strikes laws passed by many states in the 1990s. They estimate a 4 percent decline in crime attributable **227** to deterrence in the first year after enactment. Within 5-7 years, the effect grows to a 20 percent reduction. As acknowledged by Kessler and Levitt, the longer term estimate includes incapacitation effects.

Webster, Doob, and Zimring (2006) challenged the basic finding of any preventive effects. Kessler and Levitt examine data from every other year. When all annual data are used, Webster, Doob, and Zimring find that the decline in crime rates in the

affected categories begins before Proposition 8's enactment, and the slope of this trend remains constant through implementation. But see Levitt (2006) for a response and commentary supporting Webster et al. by Raphael (2006).

One exception to the scarcity of studies on the crime prevention effects of sentence enhancements concerns analyses of the deterrent effect of California's "three strikes, you're out" law, which mandated a minimum sentence of 25 years upon conviction for a third-strike offense. Zimring, Hawkins, and Kamin (2001) concluded that the law reduced the felony crime rate by at most 2 percent. They also conclude that only those individuals with two convictions for two offenses qualifying as "strikes" showed any indication of reduced offending. Other studies by Stolzenberg and D'Alessio (1997) and Greenwood and Hawken (2002), who like Zimring, Hawkins, and Kamin (2001) examine before and after trends, conclude that the crime prevention effects were negligible.

I turn now to six studies that in my judgment report particularly convincing evidence on the deterrent effect of incarceration. They also nicely illustrate heterogeneity in the deterrence response to the threat of imprisonment.[6] Weisburd, Einat, and Kowalski (2008) and Hawken and Kleiman (2009) study the use of imprisonment to enforce fine payment and conditions of probation, respectively, and find substantial deterrent effects; Helland and Tabarrok (2007) analyze the deterrent effect of California's third-strike provision and find a modest deterrent effect; Raphael and Ludwig (2003) examine the deterrent effect of prison sentence enhancements for gun crimes and find no effect; and Hjalmarsson (2009) and Lee and McCrary (2009) examine the heightened threat of imprisonment that attends coming under the jurisdiction of the adult courts at the age of majority and find no deterrent effect.

Weisburd, Einat, and Kowalski (2008) report on a randomized field *228 trial of alternative strategies for incentivizing the payment of court-ordered fines. The most salient finding involves the "miracle of the cells," namely, that the imminent threat of incarceration provides a powerful incentive to pay delinquent fines, even when the incarceration is for only a short period. The miracle of the cells provides a valuable perspective on the conclusion that the certainty, rather than the severity, of punishment is the more powerful deterrent. Consistent with the "certainty principle," the common feature of treatment conditions involving incarceration is a high certainty of imprisonment for failure to pay the fine. However, that Weisburd et al. label the response the "miracle of the cells" and not the "miracle of certainty" is telling. Their choice of label is a reminder that certainty must result in a distasteful consequence in order for it to be a deterrent. The consequences need not be draconian, just sufficiently costly, to deter the proscribed behavior.

The deterrence strategy of certain but nondraconian sanctions has been applied with apparently great success in Project HOPE, an intervention heralded in Hawken and Kleiman (2009), Kleiman (2009), and Hawken (2010). Project HOPE is a Hawaii-based probation enforcement program. In a randomized experiment, probationers assigned to Project HOPE had much lower rates of positive drug tests and missed appointments and--most importantly--were significantly less likely to be arrested and imprisoned. The cornerstone of the HOPE intervention was regular drug testing, including random tests, and certain but short punishment periods of confinement (e.g., 1-2 days) for positive drug tests or other violation of conditions of probation. Thus, both the Weisburd, Einat, and Kowalski (2008) fine experiment and Project HOPE show that highly certain punishment can be an effective deterrent in cases in which deterrence has previously been ineffective in averting crime.

Helland and Tabarrok (2007) examine whether California's "three strikes, you're out" law deters offending among individuals previously convicted of strike-eligible offenses. The future offending of individuals convicted of two previous eligible offenses was compared with that of individuals who had been convicted of only one eligible offense but who, in addition, had been tried for a second eligible offense but were ultimately convicted of a noneligible offense. The two groups of individuals were comparable on many characteristics such as age, race, and time in prison. Even so, Helland and Tabarrok find that arrest *229 rates were about 20 percent lower for the group with convictions for two eligible offenses. The authors attribute this to the greatly enhanced sentence that would have accompanied conviction for a third eligible offense.

Raphael and Ludwig (2003) examine the deterrent effect of sentence enhancements for gun crimes that formed the basis for a much publicized Richmond, Virginia, federal program called Project Exile. Perpetrators of gun crimes, with a particular emphasis on those with a felony record, were the targets of federal prosecution that provided for far more severe sanctions for weapon use than were provided by Virginia state law. In a careful and thorough analysis involving comparisons of adult homicide arrest rates with juvenile homicide arrest rates within Richmond and comparisons of gun homicide rates between Richmond and other cities with comparable pre-intervention homicide rates, Raphael and Ludwig conclude that the threat of an enhanced sentence had no apparent deterrent effect.

For most crimes, the certainty and severity of punishment increase discontinuously upon reaching the age of majority, when jurisdiction for criminal wrongdoing shifts from the juvenile to the adult court. In an extraordinarily careful analysis of individual-level crime histories from Florida, Lee and McCrary (2009) attempt to identify a discontinuous decline in offending at age 18, the age of majority in Florida. Their point estimate of the discontinuous change is negative as predicted but is minute in magnitude and not even remotely close to achieving statistical significance.[7]

Another analysis of the effect, if any, of moving from the jurisdiction of the juvenile to adult courts by Hjalmarsson (2009) uses the 1997 **230** National Longitudinal Survey of Youth to examine whether young males' perception of incarceration risk changed at the age of criminal majority. Youths were asked, "Suppose you were arrested for stealing a car; what is the percent chance that you would serve time in jail?" She found that subjective probabilities of being sent to jail increased discontinuously on average by 5.2 percentage points when youths reached the age of majority in their state of residence. While youths perceived an increase in incarceration risk, she found no convincing evidence of an effect on their self-reported criminal behavior.

### C. Summary

In combination, these six studies demonstrate that debates on the effectiveness of deterrence are poorly conceived. Instead, the discussion should be framed in terms argued by Beccaria and Bentham more than two centuries ago: Does the specific sanction deter or not, and if it does, are the. crime reduction benefits sufficient to justify the costs of imposing the sanction? Helland and Tabarrok's (2007) study is an exemplar of this type of analysis. They conclude that California's thirdstrike provision does indeed have a deterrent effect, a point even conceded by Zimring, Hawkins, and Kamin (2001). However, Helland and Tabarrok also conclude, on the basis of a cost-benefit analysis, that the crime-saving benefits are so much smaller than the increased costs of incarceration that the lengthy prison sentences mandated by the thirdstrike provision cannot be justified by means of a cost-benefit criterion.

The six exemplar studies suggest several important sources of the heterogeneity of the deterrent effect of imprisonment. One concerns the length of the sentence itself. Figure 3 depicts two alternative forms of the response function relating crime rate to sentence length. Both are downward sloping, which captures the idea that increases in severity deter crime. At the status quo sentence length, $S_1$, the crime rate, $C_1$, is the same for both curves. The curves are drawn so that they predict the same crime rate for a zero sanction level. Thus, the absolute deterrent effect of the status quo sanction level is the same for both curves. But because the two curves have different shapes, they also imply different responses to an incremental increase in sentence level to $S_2$. The linear curve (A) is meant to depict a response function in which there is a material deterrent effect accompanying the increase to $S_2$, whereas the nonlinear curve (B) is meant to depict a small crime **231** reduction response due to diminishing deterrent returns to increasing sentence length.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

### Fig. 3.--Marginal versus absolute deterrent effects

My reading of the evidence on the deterrent effect of sentence length is that it implies that the relationship between crime rate and sentence length more closely conforms to curve B than to curve A. Raphael and Ludwig (2003) find no evidence that gun crime enhancement deters, Hjalmarsson (2009) and Lee and McCrary (2009) find no evidence that the greater penalties that attend moving from the juvenile to the adult justice systems deter, and Helland and Tabarrok (2007) find only a small deterrent effect from California's third strike. As a consequence, the deterrent return to increasing an already long sentence is small, possibly zero. This interpretation forms the basis for my conclusion that mandatory minimum sentencing is unlikely to have a material deterrent effect.

The fine payment and Project HOPE experiments also suggest that curve B, not curve A, more closely resembles what in medical jargon would be described as the dose-response relationship between crime and sentence length. While neither of these studies is directed at the deterrence of criminal behavior, both suggest that, unlike increments in long sentences, increments in short sentences do have a material deterrent effect on a crime-prone population.

Notwithstanding their strengths, these six exemplar studies do not **\*232** address several important aspects of the offender response, if any, to the sanction regime. Except for the most trivial offenses, the question at hand is not the deterrent effect of some particular sanction compared to no sanction whatsoever. Instead, it is the deterrent effectiveness of a specified sanction relative to alternative sanction options. In the case of the death penalty, the alternative is a very lengthy prison sentence. For less serious crimes, sanction options to incarceration include fines and various forms of community supervision, or some combination that may also include a period of incarceration. In 2006, for example, 10 percent of felony defendants were diverted to programs such as mandatory drug treatment prior to adjudication. Of those convicted, 29 percent did not receive a jail or prison sentence (Bureau of Justice Statistics 2010) but instead were sentenced to some form of community control, paid a fine, or both.

Theories of deterrence need to be generalized to specify how offenders perceive and respond to the multiplicity of sanction options available for the punishment of most crimes. The theories also need to account for the possibility that offender perceptions of the severity of sanction options may differ. For example, some may view the possibility of life without parole as worse than execution, and still others may view strict community supervision as more onerous than a short period of incarceration (Wood and May 2003). The multiplicity of sanction options and heterogeneity in the response to these options greatly complicate the specification of a deterrence model, but both features are essential to the deterrence phenomenon.

I also note that testing such generalized models of deterrence will require a major expansion of the criminal justice data collection infrastructure at least in the United States. It is currently not possible to measure the availability and frequency of use of sanction alternatives at the state level because the required data are not available. Available data include those from the Bureau of Justice Statistics, which publishes nationwide statistics on sentences for prison admissions and time served for prison releases, based on data collected as part of the National Corrections Reporting Program initiated in the early 1980s. More than 40 states now report annual data on sentences for admissions and time served for releases. Individual-level demographic characteristics are also reported. In principle, these data could be used to measure the administration of the legally authorized dimensions of most state sanction regimes by type of crime. The difficulty is that the **\*233** data are often extremely incomplete. In some years, some states fail to report any data, and the data that are sent to the bureau are often so incomplete that it is impossible to construct valid state-level measures of the administration of the sanction regime.


## V Police and Crime

The police may prevent crime through many possible mechanisms. Apprehension of active offenders is a necessary first step for their conviction and punishment. If the sanction involves imprisonment, crime may be prevented by the incapacitation of the apprehended offender. The apprehension of active offenders may also deter would-be criminals by increasing their perception of the risk of apprehension. Many police tactics, such as rapid response to calls for service at crime scenes or postcrime investigation, are intended not only to capture the offender but to deter others by projecting a tangible threat of apprehension. Police may, however, deter without actually apprehending criminals: their very presence may deter a motivated offender from carrying out a contemplated criminal act.

Research on the deterrent effect of police has evolved in two distinct literatures. One has focused on the deterrent effect of the level of police numbers or resources, for example, by examining the relationship between police per capita and crime rates. The other has focused on the crime prevention effectiveness of different strategies for deploying police.


### A. Studies of Levels of Police Numbers and Resources

Studies of the effect of police numbers and resources come in two forms. One is an analogue of the imprisonment rate and crime rate studies described in the preceding section. These studies are based on panel data sets, usually of US cities over the period circa 1970-2000. They relate crime rates to the resources committed to policing as measured by police per capita or police expenditures per capita. The second form of study is more targeted. These studies analyze the effect on crime from abrupt changes in the level of policing due, for example, to terror alerts.

1. *Panel Studies*. Panel studies include Marvell and Moody (1994), Levitt (1997, 2002), McCrary (2002), and Evans and Owens (2007). With the exception of McCrary's study, these studies consistently find **\*234** evidence that larger resource commitments to policing are associated with lower crime rates.[8]

The studies use different statistical strategies for estimating the effect of police resource levels on crime. For example, Marvell and Moody (1996) analyze two panel data sets and apply Granger-causality type statistical models to these data. Levitt (1997, 2002) uses IV-type regression models. In Levitt (1997), election cycles are used as an IV to untangle the cause-effect relationship between crime rates and police manpower. Levitt (2002) uses the number of firefighters and civil service workers as IVs for the same purpose.

The panel studies consistently find evidence that higher levels of police resources are associated with lower crime rates. Durlauf and Nagin (2011a, 2011b) discuss important qualifications to the interpretation and validity of this form of analysis. One is that the police panel studies, like the studies of imprisonment and crime, do not distinguish between incapacitation and deterrent effects. The negative associations between police numbers and crime rates identified in these studies may reflect increased effectiveness in apprehending and incarcerating active offenders rather than in deterring crime: More importantly, an under-appreciated limitation of these analyses is the assumption that the effect of police levels on crime rates is the same across place and time. As the discussion of studies of the effects of police deployment strategies on crime makes clear, this assumption is not tenable. Nevertheless, the findings of these studies are consistent with those of studies of abrupt changes in police presence that police numbers do matter.

2. *Abrupt Change Studies.* Studies of this type, which are sometimes called "interrupted time series" or "regression discontinuity" studies, examine the effects of abrupt changes in police presence. If the change in police presence is attributable to an event unrelated to the crime rate, studies of this type can provide particularly convincing evidence of deterrence. For example, in September 1944, German soldiers occupying Denmark arrested the entire Danish police force. According to an account by Andenaes (1974), crime rates rose immediately but not uniformly. The frequency of street crimes such as robbery, whose **235** control depends heavily on visible police presence, rose sharply. By contrast, crimes such as fraud were less affected. See Sherman and Eck (2002) and Sherman (in this volume) for other examples of crime increases following a collapse of police presence.

The Andenaes anecdote illustrates several important points. It provides a useful reminder of the difference between absolute and marginal deterrence. As shown in figure 3, absolute deterrence refers to the difference in the crime rate between the status quo level of sanction threat, $S_1$, and a complete (or near) absence of sanction threat, $S_0$. The Andenaes anecdote is a compelling demonstration that the absolute deterrent effect is large. However, from a policy perspective, the issue is not the absolute deterrent effect posed by police presence. The question is whether, on the margin, crime can be prevented by incremental increases in police numbers or by changes in the way police are deployed. Also, the anecdote is another useful reminder that deterrent effects are heterogeneous: sanction threats (or the absence thereof) do not uniformly affect all types of crime or, more generally, all types of people.

Contemporary tests of the police-crime relationship based on abrupt decreases in police presence investigate the effect on the crime rate of reductions in police presence and productivity as a result of large budget cuts or lawsuits following racial profiling scandals. Such studies have examined the Cincinnati Police Department (Shi 2009), the New Jersey State Police (Heaton 2010), and the Oregon State Police (DeAngelo and Hansen 2008). Each concludes that decreases in police presence and activity substantially increase crime. Shi (2009) studies the fallout from an incident in Cincinnati in which a white police officer shot and killed an unarmed African American suspect. The incident was followed by 3 days of rioting, heavy media attention, the filing of a class action lawsuit, a federal civil rights investigation, and the indictment of the officer in question. These events created an unofficial incentive for officers from the Cincinnati Police Department to curtail their use of arrest for misdemeanor crimes, especially in communities with higher proportional representation of African Americans, out of concern for allegations of racial profiling. Shi finds measurable declines in police productivity in the aftermath of the riot and also documents a substantial increase in criminal activity. The estimated elasticities of crime to policing based on her approach were -0.5 for violent crime and -0.3 for property crime.

**236** The ongoing threat of terrorism has also provided a number of unique opportunities to study the effect of police resource allocation in cities around the world, including the District of Columbia (Klick and Tabarrok 2005), Buenos Aires (Di Tella and Schargrodsky 2004), Stockholm (Poutvaara and Priks 2006), and London (Draca, Machin, and Witt 2008). The Klick and Tabarrok (2005) study examines the effect on crime of the color-coded alert system devised by the US Department of Homeland Security in the aftermath of the September 11, 2001, terrorist attack. Its purpose was to signal federal, state, and local law enforcement agencies to occasions when it might be prudent to divert resources to sensitive locations. Klick and

Tabarrok use daily police reports of crime collected by the district's Metropolitan Police Department for the period March 2002 to July 2003, when the terrorism alert level rose from ""elevated" (yellow) to "high" (orange) and back down to "elevated" on four occasions. During high alerts, anecdotal evidence suggested that police presence increased by 50 percent. The authors estimate that each 1 percent increase in number of police during the terror alert reduced total crime by 0.3 percent.

To summarize, studies of police presence conducted since the mid-1990s consistently find that putting more police officers on the street--either by hiring new officers or by reallocating existing officers to put them on the street in larger numbers or for longer periods of time--has a substantial deterrent effect on serious crime. There is also consistency with respect to the size of the effect. Most estimates reveal that a 10 percent increase in police presence yields a reduction in total crime of about 3 percent. Yet these police manpower studies speak only to the number and allocation of police officers and not to what police officers actually do on the street beyond making arrests.

### B. Police Deployment and Crime

Much research has examined the crime prevention effectiveness of alternative strategies for deploying police resources. This research has mostly been conducted by criminologists and sociologists. Among this group of researchers, the preferred research designs are quasi experiments involving before-and-after studies of the effect of targeted interventions as well as true randomized experiments. The discussion that follows draws heavily on two excellent reviews of this research by Weisburd and Eck (2004) and Braga (2008).

For the most part, deployment strategies affect the certainty of punishment *237 through their effect on the probability of apprehension. One way to increase apprehension risk is to mobilize police in a fashion that increases the probability that an offender is arrested after committing a crime. Strong evidence of a deterrent as opposed to an incapacitation effect resulting from the apprehension of criminals is limited. Studies of the effect of rapid response to calls for service (Kansas City Police Department 1977; Spelman and Brown 1981) do not directly test for deterrence but found no evidence of improved apprehension effectiveness. The reason may be that most calls for service occur well after the crime event, with the result that the perpetrator has fled the scene. Thus, it is doubtful that rapid response materially affects crime. Similarly, apprehension risk is probably not materially affected by improved investigations. Eck concluded that "it is unlikely that improvements in the way investigations are conducted or managed have a dramatic effect on crime or criminal justice" (1992, p. 33). The reason is that most crimes are solved either by the offender being apprehended at the scene or by eyewitness identification of the perpetrator (Greenwood, Chaiken, and Petersilia 1977). Modern forensic methods may ultimately improve the effectiveness of postcrime investigations, but as Braga et al. (2011) note, clearance rates have remained stubbornly stable over the period 1970-2007.

The second source of deterrence from police activities involves averting crime in the first place. In this circumstance, there is no apprehension because there was no offense. In my view, this is the primary source of deterrence from the presence of police. Thus, measures of apprehension risk based only on enforcement actions and crimes that actually occur, such as arrests per reported crime, are not valid measures of the apprehension risk represented by criminal opportunities not acted on because the risk was deemed too high (Cook 1979).

One example of a police deployment strategy for which there is good evidence of effectiveness is "hot spots" policing. The idea of hot spots policing stems from a striking empirical regularity uncovered by Sherman and colleagues. Sherman, Gartin, and Buerger (1989) found that only 3 percent of addresses and intersections ("places," as they were called) in Minneapolis produced 50 percent of all calls to the police. Weisburd and Green (1995) found that 20 percent of all disorder crime and 14 percent of crimes against persons in Jersey City, New Jersey, arose from 56 drug-related crime hot spots. Twenty-five years later in a study of Seattle, Weisburd et al. (2004) reported that between 4 and *238 5 percent of street segments in the city accounted for 50 percent of crime incidents for each year over a 14-year period. Other, more recent studies finding comparable crime concentrations include Brantingham and Brantingham (1999), Eck, Gersh, and Taylor (2000), and Roncek (2000).

The rationale for concentrating police in crime hot spots is to create a prohibitively high risk of apprehension. The first test of the efficacy of concentrating police resources on crime hot spots was conducted by Sherman and Weisburd (1995). In this randomized experiment, hot spots in the experimental group were subjected to, on average, a doubling of police patrol

intensity compared with hot spots in the control group. Declines in total crime calls ranged from 6 to 13 percent. In another randomized experiment, Weisburd and Green (1995) found that hot spots policing was similarly effective in suppressing drug markets.

Braga's (2008) informative review of hot spots policing summarizes the findings from nine experimental or quasi-experimental evaluations. The studies were conducted in five large US cities and one suburb of Australia. All but two found evidence of significant reductions in crime. Further, no evidence was found of material crime displacement to immediately surrounding locations. On the contrary, some studies found evidence of crime reductions, not increases, in the surrounding locations but a "diffusion of crime-control benefits" to nontargeted locales. Note also that the findings from the previously described econometric studies of focused police actions--for example, in response to terror alert level--buttress the conclusion that the strategic targeting of police resources can be very effective in reducing crime.

Another example of a police deployment strategy for which there is credible evidence of effectiveness, albeit less consistent than for hot spots policing, is problem-oriented policing. One of the most visible instances of problem-oriented policing is Boston's Operation Ceasefire (Kennedy et al. 2001). The objective of the collaborative operation was to prevent intergang gun violence using two deterrence-based strategies. The first strategy was to target enforcement against weapons traffickers who were supplying weapons to Boston's violent youth gangs. The second involved a more novel approach. The youth gangs themselves were assembled by the police on multiple occasions in order to send the message that the law enforcement response to any instance of serious violence would be "pulling every lever" legally available to **239** punish gang members collectively. This included a salient severity-related dimension: vigorous prosecution for unrelated, nonviolent crimes such as drug dealing. Thus, the aim of Operation Ceasefire was to deter violent crime by increasing the certainty and severity of punishment, but only in targeted circumstances--specifically, if the gang members committed a violent crime.

Since Operation Ceasefire, the strategy of "pulling every lever" has been the centerpiece of field interventions in many large and small US cities including Richmond, Virginia; Chicago; Stockton, California; High Point, North Carolina; and Pittsburgh. See Kennedy (2009), one of the architects of the pulling every lever strategy, for an extended description of these interventions and the philosophy behind them. Independent evaluations have also been conducted of many of these interventions.[9] As part of the Campbell Collaboration review process, Braga and Weisburd (2012) identified 10 studies of pulling levers focused policing strategies that met their criteria of rigor and relevance to be included in the review. Nine of these studies reported statistically significant reductions in crime. They concluded that "pulling levers focused deterrence strategies are associated with an overall statistically-significant, medium-sized crime reduction effect" (p. 7). However, they caution that focused deterrence has yet to be tested with a randomized control trial. Their caution is also shared by others. In Cook's (2012) commentary on the High Point focused deterrence intervention, he observes that initial conclusions of eye-catchingly large effects have been replaced with far more modest assessments of effect sizes and cautions about the generalizability of the results. Reuter and Pollack (2012) wonder whether a successful intervention in a small urban area such as High Point can be replicated in a large city such as Chicago. Ferrier and Ludwig (2011) point out the difficulty in understanding the mechanism that underlies a seemingly successful intervention that pulls many levers. Despite concerns, these interventions illustrate the potential for combining elements of both certainty and severity enhancements to generate a targeted deterrent effect. Additional evaluations of the efficacy of these multipronged strategies should be a high priority, with the proviso that any designs implemented be amenable to rigorous evaluation as emphasized by commentators. For a useful **240** discussion of the importance of understanding mechanisms, see Ludwig, Kling, and Mullainathan (2011). The theory behind focused deterrence interventions includes attention to, among other things, deterrence, police legitimacy, informal social control, police/community relations, the provision of social services, and addressing situational factors. Existing evaluations do not address either the contribution (if any) of individual elements or their likely interplay.

### C. Summary

The evidence is clear that large changes in police presence do affect crime rates. The change in presence may be the result of an unplanned event, such as a terror alert that triggers a large increase in police officers in public spaces, or it may be a strategic response to a known crime problem, such as in hot spots policing deployments. In either case, crime rates are reduced in places where police presence has been materially increased. While far from definitive, there is no evidence of displacement of crime to places contiguous to the heightened police presence, at least in the short run. Indeed, there is some evidence of crime reductions in the areas immediately surrounding the heightened presence. By contrast, there is no evidence that the rapidity of the response to crime or the thoroughness of the postcrime investigation has a material influence on crime

rates. Combined, these two sets of findings suggest that how police are deployed is as important as the number of police deployed in their influence on crime rates.

Notwithstanding these important findings, some additional issues about police presence remain unresolved. The finding from the hot spots policing evaluations that crime is not displaced to adjacent places may not hold up in the long run. The seeming diffusion of crime control benefits may evaporate as offenders become aware that the heightened patrol activity is not present in adjacent places. More fundamentally, the hot spot itself may be displaced to some new location, for example, to a bar that had not previously been a crime hot spot. A longer-term perspective on the effectiveness of hot spots policing is required.

While the evaluations of hot spots policing provide important evidence that police presence can be a deterrent, overall crime control policy cannot be built around such a narrowly formulated tactic. Evaluations of problem-oriented policing suggest police effectiveness in a wider set of circumstances than intensive patrol of high crime microplaces. **241** However, these evaluations do not reveal the mechanism by which prevention is achieved.

The introduction distinguished two distinct crime prevention functions of the police: their role as apprehension agents following the commission of a crime and their role as sentinels. In their sentinel role the police are acting, in the parlance of Cohen and Felson (1979), as "capable guardians." Capable guardians are persons whose presence discourages a motivated offender from victimizing a criminal opportunity. Capable guardians include persons with no official crime control authority who nonetheless are personally willing to intervene or to summon those with the authority to intervene. The police themselves also serve as capable guardians in their conventional patrol and monitoring functions.

For many reasons the apprehension agent role is the most scrutinized and recognized crime control function of the police. The apprehension agent function has been and continues to be glamorized by television in long-running programs such as *Dragnet* in the 1950s and 1960s, *Hawaii Five-0* in the 1970s, *Hill Street Blues* in the 1980s, *Homicide Life on the Streets* in the 1990s, and *CSI* and *Law and Order* in the present. The apprehension role is also salient because it involves the police response to real victims of sometimes horrendous crimes and the ensuing efforts to bring the perpetrators to justice. From a technocratic perspective, police effectiveness in this role can be measured with statistics like the clearance rate. From a crime control perspective, the apprehension agent function protects public safety by capturing and incapacitating sometimes dangerous and repetitive offenders. However, as yet there is no evidence that the apprehension agent role results in a material deterrent effect. By contrast, the evidence on police presence suggests that in their sentinel role police can have a very large deterrent effect. While the differential deterrent effect of the police in their apprehension and sentinel roles has not been demonstrated, there is sufficient evidence to characterize it as a hypothesis with sufficient empirical support to make it credible.

What then is the explanation for the differential deterrent effectiveness of the sentinel/guardian and apprehension roles of the police? The model of the decision to victimize a criminal opportunity laid out in the introduction, I believe, provides useful perspective on the answer. The model distinguishes two key probabilities: the probability that the opportunity can be successfully completed, $P_s$, and the probability of **242** apprehension conditional on the victimization of the target, $P_a$. In this model, activities that enhance police visibility, such as concentration of police at crime hot spots, affect $P_s$, whereas actions such as rapid response to calls for service or improved investigation methods affect $P_a$. The sentinel role of police is distinct from the apprehension role because the latter comes into play only when deterrence has failed and a would-be offender becomes an actual offender. Thus, at one moment police can function as sentinels and in the next as apprehension agents.

The depiction of the decision to victimize a criminal opportunity in figure 1 provides an explanation for the greater deterrent effectiveness of the police in their sentinel role than in their apprehension role. The police in their sentinel role influence $P_s$ and thereby the probability of all four outcome branches. In particular, improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the three outcomes that represent failure from the offender's perspective. In contrast, improved effectiveness in the apprehension agent role comes into play only after a crime is committed and can affect only the three branches of the tree related to failure. Thus, innovations that make police more effective sentinels will tend to be more influential in the decision process characterized by this model than innovations in apprehension effectiveness.

The model is also useful in clarifying the basis for the effectiveness of situational crime prevention (Clarke 1995), many forms of which can be construed as reducing $P_a$. Just as police in their sentinel role reduce the attractiveness of a criminal opportunity, situational crime prevention works by affecting all four branches of the tree.

## VI. Perceptual Deterrence and Sanction Risk Perceptions Studies

Analyses of perceptual deterrence examine the association between perceptions of sanction risk, whatever their source, and self-reported illegal behavior or intent to engage in illegal behavior. Analyses of sanction risk perceptions examine the relationship of an individual's perceptions with experience (e.g., being arrested as well as factors external to the individual such as statutorily defined penalties). Some studies address both topics, but most emphasize one or the other.

### *243 A. Perceptual Deterrence

The perceptual deterrence literature was spawned by a cadre of researchers (Meier and Johnson 1977; Minor 1977; Tittle 1977, 1980; Grasmick and Bryjak 1980) interested in probing the perceptual underpinnings of the deterrence process.

Perceptual deterrence studies have been based on three types of data: cross-sectional survey studies, panel survey studies, and scenario-based studies. In cross-sectional survey studies, individuals are questioned about their perceptions of the certainty and severity of sanctions and about either their prior offending behavior or their future intentions to offend. For example, Grasmick and Bryjak (1980) queried a sample of city residents about their perceptions of the risk of arrest for offenses such as a petty theft, drunk driving, and tax cheating. They also asked respondents whether they thought they would commit any of these acts in the future. In panel survey studies the sample is repeatedly surveyed on risk perceptions and criminal behavior. For example, Paternoster et al. (1982) followed a sample of students through their 3 years in high school and surveyed them on the frequency with which they engaged in various delinquent acts and their perceptions of the risks and consequences of being caught. In scenario-based studies, individuals are questioned about their perception of the risks of committing a crime that is described to them in detail. They are also asked about their own behavior should they find themselves in that situation. Bachman, Paternoster, and Ward (1992), for instance, constructed a scenario describing the circumstances of a date rape. They then surveyed a sample of college males about their perceptions of the risk of the scenario male being arrested for sexual assault and what they themselves would do in the same circumstance.

Perceptional deterrence research has been faulted with some justification on a number of grounds. One is that the sampled populations are typically high school or college students who do not, by and large, engage in serious crime and delinquency. Other concerns are related to the veracity of the data collected. How well can respondents actually calibrate sanction risks? Do the ways in which questions about perceptions of morality and sanction cost are structured prime responses about actual or projected offending? Despite these questions, in my judgment this class of studies has provided enduring contributions to our understanding of deterrence processes.

One contribution is that, with the exception of the early panel studies, *244 perception studies consistently find that actual or projected offending is negatively related to perceptions of sanction certainty. Findings of a deterrence-like relationship of self-reported offending with perceptions of sanction severity are less consistent. When combined, these two findings provide still further support for the "certainty" principal, but with a proviso that certainty results in a negative but not necessarily draconian consequence. Grasmick and Bryjak (1980) show that when respondents' assessments of the personal costs of the sanction are incorporated into the analysis, perceptions of severity are negatively associated with self-reported behavior.

A second contribution of the perceptual deterrence literature, which may also be its most important, does not involve the evidence it has amassed on deterrence effects per se. Rather it has focused its attention on the links between formal and informal sources of social control. Recognition of this connection predates the perceptual deterrence literature. Zimring and Hawkins (1973) observe that "official *actions* can set off societal *reactions* that may provide potential offenders with more reason to avoid conviction than the officially imposed unpleasantness of punishment" (p. 174; emphasis in original). See also Andenaes (1974), Gibbs (1975), Blumstein and Nagin (1976), and Williams and Hawkins (1986) for this same argument. Perceptual deterrence research has consistently found that individuals who report higher stakes in conventionality are more deterred by perceived risk of public, exposure for lawbreaking.

A salient finding in this regard concerns my own research on tax evasion. Enforcement actions by tax authorities are private matters. Criminal prosecutions, however, are the exception to this rule. They necessarily involve public exposure. Thus, from the taxpayer's perspective, civil enforcement actions jeopardize money but not reputation whereas criminal prosecution jeopardizes both. In Klepper and Nagin (1989*a*, 1989*b*), we found that if respondents perceived no risk of criminal prosecution, a majority of respondents reported a material probability of taking advantage of noncompliance opportunities. However, the perception of a nonzero risk of criminal prosecution was sufficient to deter most of the middle-class respondents to the survey. Stated differently, if the tax evasion gamble also involved putting reputation and community standing at risk, the middle-class respondents to the survey were less likely to consider taking the gamble.

While my tax evasion research does not pin down the specific **\*245** sources of these costs, other research on the effects of a criminal record on access to legal labor markets suggests a real basis for the fear of stigmatization (Freeman 1991; Bushway 1996). Freeman estimates that a record of incarceration depresses probability of work by 15–30 percent, Waldfogel (1994) estimates that conviction for fraud reduces income by as much as 40 percent, and Bushway (1996) concludes that even an arrest for a minor offense impairs access to legal labor markets, at least in the short run.

The findings from the perceptual deterrence studies directly relate to two of the main themes of this essay. The first concerns the source of the "certainty" effect. In laying out the implications of the model of the decision to victimize a target, it was pointed out that the cost of apprehension appeared in two of the terms on the right-hand side of equation (2). This side of the equation measures the potential cost of offending: the term measuring the cost of apprehension without conviction and the term measuring the cost of apprehension with conviction. Formal and informal sanction costs appeared only in the second of these terms. Stated differently, apprehension cost is incurred regardless of whether a conviction ensues, whereas sanction costs can be incurred only if apprehension is followed by conviction. This structure formalizes the argument of Williams and Hawkins (1986) that what they call ""fear of arrest" serves as a greater deterrent than formal sanction cost. It is also consistent with the conclusion of my own research with coauthors Paternoster (Nagin and Paternoster 1993, 1994) and Pogarsky (Nagin and Pogarsky 2001, 2003) that individuals with the greatest stakes in conformity were the most deterred by informal sanction costs.

The fourth branch of figure 3 is the total cost of formal and informal sanctions. The perceptions research combined with the criminal record research suggests that, for people without a criminal record, informal sanction cost makes a large contribution to this total. That contribution may be substantially reduced once an individual has had contact with the criminal justice system and obtains a criminal record. This observation relates back to a point I emphasized in Nagin (1998). If fear of stigma is a key component of the deterrence mechanism, punishment must be a relatively rare event. Just as the stigma of Hester Prynne's scarlet "A" depended on adultery being uncommon in Puritan America, a criminal record cannot be socially and economically isolating if it is commonplace. For that reason, policies that work well in **\*246** the short term may erode their effectiveness over the long run if they increase the proportion of the population who are stigmatized.

This observation is also germane to the recommendation that future empirical research and theorizing should take account of whether and how the experience of punishment (which in my view is inappropriately referred to as specific deterrence) affects the response to the threat of punishment, or general deterrence. The experience of punishment may affect general deterrence in two distinct ways. First, it may affect perceptions of sanction risks. Second, it may affect the basic proclivity for offending. Proclivity could be reduced by effective rehabilitation programs or an individual's conclusion that prison is not an experience to be repeated. However, proclivity could also be increased by stigmatization, erosion of human capital during a spell of incarceration, or the social influence of close contact with a mostly crime-prone population. Nagin, Cullen, and Jonson (2009) provide a detailed discussion of this issue.

### B. Sanction Risk Perceptions Studies

Studies of sanction risk perception come in three primary forms: surveys of the general public's knowledge of the sanction regime, studies of the effect of apprehension (or nonapprehension) on risk perceptions and subsequent behavior, and scenario-based studies in which respondents are questioned about their perceptions of the risk of apprehension and punishment in specific circumstances.[10]

1. *General Population Surveys*. Apel (2013) identifies only two surveys of the general public's knowledge of the statutory penalties for the types of crime that compose the FBI's crime index (e.g., murder, robbery). Both are dated. A survey of

Tucson, Arizona, residents conducted in the 1970s suggests generally good knowledge of the types of sanctions (e.g., fine, prison) available for the punishment of the 14 types of crime surveyed (Williams, Gibbs, and Erickson 1980). Erickson and Gibbs (1979) also find that respondents were reasonably well calibrated on the relative severity of punishments across types of crime (e.g., punishment for robbery is generally more severe than for larceny). However, a 1960s study commissioned by the California Assembly Committee on Criminal Procedure (1968) found that the general **247** public's knowledge of the statutorily prescribed level of punishment was poor. Only about a quarter of the sample correctly identified the maximum prison sentence available for the punishment of the various crimes included in the survey. However, 62 percent of incarcerated adults correctly identified the maximum. I return to the large difference in knowledge between the incarcerated and not-incarcerated samples below.

There have also been general population surveys of sanction perceptions for two types of crimes--marijuana use and drunk driving--that are far more prevalent in the general population than crimes such as robbery or burglary. The surveys suggest far better, although hardly perfect, knowledge of the legally available sanctions for these two offenses. MacCoun et al. (2009) describe a study by Johnston Lloyd, O'Malley, and Bachman (1981) of student knowledge of punishment for marijuana possession. In states that decriminalized possession between 1976 and 1980, the percentage reporting a possible jail sentence declined from 58 percent to 18 percent. Corresponding changes for students living in states that did not decriminalize were not. as large. This finding suggests that for populations in which there is greater need-to-know of sanction risks, knowledge of the risks is better but still crude. For example, MacCoun et al. (2009) also report that knowledge of the maximum penalties for marijuana use was not good. Surveys of knowledge among adults of drunk-driving penalties by Ross (1973) and Grube and Kearney (1983) also suggest greater awareness of the drunk-driving sanctions and available enforcement tools (e.g., Breathalyzers) than corresponding knowledge for street-type crimes.

The Tucson-based survey and more recent surveys by Kleck and colleagues (Kleck et al. 2005; Kleck and Barnes, forthcoming) attempt to assess the accuracy of sanction risk perceptions. Kleck et al. (2005), for example, survey adults residing in 54 large urban counties. For crimes such as homicide and robbery, they correlate respondent estimates of quantities such as arrests per crime and convictions per crime with ratios based on the actual data. They find that the correlation is close to zero.

The results of the surveys by Kleck and colleagues are not surprising on several counts. First, for the reasons elaborated long ago by Beccaria and Bentham and most recently by Wikström et al. (2012) and Apel (2013), most of the general public has no intention of committing the **248** types of crime surveyed in these studies.[11] Thus, there is no reason for them to be aware of the sanction regime for these types of crime. Consequently, their ignorance of the sanction regime is not informative about whether people who have a potential need-to-know of the sanction regime obtain that knowledge, however crudely, and take it into account in the decision whether or not to offend. Second, the ratios calculated by Kleck and colleagues pertain only to criminal opportunities that have actually been acted on. As first pointed out by Cook (1979), the ratio of arrest per crime is not a valid measure of the risk of apprehension for criminal opportunities that are not acted on. Third, statistics such as arrests per crime are calculated at the county or city level and may be very poor indicators of risk at the specific locations where would-be offenders are plying their trade (Apel 2013).

2. *Studies of the Effect of Experience on Perceptions.* Salient findings of the early panel perceptual deterrence studies include considerable instability in sanction risk perceptions and that nonoffenders and novice offenders have higher sanction risk perceptions than experienced offenders. Paternoster and colleagues (Paternoster et al. 1982; Paternoster 1983) called this an experiential effect whereby delinquent youths learned that sanction risks were lower than initially anticipated.

An important study by Horney and Marshall (1992) of serious offenders finds that subjects who had higher arrest ratios, that is, self-reported arrests to self-reported crime, reported higher risk perception. Since that time a large number of studies have used longitudinal data to analyze, whether the effect of success or failure in avoiding apprehension influences sanction risk perceptions. The analytical strategy involves relating experience with success or failure in prior survey waves with perceptions of apprehension risk in later survey waves. Studies of this type by criminologists were prompted by an influential article by Stafford and Warr (1993), who distinguished between two sources of information on sanction risk: one's own experience and the experience of peers. A parallel literature has also appeared in economics based on the concept of "Bayesian updating."

The Bayesian updating model and the arguments of Stafford and Warr are complementary. Bayesian updating formalizes their arguments. The Bayesian updating model is designed to describe the process **249** by which people update their perceptions of a phenomenon of interest on the basis of new information about that phenomenon. In this case, individuals would update their perceptions of sanction risk with new information regarding success or failure of themselves or their peers in avoiding apprehension. The predictions of the model depend on the specifics of its mathematical specification, but models of this type make predictions about the updating process that are intuitively sensible. The models predict that people generally do not entirely abandon prior beliefs as a result of new information. Most commonly, they only incrementally adjust them.[12]

In the case of perception of apprehension risk, this implies that the experience of apprehension will result in an incremental upward shift in risk perception, and experience of what Stafford and Warr (1993) call "apprehension avoidance" will result in an incremental reduction in risk. A second prediction of the Bayesian updating model is that the magnitude of the change will depend on the depth of prior knowledge. Individuals with more prior knowledge will tend to adjust less to new information than individuals with less prior knowledge. In the context of sanction risk perceptions, this implies that individuals with more experience with offending will make smaller adjustments in their risk perceptions based on current experience with apprehension than will individuals with less experience. Both of these predictions are supported by studies of risk perception updating.

Concerning the first prediction, numerous studies find that increases (or decreases) in perceived apprehension risk are associated with failure (success) in avoiding apprehension (Bridges and Stone 1986; Piliavin et al. 1986; Paternoster and Piquero 1995; Pogarsky, Piquero, and Paternoster 2004; Pogarsky, Kim, and Paternoster 2005; Matsueda, Kreager, and Huizinga 2006; Lochner 2007; Hjalmarsson 2008). There are, however, exceptions to this finding. Apospori and Alpert (1993) and Pogarsky and Piquero (2003) report evidence that is the reverse of this prediction. Pogarsky and Piquero attribute this to a variant of what is called the "gambler's fallacy" whereby offenders believe that bad luck is not followed by bad luck. This is an interesting possibility, but the evidence is overwhelmingly consistent with the Bayesian updating model.

**250** Evidence consistent with the second prediction is reported in Pogarsky, Piquero, and Paternoster (2004), Matsueda, Kreager, and Huizinga (2006), and Anwar and Loughran (2011). Anwar and Loughran conducted a particularly thorough test of this prediction. They analyzed a sample composed of about 1,300 adjudicated/convicted youths from Arizona and Pennsylvania enrolled in the Pathways to Desistance study who were interviewed eight times in 5 years (Mulvey 2011). Being arrested significantly increased subjective probabilities (prediction 1), but the magnitude of the change was less for more experienced offenders (prediction 2). Specifically, they showed that experienced offenders placed relatively more weight on their prior subjective probabilities and therefore updated less in response to new arrests. Inexperienced offenders, by contrast, updated more by placing more weight on their current arrest ratios and less weight on their prior subjective probabilities. It is also noteworthy that they concluded that the effect of arrest on subjective probabilities was specific within classes of criminal behaviors: youths arrested for aggressive crimes did not update their subjective probabilities concerning income-generating crimes. This finding implies that there are not spillover effects across classes of crime.

3. *Studies of Situational Effects on Risk Perceptions*. This grouping of studies examines the effect of situational factors on risk perceptions. Particularly important in this regard are situational factors that can be manipulated by policy, such as official sanctions and police presence.

As already noted, knowledge of official sanctions seems to be strongly affected by the need-to-know principle. Knowledge is better, but hardly perfect, among populations with the greatest involvement in the illegal activity. On the basis of the California assembly study, for example, knowledge of maximum penalties for various FBI index-type crimes was far better for incarcerated sample members than for not-incarcerated sample members.

Other interesting evidence of awareness of official sanctions is the previously discussed study by Hjalmarsson (2009) of the effect of reaching the age of majority on perceptions of the risk of incarceration for auto theft. She found that male respondents in the 1997 National Longitudinal Survey of Youth increased that risk by 5.2 percentage points upon reaching their age of majority. The increase, however, had no statistically significant effect on behavior.

Evidence on how police presence affects perceptions of apprehension risk is scant. In my own work with Paternoster, we constructed scenarios **251** and examined how respondent perceptions of sanction risks were affected by scenario conditions

(Nagin and Paternoster 1993). We found that respondent perceptions of sanction cost in a drunk-driving scenario were higher in the scenario condition involving a police crackdown on drunk driving versus a scenario condition described as involving state police cutbacks. In addition, perceptions of sanction cost were lower if surveillance could be avoided by driving on back roads. In scenarios concerning peer provocation, Wikström et al. (2012) found that adolescents reported a lower likelihood of violent response in scenario conditions in which adult monitors were present. Evidence from ethnographic studies suggests that offenders are very conscious of police presence when selecting targets. Wright and Decker (1994) report that burglars avoid neighborhoods with a heavy police presence and that robbers prefer to target individuals unlikely to report the crime to the police, such as drug dealers.

### C. Summary

Perceptual deterrence research has established that self-reported offending or intention to do so is linked to sanction risk perceptions. The outstanding question is whether those perceptions are grounded in reality. If they are not, behavior is beyond the reach of public policy. The evidence on the sources of sanction risk perceptions suggests that risk perceptions are affected by an individual's own experience with success or failure at averting apprehension. The link between perception and the legally authorized sanctions is less compelling but does indicate that there is at least a rough awareness among individuals in a need-to-know scenario. The other key component of the sanction regime is the intensity of application of the legally authorized sanctions. Research on this topic is based on general population studies of the correlations of perceptions of quantities of the ratio of arrest to crimes with estimates of these ratios calculated from official statistics. For reasons discussed above, in my judgment these studies are not informative about whether perceptions of intensity among the population with need-to-know sanction risks are affected by the actual intensity of application of legally authorized sanctions.

Pogarsky (2007) offers a useful taxonomy of responsiveness to legal threats for considering the implications of these summary observations. The taxonomy distinguishes three groups: acute conformists, deterrables, and incorrigibles. In the context of the decision model laid out **\*252** in Section I, conformists are individuals for whom reward minus commission cost is negative. For reasons I have already discussed, they have no need to gain knowledge of sanction risks because there is no profit in crime even without potential sanction costs. Deterrables are individuals for whom reward minus commission cost is positive and who are attentive to sanction threats. For such individuals the issue is whether the net benefit of successful commission exceeds the potential costs attending failure. The incorrigible group is also composed of individuals for whom crime is profitable but who for whatever reason are not attentive to sanction threats. The relative sizes of the incorrigible and deferrable groups and the specific form of the sanction regime will determine the effectiveness of criminal justice public policy in preventing crime via deterrence and thereby avoiding the sanction costs of incapacitation.

Future research on sanction risk perceptions needs to target Pogarsky's deterrables and incorrigibles to gain better knowledge of their awareness of the two key elements of the sanction regime: the legally authorized sanctions and the intensity of their application. For the types of crime in the FBI index this will require abandoning surveys of the general population and instead sampling populations with a large representation of deterrables and incorrigibles. An example of such a survey is the Pathways to Desistance project used in the Anwar and Loughran (2011) analysis, which sampled juveniles adjudicated for felony offenses in Philadelphia and Phoenix.

Surveys targeting deterrables and incorrigibles should also include batteries of questions designed to learn how the actions of the police and other guardians affect perceptions of the probability of success, which, for the reasons described in Section V, is likely to be particularly decisive in the deterrence process.

### VII. Conclusions

Over the past four decades, much has been learned about the foundations of deterrence that were laid out more than two centuries ago by Cesare Beccaria and Jeremy Bentham. We now know that deterrence is ubiquitous but that the effects are heterogeneous, ranging in size from seemingly null to very large. There is little evidence that increasing already long prison sentences has a material deterrence effect. Evidence on the deterrent effect of the certainty of punishment **\*253** is more consistent, but the source of the effect is less clear. In this essay I have argued that the certainty effect stems primarily from police functioning in their official guardian role rather than in their apprehension agent role.

These conclusions have important policy implications that are developed in detail in Durlauf and Nagin (2011*b*). They suggest that lengthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds. The crime prevention efficiency of incapacitating aged criminals is dubious, and thus the case for lengthy prison sentences must rest on retributive considerations. The conclusions also suggest that crime control effectiveness would be improved by shifting resources from corrections to policing methods that enhance the effectiveness of police in their official guardian role.

While much progress has been made in understanding sources of deterrence and the circumstances in which deterrence is and is not effective, much remains to be learned. Theory needs to be generalized to combine the response to the threat of punishments, known as general deterrence in criminology, and the response to the experience of punishment, which I have argued is inappropriately labeled specific deterrence. A second theoretical and empirical gap concerns the concept of a sanction regime and its two dimensions: the legal authority for different types of sanctions and the way in which authority is administered. These two dimensions combine to determine the certainty, severity, and celerity of sanction options available for punishment of a specific type of crime. Theories of deterrence, however, specify sanction threats in the singular, not in the plural. Theories of deterrence that conceive of sanctions in the singular do not provide the conceptual basis for considering the differential deterrent effect of different types of sanction options. The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes.

A third theoretical and empirical gap involves sanction risk perceptions. Deterrence is the behavioral response to the perception of sanction threats. Establishing the link between risk perceptions and actual sanction regimes is imperative because policy cannot directly manipulate perceptions. Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved. More research on the sources of sanction risk perceptions in **\*254** crime-prone populations is likely to pay large dividends for theory and policy.

The fourth major gap in theory and empirical knowledge involves a thorough testing of my contention that the guardian role, not the apprehension role, of the police is the most important source of their effectiveness in crime prevention. This theory also needs to be expanded to account for how the police and other guardians affect the distribution of criminal opportunities.

**REFERENCES**

Andenaes, Johannes. 1974. *Punishment and Deterrence*. Ann Arbor: University of Michigan Press.

Anwar, Shamena, and Thomas A. Loughran. 2011. "Testing a Bayesian Learning Theory of Deterrence among Serious Juvenile Offenders." *Criminology* 49:667-98.

Apel, Robert. 2013. "Sanctions, Perceptions, and Crime: Implications for Criminal Deterrence." *Journal of Quantitative Criminology* 29(1):87-101.

Apel, Robert, and Daniel S. Nagin. 2009. "Deterrence." In *Crime*, edited by James Q. Wilson and Joan Petersilia. Oxford: Oxford University Press.

Apospori, Eleni, and Geoffrey Alpert. 1993. "Research Note: The Role of Differential Experience with the Criminal Justice System in Changes in Perceptions of Severity of Legal Sanctions over Time." *Journal of Research in Crime and Delinquency* 39:184-94.

Assembly Committee on Criminal Procedure. 1968. *Deterrent Effects of Criminal Sanctions*. Sacramento: Assembly of the State of California.

Bachman, Ronet, Raymond Paternoster, and Sally Ward. 1992. "The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault." *Law and Society Review* 26(2):343-72.

Beccaria, Cesare. 1986. *On Crimes and Punishments*. Translated by Henry Paolucci. New York: Macmillan. (Originally published 1764.)

Becker, Gary S. 1968. "Crime and Punishment: An Economic Approach." *Journal of Political Economy* 76(2):169-217.

Bentham, Jeremy. 1988. *An Introduction to the Principles of Morals and Legislation*. Amherst, NY: Prometheus Books. (Originally published 1789.)

Blake, L., and R. T. Coupe. 2001. "The Impact of Single and Two-Officer Patrols on Catching Burglars in the Act." *British Journal of Criminology* 41: 381-96.

Blumstein, Alfred, and Allen J. Beck. 1999. "Population Growth in the U.S. Prisons, 1980-1996." In *Prisons*, edited by Michael Tonry and Joan Petersilia. Vol. 26 of *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press.

**\*255** ------. 2005. "Reentry as a Transient State between Liberty and Recommitment." In *Prisoner Reentry and Crime in America*, edited by Jeremy Travis and Christy Visher. Cambridge: Cambridge University Press.

Blumstein, Alfred, Jacqueline Cohen, and Daniel Nagin, eds. 1978. *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*. Washington, DC: National Academies Press.

Blumstein, Alfred, and Daniel Nagin. 1976. "The Deterrent Effect of Legal Sanctions on Draft Evasion." *Stanford Law Review* 29(2):241-75.

Braga, Anthony A. 2008. *Police Enforcement Strategies to Prevent Crime in Hot Spot Areas*. Edited by Office of Community Oriented Policing. Washington, DC: US Department of Justice.

Braga, Anthony A., Edward A. Flynn, George L. Kelling, and Christine M. Cole. 2011. "Moving the Work of Criminal Investigators towards Crime Control." *New Perspectives in Policing*. Washington, DC: US Department of Justice, National Institute of Justice.

Braga, Anthonly A., and David L. Weisburd. 2012. "The Effects of 'Pulling Levers' Focussed Deterrence Strategies on Crime." Campbell Systematic Reviews. http://campbellcollaboration.org/lib/project/96/.

Braithwaite, John. 1989. *Crime, Shame, and Reintegration*. Cambridge: Cambridge University Press.

Brantingham, Patricia L., and Paul J. Brantingham. 1999. "Theoretical Model of Crime Hot Spot Generation." *Studies on Crime and Crime Prevention* 8:7-26.

Bridges, George S., and James A. Stone. 1986. "Effects of Criminal Punishment on Perceived Threat of Punishment: Toward an Understanding of Specific Deterrence." *Journal of Research in Crime and Delinquency* 23:207-39.

Bureau of Justice Statistics. 1999. *Prisoners in 1998*. Edited by Allen J. Beck and Christopher J. Mumola. Washington, DC: Bureau of Justice Statistics.

------. 2010. *Felony Defendants in Large Urban Counties, 2006*. Edited by Thomas H. Cohen and Tracey Kyckelhahn. Washington, DC: Bureau of Justice Statistics.

------. 2011. *Prisoners in 2010 (Revised)*. Edited by Paul Guerino, Paige M. Harrison, and William J. Sabol. Washington, DC: Bureau of Justice Statistics.

------. 2012. *Correctional Populations in the United States, 2011*. Edited by Lauren E. Glaze and Erika Parks. Washington, DC: Bureau of Justice Statistics.

Bushway, Shawn. 1996. "The Impact of a Criminal History Record on Access to Legitimate Employment." PhD dissertation, Carnegie Mellon University.

Canela-Cacho, Jose A., Alfred Blumstein, and Jacqueline Cohen. 1997. "Relationship between the Offending Frequency of Imprisoned and Free Offenders." *Criminology* 35(1):133-76.

Chalfin, Aaron, Amelia M. Haviland, and Steven Raphael. 2013. "What Do Panel Studies Tell Us about a Deterrent Effect of Capital Punishment? A Critique of the Literature." *Journal of Quantitative Criminology* 29(1):5-43.

Charles, Kerwin K., and Steven N. Durlauf. 2013. "Pitfalls in the Use of Time **\*256** Series Methods to Study Deterrence and Capital Punishment." *Journal of Quantitative Criminology* 29(1):45-66.

Clarke, Ronald V. 1995. "Situational Crime Prevention." In *Building a Safer Society: Strategic Approaches to Crime Prevention*, edited by Michael Tonry and David P. Farrington. Vol. 19 of *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press.

Cohen, Lawrence E., and Marcus Felson. 1979. "Social Change and Crime Rate Trends: A Routine Activity Approach." *American Sociological Review* 44(4):588-608.

Cook, Philip J. 1979. "The Clearance Rate as a Measure of Criminal Justice System Effectiveness." *Journal of Public Economics* 11:135-42.

------. 2009: "Potential Savings from Abolition of the Death Penalty in North Carolina." *American Law and Economics Review* 11(2):498-529.

------. 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence: An Evaluation of the High Point Drug Market Intervention." *Criminology and Public Policy* 11(2):161-64.

Cook, Philip J., and Jens Ludwig. 2006. "Aiming for Evidence-Based Gun Policy." *Journal of Policy Analysis and Management* 48:691-735.

Cornish, Derek B., and Ronald V Clarke. 1986. *The Reasoning Criminal: Rational Choice Perspectives on Offending*. Secausus, NJ: Springer-Verlag.

Corsaro, N., E. D. Hunt, N. K. Hippie, and E. F. McGarrell. 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence." *Criminology and Public Policy* 11:167-99.

DeAngelo, Greg, and Benjamin Hansen. 2008. "Life and Death in the Fast Lane: Police Enforcement and Roadway Safety." Unpublished manuscript. University of California, Santa Barbara, Department of Economics.

Di Telia, Rafael, and Ernesto Schargrodsky. 2004. "Do Police Reduce Crime? Estimates Using the Allocation of Police Forces after a Terrorist Attack." *American Economic Review* 94:115-33.

Donohue, John J. 2009. "Assessing the Relative Benefits of Incarceration: The Overall Change over the Previous Decades and the Benefits on the Margin." In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll. New York: Sage.

Donohue, John J., and Justin Wolfers. 2005. "Uses and Abuses of Empirical Evidence in the Death Penalty Debate." *Stanford Law Review* 58:791-846.

------. 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economic Review* 11(2):249-309.

Draca, Mirko, Stephen Machin, and Robert Witt. 2008. *Panic on the Streets of London: Police, Crime, and the July 2005 Terror Attacks*. Bonn: Institute for the Study of Labor.

Durlauf, Steven N., and Daniel S. Nagin. 2011*a*. "The Deterrent Effect of Imprisonment." In *Controlling Crime: Strategies and Tradeoffs*, edited by Philip J. Cook, Jens Ludwig, and Justin McCrary. Chicago: University of Chicago Press.

------. 2011*b*. "Imprisonment and Crime: Can Both Be Reduced?" *Criminology and Public Policy* 10:9-54.

**\*257** Durlauf, Steven, S. Navarro, and D. Rivers. 2008. "On the Interpretation of Aggregate Crime Regressions." In *Crime Trends*, edited by A. Goldberger and R. Rosenfeld. Washington DC: National Academy of Sciences Press.

Eck, John E. 1992. "Criminal Investigation." In *What Works in Policing? Operations and Administrations Examined*, edited by Gary W. Cordner and Donna C. Hale. Cincinnati: Anderson.

Eck, John E., Jeffrey S. Gersh, and Charlene Taylor. 2000. "Finding Crime Hot Spots through Repeat Address Mapping." In *Analyzing Crime Patterns: Frontiers of Practice*, edited by Victor Goldsmith, Philip G. McGuire, John H. Mollenkopf, and Timothy A. Ross. Thousand Oaks, CA: Sage.

Ehrlich, Isaac. 1975. "The Deterrent Effect of Capital Punishment: A Question of Life and Death." *American Economic Review* 65(3):397-417.

Erickson, Maynard L., and Jack P. Gibbs. 1979. "On the Perceived Severity of Legal Penalties." *Journal of Criminal Law, Criminology, and Police Science* 70: 102-16.

Evans, William N., and Emily G. Owens. 2007. "COPS and Crime." *Journal of Public Economics* 91:181-201.

Ferrier, M., and Jens Ludwig. 2011. "Crime Policy and Informal Social Control." *Criminology and Public Policy* 10:1029-36.

Freeman, Richard B. 1991. *Crime and the Employment of Disadvantaged Youths*. Cambridge, MA: National Bureau of Economic Research.

Gibbs, Jack P. 1975. *Crime, Punishment, and Deterrence*. New York: Elsevier.

Granger, C. W.J. 1969. "Investigating Causal Relations by Econometric Models and Cross-Spectral Methods." *Econometrica* 37:424-38.

Grasmick, Harold, and George Bryjak. 1980. "The Deterrent Effect of Perceived Severity of Punishment." *Social Forces* 59(2):471-91.

Greenwood, Peter, Jan Chaiken, and Joan Petersilia. 1977. *The Investigation Process*. Lexington, MA: Lexington.

Greenwood, Peter, and Angela Hawken. 2002. *An Assessment of the Effect of California's Three-Strikes Law*. Toronto: Greenwood Associates.

Grube, Joel W., and Kathleen A. Kearney. 1983. "A 'Mandatory' Jail Sentence for Drinking and Driving." *Evaluation Review* 7:235-46.

Hawken, Angela. 2010. "Behavioral Triage: A New Model for Identifying and Treating Substance-Abusing Offenders." *Journal of Drug Policy Analysis* 3: 1-5.

Hawken, Angela, and Mark Kleiman. 2009. *Managing Drug-Involved Probationers with Swift and Certain Sanctions: Evaluating Hawaii's HOPE*. Washington, DC: National Institute of Justice.

Heaton, Paul. 2010. "Understanding the Effects of Antiprofiling Policies." *Journal of Law and Economics* 53(1):29-64.

Helland, E., and A. Tabarrok. 2007. "Does Three Strikes Deter? A Nonparametric Estimation." *Journal of Human Resources* 42(2):309-30.

Hjalmarsson, Randi. 2008. "Criminal Justice Involvement and High School Completion." *Journal of Urban Economics* 63:613-30.

------. 2009. " **\*258** Crime and Expected Punishment: Changes in Perceptions at the Age of Criminal Majority." *American Law and Economics Review* 7:209-48.

Horney, Julie, and Ineke Haen Marshall. 1992. "Risk Perceptions among Serious Offenders: The Role of Crime and Punishment." *Criminology* 30:575-93.

Jacobs, Bruce A., and Richard Wright. 2006. *Street Justice: Retaliation in the Criminal Underworld*. New York: Cambridge University Press.

Johnson, Rucker, and Steven Raphael. 2012. "How Much Crime Reduction Does the Marginal Prisoner Buy?" *Journal of Law and Economics* 55(2):275-310.

Johnston Lloyd, D., Patrick M. O'Malley, and Jerald G. Bachman. 1981. "Cannabis Decriminalization: The Impact on Youth 1975-1980." In *Monitoring the Future: Occasional Paper*. Ann Arbor, MI: Institute for Social Research.

Kansas City Police Department, eds. 1977. *Response Time Analysis*. Kansas City: Kansas City Police Department.

Kennedy, David M. 2009. *Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction*. New York: Routledge.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   33

Kennedy, David M., Anthony A. Braga, Anne Morrison Piehl, and Elin J. Waring. 2001. *Reducing Gun Violence: The Boston Gun Project's Operation Ceasefire*. Washington, DC: US National Institute of Justice.

Kessler, Daniel, and Steven Levitt. 1999. "Using Sentence Enhancements to Distinguish between Deterrence and Incapacitation." *Journal of Law and Economics* 42:348-63.

Kleck, Gary, and J. C. Barnes. Forthcoming. "Do More Police Lead to More Crime Deterrence?" *Crime and Delinquency*. doi: 10.1177/0011128710382263.

Kleck, Gary, Brion Sever, Spencer Li, and Marc Gertz. 2005. "The Missing Link in General Deterrence Research." *Criminology* 46:623-59.

Kleiman, Mark. 2009. *When Brute Force Fails, How to Have Less Crime and Less Punishment*. Princton, NJ: Princeton University Press.

Klein, Lawrence R., Brian Forst, and Victor Filatov. 1978. "The Deterrent Effect of Capital Punishment: An Assessment of the Estimates." In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, edited by Alfred Blumstein, Jacqueline Cohen, and Daniel S. Nagin. Washington, DC: National Academy of Sciences.

Klepper, Steven, and Daniel Nagin. 1989*a*. "The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited." *Criminology* 27(4):721-46.

------. 1989*b*. "Tax Compliance and Perceptions of the Risks of Detection and Criminal Prosecution." *Law and Society Review* 23:209-40.

Klick, Jonathan, and Alexander Tabarrok. 2005. "Using Terror Alert Levels to Estimate the Effect of Police on Crime." *Journal of Law and Economics* 46: 267-79.

Lee, David S., and Justin McCrary. 2009. *The Deterrent Effect of Prison: Dynamic Theory and Evidence*. Princeton, NJ: University of Princeton, Industrial Relations Section.

Levitt, Steven D. 1996. "The Effect of Prison Population Size on Crime Rates: **\*259** Evidence from Prison Overcrowding Legislation." *Quarterly Journal of Economics* 111:319-52.

------. 1997. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime." *American Economic Review* 87:270-90.

------. 1998. "Juvenile Crime and Punishment." *Journal of Political Economy* 106:1156-85.

------. 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Reply." *American Economic Review* 92:1244-50.

------. 2006. "The Case of the Critics Who Missed the Point: A Reply to Webster et al." *Criminology and Public Policy* 5:449-60.

Liedka, Raymond V., Anne Morrison Piehl, and Bert Useem. 2006. "The Crime-Control Effect of Incarceration: Does Scale Matter?" *Criminology and Public Policy* 5:245-76.

Lochner, Lance. 2007. "Individual Perceptions of the Criminal Justice System." *American Economic Review* 97:444-60.

Loftin, Colin, Milton Heumann, and David McDowall. 1983. "Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control." *Law and Society Review* 17:287-318.

Loftin, Colin, and David McDowall. 1981. "'One with a Gun Gets You Two': Mandatory Sentencing and Firearms Violence in Detroit." *Annals of the American Academy of Political and Social Science* 455(1):150-67.

------. 1984. "The Deterrent Effects of the Florida Felony Firearm Law." *Journal of Criminal Law and Criminology* 75:250-59.

Ludwig, Jens, Jeffrey R. Kling, and Sendhil Mullainathan. 2011. "Mechanism Experiments and Policy Evaluations." *Journal of Economic Perspectives* 25(3): 17-38.

MacCoun, Robert, Rosalie Liccardo Pacula, Jamie Chriqui, Katherine Harris, and Peter Reuter. 2009. "Do Citizens Know Whether Their State Has Decriminalized Marijuana? Assessing the Perceptual Component of Deterrence Theory." *Review of Law and Economics* 5:347-71.

Marvell, Thomas B., and C. Moody Jr. 1994. "Prison Population Growth and Crime Reduction." *Journal of Quantitative Criminology* 10:109-40.

------. 1996. "Specification Problems, Police Levels, and Crime Rates." *Criminology* 34:609-46.

Matsueda, Ross L., D. A. Kreager, and D. Huizinga. 2006. "Deterring Delinquents: A Rational Choice Model of Theft and Violence." *American Sociological Review* 71:95-122.

McCrary, Justin. 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment." *American Economic Review* 92: 1236-43.

McDowall, D., C. Loftin, and B. Wiersema. 1992. "A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crimes." *Journal of Criminal Law and Criminology* 83:378-94.

Meier, R. F., and W. T. Johnson. 1977. "Deterrence as Social Control: The Legal and Extralegal Production of Conformity." *American Sociological Review* 42:292-304.

**\*260** Minor, W. W. 1977. "A Deterrence-Control Theory of Crime." In *Theory of Criminology*, edited by R. F. Meier. Beverly Hills, CA: Sage.

Mulvey, E. P. 2011. *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders*. Juvenile Justice Fact Sheet. Washington, DC: Department of Justice.

Nagin, Daniel S. 1998. "Criminal Deterrence Research at the Outset of the Twenty-First Century." In *Crime and Justice: A Review of Research*, vol. 23, edited by Michael Tonry. Chicago: University of Chicago Press.

Nagin, Daniel S., Francis T. Cullen, and Cheryl Lero Jonson. 2009. ""Imprisonment and Reoffending." In *Crime and Justice: A Review of Research*, vol. 38, edited by Michael Tonry. Chicago: University of Chicago Press.

Nagin, Daniel S., and Raymond Paternoster. 1993. "Enduring Individual Differences and Rational Choice Theories of Crime." *Law and Society Review* 27:467-99.

------. 1994. "Personal Capital and Social Control: The Deterrence Implications of Individual Differences in Criminal Offending." *Criminology* 32: 581-606.

Nagin, Daniel S., and John V Pepper, eds. 2012. *Deterrence and the Death Penalty*. Washington, DC: National Academies Press.

Nagin, Daniel S., and Greg Pogarsky. 2001. "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence." *Criminology* 39:865-92.

------. 2003. "An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity." *Criminology* 41:167-93.

Owens, Emily G. 2009. "More Time, Less Crime? Estimating the Incapacitative Effects of Sentence Enhancements." *Journal of Labor Economics* 53(3): 551-79.

Packer, H. L. 1968. *The Limits of the Criminal Sanction*. Stanford, CA: Stanford University Press.

Papachristos, Andrew V., Tracey L. Meares, and Jeffrey Fagan. 2007. "Attention Felons: Evaluating Project Safe Neighborhoods in Chicago." *Journal of Empirical Legal Studies* 4:223-72.

Paternoster, Raymond. 1983. "Estimating Perceptual Stability and Deterrent Effects: The Role of Perceived Legal Punishment in the Inhibition of Criminal Involvement." *Journal of Criminal Law and Criminology* 74:210-97.

------. 2010. "How Much Do We Really Know about Criminal Deterrence?" *Journal of Criminal Law and Criminology* 10(3):765-823.

Paternoster, Raymond, and Alex Piquero. 1995. "Reconceptualizing Deterrence: An Empirical Test of Personal and Vicarious Experiences." *Journal of Research in Crime and Delinquency* 32:251-86.

Paternoster, Raymond, Linda E. Saltzman, Theodore G. Chiricos, and Gordon P. Waldo. 1982. "Perceived Risk and Deterrence: Methodological Artifacts in Perceptual Deterrence Research." *Journal of Criminal Law and Criminology* 73:1238-58.

Piliavin, Irving, Craig Thornton, Rosemary Gartner, and Ross L. Matsueda. **\*261** 1986. "Crime, Deterrence, and Rational Choice." *American Sociological Review* 51:101-19.

Piquero, Alex, Raymond Paternoster, Greg Pogarsky, and Thomas A. Loughran. 2011. "Elaborating the Individual Difference Component in Deterrence Theory." *Annual Review of Law and Social Science* 7:355-60.

Pogarsky, Greg. 2007. "Deterrence and Individual Differences among Convicted Offenders." *Quantitative Criminology* 23(1):59-74.

Pogarsky, Greg, KiDuek Kim, and Raymond Paternoster. 2005. "Perceptual Change in the National Youth Survey: Lessons for Deterrence Theory and Offender Decision-Making." *Justice Quarterly* 22:1-29.

Pogarsky, Greg, and Alex R. Piquero. 2003. "Can Punishment Encourage Offending? Investigating the 'Resetting' Effect." *Journal of Research in Crime and Delinquency* 40:95-120.

Pogarsky, Greg, Alex R. Piquero, and Raymond Paternoster. 2004. "Modeling Change in Perceptions about Sanction Threats: The Neglected Link in Deterrence Theory." *Journal of Quantitative Criminology* 20:343-69.

Poutvaara, Panu, and Mikael Priks. 2006. "Hooliganism in the Shadow of a Terrorist Attack and the Tsunami: Do Police Reduce Group Violence?" Working Paper no. 1882. Munich: Center for Economic Studies and Ifo Institute for Economic Research.

Raphael, Steven. 2006. "The Deterrent Effects of California's Proposition 8: Weighing the Evidence." *Criminology and Public Policy* 5:471-78.

Raphael, Steven, and Jens Ludwig. 2003. "Prison Sentence Enhancements: The Case of Project Exile." In *Evaluating Gun Policy: Effects on Crime and Violence*, edited by Jens Ludwig and Philip J. Cook. Washington, DC: Brookings Institution Press.

Raphael, Steven, and Michael A. Stoll. 2009. "Why Are So Many Americans in Prison?" In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll. New York: Sage.

Reuter, Peter, and Howard Pollack. 2012. "Good Markets Make Bad Neighbors: Regulating Open-Air Drug Markets." *Criminology and Public Policy* 11(2):211-20.

Roncek, Dennis W. 2000. "Schools and Crime." In *Analyzing Crime Patterns: Frontiers of Practice*, edited by Victor Goldsmith, Philip G. McGuire, John H. Mollenkopf, and Timothy A. Ross. Thousand Oaks, CA: Sage.

Ross, H. Laurence. 1973. "Law, Science, and Accidents: The British Road Safety Act of 1967." *Journal of Legal Studies* 2:1-78.

------. 1982. *Deterring the Drinking Driver: Legal Policy and Social Control*. Lexington, MA: Lexington.

Sherman, Lawrence W. 1990. "Police Crackdowns: Initial and Residual Deterrence." In *Crime and Justice: A Review of Research*, vol. 12, edited by Michael Tonry and Norval Morris. Chicago: University of Chicago Press.

------. In this volume. "The Rise of Evidence-Based Policing: Targeting, Testing, and Tracking."

Sherman, Lawrence W., and Richard A. Berk. 1984. "The Specific Deterrent **\*262** Effects of Arrest for Domestic Assault." *American Sociological Review* 49:261-72.

Sherman, Lawrence W., and John E. Eck. 2002. "Policing for Prevention." In *Evidence Based Crime Prevention*, edited by Lawrence W. Sherman, David Farrington, and Brandon Welsh. New York: Routledge.

Sherman, Lawrence W., Patrick Gartin, and Michael Buerger. 1989. "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place." *Criminology* 27:27-55.

Sherman, Lawrence, and David Weisburd. 1995. "General Deterrent Effects of Police Patrol in Crime 'Hot Spots': A Randomized Study." *Justice Quarterly* 12:625-48.

Shi, Lan. 2009. "The Limits of Oversight in Policing: Evidence from the 2001 Cincinnati *Blot." Journal of Public Economics* 93:99-113.

Snell, T. L. 2010. *Capital Punishment 2009--Statistical Tables*. Washington, DC: US Department of Justice.

Spelman, William. 2000. "What Recent Studies Do (and Don't) Tell Us about Imprisonment and Crime." In *Crime and Justice: A Review of Research*, vol. 27, edited by Michael Tonry. Chicago: University of Chicago Press.

Spelman, William, and Dale K. Brown. 1981. *Calling the Police: A Replication of the Citizen Reporting Component of the Kansas City Response Time Analysis*. Washington, DC: Police Executive Research Forum.

Stafford, Mark C., and Mark Warr. 1993. "A Reconceptualization of General and Specific Deterrence." *Journal of Research in Crime and Delinquency* 30: 123-35.

Stolzenberg, Lisa, and Stewart J. D'Alessio. 1997. "'Three Strikes and You're Out': The Impact of California's New Mandatory Sentencing Law on Serious Crime Rates." *Crime and Delinquency* 43(4):457-69.

Tittle, Charles. 1977. "Sanction Fear and the Maintenance of Social Order." *Social Forces* 55:579-96.

------. 1980. *Sanctions and Social Deviance: The Question of Deterrence*. New York: Praeger.

Tonry, Michael. 1996. *Sentencing Matters*. Oxford: Oxford University Press.

------. 2009. "The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings." In *Crime and Justice: A Review of Research*, vol. 38, edited by Michael Tonry. Chicago: University of Chicago Press.

Vollaard, Ben. 2013. "Preventing Crime through Selective Incapacitation." *Economic Journal* 123(567):262-84.

Waldfogel, Joel. 1994. "The Effect of Criminal Conviction on Income and the Trust 'Reposed in the Workmen.'" *Journal of Human Resources* 29:62-81.

Webster, Cheryl Marie, Anthony Doob, and Franklin Zimring. 2006. "Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent." *Criminology and Public Policy* 5:417-48.

Weisburd, David, Shawn Bushway, Cynthia Lum, and Su-Ming Yang. 2004. "Trajectories of Crime at Places: A Longitudinal Study of Street Segments in the City of Seattle." *Criminology* 42:238-320.

Weisburd, David, and John Eck. 2004. "What Can Police Do to Reduce **\*263** Crime, Disorder, and Fear?" *Annals of the American Academy of Political and Social Science* 593:42-65.

Weisburd, David, Tomar Einat, and Matt Kowalski. 2008. "The Miracle of the Cells: An Experimental Study of Interventions to Increase Payment of Court-Ordered Financial Obligations." *Criminology and Public Policy* 7:9-36.

Weisburd, David, and Lorraine Green. 1995. "Policing Drug Hot Spots: The Jersey City Drug Market Analysis Experiment." *Justice Quarterly* 12:711-35.

Wikström, Per-Olof H., D. Oberwittler, K. Treiber, and B. Hardie. 2012. *Breaking Rules: The Social and Situational Dynamics of Young People's Urban Crime*. Oxford: Oxford University Press.

Williams, Kirk R., Jack P. Gibbs, and Maynard L. Erickson. 1980. "Public Knowledge of Statutory Penalties: The Extent and Basis of Accurate Perception." *Sociological Review* 23:105-28.

Williams, Kirk R., and Richard Hawkins. 1986. "Perceptual Research on General Deterrence: A Critical Overview." *Law and Society Review* 20:545-72.

Wilson, J. M., and S. Chermak. 2011. "Community-Driven Violence Reduction Programs." *Criminology and Public Policy* 10:993-1027.

Wood, Peter B., and David C. May. 2003. "Racial Differences in Perceptions of Severity of Sanctions: A Comparison of Prison with Alternatives." *Justice Quarterly* 20(3):605-31.

Wright, Richard T., and Scott H. Decker. 1994. *Burglars on the Job: Streetlife and Residential Break-ins*. Boston: Northeastern University Press.

Zimring, Franklin, and Gordon Hawkins. 1973. *Deterrence: The Legal Threat in Crime Control*. Chicago: University of Chicago Press.

Zimring, Franklin E., Gordon Hawkins, and Sam Kamin. 2001. *Punishment and Democracy: Three Strikes and You're Out in California*. New York: Oxford University Press.

**Footnotes**

[a1]   Daniel S. Nagin is the Teresa and H.John Heinz III University Professor of Public Policy and Statistics at Carnegie Mellon University.

[1]   Crime may also be sanctioned entirely outside of the criminal justice system through retaliation by the victim or by others on his or her behalf (Jacobs and Wright 2006).

[2]   This model assumes that success precludes the possibility of subsequent apprehension and the attendant risk of formal sanction.

[3]   Rewards and commission cost may also be affected by risk preferences.

[4]   Knowledge of potential punishment may also reinforce a normative sense of wrongfulness.

[5]   As in the entire imprisonment and crime literature, I too assume that sanction policies are unaffected by either the crime rate or the imprisonment rate. This is not a tenable assumption. However, all the points I make in the ensuing discussion would continue to hold if the model were generalized to allow sanction policy to be affected by crime rates and imprisonment rates.

[6]   For further discussion of heterogeneity in deterrence response, see Paternoster (2010) and Piquero et al. (2011).

[7]   The finding that the young fail to respond to changes in penalties associated with the age of majority is not uniform across studies. An earlier analysis by Levitt (1998) finds a large drop in the offending of young adults when they reach the age of jurisdiction for adult courts. For several reasons, Durlauf and Nagin (2011*a*, 2011*b*) judge the null effect finding of Lee and McCrary (2009) more persuasive in terms of understanding deterrence. First, Levitt focuses on differences in age measured at annual frequencies, whereas Lee and McCrary measure age in days or weeks. At annual frequencies, the estimated effect is more likely to reflect both deterrence and incapacitation; hence Levitt's results may be driven by incapacitation effects rather than by deterrence per se. Second, the Lee and McCrary analysis is based on individual-level data and so avoids problems that can arise because of aggregation (Durlauf, Navarro, and Rivers 2008; Durlauf and Nagin 2011*a*). On their own terms, the individual-level data studied by Lee and McCrary are unusually informative since they also contain information on the exact age of arrestees, which allows for the calculation of very short-run effects of the discontinuity in sentence severity, e.g., effects within 30 days of turning 18.

[8]   McCrary identified an error in the computation of standard errors in Levitt (1997) that when corrected nullified the finding of a crime prevention effect of police numbers. Levitt (2002) argues that McCrary's findings do not overturn his general claim that increased numbers of police reduce crime rates and presents new evidence to that effect.

[9]   For Boston, see Cook and Ludwig (2006); for Richmond, see Raphael and Ludwig (2003); for Chicago, see Papachristos, Meares, and Fagan (2007); for Pittsburgh, see Wilson and Chermak (2011); and for High Point, see Corsaro et al. (2012).

[10]   For an exhaustive and thoughtful review, on which this discussion draws heavily, see Apel (2013).

[11]   In the context of the decision model laid out in Sec. I, these are individuals for whom the net reward of committing a crime is negative even without consideration of sanction costs.

[12]   Prior history may be ignored if a regime change (e.g., the occupying German army arresting the Danish police force)

makes it irrelevant.

42 CRIMEJ 199

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

8 Cardozo J. Conflict Resol. 421

Cardozo Journal of Conflict Resolution
Spring 2007

Article
Zvi D. Gabbay[a1]

Copyright (c) 2007 Yeshiva University; Zvi D. Gabbay

# EXPLORING THE LIMITS OF THE RESTORATIVE JUSTICE PARADIGM: RESTORATIVE JUSTICE AND WHITE-COLLAR CRIME

## Preamble

Sixty-three-year old advertising executive Paul Coffin stood up in a Quebec Superior Court room and apologized "to all Canadians."[1] In his emotional testimony in mid-August 2005, Coffin stated: "I realize what I have done... I know I have tarnished my family name. I know I have disappointed all Canadians."[2] What Paul Coffin had done was to defraud the Canadian government of over a million and a half dollars. It was not a crime of passion or one committed on impulse. Instead, it was the result of careful planning and premeditation which allowed Coffin to receive money from the government from 1997 to 2002 for an advertising campaign he never executed.[3] After pleading guilty to the fifteen fraud charges related to the scandal, Coffin mortgaged his house, cashed out retirement funds, and borrowed $500,000 from friends and family in order to repay the government one million dollars.[4] Apparently, his genuine remorse and reparative actions were especially convincing because his sentencing judge, Superior Court Justice Jean-Guy Boilard, decided to reject the prosecutor's request for a thirty-four month prison term, and sentenced Coffin *422 to two years of community service, where he would give lessons on business ethics.[5]

Since the prosecution was given permission to appeal this sentence,[6] it is safe to assume that the final word is yet to be said in this case. Nevertheless, Paul Coffin's story raises many interesting questions as to the appropriate response to white-collar crime. Here, for instance, the offender confessed to the crime, apologized to his victims - the Canadian people - and repaired the harm caused by the crime. Does that justify the lenient response of community service instead of harsh imprisonment? Obviously, Justice Boilard believes it does. The many angry editorials published in the Canadian press in response to Coffin's sentence prove that many others fiercely oppose that belief.[7]

It may be argued that the problem with this case is that while the apology was definitely warranted, it should have been made in a more appropriate forum, and not as a justification for such a lenient sentence. One possibility for such a forum is a restorative justice intervention. In this type of process victims and offenders meet in the aftermath of crime and discuss how the offense affected their lives and how to repair the harm caused by the offense. Quite often these proceedings lead to an apology.[8] Restorative justice processes are known to receive high satisfaction rates from most participants and to promote healing and rehabilitation for both victims and offenders.[9]

But is restorative justice applicable to all types of criminal misconduct? Is restorative justice limited only to certain types of street crimes or juvenile offenses? And more specifically, are these processes applicable to white-collar crime cases? In order to explore the limits of restorative justice in this area of crime, I will largely focus on the less common high-profile Enron-type white- *423 collar crime scandals that affect thousands of people and cause colossal harm. Answering the question of whether restorative justice applies in these cases will contribute to a better understanding of the restorative justice paradigm in general and to its possible role in the criminal justice system in particular.

The article argues that restorative justice interventions are warranted and possible even in high-profile white-collar crime cases where restorative justice has not been applied to date. However, the article also demonstrates that the conventional restorative justice process models such as victim-offender mediation, group conferencing and circles[10] are inapplicable in high-profile white-collar crime cases, and that a different, innovative model inspired by the South African Truth and Reconciliation can offer a preferable solution.

Part I of this article introduces the restorative justice paradigm. It defines restorative justice and its basic values and principles and presents two theories which illustrate the goals of restorative interventions and the basic requirements for their commencement. Part II introduces white-collar crime and focuses on high-profile white-collar crime committed by corporate executives. This part discusses the centrality of white-collar crime within the criminal justice system and society in general and reviews the latest developments in legislation and sentencing policies on white-collar crime. Part III argues that the restorative justice paradigm should be applied to high-profile white-collar crime as a matter of principle, and as part of the sentence imposed on the offender, not instead of it. Part IV presents a model for restorative responses to white-collar crime inspired by the South African Truth and Reconciliation Commission, and demonstrates how this process model fulfills the important themes and conditions required of such an intervention. The article concludes by calling upon the criminal justice system and restorative justice advocates to combine efforts and examine the applicability and appropriateness of integrating a restorative component within the public response to white-collar crime.

### *424 I. The Restorative Justice Paradigm: Definition, Values and Theories

Before examining the applicability of restorative processes to white-collar crime cases, it is important to ascertain what restorative justice actually is. Although there is no consensus among restorative justice practitioners and scholars on a definition of restorative justice[11], the definition offered by Paul McCold and Ted Wachtel seems most appropriate. According to McCold and Wachtel, "Restorative justice is a process involving the direct stakeholders in determining how best to repair the harm done by offending behavior."[12] However, this definition cannot stand alone, since its building blocks are unclear and vague: Who are the "direct stakeholders," what is the meaning of "repairing the harm," and what is considered "offending behavior?"[13] Furthermore, the definition of restorative justice only provides a skeleton, a technical and dry description of what restorative justice may look like to a distant observer, without revealing the spirit and soul of the process.

In addition to its procedural aspect, the restorative justice paradigm consists of a set of principles and values. John Braithwaite, a prominent restorative justice advocate, compiled three lists of values which he referred to as (1) constraining values, (2) maximizing values, and (3) emergent values.[14] According to Braithwaite, "list one are values that must be honored and enforced as constraints; list two are values restorative justice advocates should actively encourage in restorative processes; list three are values we **\*425** should not urge participants to manifest - they are emergent properties of a successful restorative process."[15]

The first list consists of values such as non-domination, empowerment and equal concern for all stakeholders.[16] The second list includes basic kinds of emotional and monetary restoration, prevention of further injustice and similar principles.[17] The third list includes remorse, apology, censure of the act, forgiveness, and mercy.[18]

Combined, the definition and the values mentioned above provide a useful basis for understanding what restorative justice is. The definition provides the basic structure and procedural context, and the values provide the goals and constraints of the process. What is missing, however, is a systematic connection between them - an underlying theory of restorative justice. While attempts to arrive at an agreed-upon definition and basic set of principles for the restorative justice paradigm continue,[19] there have been very few attempts to offer a comprehensive theory of restorative justice. One of the more noteworthy of these endeavors is Paul McCold's causal needs-based theory (hereinafter "casual theory")[20] Another important theoretical model is the "making amends" model, developed by Andrew von Hirsch, Andrew Ashworth and Clifford **\*426** Shearing.[21] Together, the two theories provide a comprehensive understanding of what restorative justice processes strive to achieve.

McCold's causal theory is premised on two postulates: That crime harms people and relationships and that justice requires repair of these harms. McCold further develops these precepts by asserting that the harm caused by crime creates needs. A

restorative response is one that meets these needs and thereby repairs the harm. The key questions McCold identifies are: (1) who is harmed, (2) what are their needs, and finally (3) how can those needs be met?[22]

In answering the first question, McCold distinguishes between primary or direct stakeholders (victims, offenders, their families and communities of care)[23] and secondary or indirect stakeholders (neighbors, local community members, local governmental organizations and more).[24] Based on this distinction, McCold identifies different types of restorative practices, ranging from "fully restorative," when all participants are primary stakeholders, to "partly restorative," depending on the degree of primary stakeholder participation and the inclusion of secondary stakeholders.[25]

Unlike McCold, the three scholars who proposed the "making amends" model do not claim to be experts in the area of restorative justice. Von Hirsch, Ashworth and Shearing are prominent scholars in the area of retribution, criminal sentencing, and alternative sanctioning, respectively. Interestingly, although their goal - to formulate a theory that clarifies the aims and limits of restorative justice - is similar to McCold's, the "making amends" model is **427** quite different from the causal needs-based theory, probably due to the very different perspectives.

According to von Hirsch, Ashworth and Shearing, a restorative response is one that involves a negotiation between the offender and his victim, in the course of which the following occurs: "(1) [an] implicit or explicit acknowledgement of fault and (2) an apologetic stance on the part of the offender, ordinarily conveyed through having him undertake a reparative task."[26] However, the theory also takes into account situations in which one of these may not occur (for example, the offender does not apologize or agree to repair the harm). Even in those instances, the process will still be considered a restorative response so long as it was consistent "with the primary making-amends focus."[27] That said, von Hirsch, Ashworth and Shearing emphasize that not all kinds of intervention promote this aim, and it is up to each restorative justice program and the restorative justice community to develop guiding principles to that end.[28] Finally, as articulated by its formulators, "the making-amends model is addressed to a certain kind of case: One in which there is an identifiable person who is the offender, another identifiable person who is the victim, and a victimizing act which infringes the latter's rights."[29]

In my opinion, restorative justice is a different approach to criminal justice. While the system today is offender-oriented and focused on punishment, the restorative justice paradigm offers a more balanced view of the appropriate public response to crime. It maintains the public aspect of criminal law but introduces the victims' perspective and the reparation of the needs created by the offense as an inseparable aspect of justice. The contents of this approach are revealed through the definition of restorative justice, its values and its theories as reviewed in the previous passages. The question examined in this article is whether this approach, this paradigm, is applicable to white-collar crime.

## *428 II. White Collar Crime: Definitions, Importance and Current Trends

### A. Defining White-Collar Crime

Before attempting to match the restorative justice paradigm with white-collar crime, the type of criminal misconduct included in the phrase "white-collar crime" must be clarified. The first to coin the phrase and offer a definition was Edwin Sutherland in a famous address to the American Sociological Society in Philadelphia on December 27, 1939.[30] Sutherland defined white-collar crime as "a crime committed by a person of respectability and high social status in the course of his occupation."[31] Unsurprisingly, this definition was subject to various critiques, as were many of the other suggested definitions for this term.[32] For example, Sutherland's definition limits white-collar offenders to a particular social stature and class. This, of course, is extremely problematic from a jurisprudential perspective which focuses on the qualities of the conduct, not those of the offender. Criminal liability cannot be determined based on a defendant's social status; that would be blunt and unjustified discrimination.[33]

For this reason, among others, the United States Department of Justice (DOJ) adopted a different definition for the term. According to the DOJ, white-collar crime is

> nonviolent crime for financial gain committed by means of deception by persons whose occupational status is entrepreneurial, professional or semi-professional and utilizing their special occupational skills and opportunities;

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 117 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

also, nonviolent crime for financial gain utilizing deception and committed by anyone **429** having special technical and professional knowledge of business and government, irrespective of the person's occupation.[34]

This definition opens the door to a wide array of offenders that fit an entirely different profile than the one Sutherland probably had in mind.

A study structured to discover recidivism patterns among white-collar offenders sentenced in federal courts used a previously selected sample labeled by its assembler "a broad sampling of white collar offenders in the federal courts."[35] Contrary to the common perception of white-collar criminals, the sample consisted mostly of "offenders who are very similar to average or middle class Americans."[36] In fact, eight percent of the offenders in the sample were unemployed at the time they committed the offense, and only a third were officers or owners of businesses.[37] This data should not be surprising since "the vast majority of federal economic crime defendants are low-level offenders whose crimes caused only modest losses."[38] Many of these cases involve checks stolen from the mail (hence a federal offense), small embezzlements by employees of federally insured banks, health care fraud, student loan fraud and Social Security fraud.[39]

Nevertheless, it is the white-collar criminal that Sutherland described that is of interest for the purposes of this analysis. There is nothing new or challenging about applying a restorative justice process to a widow who continues cashing her husband's Social Security **430** checks for several months after he passes away. The Polk County Attorney's Office in Des-Moines, Iowa, for example, first began experimenting with restorative justice interventions in 1991 in unemployment fraud cases, where offenders received benefits illegally.[40] In 1998, the County Attorney's Office instituted the "Welfare Fraud Program" which offers offenders charged with welfare fraud the opportunity to participate in a restorative justice program instead of court trial.[41] Such cases are referred to restorative justice interventions just like other low-level property offenses, which are the most common offenses to be referred to restorative justice programs in the United States.[42] These types of fraud cases fall under this same category.[43] Admittedly, it has been argued that the restorative justice paradigm is also not foreign to white-collar offending in the more lucrative corporate environment. In his book "Restorative Justice and Responsive Regulation," John Braithwaite argues that restorative justice measures are in fact commonly used in many countries to regulate corporate and white-collar workers' conduct.[44] However, as critics point out, Braithwaite completed his book before Enron, WorldCom, Arthur Andersen and other massive corporate scandals that changed the way public companies are regulated in the United States. In the post-Enron era, the relevancy of restorative justice as a way of regulating the behavior of corporate executives is highly questionable due to the heavy reliance on punitive and regulatory measures.[45]

This is the question I wish to address: Is it appropriate and justified to apply restorative justice processes to the white-collar criminals that Sutherland had in mind? The mental image of **431** white-collar criminals that I would like the reader to have is one of "crooked corporate tycoons, document-shredding Big Five accountants, and devious fat cats with offshore accounts."[46] They are typically high-ranking executives in large corporations who acted fraudulently in order to promote the value of their companies' shares and for their own profit. Does restorative justice overreach with this kind of offender?

## B. Centrality of White-Collar Crime

Over the years, white-collar crime has emerged as an important area of criminal law. As Frank Bowman reports, there are hundreds of federal economic offenses, which constitute over twenty-five percent of all federal offenses sentenced according to the sentencing guidelines.[47] Adding to the centrality of this criminal category is the fact that economic crimes cover an extremely wide range of conduct and the legal provisions in this area protect a wide spectrum of important interests that go beyond the direct economic and physical interests of victims, such as the integrity of financial and commodity markets, the integrity of the judicial and political systems and more.[48] Therefore, the harm caused by economic offenses "often extends far beyond monetary losses to loss of jobs, homes, solvency, access to health care or financial security in retirement."[49]

One of the most infamous examples of the harmful effect of white-collar crime is, of course, the corporate executive misconduct that led to the fall of Enron in December 2001. As a result of the company's fraudulent insider deals and accounting, thousands of people lost their jobs and often their life savings as well. In every possible way, this episode was nothing short of a disaster.[50]

What makes things even worse is that this was not an isolated incident. In recent years, the American people have been exposed **\*432** to a series of corporate scandals that led, in the more severe cases, to the bankruptcy of major corporations. In most of these scandals top executives were allegedly engaged in criminal misconduct that ultimately caused extensive harm to their companies, employees and creditors and to the credibility and stability of the financial market. In addition to Enron, companies such as WorldCom, Tyco, Adelphia, Global Crossing and other large and influential corporations were involved in major scandals.[51]

Additionally, white-collar crime takes a substantial toll on the criminal justice system. In general, white-collar crimes, especially those of the type and magnitude discussed above, are costly and time consuming. They necessitate police officers and prosecutors to acquire special skills, their investigation and trial are often complex and lengthy, and even when they do not go to trial they "consume disproportionate amounts of judicial resources."[52]

It has also been argued that the criminal justice system as a whole has been inadequate in its treatment of crime victims, its ability to reduce crime and its capability to fulfill public expectations of fairness and justice.[53] As Bowman clearly and simply put it, "theft and fraud are never victimless crimes,"[54] and the Enron scandal exemplifies just how many people white-collar crime can victimize. In other words, if the criminal justice system has a general problem with addressing victims' needs, this problem is intensified and multiplied when it comes to white-collar crime. At the same time, there is no question that the criminal justice system is as deeply concerned with reducing and preventing white-collar crime as it is with the public's perception of its response to white-collar crime.[55] Therefore, if there were a better way to achieve these goals, this would surely be of interest to the criminal justice system.

**\*433** Elsewhere I have argued that when applied appropriately, restorative justice processes can improve these shortcomings and can even strengthen fundamental principles of punishment.[56] Since white-collar crime is such an important component of criminal law, takes up so much of the criminal justice system's resources and has such a dramatic and extensive impact on society as a whole, it is crucial to determine whether the benefits and achievements of restorative interventions in other areas of criminal law can also be achieved here.

## C. Current trends in responding to white-collar crime

As mentioned previously, America experienced an unusual wave of corporate scandals that caused massive harm between late 2001 and 2003, and public response did not wait long to follow. For those who followed the news in the United States in recent years these names and facts will undoubtedly be familiar: Bernard Ebbers, Chief Executive and founder of WorldCom, one of the largest telecommunication companies in the United States, was convicted of masterminding an $11 billion accounting fraud relating to the company's earnings and was sentenced to twenty-five years in prison; Scott Sullivan, the company's CFO, was sentenced to five years in prison for his role in the fraudulent scheme;[57] Dennis Kozlowski, the former chief executive of Tyco International and Mark Swartz, his chief lieutenant, were convicted of fraudulently stealing $150 million from the company, and were sentenced to eight to **\*434** twenty-five years in a New York State prison;[58] eighty-year-old John Rigas, founder and chairman of Adelphia Communications Corp. and his son, Timothy Rigas, former CFO of the company, were convicted of stealing $100 million from Adelphia for personal luxuries. John Rigas was sentenced to fifteen years in prison and his son was sentenced to twenty years in prison;[59] and of course Jeffrey Skilling and Kenneth Lay, former Enron chief executives, were accused of overseeing "a massive conspiracy to cook the books at Enron and to create the illusion that it was a robust, growing company... when, in fact, Enron was an increasingly troubled business kept afloat only by a series of deceptions."[60] Ultimately, Enron collapsed, leaving behind a long trail of victims and substantial harm. Skilling and Lay were convicted in May 2006. Kenneth Lay died unexpectedly two months after his conviction of heart-related problems. Jeffery Skilling was sentenced in October 2006 to twenty four years and four months in prison.[61]

Those mentioned above are merely a sample of what seems like a larger wave of powerful corporate executives exploiting their high positions and causing society substantial and long lasting harm.[62] Their stories, however, exemplify another trend as well: white-collar offenders are being indicted and sentenced to long prison terms, in sharp contrast to the practice just a few years ago. Prior to November 2001, people suspected of committing white-collar offenses were rarely even prosecuted, which is exactly what white-collar defense attorneys wanted - and usually did - achieve.[63] But even when white-collar offenders were charged and convicted, their sentences, in comparison with convicted "street" **\*435** offenders, were more likely to be fines, probation, or community service rather than prison sentences.[64]

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 119 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

This reality seems to have changed. State, and mainly federal,[65] law enforcement agencies are clearly adopting stricter policies to combat white-collar crime. The question is, why? One possible answer could be that the government was compelled to get "tougher on white-collar criminals" because of a "rising tide of economic crime."[66] Although it may certainly seem that way, especially in light of their publicity, statistics published by the DOJ prove otherwise. According to Frank Bowman, the number of referrals of white-collar cases by federal investigative agencies to U.S. Attorney's Offices has "declined steadily, dropping by 5,155 or 15% between 1994 and 2000."[67] At the same time, the number of defendants charged with economic crimes in federal courts remained roughly steady between 1994 and 2001. This means that federal prosecutors must be declining fewer economic crime cases, and "dip[ing] ever deeper into a shrinking pool of offenders to hold roughly constant the flow of economic crime defendants through the federal courts."[68] In other words, not only is there no "tide of economic crime," but the records show an actual reduction in white-collar crime rates.[69]

A possible explanation for the dramatic increase in the sentences imposed on convicted corporate executives may be that the government is responding to growing public pressure to punish white-collar offenders more severely. Studies conducted as far back as the pre-Watergate era have revealed that the public perceives some of the most typical white-collar crimes, such as misrepresenting **436** the value of an investment to a potential investor, forgery, bribe and tax fraud, among the "most morally condemnable behaviors" out of a list of fifty types of misconduct.[70] A number of studies from the late nineteen fifties and sixties found that members of the public believed that certain types of white-collar offenders should be subjected to heavier penalties.[71] Not surprisingly, these punitive attitudes have increased in the post-Watergate era.[72] In fact, one of the most interesting conclusions derived from the many studies that examined this question is that "the community perceives many forms of white-collar crime as more serious, and deserving of more severe punishment, than most forms of common crime."[73] At the same time, a national survey on white-collar crime conducted during 1999 found "a serious confidence gap between public demand for 'just deserts' for white-collar offenders and the perception of the criminal justice system's ability, or willingness, to administer adequate punishment."[74] Highly publicized prosecutions and lengthy prison sentences for convicted corporate executives may very well be the criminal justice system's attempt to answer public demand.[75]

**437** On the other hand, this answer is not based on sound and conclusive empirical evidence. John Coffee cited studies that show that "the public learns what is criminal from what is punished, not vice versa."[76] If this is true, then the public may be getting its retributive attitude toward white-collar offenders from the severe sentences pursued by prosecutors for such crimes. Either way, one thing is certain: It is by no means an accident or coincidence that white-collar offenders are being punished more often and more severely. It is the product of deliberate governmental policies and seems to be the wish of the American public. The legislative history and development of white-collar crime sentencing policies in the United States are the manifestation of these trends. Since any discussion on sentencing white-collar offenders must take these developments into account, they will be briefly reviewed here.

### D. The history and development of white-collar crime sentencing policies and legislation

The first substantial development in sentencing white-collar offenders occurred with the enactment of the Sentencing Reform Act of 1984 and the formulation of the Federal Sentencing Guidelines.[77] Through the guidelines, the Sentencing Commission strove to stop the common practice of nearly automatic probation for economic crimes, and impose "short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation."[78] The second significant landmark in prosecuting and sentencing white-collar criminals came in November 2001, when the "Economic Crime Package," passed by the Sentencing Commission **438** in April of that year, went into effect.[79] The revised guidelines consolidated the sentencing schemes for fraud and theft[80] and, among other things, redefined the term "loss" and increased sentences for "high-loss offenders."[81]

Given the amount of time, thoroughness and effort invested in putting the "Economic Crime Package" together,[82] it would have been quite reasonable to assume that the amended sentencing guidelines would last for at least a few years before being modified again. However, the great bankruptcies and corporate scandals of Enron, Global Crossing, Adelphia, WorldCom and others gave rise to yet another change in white-collar crime sentencing policies.[83] In response to the disturbing business practices revealed by these scandals and the harm they caused to the credibility and stability of the financial market, Congress and the Bush Administration enacted the Sarbanes-Oxley Act (SOA), which went into effect on July 30, 2002.[84] While the SOA targets and regulates many different aspects of business and accounting practices,[85] its criminal provisions are of most interest and relevance to our discussion.[86] These provisions include the creation of a number of new offenses to strengthen the

enforcement power of federal prosecutors and other federal regulatory agencies.[87] But these provisions are probably most known for the severe prison terms imposed on white-collar crime offenders.[88] Finally, the SOA directed the Sentencing **\*439** Commission to amend the Federal Sentencing Guidelines so that they "reflect the serious nature of the offenses and the penalties set forth in this Act" in order to "deter, prevent and punish such offenses."[89]

The next development in sentencing white-collar offenders related to a dramatic change of policy regarding offender confinement facilities. Up until December 2002, the sentencing federal judge recommended the specific type of confinement imposed on white-collar offenders (similar to penalties for other first-time non-violent offenders) - most frequently halfway houses or other community confinement centers. However, in a memorandum issued by the DOJ to the director of the Federal Bureau of Prisons (BOP), this practice was deemed "unlawful."[90] Instead, the BOP was instructed to place all defendants sentenced to a term of imprisonment, including all low-level, non-violent offenders, in prison, as opposed to halfway houses or community confinement centers.[91] In its final passage, the memorandum uncovers the rationale underlying the sudden policy change:

> BOP's current placement practices run the risk of eroding public confidence in the federal judicial system. White collar criminals are no less deserving of incarceration, if mandated by the Sentencing Guidelines, than conventional criminals... As many studies have shown, the prospect of prison - more than any other sanction - is feared by white collar criminals and has a powerful deterrent effect. Moreover, white collar crimes often involve not only a high level of intent and calculation, but are committed over an extended period of time, making the punitive dimension of prison especially deserved in many cases.[92]

The final development to date in sentencing corporate white-collar defendants came in November 2003 in the form of a second round of permanent amendments to the Federal Sentencing Guidelines, **\*440** as a direct response to the directives contained in the SOA.[93] Pursuant to the prior trend of aggravation described above, the Commission increased the penalties for fraud committed by corporate officers or directors, offenses that endanger the solvency or financial security of large numbers of victims and certain types of obstruction of justice.[94] Based on these last amendments, it opined that in cases in which the loss is $2.5 million or more and there is a large number of victims, the new guidelines will "virtually mandate a sentence of thirty years to life for every defendant - a sentence of unprecedented severity for first-time, non-violent offenders"[95]

So how did these developments actually impact on white-collar defendants? Statistics demonstrate an increase in the percentage of defendants guilty of economic crimes sentenced to prison and an increase in the length of the prison terms imposed.[96] In a letter to the United States Sentencing Commission, prior to the November 2003 sentencing guidelines amendments, Bowman predicted that the severity and length of sentences imposed on white-collar crime offenders would escalate even higher "as the sentence increases built into the 2001 Economic Crime Package begin to take effect."[97] The November 2003 amendments leave little room for doubt this prediction will be realized.

### III. Restorative Justice and White-Collar Crime: An Appropriate, Useful, and Justified Match

As will be demonstrated, adding a restorative intervention to the public response to high-profile white-collar crime is not only appropriate and theoretically justified but technically possible and pragmatically useful as well. True, in this area of white-collar crime restorative justice does not offer an alternative to the existing system as may be with other types of criminal misconduct. Nevertheless, **\*441** it will be argued that restorative justice has much to offer to the current criminal justice system in its response to white-collar crime.

First and foremost, the reason restorative justice is important and relevant to white-collar crime is because it promotes justice in a more complete way. This is true even when the restorative intervention is added to the current response to white-collar crime, as opposed to a restorative intervention that replaces the existing response. It is also true regardless of strong retributive notions justifying harsh punishments for these offenders or restitution mechanisms that the criminal justice system already implements with regard to white-collar crime victims. Simply put, restorative justice seeks to do justice as a matter of

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 121 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

principle. According to the restorative justice paradigm, "crime is more than lawbreaking"[98] and it therefore requires a response that does "more than punishing or treating those found guilty of lawbreaking."[99]

This is the reason for the two postulates upon which McCold premises his theory of restorative justice: Crime harms people and relationships and justice requires repair of these harms.[100] This is also the first core principle of restorative justice proposed by Daniel Van Ness and Karen Strong and cited with assent by Gordon Bazemore, all prominent restorative justice advocates.[101] The second proposed core principle is equally important. According to Van Ness and Strong, "victims, offenders and communities should have opportunities for active involvement in the restorative justice process as early and as fully as possible."[102] Empowerment, respectful listening and equal concern for all stakeholders are among Braithwaite's most important constraining values.[103] In other words, if justice requires repairing harm and empowering stakeholders to participate in the justice process, then an appropriate and just public response to white-collar crime should include a **\*442** restorative component. According to this approach to justice, the government should continue to do its best to preserve order and to ensure retribution, but at the same time it should enable processes that promote justice in a broader sense and should address the needs and expectations created in the aftermath of crime. White-collar crime does not differ from street crime in this sense and should not be left beyond the reach of restorative processes.

The main problem with this argument is that not everyone thinks that justice requires attending to the needs created by crime, and many may not view the inclusion of restorative processes as a justice promoting matter. The current criminal justice system in the United States, for example, is offender-oriented, focusing on punishing convicted offenders rather than healing crime-affected stakeholders. However, this in itself does not make the punishment-based approach to criminal justice preferable to the restorative approach to justice. A study that explored the public reaction to restorative sentencing based on research published in English over a period of twenty years (1982-2002) found that "there is clearly strong public support for restorative concepts such as compensation, restitution and community work."[104] But more important is the authors' explanation for the popularity of restorative sentencing options:

> The idea that the offender has made amends to the individual victim or the larger community clearly carries considerable popular appeal... [which] may reflect both a desire on the part of the public to assist victims of crime, as well as the belief that by making compensation, the offender is taking an important step toward his or her rehabilitation and restoration to the community.[105]

Admittedly, the ultimate decision is left in the hands of legislatures and policy makers. However, this evidence suggests that it may be time to reconsider the current governing perception of justice, and that there is considerable public support for an alternative understanding of the appropriate response to crime.

**\*443 A. Justification problems concerning the proposition of responding restoratively to white-collar crime**

In addition to the problem discussed above, responding restoratively to white-collar crimes is also problematic in terms of the two main theories of punishment that govern sentencing policies in most of the modern world - retribution and utilitarianism.[106] The question arises whether the application of restorative justice to white-collar crime is justified in terms of the tenets of these punishment theories. Elsewhere I have argued that although restorative justice and these theories of punishment seem, at first, to contradict each other, they are in fact compatible and share many fundamental principles.[107] However, since the differences between the various paradigms seem harder to bridge when it comes to high-profile white-collar offenders, the justification question requires a closer analysis in this context.

1. Restorative justice and retribution

Under a retributive theory, offenders must be punished according to their just deserts. This notion incorporates two important premises in the retributive ideal: first, that punishment is the goal, not the means for achieving some other social objective; second, that offenders should be punished in proportion to their wrongdoing, not more, not less.[108] These two premises create a real problem for the implementation of the restorative justice paradigm in response to white-collar crime.

Shifting from a philosophical perspective of retribution to a practical one, it is necessary to determine what a "deserved" punishment actually consists of for each offense and for each offender. In the United States, this is determined by a judge, sometimes guided by specific sentencing guidelines, subject to legislative determinations of maximum and minimum penalties for each offense. The purpose of this mechanism is to capture and reflect "the will of **444** the populace as to the punishments deserved."[109] As demonstrated above, there is little doubt about the kind of punishment which the public wants; it wants harsher punishments and longer incarceration periods.[110] Similarly, there is little doubt about what the legislature wants, as reflected in the Sarbanes-Oxley Act and the Federal Sentencing Guidelines.[111] Clearly, "soft" and "weak" restorative responses[112] to white-collar crime are not on their agenda.

The possibility that the public and its representatives demand harsher sentences for white-collar offenders creates a genuine justification problem for restorative interventions. Under a retributive sentencing regime, white-collar offenders must be punished according to their "just deserts." If it is true that the public feels strongly that this means long imprisonment and harsh sentencing for white-collar offenders, rather than an apology and symbolic restitution, then restorative responses to white-collar crime are simply unjust.

The way to solve this problem is to employ restorative measures in response to white-collar crime in addition to traditional punishment and not instead of it. This is commonly the practice when applying restorative justice to violent and severe crime cases.[113] In other words, white-collar offenders would face their "just deserts," which would include some restorative component among the other components of the punishment.

The trouble is that this model compromises many vital restorative justice values and tenets. John Braithwaite, for example, believes that a restorative regime can be extremely effective in responding to white-collar crime and preventing it in the future.[114] **445** However, that regime cannot be "corrupted"[115] with unnecessary coercive measures. In Braithwaite's words:

> [R]estorative justice works best with a specter of punishment in the background, threatening in the background but never threatened in the foreground. Where punishment is thrust into the foreground even by implied threats... [t]his is not the way to engender empathy with the victim, internalization of the values of the law and the values of restorative justice, the sequences of remorse, apology, and forgiveness.[116]

In their theory of restorative justice, Paul McCold and Ted Wachtel distinguish restorative responses from other means of social discipline through their collaborative nature, since they empower those primarily affected by a crime to come together and work with each other in order to develop a plan to repair the harm or prevent its recurrence.[117] Conversely, the punitive approach to social discipline is characterized by the state's authoritative stance toward offenders, determining what should be done to them, as opposed to with them.[118] When inserting a restorative process within the framework of other punitive components of a sentence, it would be unconvincing, and probably wrong altogether, to argue that the restorative segment of the sentence involves working with the offender when it is drowned in a sea of punitive measures primarily intended to inflict pain. It is far more likely that the inclusion of such a restorative component would merely be seen as another means of "doing things to the offender, admonishing and punishing,"[119] hardly what McCold and Wachtel had in mind.

On the other hand, even though many restorative justice proponents may feel extremely uncomfortable with this, reality has it that in certain types of criminal misconduct such as violent and severe crime, restorative justice "is not intended to be a substitute for the criminal penal system. Rather, it offers a way to link together the other aspects of justice including victim fulfillment and appropriate offender retribution."[120] In light of the studies showing a public demand for harsh punishments and the harsh legislative attitude towards white-collar crime, it is most appropriate to conclude **446** that here, just as in violent crimes, restorative measures must come in addition to the retributive response, not instead of it. This structure answers retributive-oriented concerns regarding the application of restorative justice to white-collar crime, but at the same time provides victims and offenders with a meaningful mechanism for repairing the harm caused by the offense.

It is important to note, however, that adding a restorative component to the public response to white-collar crime will change its traditional component as well. One of the most fundamental principles of retribution is proportionality: Imposing on offenders exactly what they deserve, not more or less.[121] Take for example Bernard Ebbers, former chief executive of

WorldCom, who was sentenced to a record twenty-five years in prison. Theoretically, this is his "deserved" sentence. If, hypothetically, Ebbers were to participate in a restorative justice process in which he would be confronted by his victims, as part of his sentence, the prison component would have to be reduced to some extent. Otherwise, Ebbers would be subject to a punishment that exceeds his "desert." In other words, the restorative component is to be seen as another form of punishment, not an alternative to punishment,[122] and, as such, must be taken into consideration in the overall calculation of an offender's "deserved" sentence.

2. Restorative justice and utilitarianism

According to a utilitarian theory of punishment, criminal sanctions are justified primarily if they can benefit society by deterring the offender and others from committing future crimes.[123] Specific and general deterrence are key motifs in the current public response to white-collar crime, and are probably superior even to retribution. As explicitly stated in the Sarbanes-Oxley Act, harsher punishment of white-collar offenders is necessary in order to "deter, prevent and punish such offenses."[124]

**\*447** It has long been held that white-collar offenders are particularly susceptible to deterrence, since their misconduct can often be regarded as rational, especially in comparison to street offenders. White-collar offenders are usually motivated by the prospects of monetary profits as a result of their actions, and are perceived as risk aversive due to their status and achievements. These are people who presumably would not want to go to prison and would be deterred from committing crimes if they perceived their chances of imprisonment to be substantial.[125]

It is also widely agreed that "[d]eterrence is predicated on three factors: severity, celerity, and certainty of punishment."[126] Evidently, severity of punishments for white-collar crimes in the United States is currently at its all-time high. Additionally, due to new legislation, current law enforcement policies, and the latest developments of the Sentencing Guidelines regarding white-collar crime, these severe punishments have become practically mandated in some cases.[127] This last development is particularly important since certainty of punishment is empirically known to be a far better deterrent than its severity.[128] The inevitable conclusion is that today's white-collar crime sentencing policies seem to achieve two of the three major components of deterrence in an area of law in which deterrence is presumed to be especially effective.

Furthermore, it is reasonable to associate deterrence with the sentences imposed on some of the defendants involved in the corporate scandals of 2001-2002. The twenty-five year prison sentence for WorldCom Chief Executive Bernard Ebbers, the fifteen- and twenty-year prison sentences for Adelphia executives John and Timothy Rigas, respectively, as well as some of the other sentences specified earlier in this article, have a real impact on business executives **\*448** in the United States.[129] No one wants to be the next Bernard Ebbers or the next Skilling. As expressed by one of New York's leading white-collar criminal defense attorneys, Elkan Abramowitz, "Where once white-collar defendants, particularly those who occupied executive suites and boardrooms, could previously rely on under-enforcement and relative leniency, they can [now] expect to have the book thrown at them... ."[130] Admittedly, it will take a few more years to empirically prove the deterrent effect of such punishment. Nevertheless, even at this point, it may be concluded that long prison sentences have at least some deterrent effect on white-collar offenders.

For better or worse, the same cannot be said about restorative justice. Sitting in a restorative conference and being confronted by angry victims and community members for a few hours may be an unpleasant experience, but it cannot be compared to sitting in a jail cell, surrounded by inmates convicted of the worst crimes possible, for a substantial number of years. Unlike the former experience, the latter experience physically scares many potential offenders, hence deterring them from committing a crime. As mentioned above, a restorative intervention would come as part of the public response to white-collar crime, not as the response, but it would have some effect on the punishment inflicted upon white-collar offenders as well. It may be argued that if the restorative intervention decreases the deterrent effect of the sentence, then restorative justice in these cases may be rendered unjustified from a utilitarian perspective.

However, this argument is premised on the assumption that deterrence can only be achieved through intimidation associated with harsh punishment. Undoubtedly, the thought of serving a long prison sentence in an overcrowded federal penitentiary scares potential white-collar offenders. In fact, the thought probably scares many street offenders as well. But the question is whether this thought actually deters potential white-collar offenders. Unfortunately, the answer to this question remains unclear. On the one hand, it is logical to assume that frightening potential offenders would deter them and that this fear would

manifest itself in their abstention from committing crimes.[131] On the other hand, there is no decisive evidence to support the conclusion that harsh sentences **\*449** actually have a general and specific deterrent effect on potential white-collar offenders.[132] In fact, when criminal sanctioning was found to have such an effect, it was accompanied by informal sanctions (such as social censure, shame, and loss of respect) which were equally important in producing the deterrent outcome.[133]

One possible explanation for the inconclusive empirical data regarding the deterrent effect of imprisoning white-collar offenders is that these studies did not include recent developments in white-collar sentencing, which raise the maximum punishments for certain crimes tens and even hundreds of percents higher. While this is true, some commentators still have reservations about the difference these recent developments will actually make. Michael Perino, for example, believes the Sarbanes-Oxley Act has very little impact, if at all, on increasing deterrence;[134] Geraldine Szott Moohr has opined that criminal law in itself, even after the Sarbanes-Oxley Act, is insufficient to prevent business misconduct.[135] In short, it is not clear whether future studies, even those that will reflect the current harsh sentences, will find such sentences to be justified in terms of a substantially higher deterrent effect.

**\*450** Although the federal government seems to view harsh punishment as the primary method for fighting white-collar crime, this is not the only way of preventing such misconduct. In fact, some believe other means to be as effective if not better deterrents than punishment. According to Dan Kahan and Eric Posner, shaming, by way of publicizing the identity of the offender and the details of the offense, can be just as effective in preventing white-collar crime.[136] Dan Kahan also emphasizes the important role of peers and the close community in one's decision to commit a crime or refrain from doing so.[137] Harold Grasmick and Robert Bursik have found through their studies that self-imposed shame can often be viewed as more certain and more severe than state-imposed punishment.[138] Grasmick and Bursik also mention embarrassment - a socially imposed punishment[139] - as another potential deterrent. Similarly, Raymond Paternoster and Sally Simpson, who studied the factors contributing to corporate offending, found that informal sanctions such as social censure, shame, loss of respect and moral considerations have a substantial effect on decisions to commit these types of crimes, at times entirely independent of rational cost benefit considerations.[140]

Group conferences and circles, which are common restorative practice models involving a broad group of participants, exemplify the way restorative interventions foster these deterrents.[141] Many restorative justice advocates associate these processes with "reintegrative shaming,"[142] which dictates "disapproval of the act within a **\*451** continuum of respect for the offender and terminated by rituals of forgiveness."[143] To exemplify how this theory works, Braithwaite mentions circles of support and accountability which bring together community volunteers with convicted sex offenders in Canada. In one of the cases described by Braithwaite, the volunteers were explicit in their condemnation of the act, but maintained a long-term relationship with the offender in order to help him successfully reintegrate into the community.[144] Through their work with the offender, these community members strengthen normative behavior and encourage law-abiding behavior through positive influence. Especially in the area of high-profile white-collar crime, where "[t]he population of top corporate executives in America can be characterized as living in an exclusive small town",[145] shame can be used to deter criminal behavior and peers can take on an important role in reinforcing normative behavior and censuring criminal misconduct that affects the entire business community.[146] Restorative interventions, which provide an opportunity for white-collar offenders to meet their peers and members of their "exclusive small town," can put these effective deterrents to use.

As suggested in this part, introducing restorative justice to high-profile white-collar crime must be coupled with the current traditional responses. Only through such a structure can the use of restorative interventions be justified from both a retributive and a utilitarian perspective. The challenge, of course, is to structure a response to white-collar crime that provides the ultimate deterrent effect (whether through incarceration, fines, shaming or peer pressure) together with a restorative component (that addresses the needs created by the crime and the ways of repairing the harm), while also complying with the retributive demand for "just desert" and proportionality.

### **\*452 B. Restorative justice and white-collar crime: the offender's perspective**

Another argument against the introduction of a restorative response to white-collar crime is that white-collar offenders are different from street offenders, who are currently referred to restorative justice practices, making these types of interventions inappropriate.

Restorative justice theorists have long held the notion that "crime is a dysfunctional way of saying something, and punishment.... is an equally dysfunctional way of answering."[147] But what are criminals trying to say? What is that "something"? According to many criminologists, crime is partially motivated by needs;[148] offenses may be seen as attempts to satisfy needs. This theory of crime ties in with McCold's causal theory of restorative justice, since meeting participants' needs, according to McCold, is the essence of a restorative response and a key element in achieving justice.[149]

The problem, as articulated by Braithwaite, is that "white-collar crime highlights the fact that illegitimate opportunities are grasped not only to satisfy need but also to gratify greed."[150] In his account of the reasons that led to the great corporate scandals of 2001 and 2002, Professor John Coffee places responsibility upon three different groups: The gatekeepers (mainly the big five, now big four, accounting firms), the managers of big corporations, and the shareholders (particularly institutional investors).[151] As for the role of managers in the financial collapse of their corporations, Coffee emphasizes the dramatic increase in the use of stock options as executive compensation, and their unique ability to liquidate them immediately.[152] This combination provided a strong incentive for managers to "engage in short-term, rather than long- **\*453** term, stock price maximization because executives can exercise their stock option and sell the underlying shares on the same day."[153] Moreover, these incentives made it "rational for corporate executives to use lucrative consulting contracts, or other positive and negative incentives, to induce gatekeepers to engage in conduct that assisted their short-term market manipulations."[154]

One may argue that the role of greed in white-collar crime differs from that in street crime because the needs that motivate the latter are often associated with basic necessities as opposed to luxuries. There are numerous studies that point to the connection between poverty and crime,[155] whereas high-profile white-collar offenders are often in an entirely different financial situation. This may render restorative justice interventions in white-collar crime cases irrelevant. According to the National Survey of Victim-Offender Mediation in the United States,

> the three most common offenses referred to the programs in the survey, in order of frequency, are vandalism, minor assaults, and theft. The next most frequent is burglary. Together, these four offenses account for the vast majority of offenses referred to restorative interventions, with a small number of other property-related offenses and a few severely violent offenses also being identified.[156]

These are all common street crimes, typically committed by indigent offenders with needs that are very different from those of the executives described by Coffee.

Additionally, white-collar offenders may differ from street offenders in another way. Two of Braithwaite's most important restorative values are non-domination and accountability.[157] The constraining principle of non-domination compels restorative justice programs to counter and prevent "any attempt by a participant **\*454** at a conference to silence or dominate another participant."[158] In fact, this principle is so important that "a programme is not restorative if it fails to be active in preventing domination."[159] The second principle - holding offenders directly accountable for their actions - is one of the most basic and widely agreed-upon tenets of the restorative justice paradigm.[160] Given the unique characteristics of the typical corporate executive white-collar offender, it may be argued that two of these important and central values will not be sustained in a restorative response to the wrongdoing.

A study conducted by Peter Cleary Yeager and his colleagues found that managers of large corporations completely disregard the interests of shareholders in their decision-making. Moreover, a top manager who executed an accounting trick aimed at falsifying the firm's reported profits rationalized his behavior and argued it was justified for numerous reasons.[161] In other words, these offenders stand by their actions and do not perceive them as harmful even to the owners of their firms - the shareholders.

An empirical study conducted by Alex Stein and Uzi Segal in the United States aimed at explaining criminal defendants' decisions to opt for a trial (as opposed to pleading guilty) found that high trial rates are found when accusations are "thinly evidenced" .[162] It is a well-known fact that high-level white-collar crime cases are extremely complex and document-intensive, involving financial records and corporate materials that are intentionally ambiguously drafted (usually by the

defendants).[163] Additionally, these cases hinge on the question of intent, which is difficult to prove and is usually based on circumstantial evidence.[164] The involvement of highly-paid defense attorneys in these cases **\*455** leaves very little room for doubt about the readiness of white-collar offenders to be held accountable for their actions. What are the chances that these offenders would actually accept responsibility in a restorative justice process and allow themselves to be held accountable by their victims without dominating the conversation?[165]

Furthermore, white-collar offenders may not correspond well with restorative justice in another somewhat surprising way. In Howard Zehr's seminal book Changing Lenses, the archetypical offender is portrayed as a sixteen-year-old teenager, "who came from an unhappy - probably abusive - home situation,"[166] with no record of violence. After deciding to run away with his girlfriend and discovering he does not have the necessary money, he decides to rob a young woman in the neighborhood. The event turns violent, and the juvenile offender winds up stabbing his victim a number of times, including in the eye.[167] As discussed above, white-collar offenders tend to differ considerably from Zehr's archetypical offender in almost every aspect possible. However, sometimes they differ in another meaningful way that Zehr and his colleagues may not have even considered - sometimes offenders in white-collar crime cases are not even human.

Although not many corporations are indicted and sentenced in the federal system, especially not large, publicly traded companies, corporate criminal liability is an inseparable part of white-collar crime.[168] In fact, one of the most famous criminal proceedings ever initiated against a corporation came in the aftermath of Enron, in **\*456** the prosecution of the big auditing firm Arthur Andersen.[169] In many high-level corporate scandals, the United States Attorney investigating the case has held the corporation accountable as a separate entity, making it a primary target of the investigation.[170]

According to von Hirsch and his colleagues, restorative justice interventions require an "identifiable person" as the offender.[171] Admittedly, corporations are independent legal entities capable of performing many types of tasks. However, they are not people and most probably do not qualify as appropriate offenders under the "making amends" model. It is quite clear that offending corporations do not have the same needs as offending persons. They do not need to feel empathy, to reconcile with the victim, to be forgiven, or to regain a sense of self-worth.[172] Their financial need to resolve disputes is something very different from the moral need for reconciliation and forgiveness. The fact that the restorative justice literature constantly relates to the latter needs makes it clear that the restorative justice paradigm has human beings in mind, not fictional legal entities.

On the other hand, both arguments do not justify the categorical exclusion of restorative justice from the public response to white-collar crime. As identified by McCold, offenders experience a variety of harmful outcomes in the aftermath of their own crimes, including diminished integrity, loss of standing, loss of connectedness, loss of self-control, shame, diminished personal and social prospects, moral debt and a sense of obligation to their victims.[173] White-collar offenders are no different and they too can benefit from a restorative needs-based process aimed at repairing that harm, thereby helping society as a whole.

Former Enron CEO Jeff Skilling, for example, was often caricatured as "the greedy, arrogant executive with a Darwinian view of the world."[174] On the other hand, there is evidence indicating that Skilling was emotionally distressed, felt lonely and lost the **\*457** drive to work during his short tenure as CEO.[175] Presumably, this would be something Skilling would wish to relate to the many Enron victims, regardless of whether he is found guilty or not. Indeed, Skilling tried to convey this through his testimony in court,[176] but with so much at stake, this was not the secure and supportive environment needed for sharing such emotions.

Another example of a senior corporate executive that might find a restorative intervention useful is former CEO of Krispy Kreme Doughnuts, Inc., Scott Livengood. The company's internal investigation found Livengood responsible for manipulating the company's earnings to please Wall Street. Livengood's attorney denied all responsibility in his client's name, but added "Mr. Livengood devoted his heart and soul to Krispy Kreme for 27 years."[177] Presumably, this is one of the main issues that troubles Livengood. A restorative intervention can provide him with the opportunity to talk about his feelings.

Similarly, the argument that white-collar offenders tend to disregard the interests of their potential victims is not convincing. If these restorative deliberative processes carry an increased risk of domination, then it is the responsibility of the facilitators to be more alert and active in preventing the risk from materializing. Furthermore, silencing white-collar crime victims altogether by denying them the opportunity to be heard in a restorative process is not the solution to the problem of

disregarding the interests of potential victims. On the contrary, these victims should be given the opportunity to be heard precisely by the very people that thoughtlessly and uncaringly hurt them. A process in which victims confront their offenders directly seems to be an effective way of making the offenders care. Restorative justice processes can have such a transformative effect on offenders.[178]

Furthermore, one of the main critiques of the restorative justice paradigm is that it strives to produce internal moral changes in **458** offenders who are morally immature in their development.[179] As Richard Delgado states: "Most offenders... [see] right and wrong in pragmatic terms - the action is right if you can get away with it, wrong if you are caught and punished."[180] While this is probably true in juvenile crime, where restorative justice is most common, and in many cases of adult street crime, it is unlikely to be true in high-end white-collar crime. In these latter crimes, the offenders are usually middle aged and often older adults, highly educated and experienced in managing huge corporations. Of course this does not necessarily mean they are all morally mature, but it is pretty safe to assume they know and understand the difference between right and wrong well enough to participate in a restorative justice process.

Finally, as mentioned above, the fact that at times, white-collar offenders are not humans but rather corporations, should not preclude the possibility of applying restorative justice to white-collar crime. Admittedly, an offending corporation does not experience the same harmful outcomes as a human offender and therefore does not need a restorative needs-based process to restore that harm. But corporations do not act on their own; they have real people behind them. Even if these individuals are not criminally liable for the corporation's actions, the Organizational Sentencing Guidelines recognize their role in criminal proceedings carried out against the corporation.[181] It is understood that this involvement, manifested through the compelled appearance of the company's CEO or highest ranking employee in court for the sentencing hearing, has three purposes: "To impress upon the CEO the gravity of the corporation's wrongdoing; to signify to the community that the leadership of the corporation has accepted responsibility for the crime; and to extract some indication that the corporation intends to comply with the law in the future."[182] All three purposes actually accomplish the same thing: They put a human face on the corporation's **459** abstract name. And once there is a human face, even if the person is not criminally liable for the misconduct, many of the harms and needs mentioned above, such as shame, diminished integrity and more, become relevant once again.[183]

But even if corporations are not exactly the typical offenders the forefathers of the restorative justice paradigm had in mind, this does not mean a restorative intervention cannot take place. These offenses have victims and victims have needs,[184] therefore a needs-based response is appropriate. True, one of the primary stakeholders - the offender - does not answer the traditional characteristics of offenders in restorative justice processes. However, many important restorative justice advocates such as Braithwaite and McCold believe that "mostly restorative" or even "partly restorative" processes are better than non-restorative responses to crime.[185] In the case of a corporation, an offender exists, is available and is able to participate in the process, at least to some extent, based on the inherent limits associated with the use of representatives and with the fact that "corporations are soulless... [and] cannot be damned."[186] As evident in the Sarbanes-Oxley Act and the Organizational Guidelines, corporations have many avenues to compensate **460** victims and to restore their tangible and economic harm.[187] Their participation in a restorative justice process can help restore some of the non-monetary harm caused to victims as well, while fostering a more law-abiding and caring "corporate culture," which is precisely what the criminal justice system is after.[188]

To sum up, white-collar offenders, whether corporate executives or corporations, can both participate in and benefit from a restorative justice process. Indeed, while their differences from street offenders pose certain challenges, they do not justify the categorical preclusion of a restorative response. Additionally, just as in the case of street crime, white-collar offenses include victims, which can benefit from restorative processes even if the offender does not exist at all. The fact that offenders do exist in our case only strengthens the conclusion that restorative responses should be made available in white-collar crime cases as well.

## C. Restorative justice and white-collar crime: the victim's perspective

It may be argued that even if justice requires some kind of restorative response to white-collar crime, and even if these offenders are suitable for such a process, such a proposal is impractical due to the unique harm caused by this type of criminal misconduct and the vast number of victims it creates.

The definition of restorative justice speaks of "direct stakeholders" and reparation of "the harm."[189] In his causal theory, McCold emphasizes the importance of identifying the victims of the crime and determining their harm.[190] In the "making amends" model, these elements are of crucial importance. As von Hirsch and his colleagues explicitly state:

> There are... a variety of cases which seem less well suited to this kind of response. One 'unsuitable' category... would consist of *461 crimes in which there are no individual victims. If A is charged with tax evasion, there is no person to whom he can convey an apologetic stance via some kind of restitutionary act. Saying the "community" is here the victim is not illuminating.[191]

In light of the above, the presence of an identifiable victim and tangible harm are prerequisites for a restorative intervention. However, these elements do not always exist in white-collar crime cases.

Based on his research of white-collar crime and its comparison with street crime, Stuart Green argues that in the former, the harms "tend to be more diffuse and aggregative than in the case of conventional crime; and it is often harder to say who (or what, in the case of governmental institutions or corporations) has been victimized, and how."[192] John Braithwaite illuminates the difficulties of measuring the harm caused by white-collar crime and notes that "many types of harm are not objectifiable - such as the impact that white-collar crimes like tax evasion have in undermining the trust and integrity essential for the effective functioning of the economy and polity."[193] Clearly, the same goes for accounting manipulations intended to inflate stock price or defrauding investors through misleading statements regarding the company's financial stability, which were key features of the corporate scandals of 2001-2002. But according to Braithwaite, it is not only the harm which is difficult to measure. The victims of white-collar crimes are mostly diffuse, at times unidentifiable, and in some cases are even unaware that they have been victimized.[194]

Testifying before the Senate Judiciary Committee's Subcommittee on Crime and Drugs, John Coffee addressed some of the problems associated with calculating the harm caused by offenders convicted of securities fraud and "cooking the books"[195] for the purpose of sentencing. Coffee argued that in these types of offenses, it is extremely difficult to assess who the victims are, and the extent of the harm caused by them.[196] As stated by Coffee, in cases such as Enron or WorldCom,

> *462 [T]he broader social injury needs to be recognized; that is, the victims are not just the shareholders of Enron, but shareholders in all other public corporations whose share prices have also been discounted because investors no longer trust the credibility of reported financial results. Indeed ... the victims include not only investors, but employees, creditors, other stakeholders, and citizens generally - all of who suffer a loss when securities fraud erodes investor confidence and thereby produces an increase in the cost of capital.[197]

How can a restorative intervention take place if victims do not know they are victims and if the harm is difficult to determine? And even if the victims and the harm are identifiable, is it realistically possible to facilitate a restorative justice process for thousands of victims, who are most probably scattered across the globe?

Furthermore, it may be argued that this is not merely a technical or practical issue; it is one of principle as well. Among Braithwaite's constraining values of restorative justice are non-domination, empowerment, respectful listening, and equal concern for all stakeholders.[198] With so many people and organizations affected by white-collar crime, it is clear that not everyone will be able to participate. Imagine a hypothetical restorative response to Enron. It seems impractical to allow anyone who claims to have suffered some kind of actual harm to participate in the process. At some point a decision would have to be made as to which categories of victims and stakeholders would be included within the list of participants and which would be categorically left out.

In addition to the serious question of who would decide this, it is quite clear that some of the victims would not be granted "equal concern," would not be empowered, would not be listened to and would be subjected to the domination of other points

of view by being left out of the process. In short, a majority of Braithwaite's list of the most important restorative justice values would simply crumble to the ground.

A possible solution to this latter problem may be the use of representatives. Assuming that the technical difficulties of choosing and gathering the representatives can be overcome, this kind of process may have a chance. It can provide all primary stakeholders with the opportunity to participate in a fully restorative response, while upholding the fundamental restorative principles identified **\*463** by Braithwaite. The problem with this solution is that restorative responses do not, generally, lend themselves to the use of representatives. In fact, as Braithwaite states, "the most influential text of the restorative tradition has been Nils Christie's, which defined the problem of criminal justice institutions 'stealing conflicts' from those affected."[199] Christie argued that "modern criminal control systems represent one of the many cases of lost opportunities for involving citizens in tasks that are of immediate importance to them."[200] In other words, Christie, along with many other prominent restorative justice theorists, believes that stakeholders affected by crime should be allowed to participate in the public response to crime themselves, personally, and not through representatives.

In his causal theory, Paul McCold specifies different needs of victims and offenders, mentioning the victims' need "to tell their story, to be heard,"[201] and the offenders' need for "reconciliation with victims, to be forgiven."[202] Although this determination is overly generalized, studies suggest it is true to some extent.[203] In any case, these needs cannot be met without direct and personal interaction.[204] The current criminal justice system is largely based on representatives (prosecutors and judges) voicing the public's interest in the aftermath of the crime.[205] But as articulated by Christie, this impersonal system is precisely one of the factors that first contributed to the emergence of the restorative justice paradigm. This paradigm attributes major importance to personal and direct **\*464** interaction between those effected by crime,[206] and considers the alienated and estranged nature of the criminal justice system to be one of the primary reasons for opting for a restorative justice alternative.[207] We already have a system based on representatives. There is little logic in replacing it with an alternative based on the same thing. According to the causal theory of justice and the restorative justice paradigm, the use of representatives in a restorative process would be highly questionable.

It is necessary then to provide victims with the opportunity to actively participate in the restorative process. Moreover, from a restorative justice perspective, wherever there are victims seeking to repair their harm, justice requires that "we work to heal victims, offenders and communities that have been injured by crime."[208] The problems associated with opening the process to all white-collar crime victims are technical in nature and do not impact the relevancy of the restorative justice paradigm.

The first and most evident component of the harm suffered by white-collar crime victims is their financial loss. The way to repair that harm is through the restoration of that loss, which is "a basic feature of restorative justice, both as restitution and as a signal way of vindicating the victim."[209] Monetary loss can easily be restored **\*465** by any type of willing and able offender, whether human or corporate, warm and considerate towards victims or cold and indifferent to their fate. Furthermore, unlike most street offenders who simply do not have assets from which to compensate their victims,[210] white-collar offenders are often financially able to do so, at least to some extent.

Admittedly, the current federal criminal justice system already has different victim restitution provisions[211] and the civil justice system provides victims with legal proceedings to pursue their rights against their offenders.[212] A restorative intervention can help facilitate this, but it can also accomplish what the current system cannot. While restitution and compensation provisions help victims and restore some of their financial harm, they cannot match the restoration victims receive through restorative justice processes. First, as Strang and Sherman have found: "When victims are asked, they indicate a strong preference for compensation directly by the offender,"[213] which is the case only in restorative interventions. Compensation in the current criminal justice system is indirect and facilitated by the government: Law enforcement agencies seize money and assets connected to the offense and distribute them among victims and creditors.

Second, and perhaps more importantly, restitution and compensation are limited to financial loss. Restorative justice processes offer non-monetary restoration for victims as well. As mentioned above, financial loss is only one type of harm caused to victims and therefore monetary restitution answers only one need. Victims typically have many other needs associated with other types of harm such as loss of trust, loss of control and even self-blame.[214] Restorative interventions adopt a much broader and inclusive view, acknowledging all types of harm caused to all of the stakeholders and striving to answer the different needs created by these harms. This is done by allowing victims to speak about how the crime affected

**\*466** their lives, about their fears and personal aspirations, without restricting them to providing information regarding their financial or tangible harm.[215] The criminal justice system lacks this perspective and clings to a much narrower view.[216]

Also, the possibility of receiving restitution through separate civil proceedings does not help victims in the same way as restorative processes. In securities fraud cases, for example, the Private Securities Litigation Reform Act of 1995[217] places many procedural and substantive burdens on plaintiffs, effectively limiting successful lawsuits. Along with other statutory provisions, the law places a heavy burden on victims, making the possibility of a civil lawsuit impractical and even unrealistic at times.[218] Telling crime victims they will be able to receive restitution for their harm through civil proceedings and then effectively blocking that possibility not only leaves victims without restitution, but subjects them to the risk of revictimization by the justice system.[219] Restorative justice offers victims and offenders a direct and natural process for discussing the harm caused by the offense and an effective process for ensuring that the harm is indeed repaired.[220] In this aspect, white-collar crime cases are no different.

### \*467 D. Pragmatic considerations supporting restorative responses to white-collar crime

Another possible argument against the application of restorative processes to white-collar crime is that it is just not needed in these types of cases. Elsewhere I have argued that the criminal justice system suffers from certain shortcomings regarding its treatment of crime victims, its effectiveness and efficiency and its perception by the public. I have further argued that restorative interventions outperform the criminal justice system in these areas, and that by integrating restorative processes, the criminal justice system can improve itself and advance the justice it strives to provide to the public.[221] However, when examining the current state of white-collar crime and the criminal justice system's response to it, these shortcomings and the possibility of overcoming them by means of restorative justice seem somewhat irrelevant.

First of all, victims who do not even realize they were victimized do not have the same needs as victims of street crime. The same can be said about victims who are aware of their victimization but are among thousands of others in the same situation.[222] For example, one of the most basic needs of crime victims is for financial reparation and compensation for the harm they suffered.[223] While these are rarely available through the criminal justice system in street crimes, the converse is true in white-collar crimes. The vast majority of white-collar crime cases are tried and sentenced under federal law which provides for mandatory restitution for all property and violence crimes. The Federal Sentencing Guidelines **\*468** emphasize remedying the harm caused by the offense through restitution, community service and other remedial measures,[224] and provide incentives for corporate defendants to pay restitution to their victims. In addition, federal prosecutors encourage white-collar offenders capable of compensating their victims to do so.[225] And even if compensation is not obtained in the criminal proceedings, white-collar criminal cases often involve parallel civil proceedings intended for the sole purpose of restoring the monetary harm caused to the victims.[226] If non-monetary damage or direct compensation is not important to these victims, it may be argued that restorative justice does not have a lot to offer them.

Additionally, most scholars believe that white-collar criminals are unlikely to re-offend after getting caught for their first crime,[227] thus excluding any concern for recidivism. At the same time, as discussed above, the criminal justice system has impressively signaled to potential white-collar offenders that the price for their misconduct will be unbearable. Since these types of offenders are believed to be rational individuals, it may be argued that the criminal justice system has created an effective general deterrent. Admittedly, it may be contended that there are other methods to reduce crime, more effective than deterrence, which are employed in restorative processes.[228] However, especially in white-collar and corporate sentencing, the law and the Sentencing Guidelines arguably provide judges and prosecutors with a variety of options that are based on those alternative methods in addition to the conventional sanctions.[229] Again, restorative justice may not have much to contribute.

Finally, the criminal justice system seems to be moving in the direction the public expects, by subjecting white-collar offenders to harsher sentences. Since the public probably perceives the current response to this type of crime to be fair and justified and given that **\*469** the criminal justice system is doing so well in its response to white-collar crime on all three parameters, it is seriously doubtful whether restorative justice can make a positive contribution in this type of criminal misconduct. In other words, unlike the case of street crime, restorative justice may be unnecessary when it comes to the public response to white-collar crime.

The first response to this argument is that the implementation of restorative justice in white-collar crime cases is primarily a matter of principle, a requirement of justice. In this case, it does not necessarily matter whether restorative justice is needed in improving the effectiveness of the system, since it is needed in the system's quest for justice.

The second response is that even when it comes to white-collar crime, not "everything's coming up roses" for the criminal justice system. As previously mentioned, white-collar crimes are extremely difficult to investigate and prosecute, and trials are unusually costly and complicated.[230] In order to overcome some of these difficulties, the government relies heavily on the cooperation of "insiders" willing to testify against their superiors. In most cases, this willingness is the product of a plea bargain in which the cooperating witness is guaranteed a substantially mitigated sentence or immunity.[231] A direct result of this policy is the evident and substantial disparity in penalties imposed on white-collar defendants.[232] On the one hand, some receive staggeringly harsh punishments involving long prison terms such as in the cases of Bernard Ebbers and John Rigas; on the other hand, others receive minimal sentences such as Michael Martin, former CFO of HealthSouth Finance, sentenced to a week in prison due to his cooperation with the FBI, or David Radler, COO of Hollinger **470** International, sentenced to twenty-nine months in jail in exchange for his cooperation in the prosecution of his former boss, Conrad Black.[233] Ironically, this stands in direct contradiction to the original goal of the Sentencing Guidelines - reducing unwarranted disparity in sentencing.[234]

And that is not the only problem with relying so heavily on plea bargaining. Although perceived as a practical necessity by prosecutors and judges,[235] plea bargains and immunity deals have been heavily criticized by scholars and practitioners. From a retributive perspective, plea bargaining is extremely problematic since it allows culpable offenders to get away with disproportionately light punishments that do not fit their wrongdoing and promotes inequality by allowing similarly situated offenders to receive very different sentences.[236] Although plea bargains are primarily justified as promoting utilitarian goals,[237] it may be argued that plea bargains and immunity deals diminish the deterrent effect of criminal sanctioning as well. For example, a corporate executive may rationalize committing a crime by assuming that if the crime is discovered, he could save himself by striking a deal with the prosecution and testifying against his boss. Plea bargains are also criticized for pressuring innocent defendants into guilty pleas for fear of the possible outcome of a conviction after a trial[238] and for negatively affecting the fairness of the criminal justice system.[239]

Applying restorative justice to white-collar crime cannot magically solve these problems, but it can mitigate them. Introducing a restorative response as part of plea bargains in white-collar crime cases would reduce the disparity in outcome among these offenders **471** by holding them accountable through a similar process in which they confront their victims. This common denominator would be morally justified as well. It would ensure that all corporate employees who were involved in the crime - whether senior or middle-ranked executives - would participate in restorative processes as part of their sentence. In cases where there are many mid-level executives, as in Enron, a restorative justice process will commence for each offender. This provides additional opportunities for more victims to confront at least one of the people involved in the offense that harmed them. In other words, the addition of an across-the-board restorative component to the public response to white-collar crime would mitigate the disparity found in sentences.

At the same time, the frequency of plea-bargain negotiations in white-collar crime cases (just as in other criminal cases)[240] offers a pragmatic opportunity for introducing systematic restorative interventions. One of the prerequisites for the commencement of a restorative justice process is that offenders acknowledge their wrongdoing and responsibility. Similarly, plea bargains usually entail a guilty plea or at least a concession to the factual basis of the charges. This common characteristic makes the restorative processes within white-collar plea bargaining both practical and technically convenient.

Furthermore, merging the two can benefit both the restorative justice paradigm and the criminal justice system. From a restorative perspective, more stakeholders will be able to address their needs in the aftermath of crime in a systematic way. From a criminal justice perspective, restorative interventions can be used to justify mitigated sentences and to justify plea bargains. As suggested by Donald Schmid, a federal prosecutor:

> If an agreement is reached and fulfilled, then, the prosecution and defendant could jointly report on the conference and the agreement to the sentencing court. The parties could also in some cases seek a 'downward departure' (that is, reduction in guideline sentence range) based on the defendant's successful participation in a restorative justice process.[241] **472** In other words, introducing restorative responses as part of the plea bargain process benefits the stakeholders affected by the crime, mitigates some of the problems associated with the extensive use of plea bargains and is procedurally feasible under current federal law.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 132 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

The lateral impact of incapacitation is yet another problem encountered by law enforcement agencies in the context of white-collar crime. The criminal justice system relies heavily on incapacitation - disabling offenders from committing future crimes, which in its most common form is manifested through imprisonment.[242] At the same time, punishment is rarely free of side effects. Imprisoned offenders often leave behind dependents, sometimes the victims of the crime, without their main source of livelihood.[243] The system seems willing to accept this kind of ripple effect when imposing prison sentences. In white-collar crime, however, things are not that simple. When the offender is a corporation, for example, incapacitation can be achieved by disabling it from conducting its business, but may also result from commencing criminal proceedings against it[244] or imposing heavy fines and restrictions.[245] The ripple effect here is far more substantial. Depending on the size of the corporation and the volume of business it conducts, many innocent people and organizations may be affected by the corporation's incapacitation: Shareholders, creditors, employees, communities in which the employees lived, other businesses that relied on the incapacitated corporation and many more. The same can happen if the accused are the managers and executives rather than the corporation itself, in cases where the organization is not strong enough to survive such a blow. Therefore, the use of incapacitation in white-collar crime, even of individual corporate executives, must be careful and selective in order to minimize unwanted harm to innocent parties.

Evidence of the caution employed by law enforcement agencies in dealing with corporate crime is found in the deferred indictments of KPMG and Bristol-Myers Squibb.[246] Both corporations **473** were charged with committing criminal offenses but were granted the opportunity to undergo reforms that would ensure the non-recurrence of this type of misconduct. Clearly, the federal prosecutors did not wish to be responsible for turning the once "Big Five" and today's "Big Four" into tomorrow's "Big Three." Therefore, their response to the criminal offenses of KPMG was more reminiscent of an integrative and restorative mindset than a retributive or deterring one.

Another sign of the difficulty of law enforcement agencies to respond retributively to white-collar crime is found in the principles that govern the imposition of financial penalties on fraudulent corporations by the Securities and Exchange Commission (SEC). These principles were largely created in order to respond to the SEC's need to avoid hurting shareholders in the course of disciplining companies.[247] Among these principles, the two most important considerations in determining whether to seek monetary penalties against companies are "the presence or absence of a direct benefit to the corporation as a result of the violation" and "the degree to which the penalty will recompense or further harm the injured shareholders."[248] Limiting financial penalties only to "egregious circumstances, where the culpability and fraudulent intent of the perpetrators are manifest"[249] exemplifies the difficulties associated with conventional punishment.

Here too restorative interventions can be used as a pragmatic law enforcement tool, while providing affected stakeholders the known benefits of restorative justice. In addition to requiring corporations to change their management and implement work protocols intended to minimize the risk of reoffending, as done today, law enforcement agencies can request that accused corporations participate in restorative justice processes and help repair the harm they caused before agreeing to withdraw the deferred indictments. Similarly, instead of avoiding fines altogether in an attempt to minimize the ripple effect of financial sanctions, the SEC can ask corporations that answer the appropriate criteria to participate in a restorative intervention aimed at making amends. Restorative interventions are especially appropriate in these scenarios since they **474** broaden the courses of action available to law enforcement agencies in an area of law that demands precaution.

## IV. What Would a Restorative Response to White-Collar Crime Look Like?

The first condition for a restorative justice process in response to a white-collar offense is the existence of direct, human (not corporate) victims. White-collar offenders, especially in the high-profiled accounting frauds mentioned in this article, commit their crimes in order to gain profits. Clearly, this money has to come from somewhere, usually someone, and that someone is the victim. However, in some cases, such as the Paul Coffin case, the money comes from the government; in other cases, the money may come from victimized corporations. In cases where the government is the primary and direct target, the crime does not lead to the harm, and thereby the needs, experienced by direct victims, the citizens who pay for government. Governments do not lose trust or faith in the aftermath of crime, do not feel a sense of isolation or disbelief in the experience, do not experience cognitive shock or fear and do not have the same needs as individual victims.[250] In the same way, tax paying citizens do not usually experience these harms when the government is the target of the crime. The same can be said

about corporations that are the primary victims of white-collar offenses. In the absence of such needs, it may be safe to conclude that there are no direct victims under these circumstances, rendering restorative interventions "unsuitable."[251]

At the same time, any proposal for a restorative response to white-collar crime must deal with vast numbers of victims and the difficulty of assessing the harm caused by these crimes. The restorative intervention must include mechanisms for identifying and reaching victims and facilitate a process for calculating and agreeing on the harm which offenders will then be obligated to repair.[252] Additionally, the restorative intervention must provide the direct victims an opportunity to meet with the offender and tell their **475** story in person. A representative-based process is not an appropriate solution for the practical problems associated with empowering so many victims to confront their white-collar offenders.

Another important condition for the commencement of a restorative intervention in the aftermath of a white-collar offense is the existence of an offender willing and able to participate in such a process.[253] As in most restorative justice practices today, here too, the offender must be willing to accept responsibility for the offense as a condition for participating in the process.[254] The main reason for this is to reduce the risk of revictimization that can be caused by offenders telling their victims they did nothing wrong. In addition, according to the "making amends" model, a restorative response is based on the offender's "implicit or explicit acknowledgement of fault" and "an apologetic stance on the part of the offender."[255] This is true of individual offenders as well as corporations, as exemplified by the "corporate icon provision" in the Sentencing Guidelines applicable when corporations plead guilty and seek to mitigate their sentence.[256] Due to the large number of plea bargains in high profile white-collar crime cases, finding offenders who take responsibility for the offense, even if they are not the highest ranking executives in their companies, should not be difficult. Participating in the restorative intervention would become part of these offenders' plea bargain. Offenders who do not assume responsibility for their misconduct and are found guilty after trial, especially if they maintain their innocence after their conviction, seem inappropriate for participation in a restorative intervention.

Additionally, it is important that the restorative component to the public response to white-collar crime does not infringe on important retributive notions such as condemnation and censure of **476** the act,[257] and of course on punishment of the offenders according to their "just deserts." In the same way, the restorative response must not lessen the deterrent effect of the overall response, which requires it to promote some of the alternative deterrents mentioned in this article. On top of all of this, it must also still strive to offer participating stakeholders everything that is offered by the more "conventional" restorative justice processes, while upholding the restorative values specified by Braithwaite. Is all of this even possible?

## A. The Truth and Reconciliation Commission Model

The unique characteristics of white-collar crime - its offenders, victims and the harm it causes - dictate the need for a different and innovative restorative process model. The common models such as victim offender mediation, group conferencing, and even circles are simply not applicable under these circumstances. They cannot accommodate large numbers of victims, are more intimate and private in spirit and are better suited for typical street offenders and juvenile delinquents. The South African Truth and Reconciliation Commission (TRC) may inspire a different restorative response to white-collar crime which is both feasible and appropriate.

However, before describing the proposed restorative response to white-collar crime, a short description of the South African TRC is in order. The South African Parliament established the TRC in 1995, as the state's primary institution for dealing with its recent past and the gross human rights violations committed under the apartheid regime.[258] The Commission consisted of three committees: (1) the Human Rights Violations Committee, responsible for conducting victim hearings, collecting their statements and establishing eligibility for government reparations; (2) the Reparations and Rehabilitation Committee, which facilitated the reconciliation process and made recommendations to the government regarding victim reparation and rehabilitation; and (3) the Amnesty Committee, **477** responsible for determining offender eligibility for the amnesty provided by the country's interim Constitution.[259]

Through these committees, the TRC held hearings for numerous crimes that were committed during the apartheid regime, providing thousands of victims with the opportunity to come forward and tell their stories in a non-adversarial, respectful and supportive forum.[260] At the same time, offenders were granted amnesty as an incentive to disclose their side of the story in full so that their victims and the people of South Africa would learn the truth about what happened and why.[261] The TRC's underlying commitment was

to restoration over retribution, a commitment to understanding communities as an integral part in the creation and solution of the social phenomenon of crime... to look at the implications of offences for the future and to bring together all those who have a stake in the development of that future.[262]

The TRC in its South African structure and format is unsuitable as the restorative response to white-collar crime committed in the United States. However, it is an excellent model for designing such a restorative response. In fact, the TRC has been used as a model for the creation of the Peruvian Truth and Reconciliation Commission, aimed at investigating murders, kidnappings, torture and other violations of rights of the Andean and native communities in Peru,[263] and for a proposed response to battering and domestic violence in the United States.[264]

The TRC model has a number of important advantages that make it appropriate and relevant to the type of white-collar crime addressed in this article. First, it is an innovative public process. The work of the South African Commission was broadcast on television and radio and drew a wide audience and much public attention.[265] This feature contributes to the transparency of the process and therefore to its credibility. In addition, the publicity and exposure of the process guarantee censure and public condemnation of the criminal acts and accountability of offenders. It also provides **478** an important deterrent in the form of public shaming.[266] Other advantages of the TRC model include its ability to deal with large numbers of victims and offenders, its ability to include peers and members of the community in the process,[267] its mechanism for calculating the amount of financial reparation due to victims, and its sole focus on restoration of all types of harm caused by certain types of offenses as opposed to retribution or adjudication.

As discussed previously, this article does not call for the replacement of the existing justice system for white-collar crime, but rather for its amendment. Therefore, in structuring a Truth and Reconciliation Commission to deal with white-collar crime in the United States, pardoning offenders categorically as in South Africa is simply out of the question. Moreover, even the general amnesty granted in the South African TRC was heavily criticized.[268] Thus, the Peruvian TRC does not pardon offenders and is not intended to replace the prosecution or judicial branch.[269] The same should apply to the restorative response to white-collar crime in the United States. The Truth and Reconciliation Commission will only focus on restoration and "making amends," leaving retribution and adjudication to the conventional criminal justice system.

Another difference between the South African model and the one proposed here is that unlike the former, white-collar offenders in the United States would come in direct contact with their victims, and restitution would be made by the offenders and not by the government. This is because the physical separation between victims and offenders and the extraction of reparation out of their relationship in the South African model prevents full restoration of the harm caused by the crime to both victims and offenders.[270] As discussed previously, direct contact between stakeholders is essential to the restorative process, as is the offender's undertaking of "a reparative task."[271] Admittedly, white-collar offenders may find themselves sitting long hours, day after day, listening to victims as **479** they tell their stories, something which is both inconvenient and difficult to do. However, time spent this way is far more beneficial than time spent idly in prison. Moreover, the message conveyed to offenders is straightforward: "You hurt these people, now you will hear what they have to say." This may well be an indispensable aspect of doing justice.

Workshops aimed at eliciting the views of victims and survivors regarding their experience with the TRC in South Africa found a number of recurring themes that support these last two aspects of the proposed white-collar crime TRC.[272] The first theme is that the truth is a pre-condition for reconciliation. Under this theme, victims expressed their need for offenders to come forward and "tell how and why they committed certain acts"[273] as the first step in the long and complex reconciliation process. This is precisely what offenders will be asked to do in the restorative response to white-collar crime. They will be asked to publicly talk about their wrongdoing, not as testimony or as part of a fact-finding procedure, but to further the restorative goal of allowing offenders and victims to begin addressing their harms and to reconcile with the criminal event that affected their lives. Many restorative processes begin with the offenders telling their story since this was found to be effective in promoting the discussion and helping victims confront their offenders.[274] Admittedly, white-collar crime victims are in an entirely different situation than apartheid victims and have different needs with regards to hearing the offender's side of the story. Nevertheless, the same process of storytelling should apply to white-collar crime.

**\*480** The second theme ties reconciliation and reparation to financial and material contributions by offenders, and stresses the importance of punishment in pursuit of justice.[275] In the proposed white-collar crime TRC, the restorative component would be additional to the punishment in order, among other things, to facilitate the direct payments of restitution to victims as the means for "making amends." As mentioned above, the criminal justice system in the United States already has restitution provisions aimed at compensating white-collar crime victims. However, studies have found that allowing victims to participate in the process of determining the amount of restitution increases the chance they will believe the amount is just and fair.[276]

The third theme is that reconciliation is an individual process, and that "perpetrators must be held accountable individually and be accessible to the victims to meet them."[277] Unlike the South African model, the proposal illustrated here combines a restorative process with punishment, thus holding white-collar offenders accountable for their action in the traditional way. In addition to traditional punishment, the white-collar crime TRC would hold offenders personally accountable in a different and possibly more meaningful way for their victims. In writing about the September 11th Victim Compensation Fund of 2001 (the Fund), Tom Tyler argued that some victims were initially reluctant to sign up for the Fund because they felt they would thus forgo their opportunity to get an "apology or acknowledgment of fault and responsibility from some group or organization."[278] Tyler explains that when victims believe their offenders acted immorally, they will often prefer to confront them with the intention (and hope) of getting an apology rather than settle for monetary compensation.[279] The white-collar crime TRC would provide victims with the opportunity to confront their offenders and demand (and hopefully receive) their much-needed apology.

After the South African TRC concluded its work and determined victim eligibility for reparations, approximately 18,000 victims **\*481** and survivors received a one-time payment of approximately $4,000.[280] A study aimed at assessing the impact of these payments on victims and survivors found that "by failing to consult with survivor groups before deciding on the final amount for reparations, government wasted an opportunity to learn about the different survivor needs, which would have helped in designing a more comprehensive reparation policy with potential to optimize its effectiveness."[281] The study found that survivors felt less frustrated with the amount of money they received than with the government's failure to address their most crucial needs such as acknowledgement of wrong done, revelation of the truth, pension rights, medical and educational services, housing and restoration of reputation.[282]

This demonstrates the importance of structuring a restorative process that enables attentiveness to the totality of needs expressed by victims, not just the financial ones, and reiterates the importance of integrating victims' views in shaping the appropriate restorative response to white-collar crime. As in the 9/11 Victim Compensation Fund, the white-collar crime TRC will have to assess both the legitimacy and value of the various claims, perhaps in conjunction with the courts, but that is a matter for a different discussion. The main principle here is that victims will be encouraged to address every aspect of their harm and their different needs, whether monetary or others, in a non-adversarial and supportive environment.

Although different groups that focused on different aspects of the Commission's work heavily criticized the South African TRC, a study that surveyed victims and survivors who testified before the Commission several years after their participation, revealed three substantial benefits of testifying. First, participants attributed great value to finally learning the truth about past events ("what I did not know I know now").[283] Second, the rare occasions during which personal meetings between victims and perpetrators occurred **\*482** were regarded as crucial and extremely effective ("I wanted to see those people").[284] Third, participants who testified at the hearings highly valued the opportunity to finally tell their story to the public ("I wanted the world to know").[285] These findings support the arguments made in favor of a restorative response to white-collar crime based on the TRC model. They demonstrate that this type of response answers important needs expressed by victims merely by allowing them to personally listen to their offenders, learn what happened and tell their own story.

Admittedly, in many white-collar crime cases, the victims may be wealthy investors that lost highly speculative investments they intentionally risked losing or mutual funds or large financial institutions. These victims would be welcome to come forth and participate in the process if they wish to do so. However, it seems likely that these victims are not the type of victims who would consider participating in such a restorative intervention since they often do not share the needs mentioned above. The proposed model for a restorative response to white-collar crime provides white-collar crime victims, who have a need to be heard, to see their offenders and hear their side of the story, and who wish to participate in such a process, the same opportunities.

It may be argued that this structure opens the door to too many victims, which may lead to a possible collapse of the system. While this is theoretically true, especially given the fact that so many people and organizations are directly affected by white-collar crime, it is not unrealistic to assume that such a system overload will not occur. The South African Commission, for example, operated under the assumption that "virtually every black South African can be said to be a victim of human rights abuse,"[286] and that "those who came before the Commission are only a subset of a much larger group."[287] Reality dictates that there are those who come forth and those who do not. But can the same be said about American white-collar crime victims?

**\*483** Probably yes. As mentioned previously, the current justice system attempts to define the financial harm caused by individual white-collar offenders, and direct victims have legal recourses through which they can receive at least some restitution.[288] Through the mechanism provided in the PSLRA,[289] for example, victims can file class action suits in securities fraud cases. Theoretically, given Coffee's description of the volume of direct victims affected by white-collar crime,[290] each of the large corporate scandals mentioned in this article should have produced large numbers of lawsuits clogging the federal court system. Indeed, these scandals did produce large numbers of legal proceedings, but not everyone that suffered some kind of harm eventually initiated legal actions. Some did not take any action and some decided to join others. This is the reality, and it is reasonable to predict that the same would be true regarding the proposed restorative intervention.[291]

Although structured as a more formal process than most common restorative justice intervention, the Truth and Reconciliation Commission model is very much a restorative process. It is focused on McCold's three important questions: Who is harmed? What are their needs, and how can those needs be met? It provides victims with the opportunity "to tell their stories, to be heard and acknowledged, and, eventually... to be compensated,"[292] in a way unparalleled in criminal prosecutions.[293] It provides offenders with an equal opportunity to tell their side of the story, express remorse and undertake obligations to "make amends." It allows for, and even encourages, the participation of other stakeholders such as the offender's peers, business colleagues, friends and family, neighbors and community members of the victims, and other individuals and organizations affected by the crime.[294] And it does all of this **\*484** through a forward-looking process aimed at the restoration of people and communities.[295] Undoubtedly, structuring such a formal process as the restorative intervention carries the risk of gradually turning into another court and losing some of the advantages of restorative justice processes. This is partially what occurred in South Africa.[296] However, what determines whether a process is restorative is not how a process is structured, but rather its aims and underlying tenets. The directors and facilitators of the proposed process would have to deal with the risk of transforming the commission into a court, but as long as they focus on the restorative justice paradigm as manifested in its definition, values and theories, they should be just fine.

**Conclusion**

Restorative justice practices are currently being applied to many local criminal justice systems in the United States and around the world. They are applied to juvenile crime and adult crime, to property crime and to violent crime. One of the only areas of criminal law to which they have not yet been applied is high-profile white-collar crime. The idea of responding restoratively to white-collar crime raises a multitude of challenges. The unique characteristics of white-collar crime cases pose practical difficulties for the very initiation of such an intervention. Moreover, the dominant punishment theories question the legitimacy of the application of restorative justice to white-collar crimes.

On the other hand, as demonstrated in this article, there are many good reasons for changing the current public response to white-collar crime to include a restorative component. A restorative intervention roughly structured according to the Truth and Reconciliation Commission model and held in addition to court proceedings, would better address the needs of victims, increasing their chances of restoring their financial and non-financial harm. At the same time, it would address the needs of other stakeholders affected by the crime including the offenders themselves, which are currently left out of today's public response to white-collar crime. But more importantly, it would promote justice by broadening the objectives sought by the current public response. It would provide **\*485** retribution and deterrence, while, at the same time, providing justice for victims and offenders by addressing their needs in the aftermath of white-collar crime.

Finally, responding to white-collar crime restoratively empowers stakeholders to reflect on the current response to this type of criminal misconduct and to propose other ways in which white-collar offenders can be held accountable for their actions. The public nature of the white-collar crime TRC can turn these proposals into a broader public discussion on today's methods of response to white-collar crime and even to crime in general, such as the extensive use of incarceration. Therefore, this process has the potential not only to promote justice but to promote democracy and public debate about policy as well.

## Footnotes

a1    The writer is an associate at Skadden, Arps, Slate, Meagher & Flom LLP, a former prosecutor for the Tel Aviv District Attorney's Office (Criminal Division), and holds a doctoral (JSD) degree from Columbia University School of Law. I am very grateful for the comments and contributions of Jeffrey Fagan, Carol Liebman, the honorable Gerard Lynch, and my mother, Shoshana Gabbay, and would like to thank my loving wife, Dafna, for her endless support. I would like to extend my eternal gratitude to Paul McCold for inspiring me to use the South African Truth and Reconciliation Commission model for white-collar offenses.

1    See Nelson Wyatt, Paul Coffin, Convicted of Fraud in the Sponsorship Scandal, Makes Restitution, Can. Press News Wire, Aug. 16, 2005.

2    Id.

3    Id.; see also Sentence on Hold for Scandal Figure; Curfew Lifted, Ethics Speeches Suspended as Crown Appeals Term of Community Service, Record (Kitchener-Waterloo, Ontario), Oct. 22, 2005.

4    Les Perreaux, Ad Exec Spared Prison: Ordered to Teach Business Ethics in 1st Fraud Conviction in Federal Sponsorship Scandal, Toronto Sun, Sept. 20, 2005.

5    Id.

6    See Record, supra note 3.

7    See, e.g., Greg Weston, Coffin Nails Liberals?; The Bright Side of the Adscam Wrist Slap? It Could Smack the PM At the Polls, Toronto Sun, Sept. 22, 2005; Editorial, Coffin Got Off Lightly, Toronto Star, Sept. 22, 2005.

8    According to the Reintegrative Shaming Experiments (RISE), conducted in Canberra, Australia between 1995 and 2000, eighty-six percent of "victims attending restorative justice conferences received apologies from their offenders, in comparison to only sixteen percent of victims whose cases were disposed of in court." Heather Strang & Lawrence W. Sherman, Repairing the Harm: Victims and Restorative Justice, 2003 Utah L. Rev. 15, 28.

9    See Mark S. Umbreit, Robert B. Coates & Betty Vos, Victim-Offender Mediation: Three Decades of Practice and Research, 22 Conflict Resol. Q. 279 (2004) (summarizing studies from different sites, different types of offenders and victims from different cultures, that all reported high levels of participants satisfaction).

10    For a brief description of these process models, see Mary Ellen Reimund, The Law and Restorative Justice: Friend or Foe? A Systemic Look at the Legal Issues in Restorative Justice, 53 Drake L. Rev. 667, 673-680 (2005) (reviewing victim-offender mediation and its basic stages, family group conferencing, circles and reparative boards and provides examples of different restorative justice programs in the United States implementing these process models).

11    John Braithwaite, Restorative Justice and Responsive Regulation 11 (Oxford University Press, 2002).

12    Paul McCold & Ted Wachtel, Restorative Justice Theory Validation, in Restorative Justice: Theoretical Foundations

110, 111 (Weitekamp & Kerner eds., 2002).

13    Id.

14    For a broad discussion on each of the different groups, their rationale and role in restorative processes, see John Braithwaite, Setting Standards for Restorative Justice, 42 Brit. J. Criminology 563 (2002) (listing, among the constraining values the following: non-domination, empowerment, honoring legally specific upper limits on sanctions, respectful listening, equal concern for all stakeholders, accountability and appealability and respect for the fundamental human rights specified in different internationally recognized declarations; among the maximizing values Braithwaite lists the restoration of human dignity, property loss, safety/injury/health, damaged human relationships, communities, the environment, emotional restoration and the restoration of freedom, compassion, peace, a sense of duty as a citizen, the provision of social support to develop human capabilities to the full and prevention of future injustice; among the emergent values Braithwaite identifies remorse over injustice, apology, censure of the act, forgiveness of the person and mercy).

15    John Braithwaite, Principles of Restorative Justice, in Restorative Justice and Criminal Justice: Competing or Reconcilable Paradigms? 1 (von Hirsch, Roberts & Bottoms Eds., 2003).

16    Id. at 8-9 (explaining the meaning of these terms and their role in restorative processes).

17    Id. at 11.

18    Id. at 12.

19    See, e.g., Volume 3, No. 4 (2000) of the Contemporary Justice Review, dedicated to the academic discussion regarding the restorative justice paradigm; see Paul McCold, Toward A Holistic Vision of Restorative Juvenile Justice: A Reply to the Maximalist Model, 3(4) Contemp. Just. Rev. 357 (addressing the need to identify the exact elements of restorative justice, offering a "Purist Model" of restorative justice which aims to include only elements of the restorative paradigm while excluding elements based on the retributive, deterrent and treatment paradigms. The model itself is based on the same premises and elements as McCold's needs-based theory, as described and discussed in this article); see also Lode Walgrave, How Pure Can A Maximalist Approach to Restorative Justice Remain? Or Can A Purist Model of Restorative Justice Become Maximalist? 3(4) Contemp. Just. Rev. 415 (for a response of once of the developers of the "maximalist" model of restorative justice, reviewing common grounds shared by both the "maximalist" and "purist" models and continues to justify his proposed model and clarify its unique aspects).

20    Paul McCold, A Causal Theory of Restorative Justice, Paper presented at The 7th International Conference on Conferencing, Circles, and Other Restorative Practices, Manchester, England, Nov. 2005, available at: http://fp.enter net/restorativepractices/au05/au05_mccold.pdf [hereinafter McCold, A Causal Theory]. Some elements of the theory are discussed in McCold and Wachtel, supra note 12.

21    Andre von Hirsch, Andrew Ashworth & Clifford Shearing, Specifying Aims and Limits for Restorative Justice: A 'Making Amends' Model? in Restorative Justice and Criminal Justice: Competing or Reconcilable Paradigms? 21 (von Hirsch, Roberts & Bottoms eds., 2003).

22    McCold, A Causal Theory, supra note 20, at 1.

23    The concept of 'community' in the restorative justice paradigm has various different meanings and roles. In discussing these different meanings, Paul McCold distinguishes between "local communities" and "personal

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 139 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

communities," defined as "individuals who know and are personally involved in the lives of the victim and/or the offender." For the purpose of this article, the latter form "communities of care." See Paul McCold, Restorative Justice: The Role of the Community, Paper presented to The Academy of Criminal Justice Sciences Annual Conference, Boston, MA, Mar. 1995, available at http://www.restorativepractices.org/library/community3 html.

24    McCold, A Causal Theory, supra note 20, at 2-3; see also McCold & Wachtel, supra note 12, at 114.

25    McCold, A Causal Theory, supra note 20, at 4-5; McCold & Wachtel, supra note 12, at 115-116.

26    Von Hirsch, et al., supra note 21, at 25.

27    Id. at 26.

28    Id. at 27-28.

29    Id, at 28.

30    Edwin H. Sutherland, White Collar Crime ix (Yale University Press, 1983).

31    Id. at 7.

32    See Stuart P. Green, White Collar Criminal Law in Comparative Perspective: The Sarbanes-Oxley Act of 2002: The Concept of White-Collar Crime in Law and Legal Theory, 8 Buff. Crim. L. Rev. 1 (exploring various aspects and possible meanings of the term "white-collar crime" and analyzing the use of the term in the Sarbanes-Oxley Act of 2002, which the author refers to as "the most significant piece of legislation ever to use the term 'white collar crime.'"). For a description of the general confusion regarding the definition of "white-collar crime" see David Weisburd & Elin Waring, White-Collar Crime and Criminal Careers 6-7 (Cambridge University Press, 2001)).

33    Green, supra note 32, at 8-9.

34    Bureau of Justice Statistics, U.S. Department of Justice, Dictionary of Criminal Justice Data Terminology 215 (2nd ed. Search Group, Inc. 1981).

35    David Weisburd, Elin Waring & Ellen Chayet, Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33(4) Criminology 587, 591 (citing Wheeler et al., Sentencing the White Collar Offender: Rhetoric and Reality, 47 Am. Soc. Rev. 641-659 (1982). The sample examined eight typical federal white-collar crimes from seven federal judicial districts, chosen for their geographical spread and reputation for substantial amounts of white-collar crime cases, during the years 1976 to 1978.)

36    Weisburd et al, supra note 32, at 591.

37    Id.

38    Frank O. Bowman, A Challenge to the Rationale for General Economic Crime Sentence Increase Following Sarbanes-Oxley: Letter of Frank Bowman to U.S. Sentencing Commission, Feb. 10, 2003, 15 Fed. Sent'g Rep. 284 (Apr. 2003) available at 2003 WL 22016910, at *6 [hereinafter Bowman Letter] (supporting this conclusion with the

following statistics: "In 1999, [fifty-five percent] of all federal defendants sentenced for economic crime offenses caused losses less than $40,000. More than [thirty percent] were responsible for losses less than $10,000. And fully [fifteen percent] of all federal economic defendants, or one out of seven, took less than $2000.").

39 Frank O. Bowman, Are We Really Getting Tough on White Collar Crime? Hearing Before the Subcomm. on Crime and Drugs, S. Judiciary Comm. Part 2, 15 FED.SENT.R.'G REP. 237 (June 19, 2002), available at 2003 WL 22016895, at *2 [hereinafter Bowman, Excerpts of Statement].

40 Fredrick Gay, Restorative Justice and the Prosecutor" 27 Fordham Urb. L.J. 1651, 1653, 1656-1657 (2000).

41 Id. at 1656-1657.

42 See Mark S. Umbreit & Jean Greenwood (Apr. 2000) National Survey of Victim-Offender Mediation Programs in the United States, U.S. Department of Justice, Office of Justice Programs, Office for Victims of Crime, available at: http://www.ojp.usdoj.gov/ovc/publications/infores/restorative_justice/96520-national_survey/welcome html,   at   7 [hereinafter The National Survey].

43 The fact that the Federal Sentencing Guidelines consolidated the sentencing schemes for fraud and theft supports this view. For a broader discussion on the connection between fraud and theft, see Frank O. Bowman, The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History, 35 IND. L. REV. 5, 13-17, 24 (2001) [hereinafter Bowman, "Economic Crime Package" ].

44 John Braithwaite, Restorative Justice & Responsive Regulation 16, 128 (Oxford University Press, 2002).

45 See Peter C. Yeager, Law Versus Justice: From Adversarialism to Communitarianism: John Braithwaite, Restorative Justice and Responsive Regulation, 29 Law & Soc. Inquiry 891, 908 (2004).

46 Bowman, Excerpts of Statement, supra note 39, at 2.

47 Bowman, "Economic Crime Package," supra note 43, at 17.

48 Id.

49 Bowman, Excerpts of Statement, supra note 39, at 4.

50 John R. Kroger, Enron, Fraud, and Securities Reform: An Enron Prosecutor's Perspective, 76 U. Colo. L. Rev. 57, 58-59 (2005) (explaining that as a result of Enron's fraudulent insider deals and accounting, approximately 4,500 Enron employees lost their jobs in Houston Texas alone. Many of them lost their life savings as well, since Enron encouraged its employees to invest their retirement savings in Enron stock. This, in return, led to the aggregated loss of $1.3 billion in savings accounts. Enron's countless investors lost approximately $61 billion.).

51 See Jennifer S. Recine, Examination of the White Collar Crime Penalty Enhancements in the Sarbanes-Oxley Act, 39 Am. Crim. L. Rev. 1535, 1537-1545 (2002) (for a factual summary of the bankruptcies of Enron, Global Crossing, Adelphia and WorldCom).

52 Bowman, Excerpts of Statement, supra note 39, at 5; see also Robert G. Morvillo, Barry A. Bohrer & Barbara L. Balter, Motion Denied: Systemic Impediments to White Collar Criminal Defendants' Trial Preparation, 42 Am. Crim.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 141 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

L. Rev. 157, 157-158 (discussing the difficulties and complexities of prosecuting white-collar crime); Leo Romero, Procedures for Investigating and Prosecuting White Collar Crime, 11 U.S.-Mex. L.J. 165 (reviewing the most common tactics and procedures used by prosecutors to overcome the unique difficulties of investigating and prosecuting white-collar crime cases).

[53]   See Zvi D. Gabbay, Justifying Restorative Justice: A Theoretical Justification for the Use of Restorative Justice Practices, 2005(2) J. Disp. Resol. 349, 350.

[54]   Bowman, Excerpts of Statement, supra note 39, at 4.

[55]   See Daniel A. Berman et al., summer 2002: The Genesis of the Sentencing Provision of the Sarbanes-Oxley Act, Are We Really Getting Tough on White Collar Crime? Hearing Before The Subcomm. on Crime and Drugs, Senate. Judiciary Comm. Part I, 15 Fed. Sent. Rep. 234 (June 19, 2002) (statement of James B. Comey, Jr. United States Attorney for the Southern District of New York), available at: 2003 WL 22016894, at *1 and *4.

[56]   Gabbay, supra note 53, at 375-390 (demonstrating the compatibility of restorative justice with basic retributive and utilitarian principles); see also Zvi D. Gabbay, Justifying Restorative Justice: A Practical and Theoretical Justification for Restorative Practices, Paper presented at The 7th International Conference on Conferencing Circles and Other Restorative Practice, The Next Step: Developing Restorative Communities, Manchester, England, Nov. 9-11, 2005, available at http://fp.enter.net/restorativepractices/man05/man05_gabbay.pdf (citing and reviewing empirical evidence that demonstrates the superiority of restorative justice processes compared to the formal criminal justice system in reducing recidivism rates, saving valuable judicial resources and promoting the appearance of justice and a sense of fairness. It then turns to the two prevailing theories of punishment, retribution and utilitarianism, and finds their basic principles that correspond with the basic premises of the restorative justice paradigm).

[57]   See Jennifer Bayot & Roben Farzad, WorldCom Executive Sentenced, N.Y. Times, Aug. 12, 2005.

[58]   See Andrew R. Sorkin, Ex-Tyco Officers Get Eight to Twenty-five Years, N.Y. Times, Sept. 20, 2005.

[59]   See Thomas Mulligan & Walter Hamilton, John Rigas Is Sentenced to 15 Years; The Adelphia founder and His Son Receive Some of the Harshest Prison Terms in Corporate Cases, L.A.Times, Jun. 21, 2005.

[60]   M. Rozen & B. Sapino Jeffreys, Ken Lay's Defense Strategy: Come Out Fighting, Seek Speedy Trial, Tex. Law. 3 (July 12, 2004) (quoting statement of Deputy Attorney General James B. Comey, head of the president's Corporate Fraud Task Force).

[61]   Alexei Barrionuevo and Thayer Evans, Skilling Sentenced To Twenty-four Years, N.Y. Times, Oct. 24, 2006.

[62]   See K. Eichenwald, Even if Heads Role, Mistrust Will Live On, N.Y. Times, Oct. 6, 2002 (portraying the deep mistrust in corporate leaderships and financial markets due to these types of misconduct. At the end of the article, the author provides a more detailed list of some of the corporate executives accused of criminal misconduct).

[63]   Elizabeth Szockyj, Imprisoning White-Collar Criminals? 23 S. Ill. U. L.J. 485, 487-488 (1998) (especially Kenneth Mann's words cited by the author: "Though it may seem inappropriate, white-collar defense attorneys tend to regard the case that extends past the pre-charge state as a failure." Id. at 488).

[64]   See id. at 489 nn. 25 & 26; see also Michael D. Silberfarb, Justifying Punishment for White-Collar Crime: A

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 142 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

Utilitarian and Retributive Analysis of the Sarbanes-Oxley Act, 13. B.U. Pub. Int. L.J. 95, 105 nn. 76-78, and accompanying text (summarizing the statistics and compares the average sentence length for white-collar criminals between 1991 and 2001 (between 19.0 to 20.8 months) with that of violent offenders (between 89.5 to 106.7 months) and drug offenders (between 71.7 to 88.2 months). The author attempts to demonstrate through these statistics the fact that white-collar offenders have been traditionally treated leniently by the federal criminal justice system as opposed to drug and violent offenders).

65   Bowman, Excerpts of Statement, supra note 39, at 7.

66   See Bowman, supra note 38, at 3.

67   Id. at 2.

68   Id. at 1-2 (stating that the number of defendants sentenced for economic crimes in 1997 was 13,571, while in 1994 and 2001 the numbers were somewhat lower but still close: 12,631 and 12,887 (respectively)).

69   Although technically the number of white-collar defendants remained similar per year between 1994 and 2001, it is important to note that the U.S. population grew by 20 million people during this time, which indicates that white-collar crime rates actually dropped. Id. at 2, n. 3.

70   John Braithwaite, Challenging Just Deserts: Punishing White-Collar Criminals, 73 J. Crim. L. & Criminology 723, 732-733 (1982) (summarizing, in a chapter titled "Public Attitudes to White-Collar Crime," numerous studies and polls that examined this subject. Among other studies, the author cites the study above by Rettig & Pasamanick (id. n. 47)).

71   See supra nn. 48-55 and accompanying text.

72   See supra nn. 56-75 and accompanying text (citing studies from the 1970s indicating that the public perceived certain types of white-collar crimes to be less serious than violent crimes, but more serious than all property crimes). For a more recent study see Donald J. Rebovich & Jenny Layne, The National Public Survey on White Collar Crime, National White Collar Crime Center (2000), available at www nw3c.org/downloads/research_monograph.pdf [hereinafter: the White Collar Crime Survey] for a more recent study (finding that over a third of the 1,169 participating American households considered themselves to be victimized by white collar crime in the last year, however very few (less than ten percent) of these crimes were actually reported. On the other hand, the survey found that "the level of moral condemnation of non-violent white-collar crimes was higher than expected, particularly when the crimes involve both monetary loss and the corruption of public trust." Id. at 17).

73   Braithwaite, supra note 70, at 738.

74   The White Collar Crime Survey, supra note 72, at 17.

75   See I.H. Nagel and W.M. Swenson, The Federal Sentencing Guidelines for Corporations: Their Development, Theoretical Underpinnings, and Some Thoughts About Their Future, 71 Wash. U. L. Q. 205, 224 (1993) (citing a study published by the Bureau of Justice Statistics, The United States Department of Justice, showing that sixty-five percent of Americans viewed sentences for white-collar defendants as too lenient (id. n. 94), and demonstrating the direct relation between this public perception, the Sentencing Commission's mandate to adjust the Guidelines accordingly and Congress' motives to introduce new legislative measures in prosecuting and sentencing white-collar offenders and corporations).

76      John C. Coffee, Paradigms Lost: The Blurring of the Criminal and Civil Law Models - And What Can Be Done
        About It, 101 Yale L.J. 1875, 1888, n. 39 (1992) (citing a 1965 article by Harry Ball & Lawrence Friedman
        analyzing "the interactive role between the use of criminal punishment and the public's perception of what is
        criminal." Coffee argues that this evidence demonstrates how the use of criminal sanctions helps formulate public
        perceptions regarding severity and inherent culpability of certain offenses).

77      For a more detailed account of the history of the sentencing guidelines see S.L. Kaufman, The Federal Sentencing
        Guidelines: A Formulaic and Impersonal Approach to Dispensing Justice, 7 Nev. Law. 18 (1999); see also Stephen
        Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1
        (1988) (explaining the rationales behind the guidelines and discusses the various compromises which were embedded
        in the final version of the Guidelines. One of those compromises had to do with appropriate sentencing for white-
        collar crimes (see id. at 20-23)).

78      See Breyer, supra note 77, at 20-21.

79      See Bowman, supra note 45 (discussing the deficiencies that existed in the sentencing guidelines regarding certain
        white-collar crimes prior to the "Economic Crime Package," and describing the extensive research conducted before
        formulating new sentencing schemes that would better address these deficiencies. The author also explains the
        principles underlying the new guidelines and highlights a few of the remaining unaddressed issues regarding
        sentencing white-collar offenders).

80      Id. at 24-25.

81      Id. at 30; see also Bowman, supra note 39, at 3. The revised definition of "loss" includes any harm in excess of
        $70,000- a category most corporate executive defendants fall under.

82      See generally, Bowman, supra note 39, at 8-9.

83      For a general summary of the cases mentioned see Recine, supra note 51 for a general summary of the cases
        mentioned.

84      Sarbanes-Oxley Act of 2002 (Public Company Accounting Reform and Investor Protection Act) (Pub. L. 107-204,
        July 30, 2002, 116 Stat. 745) [hereinafter SOA].

85      Such as accounting oversight, auditor independence, corporate responsibility, financial disclosures, analyst conflict
        of interest and more.

86      See generally, SOA, supra note 84, Section 1(b) (Table of Contents).

87      See Geraldine S. Moohr, An Enron Lesson: The Modest Role of Criminal Law in Preventing Corporate Crime, 55
        Fla. L. Rev. 937 (2003) (discussing, in pages 953-954, the way in which the new criminal offenses in SOA assist
        federal law enforcement agencies in their work).

88      For example, the maximum sentence for mail and wire fraud - probably the most common white-collar offenses -
        were increased by 400% from five to twenty years; the maximum sentence for insider trading was increased by
        250%, from ten to twenty-five years; the certification offense established in SOA carries a maximum sentence of
        twenty years, and the new obstruction provisions increased the maximum sentence by 200%, carrying prison terms

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 144 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

that vary from ten to twenty years. See id. at 954-955.

89    SOA, supra note 84, Section 905(b)(1).

90    See Memorandum from Larry D. Thompson, Deputy Attorney General, to Kathleen Hawk Sawyer, Director of the Federal Bureau of Prisons (Dec. 16, 2002), available at http://www.usdoj.gov/dag/readingroom/imprisonment.htm [hereinafter: the Memo].

91    Id. For a more extensive review and discussion on the legality of the new policy see Jennifer Borges, The Bureau of Prisons' New Policy: A Misguided Attempt to Further Restrict a Federal Judge's Sentencing Discretion and to Get Tough on White Collar Crime, 31 New Eng. J. on Crim. & Civ. Confinement 141, 175 (2005).

92    The Memo, supra note 90.

93    See SOA, supra note 84; see also SOA, supra note 84, Section 805 (Review of Federal Sentencing Guidelines for Obstruction of Justice and Extensive Criminal Fraud) and Section 1104 (Amendment to the Federal Sentencing Guidelines).

94    See Elkan Abramowitz & Barry A. Bohrer, White Collar Crime: Throwing the Book (The Guidelines) at Corporate Criminals, 229 N.Y. L. J. 3 (col. 1) (more broadly discussing the November 2003 amendments).

95    Practitioners Advisory Group (PAG), Letter to Hon. Diana E. Murphy, Chair, U.S. Sentencing Commission, Dec. 12, 2002, as cited by Abramowitz and Bohrer, id.

96    See Bowman, supra note 39, at 3 (citing statistics reported by the U.S. Sentencing Commission regarding the years 1994 to 2001).

97    Id. at 3.

98    Gordon Bazemore, Rock and Roll, Restorative Justice, and the Continuum of the Real World: A Response to "Purism" in Operationalizing Restorative Justice, 3(4) Contemp. Just. Rev. 459, at 464.

99    Id.

100    McCold, A Causal Theory, supra note 20, at 1.

101    According to Van Ness and Strong, as cited by Bazemore, supra note 98, "[j]ustice requires that we work to heal victims, offenders and communities that have been injured by crime"; see also Daniel Van Ness, The Shape of Things to Come: A Framework for Thinking About A Restorative Justice System, in Restorative Justice: Theoretical Foundations 1, 2 (Weitekamp & Kerner eds., 2002).

102    Van Ness, supra note 101, at 2.

103    John Braithwaite, "Restorative Justice and Therapeutic Jurisprudence" 38 Crim. L. Bull. 244, 247.

104    Julian V. Roberts & Loretta J. Stalans, Restorative Sentencing: Exploring the Views of the Public, 17(3) Soc. Just. Res. 315, 328.

105    Id. at 329.

106    See Eric Luna, Punishment Theory, Holism, and the Procedural Conception of Restorative Justice, 2003 Utah L. Rev. 205, 208 (2003); see also Michele Cotton, Back with a Vengeance: The Resilience of Retribution as an Articulated Purpose of Criminal Punishment, 37 Am. Crim. L. Rev. 1313 (2000) (describing the legislative trend of extracting retribution as an explicit purpose of criminal sentencing, and its reinstatement by the courts. The article exemplifies the role and necessity of both utilitarianism and retributivism as governing justifications for punishment).

107    Gabbay, supra note 53.

108    See Immanuel Kant, The Metaphysical Elements of Justice 100-102 (1797), trans. John Ladd, (Macmillan Publishing Comp. 1986).

109    Braithwaite, supra note 39, at 732.

110    See supra notes 68-73, and accompanying text.

111    See supra note 89 and accompanying text.

112    As Braithwaite calls them in his book Restorative Justice & Responsive Regulation, supra note 44, at 109-110.

113    In most jurisdictions, when restorative justice is applied to serious crimes it is done so in addition to the regular sentence imposed on offenders by court. See, e.g., Gay, supra note 40, at 1653-1655 (describing the way victim-offender meetings are included in the criminal proceedings in Polk County, Iowa, as a complementary component of the usual disposition of cases by the courts); Mark Umbreit et al. (2002) Victim Offender Dialogue in Crimes of Severe Violence: A Multi-Site Study of Programs in Texas and Ohio, Center for Restorative Justice and Peacemaking, School of Social Work, University of Minnesota, available at http://2ssw.che.umn.edu/rjp/Resources/Resource.htm (describing two programs, in Texas and Ohio, where victims are provided with the opportunity to meet with their offenders, if the latter voluntarily agree. These meetings are conducted after the criminal justice system disposed of the cases conventionally, usually during the imprisonment of the offender. The meetings are intended mainly for healing and rehabilitation purposes for both victims and offenders).

114    Braithwaite, supra note 44, at 16-18.

115    Braithwaite, supra note 44, at 34.

116    Braithwaite, supra note 44, at 35-36.

117    McCold & Wachtel, supra note 12, at 113.

118    Id. at 112-113.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 146 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

119     Id. at 114.

120     Ilyssa Wellikoff, Note, Victim-Offender Mediation and Violent Crimes: On the Way to Justice, 5 Cardozo J. Conflict Resol. 2, n. 128 and accompanying text, available at http://cojcr.org/vol5no1/note02.html.

121     See Kant, supra note 108 and accompanying text.

122     See Walgrave, supra note 19, at 423 (citing with assent R.A. Duff and Kathleen Daly who argue that restorative interventions should be seen as "alternative punishments" and not as "alternatives to punishment.").

123     Jeremy Bentham, An Introduction to the Principles of Morals and Legislation 165 (J.H. Burns & H.L.A. Hart eds., 1982) (1783); see also Luna, supra note 106, at 208-9 (reviewing the basic tenets and objectives of the utilitarian theory of punishment, adding a few of the most distinct utilitarian goals such as rehabilitation and incapacitation as ways of preventing future crime).

124     SOA, supra note 84, Section 905(b)(1) (interestingly, deterrence and prevention - two distinctive utilitarian objectives - are mentioned before the retributive purpose of punishment).

125     See Szockyj, supra note 63, at 492; see also United States Attorney for the Southern District of New York, James B. Comey, Jr. in his testimony before the Subcommittee on Crime and Drugs, Senate Judiciary Committee, in Berman, supra note 554, at 3:
        Certainty of real and significant punishment best serves the purposes of deterring white collar criminals, in fact to a greater extent than this principle applies to other types of offenders. People with a lot to lose, especially people who have never been in trouble with the law before, don't want to go to prison.
        Id. See also Mary Kreiner Ramirez, Just In Crime: Guiding Economic Crime Reform After The Sarbanes-Oxley Act of 2002, 34 Loy. U. Chi. L.J. 359, 416-417, n. 280-85 (2003) (citing a number of sources that refer to the deterrent effect of imprisonment on white-collar offenders).

126     Szockyj, supra note 63, at 492.

127     See, e.g., supra note 93 and accompanying text.

128     John C. Coffee (July 10, 2002) Penalties for White Collar Crime: Are We Really Getting Tough on Crime? available at http://judiciary.senate.gov/testimony.cfm?id=310&wit_id=711; see also Excerpts of Statement of Professor John C. Coffee, Jr., Are We Really Getting Tough on White Collar Crime? 15 Fed. Sent'g Rev. 245 (Recommendation One and accompanying text).

129     See Supra notes 57-61 and accompanying text.

130     Abramowitz & Bohrer, supra note 94, at 1.

131     This view is commonly voiced by prosecutors, as exemplified in the statement of U.S. Attorney for the Southern District of New York Comey, supra note 125 and accompanying text.

132     See Szockyj, supra note 63, at 493-495 (citing a study by Michael K. Block et al. that demonstrated the superiority of civil suits in deterring potential offenders from price-fixing; a study by Braithwaite and Makkai that concluded that deterrence is not effective in encouraging compliance with regulatory law; a study by Simpson and Koper that found

that deterrence had little effect on antitrust violators); see also Weisburd et al, supra note 32, at 601 (concluding that "prison does not have a specific deterrent impact upon the likelihood of re-arrest over a 126 month follow-up period").

133    See Raymond Paternoster & Sally Simpson, Sanction Threats and Appeals to Morality: Testing A Rational Choice Model of Corporate Crime, 30 Law & Soc'y Rev. 549 (1996) (testing the role of the "Rational Choice Theory" in corporate crime and exploring different means for preventing it. The researchers conducted their study on a sample of first and second year graduate students in M.B.A. programs at three different universities and a group of corporate executives attending a business school executive education program at a fourth university. All students intended to pursue corporate and business careers, and the vast majority of them had been employed in business for at least a year prior to the study).

134    See Michael A. Perino, Enron's Legislative Aftermath: Some Reflections on the Deterrence Aspects of the Sarbanes-Oxley Act of 2002, 76 St. John's L. Rev. 671, 698 (2002) (reviewing the various substantive and procedural provisions of the Sarbanes-Oxley Act, compares them to the applicable law that existed prior to its enactment, and concludes that Congress "trumpeted its new crimes and new enhanced penalties as providing significant deterrence for securities fraud. In reality, these provisions are unlikely to have much real impact on deterrence").

135    See Moohr, supra note 87, at 975 (reviewing the criminal law landscape before and after the Sarbanes-Oxley Act, discusses the role of criminal law in achieving compliance with the law among business people and concludes that the criminal law is limited in this aspect and must be combined with "market-motivated gatekeepers, private remedial suits, [and] government administrative actions").

136    Dan M. Kahan & Eric A. Posner, Shaming White-Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines, 42 J.L. & Econ. 365, 367-68 (1999).

137    Dan Kahan, Social Influence, Social Meaning, and Deterrence, 83 Va. L. Rev. 349, 350 (1997) (describing and explaining the dominant roles of "social influence" and "social meaning" in crime prevention. According to Kahan, these terms refer to the way "individuals' perceptions of each others' values, beliefs, and behavior affect their conduct, including their decisions to engage in crime") (citation omitted).

138    Harold G. Grasmick & Robert J. Bursik, Conscience, Significant Others, and Rational Choice: Extending The Deterrence Model, 24 Law & Soc'y Rev. 837, 843-55 (1990).

139    Grasmick and Bursik mention significant others, friends, family, employers and others "whose opinions about an actor are considered important by that actor" as potential "punishers." Id. at 840.

140    Paternoster & Simpson, supra note 133, at 549, 561-62 (describing the elements of "informal sanctions") and the summary of the study's findings at 579-80.

141    For a brief description of the most common restorative practice models Victim Offender Mediation; Group Conferencing; Circles; and Reparative Boards see Mary Ellen Reimund, The Law and Restorative Justice: Friend or Foe? A Systemic Look at the Legal Issues in Restorative Justice, 53 Drake L. Rev. 667, 673-680 (2005) (Victim Offender Mediation; Group Conferencing; Circles; and Reparative Boards)).

142    As explained by Braithwaite in his book, supra note 44, at 74.

143    Id.

144    Id. at 75-76.

145    Jayne W. Barnard, Reintegrative Shaming in Corporate Sentencing, 72 S. Cal. L. Rev. 959, 966 (1999).

146    See Floyd Norris, Why His Peers Say Kozlowski Got Off Easy, N.Y. Times, Sept. 23, 2005 (demonstrating the effect white-collar crime has on the entire business community and the involvement and opinions held by peers of some of the convicted offenders associated with the corporate scandals of 2001-2002. The article indicates that peers are definitely stakeholders in white-collar crimes and can take an important and positive role in restorative interventions); see also Barnard, supra note 145, at 967 (citing a number of studies that suggested that some top-level managers and members of their social class fear being shamed before their family members and peers more than they fear criminal prosecution and civil lawsuits).

147    Albert W. Dzur and Susan M. Olson, The Value of Community Participation in Restorative Justice, 35(1) Journal of Social Philosophy, 91, 93 (2004) (paraphrasing Nils Christie's manifestation from 1981).

148    See John Braithwaite, Poverty, Power, White-Collar Crime and the Paradoxes of Criminological Theory, in Regulation, Crime, Freedom 37, 38 (T. Morawetz, Ed., 2000).

149    Howard Zehr, Changing Lenses: A New Focus for Crime and Justice 200 (Herald Press, Pennsylvania, 1990) (emphasizing the deep concern for the needs of offenders and community in restorative justice).

150    Braithwaite, supra note 148, at 39.

151    John C. Coffee, What Caused Enron? A Capsule Social and Economic History of the 1990s, 89 Cornell L. Rev. 269, 272 (2004).

152    Id. at 297-298; see also John C. Coffee, Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms, 84 B.U.L. Rev. 301, 328 (2004).

153    Coffee, supra note 151, at 297-298.

154    Id. at 298.

155    See Ronald C. Kramer, Poverty, Inequality and Youth Violence, 567 Annals Am. Acad. Pol. & Soc. Sci. 123 (2000) (uncovering the underlying reasons for the link between poverty and crime, as the absence of social support and informal social control common in indigent communities); Stephen Wizner & Mary F. Keller, The Penal Model of Juvenile Justice: Is Juvenile Court Delinquency Jurisdiction Obsolete? 52 N.Y.U. L. Rev. 1120 (1977) (citing Shaw, Delinquency Areas (1929) and Shaw & H. McKay, Juvenile Delinquency and Urban Areas (rev. ed. 1969) which point to the strong connection between poverty and juvenile offending.); Lee P. Brown, Toward A Rational Drug Policy, 1994 U. Chi. Legal F. 319 (mentioning poverty among the "root causes" of crime and drug addiction).

156    The National Survey, supra note 42.

157    Braithwaite, supra note 15, at 8-10.

158    Id. at 9.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 149 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

159     Id.

160     Id. at 7 ("[w]ith values against which restorative justice should be evaluated, there are some general ones - like accountability - that must apply to restorative justice in all domains."); see also Mark S. Umbreit, The Handbook of Victim Offender Mediation: An Essential Guide to Research and Practice 2 (Jossey-Bass Inc., 2001), available at: http://media.wiley.com/product_data/excerpt/18/07879549/0787954918-1.pdf; Zehr, Changing Lenses, supra note 149, at 200-201 (where the author, one of the most important restorative justice theorists and practitioners, discusses the importance of accountability in restorative justice).

161     Yeager, supra note 45, at 909 ("the top manager who executed the particular accounting trick rationalized it as necessary to avoid the possibility of other poor outcomes, such as laying off employees to generate adequate profits.").

162     Uzi Segal and Alex Stein, Ambiguity Aversion and the Criminal Process, 81 Notre Dame L. Rev. 1495, 1505, 1545 (2006).

163     See John Hasnas, Ethics and the Problem of White Collar Crime, 54 Am. U.L. Rev. 579, 593 (2005); Romero, supra note 52, at 165; Morvillo et al., supra note 52, at 157-158.

164     See Morvillo, supra note 52.

165     Indeed, criminologists have found that "the upper-class use their resources to ensure that their power is unaccountable." Braithwaite, supra note 148, at 44; see Braithwaite, supra note 70, at 753-754 (reviewing the complexity of typical white-collar crime cases, and the fact that white-collar offenders take advantage of that in avoiding being held accountable); see also Szockyj, supra note 63, at 487-488 (reviewing the various ways white-collar offenders use their power, influence and resources to prevent being prosecuted for their misconduct).

166     Changing Lenses, supra note 149, at 16.

167     Id.

168     See generally Kendel Drew & Kyle A. Clark, Corporate Criminal Liability, 42 Am. Crim. L. Rev. 277 (2005) (discussing holding corporations criminally liable in the federal justice system); According to the statistical reports of the United States Sentencing Commission, a total of 252 corporations were sentenced pursuant to the organizational sentencing guidelines during the fiscal year 2002. In fiscal year 2003 that number dropped to 200 corporations. See U.S. Sentencing Comm'n, 2002 Sourcebook of Federal Sentencing Statistics, Table 54, available at: http://www.ussc.gov/ANNRPT/2002/SBTOC02.htm; U.S. Sentencing Comm'n, 2003 Sourcebook of Federal Sentencing Statistics, Table 54, available at http://www.ussc.gov/ANNRPT/2003/SBTOC03 htm.

169     Arthur Andersen LLP v. United States, 544 U.S. 696 (2005) (Arthur Andersen, formally among the "Big 5" auditing firms, was convicted of obstruction of justice and witness tampering, but was ultimately acquitted by the United States Supreme Court on May 31, 2005).

170     Compare the case of the accounting firm of KPMG (Hasnas, supra note 163, at 626) with the case of Bristol-Myers Squibb, the pharmaceutical company, and its deferred prosecution agreement, available at: http://lawprofessors.typepad.com/whitecollarcrime_blog/2005/06/bristol_myers_s html.

171     See supra note 29 and accompanying text.

172     See McCold supra note 20, at 2 (listing of typical offenders' needs).

173     Id.

174     Alexei Barrionuevo, Which Picture of Skilling Will Enron Jurors Believe?, N.Y. Times, Apr. 21, 2005, at C1.

175     See Bethany McLean & Peter Elkind, The Smartest Guys in the Room: The Amazing Rise and Scandalous Fall of
        Enron 337-339 (2003).

176     See Barrionuevo, supra note 174 (summarizing Skilling's testimony in his trial and analyzed the impression Skilling
        managed to make).

177     Special Committee Finds Krispy Kreme Executives Lax in Oversight, Zurich, Aug 11, 2005, available at
        http://www.zurichna.com/sm/screamin.nsf/0/69D4FCC765797F938525705B0063387E?
        opendocument&ChangeMenu=No.

178     See Mark S. Umbreit, Victim Meets Offender: The Impact of Restorative Justice and Mediation 101-104 (Criminal
        Justice Press, 1994) (describing positive themes common to offenders who participated in restorative justice
        processes. One of these themes, directly related to the discussion above, was "learning about the victims' feelings.").

179     See Richard Delgado, Prosecuting Violence: A Colloquy on Race, Community and Justice, 52 Stan. L. Rev. 751, 765
        (2000).

180     Id.

181     See ⚑ U.S. Sentencing Guidelines Manual (2005), § 8C2.5, commentary (n. 14):
        In making a determination with respect to subsection (g) [point subtractions for "Self-Reporting, Cooperation, and
        Acceptance of Responsibility" ] the court may determine that the chief executive officer or highest ranking employee
        of an organization should appear at sentencing in order to signify that the organization has clearly demonstrated
        recognition and affirmative acceptance of responsibility.
        Id.

182     Jayne W. Barnard, Reintegrative Shaming in Corporate Sentencing, 72 S. Cal. L. Rev. 959, 961 (1999).

183     Id. at 966-67 (this procedure, referred to as the "corporate icon provision," is argued to be extremely effective due to
        its shaming features, which are regarded as especially relevant among the population of top corporate executives in
        the United States).

184     See Kathy Elton & Michelle M. Roybal, Restoration, A Component of Justice, 2003 Utah L. Rev. 43, 52-56 (2003)
        (discussing and reviewing crime victims' needs and the way restorative processes help to answer those needs).

185     For example in The Resolve to Stop the Violence Project (RSVP), implemented through the San Francisco Sheriff's
        Department, community volunteers who are victims and survivors of violent crimes visit a jail once a week and meet
        with inmates partaking in the Project. In other words, these are restorative processes conducted without the actual

victim of the offense. See, e.g., James Gilligan & Bandy Lee, The Resolve to Stop the Violence Project: Reducing Violence through a Jail-Based Initiative," available at http://www.annalsnyas.org/cgi/content/full/1036/1/300 (for a detailed description of the program). Surrogate victims are also used in Victim Impact classes, which are part of the restorative justice program in Prince William County, Virginia. See interview with Vickie Shoap, Program Coordinator, (Mar. 26, 2004) (on file with author). Vickie Shoap, Restorative Justice in Prince William County, available at http://www.courts.state.va.us/drs/resolutions/march2003/restorative html. Similarly, restorative processes can commence without the actual offender. See Braithwaite, supra note 44, at 138 (describing a proposal raised in a community consultation on restorative justice in Darwin, Australia in 2000, intended to resolve the problem of victims without offenders and offenders without victims under a restorative regime. According to this proposal, "healing circles could be held in prisons for offenders without willing victims and in the community for victims without known offenders, and that every now and then a visitor could move from one circle to the other.").

186    Mary Kreiner Ramirez, The Science Fiction of Corporate Criminal Liability: Containing the Machine Through the Corporate Death Penalty, 47 Ariz. L. Rev. 933, 935 (2003).

187    See Drew & Clark, supra note 168, at 291-293 (reviewing provisions of the Organizational Guidelines regarding mandatory restitution and even community service intended to restore the harm caused to victims and the community).

188    See Ramirez, supra note 186, at 964, 997-99 (for a deeper discussion about the role of "corporate culture" in corporate crime and in the Sentencing Guidelines); Braithwaite, supra note 44, at 17, 22 (presenting some empirical evidence regarding the effectiveness of restorative interventions involving corporations and describing his involvement in trade practices enforcement in Australia).

189    See supra note 12 and accompanying text.

190    McCold, supra note 20, at 2.

191    Von Hirsch et al, supra note 21, at 28.

192    Green, supra note 32, at 33.

193    Braithwaite, supra note 70, at 742.

194    Id. at 747.

195    See Coffee, supra note 128, Introduction.

196    See Coffee, supra note 128, Recommendation Two ("Congress should instruct the Sentencing Commission to develop a special guideline for securities fraud cases involving accounting irregularities.").

197    See Coffee, supra note 128, following "Recommendation Two."

198    Braithwaite, supra note 15, at 8-9.

199    See Braithwaite, supra note 44, at 11.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 152 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

200    Dzur & Olson, supra note 147, at 91 (citing Nils Christie, Conflicts as Property, 17 Brit. J. of Criminology 1 (1977)).

201    McCold, supra note 20, at 2 (table of victims' harms and corresponding needs).

202    Id. (table of offenders' harms and corresponding needs).

203    In studying victim-offender mediation programs that deal with crimes of severe violence, Mark Umbreit and his colleagues found that one of the main reason for victims to participate in such a process is to show offenders "the human impact of their actions," and to tell the offenders their own story. In many cases, they wanted "offenders to know who the person was that was harmed." See Mark S. Umbreit et al Executive Summary: Victim Offender Dialogue in Crimes of Severe Violence, A Multi-Site Study of Programs in Texas and Ohio, 7 Center for Restorative Justice & Peacemaking (2002), available at http://rjp.umn.edu/Copy_of_Restorative_Justice_Princples-43ea0fa8cf21f html (last visited Apr. 22, 2006) (finding that one of the main reasons for offenders to agree to meet their victims was to apologize and help the victims heal, but also to seek forgiveness).

204    In fact, "having some form of human contact with the person responsible for the crime" was the third most frequent reason victims gave for wanting to meet their offenders. Id. at 7.

205    See Dzur and Olson, supra note 147, at 93.

206    See McCold & Wachtel, supra note 12, at 115 ("[t]he very process of interacting is critical to meeting stakeholders' emotional needs. The emotional exchange necessary for meeting the needs of all those directly affected cannot occur with only one set of stakeholders participating... The most restorative processes involve the active participation of all three sets of direct stakeholders.").

207    There are many different manifestations of this view in restorative justice literature. See Zehr, supra note 149, at 66-73 (describing the way the justice system views the concept of guilt and categorizes offenders):
The legal concept of guilt which guides the justice process is highly technical, abstracted from experience. This makes it easier for offenders to avoid accepting personal responsibility for their behavior. It also frustrates victims, who find it difficult to match the legal description of the event with their own experience. Both victim and offender are forced to speak the language of the "system," to define their reality in its terms instead of their own.
Id. See Sir Charles Pollard, If Your Only Tool Is a Hammer, All Your Problems Will Look Like Nails, in Restorative Justice and Civil Society 165, 173-175 (H. Strang and J. Braithwaite Eds., 2001) (describing the "failings" of the criminal justice system, in particular the trial and sentencing stages, and illustrating the impersonal features of these stages as the partial cause for the criminal justice's shortcomings, comparing them with the direct and personal interactions facilitated in restorative interventions).

208    This was proposed as one of the core principles of restorative justice by Van Ness and Strong. See Bazemore, supra note 98, at 464 (citing proposal by Van Ness and Strong).

209    See Heather Strang & Lawrence W. Sherman, Repairing the Harm: Victims and Restorative Justice, 2003 Utah L. Rev. 15, at 24 (citing Howard Zehr, Retributive Justice, Restorative Justice 8 (Mennonite Central Committee Canada Victim Offender Ministries Program and the MCC U.S. Office of Criminal Justice, 1985)).

210    Id. at 24.

211    See, e.g., Section 308 of SOA, supra note 84 (15 U.S.C.S. § 7246 titled "Fair funds for investors").

212    See Romero, supra note 52, at 166.

213    Strang & Sherman, supra note 209, at 23 (in studying victims' attitudes towards restorative processes and conventional criminal justice processes, the authors found that victims suggest different amounts as appropriate restitution, depending on the identity of the payer - a lower sum, when the offender is the one paying, and a higher sum, if they are receiving restitution from a governmental agency).

214    McCold, supra note 20, at 2 (listing typical harms caused to victims and the needs they create. In addition to the above, McCold mentions loss of faith, sense of isolation, disbelief in experience, cognitive shock, enmity, indignation and fear).

215    See Umbreit et al., supra note 203, at 11 (describing what the participants talked about during the mediation. Victims and family members mostly focused on "the impact of the crime: on themselves, on the direct victim... and on other family members and persons connected to the victim." Offenders mostly shared information about the crime, but also about their life before the crime).

216    See Ramirez, supra note 125, at 403 (describing the limits placed by the Sentencing Commission on loss calculations according to the Sentencing Guidelines, excluding "emotional distress, harm to reputation, or other non-economic harm." According to the author, these limits were placed precisely in order to limit the scope of the criminal trial, leaving out reasonably foreseeable harms "that would be more aptly addressed as civil damages.").

217    Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, Stat. 737 [hereinafter the PSLRA].

218    See Ramirez, supra note 125, at 403-404.

219    This phenomenon, also referred to as "critogenic" (law-caused) harms, is found both in civil and in criminal legal proceedings. See Thomas G. Gutheil, Harold Bursztajn, Archie Brodsky & Larry H. Strasburder, Preventing "Critogenic" Harms: Minimizing Emotional Injury From Civil Litigation, 28 J. Psychiatry & Law 5 (2000) (identifying various types of "critogenic" harms such as delay, adversarialization, retraumatization, violation of boundaries, loss of privacy and arrested healing and offer approaches for minimizing the impacts of these harms on litigants); see Mary P. Koss, Karen J. Bacher & C. Quince Hopkins, An Innovative Application of Restorative Justice to the Adjudication of Selected Sexual Offenses, in Crime Prevention--New Approaches 7 (H. Kury & J. Obergfell-Fuchs eds., 2003) ("criminal justice response often disappoints and traumatizes victims").

220    See Braithwaite, supra note 44, at 51-52 (citing a wide variety of studies demonstrating the superiority of restorative interventions in terms of the percentage of cases in which offenders fully comply with their restitution obligations); see also Mark Umbreit, Robert B. Coates & Betty Vos, Center for Restorative Justice & Peacemaking, The Impact of Restorative Justice Conferencing: A Review of 63 Empirical Studies in 5 Countries, 8-10, (May 2002), available at http://2ssw.che.umn.edu/rjp/Resources/RJP%20CONFERENCING-mono%205-5-02.pdf (reviewing studies that demonstrate higher completion rates of restitution obligations in restorative justice compared to those found in courts).

221    Gabbay, supra note 53, at 397; Gabbay, supra note 56.

222    See Strang & Sherman, supra note 209 (describing the conventional treatment of victims by the criminal justice system and providing data on victims' attitudes towards their offenders and their views on appropriate punishment. The authors claim that crime victims mainly want information regarding their case, the possibility to participate in the process, emotional and material reparation and to be treated fairly and respectfully. The authors conclude that restorative justice processes satisfy those needs and provide victims with what they want most). Victims of highly

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 154 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

publicized white-collar crime are different. Information regarding their case is usually everywhere they look, on the internet, television and newspapers, and it is probably safe to conclude that they understand all too well that the crimes were usually not intended to hurt them specifically. Rather, their victimization is a byproduct of very distant corporate executives who intended to enhance their own profits and their company's income by illegal means.

[223]   See id. at 23-24.

[224]   See Drew & Clark, supra note 168, at 291.

[225]   See Berman, supra note 55, at 3.

[226]   See Romero, supra note 52, at 166.

[227]   See Weisburd & Waring, supra note 32, at 3.

[228]   See e.g., Kahan and Posner, supra note 136 (the authors argue that shaming, when used correctly, is far more effective and efficient than incarceration for white-collar offenders.) As mentioned above, shaming is a dominant element in restorative practices. See Braithwaite, supra note 44, at 74 (describing the connection between the Reintegrative Shaming Theory and restorative justice).

[229]   See John B. Owens, Have We No Shame?: Thoughts on Shaming, "White Collar" Criminals and The Federal Sentencing Guidelines, 49 Am. U.L. Rev. 1047 (2000) (arguing that conventional sentencing consists of effective shaming and that the courts are free to use their discretion in sentencing white-collar offenders in order to include shaming when appropriate and effective).

[230]   See Hasnas, supra note 163, at 592-593; see also Morvillo et al., supra note 52, at 157-158.

[231]   See Romero, supra note 52, at 167-168; see also Alexei Barrionuevo & Thayer Evans, Witness in Enron Trial Struggles With Emotions; Koenig Talks of Decision to Plead Guilty, N.Y. Times, Feb. 6, 2006 (reporting about the cross examination of the first witness in the trial of Kenneth Lay and Jeffrey Skilling, former Enron chief executives who are standing trial for their alleged central responsibility in the collapse of the company. During his questioning by Skilling's defense attorney, the witness - Mark Koenig, the former head of investor relations in Enron - was asked about his motives in testifying against his bosses in order to show "that Mr. Koenig was willing to say almost anything to avoid a long prison term and to protect the $5 million in salary and bonus in 2000." Koenig is one of the sixteen insiders the government relied on in proving its accusations against the defendants).

[232]   Compare Greg Burns, Disparity Grows in Penalties for Execs, Chi. Trib., Nov. 20, 2005, with White Collar Crime Prof Blog, White Collar Sentencing, available at http://lawprofessors.typepad.com/whitecollarcrime_blog/sentencing/index.html (last updated Nov. 27, 2005) (commentary published in response to the Burns article).

[233]   See National Briefing, Wash. Post, Sept. 21, 2005.

[234]   Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L. J. 1681, 1689 (1992).

[235]   See, e.g., Santobello v. New York, 404 U.S. 257, 260 (1971)
The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 155 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.
Id. (Burger, C.J.).

236    See Russell L. Christopher, The Prosecutor's Dilemma: Bargains and Punishments, 72 Fordham L. Rev. 93, 119-122 (2003) (reviewing a few basic retributive principles violated by "bargain justice." The article continues and reviews in depth other aspects in which plea bargains contradict retributivism).

237    Id. at 115-116.

238    See Jeff Palmer, Abolishing Plea Bargaining: An End to the Same Old Song and Dance, 26 Am. J. Crim. L. 505, 518-519 (1999).

239    Id. at 520-521.

240    See Gabbay, supra note 53, at 364 (describing the frequency of guilty pleas and plea bargains in the criminal justice system as opportunities for integrating restorative justice within the system).

241    See Donald J. Schmid, Restorative Justice in New Zealand: A Model For U.S. Criminal Justice 54 (Aug. 2001), available at http://www.restorativejustice.org/editions/2003/December/publicpolicy.

242    See Luna, supra note 106, at 209 n. 10 and accompanying text (providing a brief review of the role of incapacitation within utilitarianism).

243    Braithwaite, supra note 70, at 729.

244    See, e.g., Carrie Johnson & Ben White, No Safety at the Top for Corporate Leaders, Wash. Post, July 9, 2004 (citing the critique of several defense attorneys linking the prosecution of Arthur Andersen to its 2002 collapse).

245    These restrictions can be imposed as conditions of probation, see Drew and Clark, supra note 168, at 292.

246    See McCold, supra note 20.

247    See Floyd Norris, Crime and Consequences Still Weigh on Corporate World: S.E.C Agree on Set of Principles for Fining Companies for Fraud, N.Y. Times, Jan. 5, 2006 (reviewing some of the main criteria for imposing fines on corporations and examples of corporations that were subjected to fines and corporations that were not).

248    Id. (quoting S.E.C. Chairman Christopher Cox).

249    Id.

250    McCold, supra note 20, at 2.

251    Von Hirsch et al., supra note 21, at 28.

252    Indeed, in some cases identifying and locating all the victims may prove extremely difficult, such as in certain market fraud cases or certain environmental offenses. However, a restorative justice intervention does not necessitate all of the victims for its commencement. Rather, it requires a victim, at least one, whether human or corporation, that suffered direct and actual harm as a result of the offense.

253    It may be argued that the defense attorneys of these white-collar offenders would be suspicious of such a process and would advise their clients against their participation. The answer to this argument is that this issue would not be negotiable. According to the proposal offered here, restorative interventions would be integrated as an inseparable part of the plea bargain and as a precondition for a "downward departure" in the expected sentence.

254    See Umbreit, supra note 42, at 8 (stating that in sixty-five percent of the programs interviewed in the survey, offenders were required to admit their guilt to the specific offense that led to their referral to the victim offender mediation program); in Recommendation No. R(99) 19, Chapter IV §14, the Committee of Ministers of the Council of Europe recommended the following: "The basic facts of a case should normally be acknowledged by both parties as a basis for mediation."

255    Von Hirsch et al., supra note 21, and accompanying text.

256    See Elton & Roybal, supra note 182; supra note 183 and accompanying text.

257    See Delgado's critique of restorative processes, supra note 179, at 769-770 (arguing that victim offender mediation neglects to pay appropriate attention to the public interests in criminal punishment and to the symbolic elements of a public trial).

258    See Anurima Bhargava, Note, Defining Political Crimes: A Case Study of the South African Truth and Reconciliation Commission, 102 Colum. L. Rev. 1304, 1306 (2002); Jennifer J. Llewellyn & Robert Howse, Institutions for Restorative Justice: The South African Truth and Reconciliation Commission, 49 Univ. of Toronto L.J. 355, 356 (1999).

259    Bhargava, supra note 258, at 1306; Llewellyn and Howse, supra note 258, at 367.

260    Llewellyn & Howse, supra note 258, at 386.

261    Bhargava, supra note 258, at 1306-1307.

262    Llewellyn & Howse, supra note 258, at 385.

263    See Julissa Mantilla Falcon, The Peruvian Truth and Reconciliation Commission's Treatment of Sexual Violence Against Women, 12 Hum. Rts. Br. 1, 1 (2005).

264    Brenda V. Smith, Battering, Forgiveness and Redemption, 11 Am. U.J. Gender Soc. Pol'y & L. 921, 942 (2003).

265    See Llewellyn & Howse, supra note 258, at 386.

266    See Kahan & Posner, supra note 136 and accompanying text.

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 157 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

267     See Llewellyn & Howse, supra note 258, at 380.

268     Id. at 369-370; see Sherrie L. Russell-Brown, Out of the Crooked Timber of Humanity: The Conflict Between South Africa's Truth and Reconciliation Commission and International Human Rights Norms Regarding "Effective Remedies," 26 Hastings Int'l & Comp. L. Rev. 227 (2003) (arguing that due to the amnesty granted to offenders in the TRC, it may not constitute an "effective remedy" under various Human Rights treaties and therefore it contradicts certain international law principles).

269     See Falcon, supra note 263, at 1.

270     See Llewellyn & Howse, supra note 258, at 387.

271     Von Hirsch et al., supra note 21, at 25.

272     Brandon Hamber, Traggy Maepa, Tlhoki Mofokeng & Hugo van der Merwe, Survivors' Perceptions of the Truth and Reconciliation Commission and Suggestions for the Final Report, The Centre for the Study of Violence and Reconciliation & The Khulumani Support Group, Survivors' Perceptions of the Truth and Reconciliation Commission and Suggestions for the Final Report, available at http://www.wits.ac.za/csvr/papers/papkhul.htm (report submitted to the Turth and Reconciliation Commission). (The study explains that the eleven workshops were conducted between August 7, 1997 to February 1, 1998, and involved 560 participating victims and survivors from rural and urban areas in South Africa where conflict and oppression were especially dominant.) [hereinafter: CSVR workshop submission].

273     Id.

274     See, e.g., the Real-Justice (an international organization promoting restorative justice practices) script for a restorative justice conference begins with the following questions directed to the offender: What happened? What were you thinking at the time? What have you thought about since? Who has been affected by what you did? In what way? What do you think you need to do to make things right? See Terry O'Connell, Why the Real Justice Script? (2005), http://www restorativepractices.org/man05/man05_papers html; then follow "Why the Real Justice Script" hyperlink (last visited Mar. 29, 2006).

275     CSVR workshop submission, supra note 272 (see especially the second and fourth categories in the part about "Victims views on reconciliation": "Justice equals Reconciliation" and "Reconciliation tied-up with Reparation").

276     Tom R. Tyler & Hulda Thorisdottir, A Psychological Perspective on Compensation for Harm: Examining The September 11th Victim Compensation Fund, 30 DePaul L. Rev. 355, 380-381 (2003).

277     CSVR workshop submission, supra note 272.

278     Tyler, supra note 276, at 362.

279     Id., at 367-368.

280     South Africa Reduces Victims' Payouts, Chi. Trib., Apr. 16, 2003; see Oupa Makhalemele, The Centre for the Study of Violence and Reconciliation, Still not talking: Government's exclusive reparations policy and the impact of the 30,000 financial reparations on survivors (2004), available at http://www.csvr.org.za/papers/papoupa.htm [hereinafter

Case 1:19-cr-00552-JPC   Document 231-3   Filed 09/07/22   Page 158 of 159

EXPLORING THE LIMITS OF THE RESTORATIVE..., 8 Cardozo J. Conflict...

CSVR research].

281    See CSVR research, supra note 280.

282    Id. at "Survivors' actual needs."

283    Ruth Picker, Victims' Perspective about the Human Rights Violations Hearings, The Center for the Study of Violence and Reconciliation (2005), available at http://www.csvr.org.za/papers/pappick htm.

284    Id.

285    Id.

286    See 6 Truth and Reconciliation Commission of South Africa Report, §2, CH. 7, at 161, available at http://www.info.gov.za/otherdocs/2003/trc/rep.pdf [hereinafter: the TRC report].

287    Id. According to reports, the South African TRC took 22,000 apartheid victims' statements over two years, and received thousands of amnesty application from offenders (See Robyn Dixon, South Africa: A Decade After Apartheid; The Official Truth Falls Short for Many, L.A. Times, May 30, 2004.

288    See supra notes 224-226 and accompanying text.

289    See PSLRA, supra note 217 and accompanying text.

290    See Coffee supra note 197 and accompanying text.

291    It may be argued that allowing victims to decide voluntarily whether they wish to participate and commencing a process in which only few victims testify will lead to a distorted and inaccurate historical account of the offense and of the true magnitude of the harm it caused. While this argument is undoubtedly true, it must be noted that the restorative intervention proposed here is not intended to create an accurate historical account of the crime. This process is structured to supplement the current system, not to replace it. The task of creating a historical record of the offenders and the harm they caused will be left in the hands of the courts.

292    See Llewellyn & Howse, supra note 258, at 356.

293    Id. at 364 (although the author mentions this in the context of war crime tribunals, the same can be said about the conventional criminal justice system in prosecuting regular offenses).

294    See McCold & Wachtel, supra note 12, at 115 (listing the various direct and indirect stakeholders affected by crime).

295    See Llewellyn & Howse, supra note 258, at 386 (see especially the third specified aim).

296    See Tama Koss, South Africa's Truth and Reconciliation Commission: A Model for the Future, 14 Fla. J. Int'l L. 517, 526 (2002).

8 CDZJCR 421

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.