**EXHIBITS V AND W TO DECLARATION OF RJB ;
RECOMMENDATION LETTERS NOS. 1-9; DEFENDANT'S LETTER
NO. 10 AND COPIES OF UNPUBLISHED OPINIONS WITHOUT
CORRESPONDING WESTLAW CITATION**

EXHIBIT V PHOTO 1



# 노아은행 맨하탄점 대폭 확장 새 도약 나서

2019-12-19 (목) 최휘은 기자

가－  가＋

### 32가 5애비뉴 이전 총 3,600스퀘어피트 규모
### 다양한 업무 편리하게 처리



노아은행의 김영만(왼쪽부터 6번째부터) 이사장, 안현준 행장 등 은행 관계자들이 찰스 윤 뉴욕한인회장과 유대현 뉴욕한인경제인협회장 등 한인 단체 관계자들과 18일 맨하탄 지점에서 테이프 커팅을 하고 있다.

노아은행(행장 안현준, 이사장 김영만)이 맨하탄 지점(지점장 상유경)을 대폭 확장하고 새로운 도약에 나섰다

한국TV앱에서 한국 방송 보기   ✕



Not Secure — koreatimes.com

EXHIBIT W PHOTO 2



.ıl Verizon 🛜            12:11 AM            🔋

# 고 시심 노른

2019-06-20 (목) 최뢰은 기자

가-  가+

**내달 31일까지 방문객 추첨 아이패드 등 경품 증정**



노아은행이 19일 6번째 지점을 제리코에 개점했다. 안현준(왼쪽에서 5
번째) 행장과 김영만(왼쪽에서 4번째)이사장, 에드윈 로이드 노아은행
감사위원회 위원장 등이 테잎커팅을 하고 있다.

노아은행(행장 안현준)이 롱아일랜드 제리코에 지점을
열고, 롱아일랜드 공략에 적극 나선다.


한국TV앱에서 한국 방송 보기            ✕

노아은행은 19일 제리코 지점/352 North Broadway

AA   Not Secure — times.com   ↻

    



Jubilee Presbyterian Church
1911 W. Marshall Street, West Norriton, PA 19403
Phone: 610/630.6300 Fax: 610/630.6301 Email: spark@jubileekapc.org
Dr. S. Steve Park, Senior Pastor

July 4, 2022

Honorable John P. Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U. S. Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Cronan:

Greeting! My name is Steve Park, and I have been the senior pastor of Jubilee Presbyterian Church in West Norriton, PA for the past 24 years. I am writing this letter on behalf of Mr. Edward Shin whom I have known for many years as his friend and as a professional client.

First, I must say that Mr. Shin has been truly instrumental for the financial stability and growth of our church. Jubilee purchased the land and several buildings that eventually became our main campus during the tumultuous financial times in 2008. The property needed a near total make-over by a number of renovation projects, construction of a new chapel and the land development. Without Mr. Shin's compassionate, caring support and guidance, we couldn't have finished our project. He successfully secured our loan despite the challenge that we had no significant buildup of assets prior to this purchase and construction. The church has done amazingly since the time of institutional transition and, to this day, is a spiritual home of over a thousand members ranging from infants to elderly. We have become a significant presence in the community of West Norriton and beyond as we promote a better quality of life for all through spiritual guidance and social services. I must say that Mr. Edward Shin had a significant impact towards our institutional success and integrity. I also know of many other churches that benefited greatly from his efforts in the same way.

Furthermore, I have known Mr. Shin personally as his pastor for a good number of years. Over the time, I've known his joys and sorrows, successes and failures. He sought me as a spiritual mentor, and I gladly stood by him, at times joyfully and in others in pain. In all in all, I would testify whole-heartedly that Mr. Shin has a tender, generous and compassionate soul, and in many ways, he made efforts to live it out. Despite his frailty, I can confidently say that he is a productive member of our community and especially to me a trust-worthy friend.

Please kindly consider what I have stated in this letter in determining a fair sentence for Mr. Shin.

Yours,

Rev. S. Steve Park

**LETTER NO. 2**

**KIM CHIROPRACTIC**
& REHAB CENTER

T. 215-782-1235
F. 215-782-1239

921 W. Cheltenham Ave. Elkins Park. PA 19027

July 18, 2022

RE:    Mr. Edward Shin

To whom it may concern;

My name is Dr. Sang H Kim.  I am a Chiropractic physician in PA and have been serving my community for the past 26 years.  During those years, I was also privileged to serve as Vice President of the Korean American Association of Greater Philadelphia (KAAGP) for two consecutive terms.  During my years as a physician and a professional dedicated to serving my community, I was honored to meet and to get to know other professionals within our Community who are dedicated to their work and have made serving their community an important part of their lives.

Mr. Edward Shin is one of those people.

When I heard about Mr. Shin's plight, I was very surprised indeed.  For it is inconsistent with everything that I have observed and experienced with this man, both as a community leader and as a patient that I have gotten to know.

Mr. Shin sought to help business owners regardless of the size of their bank books, often helping to make an immigrant's dream of owning his own business a possibility.  I have witnessed firsthand how he would put the well being of his work and Noah bank ahead of his own health when he was suffering through physical pain and disability from the aftermath of the injury that he suffered.

I do not know the details or the nuances of the crime this man has been charged. But I do know that he made a difference to many immigrants who needed a chance at creating a piece of their American dream.  He was the man that an immigrant who did not speak fluent English could talk to about  the possibility of getting his first business loan.  For another, to buy his first property.  Even while his heart was heavy with the upcoming trial, during the depths of Covid-19 lockdown, he took the time to share his knowledge and advised business owners who were devastated by the unexpected event.  He was the first one who notified those who would listen about how to access and start the application process for the government loans.  I know this, for our office was among those businesses that he helped.


He is a dedicated family man, beloved by his wife and two beautiful daughters who love him dearly.  He is a generous man, a dedicated professional, and above all an honorable man.


And it is for these reasons that I have volunteered writing this letter to you.

 Mr. Edward Shin has given so much through his service through the years and have much more to offer our community.  Do allow him to return and resume his life and work as soon as possible.


Please know that there are many, many others who would have gladly written this very same letter to you on Mr. Edward Shin's behalf.



Sincerely Yours,

Sang H. Kim, MS., DC

**LETTER NO. 3**

# Levin & Associates
## Attorneys at Law
400 Greenwood Avenue
Wyncote, Pennsylvania 19095
215-887-7000
Toll-free 1-888-SETTLE-1
1-888-738-8531
Fax 215-887-1670

Of Counsel:
Alex J. Murland, Esq.

**Murray D. Levin, Member PA Bar**

Closing Staff:
Glenn Kasper, Notary Public
Michael S. Chernoff, Consultant

**Staff:**
Shirley M. Levin
Andi Sandler
Adam Z. Levin
Meekyung Byun
Cynthia Cieri
Mariliyn Korn
Rhonda Ewing
Nicole Verna
Carmella Hayslett
Tara Henry

RE: Edward Shin

To whom it may concern:

My name is Murray D. Levin, Esq.  I am an attorney in PA and a title agent in PA and NJ. I have had the privilege of knowing Edward Shin for nearly 30 years.  My personal experience is that he is a true gentleman.  I base this on how well he has treated me, my family and anyone to I have introduced him to.

He is an intelligent man and despite the circumstances present here, he is an excellent banker as evidenced by his success at Royal Asian Bank, Neil Poritsky Loan Brokers, Woori Bank and in his other executive positions.  He has always been able to answer the most complex banking questions I have asked him.   For the last 30 years, I have run my practice from a historic building in southeastern Pennsylvania.  The loan to purchase the building was arranged and funded through the efforts of Edward Shin.  For that, I am eternally grateful.

I have had the pleasure of meeting his family and his wife and daughters are a true reflection on his family values.  I have found him to be very generous whether it be something as picking up the tab at a restaurant to significant donations to charities.  He is highly admired in the Korean religious community.  He has introduced me to ordained ministers and board members of various churches.  He is well respected by all of the people in the Korean church community.

I respectfully request that the court give him a lenient sentence in light of all the positive things he has done in his life.

Sincerely,

Murray D.  Levin, Esq.



**LETTER NO. 4**

i Smile Dental Arts, PLLC

Implant, Esthetic and Reconstructive Dentistry

August 10, 2022

Honorable John P Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Dear honorable Judge,

My name is Dr. InHan Lee. I am a dentist in N.Y. I have practiced advanced restorative dentistry and periodontics in the Korean-American community in N.Y. and N.J. areas for over 20 years. I maintained a private practice in K-Town in Manhattan and Bayside Queens, NY.

I met Mr. Shin as a patient as an associate periodontist at Sylvan Dental Clinic in N.J. He was a good friend of the owner dentist, Dr. Dong H. Lee. After I resigned from Silvan Dental Clinic and opened my private practice in Manhattan, He followed me for his dental care since 2006.

As Mr. Shin became a regular patient of mine for routine dental care for many years, our relationship grew more than the patient-doctor relationship; we became friends more like brotherhood. As our friendship grew, I recognized that Mr. Shin was more than an amiable person and that he was a Korean-American community leader. When I was going through a tough time emotionally and financially for personal reasons, Mr. Shin became my mentor, business advisor, and best friend and older brother. His encouragement, support, and guidance help me to overcome these difficulties. He understood me and introduced me to the prominent business people in the Korean-American community, building up a social network for my private practice. He also gives constant good advice to my son's career decision.

He advised me that "business financing" may help my practice run smoothly, update the equipment, and remodel the office to expand to accommodate an increasing number of new patients. He helped me to realize financial planning for business aspects of my practice. The revenue of my practice increased almost twice after remodeling and updating. Since my practice is in K-town and many of my patients are Korean-American, I have heard the many same success stories that Mr. Shin helped small business owners in the Korean-American community.

One of the reasons that Mr. Shin and I became close friends for a long time is that we love and enjoy good foods and scotch whiskies. I had numerous opportunities to have dinners with him and the number of Korean business leaders in the community. Most the occasions, we had a great time enjoying good food and drink. He is humorous and has a vast knowledge of history, arts, music, and literature. He

can sing and play the piano. He was always the life of the party and a group leader, helping people in need and giving them needed guidance and advice.

However, I also witnessed that he spoke out harshly on one rare occasion and was sarcastic to some group members after consuming little too much whiskey. I have never seen him drink alcohol since he fell down the stairs in 2017.

Your Honor, I truly believe so many in our community silently feel that the circumstances are heart-wrenching. We feel sorry not only for Mr. Shin and his family but also for the Korean-American business community.

Please consider leniency in Mr. Shin's sentence and provide a fair opportunity for Mr. Shin and hope that he is back in his normal life near future.

Sincerely yours,

InHan Lee, D.M.D.

**LETTER NO. 5**



Wanseob Kong

███████████

███████ NY 11747

██████████.com

█████████ 388

Former Editor-in-Chief, The Korea Daily New York, JoongAng Ilbo
Former President, The Korea Daily Chicago, JoongAng Ilbo

August 25, 2022

Honorable John P. Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan. U. S. Courthouse
500 Pearl Street
New York, NY 10007

Dear Honorable Judge Cronan,

My name is Wanseob Kong, and I am a retired journalist. For 30 years, I worked as a newspaper reporter, Editor-in-Chief and President of The Korea Daily newspaper known as Joong-Ang Ilbo. As a young reporter, I first met Edward Shin when I interviewed him after he became President of Pan Asia Bank. Following our interview, I wrote an article highlighting his contribution to the community as a young promising financier. As the youngest Korean-American bank president, Edward worked to serve the Korean-American community by providing proactive financial consulting and services to help establish a solid financial foundation for small business owners. Furthermore, Edward and I became good friends after our initial meeting and have remained close even after my retirement as the President of The Korea Daily Chicago.

Edward lived by example and served as a role model to many children of immigrants. As an innovative leader in the bank industry, he actively mentored prospective young professionals and helped them begin their careers by providing them the tools to succeed long-term. As these mentees progressed in their careers, they saw Edward's dedication to the community and emulated his example through their service. However, his service was not limited to the next generation. Edward provided second career opportunities to retirees who wished to continue working and contributing to society. His program was the very first offered in the Korean-American financial industry. More than any other Korean financiers of his generation, he possessed a dedication and leadership that demonstrated his heart for his own community.

His desire to help others stretched far beyond the Korean-American community. Edward used his talent and position to expand the financial services and products for all ethnic minority businesses in support of the wider immigrant community. Furthermore, he promoted the revitalization and

awareness of culture by sponsoring readership campaigns led by the media of the community. He often used his leadership to positively influence others in our community.

Lastly, Edward's compassion and his personal values led him to support several organizations and groups reaching out to those in need including the elderly and low-income families. He supported low-income students to get scholarships and funded different community development work through his work. He has been a valuable, dedicated member of our Korean-American community.

Your Honor, I sincerely hope that you consider giving Edward a lenient judgment in consideration of his contribution and distinguished services to his community.

Respectively yours,

Wanseob Kong

**LETTER NO. 6**



Sammul ("████") Shin
████ Ave.
New York, NY ████
████.com

August 19, 2022

Honorable John P. Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

RE: Edward Shin

Dear Honorable Judge Cronan,

My name is Sammie Shin, and I am writing on behalf of my father, Edward Shin. As a child, my father was my hero— the one who protected and unconditionally loved us. Unlike many children who outgrow that belief, my father is still my personal hero. He has always been one of the most intelligent, hard-working, and generous people I have ever known so it is with a heavy heart that I write this letter. The allegations brought against him are inconsistent with his character.

As an immigrant banker, my father always pushed himself to provide for us. When I was young, he usually began his day well before I was up and would travel often due to his demanding job. Despite his challenging schedule, he still found time for me and my younger sister— he would read to us, go to our concerts, and prioritize us in his life. While balancing his career and family, he always taught us how crucial hard work was, but emphasized the importance of a compassionate heart.

My earliest memories consist of my father welcoming church members into our home while cooking and serving them even after he finished a 90+ hour week. For many immigrants, these gatherings were one of the few times they felt safe and welcome so my father would always ask them how he could help. In addition to physically volunteering, my father also gave career advice and general guidance. In fact, many young adults who sought his counsel later thanked him for their successes. Luckily, I grew up with his guidance which helped me break into a male-dominated industry as an Asian woman.

During college, my father encouraged me to pursue finance despite the well-known sexism and racism in the industry. He was the first person to believe me and acted my rock while I stressed about which career to pursue. Thanks to his encouragement, I found the strength to pursue banking. That was almost a decade ago now and my father has continued to support and guide me in my professional development.

While I greatly value his words, his actions are what always truly inspired me. When I was a teenager, my father founded Noah Bank to create a regional bank which would help his community. As the bank continued to grow, I saw him look out for his employees and customers often at the expense of his own health. His success magnified his generosity and sense of honor. My father continued helping individuals, but he was also able to use his position to aid small businesses and churches. I remember visiting a few of these small businesses where my father's kindness helped them succeed. He always told me that there was nothing more rewarding than helping others, except perhaps spending time with family.

I never expected to begin my career while watching everything my father had built fall apart. Over the past couple of years, I've struggled with life as a young professional while simultaneously dealing with our circumstance— challenges which were exacerbated by the pandemic. Despite these hurdles, my father has been a pillar of strength for our family. He has continued to improve my professional development and still advises others or offers his help in any way he can. My father's actions through this trying time are another testament to his strong character.

Your Honor, thank you for reading my letter. I hope that you were able to get a glimpse of what the real Edward Shin is like. Please kindly consider my words in determining a fair sentence for my father.

Sincerely yours,

Sammul ("Sammie") Shin

**LETTER NO. 7**

 서울 장로교회   Seoul Presbyterian Church of Philadelphia (PC USA)

855 Welsh Road Maple Glen, PA 19002    (267) 461-1563

_____

August 20, 2022

Honorable John P. Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan. U. S. Courthouse
500 Pearl Street
New York, NY 10007

Dear Honorable Judge,

My name is Taemoon Park, and as a Pastor Emeritus of Seoul Presbyterian Church, I have served the church through PC (USA) for over 40 years. Currently, I serve as a dean within the doctoral program at the Global ChongShin Theological Seminary, where I'm dedicated to mentoring and teaching the next generation of spiritual leaders. Today, I am writing to you on behalf of Edward Shin.

I have known Edward since 1991 when my family first moved to the United States. He became part of the family when he married my youngest sister-in-law. In the early days of our family's life in the United States, Edward provided much guidance and help when we struggled to adjust to our new lives in an unfamiliar country. Whenever we needed translations on legal documents or support with formal transactions, such as registering my children for school, he would often take time out of his busy schedule to help them. He is one of the founding members of our church and was instrumental in laying the foundation as a faithful trustee of the church. He served the church in every aspect from teaching Sunday school weekly to advising the church on financial matters. Also loved serving in the kitchen after the service for the whole congregation.

Furthermore, Edward has been a wonderful uncle to my two children. Since I did not grow up in the United States, I could not understand fully what my son and daughter were experiencing being children of immigrants. Edward was able to share about his own experience and help them navigate the challenges of being an Asian American student. In fact, he was a part of most of my children's major milestones, encouraging and celebrating my children every step of the way. He regularly advised them on their schooling affairs such as course selections in college to providing guidance on their career paths. I have memories of him often tutoring my daughter in math when she struggled with the subject at school. My children are now all grown up with fulfilling lives and careers. I owe much to Edward for loving and supporting my children when they were young.

The Edward Shin, I have known for over 30 years, is a respected and dedicated leader in the Korean community. He always had a generous heart and a great sense of responsibility to others in need.

He especially cared for the needs of his Korean immigrant community. Whenever he heard someone from our church needed help, he would go out of his way to support them and would often follow up to make sure they received the help they needed. For example, several years ago, I had a conversation with Edward about the challenges of immigrant ministry and how pastors of small congregations needed better support to avoid the dangers of burn out in their respective ministries. A few weeks later, he called me asking if he could sponsor a retreat for them to not only recharge but receive specialized training in mental health and counseling. So, we were able to provide a time of respite and valuable training to more than 40 pastors in the Tristate region.

Because of his generosity, experience and wisdom, many people in our community seek his advice and guidance. Regardless of the person's intent, Edward would never turn away from an opportunity to help others. In some ways, he cares too much, and even garners a nickname "mom", meaning he is caring and reliable like your own mom.

During my 40 years in church ministry, I have never met anyone who loves to learn and use his knowledge to help others as much as Edward. So, when I heard the news of his indictment, I was shocked. However, I realize there are situations in life that we cannot always explain. The Edward Shin I know is a caring and loving family man who has worked hard to better his community and his family.   I am sharing my experiences with you in hopes of providing additional information that may help in deciding on his case. Your honor, I pray that, in your wisdom and mercy, you will consider all aspect of Edward's life as you decide his and his family's future. Thank you so much for your consideration and time.

Respectfully,

Rev. Taemoon Park

LETTER NO. 8

August 17, 2022



Honorable John P Cronan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:  Edward Shin

Dear Honorable Judge Cronan,

I'm writing on behalf of my brother Edward Shin.  I'm his youngest brother. I am a family physician
and a clinical researcher here in Las Vegas, Nevada.  I've been practicing medicine for about 20
years.  I have a non-profit organization called Operation H.O.P.E. that help uninsured low-income
and homeless population without charge along with other volunteer health care professionals.  I
mention that to say that without my brother, I would not be where I am today.  He may not be a
perfect human being but he certainly has deeply impacted me growing up and shaped my life through
his guidance and mentorship.

When our family immigrated to United States in 1980, I was 11 years old not knowing any English
let alone any alphabet.  As a result of the culture shock, I had tremendous difficulty adjusting to new
school.  I was in helpless state whenever I went to school usually ending up in the nurse's office
crying.  After many attempts to attend school, I was finally taken out of school for about 6 months.
During that time my family didn't know what to do to help me.  My parents and siblings were so
supportive of me and encouraged me daily.  In fact what turned the tide was when I experienced
unwavering support from my eldest brother Eddie.  Eddie has passion for cooking.  One evening he
cooked up a storm and made a gourmet Korean dinner of all kinds of dishes filling the entire large
dinner table.  It was even better than our Mom's amazing home-cooked meals.  The food was of
course delicious but it was Eddie's love for his little brother that made me return to school
successfully.  I realized that my performance at school wouldn't change God's love for me
demonstrated by my family's support of me.  What happened at school did not matter to me as long
as I had the support of my brother and family.  Soon thereafter, I began to learn English proficiently
and became a straight A student.

Most people around him may know of his devoted service to the Korean community and churches.  I
can testify that whatever his friends and associates might tell you is completely genuine and authentic
because I grew up experiencing those things from my brother.  He was my rock and ultimate example
of what I wanted to be when I grow up.  From him, I learned to be a good son to our parents, a good
brother to my siblings, a good father to my own family and a good servant to my community.  Just
like he did to me, he has helped countless people around him.  I am confident he will continue to do
so if he is given another chance.  I plead with you earnestly and respectfully to consider leniency on
his sentencing so that he can once again be a productive contributing member of the community that
he has served and loved.

Respectfully,

Elliot Shin, MD
Founder and President
Operation H.O.P.E., Inc.

400 Shadow Lane, Suite 205, Las Vegas, Nevada 89106
www.operationhopeinc.com
702.829.8491
elliotshinmd@gmail.com

9550

**LETTER NO. 9**



## Yio Kyung ("Joy") Lee

Pennsylvania.com

Honorable John P. Cronan, USDJ
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

***RE: Edward Shin***

Dear Judge Cronan:

My name is Yio Kyung ("Joy") Lee, and Edward Shin is my uncle by marriage. I have known him for more than 20 years, since my childhood.

I grew up with my cousins -- my uncle's two daughters -- like sisters. I was always welcome in their home, and my aunt and uncle cared for me like I was one of their own. Almost every childhood birthday was celebrated together, and I have fond memories of the time spent with my uncle and his family. I grew up watching my uncle take his role as a father and father figure very seriously.

I recall a specific example of my uncle's commitment to providing wisdom and guidance to me as a father figure. During my college career, feeling lost in purpose and motivation, I made a premature decision to take a break from school. At that time, my uncle went out of his way to have a difficult conversation with me, to convince me that finishing school was in my best interest. That conversation left a deep impression on me, and I made the decision to stay and finish school. I received my undergraduate degree a year later, which also allowed me to pursue my dreams of going to law school and becoming an attorney.

Despite the disappointing circumstances in which I now find my uncle, they do not erase the love and generosity I have watched him share, as a devoted father to my cousins and as an uncle to me. It has been deeply saddening to watch his health rapidly decline in the last few years, and I worry for his physical wellbeing.

I respectfully ask that the Court take the above into consideration in its sentencing determinations for Edward Shin.

Respectfully Submitted,

Yio Kyung ("Joy") Lee

**LETTER NO. 10 FROM MR.**
**SHIN**

Dear Judge Cronan,

I write to Your Honor to seek leniency in sentencing.  My lawyers have prepared and will submit a detailed memorandum requesting that I be spared incarceration, a request in which I naturally join.  My attorneys are also helping me draft this letter, as my English skills are weak, and I do not want to be misunderstood.  But I can assure Your Honor that all of the words in this letter come from my mind and my heart, and these words have been reviewed with me in English and Korean, my native language.

The jury's verdict is undeniably correct in one overriding aspect.  During 2009-2013, I was dishonest, secretive, careless, and foolish in my business dealings with Noah Bank, James Kim, and others.  I was dishonest by acted secretly when I had a duty to act openly.  Indeed, had I not engaged in such secrecy and disclosed all my acts to Noah Bank, there would have been no acts committed for the jury to consider to be crimes.  Worse, I sacrificed my integrity in my effort to become successful, with disastrous results.

I take full responsibility for my dishonest, secretive, careless, and foolish actions.  The justifications I had in those days for those actions, such as they were, were always inadequate so I will not bother to relate them here.  I look back and wonder who that "Edward Shin" was, and do not recognize him a decade later.

I am informed that letters such this always express regret, whether sincere of feigned.  I can assure Your Honor that the regrets I report to you could not be more sincere.  My dishonest, secretive, careless, and foolish actions, some now found to have been criminal by the jury, have destroyed my life.  Of course, I regret them and their repercussions on my own behalf.  But truly more powerful is my regret for the pain and suffering caused to those who relied upon me to be

honest, careful, and wise.  I had the capacity to be all three, as I was before 2009, but failed.

I especially regret the injuries visited upon Noah Bank, which had become a pillar of the Korean-American banking community due in large measure to my efforts.  My attorneys have submitted to Your Honor support for their position that the acts of which I was convicted caused Noah Bank no financial loss in and of themselves.  But, no matter how Your Honor views that issue, because of my arrest Noah Bank has been required to spend considerable time and financial capital, much better used in serving the community, to address the repercussions of this prosecution.  Now that the verdict has become known in the Korean-American community, I believe that Noah Bank will suffer from the damage I caused to its once outstanding reputation. For this I have great regret.

My regrets regarding my family, and especially my loyal and loving wife Sophie Hahn, are even greater. As a result of my actions, she is now without income or assets and will soon lose her home.  She has not abandoned me in the midst of these troubles.

She will also lose my companionship and support if I am incarcerated at time when my companionship and support will be most needed.  Indeed, to the extent I would be able to earn some income during probation, she will lose that valuable financial resource if probation is denied to me.

I am not a "career criminal."  The events of 2009-2013 stick out from the other 55 years of my life like the proverbial "sore thumb." There are several letters from persons who have known me well during, before, and after 2009-2013.  They all agree that my criminality as found by the jury is shocking to them.  This is because they all were able to observe that I devoted so much of my time, effort, and

resources to helping others be successful and happy without compensation.  I was a hero to many, not the villain portrayed by the prosecution.

These facts and others should give the Court comfort that leniency in punishment will not encourage me to commit additional crimes.  I have neither desire, nor reason, nor opportunity to commit additional crimes.  In addition, this prosecution has allowed me to understand the value of obtaining legal advice before undertaking any questionable actions.  I now have The Basil Law Group, which has promised to be available to me, regardless of my ability to pay, whenever I need legal advice regarding any matter.  I trust that Your Honor agrees with me that this extraordinary resource assures that I would understand the implications of all future potentially criminal acts, such as the ones I made that have caused me to be in the precarious position I find myself today.

My life of good deeds, kind acts, and generosity has been presented in letters to Your Honor, and some of their highlights are contained in my lawyer's sentencing memorandum.  I ask that Your Honor will give them heavy weight in considering my sentence.  I am not the greedy, evil person the Government attempts to make me appear.

The negative repercussions of incarceration for me are unusual in that my health is so bad due to the conditions reported by my lawyers in their memorandum.  Although I am fifty-nine years old, I feel much older.

I could not have entered a guilty plea under the pre-trial offers from the prosecution, had they been otherwise acceptable, because of my health and my fear that incarceration would be impossible for me to tolerate.   I currently live in nearly constant pain, and I am able to

ameliorate that pain using the freedom I have to eat, to sleep, to rest, to exercise, and to obtain treatment from the medical practitioners who have treated me for years when needed, on my own schedule. Incarceration takes away all of this amelioration and leaves me only with the pain and the fear of rapidly failing health. Incarceration would also abandon me to medical treatment of strangers that necessarily will be inferior to my continued treatment by carefully selected practitioners who are intimately familiar with my conditions, history, prognoses, and course of treatment.

In sum, I humbly seek the mercy and indulgence of this Court in the form of a non-custodial sentence. I will make sure that I do not embarrass this Court or Your Honor. I will obtain help for my longstanding alcohol and gambling addictions. I will devote myself not only to the required community service, but also to charitable and other good works referred to in the various letters my attorneys have submitted for Your Honor's consideration. I will take care of my wife and daughters.

My plan is to work to rebuild my life while on probation so that Your Honor can someday point to this case as a prime example of just, appropriate, and effective sentencing. Thank you for Your Honor's consideration of this letter.

Sincerely and respectfully submitted,

Edward Shin

September 5, 2022

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**,

v.

**LABIB CHAMMAS**,

Defendant.

Case No. 16-cr-00171 (CRC)

## MEMORANDUM OPINION

In October 2016, Labib Chammas pleaded guilty to abusive sexual contact in violation of
18 U.S.C. § 2244(a)(2). The Court subsequently sentenced Chammas to a term of 30 months of
incarceration followed by five years of supervised release. Currently before the Court is
Chammas's *pro se* motion to vacate both his conviction and sentence pursuant to 28 U.S.C.
§ 2255. Chammas asserts that he was denied the effective assistance of counsel at both the plea
and sentencing stages of his prosecution. In addition, he requests that his § 2255 petition be
assigned to a different judge than the undersigned "to avoid any and all potential biases that may
exist," suggesting the Court will not impartially review the petition because it is familiar with the
counsel Chammas now claims was ineffective. Because there is no basis for Chammas's
assertions of judicial bias, the Court will decline that request. And, with the exception of one
issue as to which the Court will reserve judgment pending the submission of additional evidence
by the government, the Court will also deny Chammas's § 2255 motion for relief from his
conviction and sentence.

### I.     Background

Chammas and his wife, the former Deputy Chief of Mission ("DCM") for the State
Department in Rabat, Morocco, lived at the DCM residence from August 2010 to February 2013.

Statement of the Offense at 49.[1]  During that period, Chammas was responsible for managing the household and staff.  Id. at 50.  According to employees, Chammas "was an abusive head-of-household" who frequently yelled at them and threatened to fire them.  Id.  In February 2013, during a routine inspection of the U.S. Embassy, the State Department's Office of the Inspector General ("OIG") received an anonymous letter reporting that Chammas was sexually abusing a female cook employed at the DCM residence.  Aff. in Supp. of Crim. Compl. and Arrest Warrant ("Affidavit") at 10.

OIG inspectors interviewed Chammas on February 13 and 14, 2013.  See Mem. of Interview of Labib Chammas ("Chammas MOI"), Feb. 13, 2013 at 31–33; Chammas MOI, Feb. 14, 2013 at 34–37.  Chammas acknowledged having sexual contact with the victim during massages, admitted ejaculating during those massages, and conceded that his penis came into contact with the victim's face on at least one occasion.  Id.  The government executed a search warrant of the DCM residence, collected potential biological evidence, obtained a warrant for Chammas's DNA, and determined that the DNA evidence was consistent with the victim's account.  Affidavit at 19–20.  In the course of the government's investigation into the reports of abuse, the government also initiated a second investigation into possible forced-labor practices at the DCM residence.  Sentencing Hr'g at 165–66.

While the investigations were ongoing, Chammas traveled to Lebanon with his wife in April 2015.  Mot., ECF 33, ¶ 29.  His wife returned to the United States a month later, but Chammas went to Syria ostensibly to resolve certain family and employment issues.  Id.

---

[1] Unless otherwise noted by docket number, the documents cited in this memorandum opinion are those attached to the government's opposition, see Opp'n, ECF No. 38, and are referred to by title and Bates stamp number.

Chammas left Syria and returned to the United States in May 2016. Id. While Chammas was abroad, the government decided to seek a warrant for his arrest. Sentencing Hr'g at 166–67. Soon after he returned from more than a year overseas, Chammas was arrested at his home on May 19, 2016 and charged by complaint with aggravated sexual abuse in violation of 18 U.S.C. § 2241(a)(1). That offense carries a maximum penalty of life imprisonment.

In October 2016, Chammas pleaded guilty to a lesser charge of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(2). Plea Agreement at 38. As part of the plea agreement, the parties agreed that the Statement of Offense, which Chammas signed, fairly and accurately set forth his offense conduct. Id. at 39. According to the Statement, Chammas began asking the victim for massages soon after moving into the DCM residence. During the course of these massages, Chammas demanded that she massage his penis with her hands; the victim complied out of fear that she would be fired otherwise. Statement of Offense at 49–50. In addition, on at least five occasions between August 2010 and February 2013, Chammas attempted to insert his penis into the victim's mouth against her will by pulling or attempting to pull her head toward his penis. Id. at 50. In each instance, the victim closed her mouth and turned her face to the side. Id.

Based on the conduct described in the Statement, the parties also agreed that Chammas's conduct supported an increase to his offense level calculation under the Sentencing Guidelines because his conduct involved the use of force in violation of 18 U.S.C. § 2241(a). Plea Agreement at 39. In addition, because the Guidelines range for Chammas's offense conduct exceeded the three-year maximum statutory penalty for abusive sexual contact, the parties agreed that a Guidelines-compliant sentence would be 36 months. Id. at 40 n.1. Finally, the parties

agreed that Chammas would not seek a sentence of less than one year and a day of incarceration. Id. at 41.

   After the plea, the Court granted defense counsel's request that Chammas remain on release pending sentencing based on Chammas's age (65 at the time) and various medical conditions.  See Oct. 24, 2016 Minute Order.  At the sentencing hearing on January 4, 2016, the Court reviewed the 18 U.S.C. § 3553 factors and imposed a below-Guidelines sentence of 30 months of incarceration followed by five years of supervised release.  See Sentencing Hr'g at 176–78.

   On January 2, 2018, Chammas filed a § 2255 motion seeking relief based on seven instances of alleged ineffective assistance of counsel.  See Mot.  On May 30, 2018, he filed a supplement to his § 2255 motion which asserts an additional claim of ineffective assistance.  See Suppl. Mot., ECF No. 39.

**II.   Analysis**

   A.  Recusal or reassignment

   Before reaching the substance of Chammas's § 2255 motion, the Court will address his request that the motion be reassigned to a different judge in order to "avoid any and all potential biases that may exist" because of the Court's alleged familiarity with defense counsel.  Mot. ¶ 93.  "Recusal is required under 28 U.S.C. § 455 if 'a reasonable and informed observer would question the judge's impartiality,'" United States v. Williamson, 903 F.3d 124, 137 (D.C. Cir. 2018) (quoting SEC v. Loving Spirit Found. Inc., 392. F.3d 486, 493 (D.C. Cir. 2004)), and "under 28 U.S.C. § 144 if a judge 'has a personal bias or prejudice' either against or in favor of a party," id. (quoting § 144).  Chammas alleges no credible basis for recusal under either section. First, he suggests the Court demonstrated favoritism by commenting at sentencing that defense

4

counsel had "done a terrific job." Mot. ¶ 93 (citing Sentencing Hr'g at 177:13). Chammas offers

no authority for the proposition that complimenting an attorney for high-quality advocacy

provides a basis for recusal in a future proceeding. And in any event, Chammas ignores the rest

of the Court's comment, which was to thank counsel for *both parties* and say the "submissions

have been excellent" on both sides. Sentencing Hr'g at 177:15–16. Second, he suggests that the

Court could be biased because of defense counsel's purported friendship with the Court's wife.

Mot. ¶ 93.[2] But even if the two are friends, no reasonable observer would conclude that such

friendship alone overcomes the strong presumption of impartiality afforded to the Court. The

Court will therefore deny Chammas's request for reassignment of his § 2255 motion.

B. Section 2255 relief

Moving to the merits, a prisoner serving a federal sentence may petition the court to

vacate his sentence if he believes that it "was imposed in violation of the Constitution or laws of

the United States . . . or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). The

petitioner bears the burden of proof and must demonstrate by a preponderance of the evidence

his right to relief. United States v. Simpson, 475 F.2d 934, 935 (D.C. Cir. 1973) (per curiam).

Chammas seeks to vacate his conviction and sentence on the basis that he received

ineffective assistance of counsel in violation of the Sixth Amendment. "The Sixth Amendment

right to counsel 'is the right to the effective assistance of counsel.'" Buck v. Davis, 137 S. Ct.

759, 775 (2017) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)). To prevail,

Chammas bears the burden of showing first "that counsel's performance was deficient" and

---

[2] In fact, defense counsel and the Court's wife were colleagues in the U.S. Attorney's Office for the District of Columbia over a decade ago. They remain professional acquaintances but are not close personal friends.

second "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687.

"The two-part Strickland v. Washington test applies to challenges to guilty pleas based on

ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985).

Under the first prong of the Strickland test, Chammas must prove that counsel's

performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687–

88. This "sets a high bar," Buck, 137 S. Ct. at 775: "Judicial scrutiny of counsel's performance

must be highly deferential" in light of the "strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689. And although

"even an isolated error" can support an ineffective-assistance claim if it is "sufficiently

egregious," Murray v. Carrier, 477 U.S. 478, 496 (1986), "it is difficult to establish ineffective

assistance when counsel's overall performance indicates active and capable advocacy,"

Harrington v. Richter, 562 U.S. 86, 111 (2011).

Under the second prong of the Strickland test, Chammas must demonstrate a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland, 466 U.S. at 694. For Chammas's claims regarding the plea-

agreement phase, prejudice means "a reasonable probability that, but for counsel's errors, he

would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 58–

59. And for Chammas's claims regarding the sentencing phase, prejudice means a reasonable

likelihood that but for counsel's errors, he "would have received a lower sentence." United

States v. Wilkins, 734 F. App'x 1, 2 (D.C. Cir. 2018) (citing Glover v. United States, 531 U.S.

198, 203–04 (2001)).

Chammas asserts eight independent grounds for his ineffective-assistance claim.

Because the record discloses no Sixth Amendment violation on any of these grounds, the Court

will deny Chammas's § 2255 petition, except as to the claim discussed in Subsection 6 below. And because, as will follow, "the motion and the files and records of the case conclusively show that [Chammas] is entitled to no relief," the Court will also deny Chammas's request for an evidentiary hearing. 28 U.S.C. § 2255(b); United States v. Gooch, 842 F.3d 1274, 1280 n.3 (D.C. Cir. 2016).

### 1. Failure to investigate prior to Chammas's plea

First, Chammas claims that counsel performed deficiently because he did not interview potential witnesses directly, identify potential alibi witnesses, or investigate the anonymous tipster and uncover potential impeachment information about them. Mot. ¶¶ 9–10, 24–26.

"Where the case involves a failure to investigate, the 'particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments.'" United States v. McDade, 699 F.3d 499, 506 (D.C. Cir. 2012) (quoting Strickland, 466 U.S. at 691). And where, as here, "the record does not explicitly disclose . . . counsel's actual strategy or lack thereof . . . , the presumption [of adequate performance] may only be rebutted through a showing that no sound strategy . . . could have supported the conduct." United States v. Abney, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (citation and internal quotation marks omitted) (first two alterations in original). Chammas fails to show that no sound strategy could have supported his counsel's decision to forego these lines of investigation. As such, the Court concludes that counsel's conduct was not "outside the wide range of professionally competent assistance" under the circumstances in this case. Strickland, 466 U.S. at 690.

The defense received voluminous discovery materials from the government months before Chammas entered his plea in October 2016. See July 15, 2016 Discovery Letter at 23–24.

These materials included the anonymous letter, the results of the search warrant, and memoranda of interviews with numerous witnesses, the victim, and Chammas himself.  See Index to Gov't Prod., July 15, 2016 at 25–30.  Chammas voluntarily met with investigators on February 13 and 14, 2013.  See Chammas MOI Feb. 13, 2013 at 31–33; Chammas MOI, Feb. 14, 2013 at 34–37.  During those interviews, Chammas admitted having sexual contact with the victim during massages, admitted ejaculating during those massages, and admitted that his penis came into contact with the victim's face on at least one occasion.  Id.  While Chammas speculates that counsel should have ascertained certain background information that he details in his motion, see Mot. ¶¶ 11–25, he reported similar information about workplace problems to the investigators during these interviews.  In addition, Chammas provided a DNA sample for forensic testing, which corroborated the victim's account of sexual contact.  See Affidavit at 10 ¶¶ 26–28.  Counsel received the results of that DNA testing on September 10, 2014.  See Sept. 10, 2014 Gov't Prod., ECF No. 48, at 46.  Given these circumstances, counsel likely made the reasonable strategic decision that investigation into alibi witnesses or the anonymous tipster would not have proved fruitful.

Furthermore, even if Chammas could show that counsel was deficient, he must still demonstrate prejudice.  To do so, Chammas "must make a 'comprehensive showing as to what [information] the investigation would have produced,' and how this information 'would have produced a different result.'"  United States v. Bertram, 209 F. Supp. 3d 243, 256 (D.D.C. 2016) (alteration in original) (quoting United States v. Askew, 88 F.3d 1065, 1073 (D.C. Cir. 1996)).  Again, although Chammas speculates what evidence counsel could have developed, Mot. ¶¶ 11–25, counsel already had access to much of that evidence.  And critically, Chammas does not explain how this evidence would have produced a different result.  This does not seem like a case

in which an alibi witness or impeached tipster would have made a difference; Chammas voluntarily admitted having sexual contact with the victim and provided DNA evidence that verified her account. Accordingly, the Court concludes that there is no reasonable probability that had counsel conducted further investigation, Chammas would not have pleaded guilty and insisted on going to trial. See Hill, 474 U.S. at 58–59.

Because Chammas demonstrates neither deficient performance nor prejudice, the Court denies the § 2255 motion with respect to the failure to investigate claim.

### 2. Failure to keep abreast of the investigation status

Next, Chammas argues that counsel performed deficiently by failing to stay informed of the status of the criminal investigation. Chammas's complaint here largely turns on his surprise when the FBI showed up at his home to arrest him ten days after he returned from more than a year of travel overseas. Mot. ¶¶ 29–32. He claims that he traveled overseas only based on counsel's assurances that there was no "pending case" against him and that his overseas travel is what led the FBI to arrest him. Id. ¶¶ 28–29, 32–33. The government confirms that "it was defendant's failure to return as planned with his wife from their trip to Lebanon . . . and his decision to take an unplanned trip to Syria, where he remained for over a year, that resulted in the circumstances of his arrest." Opp'n at 31 n.10.

The government argues that Chammas is barred from raising alleged deficiencies such as this "failure to keep abreast" because it has no bearing on the advice his counsel provided related to the plea. Id. at 31. The Court agrees. When "a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Tollett v. Henderson, 411 U.S. 258, 267 (1973). This is not to say

that a defendant who pleaded guilty cannot raise later any Sixth Amendment claims; rather, he

"'may only attack the voluntary and intelligent character of the guilty plea' 'through proof that

the advice received from counsel was not within the range of competence demanded of attorneys

in criminal cases.'" United States v. Graves, 561 F. App'x 1, 3 (D.C. Cir. 2014) (first quoting

Tollett, 411 U.S. at 267; then quoting Blackledge v. Perry, 417 U.S. 21, 30 (1974)).  Chammas

fails to explain how counsel's alleged failure to warn him about the possibility of arrest rendered

his plea not knowing or voluntary.  Accordingly, the Court will deny his § 2255 motion with

respect to this claim as well.

### 3. Misleading advice related to potential prosecution of Chammas's wife

Third, Chammas asserts that he was "misled by his counsel regarding the threatened

prosecution of his wife."  Mot. ¶ 39.  He claims that counsel first learned in May 2016 that the

government did not intend to prosecute his wife for alleged forced-labor violations stemming

from working conditions at the DCM residence.  Id.  Counsel, Chammas says, did not inform

him of this until mid-September 2016.  Id. ¶ 37.  Chammas implies that had he known earlier that

his wife was no longer a target of the forced-labor investigation, he would not have pleaded

guilty.

This argument is unavailing.  Regardless of whether counsel delayed in apprising

Chammas of the government's decision to drop the forced-labor investigation into his wife—and

nothing in the record suggests he did—Chammas was clearly aware of the decision when he

chose to accept the plea agreement.  As he explains in his motion, counsel informed him in mid-

September 2016 that the government did not intend to pursue an investigation or prosecution of

his wife.  Id. ¶¶ 37–38.  And yet, he still pleaded guilty on October 12, 2016.  See Oct. 12, 2016

Minute Entry.  Accordingly, without reaching whether counsel performed deficiently, there is no

basis for the Court to conclude that Chammas was prejudiced by the alleged delay between the government's decision to drop the charges against his wife and when Chammas learned that information.  See Bertram, 209 F. Supp. 3d at 257 (concluding that defendant failed to show prejudice for counsel's alleged failure to investigate where "the evidence defendant now says would have altered the outcome was information that was well known to him at the time he entered his plea").

<em>4.  Failure to advise Chammas of the collateral consequences of the plea</em>

Fourth, Chammas argues that counsel performed deficiently because he failed to warn Chammas of the "collateral consequences" of accepting the plea.  Mot. ¶ 41 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)).  To support this claim, he cites to the American Bar Association ("ABA") standards of practice, which explain that defense counsel should advise the client of the "collateral consequences that may arise from the charge, plea or conviction."  Id. ¶ 41 (quoting ABA Standard 4-5.4).  Chammas says he was in the dark about two collateral consequences of his guilty plea: negative media attention and adverse financial consequences, including losing his credit cards and home and auto insurance, and being denied a home equity loan.  Id. ¶¶ 43–44.

The Court doubts that these consequences—which are to some extent self-evident—are of the kind contemplated by either the ABA Standards or Padilla.  As the government suggests, the Sixth Amendment duty to warn likely applies only to severe legal, not personal, consequences.  Rather than decide whether counsel performed deficiently in this respect, however, the Court will follow the approach taken by the Supreme Court in Hill v. Lockhart, 474 U.S. 52 (1985).  In that case, the petitioner argued that his counsel performed deficiently by giving him incorrect advice about when he would be eligible for parole.  Id. at 60.  The Supreme

11

Court found "it unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective" because the petitioner "did not allege . . . that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial."  Id.  Here, Chammas asserts in conclusory terms that he "suffered harm as a result" of counsel's purported failure to warn.  Mot. ¶ 45.  But even if counsel did not apprise him of the financial and publicity-related consequences of accepting his plea, Chammas's assertion comes nowhere close to proving by a preponderance of the evidence that, armed with this knowledge, he would not have pleaded guilty and would have instead insisted on proceeding to trial.  Accordingly, the Court will deny his § 2255 motion on this ground as well.

### 5.  Likelihood of probation

Chammas also argues that counsel performed deficiently by assuring him that "a very likely outcome at sentencing would be probation."  Mot. ¶ 87.  Counsel did not tell him, Chammas says, that "because the applicable sentencing guideline range placed [him] in Zone D of the Sentencing Table, [he] was ineligible for probation."  Id. ¶ 89.  He asserts that "these assurances are a major reason why the plea deal was accepted by [him] in the first place."  Id. ¶ 87; see id. ¶ 91 ("But for this false counseling, Movant would not have accepted the plea deal with the prosecution.").

Chammas's representations are directly contradicted by the contents of the plea agreement and his own statements under oath at the Rule 11 colloquy.  In the plea agreement, the parties agreed that because the Guidelines range for Chammas's conduct would exceed the maximum statutory penalty for abusive sexual contact, a Guidelines-compliant sentence would be 36 months.  See Plea Agreement at 40 n.1.  The parties also agreed that Chammas could seek

a sentence below 36 months based on the 18 U.S.C. § 3553(a) factors but that he would not ask for a sentence of less than one year and a day incarceration. Id. at 41. Chammas's counsel confirmed at the plea hearing that Chammas "has agreed that, at sentencing, he will not affirmatively ask for a sentence less than one year and a day, which falls within the statutory period prescribed by the Court." Plea Hr'g at 140:6–13. Finally, at the plea hearing, Chammas swore to the Court that no one had promised him what sentence the Court would impose. Id. at 141:1–3. "'[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding' and the defendant's 'declarations in open court carry a strong presumption of verity.'" United States v. Farley, 72 F.3d 158, 163 (D.C. Cir. 1995) (alterations in original) (quoting Blackledge, 431 U.S. at 73–74); see also United States v. Taylor, 254 F. Supp. 3d 145, 157 (D.D.C. 2017) ("The defendant's own statements at the time of his plea about fully understanding the plea agreement and its consequences, as well as the findings of the sentencing judge, far outweigh the defendant's bare assertions now to the contrary."). Thus, based on the language of the plea agreement and his confirmation at the plea hearing, Chammas unquestionably knew that he could not request a probationary sentence or a sentence of less than one year and one day incarceration. With that knowledge, Chammas could hardly have been surprised that the Court sentenced him within the range contemplated by his plea agreement.

Moreover, when determining whether there is a reasonable probability that the defendant would have gone to trial for purposes of prejudice, a court considers "not only the count to which the defendant pled guilty, but also the other counts he would have faced had he gone to trial." In re Sealed Case, 488 F.3d 1011, 1017 (D.C. Cir. 2007) (citing United States v. McCoy, 215 F.3d 102, 106–07 (D.C. Cir. 2000)). Had Chammas refused a plea and proceeded to trial, he could

have been charged with aggravated sexual abuse in violation of 18 U.S.C. § 2241(a)(1), exposing him to a term of years up to life imprisonment and a Guidelines sentence of at least 108 to 135 months of incarceration. The severity of Chammas's potential trial exposure leads the Court to conclude that, contrary to his bare representations in the § 2255 motion, he almost certainly would have pleaded to the lesser charge regardless of what defense counsel may have advised him about the Court's likely sentence.

### 6. *Failure to inform Chammas of a previous plea offer*

In the supplement to his § 2255 motion, Chammas argues that his counsel performed deficiently by rejecting a previous plea offer regarding the government's forced-labor investigation without first informing Chammas of the offer. Suppl. Mot. at 1. To support this claim, Chammas relies on a December 8, 2014 notation in counsel's files which reads, "Meeting between counsel for L Chammas and US DOJ / DOS rejecting forced labor plea offer." Id. at 5. Chammas contends that had counsel communicated the offer to him, he "would have considered and may have accepted this prior plea offer." Id.

The documents attached to the government's opposition to Chammas's supplemental motion illuminate the history of plea negotiations in the case. They show that in October 2013, the government extended an offer to Mr. Chammas to plead guilty to one count of abusive sexual contact in violation of 18 U.S.C. § 2244(b) (aggravated sexual contact in other circumstances), which carries a maximum sentence of two years imprisonment. See Oct. 22, 2013 Plea Letter at 66; Oct. 22, 2013 Plea Offer at 67–71.[3] According to handwritten notes of a July 22, 2014

---

[3] In this section, the memorandum opinion cites to the documents attached to the government's supplemental response, see ECF No. 48, by title and Bates stamp number.

meeting with prosecutors attended by Chammas and his counsel, Chammas rejected that offer. See July 22, 2014 Notes at 16 (stating "pre-indictment offer rejected").

At that July 22, 2014 meeting, the parties apparently discussed an alternative resolution: a plea to participating in forced labor, with "no sex charge, no registration." See id. at 18. That idea was formalized some six weeks later in a September 5, 2014 plea letter to Chammas's counsel. The letter proposes a plea to one count of forced labor in violation of 18 U.S.C. § 1589(a), which carries a maximum 20-year sentence if the offense involved an attempt to commit aggravated sexual abuse. See Sept. 5, 2014 Plea Offer at 26. The proposed plea agreement calculated the base offense level under the Sentencing Guidelines as "at least 30." Id. at 28. In a separate cover letter, the government explained that the forced-labor plea offer was contingent upon Ms. Chammas entering a non-prosecution agreement with the government and agreeing not to accept any future employment requiring a classified security clearance. Sept. 4, 2014 Letter at 37.

The documents further reveal that Chammas and his wife met with their respective attorneys to discuss the conditional forced-labor plea offer, see Sept. 12, 2014 Notes at 52–53, and that Chammas later informed his counsel that Ms. Chammas "said NO" to the non-prosecution agreement, see Sept. 30, 2014 Notes at 64. As of the end of September 2014, then, Mr. Chammas's forced-labor plea offer appears to have been off the table because Ms. Chammas apparently was unwilling to forego her security clearance.

As noted above, an entry appears in defense counsel's records indicating a December 8, 2014 meeting between Chammas's counsel and the government "rejecting the forced labor plea offer." The government suggests that the notation refers to September 5, 2014 offer described above. That makes some sense: There are no other formal forced-labor offers reflected in the

record before the Court and correspondence between Chammas and his counsel just prior to the December 8th meeting could be read to reflect a strategy of returning the plea discussions to the sex-related charge.  See Dec. 4, 2014 Email from L. Chammas at 15 (noting counsel's plans to ask the government to "drop the labor charge and discuss the 'other' change").  If the government is correct that the December 8th entry refers to the September 5th plea offer, then it is beyond doubt that Mr. Chammas was fully informed of that offer and counsel's performance was not deficient.  It would be equally clear that Chammas was not prejudiced, even if for some reason he was unaware of the offer.  After all, the September 5th forced-labor offer carried much more exposure—up to 20 years in prison—than the one he ultimately accepted.  Chammas himself does not unambiguously assert that would have accepted the more punitive offer.

Still, there remains at least some uncertainty in the Court's mind as to whether there could have been an intervening forced-labor plea offer between late September 2014—when the conditional offer expired because Ms. Chammas did not accept the non-prosecution agreement— and the apparent rejection of the offer at the December 8th meeting.  To resolve that lingering uncertainty, the Court will defer a definitive ruling on this issue and direct the government to submit an affidavit from a knowledgeable member of the prosecution team attesting to whether a later offer was extended and, if so, the contents of the offer.

### 7.  Failures relating to Chammas's medical conditions

Chammas next argues that counsel provided ineffective representation at sentencing by failing to advocate for a lower sentence or a favorable prison placement due to Chammas's medical conditions.  He alleges three specific deficiencies.

First, Chammas complains that counsel failed to request a downward departure pursuant to U.S.S.G. § 5H1.4 based on Chammas's poor health.  Although counsel mentioned Chammas's

physical and medical needs, Chammas says he "did not outline [them] with any specificity" or
"request that the Court consider a downward departure because of them." Mot. ¶ 61.

    Under the performance prong of <u>Strickland</u>, "[w]here sentencing benefits are available
under existing law, [the D.C. Circuit] has concluded that counsel is ineffective when he fails to
advocate on his client's behalf at sentencing." <u>Abney</u>, 812 F.3d at 1089. This, however, is not a
case where counsel failed to advocate on behalf of Chammas at sentencing. Although counsel
did not request a *departure* under § 5H1.4, he identified Chammas's medical issues in his
sentencing memorandum as justification for a downward *variance* from the Guidelines sentence
under 18 U.S.C. § 3553(a). Specifically, counsel detailed Chammas's history of "serious health
conditions," including contracting hepatitis in the 1980s, surviving liver cancer, having a liver
transplant in 2008, and subsequently suffering from high blood pressure which causes heart
palpitations and fainting spells. Def.'s Sentencing Mem. at 84–85. And, in advocating for a
below-Guidelines sentence under § 3553(a), counsel urged the Court to "carefully consider Mr.
Chammas's age and health in fashioning a sentence. Given his liver transplant, heart and hip
conditions, and the array of medications and treatment he requires, a lengthy period of
incarceration is both unnecessarily harsh and expensive for the federal government." <u>Id.</u> at 93.
Counsel concluded by highlighting a recent report by the Department of Justice Office of the
Inspector General that criticized the Bureau of Prisons for its handling of older inmates like
Chammas. <u>Id.</u>

    Counsel raised Chammas's health issues before the Court on other occasions as well,
including at the plea hearing and in his post-plea memorandum requesting release pending
sentencing. <u>See</u> Plea Hr'g Tr. at 146:22–23 (pointing to Chammas's "very significant medical
conditions, including a liver transplant," as a reason why he should not be detained pending

sentencing); Def.'s Mem. in Supp. of Release Pending Sentencing at 57 (explaining that "Chammas has a number of serious medical conditions, including a liver transplant . . . and a compromised immune system," "need of a hip replacement," and "chronic heart condition").

The Court was well aware of "the medical issues raised by the defense" and specifically asked the government to address them at the sentencing hearing. Sentencing Hr'g Tr. at 169:3–5. And, when it was time for defense counsel to speak, he emphasized that "any sentence of jail that's imposed by the Court, as the Court has already mentioned, will pose challenges given his heart, liver, and hip issues." Id. at 175:8–10.

In short, the record is clear that counsel *did* advocate for a variance based on Chammas's detailed medical history. Moreover, the Court "recognize[d] that [Chammas's] age and health conditions pose some challenges," which it considered in imposing a below-Guidelines sentence. Id. at 177:17–18. Thus, the record is also clear that even if counsel had performed deficiently, Chammas has not shown a reasonable probability of a lower sentence.

Second, Chammas argues that counsel performed deficiently by failing to object when the prosecution described Chammas "as being in peak physical fitness" and noted that he was "on the way to the gym at the time of his arrest," and that his daughter had described him as "full of energy." Mot. ¶ 57. This argument finds no support in the record. The prosecutor did not describe Chammas as being in peak physical fitness; in fact, she did not dispute Chammas's medical history. Sentencing Hr'g at 169:6–11. And, as both the prosecution and defense pointed out, Chammas's daughter *did* describe him as "full of energy." Dec. 1, 2016 I. Chammas Letter to the Court at 103; Sentencing Hr'g at 169:15; Def.'s Sentencing Mem. at 89. Accordingly, counsel did not perform deficiently in this regard because he had no basis on which to object to the prosecutor's statements.

And third, Chammas suggests that counsel failed to research the best Bureau of Prisons ("BOP") facility to recommend to the Court at sentencing. Mot. ¶ 62. This claim easily fails on both prongs. Counsel reasonably deferred to Chammas's cardiologist regarding the BOP facility that could best care for Chammas's unique medical issues. Indeed, Chammas concedes that his cardiologist contacted BOP "to relay [Chammas's] conditions and needs." Id. Nor can he show prejudice: Chammas also concedes that after his doctor contacted BOP, he was placed in a facility that is "well-known as having one of the best medical facilities of all federal prisons in the nation." Id. ¶ 64.

### 8. *Failure to object to offense level calculation*

Chammas contends that counsel failed to object to what he views as a miscalculation of the offense level under the Guidelines. Mot. ¶ 80. He argues that the final Presentence Report improperly added four additional points to his offense level based "on the faulty presumption that the 'offense involved conduct described in 18 U.S.C. § 2241(a).'" Id. ¶ 83. However, Chammas overlooks that this enhancement was part of the plea agreement. See Plea Agreement at 39. As such, counsel was not objectively unreasonable in not objecting to it. Moreover, as the parties agreed and as Chammas admitted in the Statement of Offense, Chammas did use force on at least five occasions when he tried to force his penis into the victim's mouth even though she turned her head and pressed her mouth closed. The offense level enhancement under § 2A3.4(c)(1) based on conduct described in 18 U.S.C. § 2251(a) was correct.

### C. Discovery requests

Finally, Chammas claims that his former counsel has not honored his request to provide his entire case file. He seeks an order requiring disclosure of that file, as well as all discovery materials in the government's possession and a transcript of the grand jury proceedings. Mot.

¶¶ 94–95; Suppl. Mot. at 3.  More specifically, he seeks all communications between his former counsel and government counsel and "notes, memos, and interviews" conducted by State Department agents related to any pending claim.  Suppl. Mot. at 3.  And he seeks grand jury transcripts "to assess additional inconsistencies between witness statements."  Id.

The Court may, in its discretion, grant a § 2255 petitioner discovery upon a showing of "good cause."  Bracy v. Gramley, 520 U.S. 899, 904 (1997) (quoting Rule 6(a) Governing § 2255 Cases).  Chammas fails to make the required showing.  As discussed above, with the exception of the plea disclosure issue, Chammas's lack of entitlement to relief is abundantly clear based on the law and the existing record.  Chammas has not explained how production of the requested records would alter that conclusion.  Because he fails to demonstrate good cause, the Court will deny Chammas's request for leave to conduct discovery.

**III.  Conclusion**

For the foregoing reasons, the Court will deny Defendant's request for reassignment and his initial § 2255 motion to vacate his conviction and sentence.  The Court will defer ruling on Defendant's supplemental § 2255 motion pending review of an affidavit from the government.  A separate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:  December 19, 2018

HB6JCUNS                          Sentence

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT      **UNPUBLISHED US V. CUNNIFFE** |
| | SOUTHERN DISTRICT OF NEW YORK      **(NO WL CITE)** |
| 2 | ------------------------------x |
| 3 | UNITED STATES OF AMERICA, |
| 4 |            v.                          15 Cr. 287 LTS |
| 5 | RICHARD CUNNIFFE, |
| 6 |             Defendant. |
| 7 | ------------------------------x |
| 8 | |
| 9 |                                   November 6, 2017 |
| | |                                 2:22 p.m. |
| 10 | |
| 11 | |
| 12 | Before: |
| 13 |                   HON. LAURA TAYLOR SWAIN, |
| 14 |                                      District Judge |
| 15 | |
| 16 |                        APPEARANCES |
| 17 | |
| 18 | JOON H. KIM, |
| |      United States Attorney for the |
| 19 |      Southern District of New York |
| | BROOKE E. CUCINELLA, |
| 20 |      Assistant United States Attorney |
| 21 | BRUCE BARKET, |
| | ALEXANDER R. KLEIN, |
| 22 |      Attorneys for defendant Cunniffe |
| 23 | |
| | Also Present: |
| 24 |      MICHAEL SAVONA, Special Agent FBI |
| 25 | |

1              (In open court)

2              (Case called)

3              THE COURT:  Mr. Cunniffe, is a friend or family member

4     with you here?

5              THE DEFENDANT:  My wife.

6              THE COURT:  Good afternoon.  Thank you for coming to

7     court today.

8              We are here today for sentencing.  I have received and

9     reviewed the presentence investigation report which is dated

10    October 30th, 2017, including the recommendation and addendum

11    as well as defense counsel's September 28th, 2017 submission

12    which included a letter from Mr. Cunniffe, letters from his

13    colleagues, friends and family members totaling eight letters,

14    and two letters from his medical providers.

15             I have also received and reviewed the government's

16    October 30th, 2017 submission and a proposed consent order of

17    forfeiture.

18             Are there any other written submissions that the

19    parties intend me to have considered in connection with the

20    sentencing?

21             MS. CUCINELLA:  Not from the government.

22             MR. BARKET:  Not on behalf of Mr. Cunniffe.

23             THE COURT:  Thank you.

24             Ms. Cucinella, would you please make a statement for

25    the record as to the government's victim identification and, if

1    applicable, notification analysis.

2              MS. CUCINELLA:  Yes.  The victims have been notified

3    in this case and made aware of today's proceeding and the

4    overall trial and everything that happened in this case, so

5    notification has has occurred.

6              THE COURT:  Thank you.

7              Counsel, I note that there are two sealed items

8    remaining on the docket.  One is a letter requesting an

9    adjournment for medical reasons of sentencing.  In considering

10   that medical issues are discussed in the publicly-filed

11   submission, is there an issue with just unsealing that letter?

12             MR. BARKET:  No.

13             THE COURT:  So we will unseal that.

14             Then the other is bail, the bail bond which I gather

15   is normally filed in the Magistrate Judge's Clerk's Office, and

16   there is a way to file it that wasn't filed because initially I

17   think the indictment was sealed, and then it was unsealed a

18   couple of days later, and you apparently didn't get to that

19   part.

20             MS. CUCINELLA:  The government will have no problem

21   unsealing that, your Honor.

22             THE COURT:  Does the defense have any objection?

23             MR. BARKET:  No.

24             THE COURT:  That will be unsealed and filed in the

25   ordinary way as well.  Mr. Barket, have you read the

1  presentence report and addendum and discussed them with

2  Mr. Cunniffe?

3            MR. BARKET:  Yes, we have.

4            THE COURT:  Mr. Cunniffe, have you yourself reviewed

5  the entire presentence report?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Have you discussed it with your attorneys?

8            THE DEFENDANT:  Yes, I have.

9            THE COURT:  Mr. Barket, do you have any objections or

10 other issues with respect to the content of the report that you

11 wish to address?

12           MR. BARKET:  No, your Honor.

13           THE COURT:  Ms. Cucinella, does the government have

14 any objections or other issues with respect to the content of

15 the report?

16           MS. CUCINELLA:  No, your Honor.

17           THE COURT:  Ms. Cucinella, is the government applying

18 to have Mr. Cunniffe credited with the third point for

19 acceptance of responsibility?

20           MS. CUCINELLA:  Yes, your Honor.

21           THE COURT:  That application is granted, and I note

22 that the third point is already reflected in the computations

23 in the presentence report.

24           Ms. Cucinella, what is the government's position with

25 respect to restitution?

1          MS. CUCINELLA:  We have been in touch with the victims

2   in this case, and neither is seeking restitution, so there is

3   no application for restitution in this case.

4          THE COURT:  There will be no restitution component of

5   the sentence.  Very well.

6          I have been, as I noted before, presented with a

7   proposed consent preliminary order of forfeiture.  Ms.

8   Cucinella, would you please explain for the record the basis of

9   the computation of the figure that is reflected in the consent

10  order.

11         MS. CUCINELLA:  Yes, your Honor.

12         The consent order of forfeiture reflects the proceeds

13  of the crimes in this case and specifically the profits that

14  Mr. Cunniffe made in connection with the insider trading

15  conspiracy.

16         THE COURT:  So those are funds that went to

17  Mr. Cunniffe as opposed to other co-conspirators?

18         MS. CUCINELLA:  Yes, they're actual proceeds to

19  Mr. Cunniffe.

20         THE COURT:  Mr. Barket, have you and Mr. Cunniffe

21  reviewed the proposed consent order?

22         MR. BARKET:  Yes, your Honor.

23         THE COURT:  Do you have any objections to it in form

24  or content?

25         MR. BARKET:  No, your Honor.

1           THE COURT:  Mr. Cunniffe, have you yourself reviewed

2    the proposed order?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Have you signed it?

5           THE DEFENDANT:  Sorry?

6           THE COURT:  Have you signed it?

7           THE DEFENDANT:  Yes, I have.

8           THE COURT:  Thank you.  Ms. Cucinella, would you like

9    to make your motion now?

10          MS. CUCINELLA:  The government respectfully moves and

11   requests the court to sentence Mr. Cunniffe pursuant to Section

12   5K1.1 of the United States Sentencing Guidelines because he

13   provided substantial assistance in the prosecution of both

14   Robert and Sean Stewart in this case.

15          THE COURT:  Thank you.

16          I have reviewed the government's October 30th, 2017

17   letter, and I find, based on the information proffered in that

18   letter, that Mr. Cunniffe has provided the requisite

19   substantial assistance.  I, therefore, grant the government's

20   motion pursuant to Section 3553 (e) of Title 18 and Section

21   5K1.1 of the guidelines and will sentence Mr. Cunniffe without

22   with regard to the normally applicable advisory guidelines, and

23   in determining the departure, I will consider, among other

24   things, the factors set forth in Section 5K1.1 (a)(1) through

25   (5) of the sentencing guidelines.

1          So now I would like to hear general sentencing

2     remarks.  Mr. Barket, would you go first?

3          MR. BARKET:  Thank your Honor.

4          As the court noted, you received fairly extensive

5     briefing in the form of the probation report, the government's

6     submission and our presentence memorandum.

7          If I can, I will briefly highlight a few areas.

8     Obviously the cooperation is most significant here not only

9     because Mr. Cunniffe was instrumental in the trial and

10    conviction of a fellow conspirator, if you will, but also

11    because of the speed and thoroughness with which he both

12    accepted responsibility and recognized that it was important

13    that he make amends to society for what he did and that the

14    best way for him to do that was to be honest, truthful and open

15    with the government.  So we think that that is an important

16    factor here.

17         Secondly, of course, his prior history and character

18    is exemplary.  This is a man who is in his 60's who has lived

19    his entire life really without hardly a blemish.  This is truly

20    something out of character for him.

21         While he should receive some punishment for his

22    conduct, he should also receive I think some acknowledgment of

23    a life well lived up until this point and hopefully a life well

24    lived beyond this point.

25         Despite his health issues, which is another reason we

1    would cite for following both our recommendation and the

2    recommendation of the Department of Probation or presentence

3    report, he can anticipate living for a number of years and I

4    suspect will be again a member of society that we're all happy

5    to have as a neighbor, a friend or a co-worker.

6         Also it would be I think odd for him to be sentenced

7    to incarceration given that the most closely situated

8    co-defendant, if you will, the father, Richard Stewart -- Bob

9    Stewart -- sorry -- was given home confinement without any

10   cooperation at all, and it was Mr. Stewart who really ensnared

11   Mr. Cunniffe into this scheme.

12        That came up after in a sense Mr. Stewart was aware

13   that the federal authorities were looking at this.  Rather than

14   stopping, which would have seemed appropriate, just basic

15   common sense, he came up with this idea to continue the scheme,

16   albeit using a third party, in this case, Mr. Cunniffe.

17        It is hard to see an individual who is better situated

18   to be given leniency at this stage, which would be exactly what

19   the presentence report recommended, which is time-served and a

20   year of probation.  We're going to ask the court to sentence

21   him accordingly, and I would rely on the record that is before

22   your Honor.

23        THE COURT:  I have just a couple of technical

24   questions before you sit down.  You had requested a structure

25   that would be a sentence of probation with special conditions

1    as opposed to the structure the presentence report had

2    suggested, which was time-served and supervised release.

3            Now, special conditions can be the same under both

4    constructs, but is that a deliberate distinction that you're

5    asking?

6            MR. BARKET:  I don't know if this was a law school

7    class, I would get points off for seeing the distinction, I

8    would get points off.  Our goal is to have him not

9    incarcerated.

10           THE COURT:  Noncustodial sentence, I get it.

11           MR. BARKET:  And supervision conditions, be they

12   probation or supervision, are fine.  In my mind, supervision

13   follows a term of incarceration and probation does not.

14           THE COURT:  Technically, the surrender can be the

15   time-served or time-served plus supervised release.

16           MR. BARKET:  The next time this comes up with a quiz,

17   I'll have it.

18           THE COURT:  You'll get extra credit.

19           MR. BARKET:  I accept!

20           THE COURT:  That was the technical question.  I assume

21   that you still agree with yourself that a community service

22   component of the sentence would be appropriate?

23           MR. BARKET:  Absolutely, yes.

24           THE COURT:  Thank you.  Ms. Cucinella?

25           MS. CUCINELLA:  Just briefly, your Honor.

1              You have our submission which we detailed exactly how

2      substantial Mr. Cunniffe's assistance was in this case.  I

3      think it is significant that he did cooperate almost

4      immediately after he was approached by authorities.  He came

5      in.  His very first proffer session was among the most thorough

6      I have ever seen in terms of careful attention to detail and

7      completeness.

8              He was also willing here to do proactive work which,

9      quite frankly, I don't know if the case could have gone forward

10     without that, and so that was incredible assistance to the

11     government and to ultimately the conviction of Sean Stewart at

12     trial.

13             I think that I echo Mr. Cunniffe's counsel in the

14     sense that we saw real remorse from Mr. Cunniffe very early on

15     for getting involved in this scheme and also a real desire to

16     take responsibility and try to rectify what he had done, and he

17     saw that in assisting the government in its investigation.

18             He, like I said, was going to do proactive

19     cooperation, and his main concern from that point forward was

20     making sure that his wife would be okay and be taken care of.

21     He is truly a family man.  We think there is little to no

22     chance of recidivism in this case and we are hopeful that he

23     will go on to be a productive member of society again.

24             So unless the court has additional questions, that is

25     it from us.

1          THE COURT:  Thank you.  Mr. Cunniffe, would you like
2   to speak for yourself before I decide on your sentence?
3          THE DEFENDANT:  Sure.
4          THE COURT:  Would you stand and pull the microphone
5   closer to you.  You don't have to lean into it, but just
6   project out.
7          THE DEFENDANT:  I am nervous.
8          THE COURT:  I understand.
9          THE DEFENDANT:  I just want your Honor to know that I
10  am truly sorry for the crimes I have committed, and if I harmed
11  anyone in any way through the trades, I am sorry.
12          I also would like to apologize for putting any doubts
13  in investors' minds to the fair and openness of the market
14  because it is important for investors to trust that the markets
15  are fair and orderly and traded on open information.
16          I never ever betrayed a company's trust that I worked
17  for.  When I did have information.  I always believed in
18  everything I did, that the markets do have to be fair and
19  orderly.  To that, I regret thinking that that would put into
20  an investor's mind that people on Wall Street sometimes do have
21  an advantage over the average investor.
22          I also do want to apologize to the government, to the
23  District Attorney, to the FBI and Courts and SEC for all the
24  time and effort that I caused for this.
25          There is nothing that justifies what I did, and I am

1    truly sorry for what I did.  I would like your Honor to just

2    note one thing, and that is it was never about material goods

3    or wanting possessions.  Both my wife and I are minimalists in

4    the way we live our lives.  Instead of turning to God, which I

5    should have done, I turned to my fears.  I started to have

6    health issues, and I couldn't find a job after the 2008 crash

7    and after I got let go in 2010.

8            In the past I always had friends on Wall Street, a

9    network of people that would say things are getting better, try

10   this person or try that person.  For years I kept trying to get

11   a job, and no one would want to hire me any more, probably

12   because of my age and probably what was going on and the fear

13   of my health.

14           I just looked for an easy way out to make sure my wife

15   and I would have something for the future, to try to provide

16   financial security.  It was stupid and dumb, and I am also

17   sorry for whittling down my friends, co-workers, family who

18   know me have always known me to be a good and decent person,

19   someone they can count on, someone who can be there, and in

20   that way I let them all down.

21           Most importantly, I betrayed my wife and her trust and

22   her confidence.  I kept her totally in the dark.  She had no

23   idea what I was doing.  The date the FBI came to the door was

24   probably the worst day of her life because everything she

25   believed in me disappeared, and I will try to spend the rest of

1    my life trying to make that up for her.

2           I pray that your Honor can -- I know I have always

3    been a dedicated and prudent worker and good member of society.

4    I will go back to that.  I will find a job as soon as I can.

5    My last two and a half years were on hold, in limbo.  People

6    who would want to hire me want, one of the biggest concerns is

7    am I going to leave and be sentenced to jail in a couple of

8    months?  And it has been a barrier.  Hopefully, we can get

9    beyond this and I will become a productive member of society

10   again.

11          As I side story to show my dedication to jobs, in the

12   brief span I was at Home Depot, within two months I received a

13   mention for outstanding excellence and customer service and job

14   performance.  It its ironic that ended up leading to me being

15   pressured by myself.  I ended up being injured.  Since they had

16   no other position for me, I had to leave the job.  I am hoping

17   to find a full-time job in the near future.

18          If there is anything my skills of teaching or finance

19   can ever do for the government, I would be happy to help,

20   community service or anything I can do.  Thank you, your Honor,

21   for listening.  I hope you can find mercy for me.

22          THE COURT:  Thank you, Mr. Cunniffe.

23          I am glad to hear your words and grateful for your

24   candor, and I know that it is difficult to express all of this

25   publicly and that it is difficult for your wife to hear, but

1    also very important that she know how much you care and what

2    your goals are and where you're at now.  So I would just ask

3    that everyone sit quietly for a couple of minutes with me here

4    while I reflect on what I've heard and make my decision as to

5    the sentence which I will then explain.

6              (Pause)

7              THE COURT:  Thank you for your patience.

8              The court adopts the factual recitation that is set

9    forth in the presentence report and the additional facts

10   proffered in the government and defense submissions.

11             The court has discretion, taking into account the

12   applicable statutory provisions in exercising its power under

13   Section 3553 (a) of Title 18, to determine the particular

14   sentence to be imposed in each particular case.  The court is

15   required to consider a number of specific factors and

16   sentencing goals and is directed to impose a sentence that is

17   sufficient but not greater than necessary to comply with those

18   statutory sentencing purposes and goals.

19             One of the factors that the court must consider is the

20   provisions of the sentencing guidelines.  As to the sentencing

21   guidelines, I conclude that the applicable guideline offense

22   level is 19 and that the applicable criminal history category

23   is I, for the reasons that are detailed in the presentence

24   report.

25             I also adopt the grouping of charges analysis that is

1    set forth in the presentence report.  Accordingly, the advisory

2    guideline range for a custodial sentence is from 30 to 37

3    months of imprisonment, and I have used the 2016 edition of the

4    guidelines manual in making these determinations.

5          Actually, technically it is November 6th, and so I

6    don't believe there was a change to the 2017 edition, and so I

7    have used the 2017 edition of the sentencing guidelines manual

8    in making these determinations.  It gets republished every

9    November 1st, so this is another technical point I wanted to

10   have corrected.

11         As I previously have granted the government's motion

12   pursuant to Section 5K1.1, I will depart downward from this

13   advisory guideline range in light of Mr. Cunniffe's substantial

14   assistance in the investigation and prosecution of his

15   co-defendants.  I find that there is ample basis for

16   significant downward departure pursuant to Section 5K1.1 and

17   the factors relevant to that determination which are identified

18   in Subsection A, Subdivisons 1 through 5 of Section 5K1.1 of

19   the guidelines that do weigh in favor of a significant

20   departure.

21         Mr. Cunniffe was a prompt and proactive cooperator who

22   testified publicly as the government's principal witness at the

23   trial of his co-conspirator Sean Stewart.  That testimony which

24   I observed was credible and consistent, and his assistance to

25   the government was extensive and, as Ms. Cucinella has told us

HB6JCUNS                    Sentence

1    on the record, was also key to the government's ability to go

2    forward with the prosecution.  Therefore, the section 5K1.1

3    departure alone is a significant factor militating in favor of

4    a lenient sentence.

5            I have also considered the sum total of the Section

6    3553 (a) sentencing factors and goals as well as all of the

7    information that has been put before me in light of those

8    factors and goals.

9            Among the facts that I've considered is the fact that

10   Mr. Cunniffe has been under pretrial supervision for more than

11   two years already.  I will speak to certain of the Section 3553

12   (a) factors.  First, the nature and circumstances of the

13   offense, which is where we always start with Section 3553 (a).

14           Mr. Cunniffe participated in a very serious crime,

15   knowingly trading on nonpublic inside information, and as he

16   himself has acknowledged here in open court today, that crime

17   is one that undermines the integrity of and public confidence

18   in the financial markets.

19           He knowingly purchased securities based on inside

20   information and split the profits with a co-defendant.  He used

21   his knowledge with the financial industry to conceal this crime

22   notwithstanding his prior reputation for integrity, and as far

23   as anyone can tell here, his life prior to that time in

24   accordance with that reputation for integrity is one that he

25   earned and one that he set aside when he committed this crime.

1          He retained the bulk of the profits made through this
2     trading.  He has explained that he was in a period of fear and
3     financial insecurity, but as Mr. Cunniffe himself has said,
4     that is not a justification.
5          I do believe that his remorse is genuine, and he has
6     acted in a way that is consistent with genuine remorse in
7     seeking to make amends for his crime in assisting the
8     government.  As to further aspects of Mr. Cunniffe's personal
9     history and personal characteristics, the letters that I have
10    received tell me that he is a person who is devoted to his
11    family and has put himself wholeheartedly into work and the
12    careers that he has pursued that he was a dutiful son who
13    sacrificed a great deal to care for his parents, and he is a
14    person who always had sought to be a positive figure in the
15    lives of his extended family.
16         He was dedicated to his job as a teacher and dedicated
17    to his job in finance, devising useful tools for the financial
18    world.  He has lately struggled with unemployment and with
19    health issues.
20         It is necessary that the sentence be one that punishes
21    appropriately, promotes deterrence and respect for the law.
22    Mr. Cunniffe has lost his ability to work in the financial
23    field.  His criminal activity has become very public by virtue
24    of the coverage of the trial and the charges and his need to
25    rebuild his reputation and find work in his generally held

1    desire to live the respectable life and to regain his

2    reputation are ones that I believe, along with the government

3    will -- and defense counsel -- will deter Mr. Cunniffe from any

4    temptation to sully his reputation or indeed hurt anyone again,

5    so I believe the risk of personal recidivism is very small and

6    that the magnitude of the consequences that Mr. Cunniffe has

7    suffered will serve as deterrence to others who may be tempted

8    to engage in this activity.

9          The court has considered the full range of Section

10   3553 (a) factors in determining an appropriate sentence and

11   concludes a substantial downward departure pursuit to 5K1.1 on

12   account of Mr. Cunniffe's extensive and effective cooperation

13   is appropriate and sufficient to address the statutory purposes

14   of sentencing.

15         The court also finds that Mr. Cunniffe is required to

16   forfeit to the United States $900,000, representing proceeds

17   that he obtained as a result of the criminal activity, and that

18   is reflected in the consent forfeiture order.

19         The court is authorized by statute in this case to

20   impose a sentence of probation of between 1 to 5 years for the

21   set of felony convictions.  I will now state the sentence that

22   I intend to impose.  Mr. Cunniffe, would you and your lawyers

23   please stand.

24         Mr. Cunniffe, it is the judgment of this Court that

25   you are to be sentenced to one year of probation on each of

1    your counts of conviction.  The sentence is to be served

2    concurrently, for a total of one year of probation.  The

3    standard conditions of probation 1 through 13 as detailed in

4    the sentencing guidelines manual will apply.  These will be

5    written out specifically in the judgment that I sign.  The

6    Probation Department will explain them to you in detail, and I

7    am sure thatyour lawyers will have something to say about them

8    as well.

9              You will also be subject to the following mandatory

10   conditions.  You must not commit another federal, state or

11   local crime.  You must not illegally possess a controlled

12   substance.  You must refrain from any unlawful use of a

13   controlled substance,.

14             I will suspend the normal mandatory drug testing

15   condition based on the Probation Office's determination, which

16   I am happy to be able to adopt, that you pose a low risk of

17   future substance abuse.  You must cooperate in the collection

18   of DNA as directed by the authorities.  You must also meet and

19   follow the following special conditions:

20             You must provide the probation officer with access to

21   any requested financial information, you must not -- there is

22   no installment payment schedule for restitution, so I am not

23   imposing the recommended restriction on lines of credit.

24             I will impose the search condition as follows:  You

25   must submit your person, your residence, your place of

1   business, your vehicle and any property, computers, electronic

2   communications, data storage devices and other other media

3   under your control to a search, on the basis that the probation

4   officer has a reasonable suspicion that contraband or

5   violations of conditions of release must be found.  Any search

6   must be conducted in a reasonable time and in a reasonable

7   manner.  Failing to submit to a search may be grounds for

8   revocation of the probation sentence and resentencing.  You

9   must inform any other residents the premises must be subject to

10  search pursuant to this condition.

11          You must perform 100 hours of community service as

12  directed by the Probation Office.  You will note that I have

13  imposed a requirement of fewer hours than you had actually

14  proposed and volunteered to do.  The reason that I did that is

15  because it is just a one year probationary sentence, and I

16  share your hope that you will be able to find employment in the

17  near future.  So 100 hours is two and a half full-time weeks as

18  opposed to the five full-time weeks you had proposed and is a

19  period you can stretch out over the year if you need to combine

20  it with full-time work, and I do hope and trust that you will

21  throw yourself as seriously in the community service as you

22  have done in your professional work.

23          You will be supervised by your district of residence.

24          In light of your forfeiture obligation, I will not

25  impose a fine on you.  I will order that you pay to the United

1   States the mandatory special assessment in the total amount of

2   $600.00, which is $100 for each of your felony counts of

3   conviction, and it is payable immediately.

4          You must also inform the Probation Department of any

5   change in your financial circumstances and notify the United

6   States Attorney for this district within 30 days of any change

7   of mailing or residence address while any part of the special

8   assessment remains unpaid.

9          As noted before, I will order you to forfeit to the

10  United States $900,000, representing the proceeds of your

11  criminal activity.  I will enter the consent order of

12  forfeiture before we part company today.

13         I believe that this sentence is reasonable within the

14  meaning of the law, sufficient, appropriate and no greater than

15  necessary to satisfy the statutory purposes of sentencing,

16  which include punishment and deterrence.

17         Does either counsel know of any legal reason why the

18  sentence should not be imposed as stated?

19             MS. CUCINELLA:  No, your Honor.

20             MR. BARKET:  No, your Honor.

21             THE COURT:  The sentence as stated is imposed.

22         I must say something important to you about appeal

23  rights.  You have the right to appeal this sentence.  If you're

24  unable to pay the cost of an appeal, you may apply for leave to

25  appeal in forma pauperis.  If you request, the Clerk of Court

1    will file a notice for you.  Any notice of appeal must be filed

2    within 14 days of the judgment of conviction.  This is a short

3    deadline, and you should be sure to talk to your lawyers about

4    your legal rights in this regard before we part company today.

5          Ms. Cucinella, are there remaining counts or

6    underlying indictments that need to be dismissed?

7          MS. CUCINELLA:  No, your Honor.

8          THE COURT:  I would like to say a few more words,

9    Mr. Cunniffe, and I thank you and your wife in advance for

10   listening.

11         As you have acknowledged, you committed a serious

12   crime that has implications for the financial markets you have

13   served so well in the past, and you deviated from your prior

14   high standards of integrity.  So I hope and will trust that

15   this experience will be one that causes you always to think

16   very hard about the potential consequences of the actions that

17   you take before you take them, so that every day for the rest

18   of your life will be honest, trustworthy of the honor you have

19   earned in the past and the trust you have of those who know you

20   well, and your decision to cooperate and to do so fully and

21   proactively was a very, very good and financial step in the

22   life that you wish to lead going forward.

23         You have spent many years in dedicated work, and you

24   have overcome health issues and managed many challenges, and so

25   I urge you to carry on in this positive way even when it is

1  difficult, as it surely is for all of us at different stages in
2  our lives, and it has been particularly difficult for you now,
3  and I urge you, if you haven't already done so, literally to
4  promise your wife and yourself that you will never again do
5  anything that could even put you at risk of going to prison.
6          THE DEFENDANT:  Yes, your Honor.  Thank you.
7          MR. BARKET:  Thank you.
8          THE COURT:  I am not quite done.
9          I hear from what you said you understand how precious
10 your relationship is, how precious your wife is.  So I wish you
11 and your wife and extended family continued strength.  You will
12 have the guidance and support of the Probation Department as
13 you continue to build up your day-to-day life.
14         The Probation Department does have resources that can
15 be helpful, and my colleagues in Probation truly are dedicated
16 to helping you succeed and to helping to build up lives, and so
17 take the supervision requirement in that spirit, and I do not
18 have to worry about you.  You have to comply strictly with all
19 of the conditions I have set.  If you are brought back before
20 me for violating any of those conditions, I may resentence you
21 to a term of imprisonment.  Please don't ever put me in a
22 position of having to make that choice.
23         THE DEFENDANT:  I won't see you again, your Honor, as
24 nice as you are.
25         THE COURT:  It is mutual.

1           THE DEFENDANT:  Outside to say hi.

2           THE COURT:  If I never see you again, it means you

3     have succeeded, and so that is my goal for you.

4           I will direct that a copy of the presentence report be

5     prepared for the Sentencing Commission.  All other copies of

6     the report must remain confidential.  If an appeal is taken,

7     counsel on appeal are to be permitted access to the report.  I

8     will now sign the consent order of forfeiture.  It is a

9     preliminary order of forfeiture.  (Pause)

10          I have done that, and the Clerk of Court will enter

11    the order.  I would like to thank counsel for their work, for

12    their advocacy, for their candor with the court, and with that,

13    is there anything else we need to take up together?

14          MR. BARKET:  No, your Honor.

15          MS. CUCINELLA:  Not from the government.

16          THE COURT:  I would like to thank Special Agent Savona

17    and his colleagues for their work in aid of law enforcement.

18          So I wish you all well.  We are adjourned.

19          (Court adjourned)

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK    **UNPUBLISHED US V.**
2   ------------------------------x    **JACOBY (NO WL CITE)**

3   UNITED STATES OF AMERICA,

4              v.                              17 CR 676 (DLC)

5   PHILIP JACOBY,

6                   Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         February 2, 2018
9                                        11:00 a.m.

10

    Before:
11
                         HON. DENISE COTE,
12
                                         District Judge
13

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         Interim United States Attorney for the
16       Southern District of New York
    DANIEL TEHRANI
17  REBECCA MERMELSTEIN
    BRENDAN QUIGLEY
18       Assistant United States Attorneys

19  KING SPALDING
         Attorneys for Defendant
20  BY:  WILLIAM JOHNSON

21  ALSO PRESENT:  JIN TAE KIM, United States Postal Inspector

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Is the government ready to proceed?

3          MR. TEHRANI:  Yes.  Good morning, your Honor.  Daniel

4   Tehrani, Rebecca Marmelstein, and Brendan Quigley for the

5   government.  With us at counsel table is Postal Inspector Jin

6   Kim.

7          THE COURT:  Thank you.

8          For Mr. Jacoby, are you ready to proceed?

9          MR. JOHNSON:  Yes, your Honor.  William Johnson from

10  King Spalding on behalf of Mr. Jacoby who is with me at counsel

11  table.

12         THE COURT:  Welcome, everyone.

13         So, Mr. Johnson, have you and your client both read

14  the presentence report?

15         MR. JOHNSON:  Yes, your Honor.

16         THE COURT:  Have you discussed it with each other?

17         MR. JOHNSON:  Yes, we have.

18         THE COURT:  Do you have any objections to it other

19  than what might be contained in your written sentencing

20  submissions to me?

21         MR. JOHNSON:  No, your Honor.

22         THE COURT:  Thank you.

23         The presentence report is made a part of this record

24  and placed under seal.  If an appeal is taken, counsel on

25  appeal may have access to the sealed report without further

1   application to this Court.

2          There is agreement here that the offense level is 9,

3   the criminal history category is I, and the guidelines range is

4   4 to 10.  I've reviewed all of those calculations and adopted

5   them as my own.

6          I have submissions from the parties.  I have the

7   government's sentencing submission filed on January 26, and I

8   have the defendant's sentencing submission of January 19.  Some

9   personal sensitive information has been redacted from the

10  publicly filed document.

11         Have you, Mr. Johnson, provided the redacted material

12  to Ms. Rojas for filing under seal?

13         MR. JOHNSON:  Yes.  I need to double-check that,

14  your Honor.  I know we provided it to chambers.  I need to make

15  sure that it's in your file.

16         THE COURT:  If you could coordinate with my deputy

17  after this to make sure that everything has been filed

18  appropriately in this court.

19         There is a request here for a non-guideline sentence

20  based on the defendant's health and also arguments with respect

21  to the fact that this conduct was aberrational, given his life

22  story.  I've read the materials.  I'm prepared to hear from the

23  parties.

24         Mr. Tehrani, did you wish to add to the government's

25  sentencing submission?

1          MR. TEHRANI:  No, your Honor.  As we set forth in our

2    submission, we obviously view this as a very serious offense.

3    It is an officer of a public company who not only lied but

4    fabricated documentation in order to deceive auditors.  We

5    believe that's conduct that warrants serious punishment.

6          But rather than belabor the arguments that we made in

7    our sentencing submission, unless the Court has any particular

8    question, we're prepared to rest on our submission.

9          THE COURT:  Thank you.

10         Mr. Johnson.

11         MR. JOHNSON:  Your Honor, if I could address the

12   Court.  I just recently had some surgery.  My voice is not --

13   could I use the podium?

14         THE COURT:  Absolutely.

15         MR. JOHNSON:  Thank you.

16         I'll try to be brief, your Honor.  We are seeking a

17   sentence of probation.  We think that the essence of the

18   offense here is that Mr. Jacoby regrettably prepared a one-page

19   back-dated memo to support recognition of revenue that was

20   subsequently given to his auditor.

21         We think the key point is that he has fully

22   acknowledged that was improper.  He has not been charged with

23   accounting fraud.  The government investigated that, and we

24   think that the circumstances do indicate that at least he

25   believed, even if he was wrong, that he had a good-faith basis

1   for believing the timing of the recognition of the revenue does

2   not justify what he did and only explains his reasons for doing

3   that.

4           But I do want to address the strength of the

5   government's arguments in response to our request for a

6   non-guideline sentence.  They say that his conduct was

7   particularly pernicious and have compared it to Enron,

8   WorldCom, and Tyco.

9           I happen to know obviously that this Court presided

10  over the WorldCom massive civil litigation that resulted in

11  historic settlements.  I personally tried the WorldCom criminal

12  case.  This case is not WorldCom, and it's not Enron.

13  Mr. Jacoby, respectfully -- he's not Scott Sullivan or Andy

14  Fastow.  I won't belabor it, but that's not even close.

15          He shouldn't have done what he did.  It is a clear

16  aberration.  I think, again, as a way of explaining, he

17  believed he had a basis based on verbal discussions with the

18  distributor.

19          We're not here to try that.  He was not charged with

20  accounting fraud, and we don't think that he should be

21  sentenced based on a belief that he engaged in accounting

22  fraud.

23          The company settled with the SEC for $1.5 million.

24  Again, this is not an Enron or WorldCom situation.  We think

25  based on the facts as they played out, the memo, as bad as it

1    was, as a mistake in judgment as it was, ultimately criminal as

2    it was, had no effect on the company.

3          The very next day after Mr. Jacoby submitted the memo,

4    the company came out with a press release disavowing the

5    revenue.  They had already decided what they were going to do,

6    and in public companies, 24 hours is not a long enough time to

7    evaluate all the circumstances of accounting issues.

8          They had already done that before.  They knew what

9    they were going to do.  They gave him one last chance to

10   justify it.  He gave them what he gave them, they didn't

11   believe it, and they went the other way.

12         The government says in its memo that it doesn't matter

13   that he was unsuccessful in deceiving the auditors.  I

14   guarantee you that if he had deceived them for a year or more

15   or longer, they would be standing here in front of you telling

16   you that you should sentence him to a longer sentence, or they

17   would be arguing it stronger because of the length of that

18   deception.  It didn't happen here in that way.

19         With respect to Mr. Jacoby's personal circumstances,

20   we submit that the information in the PSR and the information

21   we've submitted show that this crime was truly an aberration in

22   his life, and I don't think the government disputes this point.

23         He has letters from friends and colleagues that show

24   he's a kind and generous man.  He's a hard-working professional

25   who took not just pride in his own work but in the work that

1     his company was doing to help provide and develop therapeutic

2     products for patients.

3              He has fully accepted responsibility here.  He entered

4     a preindictment plea and did not waste the government's time

5     when they approached us and readily agreed to plead guilty to

6     the charge.  He has no criminal history.

7              We think that separate and apart from the Court's view

8     and the government's view about the accounting revenue

9     questions, his declining health is an important sentencing

10    consideration that we believe, in combination with the other

11    factors, would suggest that probation is appropriate.

12             Incarceration would likely exacerbate his condition.

13    The probation department seems to agree.  There is no risk of

14    him being a recidivist for many reasons but certainly because

15    of his health.

16             He was medically retired from Osiris before this case

17    came up.  His health has declined since then.  We think that he

18    has learned his lesson.  Even regardless of that, he will never

19    be in a position to do something like this again.

20             With respect to the point that I think is the most in

21    contention, general deterrence, we don't think that a sentence

22    of incarceration is required to serve that purpose.

23             The government says that a minimal sentence would

24    shake the public's confidence in the integrity of the public

25    markets.  I think the facts of this case don't support that

1    extreme statement.

2         If there really is anyone out there who is watching

3    this case and considering how to interact with a public company

4    auditor, we think they've already gotten the message, if you

5    lie, the government will pursue you, they will charge you, and

6    you will be a felon for the rest of your life, and you will

7    lose your career in the process.

8         We certainly don't think, as the government submits,

9    that a reasonable person would look at all the facts here and

10   actually be emboldened to commit a crime were Mr. Jacoby be

11   sentenced to probation.

12        So, for all those reasons, we would request that the

13   Court sentence him to probation.  With respect to other

14   portions of sentencing as to a fine, probation has recommended

15   a fine of $10,000.  We'd ask that a lesser amount be imposed,

16   if the Court is inclined to do so.

17        As we noted in our memo, he is a defendant in an SEC

18   action, as well as multiple other parallel suits.  There he

19   faces potential judgments and other financial penalties.

20        Even putting those aside, he will face significant

21   legal costs.  After he pleaded guilty, his company refused to

22   pay several months of past legal bills for our firm and has cut

23   off any further advancement and indemnification of fees in

24   connection with all of his other litigation.

25        As the Court is aware and as the PSR states, he and

1    his wife have and will continue to have various financial

2    liabilities relating to the child custody suit with his wife's

3    former husband, and his longterm financial picture will almost

4    certainly get worse in the near future.

5         As the PSR notes, his disability payments will cease

6    when he turns 67 next year, and what he will have left from

7    Social Security benefits, IRA funds, and other assets will not

8    come close to making up the difference of that money that he is

9    getting now.

10        The final point I'd like to make is with respect to

11   the probation department's recommendation for a special

12   condition of alcohol testing and treatment, we don't think that

13   that's necessary respectfully.

14        THE COURT:  I'm not considering that.

15        MR. JOHNSON:  You're not?

16        THE COURT:  I'm not.

17        MR. JOHNSON:  Then I will stop, your Honor, unless you

18   have any questions.

19        THE COURT:  No.

20        MR. JOHNSON:  Thank you.

21        THE COURT:  Mr. Jacoby, is there anything that you

22   wish to say to me on your behalf in connection with your

23   sentence?  Sir, if you want to remain seated, you may.

24        THE DEFENDANT:  I'll stand.  Thank you, your Honor.

25        I would like to say that I'm truly sorry for what I've

1   done.  I know that it's wrong to submit a back-dated memo to

2   the auditors, and I don't really have a good answer for why

3   I've done this.

4        The best I can say -- this is just a reason, but it's

5   not an excuse -- is that I wrote the memo because I was really

6   frustrated with the auditors, BDO.  We had honestly briefed BDO

7   of the details of the transactions in question during their

8   audit before the PCAOB reviewed.  They signed off on it, and

9   the audit was completed without any problems related to that

10  transaction.

11       I know that people have since disagreed with how we

12  accounted for that revenue, and I thought it was proper to book

13  it when we did because I thought I had at least a verbal

14  agreement on all the important terms of the transaction.

15       I got extremely frustrated with BDO questioning months

16  and months after they initially reviewed it and apparently

17  found no problems with the accounting.  I let my frustrations

18  get the better of my judgment, but I know that's not an excuse,

19  and I have no one but myself to blame for this.

20       I should not have done what I did, no matter what the

21  circumstances.  I've tried to lead an honest life and have an

22  honorable career.  I've been able to do that up until this

23  incident.  I still can't believe I let myself do something like

24  this, and I'm appalled and ashamed that I did.

25       It's been difficult for me to come to grips with this,

1    particularly because I'm not healthy enough to work anymore and

2    I won't have the opportunity to earn back the trust of people

3    in the way I know best, working hard, helping people, and

4    trying to do the right thing.

5              I would like to thank my family and friends who have

6    supported me.  I've had a really hard time talking about this

7    and didn't even let them know about it until very recently.

8    I've been truly touched by the letters of support from them,

9    and I want to apologize for letting them down.

10             I have learned an extremely important and valuable

11   lesson and wish all of this had never happened.  I understand

12   you need to impose a sentence, and I simply ask for the mercy

13   of the Court.  Thank you, your Honor.

14             THE COURT:  So, Mr. Jacoby, I am going to impose a

15   sentence of time served to be followed by a term of supervised

16   release to follow of two years.

17             Besides the standard conditions, I'm going to require

18   that the additional condition be that you pay a fine of

19   $10,000.  I decline to reduce the fine amount below that

20   recommended by the probation department.  I think that payment

21   of a fine here is an important component of the sentence.  And

22   I impose a special assessment of $100.

23             You may be seated.  I want to explain why I'm imposing

24   the sentence that I am.

25             It's absolutely criminal and wrong from every

1   perspective to fabricate a document; to involve a third party,

2   the distributor, in the fraudulent conduct; to mislead

3   auditors; to essentially ultimately understand that a false

4   record will have an impact on the financial standing of the

5   company, and it's a public company.  So the ramifications, the

6   ripple effect of this kind of fraud, are significant.

7           However, I am very influenced here by your health.

8   I'm very influenced by the scope of the criminal activity, how

9   long it lasted, the nature of it, compared to the entirety of

10  your career.

11          I'm glad that you were prosecuted for this.  I'm glad

12  the extent of the criminal conduct is spread on the record and

13  available for others to learn from.  The penalty at this point

14  in your life is one that you will suffer from, perhaps, for the

15  rest of your life as the impact of this plays out in a variety

16  of ways.

17          Do I need to send you to prison also?  No.  There is

18  no reason here, in terms of individual deterrence, to send you

19  to prison.  I am convinced that even if you were working, you

20  would never do this again.

21          In terms of appropriate punishment, given the context

22  of everything I've just described, the punishment I'm imposing

23  is sufficient and appropriate.

24          In terms of general deterrence, well, that is a

25  problem because this is serious criminal activity.  It deserves

1  to be punished.  People need to be deterred.  This is wrongful.

2  But that's only one component here of a sentence.

3          I thought about that, and weighing your age and health

4  and all of the challenges that you face because of your health,

5  the fact that you're working days are over, the fact that this

6  is the only criminal activity for which you will have been

7  convicted in a long working career -- all of those factors tell

8  me that while a fine is appropriate, a financial penalty is

9  appropriate, sending you to prison at this time would not be

10 appropriate.

11         I want to advise you of your right to appeal.  If

12 you're unable to pay the cost of an appeal, you may apply for

13 leave to appeal in forma pauperis.  Any notice of appeal must

14 be filed within 14 days of the judgment of conviction.

15         Mr. Tehrani, are there any open counts?

16         MR. TEHRANI:  There are not, your Honor.

17         THE COURT:  With respect to payment of the fine, it

18 should be paid within 60 days.  I'm declining to impose a

19 special term of supervised release related to alcohol use.

20         I think that the defendant is under the supervision of

21 several physicians for serious health conditions.  They are the

22 persons most directly involved with his healthcare, including

23 any abuse of substances.  I leave it to them to take care of

24 Mr. Jacoby's health situation.

25         Thank you, all.