**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,      :    Criminal Action

                              :

                              :    Case No.: 1:19-cr-00552-JPC

v.                           :

                              :

EDWARD SHIN,                   :

                              :

    Defendant.               :

_____  :

---

**EDWARD SHIN'S SENTENCING MEMORANDUM**

---

<u>Of Counsel and on the Brief</u>:

Robert J. Basil, Esq.
The Basil Law Group, P.C.
125 West 31st Street #19-B
New York, NY 10001
(917) 994-9973

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707

*Counsel for Defendant Edward Shin*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................................ii

I.      PRELIMINARY STATEMENT .............................................................................. 1

II.     MR. SHIN'S PERSONAL BACKGROUND .......................................................... 4
    A.  Mr. Shin's Family and Education ................................................................ 5
    B.  Mr. Shin's Career ........................................................................................ 6
    C.  Mr. Shin's Health ........................................................................................ 9

III.    THE OFFENSE CONDUCT .................................................................................. 14

IV.     OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT'S GUIDELINE
    CALCULATIONS .................................................................................................. 22
    A.  Base Offense Level ................................................................................... 22
    B.  The Government's Loss Table Calculation ............................................... 22
        1.   The Loss to Noah Bank Posited by the Government is a Multiple
           of the Loss Claimed by Noah Bank ............................................... 25
        2.   The Garden of Eden Loan Resulted in Only Profits for Noah
           Bank ............................................................................................... 27
        3.   Any Purported Loss That the Government Does Not Prove by a
           Preponderance of the Evidence Was Caused by the Crimes
           Committed by Mr. Shin Cannot be Included in Any Loss
           Calculation .................................................................................... 28
    C.  Objection to the Guidelines Calculation Based upon Mr. Shin's Role in the
        Offenses ..................................................................................................... 30

V.      RESTITUTION ...................................................................................................... 33
    A.  Independent Investigation Costs ............................................................... 33
    B.  Legal Fees Paid in the Matter of The Basil Law Group v. Noah Bank ................. 34
    C.  Legal Fees, Lost Deposit and Abandoned Construction Costs in the Matter of
        JKAYC, LLC v. Noah Bank ....................................................................... 35
    D.  Shin v . Noah Bank Legal Fees ................................................................. 36

VI.     JUSTIFICATION FOR A DOWNWARD DEPARTURE UNDER U.S. SENTENCING
        GUIDELINES ........................................................................................................ 37

VII.    A DOWNWARD VARIANCE FOR EDWARD SHIN WOULD BE APPROPRIATE UNDER
        TITLE 18 U.S.C. § 3553 ........................................................................................ 41
        A.  Variance Based on Section 2B1.1 Loss Table ........................................... 42
        B.  Variance Based on the "Piling On" Effect of Overlapping Adjustments .............. 46
        C.  History and Characteristics of Mr. Shin ..................................................... 48
        D.  Mr. Shin's Lack of Prior Record and Good Character ............................. 48
        E.  Mr. Shin's Current Age ................................................................................. 54
        F.  Health Concerns ............................................................................................. 55
        G.  Alcohol and Alcohol-Related Gambling Conditions .............................. 59
        H.  Community Service Proposal ........................................................................ 61
        I.  Need to Avoid Sentencing Disparities ...................................................... 63
        J.  Conduct During Period of Pretrial Supervision ..................................... 66
        K.  Collateral Consequences of Mr. Shin's Felony Convections ................. 66

VIII.   FINES ...................................................................................................................... 68

IX.     VOLUNTARY SURRENDER AND DESIGNATION OF FACILITY ......................................... 68

X.      CONCLUSION ........................................................................................................ 69

TABLE OF AUTHORITIES

Cases

*Kimbrough v. United States*, 552 U.S. 85 (2007) ................................................................................ 44, 63

*Kiser v. Huge*, 517 F.2d 1237 (D.C. Cir. 1974) .................................................................................... 4

*Lagos v. United States*, 138 S. Ct. 1684 (2018) .................................................................................. 34

*Rita v. United States*, 551 U.S. 338 (2007) ........................................................................................ 44

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008). .............................................................................................................................................. 2, 4

*United States v. Alvaran-Velex, 914 F.3d 665 (D.C. Cir. 2019)* .............................................................. 58

*United States v. Austin*, 468 F. Supp. 3d 641 (S.D.N.Y. 2020) ............................................................. 58

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ......................................................................... 49

*United States v. Barbato*, No. 00-cr-1028, 2002 WL 31556376 (S.D.N.Y. 2002) ..................................... 57

*United States v. Bautista*, 23 F.3d 726 (2d Cir. 1994) ......................................................................... 19

*United States v. Booker*, 543 U.S. 220 (2005 .................................................................................... 41

*United States v. Chammas, No. 1:16-cr-00171, 2018 WL 6680924 (D.D.C. Dec. 19, 2018)* ..................... 58

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) .......................................................................... 44

*United States v. Cunniffe*, No. 15-cr-287, Dkt. 265, at 22:23–24 (S.D.N.Y. 2019) .................................. 56

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................................... 55

*United States v. Faibish*, 2015 WL 4637013 (E.D.N.Y. 2015) .............................................................. 43

*United States v. Gall*, 552 U.S. 38 (2007) ......................................................................................... 41

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012 .............................................................. 42

*United States v. Jacoby*, No. 17-cr-676, Dkt. 19 (S.D.N.Y. Feb. 27, 2018) ....................................... 57, 64

*United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) ......................................................................... 54

*United States v. Lacey*, 699 F.3d 710 (2d Cir. 2012) ........................................................................... 18

*United States v. Lauersen*, 343 F.3d 604 (2d Cir. 2003) ....................................................................... 46

*United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001) .............................................................. 32

*United States v. Martinez*, No. 04-cr-48-20, 2020 WL 7128951.......................................... 58

*United States v. Maynard*, 743 F.3d 374 (2d Cir. 2014) ................................................. 20, 32

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ...................................... 19, 24

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) .............................................................. 43

*United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996)........................................................ 57

*United States v. Rita*, 551 U.S. 338 (2007) ............................................................................. 41

*United States v. Robert Stewart*, No. 15-cr-287, Dkt. 95 at 30:17–20 (S.D.N.Y. May 18, 2016)............. 65

*United States v. Rodriguez*, No. 00-cr-761-2, 2020 WL 5810161 ......................................... 58

*United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004)................................................15-17, 45

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007)......................................................... 30

*United States v. Senesey*, 1997 WL 187345, at *1 (S.D.N.Y. Apr. 15, 1997) .................... 57, 65

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009)............................................................. 67

*United States v. Whiting*, 471 F.3d 792 (7th Cir. 2006)......................................................... 17

*United States v. Wills*, 476 F.3d 103 (2d Cir. 2007).............................................................. 63

## Statutes

18 U.S.C. § 3553 .............................................................................................................. 4, 48, 54

18 U.S.C. § 3663 ...................................................................................................................... 31

## Sentencing Guidelines

United States Sentencing Guidelines, U.S.S.G. § 2B & 2B1.1....................................... 18, 22, 30, 37, 64

## Other Authorities

American Bar Association, *Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes, Final Draft* (Nov. 10, 2014)...................... 18

Zyi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflicts Resol. 421 (Spring 2007)................................................................. 62

Nagrin, Daniel S., *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (2013)...................62

United States Sentencing Commission, *Interactive Data Analyzer*........................................................64

Kevin Voigt & Caren Weiner Cambell, 1 in 6 Small Business Administration Loans Fail, Study Finds, Nerdwallet (October 3 2017) ..........................................................................................................40-41

# I
## PRELIMNARY STATEMENT

Edward "Ed" Shin is 59 years old.  He is a husband and father of three adult daughters.  He is a classic "self-made man" who worked hard from a young age, obtained remarkable success in the banking industry against the odds, and spent decades helping members of his Korean-American community to obtain the financing they needed to make their American business dreams come true.

The events leading to this conviction constitute a total aberration of Mr. Shin's otherwise honest and productive life.  Those events were crammed into a 3-to-4-year period (2009-2013) during which Mr. Shin made several foolish decisions that were not repeated.  Those decisions were largely targeted toward growing his community bank, Noah Bank, and yes, also in an attempt to enrich himself.   Those attempts to enrich himself were largely failures, but his efforts to grow Noah Bank were a stunning success.  That stunning success benefitted others much more than Mr. Shin.  Over one hundred Noah Bank employees can thank Mr. Shin for their livelihood, and hundreds of business owners also owe Mr. Shin a large debt of gratitude.  These facts help to compel the conclusion that a mitigated, non-incarceration sentence is appropriate.  Moreover, Mr. Shin's age and ill health independently counsel in favor of such a sentence.

For these reasons and more, a sentence within the Guideline range as presented by the Government or Probation would be patently unfair.  As a

result, Mr. Shin respectfully requests a variant, non-incarceration sentence with heavy emphasis on community service. Imposing such a sentence would comport with the authority providing that Mr. Shin's sentence must be "sufficient, but not greater than necessary" to provide a just punishment for the offenses underlying Mr. Shin's conviction.

A major focus in the Court's sentencing decision for Mr. Shin must be on his personal history and characteristics, including his good works. This focus complies with the "elementary principle of weighing the good with the bad" and assessing "immediate misconduct . . . in the context of [the defendant's] overall life hitherto," particularly "at the moment of [the defendant's] sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008). Such a panoramic focus compels the conclusion that the non-incarceration sentence requested by Mr. Shin is the only just sentence.

For all of the reasons stated in this memorandum, and in the accompanying letters from Mr. Shin's friends, family and associates, as well as contained in his own letter to the Court, this Court should sentence Mr. Shin in a manner that will allow him to continue to use his business acumen, work ethic, demonstrated generosity, and his limited remaining years to good purpose. He can take advantage of a non-custodial sentence to pay his debt to society. This would be accomplished by his contributing to his community to the limits of his

capabilities, rather than simply becoming a burden to society through pointless incarceration. Accordingly, Mr. Shin's sentence should be:

- A term of 24 months of probation, including

- An initial period of 12 months of home confinement; and

- A special condition that Mr. Shin complete 700 hours of community service.

Mr. Shin would also be subject to the mandatory special assessment of $100 per count, for a total of $600.00.   The basis for Mr. Shin's request is explained in more detail *infra.*

## II
## MR. SHIN'S PERSONAL BACKGROUND

An overriding principle of sentencing is the one that requires sentencing courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  In assessing Mr. Shin, the man to be sentenced here, the Court must always remember that:

> if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp.2d at 513-514 (internal quotation marks and citation omitted).  The good Mr. Shin has done over his lifetime, including during the period of criminal conduct, must be reflected in his sentence. Shakespeare warned us all that "The evil that men do lives after them; The good is oft interred with their bones." *Kiser v. Huge*, 517 F.2d 1237, 1262 (D.C. Cir. 1974).  The combined force of these three esteemed authorities, the United States Code, this District Court, and William Shakespeare, compel the conclusion that the good Mr. Shin has done throughout his life must not be buried during this exercise of sentencing.

The Government attempts to portray Mr. Shin as a pure villain, devoid of positive personal attributes or accomplishments.  The Government does so solely for the purpose of justifying an extended sentence of incarceration.  That

portrayal is false and is the result of the Government taking an adversarial approach to Mr. Shin's sentencing.

A.      *Mr. Shin's Family and Education*

Edward Shin is a naturalized citizen of the United States.  His life was, excluding the events underlying his conviction in this case, a seemingly unrelenting success story.

Mr. Shin came to the United States at age 17 from South Korea with his mother, father and three siblings. The Shin family originally located in Los Angeles, California where Mr. Shin enrolled in high school. The family later moved to Cherry Hill, New Jersey, where Mr. Shin graduated high school at age 21. Mr. Shin was compelled to spend extra time in obtaining his high school diploma because he came to his country with very little skill in the English language.  He had to work at learning English while trying to keep up with his coursework, which was conducted entirely in English.  He preserved and eventually excelled.

Upon graduation from high school, Mr. Shin had done so well that he was admitted to the University of California, Los Angeles ("UCLA").  He graduated with a bachelor's degree in applied mathematics.

Regarding his personal life, Mr. Shin was married at an early age and that marriage produced a daughter, Jennifer Shin, who is a Yale-educated architect. Mr. Shin's first marriage ended in divorce.  Thirty years ago, in 1991, Mr. Shin

married Sophie Hahn.  The two created and have maintained a successful and loving family.

Mr. Shin and Ms. Hahn have two daughters, Sammul Shin, age 27, and Christian Shin, age 24.   Both are college graduates and gainfully employed in good jobs in Manhattan.  Mr. Shin and Sophie provided a solid upbringing for their two daughters, including family travel, but always with heavy emphasis on education and hard work.  Those efforts have paid oversized dividends for his daughters.

B.     *Mr. Shin's Career*

Mr. Shin spent most of his professional career in the banking and finance industries. Early on in his career, Mr. Shin recognized that there was an unmet need in the financial market for loan services to be provided to his fellow Korean immigrants and small business owners.  With limited opportunities for employment using their skills and energy, many of these Korean-speaking immigrants saw ownership of a small business as the only way to "make it" in America.  Mr. Shin observed that these immigrants often did not have access to traditional loan products and financing services.  As this Court may recall from the trial testimony, these immigrants often resorted to use traditional group financing methods, organized informally by the non-institutional immigrant community, collecting what resources it could manage to concentrate voluntarily.  The resulting loan recipient was chosen at random.

Mr. Shin, through years of hard work and diligence in the banking industry, rose from entry level positions to the position of president of National Asian Bank, a division of National Penn Bank/PanAsia Bank. He did not rest there. He continued his upward path by becoming president of a division of Royal Bank America called Royal Asian Bank in 2004, which catered largely to Korean immigrants with start-up businesses such as delis, dry cleaners and other service providers. During the Great Recession, Royal Bank lost interest in catering to South Korean immigrants and decided to spin off Royal Asian Bank.

Mr. Shin organized a group of Korean immigrant small business owners to invest in the effort to buy Royal Asian Bank. This group succeeded in raising sufficient funds to obtain the majority of the shares of Royal Asian Bank. James Kim, the loan broker who testified against Mr. Shin at trial, was an integral part of that effort. James Kim made personal investments, as well as bringing in other investors to create the bundle of money necessary for Mr. Shin to make the purchase. Without James Kim, Mr. Shin's effort to purchase Royal Asian Bank would have failed. Thus, Mr. Shin's unfortunate relationship with this felon, James Kim, began on a high note and began a period of reliance upon James Kim to assist Mr. Shin's banking aspirations.

Upon the purchase of Royal Asian Bank, Mr. Shin continued as president. The bank changed its name to Noah Bank in December 2010 to reference a biblical connection and a sense of security. What could be more secure than the great Ark?

Noah Bank was originally located solely in its Elkins Park, Pennsylvania home office, but due to the population centers of the Korean-American community being located elsewhere, Mr. Shin had Noah Bank take the gamble of quickly expanding from one location to five. Noah Bank then opened the four additional branches, two in Northern New Jersey and two in New York City to reach the target communities. The number of employees at Noah Bank quickly grew from twenty-three employees in December 2010 to eighty employees by 2012.

The most important loan products offered by Noah Bank to its immigrant borrowers were the loans available through the Small Business Administration (hereinafter "SBA") guaranteed loan program. This overriding importance was due to these loans having more flexible financing, lower economic requirements, more favorable loan conditions, and other benefits conferred upon both the lender and borrower. During the period of 2011 to 2013, Noah Bank issued approximately $439 million in SBA loans, far more than the amount at issue in this matter.

After the acquisition made possible by the assistance of James Kim, Mr. Shin devoted his full and considerable efforts to the growth and success of Noah Bank, very often to the exclusion of his personal activities. Mr. Shin did not have what has become to be known as "life balance."

As a result of this devotion, the assets (deposits, loans and capital) of Noah Bank grew from $75 million during 2011 to $300 million by the end of 2013.

That growth continued afterward under his leadership, which ended with his arrest during 2019.

Noah Bank's growth was reflected in Mr. Shin's compensation.  His salary was approximately $150,000 in the early years and grew to approximately $450,000 by the time of his suspension in May 2019.  In addition to salary, he received unrestricted common stock in Noah Bank that he was free to sell or keep.  He also received approximately 1,730,000 shares of restricted stock by May 2019. He also had accumulated options to purchase an additional 733,710 common shares by May 2019, which have remained unexercised.  Noah Bank shares are not publicly traded, but could be sold privately for approximately $1 per share, giving Mr. Shin a substantial, personal asset base as a result of his efforts.  But, neither the profitability nor the share price of Noah Bank was assured, so Mr. Shin's financial future was tightly tied to the financial success of Noah Bank.

C.      *Mr. Shin's Health*

Mr. Shin is seriously ill and has been for several years.  He currently suffers from the repercussions of a traumatic injury, discussed *infra*.  However, he also suffers from hypertension, pre-diabetes, glaucoma and sleep apnea unrelated to trauma.  He is an alcoholic.

Mr. Shin continues to suffer significant health issues caused by a traumatic injury resulting from his being accidentally pushed down a long flight of stairs on April 20, 2017, in Queens County.  Mr. Shin had been meeting that evening

with a potential bank customer, a Noah Bank officer and another professional.

By the end of that meeting, both Mr. Shin and the potential bank customer were

intoxicated.  The potential customer accidentally pushed Mr. Shin down a steep

and extremely long flight of stairs.



Mr. Shin fell backwards down these steps and sustained life-threatening

injuries.



This is a picture of Mr. Shin shortly after he arrived at the hospital following his fall.  As a result of this incident, Mr. Shin suffered catastrophic brain and other injuries requiring immediate and multiple surgeries.  He was treated for, among other conditions, a subdural hematoma (*i.e.*, rupture of blood vessel in the brain), fracture of the zygoma (*i.e.*, broken eye socket, which required immediate surgery) and a left arm fracture requiring insertion of permanent metal pins.  He suffered from severe dental injuries, which were not immediately treated due to the emergency nature of his other injuries.  See, photos, **Exhibit A** to Declaration of Robert J. Basil dated September 7, 2022 ("Basil Decl."). See also, basil Decl. at ¶¶9-11).

A civil suit filed by Mr. Shin is currently pending in federal court in the Eastern District of New York.  Mr. Shin's board-certified neurologist, Allan Earl Rubinstein, M.D., opined in an April 8, 2019, report (Basil Decl. at **Exhibit B)**, produced during the civil suit before Mr. Shin's arrest, that:

> Mr. Shin sustained a moderately severe traumatic brain injury with intracranial and subdural hemorrhages and multiple facial, orbital, sinus and left radius fractures 1 year ago requiring surgical repairs for a facial fracture and for a left wrist fracture. He had significant cognitive dysfunction immediately after the head injury and has now improved but has mild residual cognitive dysfunction which is likely to be permanent. Cognitive behavioral therapy may be of limited help. He continues to have post-concussion headaches, facial pain, fatigue, and unsteadiness. It is likely that his headaches and fatigue will improve. Given the extent of his facial fractures, he may have permanent facial pain. The facial numbness is permanent. His persistent left shoulder pain should be further assessed by an orthopedic specialist.
>
> Mr. Shin, having suffered a traumatic brain injury of moderate degree, is at substantially greater risk for the development of

migraine, seizures, Parkinson's disease and dementia than he
would have had he not suffered this brain injury.

Thus, for the conditions caused by this trauma alone, Mr. Shin will be in
constant need of treatment and monitoring for the rest of his life for such serious
conditions as permanent cognitive dysfunction caused by his traumatic brain
injury, as well as various post-concussion maladies. He will need to be
constantly monitored for the early onset of Parkinson's disease and dementia.
These conditions do not include his non-traumatic health issues, which are
equally serious and in similar need of constant treatment and monitoring.

As reported by one of Mr. Shin's many treating doctors, internist Simeon
Bardin, M.D., Mr. Shin currently continues to suffer headaches and stress
reactions, including daily headache pain and emotional stress. When the
barometric pressure rises, Mr. Shin's pain increases dramatically, converting Mr.
Shin into an involuntary weather prognosticator.

Mr. Shin continues to receive physical therapy to address his many
injuries and conditions. These include regular chiropractic sessions. He also
receives regular acupuncture. Mr. Shin will need to continue to have these
treatments indefinitely.

## III
## THE OFFENSE CONDUCT

Mr. Shin was found guilty of six offenses involving bank fraud, false statements on loan applications and receipt of bribes.  The Government requested no jury interrogatories or other records to help verify what evidence the jury found credible and important to its decision.  We will never know what loans the jury found to be fraudulently obtained, what commissions it found to be unearned, or what kickbacks it believed that Mr. Shin received.  We will never know which alleged incidents of Mr. Shin misconduct was found by the jury to have been unproven.  This informational void complicates Mr. Shin's sentencing and places the burden of proof on the Government to demonstrate the factual basis for the convictions that supposedly support the Government's effort to impose a lengthy jail sentence upon Mr. Shin.

One fact about the jury is nonetheless clear.  Mr. Shin was found guilty of crimes relating to a portfolio of twenty-nine loans that the Government claimed would not have been issued by Noah Bank "but for" Mr. Shin's criminal conduct. Nine of these loans were related to four entities about which the jury was asked by the Government to determine that Mr. Shin failed to disclose his "financial interest" in these entities (1797 Empire, Inc., 32 Madison Farm, Armonk Farm, Inc. and First Ave Lee's Market).  Since any one of Mr. Shin's failures to disclose would have resulted in conviction, there was no determination by the jury of whether more than one of these loans belongs in this category represented criminal activity.  That crucial matter remains unresolved.

14

It is beyond dispute that Mr. Shin had no financial interest in any of the borrowers for the other twenty loans in the "but for" portfolio.  Instead, each of these loans in the portfolio were loans for which the jury was asked to find that Mr. Shin authorized payment of commissions to James Kim that were not earned by him, and also that Mr. Shin received in return portions of these unearned commissions.   Once again, the Government did not seek jury interrogatories to determine which of these loans represented criminal activity, and which did not.  That crucial matter remains unresolved.

As set forth below in *infra*, the Government is urging this Court to find a loss to Noah Bank of approximately $5 million on a loan portfolio consisting of these twenty-nine loans.  But the Government's own evidence confirms that this Noah Bank loan portfolio, which we are told would not have existed but for Mr. Shin's crimes, produced a large net profit for Noah Bank.

Aside from other gaps in proofs, there was no evidence demonstrating that a crime committed by Mr. Shin contributed one iota to any loan default.  Indeed, this Court, at the Government's urging, excluded all evidence of "no harm, no foul" assuring that causation to default stayed out of the jury deliberations.  That evidence gap renders any claim of loss under the Guidelines as being without legal basis.

In a case on point, *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004) the court emphasized that without a clear link between the crime and the cause of the defaulted loan, there is no loss under the Guidelines:

15

> The district court's actual loss analysis was faulty, however,
> because it ignored the causation requirement inherent in the rules
> for determining loss. This court has also recognized that the
> Sentencing Guidelines import the legal concept of a causal
> relationship between the defendant's conduct and the determined
> loss. . .. Causation includes two distinct principles, cause in fact, or
> what is commonly known as "but for" causation, and legal
> causation. While the former is always a necessary condition of
> causation which often is easily satisfied, the ultimate question is
> whether the cause in fact is legally sufficient to warrant imposing
> liability upon the actor. (Internal citations and quotations omitted).

Here, the Government's theory under the Guidelines is that once it shows that a
defaulted loan was issued by Noah Bank as a "but for" result of Mr. Shin's
crimes, its burden of proving the loss in the amount of the default has been met.
This is not the law. As the *Rothwell* court held, there is a second requirement in
addition to "but for" causation. "[T]he presence of but-for causation is ordinarily
a necessary condition but rarely a sufficient one." *Id.* As a result, the Sixth
Circuit reversed based upon the lack of proof of that second element of
causation.

> Rothwell's act of fraudulently obtaining one or more progress
> payments in an otherwise legitimate loan transaction cannot
> reasonably be considered to have caused the SBA's loss under
> either a "but for" or a legal cause analysis. The SBA incurred the
> loss on foreclosure because Rothwell was unable to make the loan
> repayments. In fact, Rothwell made payments on the loan for 23
> months and then defaulted. Neither the district court nor the
> Government provided any explanation of why or how Rothwell's
> fraudulent conduct during the construction of the building made it
> more likely that Rothwell would later default on the loan. There are
> myriad explanations for the default—an unsound business risk, a
> poor economy, excess warehouse or office space in the local
> market, or developments in unrelated transactions affecting
> Rothwell's ability to repay the SBA loan—all of which are more
> likely causes than the fraud-induced progress payment.

16

*United States v. Rothwell*, 387 F.3d at 584.  Accord, *United States v. Whiting*, 471

F.3d 792, 802 (7th Cir. 2006).

In this case, the Government, instead of claiming that Mr. Shin's crimes

caused loans to default, merely asserts that the twenty-nine-loan portfolio would

never have existed "but for" Mr. Shin's crimes.  Therefore, the Government

theory goes, if any of those loans defaulted, even for reasons unrelated to Mr.

Shin's crimes, Mr. Shin's punishment must dramatically increase.  The

Government's theory ignores the legal requirement for determining loss under

the Guidelines.

The Government refuses to face multiple realities with respect to

determination of loss under the Guidelines, and more generally.  One of these

realities at issue here is that Mr. Shin's crimes, *i.e.*, his failures to disclose, may

have been the "but for" cause of issuing these twenty-nine loans.  But, Mr. Shin's

crimes had no connection to the default and the resulting loss to Noah Bank on

any of these loans.  No loans defaulted because Mr. Shin had a "financial

interest" in any borrower.  No loans defaulted because James Kim received an

unearned commission or kicked back part of his commission to Mr. Shin.

In any event, we urge this Court to consider while sentencing Mr. Shin

only the "actual loss" caused by his criminal actions, not a cherry-picked

selection of losses that ignores any gains or other offsets created by the same

conduct.  This holistic approach is consistent with the American Bar Association,

*Report on Behalf of the American Bar Association Criminal Justice Section Task Force on*

*the Reform of Federal Sentencing for Economic Crimes, Final Draft* (Nov. 10, 2014) (hereinafter, "ABA Task Force Report") (Basil Decl. at **Exhibit C**). The ABA Task Force recommended that only the "actual loss" be considered in sentencing under Section 2B1.1 for economic crimes such as those committed by Mr. Shin. The Second Circuit law is on all fours with the ABA Task Force Report regarding "actual loss," holding that, "a 'victim' is defined as 'any person who sustained any part of the actual loss determined under subsection (b)(1),' U.S.S.G. § 2B1.1 app. note 1, while 'actual loss' is in turn defined as 'the reasonably foreseeable pecuniary harm that resulted from the offense.'" *United States v. Lacey*, 699 F.3d 710, 715, (2d Cir. 2012) (emphasis added).

Here, a claim that Noah Bank was a "victim" cannot survive scrutiny. Noah Bank suffered no "actual loss." Therefore, Noah Bank should not be considered a "victim" under Section 2B1.1 or otherwise, as that term is defined in this Circuit. As this Court is called upon to consider the greater of the "actual loss" and the "intended loss" suffered by Noah Bank, and there is no evidence that Mr. Shin intended for Noah Bank to suffer any loss on the loans to entities in which Mr. Shin had a conflict of interest. Indeed, his interest was in having the borrower succeed and repay its loan in full. Thus, the actual loss of $0.00 should be utilized by this Court in sentencing with respect to Section 2B1.1.

The Government's efforts to deflect this Court from even considering these realities is not merely striking, but also demonstrates that the Government is acting as Mr. Shin's adversary rather than "ministers of justice."

> Rule 3.8 of New York's Rules of Professional Conduct provide for "Special Responsibilities of Prosecutors," which mostly detail the rules for disclosing relevant information and evidence and dealing with defendants who lack counsel. But comment 1 to the rule provides a broad general statement that, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate."

*United States v. Nesbeth*, 188 F. Supp. 3d 179, 196–97 (E.D.N.Y. 2016); *see also*

*United States v. Bautista*, 23 F.3d 726, 732, (2d Cir. 1994) (same, citing Model Rules of Profession conduct).  By asking this Court to ignore favorable evidence that counsels in favor of a mitigated sentence for Mr. Shin, the Government has ventured into forbidden territory.  In addition, the Government did not ask for jury interrogatories, but does strategically ask this Court to conclude that the jury agreed with the Government on every fact the Government now deems to be important, *without exception*.

This is not a civil litigation about money, in which the adversary system anticipates that the parties may rely upon their adversaries to weed out spurious claims.  This is about an effort to put Mr. Shin in jail when "justice" does not so require.

While operating squarely within this territory of advocacy, the Government premises its overblown $5 million loss claim upon the fact that six of the twenty-nine loans in the "but for" portfolio created by Shin's crimes went into temporary or permanent default.  Under this theory, this Court must pretend that the twenty-three profitable loans entered into by Noah Bank purportedly as a result of Mr. Shin's criminal activity, do not exist.  Even so, the

19

Government's erroneous calculation of the amount of this loss under its own theory would grossly overstate the impact and the seriousness of Mr. Shin's crimes.

For example, one "defaulted loan" is the $5,000,000 loan issued to Garden of Eden Enterprises, Inc. That loan was purportedly issued by Noah Bank without knowledge that some of the broker's commission that was not earned. That $5,000,000 loan moved completely out of default long before Mr. Shin's arrest. Indeed, that huge loan remains current. Under the Government's incarceration punishment theory of considering only the bad and not the good, this Court must consider this loan, which is paying Noah Bank handsomely every month, as one being in default in excess of $3,000,000 and that Mr. Shin be punished accordingly. This is a convincing indication of how far the Government has strayed from basing its sentencing recommendation on "actual loss." *Cf. United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014).

In addition, of the twenty-nine loans in the "but for" portfolio, twenty-three were paid in full and never defaulted. In total, Noah Bank received approximately $10 million in fees, interest and other payments on these loans induced solely by Mr. Shin's crimes. The Government asks this Court to close its eyes to these undisputed facts, which were placed before the jury through the Government's own witness, John Kim of Noah Bank, and Noah Bank's documentary evidence.

These profitable loans demonstrate, *inter alia*, the falsity of one of the premises of this prosecution.   They demonstrate that Mr. Shin was *not* attempting to induce Noah Bank to enter into risky loans that should not have passed underwriting but for his influence.  All of the loans in the "but for" portfolio were subjected to the normal Noah Bank underwriting standards and each loan passed muster.

Those underwriting standards were applied, for the most part, knowing that commissions would be paid to James Kim.  It is true that the loans to 1797 Empire, Inc., 32 Madison Farm, Armonk Farm, Inc. and First Ave Lee's Market were underwritten without knowledge of any "financial interest" Mr. Shin had in one or more of them.  But, there is nothing in record to suggest that Mr. Shin's "financial interest" affected the viability or risk of any loan.  Indeed, any financial interest of Mr. Shin would not have been disqualified for that reason by the Noah Bank loan committee, and would have enhanced the attractiveness of any particular loan had it been known to Noah Bank.[1]

---

[1]  *See* May 17 Trial Tr., Cross-Examination of Michael Reinhart,  Basil Decl. at **Exhibit D** pp1669, ln. 18-1674 ln. 8.

**IV**
**OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT'S GUIDELINE**
**CALCULATIONS**

The presentence investigation report in this case determined a total offense level of thirty-one under the Guidelines.  This determination was based upon a base offense level of seven for the offenses of convictions, an increase of eighteen levels based upon a loss under the Section 2B1.1 table between $3.5 million and $9.5 million, a two-point increase for abusing a position of private trust and a four-point increase for role in the offense as an organizer/leader of a criminal activity that involved five or more participants or was otherwise extensive.   Mr. Shin objects to these Guidelines calculations as they stray from the factual record.

> **A.**      *Base Offense Level*

Mr. Shin agrees with the level seven rating assigned by the Government for the offenses underlying his conviction.

> **B.**      *The Government's Loss Table Calculation*

The Government submitted the following table to determine Noah Bank's loss to be considered in sentencing (hereinafter the "Government Loss Table")

| Borrowing Entity | Default Amount | Amount of Liquidation | Loss |
| --- | --- | --- | --- |
| 32 Madison Farm, Inc. | $683,929.69 | $92,651.09 | $591,278.60 |
| First Ave Lee's Market, Inc. | $731,048.38 | $2,025.77 | $729,022.61 |

| First Ave Lee's Market, Inc. | $285,669.77 | $0.00 | $285,669.77 |
| Garden of Eden Enterprises, Inc. | $3,022,132.73 | $0.00 | $3,022,132.73 |
| Noah Super Laundromat, LLC | $1,347,692.08 | $885,000.00 | $462,692.08 |
| Royal Garden, Inc. | $129,248.28 | $87,520.40 | $41,727.88 |

To these amounts, the Court is urged to add the amount of James Kim's unearned commissions. The Government speculates, in the absence of a jury determination, that the amount of those unearned commissions was $273,550.00.

The flaws in the Government Loss Table are patent upon examination, as the figures vary wildly from the evidence presented at trial. More importantly, they vary from the post-trial submission by Noah Bank seeking restitution. In essence, the Government seeks to have this Court ignore Noah Bank's calculation of its losses and substitute its own, radically higher, amounts.

The jury never found that *each* of these loans was entered into by Noah Bank as the result of a crime committed by Mr. Shin. From the verdict sheet, this Court knows only that one or more of these loans was so found, but not which one or ones. Because the Government never requested jury interrogatories, this Court has no jury findings from which to calculate a reliable loss figure, even assuming the acceptability of the unfair, one-sided Government approach that disregards the overall performance of the twenty-nine loan portfolio at issue.

The Government's loss theory is apparently that although a twenty-nine loan portfolio was entered into by Noah Bank solely as a result of Mr. Shin's crimes, the Court must rely upon the Government Loss Table. That table cherry-

picks only six loans out of the twenty-nine for maximum exposure.  Indeed, even non-defaulted loans from the same borrowers are excluded from the calculation.

The omission of the twenty-three good loans that would compel a finding of zero loss by this Court, is purely strategic and an example of prosecutorial advocacy.  It is neither a search for justice nor a valid calculation of "actual loss." *Cf. United States v. Nesbeth*, 188 F. Supp. 3d at 196–97.

If the twenty-three good loans had not been omitted by the Government from the Government Loss Table, there would not only be zero loss, but there would be proof of a substantial net profit for Noah Bank on the "but for" portfolio.  Such a result would demonstrate *inter alia* that incarceration would be an unwarranted sentence option, let alone the seven-year incarceration urged by United States Probation.

Even if this Court were to agree that this one-sided, partial representation of the assumed results of Mr. Shin's crimes contained in the Government Loss Table constituted "actual loss," significant flaws remain.  The total loss (formula = default amount of cherry-picked loan principals less amounts of liquidation), according to the Government, is $5,132,523.67, plus the commissions of $273,550.00 for a total of $5,405,073.67. We have enclosed copies of the two charts, Government Exhibits 1016 and 1025 as Basil Decl. **Exhibits E and F** that are relied on by the Government in its loss calculation.  Accordingly, the best treatment of the Government Loss Table in determining a just sentence is to ignore it.

1.     *The Loss to Noah Bank Posited by the Government is a Multiple of the Loss Claimed by Noah Bank.*

In its final presentence investigation report, United States Probation referenced a letter dated August 1, 2022, from Noah Bank in which Noah Bank requested restitution (Basil Decl. at **Exhibit G).**  Noah Bank subsequently resolved its restitution claim with Mr. Shin, but its August 1, 2022 letter is nonetheless important to sentencing.  It reveals flaws in the Government Loss Table.[2] This letter was not available to United States Probation or the parties when Mr. Shin made our objection to the draft presentence investigation report.

By contrast to the Government Loss Table, Noah Bank claimed restitution for only *two* loans out of the twenty-nine-loan portfolio.   Noah Bank claimed restitution for 32 Madison Farm, Inc. in the amount of $551,627.60, and for First Ave Lee's Market in the amount of $548,286.28, for a total loan related loss of $1,099,913.88. Noah Bank's own figures are significantly lower than the amounts shown in the Government Loss Table.  Noah Bank's claimed loss for 32 Madison Farm, Inc is approximately $40,000 less than what the Government is claiming. For First Lee's Market, the gap is astounding, with Noah Bank claiming almost $500,000 less than the Government Loss Table figures.

Even more significant in showing the flawed aggressiveness of the Government's calculations is the fact that Noah Bank did not seek restitution of any money whatsoever relating to Garden of Eden Enterprise, Inc., Noah Super

---

[2] Noah Bank no longer seeks any restitution, having settled the issue through an agreement with Mr. Shin discussed *infra.*

Laundromat, LLC or Royal Garden, Inc. These three loans comprise almost $3.5 million of the Government Loss Table's version of the total loss. If the Court were to rely upon Noah Bank's claim for restation, instead of the flawed Government Loss Table, the total amount of the loss on the loans in the Government Loss Table would be reduced by two-thirds. This is yet another instance of aggressive advocacy directed at Mr. Shin's sentencing.

In addition, regarding Noah Super Laundromat, LLC, the Government aggressively calculates a loss of $462,692.08 as reflected in the Government Loss Table. However, Government Exhibit 1016, which is presumably its source of information for this loss, confirms that for Noah Super Laundromat, LLC, the amount of the write off by Noah Bank was significantly less: $199,497.88. The Government does not provide any explanation in the variance in the figure between the write off and the loss as calculated by the Government, while using the higher number to justify a longer period of incarceration.

Noah Bank knows better than the Government the amount of loss Noah Bank suffered on these five loans. That knowledge resulted in a claim of only $$1,099,913.88, not $5,405,073.67.

The Court will note that it is not as if Noah Bank was not aggressive in calculating its claim for restitution. Noah Bank was in negotiations settling conflicting claims, including a settlement of restitution, at the time it submitted its August 1, 2022 letter. Thus, Noah Bank had every incentive to inflate its restitution claim and did so.

Like the Government, Noah Bank gave no Mr. Shin no credit for any of the net profits it made on the twenty-nine loan portfolio. Futher, Noah Bank included over $1 million in restitution claims for investigation fees not recoverable under U.S. Supreme Court law, legal fees for lawsuits having nothing to do with Mr. Shin's crimes, and something called "abandoned construction costs." Noah Bank was reaching for every dollar for which it could dream up an argument, and still sought a restitution award far less than the Government calculations recommended.

Mr. Shin is besieged by unwarranted and overly aggressive loss claims that should be rejected by this Court. He asks for the Court's protection from these efforts to distort reality.

2.      *The Garden of Eden Loan Resulted in Only Profits for Noah Bank.*

The Government repeatedly advocates for this Court to declare losses that never occurred to support a lengthy sentence of incarceration. One of the supposedly "defaulted loans" was to Garden of Eden Enterprises, Inc. That loan merits more extensive discussion.

That $5,000,000 loan, which constitutes more than half of the bloated government loss figure, is still being timely paid and is not in default. The Garden of Eden default figure on the Government Default Table of $3,032.132.73, was based upon a loss that *would have occurred* if temporary default that did occur during 2015 had been permanent. It was not permanent. In fact, as per a statement provided by Noah Bank (provided to counsel as Jencks material) as of

November 15, 2021, the principal due had been paid down from the $5,000,000, and from the $3 million temporary default balance, to $1,990,777.09 (see page three).  These records establish that the borrower was regularly making principal payments of approximately $16,200.00 per month (see page twenty-two). *See* document attached to the Basil Decl. as **Exhibit H**. It is no wonder that Noah Bank, aggressive as it might be, did not venture to claim any loss for this loan.

Further, the owner of Garden of Eden Enterprises, Inc. testified at the trial to the outstanding performance of the $5,000,000 loan from its inception:

> Q:     Anyhow, the loan performed very well up
>          until today, correct?
>
> A:     Yes.
>
> Q:     It turned out to be a good deal for Noah Bank
>          and a good deal for Garden of Eden?
>
> A.     I believe so.

This borrower also testified that he intends to pay off the loan. *See* excerpt of May 6, 2022 Trial Tr., Basil Decl. at **Exhibit I** at page 1269, lines 20 to 24.   Accordingly, the Garden of Eden loan has no place in any just calculation of loss and was placed there as pure advocacy.

> 3.     *Any Purported Loss That the Government Does Not Prove by a*
>          *Preponderance of the Evidence Was Caused by the Crimes Committed by*
>          *Mr. Shin Cannot Be Included in Any Loss Calculation.*

On three of the six loans cherry-picked by the Government to calculate loss, the wrongdoing causing the issuance was not a conflict of interest or an undisclosed "financial interest" by Mr. Shin.  Rather, Mr. Shin was found guilty

of authorizing unearned commissions to James Kim and accepting kickbacks from one or more of these unearned commissions. The amount of the commission for Garden of Eden Enterprises, Inc. was $50,000.00.  However, this is not the unearned amount upon which any jury finding of a crime could have been based.  According to the testimony of James Kim regarding this loan, only $10,000 was paid to James Kim and $7000 to Mr. Shin, with the rest going to the person who did originate the loan.  Accordingly, the maximum amount for any wrongfully paid commissions for the Garden of Eden loan was only $17,000, and not $50,000.

Mr. Shin does not dispute the Government's calculations for the amount of unearned commission for Noah Super Laundromat, LLC ($3,712.50) and for Royal Garden, Inc. ($1,000.00), assuming that the Government can prove that these commission actually were unearned.  Thus, the correct calculation for maximum unearned commission loss would be $21,712.50.

However calculated, the loss to Noah Bank attributed to these loans should be limited to the amount of unearned commissions, not the default amounts appearing on the Government Loss Table.  There was no evidence at trial that the failures of these loans were attributable to Mr. Shin's crimes.  Rather, these loans defaulted due to general economic and local market conditions over which Mr. Shin had no influence or ability to predict.  *See*, for example, the Noah Bank request to the SBA to Honor Guaranty filed November 9, 2016, which lists the various reasons the Garden of Eden Enterprises, Inc. loan

originally went into default, including competition from a nearby Whole Foods and Trader Joe's. *See* Basil Decl. at **Exhibit J**.

Similar reasoning was relied upon in sentencing in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007).  The Second Circuit in *Rutkoske* recognized that in a securities fraud case "many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud." *Id.* at 179.  Thus, the Second Circuit instructed that, in determining whether the loss was caused by the crime, the District Court must determine: "the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses." *Id.* at 180.

Since no crimes, but only market forces, caused these loans to fail (or in the case of Garden of Eden Enterprises, Inc., to temporarily default), and since the Government's loss figure includes the commissions it contends were wrongfully paid on these loans, the Court should remove these default amounts from any loan loss calculation.

C.  *Objection to the Guidelines Calculation Based upon Mr. Shin's Role in the Offenses.*

Mr. Shin requests that this Court find only a two-level increase for his role in the offense. That adjustment would be two levels based on Section 3B1.1(c) that the defendant was an organizer, leader, manager or a supervisor in any criminal activity other than described in Section (a) or (b). Sections (a) and (b) required either five or more participants or otherwise extensive criminal activity. Mr. Shin does not dispute

that for purposes of the sentencing that Mr. Shin was an organizer or leader. But, there were not five participants knowingly involved in his offences.

A participant is defined in Commentary Application Note 1 as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." The qualifying participants under this definition would be James Kim, Bum Tak Lee and Marie Lee (depending upon which version of her testimony the Court credits).

Other people who may have assisted Mr. Shin did so without knowingly joining a criminal conspiracy. Moreover, the conduct at issue was not extensive in that it involved activities largely between Mr. Shin and Mr. Kim regarding the 29 "but for" portfolio loans. The bulk of the work performed by Noah Bank personnel on these portfolio loans was in the ordinary course of underwriting and approving of the bank's overall portfolio of loans. The loans at issue comprise a relatively small number of loans for Noah Bank, which processed and closed approximately 712 loans in total during this same time period.

# V
# RESTITUTION

Under 18 U.S.C. § 3663A, this Court is required to order restitution to the "victim" of the offense. The term "victim" is defined as a person or entity "proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A. The terms "victim" and

"proximately harmed" are to receive a limited interpretation in the Second

Circuit:

> The broad scope of the MVRA is subject to some limitations. Only a 'victim' (or the victim's estate) is entitled to restitution. *See* 18 U.S.C. § 3663A(a)(1). The term 'victim' is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). This causation principle also governs the calculation of reimbursable loss. *See United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir.2013). And only a victim's "actual loss" is compensable, not losses that are hypothetical or speculative. Id. at 195.

*United States v. Maynard*, 743 F.3d at 378.  Under these "limitations" Noah Bank

was not a "victim" nor did it suffer any "actual loss."  *See also United States v. Liss*,

265 F.3d 1220, 1231 (11th Cir. 2001) holding that "An award of restitution must

be based on the amount of loss actually caused by the defendant's conduct."  *Id.*

In this case, Noah Bank is the only potential victim of Mr. Shin's crimes.

Noah Bank has been fully compensated for any expenditures to which it could

legitimately lay claim by way of separate settlement with Mr. Shin.  Indeed, in

the settlement agreement between Mr. Shin and Noah Bank, not yet completely

drafted by the parties' counsel, Noah Bank's counsel has proposed the following

language: "Noah Bank will waive and release any and all claims that it has

against Shin, including any potential claim for 'restitution.'"  *See,* Declaration of

Robert J. Basil, ¶¶20-21.

Nonetheless, much of Noah Bank's claim for restitution was always

invalid, regardless of its waiver of restitution accomplished by way of the

settlement.  By letter dated August 1, 2022 (Basil Decl. at **Exhibit G**), Noah Bank

sought restitution in the amount of $3,186,905.34. But, only $1,099,913 of that request related to defaults (32 Madison Farm, Inc. and First Ave Lee's Market), which were quantified by the amount of the SBA guarantee repayments.  In addition, Noah Bank's assessment of the total of unearned broker fees paid to James Kim in the amount of $128,837.50.

Noah Bank also sought $238,796.84 solely as reimbursement for the cost of responding to the Government's subpoena. Even if the law permitted this category of "loss" to be claimed as restitution, the unfair part about this particular request is that the Government served an overly broad subpoena on Noah Bank.  That subpoena requested files for hundreds of loans, most of which turned out to have no connection to the case. Indeed, the Government produced approximately five million documents from Noah Bank concerning hundreds of loans, but in the end claimed only twenty-nine loans as being relevant to the charges against Mr. Shin. Even if these response costs would have been awarded had Noah Bank not waived restitution, it would have been unfair for Mr. Shin to have borne the expense of the Government's overbroad subpoena.

A.   *Independent investigation costs*

Noah Bank sought $582,151.12 to reimburse it for the cost of its own private investigation.  There is no allegation that Noah Bank was required by the Government to undertake this investigation. Instead, it appears it was the decision of the Noah Bank Board to do so.  This claim demonstrates that Noah Bank made no effort to determine which if its restitution claims was valid.

As this Court is aware, the United States Supreme Court in *Lagos v. United States*, 138 S. Ct. 1684 (2018) directly addressed the question of whether the cost of a private investigation can be recovered under the Mandatory Victims Restitution Act.  The Supreme Court held that the law "does not cover the costs of a private investigation that the victim chooses on its own to conduct."  *Id*. at 1690.  Accordingly, Noah Bank's request for repayment of the cost of its investigation was always invalid.

**B.** ***Legal fees paid in the matter of The Basil Law Group v. Noah Bank***

Noah Bank sought $115,818.00 in restitution for legal fees it expended in a lawsuit it had with The Basil Law Group. This request was unwarranted.  This lawsuit involved only a retainer fee dispute between The Basil Law Group and Noah Bank relating legal services for a lawsuit in which the firm represented Noah Bank.  The underlying case presented issues relating to trademarks, patents and unfair business practices.  Enclosed as **Exhibit K** to Declaration of Robert J. Basil is the decision of the New Jersey Appellate Division decided June 14, 2022, which addresses the facts of the case. It is clear from reading the opinion that this lawsuit involved a retainer agreement created in 2018 and whether it controlled the fees earned in the trademark litigation.  It was not, as speculated in Noah Bank's August 1, 2022, letter, "a spurious action brought against the Bank for the obvious purpose of forcing the Bank to fund the cost of Mr. Shin's criminal defense."  Accordingly, this expenditure was not a harm remotely

related to the commission of the offenses for which Mr. Shin was convicted.   *See*

Declaration of Robert J. Basil ¶¶18-19.

> ### C.   *Legal fees, lost deposit and abandoned construction costs in the matter of JKAYC, LLC v. Noah Bank*

Noah Bank sought $996,388.00 in restitution for the purported costs of the

cancellation of a branch office opening. This request by Noah Bank was invalid.

*JKAYC, LLC v. Noah Bank* was litigation regarding an abandoned plan by Noah

Bank to open a branch office in Bayside, Queens in a building owned by JKAYC,

LLC. The lease for the branch was signed before the arrest of Mr. Shin, and for

many reasons ultimately Noah Bank chose not to pursue regulatory approval to

permit it to open the branch. JKAYC, LLC sued Noah Bank for breach of the

lease.  The parties entered into litigation and a settlement was reached. *See*

Declaration of Robert J. Basil ¶¶ 13-16.

Noah Bank attempted to explain why it could recover restitution from Mr.

Shin almost $1 million caused by its own breach: "The [*JKAYC, LLC case*] was

brought against the Bank for breach of a lease for a new branch, the regulatory

approval of which became impossible following the arrest of Mr. Shin." There are

no supporting documents whatsoever for this assertion in support of this million

-dollar request.  Indeed, Noah Bank's answer and counterclaim in the case, filed

in December 2019, never made such a claim, nor was Mr. Shin joined as a

counterclaim defendant.

In fact, Noah Bank  never made an effort to get approval in the months

preceding Mr. Shin's arrest.  But, Noah Bank did receive approval for

and opened two other branches during 2019, a Jericho, New York branch was opened in June 2019 and a Fifth Avenue, Manhattan branch was approved and opened in December 2019. Mr. Shin was arrested in May 2019, so regulatory approval was never "impossible" as a result of Mr. Shin's arrest. Thus, this claim for restitution was invalid.  *See,* Basil Decl. at ¶14 and **Exhibits V & W** **(**Newspaper photos depicting the openings two(2)  of Noah Bank's  branches, the Jericho, New York branch approved and opened in June 2019 and a Fifth Avenue, Manhattan branch approved and opened in December 2019)

### D.     *Shin v. Noah Bank legal fees*

Noah Bank sought $25,000 for the defense of a case brought by Mr. Shin. A copy of the complaint is attached as **Exhibit L to** Declaration of Robert J. Basil. This complaint raised a number of different items, including Mr. Shin's breaches of employment agreements, his rights to his common and restricted stock, a disputed workers' compensation claim, and other items. Noah Bank's request for restitution was based on a one-sentence explanation that Shin's lawsuit "is based on Mr. Shin's own attempt to force the Bank to fund the costs of his criminal defense by laying spurious allegations of breach of contract, wrongful discharge, and defamation."   This explanation is untrue.

This filed case was voluntarily dismissed by Mr. Shin based on Noah Bank's claim that venue was improper, and without prejudice. The parties then entered into a tolling and non-waiver agreement to an attempt to mediate the claims. *See* Basil Decl. at **Exhibit M**. This entire matter has now been settled

without an award of attorney's fees to either party or admission of wrongdoing by anyone.  Accordingly, this request for restitution of legal fees (without any record that such fees were actually incurred) was invalid.

In any event, Mr. Shin has made his arrangements for complete restitution of Noah Bank for all supposed losses suffered by Noah Bank.  Noah Bank is fully satisfied with those arrangements and has agreed that the settlement satisfies any restitution obligation Mr. Shin may have had here.  This Court should honor this settlement agreement, as Mr. Shin forfeited over one million shares of valuable Noah Bank stock and gave up other valuable rights to obtain his release from these purported restitution obligations.  It would be unfair for Mr. Shin to be required to further compensate Noah Bank after all he gave up to satisfy Noah Bank's claim.

## VI
## JUSTIFICATION FOR A DOWNWARD DEPARTURE UNDER U.S. SENTENCING GUIDELINES

Mr. Shin is requesting a non-custodial sentence.  However, if this Court were to reject Mr. Shin's request, this Court should grant a dramatic downward departure.  As this Court is aware, Section 2B1.1, Application Note 21(C) provides that: "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."   This would be such a case.

As noted *supra*, three of the six loans that defaulted in this matter: Garden of Eden Enterprises, Inc., Noah Super Laundromat, LLC and Royal Garden, Inc.

None of these borrowers were owned or controlled by Mr. Shin.  The offense conduct relating to these three loans is only that Mr. Shin authorized the issuance of non-earned commission payments to co-conspirator James Kim and/or received a portion of the commission payments in return if the commission was greater than $10,000.

The amount of any purportedly unearned commissions for Garden of Eden Enterprises, Inc. was $17,000.00, that amount for Noah Super Laundromat, LLC was $3,712.50, and that amount for Royal Garden, Inc. was $1,000.00 for a total of $21,712.50.  At the same time, the total defaulted amount of these three loans for these different entities was approximately $3.5 million (under the Government disputed calculations) which comprises approximately sixty percent of the loss amount alleged by the Government. Adjusting for the non-default of Garden of Eden Enterprises, Inc. the Government's overall claim is cut by more than half.

However, there was no evidence submitted at the trial that these three loans suffered defaults because commissions paid to James Kim, or that they were approved by Noah Bank over the objection of the bank underwriters.  The commissions were paid after the loans were approved and closed with full knowledge of the loan committee.

These three loans went into default due to factors concerning economic conditions, not Mr. Shin's crimes.  Further, these commission payments to James Kim could have had no effect on any borrowers' ability to pay, as all SBA

commissions were paid by Noah Bank. Moreover, as noted *supra*, the owner of Garden of Eden Enterprises, Inc. testified at the trial that his loan was current, that it was a good loan for both Garden of Eden and Noah Bank and that he intends to pay it in full.  No commission had any effect there.

Thus, the "commission scheme" was essentially a side event to the approval and funding of the loans, unrelated to any defaults.  The purpose of these three loans was to provide loans to the qualified borrowers and to provide interest and fee income to Noah Bank.  There is no evidence that the side scheme between Mr. Kim and Mr. Shin influenced in any way the issuance or the performance of these loans. For reasons unrelated to the side scheme these three loans went into default.  As noted above, the amounts of the commissions were minuscule compared to the loan amounts themselves.  Yet, the Government's loss calculation would punish Mr. Shin not based upon the magnitude or impact of this side scheme, but on the defaults that Mr. Shin neither caused, predicted, nor intended.

The poor fit between the defaulted loans of Garden of Eden Enterprises, Inc., Noah Super Laundromat, LLC and Royal Garden, Inc. and the Government's recommended punishment is further illustrated by the twenty-three loans that did not default and that paid their interest, fees and principal amounts in full. Government Exhibit 1016 introduced through Noah Bank employee John Kim (Basil Decl. at **Exhibit E**) confirmed that of the twenty-nine loans, twenty-three were paid in full or sold profitably in the secondary market.

As noted above, Garden of Eden Enterprises, Inc. is still in payment and producing profits.

Attached as **Exhibit N** to Declaration of Robert J. Basil is a chart prepared by the defense that shows the approximate revenues that Noah Bank and the SBA received on the entire portfolio of 29 loans ("Mr. Shin's Full Impact Chart"). Mr. Shin's Full Impact Chart is based on discovery in this case and contains revenues based on bank fees, application fees, interest payments and sale of the loans. In contrast to the Government Loan Chart, Mr. Shin's Full Impact Chart does not cherry pick loans that favor his position.  Mr. Shin's Full Impact Chart neither hides the bad nor emphasizes the good.

Mr. Shin's Full Impact Chart demonstrates that Noah Bank, viewing the total portfolio of twenty-nine loans, received revenue of $10,894,306.00.  After deducting the loss of the six defaulted loans, there remains much net revenue, guaranteeing that any reasonable calculation by this Court of loss results in a final loss determination of $0.00.

Mr. Shin's Full Impact Chart also demonstrates that the Noah Bank loans at issue in this case performed remarkably well. It is an unusual bank fraud case in that regard.  Normally the victimized bank suffers large monetary losses when the loans go bad because they never would have survived normal underwriting on fully accurate information.  A study conducted by an outside group of all SBA loans nationwide during the period of 2006 to 2015 showed how risky SBA loans

40

were in general.  The group found that seventeen percent of the SBA Section (7)

loans went into default. *See* article, Basil Decl. at **Exhibit O.**

In our case, the dollar volume of defaulted loans versus non-defaulted

loans represented on the Mr. Shin's Full Impact Chart show that this twenty-nine

loan portfolio was superior in performance to this nationwide performance.

Accordingly, Noah Bank's loss attributed to Mr. Shin's crimes by this Court

should be set at $0.00 for all purposes.

**VII**

**A DOWNWARD VARIANCE FOR EDWARD SHIN WOULD BE APPROPRIATE UNDER TITLE 18 U.S.C. § 3553.**

This Court is not bound by the Guidelines.  In *United States v. Booker*, 543

U.S. 220 (2005), the Supreme Court restored substantial deference to the district

courts in determining an appropriate sentence.  As the Supreme Court held in

*Gall*, although the Guidelines are "the starting point and the initial benchmark" in

any sentencing proceeding, courts may not presume that the guidelines range is

reasonable." *United States v. Gall*, 552 U.S. 38, 39 (2007).  The sentencing court

must consider "all of the § 3553(a) factors to determine whether they support the

sentence requested by a party.  In so doing, [the court] must make an

individualized assessment based on the facts presented." *Id. at 50*, citing *United*

*States v. Rita*, 551 U.S. 338 (2007) (emphasis added).

Section 3553(a) begins with the famous "parsimony clause," that instructs

that "[t]he court shall impose a sentence sufficient, but not greater than

41

necessary" to accomplish the purposes outlined in the section.  Above all, the district court's primary concern must be to impose a just sentence.

The Government's proposed Advisory Sentencing Guideline range here of nine to fourteen years does not fairly reflect the conduct of Mr. Shin and suffers from many flaws, including the overstatement of the loss under Section 2B1.1, as well as the effect of overlapping adjustments for role in the offense and abuse of a position of private trust. It also fails to take into consideration the worthiness of Mr. Shin for a substantial variance.  It is significant to note that United States Probation concluded that some of Mr. Shin's contentions regarding sentencing in his short submission "warrant merit." As a result, it recommended a downward variance to an eighty-four-month period of incarceration based on Mr. Shin's age and lack of prior record.  However, a much greater variance is appropriate under *Booker*.

### A. *Variance Based on Section 2B1.1 Loss Table*

This Court should grant a substantial downward variance from the advisory sentencing guidelines in this case based on the well-recognized flaws in the loss table. There has been pointed criticism of the role of the loss table in sentencing and, *inter alia,* on the ground of the poor fit between the guideline range of the loss table and the degree of culpability of the defendant.  For example, in *United States v. Gupta,* 904 F. Supp. 2d 349 (S.D.N.Y. 2012), this Court noted as follows:

> But in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single

factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*Id.* at 351.

The Eastern District of New York insightfully described the inappropriateness of using the loss table for economic crimes. *United States v. Faibish*, 2015 WL 4637013 (E.D.N.Y. 2015). In that case, the court commiserated with Mr. Faibish by explaining: "Defendant's fulminations about the loss table are quite understandable." *Id a* *2. The *Faibish* court was particularly concerned about the disconnect between the loss table and the appropriate calculation of the sentence in cases such as the case at bar, in which the crimes are purely economic. "The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime." *Id.*

*Faibish* involved bank and securities fraud convictions. The Court in *Faibish* noted further: "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon Faibish's sentencing range beyond any reasonable proportion to his crimes." *Id.* *See also, United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012). In *Prosperi*, the First Circuit also questioned the utility of loss tables in cases relating to the "Big Dig" in Boston

and concluded that the loss tables did not represent a proxy for the defendants' culpability in that case.[3]

The Supreme Court and the Second Circuit Court of Appeals have also advised that the former fraud guideline was not based on empirical evidence, and it did not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 338 (2007); *see also Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013).

Mr. Shin's case is yet another example of the loss table overstating culpability. In twenty-three of the twenty-nine loan portfolio at issue in the case, Mr. Shin's crime was the authorizing of one or more unearned commissions and/or the receipt of one or more kickbacks relating to those commissions. As noted above, these loans produced large revenues and substantial net profits for Noah Bank.  They also produced substantial fee income for the SBA with no credit given for that revenue. In any event, the maximum negative impact, assuming that the Government had proven that each unearned fee charged was actually unearned, a dubious proposition, would have been approximately $273,550.00.

The Government's calculation of a loss of approximately $5 million includes over $3.5 million in default on three loans, Garden of Eden Enterprises,

---

[3] Academics agree with these courts.  *See* the ABA Task Force Report (Basil Decl. at **Exhibit D**) This report raised many concerns about the quality and fairness of the loss table, among other issues pertinent to this case.

Inc., Noah Super Laundromat, LLC and Royal Garden, Inc., where in all three cases the losses were neither intended nor caused by Mr. Shin as a matter of law. *See United States v. Rothwell*, 387 F.3d at 583.

The unearned nature of any commissions was unrelated to the process by which these loans were underwritten by Noah Bank. In the case of Garden of Eden Enterprises, Inc., the loan remains current. Garden of Eden Enterprises, Inc.'s temporary payment problems arose out of competition in its area and not due to any wrongdoing by Mr. Shin or improprieties in the underwriting process.   Those problems had no connection to commissions.

Similarly in the Noah Super Laundromat, LLC loan, the commission was only $3,712.50. With Royal Garden, Inc., the commission was only $1,000. Counting these loans in the loss table improperly in their default amounts would raise Mr. Shin's sentencing guidelines by two levels from a level sixteen to a level eighteen, which in practical terms means would mean a potential twelve-month increase in incarceration for those three loans alone.  That unwarranted increase would be in addition to other increases generated by the flaws in the loss table methodology itself.

The loss table is a big driver of unwarranted incarceration generally and is a primary cause of the over adjustment in the sentencing calculation presented by United States Probation and the Government. The Government asks this Court to consider a sentencing range of between nine to fourteen years depending on the Court's determination of the loss and other factors. The facts of

this case could not justly support a sentence of such length, given the lack of "actual loss" to Noah Bank, the only possible "victim" of Mr. Shin's crime.  For these reasons alone, the Court should grant a substantial variance in the event it does not impose a non-custodial sentence.

>    B.    *Variance Based on the "Piling On" Effect of Overlapping Adjustments*

The Court should also grant a variance based on the "piling on" effect of overlapping adjustments.  These are represented by the combination of the loss table and the proposed increase of two levels for abuse of a position of private trust and the proposed four-level increase for Mr. Shin's role in the offense.  As noted *supra*, the posited amount of loss alone raises the Guidelines 16 or 18 levels based at least in part on a loss calculation that, whatever its merits or flaws, overstates the seriousness of Mr. Shin's offense and exaggerates its repercussions on Noah Bank.

In *United States v. Lauersen*, 343 F.3d 604 (2d Cir. 2003), amended and republished as 348 F.3d 329 (2d Cir.2003), 2003 WL 22532726, a case decided before *Booker*, the Second Circuit addressed the issue of overlapping adjustments under the then existing Section 2F Guideline.  The court held that "the cumulative effect of enhancements has a significant effect under the applicable sentencing range."  *Id*. at 344.  As a result, the District Court may consider this as a basis for a downward departure.  *Id.*

Here, the proposed adjustments for abuse of private trust and role in the offense substantially overlap when combined with the loss table.  The essence of

the offense in this case was that Mr. Shin's use of his position as president of the Bank to facilitate payment of unearned commission to James Kim.  Mr. Shin did not facilitate these payments alone, but utilized the efforts of unwitting Noah Bank employees.

The amount of work undertaken by these subordinates on the actual processing and payment of the commissions was insignificant compared to the work on the underlying loans themselves, twenty-three of which did not involve any possible conflict of interest or undisclosed financial interest.

As noted *supra*, the commission scheme was essentially a side scheme committed by Mr. Shin and James Kim.  It was unbeknownst to the borrowers and to Noah Bank. To that degree, the basic offense level of seven combined with the proposed loss level substantially overlaps with the abuse of the private trust enhancement. Similarly, the role in the offense adjustment of four points, or alternatively two points, substantially overlaps with Mr. Shin's position as president of the Bank that enabled him to commit the offenses.

The net effect of these overlaps and pilings on add up to eight levels of punishment resulting in a potential sentence of nine to fourteen years.  This would be a grossly excessive punishment for Mr. Shin's actual conduct and Noah Bank's actual loss.  Thus, this Court should not permit such "piling on" to cause Mr. Shin to suffer an unwarranted period of incarceration. For these reasons alone, the Court should grant an additional, substantial variance in the event if it does not impose a non-custodial sentence.

### C. History and Characteristics of Mr. Shin

18 U.S.C. § 3553(a) provides various factors that the Court must consider when determining a sentence to be imposed. These factors include the nature and circumstances of the offense and the history and characteristics of the defendant. The statute also requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of this defendant. These factors favor a considerable variance for Mr. Shin.

There are several additional bases for which this Court, singularly or in combination, should grant a substantial variance from the Advisory Sentencing Guidelines. Significantly, United States Probation recognizes that several of these factors, including Mr. Shin's age and lack of a prior record, supports a downward variance to eighty-four months. *See* final presentence investigation report at page 34. Indeed, United States Probation characterizes his offense conduct as "truly aberrant behavior" to "an otherwise law-abiding and contributing member of society." For these reasons alone, the Court should grant an additional, substantial variance in the event if it does not impose a non-custodial sentence.

### D. Mr. Shin's Lack of Prior Record and Good Character

As noted in the presentence investigation report, Mr. Shin waited until he was 46 years old during 2009 to commit his first offender. He committed the offenses while he was ages 46 to 50. He has never been charged with any offense

48

in the almost ten-year period since that time, or in the decades before.  Indeed, there was no evidence of even an uncharged offense outside of this period of his life.

As a preliminary matter, a variant sentence is appropriate where, as here, a defendant has no criminal history.  *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (because "Criminal History Level I did not fully account for [defendant's] *complete* lack of criminal history, considering it as a mitigating factor was not redundant or improper."  (emphasis added)).   A variant sentence is supported whenever the evidence shows that the defendant's life and non-criminal acts consisted of numerous good deeds and helping the community.

Submitted with this Memorandum as ¶26 to Declaration of Robert J. Basil, are nine (9) character letters attesting to his good character and valuable assistance to others in the community.

For example, Reverend S. Steve Park, senior pastor of Jubilee Presbyterian Church in West Norriton, Pennsylvania writes about the instrumental role that Mr. Shin played in contributing to the financial stability and growth of the church. Reverend Park details how the church survived the tumultuous financial times of 2008 as a result of Mr. Shin's "compassionate, caring support and guidance." Mr. Shin's efforts resulted in Reverend Park successfully securing a loan for his church. Reverend Park reports that the church has done "amazingly" and that is "is a spiritual home of over 1,000 members ranging from infants to elderly." Reverend Park informs us that: "Mr. Edward Shin had a significant

impact towards our institutional success and integrity and I also know of many other churches that benefited greatly from his efforts in the same way." These 1,000 church members are the direct beneficiaries of Mr. Shin's good works.

Similarly, Dr. Sang H. Kim, a chiropractor, reports that he has known Mr. Shin for many years and how Mr. Shin, even while facing these criminal charges, took time to help immigrant businesses, including Dr. Kim's own business, in the process of obtaining government loans during the COVID-19 pandemic.

Murray Levin, owner of Grateful Abstract Title Company and a law firm, has known Mr. Shin for nearly thirty years and considers to him to be an "excellent banker." Mr. Levin notes that his own firm, Levin & Associates, is housed in a historic building in southeast Pennsylvania and that "[t]he loan to purchase the building was arranged and funded through the efforts of Edward Shin. For that, I am eternally grateful." Mr. Levin also reports his knowledge that Mr. Shin has good family values and has been very generous in his donations. Mr. Levin represents that he is aware that Mr. Shin is well-respected by people in the Korean-American religious community.

Dr. InHan Lee, a dentist, has known Mr. Shin as a patient and, more importantly, as a friend since 2006. He notes that Mr. Shin became his mentor during a "tough time emotionally and financially for personal reasons." He notes that Mr. Shin "introduced me to the prominent business people in the Korean-American community, building up a social network for my private practice." He also notes that Mr. Shin was able to arrange business financing for his dental

practice resulting in his revenue increase almost twice after the loan and that Mr. Shin helped other small business owners in the Korean-American community.

Wanseob Kong, the former editor-in-chief of the New York Korean daily newspaper, Joong-Ang Ilbo, and former president of the Chicago Korean Daily Newspaper, Joong-Ang Ilbo, also provides great insight into the character of Mr. Shin. Mr. Kong has known Mr. Shin since Mr. Shin was young and witnessed Mr. Shin serve as a role model to many children of immigrants, as well as actively mentor prospective young professionals and help begin their careers. Mr. Kong notes that Mr. Shin also assisted retirees in the Korean-American financial industry identifying for them opportunities to continue working if they wished. He also notes that Mr. Shin supported several organizations and groups reaching out to those in need, including elderly and low-income families. He concludes his letter to Your Honor by stating: "I sincerely hope that you consider giving Edward a lenient judgment in consideration of his contribution and distinguished services to his community."

Family members also speak glowingly of Mr. Shin and his dedication to family, education, hard work and advancement in life. His daughter, Sammul Shin, writing on behalf of the immediate family describes her father as her hero. She reports on how he supported her throughout her youth and college and encouraged her to persist in pursuing a career in finance despite hurdles placed in her way. She describes how her father, even through the last several years, remains a pillar of strength for her and how he has dedicated himself to

improving her professional development and growth. Ms. Shin also notes how her father from her earliest recollection would help members of the Korean-American community by bringing them into the family's home to cook them meals and provide them advice and general guidance in the United States. Ms. Shin states that: "Many young adults who sought his counsel later thanked him for their successes."

Mr. Shin's oldest brother-in-law, Taemoon Park, Pastor Emeritus of Seoul Presbyterian Church in Maple Glen, Pennsylvania speaks in glowing terms about Mr. Shin's generosity. "He always had a generous heart and a great sense of responsibility to others in need." Mr. Shin reached out to Reverend Park to inquire if Mr. Shin could sponsor a retreat for immigrant pastors of small congregations. These pastors often suffer from the pressure of undertaking their difficult tasks. Largely as a result of Mr. Shin's efforts, forty pastors were able to participate in Mr. Shin's sponsored program. Reverend Park reports that Mr. Shin was given the nickname "mom" because of his reputation for being "caring and reliable like your own mom."

Mr. Shin's youngest brother Dr. Elliot Shin has similar recollections of his brother. Dr. Shin is a family physician and clinical researcher in Las Vegas, Nevada and runs a non-profit organization called Operation H.O.P.E. that helps uninsured low-income and homeless populations without charge. Dr. Shin recalls a pivotal moment in his life when the family immigrated to the United States in 1980 and he found himself at 11 years old not knowing English and

having to go to school. He specifically recalls feelings of helplessness and despair and recalls further how it was his older brother "Eddie" who, through cooking and love of his younger brother, gave him the strength to return to school. Dr. Shin also notes that Mr. Shin served as a lifelong example of what Dr. Shin wanted to be in his own life.

Yio Kyung "Joy" Lee, the sister of Bum Tak Lee, also submitted a letter to the Court. Ms. Lee indicates how Mr. Shin assisted her in a pivotal moment in her life when she had dropped out of college:

> At that time, my uncle went out of his way to have a difficult conversation with me, to convince me that finishing school was in my best interest. That conversation left a deep impression on me, and I made the decision to stay and finish school. I received my undergraduate degree a year later, which also allowed me to pursue my dreams of going to law school and becoming an attorney.

Ms. Lee also reports that, "It has been deeply saddening to watch his health rapidly decline in the last few years, and I worry for his physical wellbeing."

These character letters in total show that Mr. Shin is a person who has given of himself to family, friends and the greater community and changed people's lives by his advice and example. We believe such a history is worthy of a favorable response to Mr. Shin's request for a non-custodial sentence. For these reasons alone, the Court should grant an additional, substantial variance in the event if it does not impose a non-custodial sentence.

E.     *Mr. Shin's Current Age*

Mr. Shin is now 59 years old.  The research in this area indicates that recidivism substantially decreases with age and that a non-custodial sentence will not encourage recidivism.  *See United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) (finding that "definitive research demonstrat[es] that recidivism substantially decreases with age.")  *Id.* at 192.

Mr. Shin is in the age range in which the percentage of recidivism is extremely low.  Moreover, he did not commit any crimes between 2013 and 2019 while holding his trusted position with Noah Bank.  This recent history amply demonstrates his lack of interest in committing additional crimes.

In addition, as a result of these felony convictions, Mr. Shin will not be able to obtain any position of responsibility in banking or other financial industries.  His felony convictions and health issues discussed below will adequately assure that Mr. Shin will not reoffend.

Mr. Shin submits his own letter to this Court describing his current conclusions and regrets about his wrongful conduct, its repercussions, and his representations regarding future conduct if given a non-custodial sentence.

The Court is required to impose a sentence that "protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).  There is no need to imprison Mr. Shin to accomplish that goal because there appears to be zero risk that he will commit crimes in the future.  Mr. Shin's offenses were "particularly adapted to [Mr. Shin's] chosen career," and, in no uncertain terms, "[t]hat career

is over." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (Lynch, J.) (finding no chance of recidivism because defendant's career was over). Mr. Shin poses no societal risk, and there is no need for him to be deterred—through a prison sentence or otherwise—from engaging in any similar conduct in the future.

A non-custodial sentence will be sufficient to constitute a strong deterrent effect on prospective "white collar" offenders." Indeed, the destruction of Mr. Shin's finances, social life, family time, reputation, and career from his conviction serve as an extremely potent deterrence to other potential white-collar criminals. No additional deterrence is likely from a custodial sentence, and Mr. Shin requests that none be imposed. For these same reasons, the Court should grant an additional, substantial variance in the event it does not impose a non-custodial sentence.

### F. Health Concerns

Mr. Shin suffers from a number of significant health concerns as set forth in the report of Dr. Simeon Bardin dated June 6, 2022 (Basil Decl. at **Exhibit P**) to and in the report of Dr. Allan Earl Rubinstein, M.D. dated April 8, 2019 (Basil Decl. at **Exhibit B**). Mr. Shin suffers from hypertension, pre-diabetes and sleep apnea.

In addition, as reported *supra,* Mr. Shin was accidentally pushed down a flight of stairs in 2017 while on business and while intoxicated. As a result, he suffered serious and permanent bodily injuries, including a subdural hematoma, facial factures and a left arm fracture. He remains under the care of Dr. Bardin

and, as per the enclosed letter of Dr. Kim dated June 27, 2022 (Basil Decl. at
**Exhibit Q**, also receives weekly chiropractic care on his spine, as well as
acupuncture treatment.

Mr. Shin's second neurologist, Dr. Allan Earl Rubinstein, M.D., opined in
his April 8, 2019 report produced in civil litigation pending in the United States
District Court for the Eastern District of New York that, "Mr. Shin, having
suffered a traumatic brain injury of moderate degree, is at substantially greater
risk for the development of migraine, seizures, Parkinson's disease and dementia
than he would have had he not suffered this brain injury." (Basil Decl. at **Exhibit
B**)

These reports leave no doubt that a sentence of incarceration would visit
much more harm to Mr. Shin than would such a sentence imposed upon a
younger and healthier person. It is beyond reasonable dispute that Mr. Shin
suffers from these serious and permanent health issues and that despite the best
efforts of the medical facilities at the United States Bureau of Prisons, he will be
assured of a degeneration of his physical and mental health. Accordingly, Mr.
Shin's request for a non-custodial sentence should be favorably considered by
this Court.

Other courts have granted non-custodial sentences and or at least
substantial variances based on health conditions that were likely less severe than
Mr. Shin faces daily.  *See*, e.g., *United States v. Cunniffe*, No. 15-cr-287, Dkt. 265, at
22:23–24 (S.D.N.Y. 2019) (Swain, J.) (a cooperating 63-year-old defendant

received twelve months' probation and 100 hours of community service, following conviction of conspiracy and securities fraud, where he had "health issues and managed many [related] challenges"); *United States v. Jacoby*, No. 17-cr-676, Dkt. 19 at 13:3–10 (S.D.N.Y. 2018) (Cote, J.) (a 65 year old defendant received twenty-four months supervised release, following conviction for false statements to auditors, because of "all of the challenges that you face because of your health" meaning that "sending you to prison at this time would not be appropriate"); *United States v. Senesey,* 1997 WL 187345, at *1 (S.D.N.Y. Apr. 15, 1997) (Sweet, J.) (an 83 year old defendant received sixty months of probation, following a conviction of conspiracy to commit bribery and mail fraud, where he "suffered from numerous physical ailments and disabilities"); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming the district court's decision to sentence a 62 year old defendant, who was convicted of violating the Travel Act and engaging in an extortion scheme, to 6 months home confinement, thirty-six months of probation, and five hundred hours of community service, where defendant "had a kidney transplant over 20 years ago, and his new kidney is diseased"); *United States v. Barbato*, No. 00-cr-1028, 2002 WL 31556376 (S.D.N.Y. 2002) (Kram, J.) (an 81-year-old defendant, convicted of extortion, received 12 months home confinement and 24 months of supervised release, where defendant "suffer[ed] from a variety of serious medical ailments, including

hypertension, carotid artery disease and coronary artery disease")[4] (Note:  Any

unreported cases  which do not have a corresponding Westlaw citation are

described at ¶25  to Declaration of Robert J. Basil and attached to the

declaration.).

Finally, apart from these significant baseline health risks, the COVID-19

pandemic adds an intolerable, extra layer of danger to incarcerating Mr. Shin.  This

Court has not been reluctant to grant sentence reductions and compassionate release

petitions because of COVID-19-related risks to inmates with health conditions. *See,*

*e.g., United States v. Austin*, 468 F. Supp. 3d 641, 646 (S.D.N.Y. 2020) (Rakoff, J.)

(granting a reduction in sentence where, among other factors, the "risk that this

defendant would face from COVID-19 inside a prison facility where, because of

crowded and unsanitary conditions, the virus can sometimes flourish, adds to the

combined elements warranting release."  *United States v. Martinez*, No. 04-cr-48-20,

2020 WL 7128951, at *2 (S.D.N.Y. 2020) (Rakoff, J.) (granting compassionate release

because "the risks presented by his recent COVID-19 diagnosis, the 'history and

characteristics of the defendant' and the 'need . . . to provide the defendant with

needed . . . medical care,' § 3553(a), now weigh strongly in favor of Martinez's

release, given the severe health risk that continued incarceration poses to him");

*United States v. Rodriguez*, No. 00-cr-761-2, 2020 WL 5810161, at *3 (S.D.N.Y. 2020)

---

[4] See also *United States v. Alvaran-Velez*, 914 F.3d 665, 667 (D.C. Cir. 2019) (acknowledging that the district court entered a sentence "significantly below the applicable range" due, in part, to the defendant's "poor health"); *United States v. Chammas*, No. 1:16-cr-00171, 2018 WL 6680924, at page 18 (D.D.C. Dec. 19, 2018)  (district court "'recognize[d] that [defendant's] age and health conditions pose some challenges,' which it considered in imposing a below-Guidelines sentence" (quoting plea hearing transcript)).

(Rakoff, J.) (granting a sentence reduction for health reasons and noting "courts have consistently held that the presence of underlying health conditions that increase the risks associated with COVID-19 can constitute extraordinary and compelling reasons for a sentence reduction") (collecting cases). A non-custodial sentence is the only effective way to address Covid-19 and Mr. Shin's extraordinary combination of disease, injury, pain, and poor future health prospects.

### G. Alcohol and Alcohol-Related Gambling Conditions

There is ample evidence in the record that Mr. Shin has had for many years, and continues to suffer from, an alcohol problem. He has a prior DWI in New Jersey in 2008 (which is not a criminal offense), as well as a dismissed and expunged misdemeanor charge in 2012 that also arose out of an alcohol-induced telephone call with an individual who did not see eye-to-eye with Mr. Shin concerning the operation and management of Noah Bank. The character letter of Dr. InHan Lee also references Mr. Shin's change of character when under the influence of alcohol. (*See* Declaration of Robert J. Basil ¶26, letter attachment no. 4). *See also*, Basil Decl. at ¶¶8,12.

Mr. Shin's fall in April 2017 occurred when he was accidentally pushed down a flight of stairs. This fall happened shortly after leaving an establishment in which he had consumed excessive quantities of alcohol. In fact, Mr. Shin testified in his deposition that he was so intoxicated at the time of his accident that he had no recollection of what happened leading up to his fall. *See* Declaration of Robert J. Basil ¶¶9-12.

Mr. Shin's alcohol problems are certainly not of recent vintage. Indeed, Mr. Shin broke his front tooth in 1996 and broke his left ankle in 2006 in incidents that occurred when he was under the influence of alcohol. Although Mr. Shin was able to control his alcoholism during his post-arrest period, the Court can take judicial notice of the fact that alcoholism is not necessarily cured by a period of sobriety.  *See* Declaration of Robert J. Basil ¶¶8-12.

There is also substantial evidence presented at trial concerning Mr. Shin's gambling problems. Mr. Shin was not a frequent gambler. Rather, Mr. Shin's gambling was often undertaken in short bursts, while intoxicated, during which he lost large sums of money in a short period of time. For example, evidence concerning the 2012 trip to the Las Vegas Venetian showed that Mr. Shin lost approximately $50,000 in an hour and seventeen minutes. Mr. Shin was grieving the loss of his father and had been drinking at that time.

Similarly, on August 20, 2016, Mr. Shin likewise ran up a $100,000 gambling loss at the Sands in Bethlehem, Pennsylvania in a short period while under the influence of alcohol. As an alcoholic, Mr. Shin did this despite the obvious jeopardy into which it put his career as president of a federally insured bank. Mr. Shin's handwritten notes (Basil Decl. at **Exhibit R**) shows that he recognized that he was "drunk and sick" and that he should not be permitted to gamble. *Id*. at p. 2.

The net effect of this evidence shows that Mr. Shin suffers from an alcohol-related problem that resulted in his gambling large sums of money unsuccessfully

on several occasions. The Court can take judicial notice that it is difficult enough to avoid casino gambling losses when sober, and nearly impossible when intoxicated.

Alcoholism is a disease, as is compulsive gambling, and Mr. Shin asks the Court to recognize these conditions as mitigating factors in determining Mr. Shin's sentence. For these reasons alone, the Court should allow Mr. Shin to avoid incarceration to address his alcoholism and to grant an additional, substantial variance in the event if it does not impose a non-custodial sentence.

### H.    *Community Service Proposal*

Mr. Shin also asking the Court to consider, as an alternative to a period of incarceration, that the Court order Mr. Shin, as a condition of supervised release, to perform community service. Attached as **Exhibit S** to the Declaration of Robert J. Basil is a letter dated August 20, 2022, from Dr. S. Steve Park, president of SORAE International, Inc. (Dr. Park has also submitted a separate character letter concerning Mr. Shin and his successful efforts to help his church to obtain a loan and to grow and prosper.) SORAE International, Inc. is a non-profit organization dedicated to bringing leadership development and educational excellence to local and global communities. SORAE International, Inc. has confirmed its knowledge that Mr. Shin will be a convicted felon and it is offering to provide an opportunity for Mr. Shin to conduct community service up of up to 15 hours per week and up to 700 hours in total. This service would in the area of clerical and administrative assistance for the staff as it proceeds on multiple educational projects. Dr. Park notes: "In particular, we can utilize his

service for correspondences and online communications as we continue to address issues pertaining to academic accreditation and institutional advancement." Dr. Park notes further that he would personally administer supervision, along with Professor Eunjin Kim, the programs director. By imposing this community service in lieu of incarceration, the sentence will provide a benefit to the greater community, as well as obligate Mr. Shin to dedicate substantial hours to the project. This work will provide specific and general deterrence for recidivism.

Indeed, academic study fully supports the substitution of community service for incarceration.  "{T}here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013)(Basil Decl. at **Exhibit T);** Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (Spring 2007)(Basil Decl. at **Exhibit U** (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders").  Incarceration should not be ordered for Mr. Shin in lieu of immediate efforts for community service.

## I.       *Need to Avoid Sentencing Disparities*

The appropriateness of a non-incarceration sentence for Mr. Shin is further supported by the sentences received by similarly situated offenders both within this Circuit and elsewhere.  The Second Circuit Court of Appeals instructs that the district courts must impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (noting that § 3553(a)(6) seeks to "minimize nationwide disparities"), abrogated on other grounds by *Kimbrough v. United States*, 552 U.S. 85 (2007).  Mr. Shin is entitled to a sentence consistent with the sentences of similarly situated defendants.

Similarly situated defendants to Mr. Shin receive sentences *significantly* below the applicable Guidelines range. In 2019, the average length of sentence in the entire United States for someone with one similarity, a U.S. citizen convicted of a crime falling under § 2B1.1 and with no criminal history (three thousand four hundred total cases), was eighteen months.  The median sentence for this group was seven months. This is, of course, far below the Government's proposed sentence.

These statistics must be adjusted downward when factoring in Mr. Shin's age and health issues. Among those over 60 years old in the same group, thirty-nine and a half percent received probation or probation combined with

alternative (*i.e.*, non-incarceration) punishments.[5] When considering only this Circuit, the numbers are quite similar: over the past five years (from 2015-2019), there have been one thousand eight hundred four cases involving a similarly-situated defendant (*i.e.*, a U.S. citizen, convicted of a crime governed by § 2B1.1 with no criminal history), and the average sentence was just sixteen months, with the median sentence being only six months. As above, among those over 60 years old in the same group, 34.8 percent received probation or probation combined with alternative (*i.e.*, non-incarceration) punishments. *Id.* These statistics confirm that any period of incarceration for Mr. Shin would constitute an impermissible sentencing disparity between him and similarly situated offenders.

This Court appears to agree. In *United States v. Jacoby*, Judge Cote presided over the case of the former Chief Financial Officer for Osiris Therapeutics after Mr. Jacoby was convicted of making false statements to auditors. Although the alleged accounting fraud at issue involved distributor relationships, false disclosures to auditors, and millions of dollars in transactions, Judge Cote appropriately cautioned that the "case is not WorldCom, and it's not Enron." *United States v. Jacoby*, No. 17-cr-676, Dkt. 19 at 5:9–14, 11:25–12:6 (S.D.N.Y. Feb. 27, 2018). The similarities with the case at bar are patent.

Judge Cote was also "very influenced here by [defendants'] health," which was in decline at the time. Id. at 12:7–10. On the whole, Judge Cote

---

[5] *See,* United States Sentencing Commission, *Interactive Data Analyzer*, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (using "Sentence Type" and "Sentence Length").

determined that a non-incarceration sentence was appropriate after "weighing [the defendant's] age and health and all of the challenges that [he] face[d] because of [his] health, the fact that [his] working days [were] over, the fact that this [was] the only criminal activity for which you will have been convicted[.]" Id. at 13:3–10. In the end, Judge Cote sentenced the defendant to twenty-four months of supervised release and ordered a $10,000 fine.   As with the *Jacoby* case, *United States v. Edward Shin* "is not WorldCom, and it's not Enron," but is being treated as such by the Government during sentencing.

Other courts in this Circuit have followed the practice of granting a convicted defendant's request for probation, over the insistence of incarceration by the Government, when sentencing older defendants with health issues. *See United States v. Robert Stewart*, No. 15-cr-287, Dkt. 95 at 30:17–20 (S.D.N.Y. May 18, 2016) (Swain, J.) (a 61 year old defendant received forty-eight months of probation following a conviction for conspiracy and fraud in connection with a tender offer, because of his "age, his health issues, and his otherwise lawful and positive life[.]"); *United States v. Senesey*, 1997 WL 187345, at *1 (S.D.N.Y. 1997) (Sweet, J.) (an 83-year-old defendant received 60 months of probation following conviction for conspiracy to commit bribery and mail fraud because he "suffered from numerous physical ailments and disabilities").  There is no principled reason why Mr. Shin should be treated more harshly than these several defendants who served no jail time and likely were in better health that Mr. Shin.

### J.        Conduct During Period of Pretrial Supervision

Mr. Shin was placed on pretrial supervision in May 2019 and has complied with all of its requirements during the period from May 2019 to the present. He has complied with every direction and has passed all alcohol-related tests, despite his long-standing alcoholism. This conduct should give the Court assurance and comfort that Mr. Shin's likelihood of reoffending is low to non-existent.  A substantial probationary period, will be more than adequate to deter further criminal conduct, combined with his age, health and other factors noted *supra*.

### K.        Collateral Consequences of Mr. Shin's Felony Convictions

The consequences of felony convictions in the federal system are extraordinary. There is no expungement or mitigation of the effect of felony convictions available in the federal system in contrast to the wave of expungement and other "second chance" relief now emerging in New York and other states. As a result, Mr. Shin will carry these felony convictions for the rest of his life.

The collateral consequences of the felony convictions in this case have already been devastating to Mr. Shin. Mr. Shin has lost the job he loved and which paid him a very good salary, as well as stock benefits as a result of his conduct. Likewise, Mr. Shin has lost approximately 1,730,000 shares of Noah Bank restricted stock. He forfeited 73,371.41 shares of Noah Bank common stock that he held outright.  He lost all of his 733,710 options to purchase Noah Bank

stock that he was awarded over the years.  He gave up these valuable holdings in exchange for Noah Bank's waiver of restitution.

Mr. Shin will not be able to obtain similar employment in the banking or financial fields. The financial and professional repercussions of this conviction cannot be easily overstated.  But that is not all.

Mr. Shin is shamed in his community.  He has also lost his high social status in the insular Korean-American community.  When Mr. Shin was president of Noah Bank, he was a well-regarded and influential member of the community.  Mr. Shin attended numerous Korean-American community events, both for business reasons and as a reflection of his position in the community.

Mr. Shin has now suffered the ultimate loss of face in the Korean-American community based on his convictions in this case, even for the friends and family that have remained loyal.   Rather than being a respected businessman, he is a disgraced felon.

It is extremely unlikely that Mr. Shin will ever obtain any position of substantial responsibility in any field related to his experience and expertise.  He will be of advanced age by the time he might apply for a new position and because of his negative notoriety in the Korean-American community from his criminal convictions.  These non-physical repercussions of his conviction further support a non-custodial sentence in this case.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate

a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

Accordingly, these collateral consequences counsel allowing Mr. Shin to be subject to a non-custodial sentence, as the punishment and deterrence goals of sentencing have been more than satisfied.

## VIII
## FINES

United States Probation in its presentence investigation report recommended that no fine be imposed upon Mr. Shin even before he provided full restitution to Noah Bank. Based on Mr. Shin's restitution payments, as well as his lack of economic sources to pay such a fine, in addition to his health and his age issues, no fine should be imposed other than the mandatory special assessment of $100 per count.

## IX
## VOLUNTARY SURRENDER AND DESIGNATION
## OF FACILITY

It is respectfully requested that if this Court were nonetheless to sentence Mr. Shin to incarceration, that the Court permit Mr. Shin to voluntarily surrender to begin his period of incarceration.  He has attended all court dates and has been compliant on pretrial supervision for over three years without incident.

Voluntary surrender is a significant factor on the Federal Bureau of Prisons security classification such that without it Mr. Shin might be designated to a higher security institution than his circumstances warrant.  We also request

that the Court designate the federal prison camp at Fort Dix as the site of Mr.

Shin's incarceration if such is ordered, as it is close to his wife, daughters,

attorneys, and those friends who have chosen not to abandon him.

## X
## CONCLUSION

For all these reasons, the Court should issue a sentence that is fair and

proportionate to the conduct of Mr. Shin in this case. Such sentence should be a

period of probation of twenty-four months with community service of 700 hours

as described above.

Respectfully Submitted,

_____
Robert J. Basil, Esq.
The Basil Law Group, P.C.
125 West 31st Street #19-B
New York NY 10001
(917) 994-9973

Paul B. Brickfield, Esq.
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
(201) 488-7707

*Counsel for Defendant Edward Shin*

Dated:  September 7, 2022