

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 14, 2022

**BY ECF**

The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**    *United States v. Edward Shin*, **19 Cr. 552 (JPC)**

Dear Judge Cronan:

      The Government respectfully submits this letter in advance of the sentencing hearing for defendant Edward Shin, a/k/a "Eungsoo Shin," which is scheduled for September 21, 2022. On May 25, 2022, Shin was convicted of all six counts charged in the Indictment following a multi-week jury trial before Your Honor. As established at trial, over the course of four years, the defendant abused his position as the CEO of a bank to line his own pockets. In light of all the relevant circumstances, for the reasons set forth below, the Government respectfully requests that the Court impose a below-Guidelines sentence of at least 84 months' imprisonment and order a forfeiture money judgment in the amount of $5,521,550.

## Background

### A.  The Offense Conduct

      As established by the evidence at trial, from at least 2009 through 2013, the defendant, then the Chief Executive Officer (CEO) of Noah Bank, orchestrated several fraudulent schemes concerning Noah Bank's extension of loans to small businesses, including loans guaranteed by the Small Business Administration (SBA). The loans involved fraud on the SBA in connection with SBA-guaranteed loans, fraud on Noah Bank in connection with commercial and SBA-guaranteed loans, or both.

      The defendant had a long career working in finance at various banks before rising to the highest positions of President and CEO of Royal Asian Bank in 2006, which had just received its own charter under a larger bank called Royal Bank of America. In December 2010, the defendant and a group of investors purchased Royal Asian Bank from Royal Bank of America and thereafter changed its name to Noah Bank. The defendant continued as President and CEO of the newly

September 14, 2022
Page 2

named Noah Bank until his arrest in 2019.[1]

*SBA Loans at Noah Bank*

Noah Bank is an FDIC-insured regional bank headquartered in Elkins Park, PA, with branches in New York, New Jersey and Pennsylvania. A substantial part of Noah Bank's business involved extending loans to small businesses, including loans guaranteed by the SBA. As a general matter, the SBA helps Americans start, build, and grow businesses by, among other efforts, offering a variety of loan programs to help businesses succeed. While the SBA does not lend money directly to entrepreneurs to start or grow a business, the SBA guarantees at least some of the losses lenders may incur when such loans are not repaid, provided the lender has complied with SBA loan program requirements, including relevant statutes, regulations, and the SBA's publicly available Standard Operating Procedures (SOPs). In particular, Noah Bank issued numerous SBA-guaranteed loans pursuant to the SBA's "7(a) Loan Program," which is a program designed to help small businesses by providing guarantees on loans made for a variety of business purposes, such as purchasing new land, purchasing or expanding an existing business, and purchasing machinery, furniture, supplies, or materials for the business.

During the time of the charged offenses, the SBA granted Noah Bank Preferred Lender Program (PLP) status, which permitted Noah Bank to issue SBA-guaranteed loans under the SBA's "7(a) Loan Program," without first securing approval from the SBA on each individual loan. PLP lenders, including Noah Bank, were responsible for, among other things, confirming that all PLP loan closing decisions were correct, and that the PLP lender complied with all requirements of law and SBA regulations. As part of the program, the SBA would guarantee approximately 75-percent of the total loan amount against a potential default, meaning that if the borrower could not pay back the loan, the SBA would assume responsibility and repay 75-percent of the Bank's loss. At certain times, the SBA guaranteed 90-percent of the total loan amount against a potential default.

As a condition of Noah Bank's PLP status, the Bank agreed to comply with all requirements of law and SBA regulations in connection with issuing SBA-guaranteed loans. Those regulations included rules prohibiting bank insiders from having any real or apparent conflicts of interest with any SBA loan borrowers; rules governing the payment of broker's fees and the required disclosure to the SBA of such fees; and rules prohibiting the use of borrowed cash for purposes of funding the capital injection with very limited exceptions (i.e. the borrower's required down payment to receive the loan, and further requiring disclosure to the SBA of any loans extended to the borrower for purposes of funding the capital injection). Violations of any of these rules were sufficient to cause the SBA not to guarantee the loan, meaning that the SBA would revoke its promise to pay 75-percent or 90-percent of the Bank's loss in the event of a default, as may be the case.

*The Defendant's Fraudulent Conduct*

During the course of the offense, Shin caused Noah Bank to issue SBA-guaranteed loans and other commercial loans under false and fraudulent pretenses in several ways, in order to

---

[1] As the business of Royal Asian Bank and Noah Bank were one and the same, references to Noah Bank refers to activity both at Noah Bank and at Royal Asian Bank if it occurred in or after 2009.

September 14, 2022
Page 3

secretly further his own business interests and for personal enrichment.

First, the defendant caused the Bank to issue both SBA Loans and commercial loans to multiple borrower-businesses in which he personally had a secret, undisclosed financial interest, including 1797 Empire Inc.; 32 Madison Farm Inc.; Café 45, also known as Armonk Farm; First Avenue Lee's Market Inc. and Madison Kim's Farm.[2]  Co-conspirator James Kim was the owner, principal, and/or shareholder of 1797 Empire, 32 Madison Farm, Café 45, (and Madison Kim's Farm) on paper; and the defendant's nephew, Bum Tak Lee, was the owner of First Avenue Lee's Market on paper.  However, the defendant not only loaned his own personal money for use in each of the businesses, but for at least one of the businesses (1797 Empire), the defendant also helped James Kim secure off-the-books cash loans, in the amount of approximately $250,000 (obtained from another individual, Dok Su Yi), to be used to start and operate the business.  The borrowed money was also used to mislead Noah Bank, and in turn, the SBA, that 1797 Empire had the necessary funds for a capital injection as part of its loan application. This was false.  The defendant's interests in these businesses—which were clearcut conflicts of interest—were deliberately concealed from his Bank and the SBA.

Second, the defendant received secret, undisclosed kickbacks from loan commission fees that were paid to co-conspirator James Kim, in connection with both commercial and SBA loans that were issued by the Bank.  Kim worked as a business broker linking the Bank to potential borrowers.  For that work, Kim was entitled to receive a fee for bringing the customer to the Bank and assisting the customer with their loan application.  Noah Bank employed a process by which Kim would submit an invoice for his services; the bank would document his work; the invoice and work would be disclosed to the management committee; and then payment would be authorized. On numerous occasions, however, the defendant directed that broker fees be paid to Kim (whether or not Kim had performed any actual work in connection with the issuance of the loans) and further directed Kim to provide a portion of the fee as a kickback to the defendant directly or to a third-party the defendant designated.

In doing so, the defendant often circumvented the Bank's established processes for approving broker fees by directing another executive at the Bank to approve phony invoices and issue payment to James Kim.  Neither the fact that the defendant caused the Bank to issue broker fees to Kim when Kim had not performed any work to earn those fees, nor the fact that the defendant received kickbacks from Kim, was ever disclosed to the Bank or the SBA.  Based on the evidence presented at trial, approximately $273,550 in broker fees, corresponding with $37,595,000 in loans, were paid to Kim where no broker work had been performed.  Three of those loans subsequently defaulted, burdening the Bank and the SBA[3] with the loss for loans the Bank otherwise would not have approved, as the defendant's illicit relationship with Kim posed a serious conflict of interest.

---

[2] Madison Kim's Farm received a $600,000 loan in 2011 from Noah Bank.  Evidence admitted as direct evidence and pursuant to Rule 404(b) at trial nonetheless established that the defendant had an undisclosed interest in Madison Kim's Farm.

[3] Subsequently, the SBA rescinded its guarantees due to the defendant's conduct and the Bank took the entire loss.

September 14, 2022
Page 4

## B.  The Guidelines Calculation

Based on the evidence presented at trial, the defendant's applicable United States Sentencing Guidelines ("U.S.S.G.") are calculated as follows.  The defendant's convictions on Counts One through Six are grouped, pursuant to §3D1.2(b) and §3D1.2(d).  Pursuant to § 2B1.1, the base offense level is seven.  Because the loss caused by the defendant's criminal conduct amounted to between \$3,500,000 and \$9,500,000, 18 points are added pursuant to § 2B1.1(b)(1)(J).[4]  Because the defendant abused a position of private trust, in a manner that significantly facilitated the commission or concealment of the offense, two levels are added pursuant to § 3B1.3.  Because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, four levels are added pursuant to § 3B1.1(a).  Because the defendant attempted to obstruct the administration of justice by perjuring himself during the trial, two levels are added pursuant to § 3C1.1.  Together, the adjusted offense level is 33.[5]  Given the defendant's status in Criminal History Category I, that results in an applicable Guidelines range of 135 to 168 months' imprisonment.

## Discussion

The Government respectfully submits that a sentence of at least 84 months would be sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Probation has recommended a similar sentence. (*See* PSR, at 84).  This sizeable downward variance from the applicable Guidelines takes into account the mitigating circumstances offered by the defendant while still reflecting the extreme seriousness of the offense, the alarming history and characteristics of the defendant, and the crucial need for general deterrence.

## A.  The Seriousness of the Offense

The defendant abused his position of trust to steal from Noah Bank.  Entrusted with the stewardship of an institution that controlled millions in assets and employed hundreds of employees, the defendant instead chose to use Noah Bank as his personal piggy bank.  When he wanted to become a business owner, he tricked his own management team into approving loans to his business partners.  Not just once, but for five different businesses, to the tune of millions of dollars.  When he wanted extra cash in his pocket, he simply fabricated paperwork and fooled his own accounting department into approving the payments.  The SBA loan program was and remains

---

[4] As set forth in the PSR, the Government concedes that this enhancement may be lowered to 16 at the time of sentencing based on credits against lost, pursuant to U.S.S.G. § 2B1.1, note 3(E)(ii), should the defense be able to establish that the continuing repayment by borrower Garden of Eden has lowered the total loss amount below \$3,500,000.  The concept of credits against loss is an imperfect fit in this instance of Garden of Eden since the borrower defaulted, causing Noah Bank to incur a loss, but has since restarted making loan payments.  But as the Court is aware, the Court need only make a reasonable estimate of the loss, *see* U.S.S.G. § 2B1.1, note 2(C), and the credits against loss provision seems the closest applicable provision to fairly capture the picture of the current situation.

[5] The calculation here of the adjusted offense level differs from that of the PSR (31) because Probation left it to the Court to determine whether to apply the two-point enhancement for attempted obstruction of the administration of justice.  The defendant committed perjury—his testimony at trial was firmly and swiftly rejected by the jury—and therefore the enhancement is warranted.

September 14, 2022
Page 5

a huge portion of Noah Bank's business.  Without its ability to participate in the 7(a) loan program, Noah Bank would not be able to survive.  And so, in committing his crimes, which included flagrantly violating the SBA rules just to line his own pockets, the defendant endangered the integrity of the bank, not only in terms of his reputation, but its very viability.

In committing his crime, the defendant also engaged a wide web of participants.  Beyond the employees of Noah Bank who unknowingly assisted the defendant in his crimes, the defendant enlisted James Kim as a conduit for his unearned broker fees; he enlisted Marie Lee to fabricate and approve those unearned broker fees, and to fabricate bank documents; he enlisted his wife Sophie Hahn to run a business he owned; he enlisted his own nephew Bum Tak Lee to front a business for him; and he enlisted Dok Su Yi to give him an off-the-books loan in the form of a bag of cash, among others.

The defendant then doubled down on his crime by taking the stand and perjuring himself throughout his testimony.  In doing so, the defendant not only violated the sanctity of the oath he swore before testifying but exhibited his disdain for the law, and his inability to come to terms with his own wrongdoing.  For these reasons, a lengthy and substantial sentence is warranted.

The defendant tries to minimize the impact of his crimes, pointing instead to his success in growing Noah Bank's assets from $75 million to $300 million by 2013.  However, this fact is irrelevant in justifying the defendant's offense because no aspect of the defendant's criminal activity was for the benefit of the Noah Bank.  Despite his claims to the contrary, the desire to help an underserved community was totally irrelevant to his criminal conduct.  It is not as if the defendant engaged in a number of risky loans because he wanted to help business owners and, in the process, made successful bets that helped grow Noah Bank.  It was the opposite.  The defendant stole money from Noah Bank, and put the Bank's participation in the SBA 7A Loan Program – in the lifeline of the Bank's business – in jeopardy.  The Bank grew despite his criminal conduct, not because of it.  Accordingly, Noah Bank's concurrent success is merely evidence of what the defendant should have only done, instead of excusing what he actually did.

It is for the same reason that the Court should swiftly reject defendant's proposal that he should benefit from the gains to Noah Bank that accrued because certain of the fraudulent loans did not default.  The defendant, as the Bank's CEO and President, could have advocated for Noah Bank to issue those loans, as long as he did not engage in illegal conduct.  If he had not used those loans as vehicles to line his own pockets, he would have done exactly what Noah Bank was paying him millions of dollars over the years to do.  But he did not do that.  The defendant broke the law, and he is not entitled to any benefit simply because some number of the fraudulent loans happened not to default.

Relatedly, the Government is not "cherry-picking" conduct, contrary to the defendant's claim.  Def. Sent. Mem. 17.  Rather, the Government is simply seeking to hold the defendant to account for his criminal conduct.  The defendant should be punished for instances where he broke the law.  The defendant should be punished for instances where loss resulted.  Where the defendant did not break the law or where the defendant got lucky, he already got a benefit: his substantial income.  None of that excuses his unlawful conduct, which was egregious and spanned multiple years.

September 14, 2022
Page 6

The defendant's citation to *United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004), is misguided.  In that case, Rothwell, an SBA contractor, filed false requests with the SBA for construction loan progress payments totaling $103,370, which he wasn't entitled to.  The SBA then incurred a loss when Rothwell was unable to make the loan repayments.  Rothwell was charged with multiple counts of mail fraud, but pleaded guilty only to one count of false statements.  The Sixth Circuit held that neither the district court nor the Government had provided any explanation of why or how Rothwell's false statements made it more likely that the property would default.  *Id*. at 584.  To the extent the Court finds that holding persuasive, the situation in the instant case is easily distinguishable.  The primary victim here is Noah Bank.  For the loans where the defendant and James Kim diverted an unearned commission fee, the assertion is not that the defendant made it more likely that a borrower would default.  Noah Bank was going to take some small loss for those loans.  However, Noah Bank's inability to secure its 90% guarantee from the SBA is squarely because of the defendant's conduct, which allowed the SBA to deny and rescind its guarantee.[6]  This pecuniary harm to Noah Bank was "reasonably foreseeable" to the defendant the moment he decided to violate the SBA rules.  *See* U.S.S.G. § 2B1.1, note 3(A)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.").  As to the Bank's loans to the defendant's own businesses, the defendant's conduct—misrepresenting the existence of valid equity injections, misrepresenting the existence of financially sound guarantors, causing the creation of fraudulent bank documents showing nonexistent balances, and his withdrawal of cash from those businesses while the loans were still outstanding – absolutely increased the probability (and in some cases directly led to) default.  Accordingly, the defendant's conduct was absolutely the proximate cause of Noah Bank's losses.

## B. The Characteristics of the Defendant

The defendant committed the crimes for which he was convicted out of avarice, nothing more.  He was already receiving hundreds of thousands of dollars per year from Noah Bank in salary compensation, not to mention equity compensation on top of that.  Yet that wasn't enough.  He chose to orchestrate and implement a long-running fraud scheme to doctor paperwork and steal hundreds of thousands of extra dollars for himself and his corrupt friend.  On top of that, he chose again to funnel money from Noah Bank and the SBA into companies in which he had a stake, just so he could augment his income even further.  And his breaking of the law was not some altruistic endeavor to help his family and friends.  The defendant extracted his pound of flesh, in the form of side cash payments, that he made sure to receive even before Noah Bank was paid back and sometimes even before the business turned a profit (to the extent it ever did).

---

[6] For this reason, the Government believes this situation is more analogous to *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), wherein the defendant falsely told investors that she would record mortgages against property she owned in order to secure large loans, but in fact she did not record the mortgages, leaving the investors' loans unsecured.  *Id.* at 745.  When the property was later sold in bankruptcy, the unsecured investors lost virtually all of their money.  *Id.* at 745-46.  The question on appeal was whether the losses to the investors was foreseeable, which the Second Circuit held that they were.  *Id.* at 748-51.  The parallel here, though, is that due to the defendant's action, the victim (Noah Bank) was also left unsecured (SBA guarantee) and so the defendant should be on the hook for the entirety of the loss because the pecuniary harm was reasonably foreseeable.

September 14, 2022
Page 7

The defendant then leaned into his crimes by bullying anyone who had the temerity to defy him. The defendant dragooned Bum Tak Lee into becoming the owner of First Avenue Lee's Market. But when Bum Tak Lee accidentally shared with a friend that it was really his uncle's business, the defendant quickly clamped down on Bum Tak Lee in anger and warned him never to make that mistake again. (Tr. 1435-36).

The defendant also ordered Marie Lee to do his criminal bidding. Then, when she gathered the courage to report his fraud in early 2012, she made the mistake of reporting the wrongdoing to the Chairman of Noah Bank's board, Young Man Kim, the same individual with whom the defendant conspired to steer an unearned commission fee,[7] and asked him to investigate. Unsurprisingly, no investigation was ever done. Instead, by June 2012, Marie Lee was demoted from Chief Lending Officer to Chief Administrative Office, a role with little responsibility and no oversight over the lending process the defendant had abused repeatedly.

That, however, was not the end of the defendant's efforts to silence Marie Lee. When Marie Lee decided to leave the Bank, the defendant offered her a consulting agreement with a confidentiality provision. Despite the title of the agreement, Marie Lee was never asked to do any work, nor ever sued, terminated, or reprimanded for failure to provide consulting services under the agreement. Yet tellingly, when she reported the defendant's wrongdoing by providing notice to the Department of Justice and filing a qui tam lawsuit, the defendant then filed a lawsuit against her claiming that she breached the confidentiality agreement. The consulting agreement was a farce. It was the defendant's attempt to make sure Marie Lee never reported the fraud she witnessed and participated in at his direction. And when Marie Lee did report the criminal activity, the defendant tried to use the court system to intimidate and bully her, just for telling the truth, as confirmed by the jury's verdict in the instant matter.

This is not the only instance where the defendant attempted to use the court system to try and bully others. When the instant charges were filed against the defendant, the defendant twice tried to force Noah Bank to fund his defense even though he defrauded them. As Noah Bank explained:

> The total amount claimed as loss includes the costs of two concluded legal actions against the Bank and one pending claim. *The Basil Law Group v. Noah Bank* was a spurious action brought against the Bank for the obvious purpose of forcing the Bank to fund the cost of Mr. Shin's criminal defense. The Bank prevailed but only after expending the claimed amount in legal fees and costs to litigate the case through to the appellate level…The pending action is based on Mr. Shin's own attempt to force the Bank to fund the costs of his criminal defense by laying spurious allegations of breach of contract, wrongful discharge, and defamation.

---

[7] "Q. In the conversation that you had with Mr. Shin, did he explain to you why he was directing you to have the fee go to SBA Eastern Realty? A. Yes. Q. What did he say? A. Youngman Kim – since Youngman Kim brought this loan to the bank to generate a loan, but board of directors member is not supposed to receive any referral fee from the bank that the board of directors are working for, so he wants to pay fee through broker SBA Eastern Realty." (Tr. 315:2-11).

September 14, 2022
Page 8

(PSR ¶ 26).

The defendant offers half-apologies in his statement to the Court, still unable to admit that he stole money from Noah Bank.  They are the half-apologies of someone whose only remorse is about getting caught.  The defendant's retaliatory actions against Marie Lee post-dated the charged conduct.  They are not the actions of someone who is regretful for what he had done.  Rather, it was the defendant showing that he is a greedy and ruthless individual, willing to bulldoze anyone (Marie Lee) and any institution (the court system) to get what he wants, even when he far from entitled to it.  A substantial sentence is necessary to reflect these characteristics of the defendant.

### C.  General Deterrence

Likewise, general deterrence and the need to promote respect for the law strongly advocate in favor of a lengthy sentence.  The defendant engaged in a sophisticated financial crime that went undetected for many years.  He was able to do so because as CEO of the Bank, he held a position at the Bank that protected him from internal scrutiny; because when outside regulators like the FDIC or the Pennsylvania Department of Banking came knocking, he was able to use the entire Bank's machinery to shield him from further probing; and because when individuals tried to report wrongdoing, he was able to use the Bank's resources to go after them personally.  As this case confirms, these crimes, committed by persons in positions of power, can be difficult to detect and prosecute.  A strong message of serious consequences is needed to deter individuals similarly-situated to the defendant who may be tempted to use their positions of power to commit fraud.

### Forfeiture

### A.  The Defendant Is Responsible to Forfeit $5,521,550, Representing the Gross Proceeds of His Crimes

The Government respectfully seeks a proposed Preliminary Order of Forfeiture / Money Judgment ("POF"), imposing a money judgment against the defendant in the amount of $5,521,550.[8]  This amount represents the proceeds that the defendant acquired and controlled directly or indirectly as a result of his crimes, that is, the loans he caused Noah Bank to issue under fraudulent pretenses to businesses in which he retained a secret interest, along with the commission checks he caused Noah Bank to issue as part of his kickback scheme.

### B.  Applicable Legal Principles

As the Court is well aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity." *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (citation and internal quotation marks omitted).

Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1)(A).  The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), "including testimony at the earlier trial" *United States v.*

---

[8] The Government will submit a proposed order shortly.

September 14, 2022
Page 9

*Mathieu*, No. --Fed. Appx.--, 2021 WL 1783122, at *3 (2d Cir. May 5, 2021) (internal quotation marks omitted).  The "calculation of forfeiture amounts is not an exact science. '[T]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).  A court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48.  As "an aspect of sentencing," *Libretti v. United* States, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

The forfeiture statute at issue here, 18 U.S.C. § 982(a)(2), provides: "The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate— (A) section 215, 656, . . . 1014, . . . or 1344 of this title, affecting a financial institution, . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."  Proceeds forfeitable under Section 982(a)(2) are  the gross receipts of the offense, not merely the profits. *United States v. Peters*, 732 F.3d 93, 101-102 (2d Cir. 2013).

Proceeds of a crime, in order to be forfeitable by a defendant, "need not be personally or directly in the possession of the defendant…in order to be subject to forfeiture," but rather "must have, at some point, been under the defendant's control…in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012).[9]  The Second Circuit has held that a defendant "controls" funds, giving rise to forfeiture liability, to the extent he can have the funds transferred to third parties or for his own benefit, even if those funds were never held in his own accounts.  *See United States v. Bergstein*, 788 Fed. Appx. 742, 748 (2d Cir. 2019) (summary order) (ordering forfeiture post-*Honeycutt* where "Bergstein effectively controlled the proceeds of the [third party investment funds] as he was able to transfer the funds to shell companies and use the funds for personal expenses").  Moreover, temporary control is sufficient, and the defendant need not retain the proceeds.  *See United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019); *Rajaratnam v. United States*, 736 Fed. Appx. 279, 284 (2d Cir. 2018) (summary order) (even if proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, "he nonetheless had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point.'") (quoting *Contorinis*, 692 F.3d at 147); *United States v. Ohle*, 441 Fed. Appx. 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "whether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party.").

---

[9] Prior to the Supreme Court's decision in *Honeycutt*, the Second Circuit also held defendants jointly and severally liable for proceeds acquired by co-conspirators.  *Contorinis*, 692 F.3d at 147.  *Honeycutt* rejected such co-conspirator liability, however, and so the defendant is only liable for the proceeds of the offense he personally controlled, either directly or indirectly.

September 14, 2022
Page 10

Under these principles, it is well established that a defendant who, like Shin, fraudulently obtained loans from a bank must forfeit the gross amount paid by the bank, without any reduction for amounts that may have been repaid or that the bank otherwise recovered. *Peters*, 732 F.3d at 102 (defendant who fraudulently obtained a loan must forfeit the gross amount paid by the bank, without any offset for the amount the bank may have recovered; § 981(a)(2)(C) does not apply to criminal forfeiture cases); *United States v. Apazidis*, 523 F. App'x. 17 (2d Cir. 2013), *aff'g*, 784 F. Supp. 2d 159, 167–68 (E.D.N.Y. 2011) (defendant is not entitled to offset against his money judgment for the amount of the loan he repaid whether the forfeiture is based on proceeds under § 982(a)(2) or money laundering under § 982(a)(1)); *see also United States v. Holzendorf*, 576 F. App'x. 932 (11th Cir. 2014) (because no part of § 981(a)(2) applies in a criminal forfeiture case, district court did not err in refusing to apply § 981(a)(2)(C) to give defendant credit for the amount of the fraudulently-obtained mortgage loans that were repaid); *United States v. Annabi,* 746 F.3d 83, 86 (2d Cir. 2014) (if government seeks criminal forfeiture in a fraudulent loan case under § 981(a)(1)(C), the definition of "proceeds" in § 981(a)(2)(C) applies, and defendant must be given credit for the amount of the loan that was repaid; but if government seeks forfeiture under § 982(a)(2), defendant is not entitled to such credit).

## C. Discussion

The evidence at trial in this case established that Shin, the President and CEO of Noah Bank, caused the Bank to issue loans to four businesses in which he retained a secret, controlling interest—1797 Empire; First Avenue Lee's Market; Armonk Farm, d/b/a Café 45; and 32 Madison. He did this by concealing from the Bank—and the SBA—the fact and nature of his interest in these entities, including during Bank Management and Board Committee Meetings where decisions were made to issue the loans. The evidence at trial further showed that Shin's interest in those entities was a material factor in the Bank's decision whether to make the loans and the SBA's decision whether to guarantee those loans that part of its 7A Loan Program. As reflected in Government Exhibits 1016 and 1025, loans fraudulently issued to these entities totaled $5,245,000. As the caselaw discussed above makes clear, that some portion of these loans were repaid is irrelevant to Shin's forfeiture liability for this conduct.

The evidence at trial also established that Shin, as part of his kickback scheme, caused Noah Bank to issue commission payments to his co-conspirator under the false pretense that his co-conspirator actually performed referral work to justify the commission. The evidence also established that the Bank would not have issued those payments if it knew the truth. As reflected in Government Exhibit 1025, Noah Bank issued approximately $276,550 of fraudulent commission payments as a result of the defendant's fraud, representing the proceeds of the fraud. Again, as the caselaw discussed above makes clear, that Shin may have split the commission payments with a co-conspirator does not impact his total forfeiture liability, as the trial evidence shows that he dictated and controlled this arrangement.

Accordingly, as a result of the defendant's crimes, he is liable to forfeit $5,521,550, and the Court should accordingly enter a POF in this amount.

September 14, 2022
Page 11

## **Conclusion**

   For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration of at least 84 months and order the defendant to forfeit $5,521,550.


        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York


      By:   /s/ _____
        Tara LaMorte
        Anden Chow
        Jessica Greenwood
        Assistant United States Attorneys
        (212) 637-1041 / 2348 / 1090


cc:  Defense counsel (via ECF)