

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 7, 2024

**By ECF**
The Honorable John P. Cronan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Joseph Edward Shin*, 19 Cr. 552 (JPC)

Dear Judge Cronan:

  The Government respectfully writes in response to defendant Edward Shin's letter motion requesting early termination of supervised release (the "Motion") (Dkt. 273). For the reasons described below, the defendant's request should be denied.

  I. **Background**

  As established by the evidence at trial, from at least 2009 through 2013, the defendant, then the Chief Executive Officer (CEO) of Noah Bank, orchestrated several fraudulent schemes concerning Noah Bank's extension of loans to small businesses, including loans guaranteed by the Small Business Administration (SBA). The loans involved fraud on the SBA in connection with SBA-guaranteed loans, fraud on Noah Bank in connection with commercial and SBA-guaranteed loans, or both.

  The defendant had a long career working in finance at various banks before rising to the highest positions of President and CEO of Royal Asian Bank in 2006, which had just received its own charter under a larger bank called Royal Bank of America. In December 2010, the defendant and a group of investors purchased Royal Asian Bank from Royal Bank of America and thereafter changed its name to Noah Bank. The defendant continued as President and CEO of the newly named Noah Bank until his arrest in 2019.[1]

---

[1] As the business of Royal Asian Bank and Noah Bank were one and the same, references to Noah Bank refers to activity both at Noah Bank and at Royal Asian Bank if it occurred in or after 2009.

Honorable John P. Cronan
October 7, 2024
Page 2

*SBA Loans at Noah Bank*

Noah Bank is an FDIC-insured regional bank headquartered in Elkins Park, PA, with branches in New York, New Jersey and Pennsylvania. A substantial part of Noah Bank's business involved extending loans to small businesses, including loans guaranteed by the SBA. As a general matter, the SBA helps Americans start, build, and grow businesses by, among other efforts, offering a variety of loan programs to help businesses succeed. While the SBA does not lend money directly to entrepreneurs to start or grow a business, the SBA guarantees at least some of the losses lenders may incur when such loans are not repaid, provided the lender has complied with SBA loan program requirements, including relevant statutes, regulations, and the SBA's publicly available Standard Operating Procedures (SOPs). In particular, Noah Bank issued numerous SBA-guaranteed loans pursuant to the SBA's "7(a) Loan Program," which is a program designed to help small businesses by providing guarantees on loans made for a variety of business purposes, such as purchasing new land, purchasing or expanding an existing business, and purchasing machinery, furniture, supplies, or materials for the business.

During the time of the charged offenses, the SBA granted Noah Bank Preferred Lender Program (PLP) status, which permitted Noah Bank to issue SBA-guaranteed loans under the SBA's "7(a) Loan Program," without first securing approval from the SBA on each individual loan. PLP lenders, including Noah Bank, were responsible for, among other things, confirming that all PLP loan closing decisions were correct, and that the PLP lender complied with all requirements of law and SBA regulations. As part of the program, the SBA would guarantee approximately 75-percent of the total loan amount against a potential default, meaning that if the borrower could not pay back the loan, the SBA would assume responsibility and repay 75-percent of the Bank's loss. At certain times, the SBA guaranteed 90-percent of the total loan amount against a potential default.

As a condition of Noah Bank's PLP status, the Bank agreed to comply with all requirements of law and SBA regulations in connection with issuing SBA-guaranteed loans. Those regulations included rules prohibiting bank insiders from having any real or apparent conflicts of interest with any SBA loan borrowers; rules governing the payment of broker's fees and the required disclosure to the SBA of such fees; and rules prohibiting the use of borrowed cash for purposes of funding the capital injection with very limited exceptions (i.e. the borrower's required down payment to receive the loan, and further requiring disclosure to the SBA of any loans extended to the borrower for purposes of funding the capital injection). Violations of any of these rules were sufficient to cause the SBA not to guarantee the loan, meaning that the SBA would revoke its promise to pay 75-percent or 90-percent of the Bank's loss in the event of a default, as may be the case.

*The Defendant's Fraudulent Conduct*

During the course of the offense, Shin caused Noah Bank to issue SBA-guaranteed loans and other commercial loans under false and fraudulent pretenses in several ways, in order to secretly further his own business interests and for personal enrichment.

First, the defendant caused the Bank to issue both SBA Loans and commercial loans to multiple borrower-businesses in which he personally had a secret, undisclosed financial interest, including 1797 Empire Inc.; 32 Madison Farm Inc.; Café 45, also known as Armonk Farm; First

Honorable John P. Cronan
October 7, 2024
Page 3

Avenue Lee's Market Inc. and Madison Kim's Farm.[2]  Co-conspirator James Kim was the owner, principal, and/or shareholder of 1797 Empire, 32 Madison Farm, Café 45, (and Madison Kim's Farm) on paper; and the defendant's nephew, Bum Tak Lee, was the owner of First Avenue Lee's Market on paper.  However, the defendant not only loaned his own personal money for use in each of the businesses, but for at least one of the businesses (1797 Empire), the defendant also helped James Kim secure off-the-books cash loans, in the amount of approximately $250,000 (obtained from another individual, Dok Su Yi), to be used to start and operate the business.  The borrowed money was also used to mislead Noah Bank, and in turn, the SBA, that 1797 Empire had the necessary funds for a capital injection as part of its loan application. This was false.  The defendant's interests in these businesses—which were clearcut conflicts of interest—were deliberately concealed from his Bank and the SBA.

Second, the defendant received secret, undisclosed kickbacks from loan commission fees that were paid to co-conspirator James Kim, in connection with both commercial and SBA loans that were issued by the Bank.  Kim worked as a business broker linking the Bank to potential borrowers.  For that work, Kim was entitled to receive a fee for bringing the customer to the Bank and assisting the customer with their loan application.  Noah Bank employed a process by which Kim would submit an invoice for his services; the bank would document his work; the invoice and work would be disclosed to the management committee; and then payment would be authorized.  On numerous occasions, however, the defendant directed that broker fees be paid to Kim (whether or not Kim had performed any actual work in connection with the issuance of the loans) and further directed Kim to provide a portion of the fee as a kickback to the defendant directly or to a third-party the defendant designated.

In doing so, the defendant often circumvented the Bank's established processes for approving broker fees by directing another executive at the Bank to approve phony invoices and issue payment to James Kim.  Neither the fact that the defendant caused the Bank to issue broker fees to Kim when Kim had not performed any work to earn those fees, nor the fact that the defendant received kickbacks from Kim, was ever disclosed to the Bank or the SBA.  Based on the evidence presented at trial, approximately $273,550 in broker fees, corresponding with $37,595,000 in loans, were paid to Kim where no broker work had been performed.  Three of those loans subsequently defaulted, burdening the Bank and the SBA[3] with the loss for loans the Bank otherwise would not have approved, as the defendant's illicit relationship with Kim posed a serious conflict of interest.

*Sentencing*

On October 6, 2022, the Court imposed a below-Guidelines sentence of 14 months' imprisonment and 3 years of supervised release. (Sent. Tr. at 58, 95-96.)  The Court explained that the defendant's conduct involved a "serious fraud" and "considerable deception" amounted to an abuse of a position of trust that placed his bank-employer at "significant financial risk". (Sent. Tr. at 85-86.)  However, the Court varied significantly from the Guidelines sentencing range of 70 to 87 months' imprisonment, based on the Court's finding of a low need for specific deterrence and a low risk of recidivism, including because the defendant was a first-time offender; because

---

[2] Madison Kim's Farm received a $600,000 loan in 2011 from Noah Bank.  Evidence admitted as direct evidence and pursuant to Rule 404(b) at trial nonetheless established that the defendant had an undisclosed interest in Madison Kim's Farm.

[3] Subsequently, the SBA rescinded its guarantees due to the defendant's conduct and the Bank took the entire loss.

of mitigating circumstances in the defendant's personal life, including for example financial support he gave to his church and to others in his community; and his compliance with the conditions of pretrial supervision. (Sent. Tr. at 87-91.) The Court further considered the defendant's age and health conditions, including the fall he suffered down a flight of stairs in April 2017 and resulting complications, prediabetes, glaucoma, and alcoholism. (*Id.*) As to supervised release, and as most relevant here, the Court ordered that the defendant comply with the standard conditions of supervised release and that he participate in outpatient treatment for alcohol abuse, including testing for alcohol use as directed by the Probation Department. (Sent. Tr. at 97.)

The defendant began serving his 3-year term of supervised release on September 9, 2023. Just over one year later, on September 20, 2024, the defendant filed the instant Motion for early termination of supervised release. (Dkt. 273.)

## II. Shin's Motion for Early Termination of Supervised Release Should be Denied

Pursuant to Section 3583(e) of Title 18 of the United States Code, a court may "terminate a term of supervised previously ordered previously ordered and discharge the defendant ... at any time after the expiration of one year of supervised release … if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1).

A district court is authorized to "terminate a term of supervised release ... at any time after the expiration of one year of supervised release," so long as "it is satisfied that such action is [1] warranted by the conduct of the defendant ... [2] and the interest of justice." *United States v. Key*, 602 F.3d 492, 494 (2d Cir. 2010) (quoting 18 U.S.C. § 3583(e)(1)). Before ordering early termination, a district court must consider the factors set forth in 18 U.S.C. § 3553(a), which "address 'general punishment issues such as deterrence, public safety, rehabilitation, proportionality, and consistency.'" *United States v. Harris*, 689 F. Supp. 2d 692, 694 (S.D.N.Y. 2010) (quoting *United States v. Lussier*, 104 F.3d 32, 35 (2d Cir. 1997)). As the Second Circuit has explained, "[o]ccasionally, changed circumstances" – such as "exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release—will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *Lussier*, 104 F.3d at 36. For example, early termination may be justified where conditions of supervised release hinder a fully compliant defendant's ability to obtain employment and reintegrate into society. *See, e.g.*, *United States v. Arellano*, No. 13-cr-33 (RJS), Dkt. No. 41 (S.D.N.Y. Apr. 6, 2016) (granting termination of supervised release one year early where fully compliant supervisee was a full-time truck driver and the conditions of supervision "impede[d] him from obtaining a better and more secure job" with UPS or FedEx, "for which he ha[d] applied and otherwise [was] eligible").

Even so, the law is clear that only "exceptional cases" involving "special, extraordinary, or unforeseen circumstance[s]" warrant early termination. *United States v. Bouchareb*, 76 F. Supp. 3d 478, 480 (S.D.N.Y. 2014) (quoting *United States v. Flores*, No. 99-cr-1110 (RWS), 2010 WL 2573385, at *1 (S.D.N.Y. June 28, 2010)). Thus, a defendant's full compliance with the terms and conditions of supervised release, standing alone, is insufficient. *See United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) ("While [defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release

since, if it were, the exception would swallow the rule."); *accord United States v. Rusin*, 105 F. Supp. 3d 291, 292 (S.D.N.Y. 2015) ("Early termination is not warranted where a defendant did nothing more than that which he was required to do by law."); *United States v. Gonzales*, No. 94-cr-0134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) (although defendant was a "model probationer," "present[ed] a low risk of recidivism," and "the deterrent value of his case [had] been fully realized," early termination was not appropriate).

Nothing in the defendant's submission "rises to the level of a special, extraordinary, or unforeseen circumstance that distinguishes [the defendant] from other compliant defendants on supervised release." *Bouchareb*, 76 F. Supp. 3d at 480 (quoting *Flores*, 2010 WL 2573385, at *1).

First, many of the factors cited by the defendant in seeking early termination of supervised release were presented to and considered by the Court in sentencing him to a variant, below-Guidelines term that included three years of supervised release. (Compare Def. Br. at 2-5 (pointing to the defendant's compliance with the terms of pretrial release, age and health conditions, recovery from alcoholism, community involvement, and family support) to Sent. Tr. at 87-91 (considering same or similar facts in imposing sentence).). Accordingly, those factors should be rejected as a basis for early termination of that same supervised release term.

Second, while the defendant's acts of community service and stability during his period of incarceration and while on supervised release are "commendable," such "behavior is exactly what is expected of all defendants on supervised release and therefore does not warrant early termination." *Id*. (quoting *Flores*, 2010 WL 2573385, at *1).

Finally, the defendant's request that supervised release be terminated so that he can pursue higher education and enjoy the company of unspecified friends and family in South Korea is not an adequate basis to terminate supervised release. (Def. Br. at 5-6). The defendant claims that his desire to move to South Korea furnishes a basis for early termination so he can "speak[] his native language" and "bond[] with many of his" unnamed "friends and relatives." (Def. Br. at 5). Further, the defendant claims he needs to be allowed to pursue an MBA in South Korea. (Def. Br. at 5). At base, the defendant asks to be released from Court supervision because it is his personal preference to leave the jurisdiction of the Court—despite having for years lived in this country, in a largely Korean-speaking community, and despite his having committed the crimes of which he was convicted here. Moreover, this ask is at odds with the defendant otherwise identifying as a mitigating factor the relationships he has with his wife, children, and church community—all of which are U.S.-based. Further, the defendant has identified no reason why he could not pursue an MBA in the United States—where he has previously attended institutions of higher education—while he completes his supervised release term. The defendant's personal preference to be relieved of supervised release so that he can live and study outside of the jurisdiction does not furnish a basis to terminate supervised release.

In short, early termination would be inappropriate given that the Court's below-Guidelines sentence already factored in the vast majority of the mitigating factors the defendant now relies upon, while he otherwise has failed to furnish a legitimate basis for the exceptional request that supervised release be terminated early in this case.

Honorable John P. Cronan
October 7, 2024
Page 6

### III.     Conclusion

The Court should deny the defendant's motion for early termination of supervised release.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

By:    /s *Jessica Greenwood*
          Jessica Greenwood
          Tara M. LaMorte
          Assistant United States Attorneys
          (212) 637-1090/1041

cc:    (by ECF)
       Counsel of Record